**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

THE OKAVAGE GROUP, LLC
on behalf of itself and all others
similarly situated,

       Plaintiff,

                                     CASE NO.   3:21-CV-00448

v.

UNITED WHOLESALE MORTGAGE, LLC
and
MATHEW ISHBIA, individually,

       Defendants.

_____/

**PLAINTIFF'S RESPONSE AND BRIEF IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS FIRST
AMENDED CLASS ACTION COMPLAINT**

# Table of Authorities

**Cases**                                                                  **Page(s)**

*Alabama Sportservice, Inc. v. Nat'l Horsemen's Benevolent &*
*Protective Ass'n, Inc.,* 767 F.Supp. 1573 (M.D. Fla. 1991)................
...................................................................................... 18, 19, 21

*All Care Nursing Service, Inc. v. High Tech Staffing Services, Inc.,* 135
F.3d 740 (11th Cir. 1998)...........................................................23

*American Tobacco Co. v. United States,* 328 U.S. 781 (1946)....29, 35

*Animal Science Prods, Inc. v. China Minmetals Corp.,* 604 F.3d 462
(3d Cir. 2011) ..............................................................................13

*Associated General Contractors v. California State Council of*
*Carpenters*, 459 U.S. 519 (1983) ...................................................14

*Auto Dealer Solutions, Inc. v. Southern-Owners Ins. Co., Inc.,* No.
8:17-CV-2525, 2018 WL 4600674, * 3 (M.D. Fla., Jan. 25, 2018)..39

*Bailey v. AllGas, Inc.,* 284 F.3d 1237 (11th Cir. 2002) .............31, 33

*Blue Shield v. McCready,* 457 U.S. 465 n. 21 (1982)...............12, 13

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477 (1977 ...11

*Cal. Dental Ass'n v. FTC,* 526 U.S. 756 (1999)...............................25

*Carpet Group Int'l v. Oriental Rug Importers Ass'n, Inc.,* 227 F.3d 62
(3d Cir 2000) ..............................................................................13

*Chicago Board of Trade v. United States,* 246 U.S. 231 (1918). ......26

*Clapper v. Amnesty Int'l USA,* 568 US 398, 418 (2013...................10

*Compare United States v. Apple, Inc.,* 791 F.3d 290 (2d Cir. 2015),
*cert. denied,* 577  U.S. 1193 (2016)...............................................19

*Construction Aggregate Transport, Inc. v. Florida Rock Industries, Inc.,* 710 F.2d 752 (11th Cir. 1983) .................................................12

*Continental Airlines, Inc. v. United Air Lines, Inc.,* 120 F.Supp.2d 556 (E.D. Va. 2000) .....................................................................7, 12

*Cordoba v. DirectTV, LLC,* 942 F.3d 1259 (11th Cir. 2019)..............10

*Crimpers Promotions, Inc. v. HBO,* 724 F.2d 290 (2d Cir. 1983) .....13

*Crmsuite Corp v. General Motors Corp.,* No. 8:20-CV-762, 2020 WL 5898970, * 5-7 (M.D. Fla., Oct. 5, 2020).......................................36

*DeLong Equip Co. v. Washington Mills Electro Minerals Corp.,* 990 F.2d 1186 (11th Cir. 1993) ............................................................ 8

*Disposable Contact Lens Antitrust Litigation,* 215 F.Supp. 2d 1272 (M.D. Fla. 2016)...........................................................................19

*Doe v. Thompson,* 620 So. 2d 1004, 1006 *n. 1 (Fla. 1993)*..............15

*Eastman Kodak Co. v. Henry Bath, LLC,* 936 F.3d 86 (2d Cir. 2019) ..........................................................................................13

*Foam Supplies , Inc. v. The Dow Chemical Co.,* No. 4:05CV1772, 2006 WL 2225392, * 3 (E.D. Mo. , Aug. 3, 2006) ........................... 4

*Foster Logging, Inc. v. United States,* 973 F.3d 1152 (11th Cir. 2020)4

*FTC v. Indiana Federation of Dentists,* 476 U.S. 447 (1986 ......14, 25

*Furmanite America, Inc. v. TD Williamson, Inc.,* 506 F.Supp.2d 1134 (M.D. Fla. 2007)(........................................................................36

*Gordon v. Lewiston Hosp.,* 423 F.3d 184 (3d Cir. 2005).................25

*Greene v. General Foods Corp.,* 517 F.2d 635 (5th Cir. 1975)........... 8

*Greene v. General Foods Corp.,* 517 F.2d at 663-65.......................10

*Gulf States Reorganization Group, Inc. v. Nucor Corp.,* 721 F.3d 1281 (11th Cir. 2013) ....................................................................29, 31

*Hewlett-Packard Co. v. Arch Assoc. Corp.,* 908 F.Supp. 265 (E.D. Pa. 2995)...................................................................................... 7

*I. Tan Tsao v. Captiva MVP Restaurant Partners, LLC,* 986 F. 3d 1332 (11th Cir. 2021).................................................................... 8

*Insurance Brokerage Antitrust Litigation,* 618 F.3d 300, 344-45 (3d Cir. 2010) ................................................................................19

*Interstate Circuit, Inc. v. United States,* 306 U.S. 208, 216-17, 222 (1939) ...................................................................................17

*Jones v. Salvation Army,* No. 3:18-CV-804, 2019 WL 6051437, * 8 (M.D. Fla., Nov. 15, 2019) .......................................................... 8

*Kelly v. Palmer Reifler,* 681 F.Supp.2d 1356, 1365-66 (S.D. Fla. 2010........................................................................................36

*Klor's Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207 (1959). 18, 24

*L& C Babb Mgmt v. Am Home Mortg.,* No. 6:15-CV-1209, 2016 WL 2784378, * 3 (M.D. Fla., May 13, 2016)......................................... 8

*LAPD v. General Motors Elec. Corp.,* 132 F.3d 402 (7th Cir. 1997)...23

*Levine v. Central Florida Medical Affiliates, Inc.,* 72 F.3d 1538 (11th Cir. 1996) ...................................................................................27

*Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992) ........................ 3

*M&M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp, Inc.,* 981 F.2d 160 (4th Cir. 1992)...............................................................32

*Minnesota Mining & Mfg. Co., v. Appleton Papers, Inc.,* 35 F.Supp.2d 1138 (D. Minn. 1999)................................................................... 4

iii

*Muransky  v. Godiva Chocolatier, Inc.,* 979 F.3d 917  (11th Cir. 2020) ..................................................................................... 8

*NCAA v Board of Regents,* 468 U.S. 85 (1984) ...............................25

*Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.,* 472 U.S. 284 (1985) ........................................................22, 24

*NYNEX Corp. v. Discon., Inc.,* 525 U.S. 128 (1998).........................24

*Outlet Communications Inc v. King World Productions, Inc.,* 685 F.Supp. 1570 (M.D. Fla. 1988 .......................................................21

*Pace Electronics, Inc. v. Canon Computer Systems, Inc.,* 213 F.3d 118 (3d. Cir. 2000) ......................................................................8, 10

*Palmyra Park Hospital, Inc. v. Phoebe Putney Memorial Hosp.,* 604 F.3d 1291 (11th Cir. 2010)...........................................................12

*Pierce, Ramsey Winch Co.,* 753 F.2d 416 (5th Cir. 1985) ................ 8

*Pinson v. JP Morgan Chase,* 942 F.3d 1200, (11th Cir. 2019)......7, 20

*ProCaps SA v. Patheon, Inc.,* No. 12-CV-24356, 2013 WL 673730, * 2 (S.D. Fla., Feb 25, 2013) .................................................4,20, 21

*Province v. Cleveland Press Publ. Co.,* 787 F.2d 1047  (6th Cir. 1986) .....................................................................................................13

*Quality Foods de Centro America SA v. Latin American Agribusiness Dev. Corp.,* 711 F.2d 989 (11th Cir. 1983).....................................29

*Radio Corp. v Hazeltine Res. Inc.,* 395 U.S. 100 (1969) .................. 8

*Rebel Oil Co. v. Atlantic Richfield Co.,* 51 F.3d 1421 (9th Cir. 1995) 32
*Retina Associates PA v. S. Baptist Hospital of Florida,* 105 F.3d 1376 (11th Cir. 1997) .......................................................................21

*RXStrategies, Inc. v. CVS Pharmacy, Inc.,* 390 F.Supp.3d 1341 (M.D. Fla. 2019) ...................................................................................23

*Samuels v. King Motor Co.,* 782 So. 2d 489 (Fla. 4th DCA 2001) .....35

*Serpa Corp v. McWane, Inc.,* 199 F3d 6, 12-13 (1st Cir. 1999) ........12

*Simpson v Union Oil,* 377 U.S. 13 (1964) ........................................ 7

*Sky Angel US, LLC v C-SPAN,* 947 F.Supp.2d 88 (D.D.C. 2013) ..8,10

*Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447 (1993) ..........29, 30

*TemPay, Inc. v. Biltres Staffing,* No. 8:11-CV-02732 WL 2039307 (M.D. Fla. 2013) ........................................................................36

*Terazosin Hydrochloride Antitrust Litig.,* 160 F.Supp. 2d 1365 (S.D. Fla. 2001) ...................................................................................11

*Thompson v. Metro Multi-List, Inc.,* 934 F.2d 1566 (11th Cir. 1991) .32

*TriNet USA v. Vensure,* 2021 WL 2661108, * 7 (M.D. Fla. 2021).....37

*U.S. Anchor Mfg., Inc. v. Rules Industries, Inc.,* 7 F.3d 986 (11th Cir. 1993) ...................................................................................31

*U.S. Horticultural Supply Inc. v. The Scotts Co.,* No. Civ. A 03-773, 2004 WL 1529185 (E.D. Pa., Feb 18, 2004) ..................................13

*United States v. Apple, Inc.,* 791 F.3d 290 (3d Cir. 2015) ...14, 16, 18

*United States v. Apple, Inc., cert. denied,* 577 U.S. 1193 (2016) .....19

*United States v. General Motors Corp.,* 384 U.S. 127 (1966) ...........24

*Vitacost.com v. Gaia Herbs, Inc.,* 2007 WL 951768 (S.D. Fla. Mar 28, 2007)...................................................................................12

*Wang v. United States,* No. 8:16-CV-2050, 2016 WL 6582900, * 3 (M.D. Fla., Nov. 7, 2016) ................................................................10

*Waste Services, Inc. v. Waste Mgt. Inc.,* No. 2005 WL 8159910, * 7 (M.D. Fla., Aug. 18, 2005) ............................................................15

*Wood v. Wall,* 666 So. 2d 984 (Fla. 3d DCA 1996) ..........................15

*YMD Records LLC v. Ultra Enterprises, Inc.,* 361 F.Supp. 3d 1258 (S.D. Fla. 2019) ....................................................................................20

*General Motors LLC v. Royal Motors Corp.,* 769 F.Supp. 2d 73 (D. P.R. 2011) ...................................................................................................38

*Medimmune Inc. v. Genentech, Inc.* 549 U.S. 118 (2007) ................38

Sherman Act, 15 U.S.C. § 1 (FAC, ¶ 63.).................................17, 29

*Zurich Am Ins. Co. v. S-Owners Ins. Co.,* 248 F.Supp. 3d 1268 (M.D. Fla. 2017) .................................................................................................37

**Statutes**
Declaratory Judgment Act, 28 U.S.C. §§ 2201 ..............................37

*Del Prado Mall Prof'l Condo Assn v. Voyager Indem. Ins. Co.,* No. 2:20-CV-838, 2021 WL 1578758, * 2 (M.D. Fla., Apr. 22, 2021)....38

Fla. Stat. § 501.211(1)..................................................................35

**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

THE OKAVAGE GROUP, LLC
on behalf of itself and all others
similarly situated,

    Plaintiff,

                            CASE NO.   3:21-CV-00448

v.

UNITED WHOLESALE MORTGAGE, LLC
and
MATHEW ISHBIA, individually,

    Defendants.

_____/

**PLAINTIFF'S RESPONSE AND BRIEF IN OPPOSITION**
**TO DEFENDANTS' MOTION TO DISMISS FIRST**
**AMENDED CLASS ACTION COMPLAINT**

Plaintiff, The Okavage Group, LLC, ("The Okavage Group" or "Plaintiff"),

on behalf of itself and all others similarly situated, by and through its attorneys,

files this Response and Brief in Opposition to Defendants' Motion to Dismiss

[Doc. 46] the First Amended Class Action Complaint, filed August 3, 2021 [Doc.

32], as follows:

**INTRODUCTION**

Plaintiff and Class Members are mortgage brokers who currently are

and/or have been clients of UWM and Fairway Mortgage and/or Rocket Pro TPO.

United Wholesale Mortgage, LLC ("UWM") terminated its contract with Plaintiff

by letter dated June 22, 2021, (*Ex. A*) after Plaintiff refused to acquiesce in UWM's

Ultimatum prohibiting its wholesale mortgage broker customers from doing business with UWM's competitors, Fairway Mortgage and Rocket Pro TPO. According to UWM, the vast majority of its mortgage brokers agreed to the Ultimatum and thereby stopped doing business with Fairway Mortgage and Rocket Pro.

Plaintiff filed its Original Class Action Complaint on April 23, 2021 (Doc.1). By agreement, Plaintiff filed its First Amended Class Action Complaint (the "FAC") on August 3, 2021. [Doc. 32].  Defendants again moved to dismiss on September 7, 2021. [Doc. 46, hereinafter "Motion to Dismiss"].  Although the Motion to Dismiss is ostensibly based on Rules 12(b)(1), (2), and (6) of the Federal Rules of Civil Procedure, it is not based on any affidavit or controverting facts, and relies solely on a strained reading of Plaintiff's FAC.

Plaintiff's FAC satisfies the  pleading tests lodged by Defendants and then some.  UWM's horizontal group boycott  is a per se anticompetitive conspiracy and concerted refusal to deal that only the most brazen attorneys would try to defend.  Defendants openly—and defiantly-- broke every rule in the competition rulebook to attack competitors which it deemed a threat to its future monopoly. Defendants did not care that their concerted illegal conduct might also harm the independent brokers that chose to work with them. They knew the brokers would be easy prey when "loyalty oaths" were demanded of them. It is likely that this was just the first step of a scheme to monopolize the wholesale lending market---

a market that Defendants control. Defendants' anticompetitive animus is obvious; counsel's attempts to provide a legitimate justification for it is specious and disingenuous.

The person behind UWM's group boycott, CEO and Defendant Mat Ishbia ("Ishbia") is similarly disingenuous in his arguments that this Court lacks personal jurisdiction over him. First, the corporate shield doctrine does not apply because the FAC alleges intentional tortious conduct by Ishbia individually within the State of Florida, a clear and established basis for long-arm jurisdiction in Florida. But what makes his argument misleading at best is the fact that his individual contacts with the State of Florida are pervasive and substantial. It was publicized that his Trust bought the most expensive house in Florida, a mansion in Naples, where he apparently resides during the winter season. Ishbia's attempts to deny his open and obvious residence in Florida strain credibility and this Court should reject them out of hand. Plaintiff requests the opportunity to depose Ishbia (which his counsel has already rejected).

## ARGUMENT & AUTHORITIES

## I. DEFENDANTS' FACIAL CHALLENGE TO THIS COURT'S SUBJECT MATTER JURISDICTION SHOULD BE REJECTED

Where, as here, Defendants make a facial challenge to the Court's subject matter jurisdiction in a Motion to Dismiss, prior to any responsive pleading, the Court must afford the Plaintiff "safeguards" which presume that the FAC allegations are true, and "presume that general allegations embrace those specific

facts that are necessary to support the claim." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992). Contrary to Defendant's misleading excerpt from a dissenting opinion in an Eleventh Circuit decision, "specific facts' are not required to support standing until the summary judgment stage. *Id.; compare Foster Logging, Inc. v. United States,* 973 F.3d 1152, 1170 (11th Cir. 2020)(dissenting opinion)(cited at page 8 of the Motion to Dismiss).

There is no "heightened pleading requirement" for antitrust claims above that which is required under Rule 8 of the Federal Rules of Civil Procedure. This Court consistently holds that on a Motion to Dismiss antitrust claims, the Court must view the allegations of the complaint in the light most favorable to Plaintiff, consider all such allegations to be true, and accept all inferences of the facts which are alleged in Plaintiff's favor. *ProCaps SA v. Patheon, Inc.,* No. 12-CV-24356, 2013 WL 673730, * 2 (S.D. Fla., Feb 25, 2013); *see also Foam Supplies , Inc. v. The Dow Chemical Co.,* No. 4:05CV1772, 2006 WL 2225392, * 3 (E.D. Mo. , Aug. 3, 2006)(the Supreme Court did not create a heightened pleading rule to supercede Rule 8 for antitrust claims). In this case, the FAC more than satisfies the general pleading rules for Article III and antitrust standing. Courts have long held that "competitors frozen out by exclusive dealing arrangements have suffered an antitrust injury and possess antitrust standing to sue for redress of this injury." *Minnesota Mining & Mfg. Co., v. Appleton Papers, Inc.,* 35 F.Supp.2d 1138, 1147 (D. Minn. 1999). It is enough that Plaintiff is the target of the anticompetitive conduct,

and the means by which the defendant implements his scheme to restrain trade by a competitor.

## A.  PLAINTIFF'S ALLEGATIONS SATISFY ARTICLE III STANDING

The FAC alleges that from October 2018  to March 15, 2021,  Plaintiff was authorized under a Wholesale Lending Agreement with UWM to arrange financing for its customers through UWM.  (FAC, ¶s 44, 45, 46). Shortly after March 15, 2021,  UWM  terminated Plaintiff's contract as a result of an Ultimatum announced by UWM on March 15, 2021 (FAC, ¶ 46).

As alleged in the FAC, ¶12, UWM first announced its Ultimatum via a video by Ishbia posted on Facebook Live on March 4, 2021, which the Court can see at https://www.facebook.com/97640871999/videos/845176203005957.  In the video, Ishbia states more than a half-dozen times that he is inviting the wholesale brokers in his audience to "dominate" and help UWM to achieve a 33% market share by 2025 targeting two competitors (Fairway and Rocket Mortgage) which he states will force Fairway and Rocket Mortgage to lose 80% of their business potential.  To ensure that his independent mortgage brokers acquiesce in his Ultimatum, he states that "if you work with them, you can't work for us."  (FAC, ¶ 12).

To ensure the "cooperation" of his mortgage "family," Ishbia/ UWM sent an email to each of the independent wholesale brokers doing business with UWM, stating that they were required to sign a contract addendum in order to continue

doing business with UWM.  The contract addendum stated that each broker "will not submit loans to either Rocket Mortgage or Fairway Independent Mortgage." If the broker breached this representation, the contract addendum required that the broker to pay "liquidated damages" to UWM of $5000 per loan closed, or $50,000 whichever was greater. (FAC, ¶ 13). This punitive measure was designed to hurt the brokers disproportionately, causing them to cease doing business with Rocket and Fairway, achieving UWM's goal of destroying 80% of their business, to UWM's benefit.

UWM's mortgage brokers were given until 11:59 pm on March 15, 2021, to accept Defendants' Ultimatum or have their business relationship with UWM terminated. (FAC, ¶ 14).  Okavage refused to sign the contract addendum, and UWM terminated Okavage's contract almost immediately after the midnight deadline. According to Defendants, more than 93% of  Okavage's independent mortgage broker competitors agreed to the addendum, constituting a  brazen group boycott, a classic per se restraint on trade, in violation of section 1 of the Sherman Act.  (FAC, ¶ 13). Okavage, who did not acquiesce in the Ultimatum was "frozen out" of UWM loans (which are sometimes more favorable to its customers than the loan terms of other lenders largely because of UWM's efforts to force its competitors out of business), because of it refused to engage in UWM's illegal conspiracy.  Okavage alleges that it has "lost customers who were interested in loans from UWM" (FAC ¶ 46) and that it has suffered "direct financial injury"

including "lost sales and lost commissions." (FAC ¶ 47). Okavage also alleges repeatedly in the Amended Complaint that it and the Class Members have been financially damaged by the "reduction in choice, lost customers and commissions", and the injury to their business and property." (FAC 47, 76, 90, 100, 112, 123, 133, 145, 156).

These allegations are more than sufficient to satisfy the test of Article III standing. The law is well-settled that Article III standing is established where a plaintiff suffers "an injury in fact traceable to the defendant's conduct and redressable by a favorable decision." *Pinson v. JP Morgan Chase Bank,* 942 F.3d 1200, 1207 (11th Cir. 2019)(reversing dismissal). Defendants' Motion to Dismiss challenges only the first two factors; it concedes that Plaintiff's injuries can be redressed through the damages, declaratory and equitable relief sought on behalf of the class.

*Injury-in-Fact*

Economic harm, including lost customers, lost opportunities, reduction in choice, and lost time in dealing with the defendants are each sufficient to establish injury-in-fact. *Id.*; *Simpson v Union Oil,* 377 U.S. 13, 15-16 (1964)(injury in fact established by depriving independent dealers of the exercise of free judgment whether to become consignees at all or remain consignees and sell at competitive prices); *Continental Airlines, Inc. v. United Air Lines, Inc.,* 120 F.Supp.2d 556, 569 (E.D. Va. 2000))(allegation of lost customers is a "classic antitrust injury"); *Hewlett-*

*Packard Co. v. Arch Assoc. Corp.,* 908 F.Supp. 265, 269 (E.D. Pa. 2995)(deauthorization as a dealer and lost customers sufficient for injury in fact).

Indeed, where, as here, a plaintiff is terminated by the defendant because of its refusal to acquiesce in illegal conduct, the termination itself is the injury-in-fact. *DeLong Equip Co. v. Washington Mills Electro Minerals Corp.,* 990 F.2d 1186, 1198 (11th Cir. 1993), *amended on other grounds,* 997 F.2d 1340 (11th Cir. 1993)("DeLong's injury was a loss of opportunity to compete"; affirming jury verdict for plaintiff); *Pace Electronics, Inc. v. Canon Computer Systems, Inc.,* 213 F.3d 118, 124 (3d Cir. 2000); *Greene v. General Foods Corp.,* 517 F.2d 635, 660 (5th Cir. 1975), *cert.denied,* 424 U.S. 942 (1976)(diminution of overall business value following termination of distributorship satisfies injury-in-fact; affirming jury verdict for treble damages). The inability to do business in the product sold by the defendant is injury-in fact. *Pierce, Ramsey Winch Co.,* 753 F.2d 416, 435-36 (5th Cir. 1985)(injury in a dealer termination case is "an inability to obtain the product"); *Pace,* 213 F.3d at 121-22; *Greene,* 517 F.2d at 663-65.

Citing Eleventh Circuit cases that do not support its position,[1] Defendants argue that "unidentified" lost customers, sales and commissions are insufficient to allege an injury-in-fact.   (Motion to Dismiss at 12). This is contrary to law, and no

---

[1] *I. Tan Tsao v. Captiva MVP Restaurant Partners, LLC,* 986 F. 3d 1332, 1337, 1343 (11th Cir. 2021)(plaintiff cancelled his credit card before data breach caused any harm); *Muransky  v. Godiva Chocolatier, Inc.,* 979 F.3d 917, 928 (11th Cir. 2020)(no allegation of harm from printing credit card numbers on receipt); *Jones v. Salvation Army,* No. 3:18-CV-804, 2019 WL 6051437, * 8 (M.D. Fla., Nov. 15, 2019)(credit report, upheld partial standing); *L& C Babb Mgmt v. Am Home Mortg.,* No. 6:15-CV-1209, 2016 WL 2784378, * 3 (M.D. Fla., May 13, 2016)(misnamed plaintiff, only individual suffered TILA damages, not management company).

authority requires this specificity on a motion to dismiss. Plaintiff is not required to identify or quantify its lost customers, sales, and commissions. *Sky Angel US, LLC v C-SPAN*, 947 F.Supp.2d 88, 106 (D.D.C. 2013)(termination sufficient for injury-in-fact;  quantification of lost profits or subscribers ***not required*** at the pleading stage), *citing, Radio Corp. v Hazeltine Res. Inc.,* 395 U.S. 100 (1969)(Plaintiff's burden is satisfied by proving the fact of damage, not the amount)[2].

Defendants strain to attack the "plausibility" of Plaintiff's allegation of lost customers, rather than engage in discovery regarding the specifics of those allegations. Thus, Defendants argue that Plaintiff could not lose customers interested in UWM loans because UWM "does not work directly with consumers/borrowers until after a loan has been funded" and that the broker, not the customer selects the lender.    (Motion to Dismiss at 11-12). As UWM well knows, it markets its loan terms directly to borrowers, who are well aware of the pricing available.  It is the borrower who applies for a specific loan, not the broker. The broker advises and recommends loan products to client (the borrower), but the decision to borrow, of course, is between the borrower and the lender. Similarly, Defendants sarcastically argue that Plaintiff could not be injured by the

---

[2]  *See also General Industries Corp v. Hartz Mountain Corp.*, 810 F.2d 795 (8th Cir. 1987)(termination in retaliation for distributor's decision to market pet supplies from other manufacturers followed by market blitz to draw away distributor's clients);  *Copper Liquor, Inc. v. Adolph Coors, Co.,* 624 F.2d 575, 580 (5th Cir. 1980)("A plaintiff is held to a less rigid standard of proof with respect to the amount of damage caused by an antitrust violation because economic harm is intangible and difficult to quantify. To hold otherwise, would enable Coors to profits from its wrongdoing at the expense of its victim").

termination of its relationship with UWM because Rocket and Fairway were allegedly more innovative with better pricing and lower rates. (Motion to Dismiss at 11-12, citing FAC, ¶ 11.) The FAC , ¶ 11, does not and cannot allege that Rocket and Fairway loans are always better priced; it alleges only that Fairway and Rocket Pro expanded their market share prior to 2021 by improving their prices and rates to mortgage brokers. Okavage has lost customers due to pricing and other terms offered by UWM after March 15, 2021. Again, this is a matter for discovery, not pleading.

### *Causal Connection*

UWM terminated Plaintiff's contract because Plaintiff refused to join UWM's conspiracy to boycott its competitors, Fairway and Rocket Mortgage. (FAC ¶s 12, 13, 29 ("if you work with them, you can't work with UWM, effective immediately"); 33, 34, 46, 47, 76, 90, 100, 112, 123, 133, 145, 156). Termination for failure to participate in a group boycott is "traceable" to the "challenged action of the defendant" as a matter of law. *Sky Angel US, LLC v. C-Span,* 947 F.Supp.2d 88, 106 (D. D.C. 2013)(Where Plaintiff alleges that the termination was motivated by anticompetitive animus, courts "will accept the truth of that allegation for purposes of the pleading stage"); *Pace Electronics, Inc. v. Canon Computer Systems, Inc.,* 213 F.3d 118, 121-22 (3d. Cir. 2000)(reversing dismissal; termination of dealer contract for refusal to acquiesce in price-fixing conspiracy); *Greene v. General Foods Corp.,* 517 F.2d at 663-65 (termination as part of anticompetitive scheme).

Contrary to Defendants' arguments at page 15 of their Motion to Dismiss, Plaintiff clearly did not choose to be terminated. Prior to March 15, 2021, Plaintiff did substantial business with UWM as well as Fairway and Rocket Pro. (FAC, ¶ 44-45). Defendants cannot force their clients, the independent mortgage brokers forming this class, to choose between UWM and its competitors. None of the cases cited by Defendants support this baseless legal argument.[3] Availability of other sources of lending does not preclude the finding that termination of a contract for anticompetitive purposes caused injury in fact in the form of lost profits. *DeLong,* 990 F.2d at 1198.

## B. The FAC Alleges Antitrust Standing

The Eleventh Circuit utilizes a two-prong test to analyze antitrust standing. *Palmyra Park Hospital, Inc. v. Phoebe Putney Memorial Hosp.,* 604 F.3d 1291, 1299 (11th Cir. 2010)(reversing dismissal and finding antitrust injury based on exclusivity requirement).The first test requires that the plaintiff plead, and later prove, an "antitrust injury."[4] The second test is not a pleading requirement; it requires that the plaintiff "be" an efficient enforcer of the antitrust laws.

## Antitrust Injury

---

[3] *Clapper v. Amnesty Int'l USA,* 568 US 398, 418 (2013)(no tangible damage from credit issues, only fear of future harm); *Cordoba v. DirectTV, LLC,* 942 F.3d 1259, 1271 (11th Cir. 2019)(to have standing under TCPA, must request to be on Do-Not-Call list); *Wang v. United States,* No. 8:16-CV-2050, 2016 WL 6582900, * 3 (M.D. Fla., Nov. 7, 2016)("Wang's change in coverage and premiums occurred because he requested increased coverage"); *In re Terazosin Hydrochloride Antitrust Litig.,* 160 F.Supp. 2d 1365, 1371 (S.D. Fla. 2001)(indirect purchasers had no standing under Arizona law, but standing was established for monopolization).

[4] Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489 (1977).

Where, as here, the plaintiff is terminated for its refusal to acquiesce in a group boycott, antitrust injury is clearly established.[5]  What matters most in evaluating antitrust injury is whether the plaintiff was a participant in the market targeted by the alleged conspiracy and was directly harmed by the defendant's unlawful conduct. [6]

Contrary to Defendants' argument at page 16 of its Motion to Dismiss, it is not necessary under controlling Eleventh Circuit authorities to plead or prove reduction of competitors, output or increasing prices to establish antitrust injury. *Palmyra Park,* 604 F.3d at 1299 (antitrust injury established where exclusivity led insurers to deal with one competitor and not the other); *Pace Electronics,* 213 F.3d at 121-22 (termination as a wholesale dealer caused lost profits because it may no longer obtain profits from selling Canon-brand products at "dealer prices."). Plaintiff's allegation of lost customers, reduction in choice, and lost opportunities alleges a classic antitrust injury. *Continental Airlines, Inc. v. United Air Lines, Inc.,* 120 F.Supp.2d 556, 569 (E.D. Va. 2000).

Similarly, it is not necessary for the Plaintiff to be a consumer or competitor

---

[5] *Sky Angel U.S., LLC v. C-SPAN,* 947 F.Supp.2d 88, 106 (D.D.C. 2013)(termination based on boycott sufficient to establish antitrust injury); *Pace Electronics, Inc. v. Canon Computer Systems, Inc.,* 213 F.3d 118, 121-24 (3d Cir. 2000)(termination of dealer contract for refusal to acquiesce in price fixing conspiracy constitutes antitrust injury); *Vacation Break USA, Inc. v. Marketing Response Group & Laser Co., Inc.,* 169 F.Supp. 2d 1325, 1334 (denying summary judgment on defendant's group boycott claims; antitrust standing established).
[6] *Assoc. Gen'l Contractors v. Cal. State Counsel of Carpenters,* 459 U.S. 519, 544-45 (1983); *Blue Shield v. McCready,* 457 U.S. 465, 484 (1982)(same); *Koefoot v. American College of Surgeons,* 610 F.Supp. 1298, 1307 (N.D. Ill. 1985)(Dr. Koefoot was within the target area of the alleged anticompetitive scheme when he was expelled as a fellow of the ACS).

of the defendant; the courts have long rejected this requirement.[7] The Eleventh

Circuit adopted the "target area" test used by the Fifth Circuit Court of Appeals

to analyze antitrust standing in *Construction Aggregate Transport, Inc. v. Florida Rock*

*Industries, Inc.*, 710 F.2d 752, 762 (11th Cir. 1983). Under this test, the Plaintiff must

show that it "is within that sector of the economy which is endangered by a

breakdown of competitive conditions in a particular industry." *Id.* It is not

necessary that a plaintiff be a consumer or a competitor, although most plaintiffs

fall within these categories.

Thus, in *Blue Shield v. McCready,* 457 U.S. 465, 479, 484,  n. 21 (1982), the

United States Supreme Court noted the following:

> If a group of psychiatrists conspired to boycott a bank until the bank
> ceased making loans to psychologists, the bank would no doubt be
> able to recover the injuries suffered as a consequence of the
> psychiatrists' actions.

Even though it is the competing psychologists who are targeted primarily, the

direct aim at the bank as the vehicle to damage the competitor makes the bank a

proper antitrust plaintiff. Standing exists because the Plaintiff experiences

injuries that are "inextricably intertwined" with the injury the conspirator sought

to inflict.  This was explained and adopted in *Crimpers Promotions, Inc. v. HBO,*

724 F.2d 290, 292, 297 (2d Cir. 1983)("we are unconvinced that the victim of a

---

[7] Defendants incorrectly cite an unpublished opinion, *Vitacost.com v. Gaia Herbs, Inc.,* 2007 WL 951768 (S.D. Fla. Mar 28, 2007) at page 17 of their Motion to Dismiss in support of an argument that a "commercial intermediary" cannot be an efficient enforcer of the antitrust laws.  *Vitacost* based this argument on *Serpa Corp v. McWane, Inc.,* 199 F3d 6, 12-13 (1st Cir. 1999) which makes clear that this relates to antitrust injury, not Plaintiff's status as an efficient enforcer.

successful boycott designed to support a broad policy of market limitation lacks standing under § 4 simply because the boycottee was not a buyer or a seller but was endeavoring to provide a method whereby buyers and sellers could deal effectively with each other without paying tribute to the defendants").[8]

**Efficient Enforcer**

The Eleventh Circuit Court of Appeals also requires, at least where the sole relief requested is money damages, that a plaintiff be an efficient enforcer of the antitrust laws, employing the following factors: the directness or indirectness of the injury, the remoteness of the injury, whether other potential plaintiffs were better suited to vindicate the harm, whether the damages were highly speculative, the extent to which the apportionment of damages was highly complex and would risk duplicative recoveries, and whether the plaintiff would be able to efficiently and effectively enforce the judgment. These factors are derived in large part from *Associated General Contractors v. California State Council of Carpenters*, 459 U.S. 519, 539-543 (1983), and are not designed to be applied rigidly without regard to the United Supreme Court's holdings in *McCready* which the courts apply interchangeably with *Associated General Contractors.*

With regard to direct injury, as the cases discussed above make clear,

---

[8] *See also Eastman Kodak Co. v. Henry Bath, LLC,* 936 F.3d 86, 94 (2d Cir. 2019); *Carpet Group Int'l v. Oriental Rug Importers Ass'n, Inc.,* 227 F.3d 62, 77 (3d Cir 2000), *overruled on other grounds in Animal Science Prods. Inc. v. China Minmetals Corp.,* 604 F.3d 462 (3d Cir. 2011)(limiting standing to purchasers or competitors would violate applicable U.S. Supreme Court precedent).*Province v. Cleveland Press Publ. Co.,* 787 F.2d 1047, 1052 (6th Cir. 1986)(former employees had antitrust standing because their injury was inextricably intertwined with the injury to competitor); *U.S. Horticultural Supply Inc. v. The Scotts Co.,* No. Civ. A 03-773, 2004 WL 1529185 (E.D. Pa., Feb 18, 2004)(harm to plaintiff was the "very means" by which defendant used to restrain competition from its competitor).

Plaintiff was directly injured by a group boycott aimed at wholesale brokers as a method to hurt its primary targets, Fairway and Rocket Pro.  Second, the injury is not remote because Plaintiff's contract was terminated.  Okavage does not have access to UWM's product----mortgage loans, and that is resulting in anticompetitive injury to both it and the wholesale mortgage borrowers as a whole.  Third, no other plaintiffs are better suited for these claims because the means used to accomplish the illegal objective are wholesale mortgage brokers, (most of whom are now acquiescing and constitute non-defendant coconspirators).  *See United States v. Apple, Inc.*, 791 F.3d 290, 322 (3d Cir. 2015), *cert. denied,* 577 U.S. 1193 (2016)("The Supreme Court and our Sister Circuits have held that all participant in hub-and-spoke conspiracies liable when the objective of the conspiracy was a per se restraint of trade") Fourth, the damages are not speculative.  Plaintiff has alleged and can prove that it has lost customers and profits, based on its inability to access UWM loans, and because of false marketing claims by UWM.  As the courts have held, there is no risk of duplicative recoveries because Plaintiff's damages from termination are separate and distinct from the damages suffered by Fairway and Rocket Pro.  Finally,  a judgment for Plaintiff, declaring the contract addendum and termination null and void, is the best way to redress the violation.

## II.    DEFENDANT ISHBIA HAS NOT ADEQUATELY CHALLENGED THIS COURT'S PERSONAL JURISDICTION OVER HIM

Ishbia half-heartedly and without any affidavit or other evidentiary

support, argues that he, who announced the Ultimatum via Facebook, is not subject to this Court's jurisdiction because all of his acts were "official acts as President and CEO of UWM." Ishbia clearly miscomprehends the corporate shield doctrine which was never intended to shield intentional and malicious acts even if ostensibly carried out in the name of the corporation.[9]

The cases cited by Ishbia do not apply here. In *Divcik v. Am. Mortgage Consultants, Inc.,* 2010 WL 11629138, * 2 (M.D. Fla. 2010), the plaintiffs alleged that the executive was responsible for failure to pay overtime compensation. In *Klayman v. Jud. Watch, Inc.,* 2008 WL 11333054, * 2 (S.D. Fla. 2008), the defendant filed an affidavit to controvert the allegations of the Plaintiff's complaint.

In this case, any cursory review whatsoever of the Facebook video transcribed at Exhibit B of Defendants' Motion to Dismiss, would reveal that Ishbia had a personal role in the anticompetitive conduct of UWM----"if you're not with us, you're against us." Sophisticated companies like UWM don't level threats. The open and brazen threat in this matter was clearly a personal threat from Ishbia to all of the wholesale brokers doing business with UWM. Absent any affidavit proving otherwise, Plaintiff's allegations are clearly sufficient to withstand a personal jurisdiction challenge at this stage of the proceedings.

---

[9] *Doe v. Thompson,* 620 So. 2d 1004, 1006 *n. 1 (Fla. 1993)("[a] corporate officer committing fraud or other intentional misconduct can be* subject to personal jurisdiction"); *Waste Services, Inc. v. Waste Mgt. Inc.,* No. 2005 WL 8159910, * 7 (M.D. Fla., Aug. 18, 2005)(corporate shield doctrine "applies to employees who are negligent in the performance of corporate duties; and is not applicable where a complaint alleges that the executive committed intentional torts."); *Wood v. Wall,* 666 So. 2d 984, 986 (Fla. 3d DCA 1996)("Because Wall and Adsit are alleged to have committed purposeful, non-fortuitous intentional tortious acts on Wood and his associates located in Florida, the promoters are deemed to have subjected themselves to the long-arm jurisdiction of Florida courts under § 48.193(1) (b)."). d

Finally, Plaintiff believes that Ishbia had numerous and substantial individual contacts with the State of Florida, where he owns property[10], supervises marketing and other networking events, and travels extensively.    Discovery is required to develop these facts.    Plaintiff requests that it be permitted to depose Ishbia and supplement its response to the personal jurisdiction arguments with specific testimony obtained through deposition.

## III.    ALL OF PLAINTIFF'S SUBSTANTIVE COUNTS ARE SUFFICIENT TO STATE   CLAIMS UNDER RULE 12(b)(6)

### A.    PLAINTIFF HAS ALLEGED A PER SE HORIZONTAL CONSPIRACY TO BOYCOTT COMPETITORS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

Count I of the FAC alleges that Defendants "combined, conspired, contracted, threatened and coerced" its acquiescing mortgage brokers (93% of its broker sales force) to effectively boycott and force its competitors, Fairway Mortgage and Rocket Pro, out of business  in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (FAC, ¶ 63.)   The elements of a claim under section 1 are: (1) an agreement between two or more persons, to (2) unreasonably restrain trade.[11]

### 1.  Plaintiff Has Sufficiently Alleged an Agreement to Restrain Trade

Defendants have not and cannot challenge that Plaintiff has sufficiently alleged an "agreement" between UWM and its acquiescing mortgage brokers to

---

[10]  Recent investigation indicates that Mr. Ishbia's Trust owns the most expensive property ever sold in Florida---a residence located in Naples, Florida.
[11] *United States v. Apple, Inc.,* 791 F.3d 290, 313 (2d Cir. 2015), *cert. denied,* 577 U.S. 1193 (2016)("To hold a defendant liable for violation of section 1 of the Sherman Act, a district court must find a combination or some form of concerted action between at least two legally distinct economic entities that constitutes an unreasonable restraint of trade").

refuse to do business with UWM's competitors.  Indeed, Defendant's Ultimatum and contract addendum brazenly state in unequivocal terms that the mortgage brokers are prohibited from doing business with Fairway and Rocket Pro.  Ishbia proclaimed "if you work for them, you can't work for us." [12]

Coercive acts to obtain agreement by customers or distributors to boycott a competing supplier have long been held to constitute a horizontal, concerted refusal to deal which justified per se illegality.    *See, e.g., Interstate Circuit, Inc. v. United States,* 306 U.S. 208, 216-17, 222 (1939)(theatre chain wrote, collectively to eight distributors asking them to not license films to competitors, and each distributor agree to the terms knowing that the other distributors were also agreeing; stated horizontal per se claim because "from the beginning each of the distributors knew that the proposals were under consideration by the others"); *Alabama Sportservice, Inc. v. Nat'l Horsemen's Benevolent & Protective Ass'n, Inc.,* 767 F.Supp. 1573, 1580-81 (M.D. Fla. 1991)("a boycott exists even if each supplier, without considering the others, agrees to the demands of the target's competitors to cut off the target").

The Ultimatum announcement, coerced agreement of independent mortgage brokers to a single unified contract addendum, and the contract addendum itself  evidence "so plainly anticompetitive that no elaborate study is necessary to establish their illegality"[13] and constitute a "naked restraint with no

_____

[12] This statement clearly can be heard on the audio; but for some reason it is not transcribed on Defendants' Ex. B.
[13]  *Nat'l Soc'y of Engineers v. United States,* 435 U.S. 679, 692 (1978).

purpose other than stifling competition"[14] that this Court should deem them unreasonable *per se.* (FAC, ¶s 66). The courts consistently analyze conspiracies to boycott a competitor under the per se test of illegality, which requires no pleading or proof of market power or anticompetitive effect. [15]

This is because the anticompetitive objective is clear on the face of the Ultimatum---3000 mortgage brokers are being coerced not to deal with UWM's competitors----not because they do not offer a better product----but solely because of UWM's anticompetitive animus. This is not a "rimless wheel."  The concerted agreement is clearly established by UWM's requirement that all of its brokers sign the same addendum agreeing not to do business with UWM's competitors, Fairway and Rocket Pro.  The brokers are coerced by UWM and other brokers to boycott UWM's competitors, making the rim connected not only to the spokes but to each other (mortgage brokers who would otherwise compete against each other. *Compare United States v. Apple, Inc.,* 791 F.3d 290 (2d Cir. 2015), *cert. denied,* 577 U.S. 1193 (2016)(concerted agreement based on fact that it was likely that multiple

---

[14] *FTC v. Indiana Fed'n of Dentists,* 476 U.S. 447, 465-66 (1986).

[15] *NYNEX Corp. v. Discon., Inc.,* 525 U.S. 128, 133 (1998); *Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 765 (1984); *Continental Ore Co. v. Union Carbide,* 370 U.S. 690, 708 (1962)(concerted refusal to deal is per se illegal); *Klor's Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 212-13 (1959); *MM Steel, LP v JSW Steel (USA), Inc.,* 806 F.3d 835, 848 (5th Cir. 2015), *cert. denied,* 137 S. Ct. 372 (2016)("The Supreme Court has consistently held that the per se rule is applicable to group boycotts identical to the boycott alleged in this case"); *United States v. Apple, Inc.,* 791 F.3d 290, 324-25 (2d Cir. 2015)(Apple agreed to create the horizontal restraints, making it a per se unreasonable restraint on trade); *Jacobs v. Tempur-Pedic Int'l Inc.,* 626 F.3d 1327 (11th Cir. 2010)(group boycotts are per se illegal);  *Vacation Break USA, Inc. v. Marketing Response Group,* 169 F.Supp.2d 1325, 1335 (M.D. Fla. 2001)(sufficient evidence to support group boycott); *Alabama Sportservice, Inc. v. Nat'l Horsemen's Benevolent & Protective Ass'n, Inc.,* 767 F.Supp. 1573, 1580-81 (M.D. Fla. 1991)(finding that allegations stated claim for group boycott based on theory of coerced acquiescence); *Hewlett-Packard Co. v. Arch Assoc Corp.,* 908 F.Supp. 265, 269 (E.D. Pa. 1995)(While a manufacturer can "deauthorize dealers at will, it cannot take those actions if in addition the manufacturer attempt to exact some collateral anticompetitive advantage.").

publishers would sign the same agreement); *Alabama Sportservice, Inc. v. Nat'l Horsemen's Benevolent & Protective Ass'n, Inc.,* 767 F.Supp. 1573, 1580-81 (M.D. Fla. 1991)("a boycott exists even if each supplier, without considering the others, agrees to the demands of the target's competitors to cut off the target").

Even Defendants' cases make clear that this is a horizontal hub-and-spoke conspiracy which is per se illegal.   Thus, in *In re Disposable Contact Lens Antitrust Litigation,* 215 F.Supp. 2d 1272, 1296, 1300, 1304 (M.D. Fla. 2016), the court denied Defendants' Motion to Dismiss, holding that the vertical agreement was an integral part of a larger hub-and-spoke conspiracy; "the UPPs are contrary to the manufacturer defendants economic self-interest if not adopted in tandem".   In reversing the trial court's dismissal of a hub-and-spoke conspiracy involving Marsh & McLennan, the Third Circuit Court of Appeals held in *Insurance Brokerage Antitrust Litigation,* 618 F.3d 300, 344-45, 347 (3d Cir. 2010) that the orchestration of a bid-rigging scheme by Marsh with various insurers was sufficient to state a per se claim for a horizontal hub-and-spoke conspiracy.   Significantly, the court stated that under defendants' argument, there would never be a per se condemnation of hub-and-spoke conspiracies because they always involve vertical action coercing a horizontal agreement between competitors.

The Second Circuit Court of Appeals removed all doubt that group boycotts like the one alleged here are per se illegal  in *United States v. Apple, Inc., cert. denied,* 577 U.S. 1193 (2016). In applying a *per se* test of illegality, the Court

explained that "a horizontal conspiracy can use vertical agreements to facilitate coordination without the other parties knowing about or agreeing to the horizontal conspiracy goals." *Id. at 324-25.* The predatory conduct of using brokers to boycott a new entrant into the mortgage lending industry is equally offensive and pernicious as the price-fixing conspiracy orchestrated by Apple.

In each of the cases cited by Defendants, the courts began their analysis by determining whether plaintiff alleged a per se restraint, including "group boycotts or concerted refusals to deal," which is clearly alleged in this case. *See, e.g., YMD Records LLC v. Ultra Enterprises, Inc.,* 361 F.Supp. 3d 1258, 1265 (S.D. Fla. 2019). Only in cases where there is no per se allegation do the courts require any allegation of market power or anticompetitive effect. *Id.*

Plaintiff has clearly alleged facts which constitute a per se, horizontal restraint on trade. This is sufficient to withstand a motion to dismiss. *Pinson v. JP Morgan Chase,* 942 F.3d 1200, 1213 (11th Cir. 2019)(reversing 12(b)(6) dismissal; "all a plaintiff must do to survive a motion to dismiss is state a plausible claim for which relief can be granted…not a surefire claim, not one likely to succeed…a plausible claim"); *ProCaps , S.A. v. Patheon, Inc.,* No. 12-CV-24356, 2013 WL 673730, * 2 (S.D. Fla., Feb. 25, 2013)("It is not for the Court to determine the merits of Procaps' per se claim at the motion to dismiss stage of the proceedings."); *Alabama Sportservice, Inc. v. Nat'l Horsement's Benevolent & Protective Ass'n, Inc.,* 767 F.Supp. 1573, 1581 (M.D. Fla. 1991)(stated claim for group boycott); *Outlet Communications*

*Inc v. King World Productions, Inc.,* 685 F.Supp. 1570, 1576, 1578 (M.D. Fla. 1988)(rejecting defendant's arguments on rule of reason on a motion to dismiss because "plaintiff may be able to prove some set of facts to overcome potential barriers to per se [treatment]").

### 2. Anticompetitive Effect is Presumed in a Horizontal Group Boycott; No Market Power is Required to State a Claim

Although Defendants place their "quick look" and "rule of reason" arguments within the body of their argument regarding horizontal boycotts (Motion to Dismiss at 18-20), each of these arguments is premised on the Court rejecting, on a motion to dismiss, Plaintiff's allegations of a per se group boycott. Defendants rely primarily on a district court opinion adopted in an appendix by the Eleventh Circuit Court of Appeals in *Retina Associates PA v. S. Baptist Hospital of Florida,* 105 F.3d 1376, 1381 (11th Cir. 1997) to essentially ignore more than 100 years of precedent on group boycotts and establish a new rule on a category of offense which the Eleventh Circuit and all of the district courts in Florida have treated as established and not open to dispute. Unlike this case, where brokers are prohibited from doing business with the defendant's competitors, *Retina* involved only an exclusive referral agreement which was historically accepted in the medical industry. The excluded competition was only incidental from the exclusive referral; it was not the primary aim to use third parties to injure the business of a competitor by coerced agreement. The court in *Retina* carefully explained that it was not adopting a new rule for group boycotts, contrary to

Defendants' misleading argument at page 19 of the Motion to Dismiss to this

Court.   The court stated:

> In sum, the *per se* rule requires a historically focused inquiry directed
> at ascertaining whether the behavior complained of is of the type that
> regularly poses anticompetitive consequences.   Where prior cases
> have shown that a certain practice is of this type, a deleterious effect
> on the market will be presumed and no detailed market analysis is
> required.  Where the anticompetitive effect of a practice is not
> historically clear the practice may still be *per se* violative of the
> antitrust laws if a preliminary examination of market    conditions
> surrounding the alleged restraint at issue reveals such an impact
> absent any procompetitive justification.

*Id. at 1381.*  The incomplete quotation Defendants cite from *Northwest Wholesale*

*Stationers, Inc. v. Pacific Stationery & Printing Co.,* 472 U.S. 284, 296 (1985) is similarly

limited to "wholesale purchase cooperatives"  in which expulsion of a member for

violation of disclosure rules did not imply the anticompetitive animus that group

boycotts normally entail.  The Supreme Court made clear it was not overruling its

*per se* treatment of group boycotts and it was clearly not requiring a plaintiff to

prove market conditions in all group boycott cases.  Plaintiff's burden is merely to

point out the category of per se illegality (in this case group boycott) which has

been held historically to have predominantly anticompetitive effect.   Only in the

case of a wholesale cooperative or a professional association where expulsion for

violation of a rule is expected, does the Court require any showing of market

conditions. *Id. at 298.*

    Cases applying *Retina and Northwest  Wholesale Stationers* have limited the

requirement of a "market showing" to cases involving cooperatives, associations, and other cases where a defendant is excluded because of the violation of a rule or other basis that does not itself suggest an anticompetitive animus.    Moreover, *Retina* was decided on summary judgment; not a motion to dismiss.  The same is true for *All Care Nursing Service, Inc. v. High Tech Staffing Services, Inc.,* 135 F.3d 740, 746 (11th Cir. 1998), where the Court affirmed a jury verdict for the defendant because plaintiff failed to prove any actual refusal to deal with the plaintiff.  *See also LAPD v. General Motors Elec. Corp.,* 132 F.3d 402, 405 (7th Cir. 1997)("employing a joint sales representative is not a *per se* offense" and because it was not per se, proof of market power was required on summary judgment); *RXStrategies, Inc. v. CVS Pharmacy, Inc.,* 390 F.Supp.3d 1341, 1348 (M.D. Fla. 2019)(tying act claim governed by Rule of Reason not *per se;* complaint dismissed with leave to amend to define relevant market and establish that defendants possessed power in the market).

Market power is required only where a plaintiff is unable to establish actual anticompetitive effect under a rule of reason analysis under section one of the Sherman Act.  It is not required for a per se offense which brazenly instructs 3000 independent brokers to boycott two competitors for no legitimate reason, simply to drive the competitors out of business.  Implied anticompetitive animus is clear on the fact of the coerced agreement.  It would be absurd to adopt any market power requirement on a per se conspiracy to boycott a competitor---it is the

coerced illegal agreement among numerous competing brokers to force a competing supplier out of business which constitutes the anticompetitive conduct---not the unilateral market power of the supplier in an untainted market. Such a requirement would be inconsistent with United States Supreme Court authorities which continue to mandate per se treatment of group boycott cases.[16]

### 3. If the Court Rejects Per Se Treatment, the First Amended Class Action Clearly Satisfies a "Quick Look" or "Rule of Reason" Analysis

Even if the Court rejects per se treatment to the group boycott at issue in this case, which is contrary to applicable U.S Supreme Court precedent, Plaintiff's pleadings clearly are sufficient to meet either the "quick look" or "rule of reason" approaches to determine unreasonableness under section 1 of the Sherman Act.

### a. "Quick Look"

In certain cases where concerted, horizontal action does not imply a naked, anticompetitive animus, or the Court has insufficient experience with the industry to determine whether the anticompetitive effect is obvious, the courts have applied what has been termed a "quick look" approach. *Cal. Dental Ass'n v. FTC,* 526 U.S. 756, 770 (1999)(stating that a "quick look" analysis is appropriate where per se is inappropriate but "an observer with even a rudimentary understanding of

---

[16] *NYNEX Corp. v. Discon., Inc.,* 525 U.S. 128, 133 (1998); *NW Wholesale Stationers, Inc. v. PAC Stationery & Printing Co.,* 472 U.S. 284, 294 (1985)(per se liability applies to agreements "either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle."); *Klor's Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 209-10 (1959)(per se unlawful for manufacturers, distributors and a retailer to agree to refuse to deal with another competing retailer); *United States v. General Motors Corp.,* 384 U.S. 127, 145 (1966)(per se unlawful for an automobile manufacturer to agree with automobile dealers to boycott other dealers that were discounting cars).

economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets"); *FTC v. Indiana Federation of Dentists,* 476 U.S. 447, 466 (1986)(upholding FTC ruling on dental association rule forbidding members to submit xrays to dental insurers without proof of market based on lack of legitimate business justification for rule); *NCAA v Board of Regents,* 468 U.S. 85, 110 (1984).

Under a quick look analysis, anticompetitive harm is presumed, but the defendant is given the opportunity to provide some competitive justification for the restraint. *Gordon v. Lewiston Hosp.,* 423 F.3d 184, 210 (3d Cir. 2005). If no plausible justification is provided, the restraint will be condemned without any analysis of market conditions. If the defendant is able to offer sound procompetitive justifications, the court will proceed to weigh the overall reasonableness of the restraint using a full rule of reason analysis. *See generally,* 11 Herbert Hovenkamp, *Antitrust Law* ¶ 1911a (2d ed. 2005).

It is dubious whether a court is ever authorized to conduct a "quick look" analysis on a motion to dismiss. Defendants have not filed an answer, and their justifications are simply legal argument by their attorneys, with no pleading or evidentiary support. However, the procompetitive justifications offered by defendants clearly do not plausibly support an Ultimatum and a contract addendum which specifically prohibits independent mortgage brokers from dealing with Defendants' largest competitors. Defendants' so-called

26

"justification" referenced in the Motion to Dismiss is their belief that Rocket and Fairway were "soliciting loan officers," "talking negatively about brokers," "going after real estate agents." "trying to cut the loan officers," "soliciting your past clients," and a desire not to support broker with UWM technology and service by funding brokers in competition with "the wholesale channel." But these are not procompetitive justifications, and even if the allegations are true (which remains to be discovered), they would not constitute a legal justification for a group boycott.

The wholesale mortgage brokers who were the target of the ultimatum were not free to choose whether they agreed with Defendants. They were directed to sign a contract addendum or face termination of their existing contract if they chose to refer customers to both UWM, and Rocket and Fairway. This is precisely the type of hub-and-spoke, illegal conspiracy condemned in the group boycott and hub-and-spoke conspiracies discussed above.

### b. "Rule of Reason"

Traditionally, under the rule of reason, the "test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." *Chicago Board of Trade v. United States,* 246 U.S. 231, 238 (1918). The Plaintiff's burden of proof at trial on the merits is to prove an anticompetitive effect on the relevant market. This can be in one of two forms: (1) an actual detrimental effect,

or (2) behavior having the potential for genuine effects on competition. *Levine v. Central Florida Medical Affiliates, Inc.*, 72 F.3d 1538, 1551 (11th Cir. 1996)(affirming summary judgment). Only in the case of the latter test, potential for genuine effects on competition, is the plaintiff required to define the relevant market and establish that the defendants possessed power in that market. *Id.* The Eleventh Circuit does not require that Plaintiff plead each of the anticompetitive effects of Defendants' conduct with no discovery. The courts merely require enough facts to plausibly suggest that some anticompetitive effects were intended or effected.

Plaintiff alleged, as is abundantly clear from the Ultimatum and contract addendum itself, that the boycott of independent brokers who chose to do business with new entrants, competing for wholesale mortgage loans, is obviously designed to shut out competition, which will harm customers and the wholesale market. (FAC, ¶ 66).

The relevant market is the wholesale lending market, not the mortgage lending market as a whole.[17] The heavily-regulated retail mortgage banking market does not depend on mortgage brokers to originate and sell its products and therefore is incapable of being coerced by UWM. As alleged in the FAC paragraph 66, the boycott (orchestrated through the Ultimatum), "achieves no legitimate efficiency benefits to counterbalance the defendants' express and demonstrated

---

[17] The only authority cited by Defendants to controvert the wholesale lending market as the relevant market is a treatise, which was long superceded by a subsequent treatise, which makes no such conclusion. See Defendants' Motion to Dismiss at 28, citing the 4th edition of Hovenkamp in support of the proposition that even "a large percentage of one mode of distribution will have little anticompetitive effect if another is available".

anticompetitive effects, including the obstruction of competition from UWM's competitors, Fairway Mortgage and Rocket Pro TPO, who have had significant market share in the wholesale lending market." Moreover, Plaintiff alleges in paragraph 96 of the First Amended Class Action that the group boycott was intended to, and has the potential to foreclose 50% of the wholesale lending market by boycotting two competitors of UWM which collectively comprise 50% of the market. This is a major structural change in the wholesale lending market. Foreclosure of fifty percent of the market is, *a fortiori*, anticompetitive effect. Once UWM has complete control, a monopoly, it will just be a matter of time before rates rise, output and quality are reduced. If UWM can get away with targeting its largest competitors, it can easily target the small, "mom and pop" lending outlets comprising the 70 wholesale lenders UWM talks about in its Motion to Dismiss, but never provides proof of their existence.

Anticompetitive effect includes a large number of fact-based issues which require discovery. All of the issues which pertain to this analysis must be addressed through discovery before any ruling on the merits.

### B.    Plaintiff States a Claim for Unlawful Steering (Count 2)

Defendants incorporate the same arguments with respect to Count 2 as they allege in Count 1. Plaintiff accordingly incorporates its arguments made above with regard to the sufficiency of Count 2.

### C.    Plaintiff    Sufficiently    Alleges    a    Claim    for    Attempted

## Monopolization (Count 3)

Section 2 of the Sherman Act, 15 USC § 2, provides that "[e]very person who shall monopolize or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states, or with foreign nations, shall be deemed guilty of a felony." Section 2 covers behavior by a single business as well as coordinated action by two or more businesses.

Attempted monopolization is defined as "the employment of methods, means and practices which would, if successful, accomplish monopolization, and which, though falling short, nevertheless approach so close as to create a dangerous probability of it." *American Tobacco Co. v. United States,* 328 U.S. 781, 785 (1946)(reversing dismissal of attempted monopolization claim). To state a claim for attempted monopolization, Plaintiff need only show two elements: a specific intent to monopolize and a dangerous probability of success. *Gulf States Reorganization Group, Inc. v. Nucor Corp.,* 721 F.3d 1281, 1285 (11th Cir. 2013)*, cert. denied,* 571 U.S. 1199 (2014)(2 elements); *Quality Foods de Centro America SA v. Latin American Agribusiness Dev. Corp.,* 711 F.2d 989, 997 (11th Cir. 1983). Anticompetitive or predatory conduct is sometimes added as a third element, but it is really an evidentiary basis for proving the other elements. *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 459 (1993)("We hold that petitioners may not be liable for attempted monopolization under section 2 of the Sherman Act absent proof of a dangerous

probability that they would monopolize a particular market and specific intent to monopolize"). In this case, Plaintiff has adequately alleged a claim for attempted monopolization.

### *Specific Intent*

Plaintiff alleged "specific intent" (First Amended Class Action, paragraph 94) and it is obvious from the announced Ultimatum. In his announcement, Defendant Ishbia stated "If you work and send loans and send business to Fairway Independent or Rocket Mortgage, which, by the way is about 25% of the broker channel… you can't work with UWM anymore effective immediately…So you have until March 15 to sign an addendum saying you're not working with those two lenders." (Defendants' Motion to Dismiss, Ex. B. at 15). Defendants understood this would destroy its competitors, stating "They just lost 80 percent of their business potentially." (Defendants' Motion to Dismiss, Ex. B. at 18). Defendants did not intend to improve their market share by legitimate means. They intended to increase their market share by coercing an illegal group boycott designed to drive its largest competitors out of business. This is sufficient to prove specific intent to monopolize. *Spectrum Sports v. McQuillan*, 506 U.S. 447, 459 (1993)("Unfair or predatory conduct may be sufficient to prove the necessary intent to monopolize").

### *Dangerous Probability of Success*

Finally, Plaintiff has clearly alleged a dangerous probability of success.

At the time the original Class Action complaint was filed, Plaintiff alleged that UWM was the dominant, largest lender in the wholesale mortgage market, controlling 34% of the market.   It likely controls more than 50% now.  Similarly, the 70 other competitors relied upon by Defendants collectively control a market share of likely less than ten percent.  Defendants themselves stated that 93% of brokers subject to the Ultimatum agreed to its terms. That admission alone constitutes a dangerous probability of success---a possibility Ishbia brazenly and gleefully celebrated in various public forums.   Facing the practical impact of their own fatal admissions, Defendants turn to an obfuscation parade.

Contrary to Defendant's misleading arguments, not supported by the authorities it cites, there is no hard-and-fast rule on the market share required to allege a claim of attempted monopolization.  *Bailey v. AllGas, Inc.*, 284 F.3d 1237, 1250 (11th Cir. 2002) did not address either monopolization or attempted monopolization claims.   It merely stated in dicta that "monopoly power" as distinguished from market power sufficient to achieve a monopoly, requires 50% for a claim of monopolization.  In contrast, *Gulf States Reorganization Group, Inc. v. Nucor Corp.*, 721 F.3d 1281, 1285 (11th Cir. 2013), *cert. denied,* 571 U.S. 1199 (2014) made clear that on motion for summary judgment, the plaintiff need only prove that at the time the alleged predation began *and throughout the time when it was alleged to have continued,* "it came close to achieving monopoly power in the relevant market."   (Emphasized language from lower court opinion at 822

F.Supp.2d 1201, 1250 (N.D. Ala. 2011), *aff'd*, 721 F.3d 1281 (11th Cir. 2013).

UWM may well have over 50% market power now that its anticompetitive conduct has remained unchecked for six months. Plaintiff's FAC makes clear that Defendant's attempts to monopolize the market are continuing.   But the Eleventh Circuit, following binding Fifth Circuit precedent has made clear that there is no "numbers game" in defining a dangerous probability of success.  *U.S. Anchor Mfg., Inc. v. Rules Industries, Inc.*, 7 F.3d 986, 999 (11th Cir. 1993), *cert. denied*, 512 U.S. 1221 (1994). The ability to control supply, demand, pricing, and new entrants is a subject of expert testimony, and "the definition of the relevant market is essentially a factual question."  *Id. at 993.*

Where the market share is between 30% and 50%, the courts typically analyze whether the conduct is likely to achieve a monopoly or is particularly anticompetitive.  *M&M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp, Inc.*, 981 F.2d 160, 168 (4th Cir. 1992); *see also Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995).  As the Eleventh Circuit has held, these are inherently issues of fact which require discovery.  *Thompson v. Metro Multi-List, Inc.*, 934 F.2d 1566, 1573 (11th Cir. 1991)("The parameters of a given market are questions of fact").

### *Anticompetitive Effect*

The group boycott itself is predatory and anticompetitive conduct. UWM is the dominant power in the wholesale lending market and therefore maintains

sufficient power to harm that market.  UWM's geographic market is national. In paragraph 94 of the FAC, plaintiff alleges that "Defendants have willfully, knowingly, and *with specific intent*, attempted to monopolize the wholesale mortgage market." In paragraph 96 of the FAC, plaintiff alleges that "UWM's 34% market share is currently the largest share of the market."  Prior to its coerced group boycott, Rocket Pro was the second largest wholesale mortgage lender, and Fairway Mortgage was the eighth largest wholesale mortgage lender. Defendants admit that 93% of its 3000 mortgage brokers agreed to the Ultimatum and contract addendum, and therefore no longer do business with Rocket Pro or Fairway Mortgage. Plaintiff alleges in paragraph 96 that 50% of the wholesale lending market has been or will be extinguished by the boycott. This constitutes both specific intent and dangerous probability of success. *See Bailey v. AllGas, Inc.,* 284 F.3d 1237, 1244 (11th Cir. 2002)("If the predator reaches this long-run goal, it enters the 'recoupment' period.  It then can collect the fruits off the predatory scheme by charging supracompetitive prices---prices above competitive levels.").

Defendants argue that the FAC fails to allege that the contract addendum (in which 3000 brokers agree not to do business with UWM's competitor) has an impact on competition or market share, or how it could possibly gain a monopoly when there are 70 mortgage lenders in the wholesale lending market.  (Motion to Dismiss at 31).  But this argument is blatantly false.  Clearly, UWM's attempt to eliminate and foreclose 50% of the relevant market is a major structural change in

the market which eliminates consumer choice, impacts quality, impacts output, and eventually impacts price.  Defendants mislead this Court by suggesting that the Eleventh Circuit requires anything more.  In *Mr. Furniture Warehouse Inc. v Barclays Am/Commercial Ins.*, 919 F.2d. 1517, 1522 (11th Cir. 1990)(a standing case, not a 12(b)(6) case), the Eleventh Circuit's complete statement in dicta was that attempted monopolization required some anticompetitive effect "whether ***to gain greater market share***, to drive up prices, or to obtain some other illegal goal").  The illegal goal here is clearly to drive Rocket Pro and Fairway out of the wholesale lending market, and thereby increase UWM's dominant market share to the point of a monopoly.

All of these issues are evidentiary/proof issues which must be addressed through discovery.  Okavage, a single mortgage broker no longer able to do business with UWM, cannot be expected to know these issues which are exclusively within the province of UWM to know.

### D.    Plaintiff Sufficiently Alleges a Claim for Violation of the Florida Antitrust Act

Defendants incorporate the same arguments with respect to Counts IV-VI, as they made with regard to the federal antitrust claims.  Accordingly, Plaintiff incorporates its arguments with respect to the federal violations as its response to the arguments under the Florida Antitrust Act.

### E.    Plaintiff Sufficiently Alleges a Claim of Tortious Interference (Count VII)

Plaintiff alleged in Count VII that Defendants' illegal conduct intentionally

interfered with Plaintiff's relationship with its customers---customers seeking mortgage loans available without restriction or undisclosed anticompetitive agreements---forcing it to choose between Fairway and Rocket Pro, and UWM on the other hand---without disclosure to the customer.  (FAC, ¶ 137, 141, 144).

Defendants argue that Plaintiff's claim for tortious interference (Count VII) fails to state a claim for relief because it is not plausible for customers "who do not work" with wholesale lenders to be induced not to deal with one or another mortgage lender because of any intentional act by UWM.  Defendants also argue that there was no existing or prospective business relationship with any customer capable of being disrupted by the UWM Ultimatum.   Both arguments  are false and unsupported by Plaintiff's FAC.

Tortious interference does not require that the defendant meet directly with the customer. It is enough that defendants abolished any fair choice by the loan customers by preventing their wholesale brokers from dealing with UWM's competitors.

If necessary, Plaintiff can further amend the Complaint to specify that it has, so far, lost specific business relationships from clients which received direct to consumer marketing from UWM about their 1.75% rates on a 15-year mortgage. Prior to the Ultimatum, Okavage could have serviced these relationships, but now it is frozen out of the UWM mortgage lending market.

**F.**     **Plaintiff Sufficiently Alleges a Claim for Violations of FDUTPA**

**(Count VIII)**

Defendants argue that Count VII fails to state a claim under FDUTPA, Florida Statutes, sections 501.204, et seq., based on failure to allege actual damages, and failure to allege a deceptive act or unfair practice.  (Motion to Dismiss at 38).

Plaintiff adequately alleged that it suffered actual damages from the termination of its contract with UWM, including lost customers, lost opportunities, and lost profits.    (FAC, ¶s 46-47.)  Plaintiff also seeks equitable relief which does not require any allegation or proof of actual damages. Fla. Stat. § 501.211(1); *Kelly v. Palmer Reifler,* 681 F.Supp.2d 1356, 1365-66 (S.D. Fla. 2010).

With regard to deceptive or unfair practices, an unfair practice is "one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *TemPay, Inc. v. Biltres Staffing,* No. 8:11-CV-02732, 2013 WL 2039307 (M.D. Fla. 2013)(citing *Samuels v. King Motor Co.,* 782 So. 2d 489, 499 (Fla. 4th DCA 2001). It is not necessary that Plaintiff be engaged in a consumer transaction at the time of the violation, and it is not necessary that the consumer injury be suffered by the Plaintiff.  *Crmsuite Corp v. General Motors Corp.,* No. 8:20-CV-762, 2020 WL 5898970, * 5-7 (M.D. Fla., Oct. 5, 2020), *citing, Furmanite America, Inc. v. TD Williamson, Inc.,* 506 F.Supp.2d 1134, 1146 (M.D. Fla. 2007)("Accepting all reasonable inferences from the facts of the case, TDW's alleged plan to hire all of Furmanite's employees en masse and use them to misappropriate Furmanite's trade secret's would constitute unlawful

and unfair or deceptive practices under the broad reading Florida courts traditionally apply to FDUTPA"); *TriNet USA, Inc. v. Vensure Employers Services, Inc.*, No. 8:20-CV-2018, 2021 WL 2661108, * 3 (M.D. Fla., June 29, 2021 (FDUTPA claim against competitor for poaching employees).

It is sufficient here that Plaintiff alleged that it was terminated for refusing to acquiesce in an unfair trade practice.  The act of coercing independent brokers to boycott a competitor is, as explained above, illegal under the antitrust laws; and it also constitutes an unfair trade practice under FDUTPA. *See Carrinolo v. General Motors Corp.*, 823 F.3d 977, 986 (11th Cir. 2016)(misrepresentation of safety ratings resulted in actual damages based on "difference between the market value of a 2014  Cadillac CTS with perfect safety ratings … and the market value of a 2014 Cadillac CTS with no safety ratings."); *TriNet USA v. Vensure,* 2021 WL 2661108, * 7 (M.D. Fla. 2021)("Vensure encouraged and induced former TriNet employees to misappropriate TriNet's confidential customer information…the Court finds this just sufficient to allege an injury to consumers").

## G.    Plaintiff Sufficiently Alleges a Claim for Declaratory Relief (Count IX)

In Count IX, Plaintiff alleges that an actual controversy now exists between Plaintiff and UWM regarding the validity and enforceability of Defendants' Ultimatum, its implementing contract addendum, and the rights and liabilities related to the contract, and subsequent termination. This is sufficient to state a claim under the federal Declaratory Judgment Act, 28 U.S.C. §§ 2201(a), which

provides, in pertinent part, as follows:

> In a case of actual controversy within its jurisdiction….any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

Defendants misstate the elements of a federal declaratory judgment claim, and conflate the Article III case or controversy requirement as the elements for asserting a declaratory judgment claim. As set forth above, *supra at 6*, Plaintiff satisfies the case-or-controversy requirement, which applies to all substantive claims. Unlike *Zurich Am Ins. Co. v. S-Owners Ins. Co.,* 248 F.Supp. 3d 1268, 1280 (M.D. Fla. 2017), there is no issue here that the Article III justiciable requirements are not satisfied.  Plaintiff's contract was illegally terminated. That creates a live case or controversy.

The test for declaratory relief, however, is different.   The United States Supreme Court holds that the requirements for a federal declaratory judgment under 28 USC section 2201 are satisfied where "the facts alleged, under all the circumstances, show that there is a substantial controversy between the parties having adverse legal interests. sufficient immediacy, and reality to warrant issuance of a declaratory judgment."  *Medimmune Inc. v. Genentech, Inc.* 549 U.S. 118, 127 (2007)(reversing dismissal of declaratory judgment claim).

In this case, Plaintiff clearly alleges that the termination of its contract with UWM  is null and void and the contract addendum is unenforceable.   If plaintiff is right, the legal relationship of UWM with Okavage is continuing and the

contract addendum is null and void.  The effect of the declaratory judgment would permit Plaintiff and the remaining class members to continue to originate mortgage loans for UWM and compete with each other on a level playing field. This is precisely what the declaratory judgment statute was designed to do.  *See, e.g., General Motors LLC v. Royal Motors Corp.,* 769 F.Supp. 2d 73, 76 (D. P.R. 2011)("GM's right to terminate its contractual relationship with RMC is the exact type of dispute considered ripe for declaratory judgment").

The relief requested is not duplicative because none of the other counts request that the termination, and contract addendum be declared null and void. Even if there were some overlap, Rule 57 of the Federal Rules of Civil Procedure specifically states that "[t]he existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate."  Defendants' unpublished cases on this point clearly do not apply. [18]

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully submits that Defendants' Motion to Dismiss should be denied, and the case should proceed with discovery. In the alternative with regard to personal jurisdiction over Defendant Mat Ishbia, Plaintiff requests entry of an order permitting limited discovery (document production, interrogatories, and deposition testimony from Mat Ishbia)  on his contacts with the State of Florida.  Finally, Plaintiff requests such other and further

---

[18] *Del Prado Mall Prof'l Condo Assn v. Voyager Indem. Ins. Co.,* No. 2:20-CV-838, 2021 WL 1578758, * 2 (M.D. Fla., Apr. 22, 2021)(insurance claim; court exercised discretion to decline jurisdiction over declaratory judgment claim because it merely incorporated prior breach of contract claim); *Auto Dealer Solutions, Inc. v. Southern-Owners Ins. Co., Inc.,* No. 8:17-CV-2525, 2018 WL 4600674, * 3 (M.D. Fla., Jan. 25, 2018)(insurance claim; dismissed as not ripe, not because it was duplicative).

relief the Court may deem it entitled.

Respectfully Submitted,
**PARRISH & GOODMAN, PLLC**
*/s/ Robert H. Goodman*
ROBERT H. GOODMAN, ESQUIRE
Florida Bar No.:  1008059
13031 McGregor Blvd., Suite 8
Fort Myers, Florida 33919
Phone: (813) 643-4529
Facsimile: (813) 315-6535
Primary:
rgoodman@parrishgoodman.com
Secondary:admin@parrishgoodman.com
AND
JOSEPH E. PARRISH, ESQUIRE
Florida Bar. No: 690058
Primary: jparrish@parrishgoodman.com
Secondary:admin@parrishgoodman.com
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 28th day of October, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

Dated: October 28th, 2021

/s/ Robert H. Goodman
*Attorney for Plaintiff*