United States District Court
Middle District of Florida
Jacksonville Division

THE OKAVAGE GROUP, LLC
ON BEHALF OF ITSELF AND
ALL OTHERS SIMILARLY SITUATED,

      **Plaintiff,**

**v.**                       **No. 3:21-cv-448-BJD-LLL**

UNITED WHOLESALE MORTGAGE,
LLC AND MATTHEW ISHBIA,
INDIVIDUALLY

      **Defendants.**

---

## Report and Recommendation

Defendants United Wholesale Mortgage (UWM) and Matthew Ishbia move to dismiss Plaintiff's First Amended Class Action Complaint under Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6), doc. 46. Plaintiff, The Okavage Group, LLC, responded in opposition, doc. 53. This motion has been referred to me for a report and recommendation for appropriate resolution, doc. 60. For the reasons discussed below, I respectfully recommend defendants' motion be denied in part and granted in part.

## Background

UWM is a wholesale residential mortgage lender. Amended Complaint (AC), doc. 32 ¶ 3. Wholesale mortgage lenders offer mortgage loans through independent

third parties, including mortgage brokers. As a result, a wholesale mortgage lender does not work directly with borrowers until after a loan is funded, if it works with borrowers at all, *id*.[1] According to UWM, "wholesale mortgage lending allows customers to access a wide array of better mortgages at more favorable rates than they are most often able to obtain through retail mortgage lenders." Doc. 46 at 13.[2] Fairway Mortgage (Fairway) is a competitor of UWM; it offers both retail mortgage lending and wholesale mortgage lending. Rocket Mortgage is also a competitor of UWM; it offers both retail mortgage and wholesale mortgage lending, with Rocket Pro TPO (Rocket) handling the wholesale side. AC ¶¶ 7-8, 11. Neither Fairway nor Rocket are parties to this lawsuit, but their status as competitors to UWM is central to understanding the alleged anticompetitive scheme.

Plaintiff, a one-member LLC and mortgage broker based in St. Augustine, Florida, alleges it is, or has been, a client of UWM, Rocket, and/or Fairway. *Id*. ¶ 2. According to plaintiff, during the process of wholesale lending, mortgage brokers provide loan applications to the borrower, collect completed loan applications, verify income, and gather other documentation. Mortgage brokers also advise borrowers of interest rates, loan terms, and select the wholesale mortgage lender who best suits the needs of the borrower. AC ¶ 5. Plaintiff emphasizes the importance of independence

---

[1] Retail mortgage lenders, on the other hand, work directly with borrowers "from the beginning, including providing loan applications and collecting completed loan applications, performing income verification and collecting other required documentation, as well as quoting interest rates." AC ¶ 4.

[2] Citations to page numbers in the record are to the CM/ECF pagination.

to the mortgage-broker business because brokers must be able "to choose from a variety of wholesale lenders to select the mortgage product and experience that best matches the specific needs of the broker's client." AC ¶ 5.

According to plaintiff, UWM, faced with a declining stock price and a decreasing share of the wholesale lending market, acted improperly by orchestrating an anticompetitive scheme that violated federal and state antitrust laws. *Id.* ¶¶ 11-12. On March 4, 2021, UWM hosted a virtual event, and its Chief Executive Officer Matthew Ishbia publicly announced an ultimatum[3] by UWM to mortgage brokers.

Ishbia's speech was posted to Facebook. Throughout the speech, Ishbia highlighted that UWM is "all in" for the broker family; emphasized its goals of being faster, easier, and cheaper; and stressed UWM's mantra as helping mortgage brokers succeed.  http://www.facebook.com/97640871999/videos/845176203005957  (last visited June 27, 2022). Ishbia explained in the announcement that UWM was separating retail mortgage lending from wholesale lending and made a series of statements geared towards exciting the broker network, exclaiming, "there is no stopping brokers," and "we are going to win together as a family." *Id.*

Ishbia further alleged there were two companies "hurting the wholesale channel"—Fairway and Rocket—by cutting the mortgage brokers out. He announced

---

[3] The Court refers to the allegation by plaintiffs that defendants forced a choice between working with UWM or Rocket and Fairway to secure mortgages as "the ultimatum." By doing so, however, the Court does not imply the alleged conduct was illegal. Instead, I use the term ultimatum because it is the descriptor given by plaintiff and, at this stage, the Court must accept well-pleaded allegations as true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).

that "at UWM, we're not helping those, that help them . . . if you work with them, you can't work for UWM anymore, effective immediately." *Id.* at 11:30-11:56. Ishbia continued, "owners, you have until March 15 to sign an addendum saying you're not working with those two lenders . . . And if you don't sign the addendum . . . you and nobody at your company will work with UWM anymore, and that's okay, there's no hard feelings." *Id.* starting at 12:17. Ishbia stated: "this is what I think, there are 75 great lenders out there, you need to have options, but there's two that are out there hurting the channel . . . . You can pick us and the 73 other lenders or you can pick those others and not have UW[M]. . . ." *Id.* at 13:20.

Plaintiff alleges that in order to "implement the [u]ltimatum and coerce a boycott" of Fairway and Rocket, defendants advised their broker clients that "they were required to consent to a contract addendum." AC ¶ 13. The addendum memorialized Ishbia's announcement, that from now on, brokers could not engage in business with Fairway or Rocket if they wanted to work with UWM, and that UWM would seek damages if the warranty was violated:

> United Wholesale Mortgage, LLC ("UWM") is amending its broker, correspondent[,] and financial institution agreements by adding a representation and warranty that its clients will not submit loans to either Rocket Mortgage or Fairway Independent Mortgage for review, underwriting, purchase and/or funding (unless such loan was locked with Rocket Mortgage or Fairway Independent Mortgage prior to March 21, 2021). If client or client's employees breach this representation and warranty, the client agrees to pay liquidated damages to UWM of: (i) Five Thousand Dollars ($5,000.00) per loan closed with UWM, or (ii) Fifty Thousand Dollars ($50,000.00), whichever is greater.

4

AC ¶ 13. According to plaintiff, 93 percent of the brokers presented with the addendum signed it. *Id.*

Plaintiff refused to sign the addendum. UWM terminated its contract with plaintiff, and no longer accepted mortgage applications by plaintiff's customers. *Id.* ¶ 46. Before plaintiff was terminated, UWM regularly accepted mortgage loan applications submitted by plaintiff. *Id.* ¶ 28

Plaintiff argues that defendants' conduct amounted to a "contract, combination, or conspiracy in restraint of trade to jointly boycott [Rocket and Fairway] to suppress competition in the relevant markets," a scheme that is "pernicious, or manifestly anticompetitive, because, whether or not any broker agreed to the ultimatum, it limits the choice of lending options available to brokers, and ultimately the loan options available to consumers, in the relevant market." *Id.* ¶ 13. Plaintiff alleges that Rocket and Fairway "consistently offer better suited and/or lower[-]priced mortgage loans in connection with the . . . applications submitted by mortgage brokers as compared to UWM, [but that nevertheless] Defendants' [u]ltimatum limits the ability of Plaintiff . . . to offer their clients (consumers/prospective borrowers) the best-suited mortgage loan products . . . thereby restraining trade and limiting competition." *Id.* ¶ 34.

In its amended complaint, doc. 32, plaintiff alleges defendants violated the Sherman Act by unlawfully restraining trade (count I) and engaging in unlawful steering (count II) in violation of 15 U.S.C. § 1; and by attempting to monopolize the wholesale mortgage market (count III) in violation of 15 U.S.C. § 2. Plaintiff also

brings claims under Florida law alleging that: 1) defendants unlawfully restrained trade (count IV), 2) engaged in unlawful steering (count V), and 3) unlawfully attempted to monopolize the wholesale mortgage market (count VI) in violation of the Florida Antitrust Act, Fla. Stat. § 542.18;[4] 4) tortiously interfered with business contracts and prospective economic advantage (count VII),[5] and 5) violated Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 (count VIII). Plaintiff also brings a count for a declaratory judgment, 28 U.S.C. §§ 2201-2202 (count IX). It asks the Court to declare: 1) the ultimatum and associated addendum are per se illegal; and 2) the addendum, and all rights, damages, and obligations under it, are unlawful and unenforceable. AC ¶ 164.

Defendants raise six grounds for dismissing plaintiff's amended complaint: 1) plaintiff lacks standing to sue; 2) the Court lacks personal jurisdiction over Ishbia; 3) plaintiff's antitrust claims (counts I-VI) fail to state a claim upon which relief can be granted; 4) the tortious interference claim (count VII) fails to allege intentional or unjustified interference with plaintiff's contractual relationships or reasonable business expectancies; 5) the amended complaint fails to state a claim under Florida Deceptive

---

[4] The Florida legislature has adopted the antitrust law developed by the federal courts under the Sherman Act. *All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.*, 135 F.3d 740, 745 n. 11 (11th Cir. 1998) (citations omitted) (noting "[f]ederal and Florida antitrust laws are analyzed under the same rules and case law."). As a result, my analysis of federal antitrust law in section III, A-C, applies equally to alleged violations of the Florida Antitrust Act, Fla. Stat. § 542.18 (counts IV, V, and VI).

[5] Plaintiff does not specify what body of law applies to its tortious interference claim, but when read in tandem with the rest of the amended complaint and plaintiff's response to the motion to dismiss, it is evident plaintiff intended Florida law to apply.

and Unfair Trade Practices Act (count VIII); and 6) plaintiff's count for declaratory relief (count IX) is duplicative and therefore improper.

## Analysis

### I. Standing

#### A. Constitutional Standing

Defendants move to dismiss under Rule 12(b)(1) because, they argue, plaintiff lacks standing under Article III of the United States Constitution, and thus the Court lacks subject matter jurisdiction over the case. Doc. 46 at 20-26. A Rule 12(b)(1) motion can be based on either a facial challenge or a factual challenge that looks beyond the complaint to evidence related to jurisdiction. *Butler v. Morgan*, 562 F. App'x 832, 835 (11th Cir. 2014) (citing *McElmurray v. Consol. Gov't of Augusta-Richmond Cnty.*, 501 F.3d 1244, 1251 (11th Cir. 2007)). Defendants raise a facial attack, asking the Court to "look and see if the plaintiff's complaint has sufficiently alleged a basis of subject matter jurisdiction." Doc. 46 at 19 (quoting *McElmurray*, 501 F.3d at 1251) (additional citations omitted).

In analyzing a facial attack, the Court treats the amended complaint as it would in considering a Rule 12(b)(6) motion—taking the allegations as true and properly considering the exhibits attached to the amended complaint, doc. 32, the addendum, doc. 32-1, and Ishbia's public announcement referenced in the amended complaint and attached to defendant's motion to dismiss, doc. 46-2. *See Tellabs, Inc. v. Makor Issues & Rts. Ltd.*, 551 U.S. 308, 322 (2007) (citations omitted) (explaining that when ruling

on Rule 12(b)(6) motions to dismiss, documents "incorporated into the complaint by reference" are properly considered); *Lawrence v. United States*, 597 F. App'x 599, 602 (11th Cir. 2015) (citing *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002) (holding a district court may consider documents attached to a motion to dismiss if considering a facial attack on subject matter jurisdiction, "if the documents are central to plaintiff's claim and their authenticity is not disputed.").

Defendants argue plaintiff lacks Article III standing because the amended complaint alleges "implausible injuries with no causal connection to defendants' purported actions." Doc. 46 at 20. Specifically, defendants argue the amended complaint protests the loss of unspecified customers and commissions but fails to allege plausible facts establishing plaintiff's loss or the connection between the loss and the challenged conduct. *Id.*

Before proceeding to the merits of any case, a court must first find it has subject matter jurisdiction over the action. *Douglas v. United States*, 814 F.3d 1268, 1280-81 (11th Cir. 2016) (Tjoflat, J., concurring). This inquiry is necessary because "[f]ederal courts are courts of limited jurisdiction," meaning "[t]hey possess only that power authorized by the Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted). If at any time a court determines it lacks subject matter jurisdiction, the action must be dismissed. *Douglas*, 814 F.3d at 1280-81 (citation omitted).

Standing is a "threshold jurisdictional question" originating from the requirement in Article III of the Constitution that "the jurisdiction of the federal courts

be limited to actual cases and controversies." *Fla. Fam. Pol'y Council v. Freeman*, 561 F.3d 1246, 1253 (11th Cir. 2009) (citations and quotations omitted). There are three elements of the constitutional standing requirement: "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citation omitted). Plaintiff, as the party invoking the Court's jurisdiction, has the burden of establishing standing; because the case is at the pleading stage, it must "clearly allege facts demonstrating each element." *Id.* (quotations, citations, and alterations omitted). *See also Church v. City of Huntsville*, 30 F.3d 1332, 1336 (11th Cir. 1994) (quotation and citations omitted) ("Standing requirements are not mere pleading requirements but rather are an indispensable part of the plaintiff's case. Therefore, each element of standing must be supported with the manner and degree of evidence required at the successive stages of litigation.").

To meet the requirement of an "injury in fact," a plaintiff "must show that [it] suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo*, 578 U.S. at 339 (quotations and citation omitted). Particularized means it "affected the plaintiff[s] in a personal and individual way." *Id.* For an injury to be concrete, "it must actually exist." *Id.* at 340. Faced with a motion to dismiss, general factual allegations of injury resulting from a defendant's conduct may suffice, because a court "presume[s] that general factual allegations embrace those specific facts that are necessary to support

the claim." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (quotations and citations omitted).

Defendants argue that each of plaintiff's claims relies on the same theory of conclusory and facially implausible injury: "direct financial injury, including lost sales and commissions," and that plaintiff has been "financially damaged" by a "reduction in choice, lost customers and commissions." Doc. 46 at 21-22 (citing AC ¶¶ 47, 76, 90, 100, 112, 123, 133, 145, 156). Plaintiff counters that its amended complaint satisfies the general pleading rules for Article III standing because the amended complaint alleges plaintiff is "the target of anticompetitive conduct," and it was through this targeting that defendants "implemented [their] scheme to restrain trade by a competitor." Doc. 53 at 11-12.

The amended complaint alleges that plaintiff is a mortgage brokerage company that advises and helps individuals apply for and obtain residential mortgages and that since October 2018, it had a business relationship with UWM—"submitting mortgage loan applications on behalf of clients to UWM and Fairway Mortgage and/or Rocket Pro TPO," bringing a "substantial number of clients to these entities." AC ¶¶ 44-45. Plaintiff alleges further that after the ultimatum, UWM terminated its wholesale lending agreement with plaintiff and refused to accept mortgage applications by its customers. *Id.* ¶ 46. Plaintiff states it has lost customers "who were interested in loans from UWM but from who [plaintiff] could not offer since doing so would mean losing customers seeking loan products from Rocket and Fairway." *Id.* As a result, plaintiff claims it suffered financial damages of lost sales and commissions. *Id.* ¶ 47.

10

At the motion to dismiss stage, where the Court is required to accept the allegations in the amended complaint as true, I find the allegations specific enough to conclude that plaintiff "plausibly suffered an injury traceable to [defendants'] conduct." *Pinson v. JPMorgan Chase Bank, Nat'l Assoc.*, 942 F.3d 1200, 1207 (11th Cir. 2019). Economic injuries have long been recognized as sufficient to establish an injury in fact. *Sierra Club v. Morton*, 405 U.S. 727, 733-34 (1972) (citations omitted) ("[P]alpable economic injuries" have been held sufficient to "lay the basis for standing," such as injury to plaintiff's competitive position in the computer-servicing market); *MSPA Claims 1, LLC v. Tenet Fla., Inc.*, 918 F.3d 1312, 1318 (11th Cir. 2019) (finding an allegation plaintiff was not paid a reimbursement on time was "a type of economic injury, which [was] the epitome of 'concrete.'"). Restricting plaintiff's ability to make independent pricing recommendations and decisions on behalf of their customers is sufficient, at this early stage, to allege an injury. *Simpson v. Union Oil*, 377 U.S. 13, 16 (1961).[6]

The amended complaint also alleges that plaintiff's relationship with UWM was terminated because of the change in the agreement. AC ¶ 46. The termination is itself

---

[6] In *Simpson*, the plaintiff entered a consignment agreement with the defendant requiring it to charge a minimum price for gasoline. Plaintiff sold gas at a disallowed price, the defendant terminated the agreement, and plaintiff sued. 377 U.S. at 16. The Supreme Court reversed summary judgment for the defendant, finding the restriction on plaintiff's ability to make independent, competitive pricing decisions was an "actionable wrong." *Id.* It also noted that "if the 'consignment' agreement achieves resale price maintenance in violation of the Sherman Act, it and the lease are being used to injure interstate commerce by depriving independent dealers of the exercise of free judgment whether to become consignees at all, or remain consignees, and in any event, to sell at competitive prices." *Id.*

a concrete and particularized injury. *Spokeo*, 578 U.S. at 339. More detail and evidence supporting plaintiff's allegations about the customers, sales, and commissions lost is not required at this stage of the proceeding. *See, e.g.*, *Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*, 947 F. Supp. 2d 88, 106 (D.D.C. 2013) (rejecting defendant's argument that the complaint could not establish an injury in fact because it did not quantify lost profits or numbers of lost subscribers).

Defendants argue plaintiff's claim that it lost customers interested in business with UWM is facially implausible given plaintiff's concession that wholesale lenders "do not work directly with consumers/borrowers until after a loan has been funded, if at all[,]" doc. 46 at 22 (citing AC ¶ 3); and its further allegation that a mortgage broker advises the customer of the rates and terms and selects the wholesale mortgage lender. *Id.* (citing AC ¶ 5). Defendants argue that because the customers do not literally pick the lender, plaintiff's allegation it lost customers is implausible. But the amended complaint alleges that it is the borrower's final decision whether to accept a loan. AC ¶ 72 (explaining that the ultimatum "prevents prospective home buyers from obtaining potentially better-suited and/or lower-priced mortgage products."). Accepting the well-pleaded allegations as true, a customer seeking a mortgage[7] may plausibly decide not to do business with plaintiff because it cannot obtain mortgage quotes from UWM.

---

[7] I note that plaintiff's theory of relief evidenced in parts of its response, doc. 58, presumes UWM directs marketing and advertising directly to borrowers; but no such allegation is explicitly made in the amended complaint, although the announcement at issue is viewable by the public on Facebook.

Defendants make an additional argument regarding the factual implausibility of the amended complaint. They argue that because plaintiff pleads that Rocket and Fairway offer lower-rate mortgages, plaintiff could not be injured by being unable to do business with UWM. Doc. 46 at 22-23. Plaintiff does not, however, allege that Rocket and Fairway loans are *always* better priced. Rather, the Court reads the assertions about Rocket and Fairway in the amended complaint as explaining the reason for plaintiff's rejection of defendants' ultimatum and as context for why defendants issued it in the first instance. And because defendants extol UWM's other qualities as compared to different wholesalers, it is plausible UWM is an attractive lender for more reasons than just its rate offerings. The extent of injury suffered by plaintiff because of an inability to engage in business with all three mortgage companies can be developed during discovery.

Defendants next argue plaintiff only alleges their conduct harmed Rocket and Fairway, "with no causal connection between defendants' actions and plaintiff's . . . injury." Doc. 46 at 26. *See also id*. at 12 ("Each of plaintiff's claims focuses almost exclusively on the effect of defendants['] supposed actions on Rocket and Fairway— not plaintiff."). Although some allegations included the 37-page amended complaint are unusual, given that Rocket and Fairway are not parties here,[8] plaintiff plausibly alleges that UWM's conduct has injured plaintiff by causing it to suffer "direct financial injury, including loss of sales and commissions," and that it has been

---

[8] *See, e.g.*, AC ¶¶ 30-32 (alleging Ishbia falsely accused Fairway and Rocket of various wrongs to justify mortgage brokers to acquiesce to his ultimatum).

"financially damaged by a reduction in choice, lost customers and commissions." AC ¶¶ 46, 76.

## B. Antitrust Standing

The Court next considers whether plaintiff has sufficiently alleged antitrust standing. "To have antitrust standing, a party must do more than meet the basic 'case and controversy' requirement that would satisfy constitutional standing." *Palmyra Park Hosp. v. Phoebe Putney Mem. Hosp.*, 604 F.3d 1291, 1299 (11th Cir. 2010) (citations and quotations omitted). A plaintiff alleging violations of the antitrust laws "must also show that they have suffered 'antitrust injury,' or 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendant's acts unlawful.'" *Gulf States Reorg. Grp., Inc. v. Nucor Corp.*, 466 F.3d 961, 966 (11th Cir. 2006) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). The Eleventh Circuit has explained the added burden on an antitrust plaintiff this way: even if the defendants violated the antitrust laws, the plaintiff "must still show that its injury due to those violations [is] the sort that the antitrust laws were intended to prevent." *Id.*

The Eleventh Circuit employs a two-step test to determine whether a plaintiff has antitrust standing. *Palmyra Park Hosp.*, 604 F.3d at 1299. "First, the plaintiff must have alleged an antitrust injury; and second, the plaintiff must be an efficient enforcer of the antitrust laws." *Id.* (citing *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1448 (11th Cir. 1991)). Defendants argue plaintiff has not met either prong.

14

The Supreme Court has defined an antitrust injury as "flow[ing] from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be 'the type of loss that the claimed violations . . . would be likely to cause[,]'" *Brunswick Corp.*, 429 U.S. at 489 (quoting *Zenith Radio Corp. v. Hazeltine Rsch.*, 395 U.S. 100, 125 (1969)), meaning those injuries "result[ing] from interference with the freedom to compete." *Johnson v. Univ. Health Servs. Inc.*, 161 F.3d 1334, 1338 (11th Cir. 1998).

Defendants argue plaintiff does not establish an antitrust injury because it fails to allege "any actual reduction in the number of competitors, reduced output, or an increase in prices for lenders or consumers," nor has it alleged an anticompetitive effect on plaintiff. Doc. 46 at 27. Plaintiff counters that an antitrust injury is established where a party is terminated for failing to participate in a group boycott. Doc. 53 at 12.

At this stage, I find plaintiff has plausibly alleged harm that may be addressed through the antitrust laws. For example, in the amended complaint, plaintiff alleges defendants acted to "boycott and force its competitors . . . out of business," in order to "suppress and eliminate competition in the wholesale lending market[,]" leading to a restraint on trade. AC ¶ 71. Plaintiff also alleges that by conspiring with acquiescing mortgage brokers "who would otherwise compete for new sources of wholesale lending, [defendants attempt] to force UWM's competitors out of the wholesale lending business and deprive mortgage customers of competing sources of mortgage loans." *Id.*

Plaintiff contends UWM's ultimatum "eliminat[ed] the ability of plaintiff . . . to offer [its] clients the full array of loan products that existed before the ultimatum was issued . . . prevent[ing] prospective home buyers from obtaining potentially better-suited and/or lower-priced mortgage loan products." *Id.* ¶ 72. From the face of the complaint, it "appears plausible that the same alleged violation [of the antitrust laws] both reduced competition and injured [plaintiff]—that [plaintiff's] injury 'flows from that which makes [defendants'] acts unlawful.'" *Sky Angel*, 947 F. Supp. at 107 (quoting *Brunswick*, 429 U.S. at 489). This is so because of both the alleged effect of UWM's ultimatum on consumers and its termination of the agreement with plaintiff. *See also Pace Elecs., Inc. v. Canon Comput. Sys.*, 213 F.3d 118, 121-22, 124 (3d Cir. 2000) (finding a terminated dealer who refused to participate in a vertical price fixing scheme sufficiently alleged an antitrust injury because it lost profits and could no longer sell the defendant's brand at dealer prices); *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1103 (9th Cir. 1999) (holding a boycott restricting nonassociation members access to customers and supplies "that may be necessary for effective competition" was an antitrust injury).

Defendants also argue the amended complaint fails to allege plaintiff is an efficient enforcer of the antitrust laws—the second prong of the Eleventh Circuit's antitrust standing test. Defendants' claim that plaintiff is not a "'consumer' of the mortgage nor a 'competitor' of UWM, but a mere 'commercial intermediary' between mortgage lenders and mortgage consumers . . . As such, plaintiff's purported injuries do not qualify as antitrust injuries, and plaintiff cannot efficiently enforce any antitrust

16

violation." Doc. 46 at 28 (citations and additional quotations omitted). Plaintiff argues it is unnecessary for it to be a consumer or competitor to be an efficient enforcer and urges the Court to follow the factors in *Palmyra Park*, addressed below. Doc. 53 at 18-22.

A court considers various factors when determining whether plaintiff would be an efficient enforcer of the antitrust laws:

> the directness or indirectness of the injury, the remoteness of the injury, whether other potential plaintiffs were better suited to vindicate the harm, whether the damages were highly speculative, the extent to which apportionment of damages was highly complex and would risk duplicative recoveries, and whether the plaintiff would be able to efficiently and effectively enforce the judgment.

*Palmyra Park*, 604 F.3d at 1299 (citing *Todorov*, 921 F.2d at 1451-52).

Taking the allegations as true, as I must at this stage, I find plaintiff would be an efficient enforcer of the antitrust law. Plaintiff alleges that it was injured directly because its contract was terminated for not agreeing to the ultimatum aimed at hurting Fairway and Rocket's share of the market. It also alleges that it lost customers and profits because it could not access the UWM loans, and therefore, borrowers as whole suffered from reduced competition among wholesalers. I find that, when considered together, these alleged damages are direct enough to satisfy the first two factors of antitrust standing. I further find the damages are not speculative; however, as the litigation progresses, plaintiff will have to identify its lost customers and profits.

Nor do I find that there is a risk of duplicative recoveries because the harms, particularly those allegedly suffered by plaintiff directly, are specific and distinct. I

17

make no finding, however, whether other plaintiffs would be better suited to make these claims and whether a judgment for the plaintiff "declaring the contract addendum and termination null and void, is the best way to redress the violation." Doc. 53 at 15. Overall, I find the *Palmyra* factors[9] outlined above, at this early stage of the litigation and considering my obligation to accept all well-pleaded allegations as true, meet the minimum pleading standards necessary to survive a motion to dismiss and recommend denial of defendants' Rule 12(b)(1) motion without prejudice.

## II. Rule 12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction

Defendants also move to dismiss Ishbia from this matter under Federal Rule of Civil Procedure 12(b)(2), because the Court lacks personal jurisdiction over him. Defendants contend that plaintiff failed to "allege[] personal jurisdictional connection to Florida outside of Mr. Ishbia's official acts as President and CEO of UWM," and Florida's corporate shield doctrine precludes the Court's exercise of jurisdiction over him for acts committed in furtherance of UWM's interest. Doc. 46 at 17. Plaintiff counters that defendants have not adequately challenged the Court's personal jurisdiction and that Florida's corporate shield doctrine does not apply to his alleged conduct. Doc. 53 at 22-24.

As stated above, I must accept the facts alleged in the complaint as true and "construe all reasonable inferences in favor of plaintiff." *Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990). Courts in the Eleventh Circuit ask two questions when

---

[9] Defendants make no argument based on these factors.

determining personal jurisdiction—1) does personal jurisdiction exist under the forum state's long-arm statute; and 2) does the exercise of that "jurisdiction violate the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution." *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1350 (11th Cir. 2013) (additional citation omitted).

I look to Florida's long arm statute, Fla Stat. § 48.193, to decide whether the Court has personal jurisdiction over non-Florida resident Ishbia and construe the statute as the Florida state courts would. *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 627 (11th Cir. 1996) (citations omitted). Florida's corporate shield doctrine precludes the exercise of personal jurisdiction over a nonresident corporate employee sued individually for conduct performed in his corporate capacity. *Doe v. Thompson*, 620 So.2d 1004, 1006 (Fla. 1993). "The rationale of the doctrine is the notion that it is unfair to force an individual to defend a suit brought against him personally in a forum with which his only relevant contacts are acts performed not for his own benefit but for the benefit of his employer." *Id.* at 1006 (quotations and citations omitted).

"A plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction." *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009) (additional citations omitted). If a defendant challenges personal jurisdiction "by submitting affidavit evidence in support of its position, the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction." *Madara*, 916 F.2d at 1514. But when the defendant provides only conclusory

19

allegations that it is not subject to jurisdiction, the burden does not revert to the plaintiff. *Louis Vuitton*, 736 F.3d at 1350 (quoting *Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino*, 447 F.3d 1357, 1360 (11th Cir. 2006)). Defendants have submitted no affidavit(s) or other evidence in support of its motion about personal jurisdiction. Thus, I look to the amended complaint to see if plaintiff has pleaded a prima facie case of personal jurisdiction over Ishbia. *Louis Vuitton*, 736 F.3d at 1350.

Plaintiff alleges Ishbia is a citizen of Michigan who "has conducted and continues to regularly conduct business in and with mortgage brokers in the state of Florida." AC ¶ 18. Plaintiff also alleges Ishbia "knowingly and intentionally directed communications announcing the unlawful ultimatum and false statements to mortgage brokers in order to justify and convince mortgage brokers to acquiesce to and not contest the ultimatum, including plaintiff and class members located in the state of Florida." *Id.* ¶ 19. According to plaintiff, "[a]t all relevant times Matthew Ishbia actively and knowingly directed and participated in the illegal scheme to boycott UWM's competitors." *Id.* ¶ 52. I find these conclusory allegations fail to allege Ishbia has a personal connection to the state of Florida outside of those that are part of his job as CEO of UWM. *Snow v. DirecTV, Inc.*, 450 F.3d 1314, 1318 (11th Cir. 2006) (holding vague and conclusory allegations cannot establish personal jurisdiction).

The corporate shield doctrine does not protect a corporate officer who commits intentional torts, such as fraud or other intentional misconduct. *Louis Vuitton*, 736 F.3d at 1355 (citing *Doe*, 620 So.2d at 1006 n.1). The next question, therefore, is "whether the [amended] complaint sufficiently states a cause of action for an intentional tort.

20

*LaFreniere v. Craig-Myers*, 264 So.3d 232, 239 (Fla. 1st DCA 2018) (citations omitted). Plaintiff has alleged at least one intentional tort against Ishbia, tortious interference with business contracts and prospective advantage (count VII); but because of pleading infirmities outlined below, count VII should be dismissed and it cannot serve as plaintiff's jurisdictional hook to Ishbia. *Drewes v. Cetera Fin. Group, Inc.*, No. 19-cv-80531-KAM, 2020 WL 1875639, at *3-*4 (S.D. Fla. 2020).

I respectfully recommend defendants' motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2) be granted and Ishbia dismissed from this lawsuit without prejudice.

### III. Rule 12(b)(6) Motions for Failure to State a Claim

Defendants argue that each count of the amended complaint fails to state a claim upon which relief can be granted and move to dismiss each count under Rule 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court has explained this requires "a complaint . . . contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Conclusory allegations are insufficient. *Twombly*, 550 U.S. at 55 ("[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic

recitation of the elements of a cause of action will not do . . . .") (alterations, quotations, and citations omitted). "The plausibility standard 'calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' of the defendant's liability." *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (2012) (quoting *Twombly*, 550 U.S. at 556).

In deciding a Rule 12(b)(6) motion, a district court should construe the complaint broadly and view the allegations in the light most favorable to the plaintiff. *Levine v. World Fin. Network Nat'l Bank*, 437 F.3d 1118, 1120 (11th Cir. 2006). "A well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal citation and quotation omitted).

### A. Unlawful Restraint of Trade, Section One of the Sherman Act

Plaintiff sues for unlawful restraint of trade in violation of the Sherman Act, 15 U.S.C. § 1 (count I). The heart of this claim is  the allegation that defendants "engaged in a concerted action and course of conduct with its acquiescing mortgage brokers to effectively boycott and force its competitors, [Fairway and Rocket], out of business, to suppress and eliminate competition in the wholesale lending market." AC ¶ 71. Defendants, plaintiff alleges, used the ultimatum to encourage brokers to boycott Rocket and Fairway, creating a "classic 'hub-and-spoke' horizontal conspiracy between itself and mortgage brokers who would otherwise compete with each other for new sources of wholesale lending." *Id.* This conspiracy, plaintiff claims, would

22

"force UWM's competitors out of the wholesale lending business and deprive mortgage customers of competing sources for mortgage loans." *Id.*

Section One of the Sherman Act, under which counts I and II are brought, provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. In interpreting this prohibition, the Supreme Court explained that "Congress intended only to prohibit 'unreasonable' restraints on trade." *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1261 (11th Cir. 2019) (citing *Arizona v. Maricopa Cnty. Med. Soc.*, 457 U.S. 332, 343 (1982)). *See also Texaco, Inc. v. Dagher*, 547 U.S. 1, 5 (2006) (emphasis in original) (observing that the Supreme Court does not take a "literal approach" to the language of Section One, but "has long recognized that Congress intended to outlaw only *unreasonable* restraints[.]"). A Section One claim has three elements: (1) a conspiracy that (2) unreasonably (3) restrains interstate or foreign trade. *Quality Auto Painting*, 917 F.3d at 1260 (citation omitted).

In deciding whether an alleged restraint is unreasonable, a court generally analyzes the claim under one of two frameworks—the rule of reason or the per se rule. *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 848 (5th Cir. 2015). Antitrust claims are typically analyzed under the rule of reason, which requires a court to "decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed,

23

and the restraint's history, nature, and effect." *State Oil Co. v. Khan,* 522 U.S. 3, 10 (1997).

But as the law has developed, courts have recognized that some restraints on trade are per se illegal. *State Oil*, 522 U.S. at 10 (citing *Maricopa Cnty.*, 457 U.S at 344). "Some types of restraints . . . have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit, that they are deemed unlawful *per se.*" *Id.* (citing *N. Pac. R. Co. v. United States*, 356 U.S. 1, 5 (1958)). *See also Jacobs v. Tempur-Pedic Intern., Inc.*, 626 F.3d 1327, 1334 (11th Cir. 2010) (additional citations omitted) (explaining "per se violations of § 1 of the Sherman Act are limited to a very small class of antitrust practices whose character is well understood and that almost always harm competition.").

Plaintiff does not bring separate counts for each theory of relief (rule of reason or per se) under Section One; instead, in count I, it mashes all theories together and hedges[10], alleging defendants' conduct should be treated as a per se violation of

---

[10] Rule 8(a)(2) requires a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Complaints that do not comply with Rule 8(a)(2) "are often disparagingly referred to as 'shotgun pleadings.'" *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1320 (11th Cir. 2015); *see also Barmapov v. Amuial*, 986 F.3d 1321, 1324 (11th Cir. 2021) (discussing shotgun pleadings). A shotgun pleading fails "to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Weiland*, 792 F.3d at 1323. There are four types of shotgun pleadings, and the amended complaint here falls into three of the four prohibited categories.

The first type of shotgun pleading, "contain[s] multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint." *Barmapov*, 986 F.3d at 1324-25 (quoting *Weiland*, 792 F.3d at 1321). Plaintiff here uses such a tactic, with each count repeating and realleging all paragraphs that came before it "as if fully set forth herein." *See* AC ¶¶ 69, 83, 93, 103, 116,126, 136, 149, 159.

antitrust law, but even if the Court applies the "rule-of-reason approach," defendants have unlawfully restrained trade. AC ¶ 74. Defendants argue counts I, II, IV and V fail because plaintiff has not alleged a horizontal boycott or hub-and-spoke conspiracy; that it has failed to establish a per se violation of the Sherman Act; and that even when its claims are assessed under the rule-of-reason framework, it fails to state a claim upon which relief can be granted. Doc. 46 at 29-35.

---

The second type is one "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action." *Barmapov*, 986 F.3d at 1325 (quoting *Weiland*, 792 F.3d at 1322). Here, plaintiff's amended complaint teems with vague and conclusory facts and repeated use of antitrust jargon such as "group boycott," "naked horizontal boycott," and "hub-and-spoke conspiracy," without sufficient explanation of their operation, meanings, or application here. The unorganized and frequent use of these terms and phrases made analysis here particularly challenging. I have undertaken my analysis, however, mindful of my obligation to construe the complaint broadly and in the light most favorable to plaintiff. *Levine v. World Fin. Network Nat'l Bank*, 437 F.3d 1118 (11th Cir. 2006).

The fourth type "assert[s] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against." *Barmapov*, 986 F.3d at 1325 (alteration in original) (quoting *Weiland*, 792 F.3d at 1323). The amended complaint here treats UWM and Ishbia as the same, and does not separately allege Ishbia committed individual counts. This practice is impermissible.

"A district court has the inherent authority to . . . dismiss a complaint on shotgun pleading grounds." *Vibe Miko, Inc. v. Shabanets*, 878 F.3d 1291, 1295 (11th Cir. 2018) (citing *Weiland*, 792 F.3d at 1320); *see also Lumley v. City of Dade City, Fla.*, 327 F.3d 1186, 1192 n.13 (11th Cir. 2003) ("When faced with [a shotgun] pleading, the district court, acting on its own initiative, [may] require a repleader"). Considering *Weiland*, and for the reasons stated in this recommendation, plaintiff's complaint appears to be a shotgun pleading. Should the Court allow plaintiff to file a second amended complaint, I suggest plaintiff separate its theories of relief under Section One of the Sherman Act into separate counts, so it is clear what facts it alleges support the individual theories it asserts.

25

The amended complaint is confusing and laden with buzz words. The Court must, therefore, undertake its own study of these specialized relationships and what must be pled at this stage for plaintiff to move forward.

A court's decision "to apply the *per se* rule turns on whether the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output . . . or instead one designed to 'increase economic efficiency and render markets more, rather than less competitive.'" *Nw Wholesale Stationers, Inc. v. Pac. Stationary and Printing Co.*, 472 U.S. 284, 289 (1985) (quoting *Broadcast Music, Inc. v. Columbia Broadcast. Sys., Inc.*, 441 U.S. 1, 19-20 (1979)). Generally, horizontal agreements are per se illegal, *In re Disposable Contact Lens Antitrust Litig.*, 215 F. Supp. 3d 1272, 1291 (M.D. Fla. 2016), as are group boycotts, "because, in the courts' experience, [these business relationships], virtually always stifle competition." *Jacobs*, 626 F.3d at 1334 (citing *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 607-08 (1972)). *See also State Oil*, 522 U.S. at 10 (additional quotations and citation omitted) ("*Per se* treatment is appropriate once experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it.").

The Supreme Court has cautioned, however, against adopting per se rules "where the economic impact of certain practices is not immediately obvious." *Dagher*, 547 U.S. at 5 (additional citations and quotations omitted). The courts, therefore, "should apply the per se label 'infrequently and with caution.'" *United Am. Corp. v.*

*Bitmain, Inc.*, 530 F. Supp. 3d 1241, 1272 (S.D. Fla. 2021) (quoting *Seagood Trading*

*Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1567 (11th Cir. 1991)).

Whether to apply the per se or rule-of-reason analysis is a question of law for a

trial court. *Procaps S.A. v. Patheon*, 36 F. Supp. 3d 1306, 1323 (S.D. Fla. 2014) (citing

*State Oil*, 522 U.S. 3 (1997)). The Court is therefore required to undertake some

analysis to determine the economic effect, if any, of the alleged restraint on trade.

*Cont'l T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 58-59 (1977) ("[D]eparture from the

rule-of-reason standard must be based upon demonstrable economic effect rather than

. . . upon formalistic line drawing."); *Bitmain*, 530 F. Supp. 3d at 1274 (finding plaintiff

failed to "make factual assertions that plausibly suggest[ed] [d]efendants, through bid

rigging or group boycott, committed a per se violation of § 1 of the Sherman Act."); *In*

*re Disposable Contact Lens Antitrust Litig.*, 215 F. Supp. 3d 127 (holding plaintiffs stated

a per se claim at the motion to dismiss stage); *but see In re Blue Cross Blue Shield Antitrust*

*Litig.*, 26 F. Supp. 3d 1172, 1187 (N.D. Ala. 2014) (denying a motion to dismiss a

Section One claim as it was "simply too early to assess which standard of review

should be applied to plaintiffs' allegations[,]" because even though the question

whether rule-of-reason or per se analysis applies is a question of law, "it is predicated

on a factual inquiry into the restraint's competitive effect."). With this framework in

mind, the Court undertakes its analysis of the amended complaint, doc. 32.

Plaintiff here alleges the restraint on trade is the group boycott, which took the

form of an ultimatum. The Eleventh Circuit has defined a group boycott as:

> [p]ressuring a party with whom one has a dispute by withholding, or enlisting others to withhold, patronage or services from the target. The ultimate target of the agreement can be either a competitor or a customer of some or all of the [boycotters] who is being denied access to desired goods or services because of a refusal to accede to particular terms set by some or all of the [boycotters].

*Quality Auto Painting*, 917 F.3d at 1271 (citations and quotation marks omitted). *See also In re Keurig Green Mountain Single Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 245 (S.D.N.Y 2019) (citation and quotation omitted) (explaining a "group boycott is an agreement to pressure a supplier or customer not to deal with another competitor."). Plaintiff argues it has sufficiently alleged its boycotting claim is a per se violation of Section One.

### i. Per se analysis

The Supreme Court has treated boycotts as per se unlawful, *see, e.g.*, *Klor's, Inc. v. Broadway Hale Stores, Inc.*, 359 U.S. 207 (1959). But it has limited "the *per se* rule in the boycott context to cases involving horizontal agreements among direct competitors." *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998) (detailing an example of group boycott "in the strongest sense: A group of competitors threatened to withhold business from third parties, unless those third parties would help them injure their directly competing rivals."). The Court reasoned that

> [t]he freedom to switch suppliers lies close to the heart of the competitive process that the antitrust laws seek to encourage. *Cf. Standard Oil*, 221 U.S. at 62, 31 S.Ct. 502 (noting "the freedom of the individual right to contract when not unduly or improperly exercised [is] the most efficient means for the prevention of monopoly"). At the same time, other laws, for example, "unfair competition" laws, business tort laws, or regulatory laws, provide

28

remedies for various "competitive practices thought to be offensive to proper standards of business morality." 3 P. Areeda & H. Hovenkamp, Antitrust Law ¶ 651d, p. 78 (1996). Thus, this Court has refused to apply *per se* reasoning in cases involving that kind of activity. *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 225, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993) ("Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws"); 3 Areeda & Hovenkamp, *supra,* ¶ 651d, at 80 ("[I]n the presence of substantial market power, some kinds of tortious behavior could anticompetitively create or sustain a monopoly, [but] it is wrong categorically to condemn such practices ... or categorically to excuse them").

*Id.* at 137 (alterations, punctuation and citations in original).

The gist of plaintiff's Section One claim is this: because UWM mandated its brokers sign the ultimatum and 93 percent of the brokers complied, it is per se illegal. This theory fails for three reasons. First, there is no plausible allegation of a horizontal agreement between UWM and its direct competitors; second, plaintiff does not provide sufficient factual material supporting its claim that UWM took part in a hub-and-spoke conspiracy with brokers, specifically that the brokers entered into any agreement with each other. Third, and finally, even if plaintiff plausibly alleged a horizontal agreement among direct competitors, the claim fails because per se treatment only applies to cases in which "the conspirators imposing the group boycott possess market power or exclusive access to an element essential to effective competition." Doc. 46 at 30 (quotations and citations omitted).

Labels and buzzwords notwithstanding, plaintiff has not pleaded factual matter suggesting defendants' ultimatum and accompanying behavior was a horizontal agreement between UWM and its direct competitors. UWM is a wholesale mortgage

lender; there is no allegation in the amended complaint that UWM conspired with one of its direct competitors, such as another wholesale lender, to push Rocket and Fairway out of the market. *Bitmain*, 530 F. Supp. 3d at 1273 (finding plaintiff had not pleaded a group boycott entitled to per se treatment because not all defendants were competitors).

Plaintiff argues its Section One claim is nevertheless entitled to per se treatment because it is a "horizontal hub-and-spoke conspiracy." Doc. 53 at 27. A hybrid type of agreement "dubbed a 'hub and spoke' conspiracy exists where an entity at one level of the market structure (the 'hub') coordinates an agreement among competitors at a different level (the 'spokes')." *Bitmain*, 530 F. Supp. 3d at 1255-56 (citations omitted). "A horizontal conspiracy either alone, or as part of a 'rimmed hub-and-spoke conspiracy,' defined as 'a collection of vertical agreements joined by horizontal agreements,' is a *per se* violation of § 1 of the Sherman Act." *In re Disposable Contact Lens Antitrust Litig.*, 215 F. Supp. 3d at 1294 (citing *In re Musical Instruments and Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 n.3 (2015)). Once a horizontal agreement, alone or as part of a hub-and-spoke conspiracy, is established, a court need not inquire further into the alleged wrongful act's effect on the market. *Id.* (citations omitted).

Plaintiff alleges that "by coercing mortgage brokers to boycott the wholesale lending business of its competitors, it created a classic hub-and-spoke horizontal conspiracy between itself and mortgage brokers who would otherwise compete with each other for new sources of wholesale lending[.]" AC ¶ 71. The amended complaint

alleges that "[m]any brokers in attendance at the [Facebook] event explicitly heeded Mr. Ishbia's clarion call to boycott UWM's closest competitors." *Id.* ¶ 12.

Plaintiff gives examples of broker comments during the virtual event. Some of those broker comments were: "'We are ALL IN' 'unstoppable together . . .' 'We are all family! Brokers are better when we work together'; 'Brokers are family. We don't go against our family'; 'All in . . . . with us or out'; 'You're either with the captain [UWM] or off the boat'; 'with us or against us'; and 'all for one and one for all.'" *Id.* (punctuation and errors in original). *See also id.* ¶ 33 (recounting broker comments allegedly "reflecting an agreement to boycott."). Plaintiff contends the boycott was "successful" because UWM announced that 93 percent of the brokers participated. *Id.* ¶ 13. Critically, plaintiff conclusorily alleges that "UWM further facilitated the boycott by providing forums for mortgage brokers to join the boycott in plain sight, assisting each other with terminating their relationships with Rocket and Fairway. UWM joined in facilitating these terminations." *Id.*

Plaintiff explains in the amended complaint the various parts of the alleged conspiracy this way:

> 49. As the hub, UWM hosted a live event, calling on mortgage brokers in attendance to boycott its competitors, and further facilitated that boycott by assisting brokers in terminating their relationships with Rocket and Fairway. UWM coerced and enforced the boycott by asking the boycotting brokers to sign the addendum that would penalize brokers that continued to do business with Rocket and Fairway.

> 50. Mortgage brokers, as the spokes, joined the boycott in plain sight. *Their concerted actions formed the rim of the conspiracy*. The brokers' agreements to participate in the boycott immediately

31

> restructured the market by preventing mortgage brokers from conducting business in which they submitted loan applications to UWM, Rocket and Fairway on behalf of their clients.

*Id.* ¶¶ 49-50 (emphasis added).

An agreement under Section One of the Sherman Act is a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (quotations and citations omitted). "The critical issue for establishing a *per se* violation with the hub and spoke system is how the spokes are connected to each other." *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 436 (6th Cir. 2008).

Plaintiff's allegation of a per se violation based on a hub-and-spoke conspiracy fails because there are not enough facts in the amended complaint to plausibly suggest that the brokers agreed among themselves to boycott Rocket and Fairway. Put differently, plaintiff does not plausibly allege any horizontal agreement between each spoke (the brokers); only a hub (UWM) and vertical agreements between it and each spoke (the brokers). There are no factual allegations of any agreement among the brokers. *See* doc. 46 at 32-33. The wheel, in antitrust terms, has no rim, and a rimless wheel does not amount to a per se restraint-of-trade under Section One. The Ninth Circuit explained the centrality of a horizontal agreement between vertical members of the conspiracy this way: "a rimless hub-and spoke conspiracy is not a hub-and-spoke conspiracy at all (for what is wheel without a rim?); it is a collection of purely vertical agreements." *In re Musical Instruments and Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 n.3 (9th Cir. 2015) (citation omitted).

As alleged, independent expressions of enthusiasm and encouragement among brokers observing Ishbia's speech and conclusory allegations that UWM "provid[ed] forums" or "joined in facilitating these terminations" are not enough to plausibly suggest "concerted actions" or an agreement among the brokers sufficient to form the rim of a conspiracy. *See In re. Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 329-30 (3d Cir. 2010) (rejecting the plaintiff's attempt to infer a horizontal agreement from information sharing between the spokes and upholding the district court's refusal to find a per se hub-and-spoke conspiracy when the plaintiff established no agreement between the spokes). Nor is it sufficient that the brokers knew they were all accepting UWM's ultimatum. *In re EpiPen Direct Purchaser Litig.*, No. 20-cv-0827 (ECT/JFD), 2022 WL 101770, at *7 (D. Minn. Apr. 5, 2022) (citations and quotations omitted) (explaining the vertical spokes' knowledge of the other vertical spokes' deals with the hub was insufficient to establish an agreement under Section One, and so its hub-and-spoke conspiracy failed).[11]

Even if plaintiff had sufficiently alleged a horizontal agreement between direct competitors (either between UWM and competing wholesale residential mortgage lender, or as part of a (rimmed) hub-and-spoke conspiracy), I find its Section One claim

---

[11] I do not, however, imply that a rimless hub-and-scope conspiracy may never restrain trade. *In re Musical Instruments and Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 n.3 (9th Cir. 2015). Rather, it is the mode of analysis affected by a lack of horizontal agreement. "One key difference between a rimless hub-and-spoke conspiracy (*i.e.*, a collection of purely vertical agreements) and a rimmed hub-and-spoke conspiracy (*i.e.*, a collection of vertical agreements joined by horizontal agreements): courts analyze vertical agreements under the rule of reason, . . . whereas horizontal agreements are violations per se." *Id.* (citations omitted).

is still not entitled to per se treatment because plaintiff has not plausibly alleged UWM and the mortgage brokers it conspired with wield "market power or exclusive access to an element essential to effective competition." *Nw Wholesale*, 472 U.S. at 295 (citations omitted).

Plaintiff argues coercive acts, like ultimatums by customers or distributors to boycott a competing supplier "have long been held to constitute a horizontal, concerted refusal to deal,[12] which justified per se illegality." Doc. 53 at 25 (citation omitted). Only in specific contexts not applicable here, plaintiff argues, does a court require showing market conditions. *Id.* I disagree.

In *Northwest Wholesale*, the defendant expelled a competitor from a wholesale cooperative. The Supreme Court faced the question of whether a rule-of-reason or per se analysis should apply. 472 U.S. at 297. The Court rejected per se treatment because the plaintiff had not made a preliminary showing the expulsion was "characteristically" likely "to result in predominately anticompetitive effects." *Id.* at 296. Put another way, "conduct is unreasonable *per se* when it 'always or almost always tends to restrict competition and decrease output.'" *Retina Assocs., P.A. v. S. Baptist Hosp. of Fla., Inc.*, 105 F.3d 1376, 1381 (11th Cir. 1997) (quoting *Broadcast Music, Inc. v. Columbia Broad. Sys.*, 105 F.3d 1376, 1381 (11th Cir. 1997)). *See also F.T.C. v. Ind. Fed. of Dentists*, 47 U.S. 447, 458-59 (1986) (holding that the policy of the defendants was a group boycott; nevertheless, the Supreme Court did not invoke the per se rule, because

---

[12] "Group boycotts" are also called "concerted refusals to deal."

it was not a case in which "firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor . . . .").

Applications of "the *per se* approach have generally involved joint efforts by a firm or firms to disadvantage competitors by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle." *Nw Wholesale*, 472 U.S. at 294 (citations and quotations omitted). The Court explained that in cases where the per se rule was applied, "the boycott often cut off access to a supply, facility, or market necessary to enable the boycotted firm to compete . . . and frequently the boycotting firms possessed a dominant position in the relevant market." *Id.* (citations omitted). Critically, the Court highlighted that "not every cooperative activity involving a restraint or exclusion will share with the *per se* forbidden boycotts the likelihood of predominately anticompetitive consequences." *Id.* at 295. "Unless the cooperative possesses market power or exclusive access to an element essential to effective competition, the conclusion that expulsion is virtually always likely to have an anticompetitive effect is not warranted." *Id.* (citations omitted).

Plaintiff argues *Retina* and *Northwest Wholesale's* holdings are limited; that the requirement of a "preliminary examination of market conditions surrounding the alleged restraint" before applying a per se rule applies only when a "wholesale cooperative or a professional association where expulsion for violation of a rule is expected[.]" Doc. 33 at 30 (additional citations omitted). I disagree. The holding of *Northwest Wholesale* is not limited to any particular organization, such as cooperatives

35

and associations, because in its decision, the Court "engaged in a[n] explicit and detailed survey of the broad classes of cases that comprise the 'group boycott category.'" *Victory Int'l (USA) Inc. v. Perry Ellis Int'l, Inc.*, No. 08-20395-Civ, 2008 WL 11468225, at \*6 (S.D. Fla. June 12, 2008) (citing *Nw Wholesale*, 472 U.S. at 293-94).

Upon review of the amended complaint, it is not facially apparent, nor characteristically likely that the anticompetitive conduct alleged here cut off consumer or broker access to the wholesale mortgage market. Plaintiff has not plausibly pled UWM's market dominance, or that plaintiff's access to certain essential supplies (wholesale mortgages) needed to compete was cut off. *Nw Wholesale*, 472 U.S. at 295. Additionally, it is not facially apparent that an ultimatum of this nature in the wholesale mortgage market "tends to restrict competition and decrease output." *Retina Assocs.*, 105 F.3d at 1381 (citation and quotations omitted).

The amended complaint fails to plausibly allege UWM possessed a dominant position in the marketplace at the time of the ultimatum or after 93 percent of its mortgage brokers signed the addendum promising not to do business with Rocket or Fairway. "[T]he principal judicial device for measuring actual or potential market power remains market share[.]" *U.S. Anchor Mfg. v. Rule Indus., Inc.*, 7 F.3d 986, 994 (11th Cir. 1993). The Court assumes, without deciding, that the market here is the wholesale lending market, not the mortgage lending market as a whole. *See* AC ¶ 3 ("Within the market for residential mortgage lending in the United States, the relevant

sub-market for this case is the market for wholesale lending for mortgages sold through mortgage brokers.").[13]

Plaintiff alleges UWM has about 34 percent market share of the wholesale lending channel, and that 93 percent of brokers who were given the addendum agreed to it. AC ¶¶ 6, 96. Plaintiff does not plead or estimate, however, what percentage of the brokers in the wholesale market as a whole "joined the boycott." *See, e.g.*, AC ¶ 13. Thus, for example, the plaintiff does not plead what the effect of the boycott was vis-à-vis the relevant market. "The relevant market is defined by both a product and a geographic dimension." *Spectrofuge Corp. v. Beckman Instruments, Inc.,* 575 F.2d 256, 276 (5th Cir. 1978). Nor does it allege that UWM possessed the market power in the relevant market (before or after the ultimatum). The Court acknowledges that anticompetitive effect is a fact-intensive inquiry developed in discovery, doc. 53 at 36; the amended complaint, however, does not allege sufficient facts, which could be developed further in discovery, that UWM wielded actual market power or exclusive access.

The Eleventh Circuit has also suggested that a plaintiff may establish entitlement to a per se rule if "prior cases have shown that a certain practice" regularly

---

[13] I do so because this assumption follows my duty to view the allegations in the light most favorable to plaintiff. *See, e.g.*, AC ¶ 6 (alleging that as of March 31, 2020, "mortgage lending originating through independent brokers [like plaintiff] controlled [only] 15.8 percent of residential loan originations in the United States[.])" "Many antitrust cases turn on the precise definition of this market, as defendants contest whether they possess market power or whether the restraint at issue affected the market as a whole." *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.,* 376 F.3d 1065, 1074 (11th Cir. 2004).

poses anticompetitive consequences, "a deleterious effect on the market will be presumed[,] and no detailed market analysis is required." *Retina Assocs.*, 105 F.3d at 1381. *See, e.g.*, *Pierson v. Orlando Reg'l Healthcare Sys., Inc.*, 619 F. Supp. 2d 1260, 1278 (M.D. Fla. 2009) (noting that where plaintiff could not cite a case in which the alleged anticompetitive conduct was a per se Section One violation, it had to "rely on the rule of reason" to set forth a Section One violation.). Plaintiff has pointed to no historical comparison, no case on all fours with the group boycott alleged here, when a court analyzed the case under the per se rubric.

I respectfully recommend counts I and IV be dismissed without prejudice because plaintiff failed to plausibly allege defendants committed a per se violation.

### ii. Rule-of-Reason Analysis

"Restraints that are not unreasonable *per se* are judged under the rule of reason." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018). The Supreme Court explained that "[t]he rule of reason requires courts to conduct a fact-specific assessment of 'market power and market structure . . . to assess the restraint's actual effect' on competition." *Id.* (citations and quotations omitted) *See also Dagher*, 547 U.S. at 5 (explaining that whether the restraint is an undue burden presumptively turns on a rule-of-reason analysis). The Supreme Court has outlined a three-step, burden-shifting analysis to determine whether a particular restraint violates the rule of reason. *Am. Express Co.*, 138 S. Ct. at 2284.

Under this approach, a plaintiff "has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in

the relevant market." *Id.* (citations omitted). If a plaintiff makes such a showing, the burden shifts back to the defendant to show "a procompetitive rationale for the restraint." *Id.* (citations omitted). "If a defendant makes that showing, then the burden shifts back to plaintiff to demonstrate that the competitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.*

These steps are not to be applied mechanically or without thought; rather, "[t]he whole point of the rule of reason is to furnish 'an enquiry meet for the case, looking to the circumstances, details and logic of a restraint' to ensure that it duly harms competition before a court declares it unlawful." *Nat'l Collegiate Athletic Assoc. v. Alston*, 141 S. Ct. 2141, 2160 (2021) (citing *Ca. Dental Assn v. FTC*, 526 U.S. 756, 781 (1999)).

To fulfill step one—showing an anticompetitive effect on the market—plaintiff may either show 1) "the potential for genuine adverse effects on competition;" or 2) that the "behavior had an actual detrimental effect on competition." *Levine v. Cent. Fla. Med. Affiliates*, 72 F.3d 1538, 1551 (11th Cir. 1996) (citations and additional quotations omitted). Plaintiff can meet this initial burden with direct or indirect evidence. *American Express Co.*, 138 S. Ct. at 2284. "Direct evidence of anticompetitive effects would be proof of actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality in the relevant market . . . [i]ndirect evidence would be proof of market power plus some evidence that the challenged restraint harms competition." *Id.* (citations and quotations omitted).

Upon review of the amended complaint and plaintiff's response to the motion to dismiss, it is clear plaintiff is proceeding on the theory that defendants' behavior had

the potential for adverse effects on competition; *see, e.g.*, doc. 53 at 35 (citing AC ¶ 66) (arguing it is clear from the ultimatum and the contract addendum that the boycott of independent brokers was "designed to shut out competition, which will harm customers and the wholesale market.").

To proceed on the theory that anticompetitive conduct has the potential for "genuine adverse effects on competition," plaintiff is required "to define the relevant market and establish defendants possessed power in that market." *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'n.*, 376 F.3d 1065, 1072-73 (11th Cir. 2004) (citation and quotations omitted). For the reasons discussed above while analyzing the anticompetitive effect of UWM's conduct, plaintiff has not alleged sufficient factual detail to support its claim that the alleged unlawful behavior—the ultimatum—had the potential for genuine adverse effects on competition. *Id.* at 1073-74 (explaining damage to a specific competitor may also damage competition in general when a plaintiff draws that implication with specific factual allegations).

Further, the amended complaint does not offer a "clear picture" of UWM's total market power; nor has plaintiff plausibly connected the ultimatum to possible harm to competition. *Appleton v. Intergraph Corp.*, 627 F. Supp. 2d 1342, 1355 (M.D. Ga. 2008). The amended complaint describes defendants' wrongful conduct directed at Rocket and Fairway, via the ultimatum; but fails to allege a sufficient link between the ultimatum and harm to competition within the wholesale retail mortgage market. *Id.*

I respectfully recommend counts I and IV be dismissed without prejudice because plaintiff failed to plausibly allege defendants committed a rule-of-reason violation. *Id.*

### B. Unlawful Steering, Section One of the Sherman Act

In count II, plaintiff alleges defendants, using the ultimatum and addendum, unlawfully restrained trade by inducing mortgage brokers in the wholesale mortgage market to steer their clients "away from what are often-times better-suited and/or lower-priced mortgage loan products offered by [Fairway and Rocket] and/or forcing and coercing mortgage brokers in the wholesale lending market to steer their clients to often-times ill-suited and/or higher-priced mortgage loan products offered by UWM." AC ¶ 84. This violation is based on the same conduct addressed above in the Court's analysis of the unlawful boycott claim and will not be repeated here.

Defendants proffer, and plaintiff does not contradict, that steering is not a separate claim from boycott, but "a description sometimes applied to contract provisions challenged as unreasonable restraints under Section [One]." Docs. 46 at 40-41, 53 at 36. *See Quality Auto Painting*, 917 F.3d at 1271 (analyzing steering and boycott allegations together where plaintiffs alleged insurance companies engaged in steering by unlawfully discouraging insureds from using a certain repair shop by using misrepresentations and other deceitful methods.). Essentially, count II is a re-allegation of unlawful restraint on trade, *see* section A. Because the same analysis applicable to counts I and IV apply here, I recommend that counts II and V be dismissed without prejudice.

41

## C. Attempted Monopolization, Section Two of the Sherman Act

In count III, plaintiff sues under Section Two of the Sherman Act, for attempted monopoly. That section makes it a crime to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations[.]" 15 U.S.C. § 2. "This provision covers behavior by a single business as well as coordinated action taken by several businesses." *Spanish Broad. Sys.*, 376 F.3d at 1074 (citing 15 U.S.C. § 2). A claim for attempted monopolization must establish "three distinct elements: '(1) the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.'" *Id.* (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)). "Monopoly power is 'the power to raise prices to supra-competitive levels or . . . the power to exclude competition in the relevant market either by restricting entry of new competitors or by driving existing competitors out of the market.'" *U.S. Anchor Mfg.*, 7 F.3d at 994 (quoting *Am. Key Corp. v. Cole Nat'l Corp.*, 762 F.2d 1569, 1581 (11th Cir. 1985)).

A claim brought under Section Two, like claims brought under Section One "require[s] harm to competition that must occur within a 'relevant,' that is, a distinct market, with a specific set of geographical boundaries and a narrow delineation of the products at issue." *Spanish Broad. Sys.*, 376 F.3d at 1074 (citing *U.S. Anchor Mfg.*, 7 F.3d at 995). For a Section One claim, the "relevant market" must be harmed by an alleged unreasonable restraint on trade; to bring a Section Two claim, however, defendants

42

"must possess enough power or potential power in this relevant market [to] harm competition." *Id.* (citing *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1293-94 (11th Cir. 2004)).

Plaintiff alleges there is a "dangerous probability UWM will monopolize the wholesale mortgage market" because of its ultimatum and related overt acts. AC ¶ 96. Plaintiff states UWM has a 34 percent market share, which is currently the largest share of the wholesale mortgage market, AC ¶ 96; and "[p]rior to the illegal conduct alleged herein, Rocket had the second-largest share of the market, and Fairway had the eighth-largest share of the market. Collectively, UWM's illegal conduct has been designed to eliminate over 50 percent of the competition in the wholesale lending market." AC ¶ 96.

Again, as in the Section One analysis, the Court assumes, without deciding, that the relevant market is the wholesale lending market; still, plaintiff has not pleaded facts plausibly suggesting defendants possessed enough market power to pose a danger of monopolization. A "dangerous probability of success arises when the defendant comes close to achieving monopoly power in the relevant market." *Gulf States Reorg. Grp., Inc. v. Nucor*, 721 F.3d 1281, 1285 (11th Cir. 2013) (citing *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1555 (11th Cir. 1996)).

Put another way, plaintiff has the burden to show that, as result of the wrongful conduct, there is a dangerous probability a monopoly will exist or already exists. A 34 percent market share does not plausibly suggest that UWM has come close to achieving monopoly power in the relevant market. *See U.S. Anchor Mfg.*, 7 F.3d at 1001

(holding that because the defendant "possessed less than 50 percent of the market at the time the alleged predation began and throughout the time when it was alleged to have continued, there was no dangerous probability of success . . . as a matter of law."); *Paycargo, LLC v. CargoSpring, LLC*, No. 3:19-cv-85-TCB, 2019 WL 5793113, at *5 (N.D. Ga. Nov. 4, 2019) (collecting cases explaining that even when a plaintiff pleads a defendant has at least 50 percent market share, they must also "show that new rivals are barred from entering the market."); *Moecker v. Honeywell Intern., Inc.*, 144 F. Supp. 2d 1291, 1308 (M.D. Fla. 2001) (citations and quotations omitted) (explaining that "[a]lthough a high market share . . . may ordinarily raise an inference of monopoly power, it will not do so in a market with low entry barriers or other evidence of a defendant's ability to control process or exclude competitors.").

Plaintiff's conclusory allegations that before the offending conduct, Rocket and Fairway held the second and eighth largest share of the market and therefore defendants' illegal conduct sought to eliminate 50 percent of its competition are insufficient to plead market share. "There can be no 'dangerous probability of success' [under Section Two of the Sherman Act] if the defendant 'was never able to maintain a majority position in the market.'" *Gulf States Reorg. Grp., Inc. v. Nucor*, 822 F. Supp. 2d 1201, 1237 (N.D. Ala. 2011) (quoting *U.S. Anchor Mfg.*, 7 F.3d at 1001). Because I find plaintiff has failed to plead UWM has a dangerous probability of achieving monopoly power, I need not reach the question of whether plaintiff has sufficiently

pled "defendants engaged in predatory or anticompetitive conduct with a specific intent to monopolize[.]" *Spectrum Sports*, 506 U.S. at 456.[14]

I recommend that counts III and VI be dismissed without prejudice.

### D. Tortious Interference with Business Contracts and Prospective Advantage

In count VII, plaintiff brings a claim against UWM for tortious interference with business contracts and prospective advantage, presumably under Florida law, though plaintiff does not specify.

Plaintiff's theory is as follows: plaintiff "had and w[as] likely to maintain business contracts and/or prospective economic advantage with borrowers desiring mortgage loans from [Fairway and/or Rocket]." AC ¶ 137. Defendants knew of these relationships, and interfered with them by making false statements, coercing brokers to engage in a boycott, and "enforcing a coercive contract of adhesion," which caused an assenting broker to either terminate his or her relationship with UWM or be precluded from offering loans by Rocket and Fairway. These acts aimed to and did

---

[14]. The Eleventh Circuit explained that "injury to a competitor need not always result in injury to competition. The use of unfair means resulting in the substitution of one competitor for another without more does not violate the antitrust laws." *Spanish Broad. Sys.*, 376 F.3d at 1076 (citing *Mfg. Research Corp. v. Greenlee Tool Co.,* 693 F.2d 1037, 1043 (11th Cir. 1982)).

Even if the ultimatum qualified as "unfair means," *id.*, it is not clear from the amended complaint that defendants' actions had or could have an anticompetitive effect to the market or competition in general. AC ¶¶ 11-12. It appears, rather, that plaintiff has "merely alleged an attempt to eliminate two firms from the market rather than injury to competition."

interfere with plaintiff's business relationships. Plaintiff relied on the representations; and as a result, plaintiff was harmed by "the reduction in choice, lost customers and commissions" and was "injured in [its] business and property with millions of dollars in losses." AC ¶¶ 136-145.

The elements of a claim of tortious interference with a business relationship under Florida law are: "(1) the existence of a business relationship, not necessarily evidenced by an enforceable contract, under which the plaintiff has legal rights; (2) the defendant's knowledge of the relationship; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of that interference." *Palm Beach Cnty. Health Care Dist. v. Prof'l Med. Educ., Inc.*, 13 So.3d 1090, 1094 (Fla. 4th DCA 2009) (citation omitted).

Defendants argue count VII must be dismissed for four reasons: 1) the claim is facially implausible; 2) the amended complaint identifies no actual business contract or advantage breached or interrupted because of the contract; 3) plaintiff cannot plead a viable theory of damages; and 4) plaintiff failed to allege facts demonstrating defendants had the requisite intent to violate Florida law. Doc. 46 at 45-48.

This count, as pleaded, must be dismissed. The business contract and prospective economic advantage that serves[15] as the basis for the claim is the relationship between plaintiff and borrowers desiring mortgage loans from Fairway or

---

[15] As I have explained, plaintiff's theories of relief are difficult to parse out. I read count VII as based, at least in part, on the claim that defendants interfered with plaintiff's relationship with Rocket and Fairway. The count thus fails.

Rocket, AC ¶ 137; *not* the relationship between UWM and plaintiff. *Id.* ¶¶ 137-48. Plaintiff alleges that it retained contracts with Rocket and Fairway because it did not agree to the ultimatum, and thus the amended complaint identifies no business contract or prospective economic advantage interrupted by the ultimatum or boycott.

While a cause of action may lie for present or prospective customers, "[a]s a general rule, an action for tortious interference with a business relationship requires a business relationship evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered." *Ethan Allen, Inc. v. Georgetown Manor*, 647 So.2d 812, 815 (Fla. 1995) (citation omitted). *See also Int'l Serv. & Servs., Inc. v. Austral Insulated Prods., Inc.,* 262 F.3d 1152 (11th Cir. 2001). As noted above, the relationship alleged to have been disrupted is between plaintiff and borrowers desiring mortgage loans from Fairway and/or Rocket. AC ¶ 137.

Because the amended complaint does not allege that existing customers ended their business with plaintiff because of the unavailability of mortgages with Rocket and Fairway, plaintiff fails to allege an understanding or agreement not consummated because of UWM's action(s). *Compare* AC ¶ 46. *See, e.g.*, *Med. Sav. Ins. Co. v. HCA, Inc.*, No. 2:04cv156, 2005 WL 1528666, at *9 (M.D. Fla. June 24, 2005), *aff'd by* 186 F. App'x 919 (11th Cir. 2006) (explaining that because the complaint failed to allege existing customers were induced to breach their contracts, or that any breach occurred, there was no claim for tortious interference; a mere hope that its customers would renew could not sustain the claim).

I recommend count VII be dismissed without prejudice.

### F. FDUPTA Claim

In count VIII, plaintiff alleges defendants violated Florida's Deceptive and Unfair Trade Practices Act (FDUPTA), Fla. Stat. § 501.201. The FDUPTA prohibits all "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). To state a FDUPTA claim, plaintiffs must allege "(1) a deceptive act or unfair trade practice; (2) causation; and (3) actual damages." *Dolphin LLC v. WCI Cmty., Inc.*, 715 F.3d 1243, 1250 (11th Cir. 2013) (citing *Rollins, Inc. v. Butland*, 951 So.2d 860, 869 (Fla. 2d DCA 2006)).

In support of its claim under the FDUPTA, plaintiff claims the ultimatum restrained trade and attempted to create an illegal monopoly in the wholesale mortgage market. AC ¶ 154. Because the Court previously found the federal antitrust violations as alleged are insufficient, I need not reach the question of whether the acts as alleged violated the FDUPTA.[16] *See Hunter v. Bev Smith Ford*, LLC, No. 07-80665-CIV-RYSKAMP, 2008 WL 1925265, at *7 (S.D. Fla. Apr. 29, 2008) (dismissing FDUTPA claims based on violations of state and federal statutes that the court had considered and rejected); *JES Props., Inc. v. USA Equestrian, Inc.,* No. 802CV1585T24MAP, 2005

---

[16] The Court does not reach the question of whether plaintiff stated a claim for declaratory relief under count IX for the same reason.

WL 1126665, at *19, n.23 (M.D. Fla. May 9, 2005) ("Plaintiffs concede that their FDUPTA claims 'survive' or 'fall' with their antitrust claims.").[17]

**Recommendation**[18]

I respectfully **recommend**:

1. Defendants' Motion to Dismiss, doc. 46, be **denied in part and granted in part**, and the complaint **dismissed without prejudice**:

    a. Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) be **denied without prejudice**,

    b. Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2), **be granted**,

---

[17] I note, however, that I maintain some reservations as to whether plaintiff has sufficiently plead damages for the FDUPTA claim. *See Casa Dimitri Corp. v. Invicta Watch Co. of Am., Inc.*, 270 F. Supp. 3d 1340, 1352 (S.D. Fla. 2017) (citations and quotations omitted) (explaining the element of "actual damages" is a "term of art" that does not include "consequential damages;" and that "harm in the manner of competitive harm, diverted or lost sales, and harm to the goodwill and reputation" are consequential damages).

[18]"Within 14 days after being served with a copy of [a report and recommendation on a dispositive issue], a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2). "A party may respond to another party's objections within 14 days after being served with a copy." *Id.* A party's failure to serve and file specific objections to the proposed findings and recommendations alters the scope of review by the District Judge and the United States Court of Appeals for the Eleventh Circuit, including waiver of the right to challenge anything to which no specific objection was made. *See* Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1; Order (Doc. No. 3), No. 8:20-mc-100-SDM, entered October 29, 2020, at 6.

c.  Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) **be granted**, **on all counts**.

2.  The Court direct plaintiff to file a second amended complaint, if it so chooses, **within fourteen days** of the entry of an order on the motions.

**Entered** in Jacksonville, Florida, on July 27, 2022.

LAURA LOTHMAN LAMBERT
United States Magistrate Judge

c.
The Honorable Brian J. Davis
United States District Court, Middle District of Florida

Avi Benayoun, Esquire
Glenn E. Goldstein, Esquire
Stephanie Peral, Esquire
Joseph E. Parrish, Esquire
Robert H. Goodman, Esquire