UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

THE OKAVAGE GROUP, LLC
on behalf of itself and all others
similarly situated,

      Plaintiff,               Case No. 3:21-cv-448-BJD-LLL

v.                       Hon. Brian J. Davis

UNITED WHOLESALE       Magistrate Judge Laura Lothman
MORTGAGE, LLC and       Lambert
MATTHEW ISHBIA,
individually

      Defendants.

## **PLAINTIFFS' OBJECTIONS TO REPORT AND RECOMMENDATION ON MOTION TO DISMISS**

# **TABLE OF CONTENTS**

I.      OBJECTIONS ........................................................................1

II.     INTRODUCTION..................................................................1

III.    STANDARD OF REVIEW ..................................................... 2

IV.     STATEMENT OF ALLEGED FACTS ................................... 3

V.      THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
        IS CONTRARY TO LAW ...................................................... 6

        A.      The Magistrate Judge Improperly Dismissed Plaintiffs'
                Group Boycott Claim ................................................ 6

                1.      The FAC Plausibly Alleged A Horizontal Agreement
                        Between Brokers ............................................... 7

                        a.      Applicable Law....................................... 7

                        b.      The Conduct Here Plausibly Suggested An
                                Agreement............................................. 8

                        c.      The Role Of UWM Does Not Affect The *Per Se*
                                Illegal Nature of The Agreement...........................12

                        d.      The Magistrate Judge's Analysis Was Contrary
                                To Law ...................................................13

                2.      The Boycotters Possess Sufficient Power Under
                        *Northwest Wholesale Stationers* ....................................14

        B.      The FAC Plausibly Alleges An Unreasonable Restraint of
                Trade....................................................................17

        C.      The FAC States A Claim For Attempted Monopolization..........19

        D.      Mr. Ishbia Is Individually Liable For These Actions ................ 22

        E.      The Magistrate Judge's Recommendation With Regard To
                The Claimed Violations Of the FDUTPA Should Be
                Rejected ............................................................... 23

i

F.    This Court Has Personal Jurisdiction Over Mr. Ishbia ............ 23

VI.    CONCLUSION ...................................................................................... 25

44817482.24

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................... 2

*Bell Atlantic v. Twombly*,
   550 U.S. 544 (2007) ........................................................ 2, 8, 11

*Chicago Bridge & Iron Co. N.V. v. F.T.C.*,
   534 F.3d 410 (5th Cir. 2008) ................................................. 22

*Cliff Food Stores, Inc. v. Kroger, Inc.*,
   417 F.2d 203 (5th Cir. 1969) ................................................. 20

*Danielson v. Tropical Shipping & Constr. Co.*,
   2019 WL 13183885 (S.D. Fla. June 25, 2019) ......................... 22

*Delong Equip. Co. v. Washington Mills Abrasive Co.*,
   840 F.2d 843 (11th Cir. 1988) ............................................... 25

*DeLong Equip. Co. v. Washington Mills Abrasive Co.*,
   887 F.2d 1499 (11th Cir. 1989) ............................................... 8

*Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*,
   593 F.3d 1249 (11th Cir. 2010) ............................................. 24

*In re Disposable Contact Lens Antitrust Litigation*,
   215 F. Supp. 3d 1272 (M.D. Fla. 2016) ............................... 8, 11

*Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*,
   732 F.2d 480 (5th Cir. 1984) ................................................. 20

*Eastman Kodak Co. v. Image Technical Systems, Inc.*,
   504 U.S. 451 (1992) ............................................................... 15

*In re EpiPen Direct Purchaser Litigation*,
   No. 20-cv-0827, 2022 WL 1017770 (D. Minn. Apr. 5, 2022) ................. 13

*F.T.C. v. Indiana Fed'n of Dentists*,
   476 U.S. 447 (1986) ............................................................... 17

iii

*Fishman v. Estate of Wirtz,*
807 F.2d 520 (7th Cir. 1986) ................................................................. 18

*Fortner Enterprises, Inc. v. United States Steel Corp.,*
394 U.S. 495 (1969) ............................................................................... 16

*Gen. Chems., Inc. v. Exxon Chem. Co., USA,*
625 F.2d 1231 (5th Cir. 1980) ................................................................. 8

*Healthe, Inc. v. High Energy Ozone LLC,*
533 F. Supp. 3d 1120 (M.D. Fla. 2021) ................................................. 24

*In re Insurance Brokerage Antitrust Litigation,*
618 F.3d 300 (3d Cir. 2010) ....................................................9, 10, 12, 13

*In re Plywood Antitrust Litig.,*
655 F.2d 627 (5th Cir. 1981) ................................................................. 12

*In re Terazosin Hydrochloride,*
220 F.R.D. 672 (S.D. Fla. 2004) ............................................................ 16

*In re Text Messaging Antitrust Litig.,*
630 F.3d 622 (7th Cir. 2010) ................................................................... 7

*Kearney & Trecker Corp. v. Giddings & Lewis, Inc.,*
452 F.2d 579 (7th Cir. 1971) ................................................................. 15

*Klor's, Inc. v. Broadway-Hale Stores, Inc.,*
359 U.S. 207 (1959) ................................................................................. 6

*La Grasta v. First Union Securities, Inc.,*
358 F.3d 840 (11th Cir. 2004) ................................................................. 3

*Lorain Journal Co. v. United States,*
342 U.S. 143 (1951) ............................................................................... 19

*McGahee v. Northern Propane Gas Co.,*
858 F.2d 1487 (11th Cir. 1988) ............................................................. 22

*McWane, Inc. v. F.T.C.,*
783 F.3d 814 ......................................................................................... 16

*MM Steel L.P. v. JSW Steel (USA) Inc.,*
806 F.3d 835 (5th Cir. 2015) ................................................................. 10

iv

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
  465 U.S. 752 (1984) ............................................................... 3, 9

*Northern Pacific Railway Co. v. United States*,
  356 U.S. 1 (1958)......................................................................16

*Northwest Wholesale Stationers, Inc. v. Pacific Stationery &*
  *Printing Co.*,
  472 U.S. 284 (1985) .................................................................14

*Ohio v. Am. Express Co.*,
  138 S. Ct. 2274 (2018) ............................................................. 18

*Omni Healthcare, Inc. v. Health First, Inc.*,
  No. 6:13–cv–1509–Orl–37DAB, 2015 WL 275806 (M.D. Fla.
  Jan. 22, 2015) ........................................................................ 23

*Realcomp II, Ltd. v. Federal Trade Commission*,
  635 F.3d 815 (2011) ................................................................. 18

*Retina Associates PA v. Southern Baptist Hosp. of Florida Inc.*,
  105 F.3d 1376 (11th Cir. 1997).................................................16

*Tarrant Services Agency, Inc. v. American Standard, Inc.*,
  12 F.3d 609 (6th Cir. 1993).................................................... 20

*Toys "R" Us, Inc. v. Federal Trade Commission*,
  221 F.3d 928 (7th Cir. 2000)............................................. 10, 11

*U.S. Anchor Manufacturing v. Rule Industries, Inc.*,
  7 F.3d 986 (11th Cir. 1993) .............................................. 15, 17

*U.S. v. Visa USA, Inc.*,
  344 F.3d 229 (2d Cir. 2003)......................................................15

*United States v. H&R Block, Inc.*,
  833 F. Supp. 2d 36 (D.D.C. 2011) ........................................... 18

*United States v. Powell*,
  628 F.3d 1254 (11th Cir. 2010) ................................................. 2

*United States v. Wise*,
  370 U.S. 405 (1962).................................................................. 23

v

*White Motor Co. v. United States,*
   372 U.S. 253 (1963) ............................................................. 6

*Williamson Oil Co., Inc. v. Philip Morris USA,*
   346 F.3d 1287 (2003) ........................................................... 9

*Wilson P. Abraham Const. Corp. v. Texas Indus., Inc.,*
   604 F.2d 897 (5th Cir. 1979)............................................... 25

**STATUTES**

Florida Deceptive and Unfair Trade Practices Act ..................................... 23

Section 1 of the Sherman Act.............................................*passim*

Section 2 of the Sherman Act ..................................................................15

## I.  <u>OBJECTIONS</u>

The Okavage Group, LLC ("Okavage") hereby objects to the Report and Recommendation of Magistrate Judge Lambert (Doc. 61) ("Report") at 1b and 1c. *See* Report pp.49-50. Okavage specifically objects to the Magistrate Judge's conclusions that personal jurisdiction does not exist over Matthew Ishbia and that Counts I-VI and VIII fail to state a claim for relief. Okavage also objects to the Magistrate Judge's conclusion on Mr. Ishbia's personal liability. The basis for these objections is set forth below.

## II.  <u>INTRODUCTION</u>

This case challenges the actions by Defendants United Wholesale Mortgage, LLC ("UWM") and its CEO, Mr. Ishbia, resulting in a boycott of UWM's closest competitors, Rocket Pro TPO ("Rocket") and Fairway Independent Mortgage ("Fairway"), by (according to UWM) almost 10,000 mortgage brokers. The First Amended Complaint (Doc. 32) ("FAC") alleges that these actions were taken in order to prevent Fairway's and Rocket's competition with UWM.

This was an illegal boycott under the antitrust laws. It eliminated lower priced, higher quality alternatives, and effectively destroyed the role of the mortgage brokers as objective representatives of their customers, committed to find the best possible mortgage.

The Report's conclusions on personal jurisdiction, personal liability and Counts I-VI and VIII of the FAC should be rejected, because Magistrate Judge Lambert failed to adequately consider the factual allegations that addressed these claims. While Okavage plans to very shortly file a motion for leave to file a second amended complaint to supplement the factual allegations in the FAC, the FAC contains more than sufficient facts to state a claim.

## III.  <u>**STANDARD OF REVIEW**</u>

Where, as here, a party files an objection to the magistrate's findings on a dispositive motion, the Court must conduct a *de novo* review of the portions of a magistrate judge's recommendations to which the party objects. *United States v. Powell*, 628 F.3d 1254, 1256 (11th Cir. 2010).

The Supreme Court explained in *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007) that a conspiracy claim must allege "only enough facts to state a claim to relief that is plausible on its face." "Factual allegations must be enough to raise a right to relief above the speculative level." The test is whether there is a "reasonable expectation that discovery will reveal evidence of the illegal agreement…" *Id.* at 555-57.

"The plausibility standard is not akin to a *probability* requirement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added) (citing

2

*Twombly*, 550 U.S. at 556). The "choice between two reasonable interpretations" of documents and testimony is for the jury. *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984).

## IV.  **STATEMENT OF ALLEGED FACTS**

The following summarizes the facts alleged in the FAC and in the documents cited and thereby incorporated by reference. *La Grasta v. First Union Securities, Inc.*, 358 F.3d 840, 845 (11th Cir. 2004). Wholesale mortgage lenders offer loans through independent third parties, such as mortgage brokers. FAC ¶3. UWM, the largest wholesale mortgage lender in the United States, has an approximately 34% share of the wholesale mortgage lending market. *Id.* ¶6.

According to UWM, it has over 10,000 mortgage brokers under contract. *Id.* Mortgage brokers deal directly with consumers and help them select the most appropriate lender. *Id.* ¶3.

UWM's competition includes Rocket and Fairway. These firms also compete at "retail," providing products directly to consumers. *Id.* ¶¶7-8.

As of early 2021, UWM's leading position in the wholesale market was threatened. Just prior to the boycott, "Fairway Mortgage and Rocket Pro TPO expanded their market share ... including through innovative product offerings, better pricing and lower rates..." FAC ¶11.

In response, UWM's CEO, Matthew Ishbia, announced an ultimatum at a live meeting with brokers on UWM's Facebook page. UWM amended UWM's broker agreements by adding a requirement that the signatory would not submit loans to either Rocket or Fairway. Any breach would result in substantial penalties. *Id.* ¶13. Mr. Ishbia said specifically that "[i]f you work with them [Rocket or Fairway], you can't work with UWM anymore, effective immediately." Video cited ¶12 of FAC ("Video").[1] Okavage refused to agree to the ultimatum, and was terminated by UWM. *Id.* ¶46.

Mr. Ishbia stated that one purpose of the boycott related to Fairway's and Rocket's competition at retail. He stated that "[w]e don't need to fund Fairway Independent or Rocket Mortgage to try to put brokers out of business." Ex. A p.5. The FAC also alleges that UWM took its actions in order to "mitigate its acknowledged risk of losing market share in the wholesale mortgage lending channel...." FAC ¶12.

During the virtual meeting, there were significant communications between brokers in support of the boycott. These included the following statements relating to collective action by all brokers:

> One broker responded to Mr. Ishbia and his fellow brokers, saying: 'We are ALL IN' 'unstoppable together...' 'We are all family! Brokers are better when we work together'; 'Brokers are family. We don't go against our

---

[1] A transcribed copy is attached as Ex. A hereto.

> family'; 'All in....with us or out'; 'You're either with the captain [UWM] or off the boat'; 'with us or against us'; and 'all for one and one for all.'

*Id.* ¶12.

> 'Team Broker!'; Let's kill it fam--- you know it's going to be good'; BROKERS---WAKE UP!!! Stop sending files to the enemy! Protect your book of business' 'This is what we have been waiting for broker community': 'We are ALL IN' 'unstoppable together'; 'We are all family! 'Sign on the line that is dotted'; 'All in'; 'With us or out' 'You're either with the captain [UWM] or off the boat'; 'with us or against us' and 'all for one and one for all.'

*Id.* ¶33. UWM provided forums for mortgage brokers to assist each other with terminating their relationships with Rocket and Fairway. *Id.* ¶13.

UWM announced "93% of the brokers presented with the addendum agreed to join the boycott." *Id.* ¶13. Mr. Ishbia predicted on the video that Rocket and Fairway would lose 70%-90% of their business. Ex. A p.6.

The boycott harmed consumers by reducing their access to the lower price, innovative, higher quality products offered by Fairway and Rocket. *Id.* ¶34. UWM stated that it did not wish to provide the lowest priced mortgages. *Id.* ¶29. *See also* UWM Holdings Corporation Prospectus (cited and incorporated in the FAC ¶13), attached hereto as Ex. B p.74 ("Some of our competitors may have greater financial and other resources than we have [or] more operational flexibility in approving loans.").

The boycott also prevented brokers from performing their stated function of reviewing all available sources of lending and providing their

customers with the most suitable and lowest priced loans. This interfered with the normal functioning of the market. *Id.* ¶75.

UWM has had substantial market power. This is reflected in the fact that 93% of the brokers with whom it dealt agreed to accept its ultimatum, even though that deprived them of access to the lower priced, innovative lenders. *Id.* ¶85.

## V.    THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION IS CONTRARY TO LAW

### A.    The Magistrate Judge Improperly Dismissed Plaintiffs' Group Boycott Claim

The decision by almost 10,000 brokers to agree to refuse to deal with Rocket or Fairway was a blatantly anticompetitive act. Such concerted refusals to deal, called "group boycotts," have been condemned for decades as *per se* violations of the antitrust laws. *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212 (1959) ("Group boycotts, or concerted refusals by traders to deal with other traders, have long been held to be in the forbidden category."). The boycott of Fairway and Rocket was a "naked restraint of trade with no purpose except stifling competition." *White Motor Co. v. United States*, 372 U.S. 253, 263 (1963). Indeed, Mr. Ishbia described the purpose of the boycott as cutting off Rocket and Fairway because of their retail competition with mortgage brokers.

44817482.24

The Magistrate Judge recommended dismissal of the *per se* group boycott claim (Counts I, IV and V) for two reasons. First, she did not find a basis for concluding that Plaintiff had plausibly alleged an agreement *among the brokers* to refuse to deal with Rocket and Fairway. Okavage does not contest the Magistrate Judge's conclusion that in order to plead a *per se* "hub and spoke" boycott conspiracy, with UWM as the hub and the individual brokers as the spokes, *see* Report at 32, it is necessary to also alleges a "rim," i.e. an agreement between the brokers. But the FAC did plausibly allege such a "horizontal" agreement.

Second, the Magistrate Judge concluded that the FAC did not allege facts sufficient to suggest that "UWM and the mortgage brokers it conspired with" had market power. Report pp.33-34. This conclusion was erroneous.

### 1.  The FAC Plausibly Alleged A Horizontal Agreement Between Brokers

#### a.  Applicable Law

The requirement that a complaint need only plausibly (not probably) indicate a conspiracy is especially appropriate in antitrust conspiracy cases, where the proof is largely in the hands of the alleged conspirators. *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628–29 (7th Cir. 2010) (at the complaint stage, "plaintiffs have conducted no discovery" which "may reveal the smoking gun"). As this Court has explained, "[e]ven a successful antitrust plaintiff

44817482.24

will seldom be able to offer a direct evidence of a conspiracy and such evidence is not a requirement." *Gen. Chems., Inc. v. Exxon Chem. Co., USA,* 625 F.2d 1231, 1233 (5th Cir. 1980). As a result, "[c]onspiracies ... must almost always be proven by inferences that may fairly be drawn from the behavior of the alleged conspirators." *DeLong Equip. Co. v. Washington Mills Abrasive Co.*, 887 F.2d 1499, 1515 (11th Cir. 1989).

At the pleading stage, to be plausible a complaint must only provide "*some* factual context suggesting [that the parties reached an] agreement." *Twombly,* 550 U.S. at 549 (emphasis added).

### b.   <u>The Conduct Here Plausibly Suggested An Agreement</u>

The factual allegations here far exceeded these requirements. First, there was parallel conduct, the signing of an agreement by more than 9,000 brokers to forego relationships with two low price lenders who had been gaining share. As this Court stated in *In re Disposable Contact Lens Antitrust Litigation*, 215 F. Supp. 3d 1272, 1289 (M.D. Fla. 2016), an allegation of parallel conduct "gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility..."

Here, there was such "further factual enhancement." The brokers' communications with each other, the fact that thousands of brokers

dramatically changed their behavior, and the fact that such actions were against the brokers' interests unless they acted together, are all "plus factors" which help make the conspiracy allegations more than plausible.

As described above, the acquiescence in UWM's ultimatum did not simply involve communications between UWM and individual brokers. The ultimatum was proposed at a virtual meeting where the brokers communicated with each other. It is hard to imagine statements that could more clearly evidence a conspiracy. "Unstoppable together," "brokers are better when we work together," "brokers are family. We don't go against our family," "All in... with us or out," are all statements indicating that the brokers intended to agree on a common course of action rather than individual decisions. This more than plausibly suggests "a conscious commitment to a common scheme," all that is required under the antitrust laws. *Monsanto*, 465 U.S. at 764 (quotations and citations omitted). *Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287, 1299 n.10 (2003) ("meeting of the minds need not be formal").

The Third Circuit in *In re Insurance Brokerage Antitrust Litigation*, 618 F.3d 300, 322 (3d Cir. 2010) relied upon by the Magistrate Judge, explained that "evidence implying a traditional conspiracy" requires "'proof that the defendants got together and exchanged assurances of common

action or otherwise adopted a common plan.'" Here, the statements regarding the parties' being "all in," "unstoppable together," "all family" and "all for one" are certainly "assurances of common action" and "a common plan." *Id.* And it was quite clear, based on Mr. Ishbia's statements referring to depriving Fairway and Rocket of 70%-90% of their business, that what was contemplated was an offer that would be accepted by most or all of the brokers. The allegations in ¶12 of the FAC make clear that that is exactly how the brokers understood it. The facts "plausibly suggest[ed] 'a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.'" 618 F.3d at 331.

The "further factual enhancement" also arises from the fact that the brokers who agreed to the ultimatum acted against their individual self-interests. Prior to UWM's meeting with its brokers, Fairway and Rocket (the lower priced, higher quality alternatives) were gaining wholesale share, necessarily implying that they were gaining additional business from mortgage brokers. After the meeting, there was an abrupt "about face"; 93% of the brokers agreed not to deal any more with these attractive alternatives. This is circumstantial evidence of conspiracy, *MM Steel L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 844 (5th Cir. 2015). In *Toys "R" Us, Inc. v. Federal Trade Commission*, 221 F.3d 928 (7th Cir. 2000), the Seventh Circuit found

10

a conspiracy based in part on evidence that the manufacturers "were specifically interested in cultivating a relationship with the warehouse clubs and increasing sales there. Thus, the sudden adoption of measures under which they decreased sales to the clubs ran against their independent economic self-interest." *Id.*

The Supreme Court in *Twombly* explained that parallel behavior "that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties'" would support a conspiracy claim. 550 U.S. at 557 n.4. Here, the parallel behavior certainly did not result from chance. It was a result of UWM's ultimatum, and the collective action of the brokers to follow that ultimatum. It was certainly not simply the result of "independent responses to common stimuli"; the brokers did not act independently. They talked at length among each other. Nor did it involve "mere inter-dependence unaided by an advance understanding." The comments by brokers to each other described in the FAC certainly created an understanding as to what the "team" would do.

Notwithstanding UWM's pressure, the conduct that occurred here also would have been contrary to the individual brokers' self-interests if not undertaken by the brokers as a whole. *See In re Disposable Contact Lens*

*Antitrust Litigation*, 215 F. Supp. 3d at 1296 (a new pricing policy would only make sense if a manufacturer "can be confident that other manufacturers will be taking similar action, and won't be taking a competitive advantage."). Here, if an individual broker deprived itself of the availability of alternative loans from Fairway and Rocket it could expect to lose business to other brokers who offered these alternatives, unless the brokers were "all in." FAC ¶12. As the brokers also said, they are "unstoppable together." *Id.* Quite clearly, the implication was that they were *not* unstoppable individually, and therefore collective action was necessary.

### c.   The Role Of UWM Does Not Affect The *Per Se* Illegal Nature of The Agreement

As the "hub and spoke" cases mentioned by the Magistrate Judge explain, an unlawful horizontal conspiracy may arise from the coordinating and facilitating activities of a powerful firm such as UWM. "It is 'enough that, knowing that concerted action was contemplated and invited, the (defendants) gave their adherence to the scheme and participated in it.'" *In re Plywood Antitrust Litig.*, 655 F.2d 627, 634 (5th Cir. 1981). *See also Insurance Brokerage*, 618 F.3d at 344 ("the conspiracy was instigated, coordinated and policed by Marsh, but this does not belie the alleged horizontal agreement. On the contrary, Marsh's influence could create a powerful incentive for exactly such an agreement..."). Similarly, here, the fact

44817482.24

that UWM instigated and enforced the agreement does not belie the fact that the brokers understood that they needed to work together, and did so.

### d.   The Magistrate Judge's Analysis Was Contrary To Law

The Magistrate's rejection of these allegations relies on two cases, *In re Insurance Brokerage*, and *In re EpiPen Direct Purchaser Litigation*, No. 20-cv-0827 (ECT/JFD), 2022 WL 1017770 (D. Minn. Apr. 5, 2022). Neither supports her conclusion. As described above, the statements of the legal standard in *Insurance Brokerage* are more than plausibly met by the allegations here. Moreover, the alleged facts in *In re Insurance Brokerage* were far different than in this case; they involved only separate, compartmentalized discussions between the brokers (the hubs) and the insurers (the spokes). The Third Circuit noted that "there are no allegations that any insurer ever horizontally disclosed to its competitors the details of its vertical agreement with a broker." 618 F.3d at 329. Here, to the contrary, the agreement was provided publically to all the mortgage brokers in a forum in which the brokers specifically discussed their common plan. *In re EpiPen*, simply says "[t]he mere knowledge of the existence of other... agreements... does not constitute an agreement under § 1." *Id.* at *7. But the discussion alleged here is far more than "mere knowledge."

13

The Magistrate Judge's assertion that the broker's discussions were only "independent expressions of enthusiasm and encouragement" was unfounded. Statements such as "we are ALL IN," "unstoppable together," "we are all family," "all for one and one for all," FAC ¶12, at the very least plausibly suggest collective action.

### 2. The Boycotters Possess Sufficient Power Under *Northwest Wholesale Stationers*

The Magistrate Judge also concluded that there were not sufficient allegations of market power to satisfy the requirement set forth by the Supreme Court in *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284 (1985). But she failed to consider the evidence on the video, and failed to consider evidence of UWM's market power aside from its market share.

The Supreme Court explained in *Northwest Wholesale Stationers* that in many *per se* boycotts, "the boycott often cut off access to a supply, facility or market necessary to enable the boycotted firm to compete... and frequently the boycotting firms possessed a dominant position in the relevant market." 472 U.S. at 294. The facts alleged here clearly meet that standard. If Rocket and Fairway were cut off from 70%-90% or more of the referrals they received from brokers, they would lose business "essential" to their effective competition. Moreover, if the boycotting brokers represented

70%-90% of their business, that certainly plausibly suggests that the brokers possessed a "dominant position" in the wholesale market.

This Circuit in *U.S. Anchor Manufacturing v. Rule Industries, Inc.*, 7 F.3d 986, 1000 (11th Cir. 1993), cited by the Magistrate Judge, has stated that "a dangerous probability of achieving monopoly power may be established by a 50% share." Given that standard under Section 2 of the Sherman Act, the 70%-90% share of Rocket's and Fairway's business represented by the boycotters plausibly suggests a market share far more than sufficient to establish market power under the lesser standard applicable to Section 1 of the Sherman Act. *Eastman Kodak Co. v. Image Technical Systems, Inc.*, 504 U.S. 451, 481 (1992).

UWM itself also possessed market power. While a 34% share may be insufficient by itself to establish the existence of monopoly power, courts have found it to be sufficient to satisfy the lesser requirements for a Section 1 claim. *See, e.g.*, *Kearney & Trecker Corp. v. Giddings & Lewis, Inc.*, 452 F.2d 579, 598 (7th Cir. 1971) (holding that one-third market share was sufficient where the firm's conduct "would endanger the competitive process" and the "[f]ulfillment of its objectives would have significantly enhanced its market position"). *See also U.S. v. Visa USA, Inc.*, 344 F.3d 229, 239 (2d Cir. 2003) (26% share sufficient for market power under Section 1).

In *Retina Associates PA v. Southern Baptist Hosp. of Florida Inc.*, 105 F.3d 1376 (11th Cir. 1997), cited by the Magistrate Judge, the Eleventh Circuit stated that 25%-30% control was insufficient for market power. *Id.* at 1382-1383. But Mr. Ishbia's statements indicate an expectation that 70%-90% of referrals would be eliminated by the boycott, far exceeding these standards.

Moreover, share is not the only way to measure either monopoly power or the lesser degree of market power required under Section 1. The ability to exclude competition is itself sufficient to establish monopoly power. *McWane, Inc. v. F.T.C.*, 783 F.3d 814, 830 ("Monopoly power is 'the power to control prices *or* exclude competition'" (citation omitted) (emphasis added)). The Supreme Court has held that there was sufficient market power to establish a *per se* tying violation when the conduct brought about a "appreciable restraint," *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 11 (1958), or where the defendant "has the power to raise prices or impose other burdens and terms such as a tie in, with respect to any appreciable number of buyers." *Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495, 503-4 (1969). Cases from this district have reached the same conclusion. *See also In re Terazosin Hydrochloride*, 220 F.R.D. 672, 696 (S.D. Fla. 2004) ("In determining whether a defendant has market power, a court must assess whether the 'seller has the power to raise prices,

or impose other burdensome terms such as a tie-in, with respect to any appreciable number of buyers within the market.' (quoting *Fortner*)).[2]

The FAC alleges that UWM had sufficient power to successfully impose its ultimatum on 93% of the 10,000 brokers used by UWM. This certainly imposed "burdensome terms" on an "appreciable number of buyers."

## B. The FAC Plausibly Alleges An Unreasonable Restraint of Trade

Okavage also alleges an unreasonable restraint of trade. As the Magistrate Judge recognized, to allege and prove an unreasonable restraint of trade, a plaintiff must show *either* "actual detrimental effects" *or* market power plus "the potential for genuine adverse effects on competition." *F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460 (1986).

The Magistrate Judge first found that the standard was not met because the FAC failed to allege that UWM possessed market power. But, as described above, that conclusion ignores critical facts in the FAC which are more than sufficient to establish market power under Section 1.

Second, the Magistrate Judge said that "it is clear Plaintiff is proceeding on the theory that Defendants' behavior had the potential for

---

[2] The Magistrate Judge quotes *Anchor Manufacturing* for the proposition that the "principal judicial device" for measuring market power "remains market share." 7 F.3d at 994. But the fact that market share may be the most commonly used measure does not mean that it is the only measure.

adverse effects on competition" rather than alleging actual effects. Report pp.39-40. But the FAC alleges facts establishing such actual effects. Under those circumstances, allegations of market power were not necessary.

Direct harm to competition can be proven by factors "such as reduced output, increased prices, or decreased quality…" *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) (emphasis added). Courts recognize harm to competition where a low price competitor is eliminated, since that reduces pricing pressure on the other competitors in the market. *See United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 79–80 (D.D.C. 2011).

Restrictions on choice can also constitute anticompetitive effect. The "anticompetitive nature of the restraint" in *Realcomp II, Ltd. v. Federal Trade Commission*, 635 F.3d 815 (2011), was the reduction in competitive brokerage options available to home sellers, *id.* at 827, quite analogous to the restriction of consumers' lender options which were constricted by UWM's actions here. Realcomp's policies were unlawful because they "narrow[ed] consumer choice" and "hinder[ed] the competitive process." *Id.* at 829-31. Courts have similarly held that a plaintiff need only show "harm to the competitive process" in order to prove a violation. *See Fishman v. Estate of Wirtz*, 807 F.2d 520, 543-44 (7th Cir. 1986).

44817482.24

All these actual anticompetitive effects are alleged here. The FAC explains that UWM was not interested in being the lowest priced competitor, and that Rocket and Fairway had lower prices. The FAC also explains that Rocket and Fairway provided better suited mortgages to many consumers, and offered innovative products. The elimination of lower priced, higher quality competition, allowing UWM to maintain higher prices, is a clear anticompetitive effect.

Additionally, the boycott disrupted the basic mechanism of the wholesale lending market; that brokers act as independent agents of their clients, seeking the best wholesale lender for their clients. *See* FAC ¶5 (that is "the central pillar of the mortgage broker business"). Thus, the boycott interfered with the "autonomy of the marketplace" and consumer choice.

### C.      The FAC States A Claim For Attempted Monopolization

The Magistrate Judge also improperly recommended dismissal of Okavage's claim for attempt to monopolize (Counts II and VI). UWM's efforts to quash its rivals by pressuring brokers to not deal with them is a well-established antitrust violation. In *Lorain Journal Co. v. United States*, 342 U.S. 143 (1951), a newspaper refused to allow ads to be placed by advertisers who also patronized the Journal's only rivals—local radio stations. *Id.* at 152–53. The Supreme Court found the newspaper was using

its "monopoly to destroy threatened competition" of its rivals, the radio stations. *Id.* at 154.

The District Court concluded that a "dangerous probability" of monopolization could not arise from UWM's 34% market share. But a dangerous probability of success need not be proven by high market share, any more than completed monopoly power need be proven in that manner. *See* discussion, *supra.* This Circuit has added that "one must be particularly wary of the numbers game of market percentage when considering an 'attempt to monopolize' suit." *Cliff Food Stores, Inc. v. Kroger, Inc.*, 417 F.2d 203, 207 n.2 (5th Cir. 1969). *See also Tarrant Services Agency, Inc. v. American Standard, Inc.,* 12 F.3d 609, 615-16 (6th Cir. 1993) (a high market share is *not* a requirement, but is only a "shortcut" that is not to be used where "other evidence" exists).

Here, UWM's dangerous probability of success is revealed by its own statements that it could cut off its two largest competitors' access to more than 70% of brokers. Facts were also alleged suggesting that absent Fairway's and Rocket's competition, UWM's share would grow. The UWM Prospectus, incorporated in the FAC, notes that "the mortgage business has experienced substantial consolidation." This increases the probability of successful monopolization. Ex. B p.30. *Domed Stadium Hotel, Inc. v. Holiday Inns,*

*Inc.*, 732 F.2d 480, 490 (5th Cir. 1984) (holding that a "consolidation trend in the market" makes successful monopolization more likely). Moreover, UWM's market share doubled from 2017-2019. *Id.* p.66. For the 12 months ended September 30, 2020, UWM experienced a "more than 84% increase year over year" in home loans closed. *Id.* p.80.

The Magistrate Judge cited the absence of allegations regarding barriers to entry. But the UWM Prospectus identifies a series of "risk factors" applicable to its "business and operations" that illustrate requirements facing wholesale mortgage lenders. These requirements are significant for an existing competitor such as UWM which is currently meeting them all. They would be far more significant for a new entrant which has to establish all these capabilities. *See, e.g.,* Ex. B p.12 (need to comply with Fannie Mae/Freddie Mac or VA guidelines); pp.16-17 (need for information technology networks and systems sufficient to provide good service for customers); p.19 (need to have sufficient funds to advance funds where borrowers do not make payments); p.23 (need to invest in qualified personnel); pp.31-36 (need to obtain licenses and approvals and comply with many federal, state and local statutes, ordinances and regulations); p.74 (need "a very high level of operational, technological and managerial expertise, as well as access to capital at a competitive cost"). These

allegations plausibly suggest that new competitors could not easily enter and compete effectively with UWM. *See McGahee v. Northern Propane Gas Co.*, 858 F.2d 1487, 1495 n.11 (11th Cir. 1988) (reversing summary judgment because in holding that there were no significant barriers to entry, the district court neglected to consider "factors, such as large capital outlays required to start a new business"); *Danielson v. Tropical Shipping & Constr. Co.*, 2019 WL 13183885, at *4 (S.D. Fla. June 25, 2019) (barriers to entry include "legal license requirements"); *Chicago Bridge & Iron Co. N.V. v. F.T.C.*, 534 F.3d 410, 438 (5th Cir. 2008) (barriers to entry include "expertise," "regulatory experience," "license requirements").

### D.  <u>Mr. Ishbia Is Individually Liable For These Actions</u>

The Magistrate Judge also dismissed the claims as to Mr. Ishbia, stating that there were no separate allegations as to him. But all of the foregoing allegations apply equally to UWM and Mr. Ishbia, its CEO. Mr. Ishbia conducted the video presentation where he explained the boycott and referenced the agreement that each broker would be required to sign. The FAC separately refers to the actions of Mr. Ishbia in ¶¶12, 31, and 32.

Mr. Ishbia's direct participation in these activities is more than enough to establish personal liability. "[A] corporate officer is subject to prosecution under § 1 of the Sherman Act whenever he knowingly participates in effecting

the illegal contract, combination, or conspiracy—be he one who authorizes, orders, or helps perpetrate the crime—regardless of whether he is acting in a representative capacity." *United States v. Wise*, 370 U.S. 405, 416 (1962). Allegations of a corporate officer's active participation in an anticompetitive scheme "suffice for individual antitrust liability." *Omni Healthcare, Inc. v. Health First, Inc.*, No. 6:13–cv–1509–Orl–37DAB, 2015 WL 275806, at *15 (M.D. Fla. Jan. 22, 2015).

### E.   The Magistrate Judge's Recommendation With Regard To The Claimed Violations Of the FDUTPA Should Be Rejected

The Magistrate Judge concluded that Okavage's claims under the Florida Deceptive and Unfair Trade Practices Act (Count VIII) were deficient based on her conclusions that Okavage's allegations did not state a claim for antitrust violations. Since those conclusions were not correct, the same is true of her recommendations with regard to the FDUTPA.

Additionally, the Magistrate Judge failed to address the allegations in ¶154(B) of the FAC that Mr. Ishbia and UWM intentionally and maliciously made false representations. This provides a separate and independent basis for a violation of the FDUTPA.

### F.   This Court Has Personal Jurisdiction Over Mr. Ishbia

The Magistrate Judge recommended dismissal of the claims against Mr. Ishbia for lack of personal jurisdiction for two reasons. First, the

44817482.24

Magistrate Judge found that there were not adequate allegations of personal contacts with Florida, because she regarded the allegations in the FAC concerning Mr. Ishbia's conduct as conclusory. But the FAC described and attached a video recounting the precise substance of Mr. Ishbia's efforts to pressure the brokers to boycott Rocket and Fairway—including Plaintiff and other brokers located in Florida. Mr. Ishbia personally warned brokers, in Florida and around the country, that "[i]f you work with [Rocket or Fairway], you can't work with UWM anymore, effective immediately." FAC ¶29.

Under Florida's long-arm statute and the U.S. Constitution, such substantial and intentionally tortious conduct directed at residents of Florida is more than sufficient to bring Mr. Ishbia within this Court's jurisdiction. *Healthe, Inc. v. High Energy Ozone LLC*, 533 F. Supp. 3d 1120, 1124-25 (M.D. Fla. 2021); *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1267-68 (11th Cir. 2010).

The Magistrate Judge also erred in applying the "corporate shield" doctrine to Mr. Ishbia's misconduct. As the Magistrate Judge acknowledged, "[t]he corporate shield doctrine does not protect a corporate officer who commits intentional torts, such as fraud or other intentional misconduct." The Magistrate Judge concluded that "pleading infirmities" related to Plaintiff's tortious interference claim prevented the finding of a

24

"jurisdictional hook" as to Mr. Ishbia. (*Id.* at 21.) But it is well-settled that an antitrust violation is, itself, an intentional tort. *Delong Equip. Co. v. Washington Mills Abrasive Co.*, 840 F.2d 843, 848 (11th Cir. 1988) ("[C]onspiracy and other antitrust violations, sound in tort rather than contract... ."); *Wilson P. Abraham Const. Corp. v. Texas Indus., Inc.*, 604 F.2d 897, 900 n.5 (5th Cir. 1979).

## VI.    **CONCLUSION**

For the foregoing reasons, Magistrate Judge Lambert's Report and Recommendation should be rejected in part and Defendants' Motion to Dismiss should be denied.

Date: August 10, 2022          Respectfully Submitted,
                              **PARRISH & GOODMAN, PLLC**
                              /s/ Robert H. Goodman
                              ROBERT H. GOODMAN
                              Florida Bar No.: 1008059
                              13031 McGregor Blvd., Suite 8
                              Fort Myers, Florida 33919
                              Phone: (813) 643-4529
                              Facsimile: (813) 315-6535
                              Primary: rgoodman@parrishgoodman.com
                              Secondary: admin@parrishgoodman.com
                              AND
                              JOSEPH E. PARRISH
                              Florida Bar No: 690058
                              Primary: jparrish@parrishgoodman.com
                              Secondary: admin@parrishgoodman.com
                              *Counsel for Plaintiffs*

44817482.24

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on this 10th day of August, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing Generated by CM/ECF.

/s/Robert H. Goodman
*Attorney for Plaintiffs*

44817482.24