## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

### Case No. 3:21-cv-00448-BJD-LLL

THE OKAVAGE GROUP, LLC
on behalf of itself and all others
similarly situated,

       *Plaintiff*,

        v.

UNITED WHOLESALE MORTGAGE, LLC
and MATHEW ISHBIA, individually,

       *Defendants.*

_____/

### DEFENDANTS' MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT PURSUANT TO RULES 12(B)(2), AND 12(B)(6), AND MEMORANDUM OF LAW IN SUPPORT

# TABLE OF CONTENTS

**Page(s)**

I.   Introduction ................................................................... 1

II.  Summary of Factual Allegations ................................................ 3

    A.   Plaintiff Is a Mortgage Broker in a Vertical Relationship with
        Wholesale Mortgage Lenders Like UWM, Rocket, and Fairway ........ 3
    B.   The Alleged Wholesale Mortgage Lending "Submarket" ................... 5
    C.   UWM Announced the Amendment to Combat Practices It
        Believes Are Harmful to the Wholesale Mortgage Lending
        Channel. ........................................................................ 5
    D.   Brokers and Trade Associations Engaged in a Robust Discussion
        of the Amendment Following Its Announcement .............................. 7
    E.   Plaintiff and Other Brokers Remain Free to Choose Their
        Lenders. ......................................................................... 8
    F.   Plaintiff's Allegations Regarding the Effects of the Amendment. ......... 9
    G.   Procedural Background and the Magistrate Judge's Report. ............. 11

III. Standard of Review ........................................................... 12

    A.   Rule 12(b)(2) ............................................................... 12
    B.   Rule 12(b)(6) ............................................................... 12

IV.  Argument ...................................................................... 12

    A.   This Court Lacks Personal Jurisdiction Over Mr. Ishbia .................... 12
    B.   Plaintiff Fails to State a Claim for a Per Se Illegal Group Boycott
        in Violation of Section 1 of the Sherman Act (Counts I and X) .......... 15

        1.   Plaintiff Does Not Plead a Per Se Illegal Group Boycott
            Based on a Horizontal Agreement Between UWM and Its
            Competitors .......................................................... 15
        2.   Plaintiff Does Not Plead an Illegal Hub-and-Spoke
            Conspiracy .......................................................... 19
        3.   Plaintiff's Allegations Do Not Demonstrate Market Power
            Sufficient to Support a Per Se Violation of Section 1 ............... 23
        4.   Plaintiff Fails to Plead a Claim Against Mr. Ishbia for Per
            Se Violation of the Sherman Act .................................... 27

    C.   Plaintiff Fails to State a Claim for Unreasonable Restraint of
        Trade in Violation of Section 1 of the Sherman Act (Counts II
        and XI) .......................................................................... 28

i

1. Plaintiff's Allegations Do Not Plead the Potential for a Genuine Adverse Effect on Competition.................................. 29

2. Plaintiff Does Not Plead a Potential or Actual Detrimental Effect on Competition.................................................... 31

3. Plaintiff Fails to Plead a Claim Against Mr. Ishbia for Unreasonable Restraint of Trade ............................. 32

D. Plaintiff Fails to State a Claim for Attempt to Monopolize in Violation of Section 2 of the Sherman Act (Counts III and XII)......... 32

1. Plaintiff Fails to Allege a Dangerous Probability of Achieving Monopoly Power.................................... 32

2. Plaintiff Fails to Allege Anticompetitive Conduct or a Specific Intent to Monopolize................................ 35

3. Plaintiff Fails to State a Claim Against Mr. Ishbia for Attempted Monopolization ..................................... 35

E. Plaintiff's Claims Against UWM Under the Florida Antitrust Act Follow the Sherman Act Claims and Fails for the Same Reasons (Counts IV, V, VI, XIII, XIV, XV) ..................................... 35

F. Plaintiff Fails to State a Claim for Tortious Interference with Business Contracts and Prospective Economic Advantage (Counts VII and XVI) ....................................................... 36

G. Plaintiff Fails to State a Claim for Violation of Florida's Deceptive and Unfair Trade Practices Act (Counts VIII and XVII) ............................................................................ 38

H. Plaintiff Fails to State a Claim for Declaratory Relief (Count IX)....... 39

V. Conclusion............................................................................. 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A & E Auto Body, Inc. v. 21st Century Centennial Ins. Co.*,
  No. 6:14-cv-310, 2015 WL 12867010 (M.D. Fla. Jan. 22, 2015) ...................... 21

*All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.*,
  135 F.3d 740 (11th Cir. 1998)....................................................................... 16, 36

*Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*,
  108 F.3d 1147 (9th Cir. 1997)........................................................................... 25

*Appleton v. Intergraph Corp.*,
  627 F. Supp. 2d 1342 (M.D. Ga. 2008).............................................................. 31

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..................................................................................... 12, 37

*Atlanta Gas Light Co. v. Aetna Cas. Sur. Co.*,
  68 F.3d 409 (11th Cir. 1995) ............................................................................. 40

*Auto Dealer Sols., Inc. v. S.-Owners Ins. Co.*,
  No. 8:17-cv-2525, 2018 WL 4600674 (M.D. Fla. Jan. 25, 2018) ...................... 40

*Bailey v. Allgas, Inc.*,
  284 F.3d 1237 (11th Cir. 2002)......................................................................... 25

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ..................................................................................... 12, 22

*Bolinger v. First Multiple Listing Serv., Inc.*,
  838 F. Supp. 2d 1340 (N.D. Ga. 2012) .............................................................. 22

*Broadcast Music, Inc. v. Columbia Broadcast. Sys., Inc.*,
  441 U.S. 1 (1979)............................................................................................. 17

*Casa Dimitri Corp. v. Invicta Watch Co. of Am., Inc.*,
  270 F. Supp. 3d 1340 (S.D. Fla. 2017) .............................................................. 39

*Cha-Car, Inc. v. Calder Race Course, Inc.*,
  752 F.2d 609 (11th Cir. 1985)...................................................................... 16, 17

*Chambers v. Nasa Fed. Credit Union*,
  222 F. Supp. 3d 1 (D.D.C. 2016) ...................................................................... 11

*Chaparro v. Carnival Corp.*,
  693 F.3d 1333 (2012) ....................................................................................... 12

*City First Mortg. Corp. v. Barton*,
   988 So. 2d 82 (Fla. 4th DCA 2008) .................................................................. 39

*Constr. Aggregate Transp., Inc. v. Fla. Rock Indus., Inc.*,
   710 F.2d 752 (11th Cir. 1983) .......................................................................... 22

*Del Prado Mall Pro. Condo. Ass'n, Inc. v. Voyager Indem. Ins. Co.*,
   No. 2:20-cv-838, 2021 WL 1578758 (M.D. Fla. Apr. 22, 2021) ....................... 40

*Denan v. Trans Union LLC*,
   959 F.3d 290 (7th Cir. 2020) ............................................................................ 11

*Dickson v. Microsoft Corp.*,
   309 F.3d 193 (4th Cir. 2002) ............................................................................ 20

*In re Disposable Contact Lens Antitrust Litig.*,
   215 F. Supp. 3d 1272 (M.D. Fla. 2016) ....................................................... 19, 20

*Divcic v. Am. Mortg. Consultants, Inc.*,
   No. 8:09-CV-2233, 2010 WL 11629138 (M.D. Fla. Feb. 22, 2010) .................. 15

*Doe v. Thompson*,
   620 So. 2d 1004 (Fla. 1993) ............................................................................. 13

*EnviroPak Corp. v Zenfinity Capital, LLC*,
   No. 4:14-CV-00754, 2015 WL 331807 (E.D. Mo. Jan. 23, 2015) ..................... 31

*In re EpiPen Direct Purchaser Litig.*,
   No. 20-cv-0827, 2022 WL 101770 (D. Minn. Apr. 5, 2022) ............................. 21

*Ethan Allen, Inc. v. Georgetown Manor, Inc.*,
   647 So. 2d 812 (Fla. 1994) ............................................................................... 36

*F.T.C. v. Ind. Fed'n of Dentists*,
   476 U.S. 447 (1986) ......................................................................................... 16

*Fid. Nat'l Fin., Inc. v. Attachmate Corp.*,
   No. 3:15-CV-01400, 2017 WL 3726687 (M.D. Fla. Mar. 1, 2017) ................... 38

*Fin. Sec. Assur., Inc. v. Stephens, Inc.*,
   500 F.3d 1276 (11th Cir. 2007) .......................................................................... 4

*Fla. Steel Corp. v. Whiting Corp.*,
   677 F. Supp. 1140 (M.D. Fla. 1988) ................................................................. 36

*Fru Veg Mktg., Inc. v. Vegfruitworld Corp.*,
   896 F. Supp. 2d 1175 (S.D. Fla. 2012) ............................................................. 12

*Greenberg, M.D. v. Mount Sinai Med. Ctr. of Greater Miami, Inc.*,
   629 So. 2d 252 (Fla. 3d DCA 1993) .................................................................. 38

*Griffin Indus., Inc. v. Irvin*,
   496 F. 3d 1189 (11th Cir. 2007) ....................................................................... 12

*Gulf States Reorg. Grp., Inc. v. Nucor,*
   721 F.3d 1281 (11th Cir. 2013)....................................................................... 33

*Gulf States Reorganization Grp., Inc. v. Nucor,*
   822 F. Supp. 2d 1201 (N.D. Ala. 2011)........................................................... 33

*Handicomp, Inc. v. U.S. Golf Ass'n,*
   No. 99-5372, 2000 WL 426245 (3d Cir. 2000)................................................ 25

*Hunter v. Bev Smith Ford, LLC,*
   No. 07-80665-CIV, 2008 WL 1925265 (S.D. Fla. Apr. 29, 2008) ..................... 38

*In re. Ins. Brokerage Antitrust Litig.,*
   618 F.3d 300 (3d Cir. 2010)...................................................................... 21, 23

*Int'l Serv. & Servs., Inc. v. Austral Insulated Prods., Inc.,*
   262 F.3d 1152 (11th Cir. 2001)...................................................................... 36

*Jacobs v. Tempur-Pedic Int'l, Inc.,*
   626 F.3d 1327 (11th Cir. 2010)...................................................................... 29

*Jacobs v. Tempur-Pedic Int'l, Inc.,*
   No. 4:07-CV-02, 2007 WL 4373980 (N.D. Ga. Dec. 11, 2007) ........................ 29

*JES Props., Inc. v. USA Equestrian, Inc.,*
   No. 8:02-cv-01585-T-24MAP, 2005 WL 1126665 (M.D. Fla. May 9,
   2005)............................................................................................................. 38

*Kitroser v. Hurt,*
   85 So. 3d 1084 (Fla. 2012) ............................................................................ 14

*Klayman v. Jud. Watch, Inc.,*
   No. 07-22413-CIV, 2008 WL 11333054 (S.D. Fla. Feb. 22, 2008)................... 15

*Lane v. XYZ Venture Partners, L.L.C.,*
   322 F. App'x 675 (11th Cir. 2009) ................................................................. 13

*Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n,*
   884 F.2d 504 (9th Cir. 1989) ......................................................................... 31

*Levine v. Cent. Fla. Med. Affiliates,*
   72 F.3d 1538 (11th Cir. 1996)................................................................... 28, 33

*Levine v. Cent. Fla. Med. Affiliates,*
   864 F. Supp. 1175 (M.D. Fla. 1994), *aff'd*, 72 F.3d 1538 (11th Cir.
   1996)........................................................................................................ 17, 18

*Living Color Enters., Inc. v. New Era Aquaculture, Ltd.,*
   No. 14-62216-CIV, 2015 WL 1526177 (S.D. Fla. Apr. 3, 2015) ...................... 37

*Louis Vuitton Malletier, S.A. v. Mosseri,*
   736 F.3d 1339 (11th Cir. 2013)............................................................... 13, 14

*M H Tire Co. v. Hoosier Racing Tire Corp.*,
   733 F.2d 973 (1st Cir. 1984) ............................................................. 17

*Madara v. Hall*,
   916 F.2d 1510 (11th Cir. 1990) ........................................................ 12

*Matsushita Elec. Indus. Co. v. Zenith Radio*,
   475 U.S. 574 (1986) .......................................................................... 22

*Maxon Hyundai Mazda v. Carfax, Inc.*,
   No. 13-cv-2680 (AJN), 2016 WL 7231941 (S.D.N.Y. Dec. 9, 2016),
   *aff'd*, 726 F. App'x 66 (2d Cir. 2018) ............................................... 25

*McWane, Inc. v. Fed. Trade Comm'n*,
   783 F.3d 814 (11th Cir. 2015) ......................................................... 30

*Med. Sav. Ins. Co. v. HCA, Inc.*,
   No. 2:04-cv-156, 2005 WL 1528666 (M.D. Fla. June 24, 2005), *aff'd
   by* 186 F. App'x 919 (11th Cir. 2006) ............................................ 37

*Mfg. Research Corp. v. Greenlee Tool Co.*,
   693 F.2d 1037 (11th Cir. 1982) ....................................................... 34

*Moecker v. Honeywell Intern., Inc.*,
   144 F. Supp. 2d 1291 (M.D. Fla. 2001) .......................................... 34

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
   465 U.S. 752 (1984) .......................................................................... 21

*Morris v. SSE, Inc.*,
   843 F.2d 489 (11th Cir. 1988) ......................................................... 12

*Mukamal v. Bakes*,
   No. 07-20793-CIV, 2008 WL 11391157 (S.D. Fla. May 20, 2008),
   *aff'd*, 378 F. App'x 890 (11th Cir. 2010) ........................................ 39

*In re Musical Instruments and Equip. Antitrust Litig.*,
   798 F.3d 1186 (9th Cir. 2015) ......................................................... 20

*Northeastern Tel. Co. v. Am. Tel. & Tel. Co.*,
   651 F.2d 76 (2d Cir. 1981) .............................................................. 35

*Nw. Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.*,
   472 U.S. 284 (1985) .............................................................. 17, 19, 24

*NYNEX Corp. v. Discon, Inc.*,
   525 U.S. 128 (1998) .......................................................................... 18

*Ohio v. Am. Express Co.*,
   138 S. Ct. 2274 (2018) ..................................................................... 28

*Paddock Pubs., Inc. v. Chicago Tribune Co.*,
 103 F.3d 42 (7th Cir. 1996) ............................................................ 30

*Paycargo, LLC v. CargoSpring, LLC*,
 No. 3:19-cv-85-TCB, 2019 WL 5793113 (N.D. Ga. Nov. 4, 2019) ................... 34

*PNY Techs., Inc. v. Sandisk Corp.*,
 No. 11-CV-04689, 2014 WL 1677521 (N.D. Cal. Apr. 25, 2014) ..................... 30

*Pro Search Plus, LLC v. VFM Leonardo, Inc.*,
 No. 8:12-cv-02102, 2013 WL 3936394 (C.D. Cal. July 30, 2013) .................... 30

*Procaps S.A. v. Patheon*,
 36 F. Supp. 3d 1306 (S.D. Fla. 2014) ................................................ 16

*Procaps S.A. v. Patheon, Inc.*,
 845 F.3d 1072 (11th Cir. 2016) ...................................................... 31

*Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*,
 917 F.3d 1249 (11th Cir. 2019) ................................................. 18, 22

*Retina Assocs., P.A. v. S. Baptist Hosp. of Fla., Inc.*,
 105 F.3d 1376 (11th Cir. 1997) ............................................ 16, 24, 26

*Romika-USA, Inc. v. HSBC Bank USA, N.A.*,
 514 F. Supp. 2d 1334 (S.D. Fla. 2007) ............................................. 37

*Rxstrategies, Inc. v. CVS Pharmacy, Inc.*,
 390 F. Supp. 3d 1341 (M.D. Fla. 2019) ............................................ 25

*Seagood Trading Corp. v. Jerrico, Inc.*,
 924 F.2d 1555 (11th Cir. 1991) ..................................................... 17

*Shahar v. Bowers*,
 120 F.3d 211 (11th Cir. 1997) ...................................................... 10

*Sherr v. HealthEast Care Sys.*,
 262 F. Supp. 3d 869 (D. Minn. 2017) .............................................. 31

*Sierra v. City of Hallandale Beach*,
 904 F.3d 1343 (11th Cir. 2018) ..................................................... 12

*Snow v. DirecTV, Inc.*,
 450 F.3d 1314 (11th Cir. 2006) ..................................................... 14

*Spanish Broad. Sys. of Fla. v. Clear Channel Commc'ns, Inc.*,
 376 F.3d 1065 (11th Cir. 2004) ............................... 29, 31, 32, 34, 35

*St. Petersburg Yacht Charters, Inc. v. Morgan Yacht, Inc.*,
 457 So. 2d 1028 (Fla. 2d DCA 1984) .............................................. 36

*State Oil Co. v. Khan*,
 522 U.S. 3 (1997) .................................................................. 28

*Tampa Elec. Co. v. Nashville Coal Co.*,
   365 U.S. 320 (1961) ..................................................................................... 29

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ................................................................................. 6, 10

*Thorpe ex rel. Situated v. Walker Inv. Mgmt. Corp.*,
   111 F. Supp. 3d 1335 (S.D. Fla. 2015) ..................................................... 11

*Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
   552 F.3d 430 (6th Cir. 2008) ................................................................. 20, 23

*U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*,
   7 F.3d 986 (11th Cir. 1993) ................................................................... 24, 33

*United Am. Corp. v. Bitmain, Inc.*,
   530 F. Supp. 3d 1241 (S.D. Fla. 2021) ................................................. 17, 19

*United States v. Chandler*,
   388 F.3d 796 (11th Cir. 2004) ..................................................................... 20

*United States v. Colgate & Co.*,
   250 U.S. 300 (1919) ..................................................................................... 21

*United States v. E. I. du Pont de Nemours & Co.*,
   351 U.S. 377 (1956) ............................................................................... 29, 33

*United Techs. Corp. v. Mazer*,
   556 F.3d 1260 (11th Cir. 2009) ................................................................... 14

*Vacation Break, U.S.A. v. Mktg. Response Grp.*,
   169 F. Supp. 2d 1325 (M.D. Fla. 2001) ................................................. 16, 17

*Van Vechten v. Elenson*,
   920 F. Supp. 2d 1284 (S.D. Fla. 2013) ....................................................... 14

*Vitacost.com v. Oregon Freeze Dry, Inc.*,
   No. 09-80367-CIV, 2009 WL 10667820 (S.D. Fla. July 21, 2009) ......... 21

*Wackenhut Corp. v. Maimone*,
   389 So. 2d 656 (Fla. 4th DCA 1980) ........................................................... 38

*ZF Meritor, LLC v. Eaton Corp.*,
   696 F.3d 254 (3d Cir. 2012) ........................................................................ 31

## Statutes

Fla. Stat. § 48.193 .............................................................................................. 13

Fla. Stat. § 48.193(1)(a)(2) ................................................................................ 14

Fla. Stat. § 501.201 ............................................................................................ 38

Fla. Stat. § 542.22(1)................................................................................. 40

Sherman Act § 1 ...................................................... 15, 20, 21, 22, 23, 28

Sherman Act § 2 ...................................................................................... 32

## Other Authorities

Fed. R. Civ. P. 9(b) .................................................................................. 38

Fed. R. Civ. P. 12(b)(1)............................................................................ 11

Fed. R. Civ. P. 12(b)(2).............................................................................. 1

Fed. R. Civ. P. 12(b)(6)................................................................... 1, 11, 12

Fed. R. Evid. 201 .................................................................................... 10

Herbert Hovenkamp, *Federal Antitrust Policy* § 10.8 (1994) ...................... 30

HousingWire.com (Mar. 18, 2021), available at
    www.housingwire.com/articles/uwm-rocket-both-declare-victory-
    in-broker-war/ (last accessed Dec. 10, 2022)...................................... 10

S&P Global Market Intelligence (July 13, 2022) available at
    https://www.spglobal.com/marketintelligence/en/news-
    insights/latest-news-headlines/nonbank-mortgage-originations-up-
    10-6-in-2021-yoy-71142930 (last accessed Dec. 10, 2022) ................... 11

Defendants United Wholesale Mortgage, LLC ("UWM") and Mathew Ishbia ("Mr. Ishbia") (collectively, "Defendants") submit their motion to dismiss Plaintiff's Second Amended Class Action Complaint ("Second Amended Complaint" or "SAC") filed by Plaintiff The Okavage Group, LLC ("Plaintiff"), pursuant to Rules 12(b)(2) and 12(b)(6), and their memorandum of law in support thereof, as follows:

## I.    Introduction

After three failed attempts, Plaintiff has demonstrated conclusively that it cannot plead a plausible claim against UWM or Mr. Ishbia. Plaintiff complains of UWM's decision to announce the terms on which it will do business with independent mortgage brokers going forward. UWM made this announcement to address its concerns regarding practices by Rocket Pro TPO ("Rocket") and Fairway Independent Mortgage ("Fairway"), which UWM believes threaten the vibrant, pro-consumer network of wholesale mortgage brokers that originate loans with UWM. UWM believes Rocket and Fairway harm mortgage brokers by originating loans through brokers on the wholesale side and then converting the brokers' customers to the retail side—leeching customers from the wholesale lending channel.

To confront these practices, UWM announced its "All-In Initiative" on March 4, 2021, stating it had decided to end its business relationship with brokers who chose to continue originating loans with Rocket and Fairway. UWM amended its Broker Agreement (the "Amendment") to that effect, and presented the Amendment to some of its contracted mortgage brokers in accordance with its contractual right to amend. UWM asked some mortgage brokers to execute an "Addendum" indicating their

intentions. The Amendment (which Plaintiff continues to describe falsely as an "ultimatum" and "boycott") did not require brokers to originate any loans with UWM. It is terminable at any time, with or without cause, and terminating brokers can immediately originate mortgages with Rocket or Fairway upon such notice. And both brokers who agreed to the Amendment and those who did not continued to have access to  more than 70 other wholesale mortgage lenders.

Precedent is entirely clear that UWM is permitted to choose the terms on which it conducts business, and brokers like Plaintiff are free to accept or reject those terms. Plaintiff elected to reject UWM's terms, then turned around and sued UWM for declining to do business with Plaintiff on the exact terms Plaintiff prefers. The Magistrate Judge entered a well-reasoned, 50-page Report and Recommendation on July 27, 2022 [ECF 61] (the "Report") with respect to Plaintiff's First Amended Complaint, recommending dismissal of Plaintiff's claims against Mr. Ishbia for lack of personal jurisdiction, and Plaintiff's claims against UWM for failure to state a claim. Plaintiff has now submitted a Second Amended Complaint, which fails to cure or address the numerous jurisdictional and pleading deficiencies identified in the Report.

The Second Amended Complaint should be dismissed with prejudice.

*First*,   Plaintiff still fails to allege facts supporting this Court's personal jurisdiction over Mr. Ishbia, the corporate shield doctrine precludes application of Florida's long-arm statute to him, and the "intentional tort" exception does not apply because Mr. Ishbia is not alleged to have committed any torts in Florida.

*Second*, Plaintiff's antitrust claims for per se illegality, unreasonable restraint of

trade, and attempted monopolization (Counts I to VI and X to XV) fail to state a claim because, among other deficiencies: Plaintiff does not allege facts establishing a horizontal boycott or a "hub-and-spoke" conspiracy; Plaintiff does not allege sufficient market power by UWM; Plaintiff does not plausibly allege any potential or actual anticompetitive effect in a properly defined market; and Plaintiff does not adequately allege any plausible risk of monopolization or specific intent to monopolize.

*Third*, Plaintiff's tortious interference claims (Counts VII and XVI) fail to allege, among other defects, any interference with an actual and identifiable business relationship, intentional or unjustified interference, or interference with any contract other than agreements already terminable at will.

*Fourth*, Plaintiff's Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") claims (Counts VIII and XVII) fail to state a claim because they are derivative of the deficient antitrust claims and do not allege actual damages.

*Fifth*, Plaintiff's declaratory relief claim (Count IX) is wholly duplicative and non-justiciable because it seeks a declaration as to an agreement Plaintiff did not sign.

## II.   <u>Summary of Factual Allegations</u>

### A.   Plaintiff Is a Mortgage Broker in a Vertical Relationship with Wholesale Mortgage Lenders Like UWM, Rocket, and Fairway

Plaintiff is a mortgage broker who did business with UWM for less than a year pursuant to a Broker Agreement it signed with UWM on or about November 20, 2020.

3

*See* SAC ¶¶ 17, 68-69; Broker Agreement, attached as **Exhibit A**.[1] Plaintiff alleges it also has a business relationship with Rocket and Fairway.  SAC ¶¶ 68-69. UWM is a wholesale residential mortgage lender, as are the wholesale divisions of Rocket and Fairway. SAC ¶¶ 16, 20, 27, 29. Unlike UWM, Rocket and Fairway also have retail mortgage lending divisions. *Id.* ¶¶ 30-31.

Plaintiff acknowledges that wholesale mortgage lenders like UWM offer advantages to consumers. Wholesale mortgage lenders offer mortgage loans through independent third parties, including mortgage brokers, and do not work directly with borrowers until after a loan has been funded, if at all. *Id.* ¶ 20. Independent mortgage brokers have the ability to choose from a variety of wholesale lenders to select the mortgage product that best matches the needs of the brokers' clients. *Id.* ¶ 22. This enables knowledgeable brokers to offer more choices of mortgages that meet consumers' needs and can be less expensive or provide more attractive terms. *Id.* ¶ 23.

The relationship between Plaintiff and wholesale mortgage lenders like UWM is vertical: Plaintiff submits loans to its chosen lenders and acts as a commercial intermediary between the lender and the borrower. *Id.* ¶ 22. Independent mortgage brokers stand in a horizontal relationship to one another; they compete with one another for the business of consumers seeking mortgages. *Id.* ¶ 24.

---

[1] This Court may take judicial notice of and rely on the Broker Agreement and its amendments because they are referred to in the Second Amended Complaint and neither party challenges their authenticity. *See Fin. Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1285 (11th Cir. 2007).

### B.     The Alleged Wholesale Mortgage Lending "Submarket"

Plaintiff describes wholesale mortgage lending as a "separate submarket" of residential mortgage lending. SAC ¶ 25. Plaintiff alleges that wholesale mortgage lending entails a distinct group of customers, a separate lending channel, specialized brokers, no direct marketing to consumers, consumers who would not "readily" switch to a retail lender, and potentially significant costs savings. *Id.*

According to Plaintiff, as of March 2020, wholesale mortgage lenders supplied 15.8% of residential mortgage loan originations in the United States, while retail mortgage lenders supplied 57.5% of such originations. SAC ¶ 26. Plaintiff describes UWM as the largest wholesale mortgage lender with approximately 34% market share of the wholesale market. *Id.* ¶ 27.

### C.     UWM Announced the Amendment to Combat Practices It Believes Are Harmful to the Wholesale Mortgage Lending Channel.

This lawsuit arises out of the March 4, 2021 announcement by Mr. Ishbia, in his capacity as President and CEO of UWM, that UWM was amending its Broker Agreement to require a representation and warranty that mortgage brokers who submit loans to UWM will not also submit loans to Rocket or Fairway. SAC ¶ 36. Some brokers were asked to sign an Addendum confirming their assent to the Amendment. *Id.* ¶¶ 44, 54-55. UWM had the contractual right to amend the Broker Agreement, and a broker's submission of any mortgage loan application to UWM after the date of the Amendment constitutes acceptance. Ex. A § 7.08.

The Second Amended Complaint expressly incorporates Mr. Ishbia's

announcement, as well as an interview he conducted on mortgage news outlet HousingWire later in the day. SAC ¶¶ 36-40, 51; *see also* Transcript of Mar. 4, 2021 Facebook Live Video Announcement, attached as **Exhibit B**.[2] Mr. Ishbia stated that one of the purposes of the Amendment was, "[w]e don't need to fund Fairway [] or Rocket [] to try to put brokers out of business." SAC ¶ 37. He explained UWM's view that Rocket and Fairway were "out there hurting the wholesale channel" by "soliciting loan officers," "talking negatively about brokers," "going after real estate agents," "trying to cut the loan officers," and "solicit[ing] your past clients." Ex. B at 12:14-16:11. He emphasized that "[w]hatever they want to do they can do [] as long as they play by the rules," but "that's not my business model," which is "helping you win" and "[b]eing all in for brokers." *Id.* at 13:18-24.[3]

Mr. Ishbia said there would be "no hard feelings" and brokers could "close out your loans" and "take care of consumers [e]ven if you [] decline[.]" Ex. B at 15:10–15:18.  He emphasized this was a decision "going forward," and that UWM would not "support[] brokers with our technology [and] with our service … to hurt the rest of the broker channel by funding the competition of brokers [and] the competition of the wholesale channel[.]" *Id.* at 15:23-16:4. He noted there were "73 other lenders,"

---

[2] The Court may consider Mr. Ishbia's comments in ruling on Defendants' motion to dismiss because they are relied upon and incorporated into the Second Amended Complaint. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (documents incorporated in the complaint by reference may be considered by the court on a motion to dismiss).

[3] Plaintiff alleges that certain of Mr. Ishbia's statements about Rocket were false. SAC ¶¶ 38-39. Plaintiff also alleges that UWM's account executives made false statements to mortgage brokers about Rocket in a supposed effort to persuade them to sign the Addendum. *Id.* ¶¶ 56-59.

and brokers would "have options" with or without the "two [lenders] that are out there hurting the channel," because "there's nothing that those two lenders do for brokers that the other 73 lenders don't do." *Id.* at 16:9-18.

### D.   Brokers and Trade Associations Engaged in a Robust Discussion of the Amendment Following Its Announcement.

Plaintiff alleges that Mr. Ishbia's announcement took place in public view and drew numerous public reactions. The Second Amended Complaint cites numerous public comments made by brokers participating in the live Facebook event, commenting on the HousingWire real-time chat, or commenting on UWM's digital forum on its Facebook page, such as "We are ALL IN," "unstoppable together," "Let's go!" and descriptions of brokers as "family," and also describes instances of brokers responding to one another's comments or questions and encouraging one another to sign the Addendum. SAC ¶¶ 41-42, 44, 49-50, 52. Plaintiff alleges that other brokers expressed vigorous opposition to the Amendment. *Id.* ¶¶ 43, 78, 80-81. Plaintiff alleges some UWM employees participated in these discussions. *Id.* ¶ 53.

Plaintiff alleges split views by trade associations reacting to the announcement. Plaintiff alleges that the Association of Independent Mortgage Experts ("AIME") issued a letter of support and made supportive statements during the Facebook live chat. *Id.* ¶¶ 45-47. Plaintiff alleges that The Mortgage Bankers Association and the National Association of Mortgage Brokers issued statements opposing the Amendment. *Id.* ¶ 79. Plaintiff alleges that AIME and other trade associations have regular meetings and at least one private Facebook discussion page that "have

provided significant vehicles for communication and agreement between the mortgage brokers with regard to the boycott." *Id.* ¶ 48. Plaintiff cites no examples of such "communication and agreement" carried out through trade associations.

Notwithstanding the many cited examples of vocal enthusiasm by brokers, Plaintiff insists the Amendment was "against the brokers' unilateral self-interest" and describes it as "coercion" reflecting UWM's "market power" due to supposed "barriers to entry" into wholesale mortgage lending. *Id.* ¶¶ 65-66, 82-84. Plaintiff does not identify any broker "coerced" into signing by UWM. Plaintiff also does not indicate how many wholesale mortgage brokers have overcome the alleged "barriers to entry" and entered the putative wholesale mortgage "submarket."

### E.   Plaintiff and Other Brokers Remain Free to Choose Their Lenders.

Plaintiff alleges it declined UWM's Amendment to maintain its relationship with Rocket and Fairway. SAC ¶ 70. As a result, Plaintiff alleges its Broker Agreement with UWM was terminated and it suffered unspecified "direct financial injury" in the form of "lost sales and lost commissions." *Id.* ¶¶ 70-71. Plaintiff alleges other brokers who had not acknowledged acceptance of the Amendment received notices of termination or suspension from UWM. *Id.* ¶ 64.

Each broker had the same freedom as Plaintiff to accept or decline the Amendment.[4] *Id.*; Ex. B at 15:10–15:18. Likewise, every broker contracting with

---

[4] Of course, some lenders (like major retail banks) have ceased working with mortgage brokers altogether, offering mortgages only through their own captive loan officer employees. Plaintiff does not allege these lenders are engaged in anticompetitive conduct.

UWM could exit the Broker Agreement at any time, and utilize any of the 70+ other wholesale mortgage lenders throughout the pendency of the contract term with UWM. No brokers are required to submit a single loan to UWM during the pendency of their Broker Agreements. The Broker Agreement contains one-year renewable terms, but either party can terminate "for any reason, with or without cause, breach or other justification, upon seven (7) days prior written notice[.]" Ex. A §§ 7.05, 7.06. A notice of termination immediately releases the broker from its commitment not to submit loans to Rocket or Fairway, without waiting for the notice period to elapse. *See* Amended Broker Agreement § 3.05, attached hereto as **Exhibit C**. Plaintiff nevertheless alleges that the Addendum imposes "exorbitant and unconscionable monetary penalties in the minimum amount of $50,000" for those who breach their representations and warranties to UWM rather than exercising their right to terminate. SAC ¶ 1. Plaintiff further alleges that UWM has "retaliated" against brokers who breached the Addendum by filing lawsuits against three of them. *Id.* ¶ 60.

### F.   Plaintiff's Allegations Regarding the Effects of the Amendment.

The Second Amended Complaint does not contain any factual allegations that UWM gained market share, or that Rocket or Fairway lost market share, following the announcement of the Amendment. Plaintiff also supplies no factual allegations or examples demonstrating that consumers had fewer mortgage options, or less favorable terms, or paid higher prices following the announcement. Plaintiff instead simply asserts in conclusory strokes that Defendants' actions purportedly caused a shift in origination of mortgages away from Rocket and Fairway, "caused consumers to pay

9

higher prices and obtain lower quality mortgages," and resulted in higher costs of operation and reduced competition. SAC ¶¶ 18-19, 72-77.

Plaintiff alleges that the so-called "boycott" was "highly successful," based on public statements from UWM estimating that 93% of brokers presented with the Addendum agreed to sign it, and 11,000 out of 12,000 of UWM's independent mortgage brokers participated. SAC ¶ 61. Plaintiff alleges that UWM's loan applications increased in April 2021 and its funded loans increased by 20% in 2021. *Id.* ¶¶ 61, 63. Plaintiff also cites statements by Mr. Ishbia that he considered it "realistic" for UWM to pass Rocket in total mortgage loan business. *Id.* ¶ 62.

Rocket's own press release following the announcement of the Amendment states, "Rocket Pro TPO has already grown its market share since UWM's announcement and will continue to do so in the weeks, months and years ahead," that "[m]ore than 9,000 brokers stood up and said no to UWM's ultimatum," and that Rocket "had hundreds of new brokers submit an application to partner with us yesterday[.]" *See* James Kleinman, "UWM & Rocket both declare victory in broker war," HousingWire.com (Mar. 18, 2021), available at www.housingwire.com/articles/uwm-rocket-both-declare-victory-in-broker-war/ (last accessed Dec. 10, 2022).[5] Like UWM, Rocket and Fairway also both experienced

---

[5] The Court may consider Rocket's public statement to HousingWire.com because the Second Amended Complaint relies upon and incorporates HousingWire's coverage by reference. *See Tellabs*, 551 U.S. at 322. The Court may also take judicial notice of a press release under Fed. R. Evid. 201 for the purpose of noting the existence of the press release's message. *See Shahar v. Bowers*, 120 F.3d 211, 214, n. 5 (11th Cir. 1997).

large increases in funded loans from 2020 to 2021, 8.5% and 9.8% respectively, reflecting a large increase in nonbank mortgage originations industry-wide in 2021. *See* Rica Dela Cruz & Syed Muhammad Ghaznai, "Nonbank mortgage originations up 10.6% in 2021 YOY," S&P Global Market Intelligence (July 13, 2022) available at https://www.spglobal.com/marketintelligence/en/news-insights/latest-news-headlines/nonbank-mortgage-originations-up-10-6-in-2021-yoy-71142930 (last accessed Dec. 10, 2022) (based on Home Mortgage Disclosure Act data from Consumer Financial Protection Bureau ("CFPB")).[6]

### G.  Procedural Background and the Magistrate Judge's Report.

Plaintiff filed its original Complaint on April 23, 2021. [DE 1]. Defendants moved to dismiss, and Plaintiff filed its First Amended Complaint. [DE 16, 32]. Defendants moved to dismiss the First Amended Complaint for lack of standing, lack of personal jurisdiction over Mr. Ishbia, and failure to state a claim on each of Plaintiff's counts. [DE 46]. Following briefing, the Court referred the motion to dismiss to the Magistrate Judge for a report and recommendation. [DE 60]. The Magistrate Judge entered the Report on July 27, 2022, recommending in relevant part that the claims against Mr. Ishbia should be dismissed for lack of personal jurisdiction under Rule 12(b)(1), and each of Plaintiff's claims should be dismissed without prejudice for failure to state a claim under Rule 12(b)(6). [DE 61]. Plaintiff filed the

---

[6] The Court may take judicial notice of CFPB data. *See Denan v. Trans Union LLC*, 959 F.3d 290, 294 n.3 (7th Cir. 2020) (taking judicial notice of CFPB report); *Chambers v. Nasa Fed. Credit Union*, 222 F. Supp. 3d 1, 7 (D.D.C. 2016) (same); *Thorpe ex rel. Situated v. Walker Inv. Mgmt. Corp.*, 111 F. Supp. 3d 1335, 1350 (S.D. Fla. 2015) (taking judicial notice of CFPB press release).

present Second Amended Complaint on November 8, 2022. [DE 69].

## III. Standard of Review

### A. Rule 12(b)(2)

Plaintiff has "the burden of establishing personal jurisdiction over the defendant." *Fru Veg Mktg., Inc. v. Vegfruitworld Corp.*, 896 F. Supp. 2d 1175, 1180 (S.D. Fla. 2012) (citing *Morris v. SSE, Inc.*, 843 F.2d 489, 492 (11th Cir. 1988)). Dismissal is required when the plaintiff fails to establish a prima facie case of personal jurisdiction over a nonresident defendant. *Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990).

### B. Rule 12(b)(6)

To survive a Rule 12(b)(6) motion, Plaintiff "must state a claim for relief that is 'plausible on its face.'" *Sierra v. City of Hallandale Beach*, 904 F.3d 1343, 1353 n. 9 (11th Cir. 2018) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Conclusory allegations are insufficient. *Twombly*, 550 U.S. at 55; *Griffin Indus., Inc. v. Irvin*, 496 F. 3d 1189, 1205-06 (11th Cir. 2007). "The plausibility standard 'calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' of the defendant's liability." *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (2012) (quoting *Twombly*, 550 U.S. at 556).

## IV. Argument

### A. This Court Lacks Personal Jurisdiction Over Mr. Ishbia

Plaintiff asserts eight counts (Counts X-XVII) against Mr. Ishbia based solely on his role in directing and announcing the Amendment, giving an interview about it, and making follow-up statements. *See* SAC ¶¶ 7-8, 36-40, 42, 47, 51, 61-62, 153-93.

12

Mr. Ishbia is a Michigan resident and Plaintiff alleges no connection between Mr. Ishbia and Florida aside from his statements. *See id.* ¶¶ 6-8.

The Magistrate Judge recommended dismissal of Plaintiff's claims against Mr. Ishbia for lack of personal jurisdiction based on Plaintiff's failure to allege a personal connection to Florida outside of Mr. Ishbia's role as chief executive officer of UWM. Report at 18-21. The Second Amended Complaint has not cured this defect.

This Court determines personal jurisdiction based on whether: (1) personal jurisdiction exists under Florida's long-arm statute, Fla. Stat. § 48.193; and (2) the exercise of that jurisdiction "would violate the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution." *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1350 (11th Cir. 2013) (additional citation omitted); *see also* Report at 18-19. Plaintiff's claims fail on the first question. Florida's corporate shield doctrine "prohibit[s] the exercise of jurisdiction under the Florida long-arm statute over corporate employees whose only conduct in Florida was in furtherance of a corporation's interests." *Lane v. XYZ Venture Partners, L.L.C.*, 322 F. App'x 675, 678 (11th Cir. 2009) (citing *Doe v. Thompson*, 620 So. 2d 1004, 1006 (Fla. 1993)). "The rationale of the doctrine is the notion that it is unfair to force an individual to defend a suit brought against him personally in a forum with which his only relevant contacts are acts performed not for his own benefit but for the benefit of his employer." *Doe*, 620 So. 2d at 1006 (quotations and citations omitted); *see also* Report at 19. Plaintiff "bears the initial burden of alleging in the complaint sufficient facts to make out a

prima facie case of jurisdiction." *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009) (additional citations omitted).

Here, just as the Magistrate Judge found with respect to the First Amended Complaint, Plaintiff again does not allege any non-conclusory connection between Mr. Ishbia and Florida "outside of those that are part of his job as CEO of UWM," and thus has failed to allege personal jurisdiction under Florida's long-arm statute. Report at 20 (citing *Snow v. DirecTV, Inc.*, 450 F.3d 1314, 1318 (11th Cir. 2006)).

The Magistrate Judge found that the corporate shield doctrine "does not protect a corporate officer who commits intentional torts, such as fraud or other intentional misconduct," but concluded that Plaintiff had failed to allege an intentional tort against Mr. Ishbia due to the pleading infirmities in the First Amended Complaint. Report at 20-21 (citing *Louis Vuitton*, 736 F.3d at 1355). Plaintiff has not cured these infirmities, for the reasons discussed in §§ IV.B-G, *infra*. But even if Plaintiff had alleged an intentional tort against Mr. Ishbia, the exception still would not apply here, as it requires the individual be physically present in Florida and commit the tort in Florida to be excepted from the corporate shield doctrine. *See Kitroser v. Hurt*, 85 So. 3d 1084, 1089-90 (Fla. 2012) (holding exception to corporate shield doctrine applies to "an actor who is present in Florida and commits tortious acts in-state," but not one who "commits no acts in Florida") (emphasis in original); *Van Vechten v. Elenson*, 920 F. Supp. 2d 1284, 1291 (S.D. Fla. 2013) (same). That comports with Florida's long-arm statute, which requires a person to "commit[] a tortious act within this state" to be brought within the jurisdiction of Florida courts. Fla. Stat. § 48.193(1)(a)(2).

The Court thus lacks personal jurisdiction over Mr. Ishbia and the claims against him should be dismissed. *See Divcic v. Am. Mortg. Consultants, Inc.*, No. 8:09-CV-2233, 2010 WL 11629138, at *2 (M.D. Fla. Feb. 22, 2010); *Klayman v. Jud. Watch, Inc.*, No. 07-22413-CIV, 2008 WL 11333054, at *2 (S.D. Fla. Feb. 22, 2008).

**B.    Plaintiff Fails to State a Claim for a Per Se Illegal Group Boycott in Violation of Section 1 of the Sherman Act (Counts I and X)**

The Second Amended Complaint has now divided Plaintiff's claims for violation of Section 1 of the Sherman Act into separate counts asserting theories under "per se" and "rule of reason" analyses.[7] Counts I and X purport to assert claims of per se illegality against UWM and Mr. Ishbia, respectively, for allegedly initiating a "group boycott" against Rocket and Fairway. The Magistrate Judge correctly found in the Report that Plaintiff failed to state a claim against UWM for a per se violation of Section 1 because: (1) Plaintiff does not allege a per se illegal horizontal agreement between UWM and its competitors; (2) Plaintiff does not supply sufficient facts to plausibly allege a hub-and-spoke conspiracy; and (3) Plaintiff does not allege adequate market power to support a per se violation of Section 1. Report at 28-38. Each of these pleading deficiencies applies with equal force to the Second Amended Complaint.

1.    <u>Plaintiff Does Not Plead a Per Se Illegal Group Boycott Based on a Horizontal Agreement Between UWM and Its Competitors</u>

The crux of Plaintiff's per se claim is that Defendants allegedly "initiated and

---

[7] Plaintiff's First Amended Complaint contained a separate theory for unlawful "steering" in violation of Section 1 of the Sherman Act, which the Magistrate Judge recommended be dismissed because steering is not a separate claim from boycott. Report at 41. The Second Amended Complaint does not assert a separate claim for steering and contains no allegations of unlawful steering.

coerced" a "per se illegal group boycott" to "cut off more than 9,000 mortgage brokers" from the "mortgage lender of their choice," which "amounted to a coerced concerted refusal to deal" with Rocket and Fairway. SAC ¶ 2 , 102. But the so-called "boycott" asserted by Plaintiff bears no resemblance to a "traditional group boycott" and does not pose "such a habitual unacceptable risk of restraining trade that [it is] unreasonable per se" and can avoid a rule of reason analysis. *Vacation Break, U.S.A. v. Mktg. Response Grp.*, 169 F. Supp. 2d 1325, 1334 (M.D. Fla. 2001). "[A]ny departure from the rule of reason must be based upon demonstrable anticompetitive economic effect, rather than formalistic line drawing." *Cha-Car, Inc. v. Calder Race Course, Inc.*, 752 F.2d 609, 613 (11th Cir. 1985). Determining whether the per se rule or rule of reason applies is a question of law. *Procaps S.A. v. Patheon*, 36 F. Supp. 3d 1306, 1323 (S.D. Fla. 2014) (citation omitted). The Second Amended Complaint, like its predecessor, is "confusing and laden with buzz words," but lacks plausible factual allegations of a genuine group boycott. Report at 26.

The U.S. Supreme Court and the Eleventh Circuit have both strongly cautioned "against the haphazard expansion of the 'group boycott label' and the concomitant imposition of per se liability." *Retina Assocs., P.A. v. S. Baptist Hosp. of Fla., Inc.*, 105 F.3d 1376, 1381 (11th Cir. 1997) (quoting *F.T.C. v. Ind. Fed'n of Dentists*, 476 U.S. 447, 458 (1986)). "[E]asy labels do not always supply ready answers," and the Court should be wary of "pigeonhole[s]" to invoke the per se rule. *All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.*, 135 F.3d 740, 746 (11th Cir. 1998) (quotation marks and citations omitted). A rule of per se illegality may be applied only to challenged conduct

16

that "fits into a proscribed category without distortion," and "should not be extended to restraints of trade that are of ambiguous effect." *Cha-Car*, 752 F.2d at 612-13 (quoting *M H Tire Co. v. Hoosier Racing Tire Corp.*, 733 F.2d 973, 977 (1st Cir. 1984)). In short, courts "should apply the per se label 'infrequently and with caution.'" *United Am. Corp. v. Bitmain, Inc.*, 530 F. Supp. 3d 1241, 1272 (S.D. Fla. 2021) (quoting *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1567 (11th Cir. 1991)).

To establish a claim of per se illegality under this stringent standard, Plaintiff must allege "[a]greements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Vacation Break*, 169 F. Supp. 2d at 1335 (quoting *Nw. Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.*, 472 U.S. 284, 289 (1985)). There are "very few classes of conduct that are illegal per se." *Levine v. Cent. Fla. Med. Affiliates*, 864 F. Supp. 1175, 1181 (M.D. Fla. 1994), *aff'd*, 72 F.3d 1538 (11th Cir. 1996). "The mere allegation of a concerted refusal to deal does not suffice because not all concerted refusals to deal are predominantly anticompetitive." *Nw. Wholesale*, 472 U.S. at 298. The decision to apply a per se rule turns on "whether the practice facially appears to be one that would always or almost always tend to restrict competition . . . or instead one designed to 'increase economic efficiency and render markets more, rather than less competitive.'" *Id.* at 289 (quoting *Broadcast Music, Inc. v. Columbia Broadcast. Sys., Inc.*, 441 U.S. 1, 19-20 (1979)).

Here, Plaintiff's repeated use of the labels "group boycott" and "boycott" cannot justify the application of a per se illegality rule where the "facts presented" are not "consistent with the traditional group boycott situation." *Levine*, 864 F. Supp. at 1182. At the most basic level, as the Magistrate Judge noted in the Report, the U.S. Supreme Court has limited the per se rule in the group boycott context "to cases involving horizontal agreements among direct competitors." *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998) (rejecting application of per se rule to "an agreement by a buyer to purchase goods or services from one supplier rather than another" even with "no legitimate business reason for that purchasing decision," because the "freedom to switch suppliers lies close to the heart of the competitive process that the antitrust laws seek to encourage"); *see also Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1271 (11th Cir. 2019); Report at 28. Plaintiff again "has not pleaded factual matter" suggesting that UWM's Amendment "was a horizontal agreement between UWM and its direct competitors." Report at 29. "UWM is a wholesale mortgage lender; there is no allegation in the amended complaint that UWM conspired with one of its direct competitors, such as another wholesale lender, to push Rocket and Fairway out of the market." *Id*. at 29-30.

More than that, the Second Amended Complaint sets forth facts disqualifying Plaintiff's theory from per se treatment by plausibly identifying a procompetitive purpose for UWM's actions: to preserve the wholesale mortgage lending channel. Plaintiff affirmatively identifies the advantages to consumers attendant to the wholesale lending channel, including giving borrowers access to experienced and

knowledgeable independent brokers, providing access to a variety of wholesale lenders to select mortgage products best matching the borrowers' needs, and saving borrowers significant amounts over the lifetime of the loan. SAC ¶¶ 20-25. Plaintiff also acknowledges that that stated purpose of UWM's initiative was to confront the problem of Rocket and Fairview putting independent brokers out of business by diverting wholesale mortgage borrowers to their retail mortgage divisions. SAC ¶ 37; Ex. B at 12:14-16:11. The very existence of this plausible procompetitive rationale for UWM's actions prevents the conclusive presumption of illegality necessary to apply a per se rule. *See Nw. Wholesale*, 472 U.S. at 289. Thus, Plaintiff has failed to plead a per se illegal group boycott. *See Bitmain*, 530 F. Supp. 3d at 1274; *In re Disposable Contact Lens Antitrust Litig.*, 215 F. Supp. 3d 1272, 1291 (M.D. Fla. 2016).

> ### 2.   Plaintiff Does Not Plead an Illegal Hub-and-Spoke Conspiracy

Plaintiff once again attempts to cure its inadequate "group boycott" theory by alleging that the structure of the so-called "boycott" was a "hub-and-spoke" conspiracy by which UWM purportedly facilitated an agreement among brokers to boycott Rocket and Fairway. *See* SAC ¶¶ 41-60. *See Bitmain*, 530 F. Supp. 3d at 1255-56 (describing a hub-and-spoke conspiracy); *In re Disposable Contact Lens Antitrust Litig.*, 215 F. Supp. 3d at 1294 (same). The Magistrate Judge rejected this theory in the Report, finding that the First Amended Complaint lacked facts plausibly suggesting that the brokers agreed among themselves to boycott Rocket and Fairway. Report at 32. At most, Plaintiff established vertical agreements between UWM and each broker, but no agreement among the brokers to boycott, rendering the "hub-and-spoke" a

"rimless wheel," which "does not amount to a per se restraint-of-trade" under Section 1. *Id.* (quoting *In re Musical Instruments and Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 n.3 (9th Cir. 2015)); *see also United States v. Chandler*, 388 F.3d 796, 807 (11th Cir. 2004); *Dickson v. Microsoft Corp.*, 309 F.3d 193, 203-04 (4th Cir. 2002); *In re Disposable Contact Lens Antitrust Litig.*, 215 F. Supp. 3d at 1291.

The Second Amended Complaint has not cured this defect. Plaintiff's new allegations still fall well short of plausibly alleging any agreement among the brokers to boycott Rocket and Fairway. "The critical issue for establishing a *per se* violation with the hub and spoke system is how the spokes are connected to each other." *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 436 (6th Cir. 2008). The Second Amended Complaint establishes no such connection at all.

Plaintiff instead repeats more of the same kinds of allegations the Magistrate Judge already found insufficient. Plaintiff again alleges and provides additional examples of brokers who purportedly "heeded Mr. Ishbia's clarion call to boycott UWM's closest competitors" by expressing support and enthusiasm, answering one another's questions, and criticizing others who voiced opposition. SAC ¶¶ 41-44, 49-50, 52-53, 78, 80-81. Plaintiff adds a trade association, AIME, to the list of supporters. *Id.* ¶¶ 45-47 Plaintiff also alleges that UWM and its supporters facilitated information-sharing among the brokers through Facebook forums, trade association forums, and industry publication live chats . *Id.* ¶¶ 42-43, 48-52.

As the Magistrate Judge already concluded, neither "independent expressions of enthusiasm and encouragement among brokers" nor allegations that UWM

"provid[ed] forums" or "joined in facilitating these terminations" plausibly suggest "concerted actions" or "an agreement among the brokers sufficient to form the rim of a conspiracy." Report at 33 (citing *In re. Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 329-30 (3d Cir. 2010)). Likewise, it is not "sufficient that the brokers knew they were all accepting" UWM's Amendment. *Id.* (citing *In re EpiPen Direct Purchaser Litig.*, No. 20-cv-0827 (ECT/JFD), 2022 WL 101770, at *7 (D. Minn. Apr. 5, 2022)). Antitrust law "does not restrict the long recognized right of [a party] engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal; and, of course, he may announce in advance the circumstances under which he will refuse to sell." *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919). A party "has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984). Here, UWM announced its Amendment, and mortgage brokers are "free to acquiesce in the [defendants'] demand" if they wish to continue working with UWM—or, like Plaintiff, to refuse if they do not. *Vitacost.com v. Oregon Freeze Dry, Inc.*, No. 09-80367-CIV, 2009 WL 10667820, at *6 (S.D. Fla. July 21, 2009); *A & E Auto Body, Inc. v. 21st Century Centennial Ins. Co.*, No. 6:14-cv-310, 2015 WL 12867010, at *9-10 (M.D. Fla. Jan. 22, 2015) (dismissing Section 1 claims because parties may exercise independent discretion regarding with whom they deal).

The Second Amended Complaint merely adds more examples of expressions of enthusiasm and encouragement, and identifies some of the online forums where these expressions took place. None of Plaintiff's allegations come any closer to alleging a

connection between the brokers to form the rim of the wheel. It still amounts to different brokers independently voicing their views that entering into the Amendment was in their respective self-interests, which does not state a violation of Section 1. *See Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986) (holding that where "refusal to deal was consistent with the defendant's independent interest, the refusal to deal could not by itself support a finding of antitrust liability"). Widespread enthusiasm and participation does not constitute a horizontal agreement to restrain trade. Plaintiff has alleged no facts demonstrating any "uniformity that would be unexpected or idiosyncratic" or "rule out the possibility" that the brokers "were acting independently" for their individual best interests. *Quality Auto*, 917 F.3d at 1271-72 (quoting *Twombly*, 550 U.S. at 553-54). "The Court cannot infer such an agreement from what is simply a unilateral business decision." *Bolinger v. First Multiple Listing Serv., Inc.*, 838 F. Supp. 2d 1340, 1361 (N.D. Ga. 2012). A market participant "may choose with whom he will do business and with whom he will not do business," and a "unilateral exercise of business judgment" to "refuse to deal" will "not give rise to antitrust liability without proof of actual competitive injury." *Constr. Aggregate Transp., Inc. v. Fla. Rock Indus., Inc.*, 710 F.2d 752, 772-73 (11th Cir. 1983).

Even if Plaintiff could overcome this fatal deficiency in its per se theory—though it has not been able to do so after three attempts—there is a deeper problem. Plaintiff is attempting to portray the brokers that entered into the so-called "boycott" as *both* perpetrators *and* victims—as *both* plaintiffs *and* defendants. On the one hand, Plaintiff alleges that "UWM *and its participating brokers* are jointly and severally liable"

for the alleged boycott. SAC ¶¶ 102, 109 (emphasis added). Yet, at the same time, Plaintiff insists these very same participating brokers are *members of the putative class* it seeks to represent. *Id.* ¶ 85. In support of this latter assertion, Plaintiff alleges that the brokers were "coerced," "pressure[d]," and "induce[d]" by Defendants to sign their individual Addendums. *Id.* ¶¶ 2, 7, 54-59, 65-66, 85.

These allegations highlight the incoherence of Plaintiff's theory. Plaintiff might try to allege facts (though it has not) establishing that the brokers were willing participants in a horizontal "rim" of a conspiratorial "wheel" to boycott Rocket and Fairway, and are thus jointly and severally liable for the alleged violation as antitrust defendants. Or Plaintiff might try to allege facts (though, again, it has not) establishing that the brokers were unwilling participants coerced and pressured into entering individual vertical agreements with UWM, and are therefore properly defined as members of a putative class of antitrust plaintiffs. But Plaintiff cannot allege both, and the Second Amended Complaint alleges neither. It thus remains a "rimless wheel." *See In re Insurance Brokerage Antitrust Litig.*, 618 F.3d 300, 327 (3d Cir. 2010) (rejecting "rimless wheel" conspiracy because "one cannot plausibly infer a horizontal agreement" from "nothing more than a series of vertical relationships"); *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 435-36 (6th Cir. 2008) (rejecting claim when "the rim holding everything together is missing").

### 3.   Plaintiff's Allegations Do Not Demonstrate Market Power Sufficient to Support a Per Se Violation of Section 1

Plaintiff also fails in its attempt to address the third deficiency identified by the

Magistrate Judge—lack of market power. To guard against capricious attempts to invoke the "group boycott" label where *per se* treatment "is not warranted," courts limit its application to cases in which "the conspirators imposing the group boycott possess 'market power or exclusive access to an element essential to effective competition[.]'" *Retina Assocs.*, 105 F.3d at 1381 (quoting *Nw. Wholesale*, 472 U.S. at 296). The Magistrate Judge concluded in the Report that Plaintiff's allegations of "coercive acts" failed to support a per se theory because Plaintiff failed to allege that UWM had sufficient market power for its alleged anticompetitive conduct to cut off consumer or broker access to the wholesale mortgage channel. Report at 33-38. The Second Amended Complaint again has not cured this defect.

The "principal judicial device for measuring actual or potential market power remains market share[.]" *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 994 (11th Cir. 1993). Plaintiff alleges mortgage lending through independent brokers comprises 15.8% of residential mortgage loan originations (versus 57.5% for direct-to-buyer retail lending), and that UWM has "approximately 34% market share" of that wholesale lending channel. SAC ¶¶ 26-27. Plaintiff also alleges that wholesale residential mortgage lending is a "separate submarket." SAC ¶ 25. That is incorrect. As discussed in § IV.C.1, *infra*, the correct market is all residential mortgage lending, and UWM has less than 5.4% market share in that market.

Regardless, the Magistrate Judge assumed without deciding that the relevant market is the wholesale mortgage market. Report at 36. Even making that assumption, the Magistrate Judge concluded that UWM's 34% market share did not establish

24

sufficient market power to assert a per se theory because Plaintiff: (1) does not plead what percentage of the brokers in the wholesale market as a whole "joined the boycott"; and (2) does not plead what the effect of the alleged boycott was on the relevant market. Report at 37. That was the correct result. *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1250 (11th Cir. 2002) ("A market share at or less than 50% is inadequate as a matter of law to constitute monopoly power.") (collecting cases); *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 108 F.3d 1147, 1154 (9th Cir. 1997) ("[a] mere showing of substantial or even dominant market share alone cannot establish market power..."); *Handicomp, Inc. v. U.S. Golf Ass'n*, No. 99-5372, 2000 WL 426245, at *3-4 (3d Cir. 2000) (72% market share insufficient); *Maxon Hyundai Mazda v. Carfax, Inc.*, No. 13-cv-2680 (AJN), 2016 WL 7231941, at *14-15 (S.D.N.Y. Dec. 9, 2016) (90% market share insufficient) (citation omitted), *aff'd*, 726 F. App'x 66 (2d Cir. 2018); *Rxstrategies, Inc. v. CVS Pharmacy, Inc.*, 390 F. Supp. 3d 1341, 1351 (M.D. Fla. 2019).

These defects remain in the Second Amended Complaint. Plaintiff has now added a section captioned "Anticompetitive Effects of Defendants' Conduct and Harm to Brokers and Consumers," but it consists of nothing more than conclusory assertions regarding supposed anti-competitive effects from the "elimination of two of the largest" wholesale mortgage lenders, followed by a parade of conclusory assertions regarding lessened competition and injury to brokers. SAC ¶¶ 72-77. These assertions are not backed up by any factual allegations, such as the percentage of brokers who joined the alleged "boycott" or the concrete effects on the market, but rather by posts

25

and statements made by brokers and trade associations at the time of the announcement voicing their opposition to it. *Id.* ¶¶ 78-81.

Indeed, there has been no "elimination" of Rocket and Fairway. Plaintiff does not allege that they have lost any market share at all, much less how much. And Plaintiff does not address the 70+ other wholesale mortgage lenders in the market who could continue to service all brokers—those who signed the Addendum and those who did not. *See* § II.C, *supra*. Plaintiff also has never addressed the brokers' freedom to terminate their Broker Agreements with UWM at any time, with or without cause, and to immediately originate loans with Rocket or Fairway upon giving notice of termination. *See* § II.F, *supra*. That negates Plaintiff's assertion of market power to coerce the brokers. *See* § IV.C.1, *infra*.

Plaintiff has also added a section captioned "Market Power and Barriers to Entry," which asserts in circular fashion that UWM's ability to "force more than 9,000 brokers to agree to refuse to deal" with Rocker and Fairway "reflects UWM's market power." SAC ¶ 82. But does it? Or does the *willing* participation of more than 9,000 brokers in the Amendment simply evidence that many brokers considered it in their self-interest to do so? That is the plausible alternative that Plaintiff must exclude with *facts* in order to proceed on a per se theory. *Retina Assocs.*, 105 F.3d at 1381. And that is why the Magistrate Judge directed Plaintiff to supply *facts*, not conclusions, to support an inference of market power. Report at 33-38. Yet Plaintiff did not.

Lastly, Plaintiff adds a conclusory assertion that 93% of UWM's 10,000 brokers "represented the majority of brokers in the wholesale mortgage loan market, and

therefore involved a dominant portion of the market." SAC ¶ 102. Not only is that also conclusory, it is facially inconsistent. Plaintiff does *not* allege that 93% of all of UWM's brokers signed the Addendum; it alleges only that UWM announced that "93% of the brokers *presented with* the [A]ddendum" agreed to sign it, without identifying how many of UWM's brokers were presented with the Addendum. SAC ¶ 61 (emphasis added). Plaintiff separately alleges that UWM "boasts" of having 10,000 mortgage brokers under contract, representing "more than 60% of the wholesale mortgage brokers in the United States." *Id.* ¶ 27. Yet, Plaintiff also alleges that Rocket has 10,000 mortgage broker partners. *Id.* ¶ 35. And Rocket has publicly stated that more than 9,000 brokers declined UWM's Amendment and that Rocket gained "hundreds of new brokers" following the announcement. *See* § II.F, *supra*.

What these allegations do not provide, and what Plaintiff has never provided, are the two things the Magistrate Judge said were needed: a factual allegation of the actual percentage of brokers in the wholesale market as a whole who "joined the boycott," and factual allegations regarding the effect on the market. Plaintiff has not alleged how many brokers are in the wholesale mortgage market, how many signed the Addendum, or facts demonstrating how (if at all) this affected the market.

   4. <u>Plaintiff Fails to Plead a Claim Against Mr. Ishbia for Per Se Violation of the Sherman Act</u>

Plaintiff alleges no new or additional facts against Mr. Ishbia to support a per se claim against him; it simply asserts that Mr. Ishbia "directed, authorized, and ordered" UWM's actions and is therefore "personally liable" for UWM's

participation. SAC ¶¶ 153-57. Plaintiff's per se claim against Mr. Ishbia therefore fails for the same reasons as the claim against UWM.

### C. Plaintiff Fails to State a Claim for Unreasonable Restraint of Trade in Violation of Section 1 of the Sherman Act (Counts II and XI)

Counts II and XI set forth Plaintiff's "rule of reason" claims, purporting to assert claims against UWM and Mr. Ishbia, respectively, for allegedly undertaking an unreasonable restraint of trade. The rule of reason, which applies to restraints that are not unreasonable per se, requires a court to "decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." *State Oil Co. v. Khan,* 522 U.S. 3, 10 (1997). The rule entails a three-step, burden-shifting analysis, with Plaintiff having "the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018). To fulfill this initial burden, Plaintiff may either show "the potential for genuine adverse effects on competition" or "an actual detrimental effect on competition." *Levine v. Cent. Fla. Med. Affiliates*, 72 F.3d 1538, 1551 (11th Cir. 1996) (citations and additional quotations omitted).

The Magistrate Judge correctly found in the Report that the rule of reason analysis need not proceed past the first step, because Plaintiff did not carry its initial burden on the pleadings. Report at 38-41. In particular: (1) Plaintiff did not allege sufficient facts to support its claim that the alleged conduct had the potential for

genuine adverse effects on competition; and (2) Plaintiff failed to offer a clear picture of UWM's total market power or how UWM's conduct harmed competition. *Id.* The same pleading deficiencies again apply equally to the Second Amended Complaint.

        1.    <u>Plaintiff's Allegations Do Not Plead the Potential for a Genuine Adverse Effect on Competition</u>

To plead the potential for genuine adverse effect on competition, Plaintiff must allege that UWM exercises market power in a proper market. *Spanish Broad. Sys. of Fla. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1073 (11th Cir. 2004). It must further allege the Amendment substantially foreclosed competition in that market. *See Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961). Plaintiff has failed to allege that UWM held the requisite market power or foreclosed competition. *See* § IV.B.3, *supra*.

Moreover, Plaintiff fails to include "enough information in [its] complaint to plausibly suggest the contours of the relevant geographic and product markets." *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1336 (11th Cir. 2010). Defining the relevant market requires the Court to consider all reasonably interchangeable commodities. *See United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 394-95 (1956). Plaintiff alleges certain minor differences between the wholesale and retail channels (SAC ¶ 25), but fails to explain how the products offered in the two channels—residential mortgages to consumers—in any way fail to be reasonably interchangeable. *See Jacobs v. Tempur-Pedic Int'l, Inc.*, No. 4:07-CV-02, 2007 WL 4373980, at *4 (N.D. Ga. Dec. 11, 2007) (granting motion to dismiss because relevant market was mattresses, rather than narrower "visco-elastic foam mattresses"). Applying the correct market definition

of all residential mortgages, UWM's share of the relevant market is less than 5.4% (15.8% x 34%). SAC ¶¶ 26-27.

Plaintiff also has not alleged that the Amendment has foreclosed competition in the relevant market. "[F]or exclusive dealing to run afoul of the antitrust statutes," the exclusivity arrangements must substantially foreclose the relevant market—*i.e.*, they must significantly limit the ability of other competitors to enter or remain in the market. *McWane, Inc. v. Fed. Trade Comm'n*, 783 F.3d 814, 837 (11th Cir. 2015). Plaintiff alleges in conclusory fashion that there are "barriers to entry" to wholesale mortgage lending, but does not allege that Defendants' conduct substantially foreclosed the market, which already has 70+ other wholesale lenders and an entire retail channel. *See* SAC ¶ 83; *see also* Herbert Hovenkamp, *Federal Antitrust Policy* § 10.8 at 391 (1994) (foreclosure of even "a large percentage of one mode of distribution will have little anticompetitive effect if another mode is available").

Competition also cannot be foreclosed where, as here, the Amendment is "of relatively short duration and, crucially, can be terminated upon short notice"; such terms thus "do not—by themselves—sustain the Sherman Act claims." *Pro Search Plus, LLC v. VFM Leonardo, Inc.*, No. 8:12-cv-02102, 2013 WL 3936394, at *4 (C.D. Cal. July 30, 2013); *see also Paddock Pubs., Inc. v. Chicago Tribune Co.*, 103 F.3d 42, 44 (7th Cir. 1996); *PNY Techs., Inc. v. Sandisk Corp.*, No. 11-CV-04689, 2014 WL 1677521, at *8 (N.D. Cal. Apr. 25, 2014). The Amendment also includes no minimum requirement or obligation to submit loans to UWM, and permits brokers to submit loans to more than 70 other wholesale lenders while under contract with UWM. That

is a facially lawful relationship that "generally pose[s] little threat to competition." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012).

2.   <u>Plaintiff Does Not Plead a Potential or Actual Detrimental Effect on Competition</u>

Plaintiff likewise does not plead potential or actual detrimental effects on competition. The Complaint fails to allege an "actual increase in the price of the good or service, a decrease in output, or a decline in quality," the hallmarks of an actual detrimental effect. *EnviroPak Corp. v Zenfinity Capital, LLC*, No. 4:14-CV-00754, 2015 WL 331807, at *13-14 (E.D. Mo. Jan. 23, 2015). As discussed above, Plaintiff's new allegations of competitive harm are broad, conclusory, and implausible, backed by nothing more than unsubstantiated statements online and in press releases. *See* § II.B.3, *supra*. Such "[b]road, unsupported allegations of actual detrimental effects" are "inadequate to withstand a motion to dismiss." *Sherr v. HealthEast Care Sys.*, 262 F. Supp. 3d 869, 884 (D. Minn. 2017); *see also Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1084 (11th Cir. 2016) ("[A] plaintiff may not meet its burden of showing actual anticompetitive effects with mere conclusory assertions" and must "point to specific facts demonstrating harm to competition"); *Spanish Broad. Sys. of Fla.*, 376 F.3d at 1074; *Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 507-08 (9th Cir. 1989). As the Magistrate Judge found in the Report, Plaintiff still has not plausibly connected Defendants' alleged conduct to possible harm to competition. Report at 40 (citing *Appleton v. Intergraph Corp.*, 627 F. Supp. 2d 1342, 1355 (M.D. Ga. 2008)).

31

    3.    <u>Plaintiff Fails to Plead a Claim Against Mr. Ishbia for Unreasonable Restraint of Trade</u>

Plaintiff again alleges no new or additional facts against Mr. Ishbia; it simply asserts that he is "personally liable" for UWM's actions. SAC ¶¶ 158-62. Plaintiff's claim against Mr. Ishbia fails for the same reasons as the claim against UWM.

**D.    Plaintiff Fails to State a Claim for Attempt to Monopolize in Violation of Section 2 of the Sherman Act (Counts III and XII)**

Counts III and XII assert Plaintiff's claims against UWM and Mr. Ishbia, respectively, for an alleged attempt to monopolize in violation of Section 2 of the Sherman Act. The Magistrate Judge correctly found in the Report that Plaintiff failed to state a claim for attempted monopolization because UWM's alleged 34% market share of the putative wholesale mortgage market did not establish a dangerous probability of achieving monopoly power. Report at 42-45. That defect applies again to the Second Amended Complaint, and Plaintiff has also failed to allege anticompetitive conduct or a specific intent to monopolize. *See Spanish Broad. Sys.*, 376 F.3d at 1074 (identifying three "distinct elements" of claim for attempted monopolization: (1) predatory or anticompetitive conduct; (2) specific intent to monopolize; and (3) a dangerous probability of achieving monopoly power).

    1.    <u>Plaintiff Fails to Allege a Dangerous Probability of Achieving Monopoly Power.</u>

Plaintiff alleges that UWM has 34% market share of the putative wholesale mortgage market, which in turn accounts for just 15.8% of residential mortgage loan originations. SAC ¶¶ 26-27. As discussed above, *see* § IV.C.1, *supra*, the properly

defined market is the market of all residential mortgages, in which UWM has less than 5.4% market share. But even assuming, as the Magistrate Judge assumed without deciding, that the relevant market is confined to wholesale mortgages, UWM's 34% market share falls far short of evidencing a dangerous probability of achieving monopoly power. *See* Report at 43-44. A "dangerous probability of success arises when the defendant comes close to achieving monopoly power in the relevant market." *Gulf States Reorg. Grp., Inc. v. Nucor*, 721 F.3d 1281, 1285 (11th Cir. 2013) (citing *Levine*, 72 F.3d at 1555). A 34% market share does not plausibly indicate such a dangerous probability. *See U.S. Anchor Mfg.*, 7 F.3d at 1001 (holding that market share of "less than 50 percent" indicated "no dangerous probability of success"); *see also Gulf States Reorganization Grp., Inc. v. Nucor*, 822 F. Supp. 2d 1201, 1237 (N.D. Ala. 2011).

The Second Amended Complaint still contains no allegations plausibly indicating that UWM has come anywhere close to achieving a "dangerous probability" of monopoly power. The only allegation Plaintiff adds on this point is a citation to an alleged statement by Mr. Ishbia in June of 2021 that it was "more than realistic" to infer that UWM would pass Rocket in total mortgage loan business, which Plaintiff uses to infer that UWM would increase its market share in the "wholesale submarket" to between 50% and 60%. SAC ¶ 62. That allegation primarily confirms that Plaintiff's market definition is wrong; if market comparisons are made based on "total mortgage loan business," then the interchangeability of these loans necessarily means the relevant market is the total residential mortgage loan market. *See E. I. du Pont de Nemours & Co.*, 351 U.S. at 394-95. Plaintiff's inference is also implausible

because it assumes a static total wholesale mortgage market at 15.8%, rather than the more plausible inference of a growth of the wholesale channel relative to the retail channel. Regardless, one competitor passing another in total market share, even by "unfair means," does not indicate a dangerous probability of monopolization in a market of 70+ competitors. *Spanish Broad. Sys.*, 376 F.3d at 1076 (citing *Mfg. Research Corp. v. Greenlee Tool Co.,* 693 F.2d 1037, 1043 (11th Cir. 1982)).

Moreover, even were it assumed that UWM might achieve 50% to 60% market share, that does not establish a dangerous probability of success in the absence of significant barriers to entry. *See Paycargo, LLC v. CargoSpring, LLC*, No. 3:19-cv-85-TCB, 2019 WL 5793113, at *5 (N.D. Ga. Nov. 4, 2019) (collecting cases explaining that even when a plaintiff pleads a defendant has at least 50% market share, they must also "show that new rivals are barred from entering the market."); *Moecker v. Honeywell Intern., Inc.*, 144 F. Supp. 2d 1291, 1308 (M.D. Fla. 2001) (citations and quotations omitted) (stating that even "high market share" will not raise an inference of monopoly power "in a market with low entry barriers"). Plaintiff has added conclusory assertions of supposed "barriers to entry" such the need for a sophisticated electronic platform, qualified personnel, a sales force, satisfaction of licensing requirements, and substantial funds. SAC ¶¶ 83-84. But Plaintiff also alleges that wholesale mortgages account for "hundreds of millions of dollars" in loans annually, providing strong motives to enter even at high cost. *Id*. ¶¶ 16-17. And Plaintiff has never disputed that there are more than 70 other competitors already in the market. Ex. B at 16:9-18. Plaintiff thus lacks a plausible allegation of barriers to entry.

34

2.    Plaintiff Fails to Allege Anticompetitive Conduct or a Specific Intent to Monopolize.

Plaintiff's monopolization claim also fails on its other elements. As discussed above, Plaintiff has failed to allege that Defendants' conduct was anticompetitive. *See* §§ II.B.1-3, IV.C.1-2, *supra*. Anticompetitive conduct "'is arguably the single most important aspect'" of attempted monopolization. *Spanish Broad. Sys.*, 376 F.3d at 1075 (quoting *Northeastern Tel. Co. v. Am. Tel. & Tel. Co.*, 651 F.2d 76, 85 (2d Cir. 1981)).

Plaintiff also has failed to allege, beyond a boilerplate recitation, that Defendants had a specific intent to monopolize the wholesale lending market. SAC ¶ 128. Indeed, Plaintiff concedes it and every other broker remain free to submit loans to 70+ other lenders regardless of whether they agree to the Amendment, and every broker who consents to the Amendment can terminate the obligation not to submit loans to Rocket and Fairway immediately upon notice. *See* § II.E, *supra*.

3.    Plaintiff Fails to State a Claim Against Mr. Ishbia for Attempted Monopolization

Plaintiff once more alleges no additional facts against Mr. Ishbia; it simply asserts that he is "personally liable" for UWM's actions. SAC ¶¶ 163-67. Plaintiff's claim against Mr. Ishbia fails for the same reasons as the claim against UWM.

**E.    Plaintiff's Claims Against UWM Under the Florida Antitrust Act Follow the Sherman Act Claims and Fails for the Same Reasons (Counts IV, V, VI, XIII, XIV, XV)**

Counts IV, V, VI, XIII, XIV, and XV assert violations of the Florida Antitrust Act against UWM and Mr. Ishbia, mirroring Plaintiff's Sherman Act claims in Counts I, II, III, X, XI, and XII. In interpreting the Florida Antitrust Act, the body of federal

case law interpreting the Sherman Act is determinative. *See All Care*, 135 F.3d at 745 n. 11 ("Federal and Florida antitrust laws are analyzed under the same rules and case law."); *St. Petersburg Yacht Charters, Inc. v. Morgan Yacht, Inc.*, 457 So. 2d 1028, 1032 (Fla. 2d DCA 1984) ("The Florida legislature has, in effect, adopted as the law of Florida the body of antitrust law developed by the federal courts under the Sherman Act."). Accordingly, for the reasons articulated above, *see* §§ IV.B-D, *supra*, Plaintiff fails to state a claim under the Florida Antitrust Act, and Counts IV, V, VI, XIII, XIV, and XV should likewise be dismissed. *See* Report at 6 n.4.

## F.   Plaintiff Fails to State a Claim for Tortious Interference with Business Contracts and Prospective Economic Advantage (Counts VII and XVI)

Counts VII and XVI assert claims for tortious interference against UWM and Mr. Ishbia. The Magistrate Judge recommended dismissal of the tortious interference claim because Plaintiff failed to allege that existing customers ended their business with Plaintiff as a result of Defendants' alleged conduct. Report at 45-48. Plaintiff has still made no such allegations, dooming its amended claims. SAC ¶¶ 132-39, 180-86.

*First*, under Florida law,[8] Plaintiff has not alleged Defendants' interference with "a business relationship evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered." *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 815 (Fla. 1994) (citation omitted); *see also Int'l Serv. & Servs., Inc. v. Austral Insulated Prods., Inc.*,

---

[8] Defendants assume, without conceding, that Florida law governs Plaintiff's tortious interference claim. *See* SAC ¶¶ 15, 17-18; *Fla. Steel Corp. v. Whiting Corp.*, 677 F. Supp. 1140, 1141 (M.D. Fla. 1988).

262 F.3d 1152 (11th Cir. 2001). The Second Amended Complaint does not allege that existing customers ended their business with Plaintiff because of the unavailability of mortgages with UWM, and thus fails to allege an understanding or agreement not consummated because of Defendants' action. *See Med. Sav. Ins. Co. v. HCA, Inc.*, No. 2:04-cv-156, 2005 WL 1528666, at *9 (M.D. Fla. June 24, 2005), *aff'd by* 186 F. App'x 919 (11th Cir. 2006) (stating that failure to allege existing customers were induced to breach their contracts precluded claim for tortious interference).

*Second*, Plaintiff's claim remains facially incoherent, because Plaintiff alleges that wholesale mortgage lenders "do not work directly with consumers/borrowers," and that mortgage brokers "choose from a variety of wholesale lender" to "select the mortgage product" that fits the customer's needs. SAC ¶¶ 20, 22. With 70+ wholesale lenders still available, Plaintiff does not plausibly allege a "disruption" of its business relationships based on the unavailability of one lender. *See Iqbal*, 556 U.S. at 678.

*Third*, Plaintiff still fails to allege facts demonstrating Defendants had "the intent to damage [Plaintiff's] business relationship and a lack of justification for doing so." *Romika-USA, Inc. v. HSBC Bank USA, N.A.*, 514 F. Supp. 2d 1334, 1339 (S.D. Fla. 2007) (quotation marks omitted). The Second Amended Complaint incorporates the March 15, 2021 announcement of the Amendment, in which Mr. Ishbia enumerated UWM's numerous lawful justifications for its actions. Ex. B at 12:14-16:11. A company "may take steps to protect its business interests without liability for tortious interference" so long as the company "does not engage in improper conduct." *Romika-USA, Inc.*, 514 F. Supp. 2d at 1339; *Living Color Enters., Inc. v. New Era Aquaculture, Ltd.*,

No. 14-62216-CIV, 2015 WL 1526177, at *7 (S.D. Fla. Apr. 3, 2015).

*Fourth*, "an action for tortious interference will not lie where a party tortiously interferes with a contract terminable at will." *Greenberg, M.D. v. Mount Sinai Med. Ctr. of Greater Miami, Inc.*, 629 So. 2d 252, 255 (Fla. 3d DCA 1993); *see also Wackenhut Corp. v. Maimone*, 389 So. 2d 656, 658 (Fla. 4th DCA 1980). Plaintiff alleges no facts indicating its customer relationships were anything other than terminable at will.

### G.  Plaintiff Fails to State a Claim for Violation of Florida's Deceptive and Unfair Trade Practices Act (Counts VIII and XVII)[9]

Counts VIII and XVII assert claims for violation of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, against UWM and Mr. Ishbia. The Magistrate Judge recommended dismissal of the FDUPTA claim in the First Amended Complaint because it was predicated on the alleged antitrust violations, which were insufficient. Report at 48-49. The same result applies here, because Plaintiff's FDUPTA claims remain entirely derivative of their antitrust claims. *See* SAC ¶¶ 142, 188. They fail for the same reasons discussed in §§ IV.B-D, *supra*; *see also Hunter v. Bev Smith Ford, LLC*, No. 07-80665-CIV, 2008 WL 1925265, at *7 (S.D. Fla. Apr. 29, 2008) (dismissing FDUTPA claims based on dismissed violations of state and federal statutes); *JES Props., Inc. v. USA Equestrian, Inc.,* No. 8:02-cv-01585-T-24MAP, 2005 WL 1126665, at *19, n.23 (M.D. Fla. May 9, 2005) (similar).

---

[9] To the extent the Court finds Plaintiff's FDUTPA claim sounds in fraud by virtue of Plaintiff's allegation that Defendants made "false statements" to mortgage brokers (*see* SAC ¶¶ 7-8, 38-39, 56-57, 59, 135), Plaintiff's failure to comply with Rule 9(b) presents additional grounds for dismissal. *See Fid. Nat'l Fin., Inc. v. Attachmate Corp.*, No. 3:15-CV-01400, 2017 WL 3726687, at *3 (M.D. Fla. Mar. 1, 2017) (requiring claims arising under FDUTPA to satisfy Rule 9(b) where they sound in fraud).

The Magistrate Judge also expressed "reservations" as to whether Plaintiff sufficiently pled damages to support a FDUTPA claim. Report at 49 n. 17. It has not. FDUTPA requires the allegation of "actual damages." *City First Mortg. Corp. v. Barton*, 988 So. 2d 82, 86 (Fla. 4th DCA 2008). "Actual damages" does not include "consequential damages," and "harm in the manner of competitive harm, diverted or lost sales, and harm to the goodwill and reputation" are consequential damages. *Casa Dimitri Corp. v. Invicta Watch Co. of Am., Inc.*, 270 F. Supp. 3d 1340, 1352 (S.D. Fla. 2017) (citations and quotations omitted). Plaintiff only alleges consequential damages in the Second Amended Complaint, in the form of "lost customers and commissions," and does so only in conclusory terms. SAC ¶¶ 144, 191. Plaintiff's failure to plead actual damages requires dismissal. *See Mukamal v. Bakes*, No. 07-20793-CIV, 2008 WL 11391157, at *5 (S.D. Fla. May 20, 2008), *aff'd*, 378 F. App'x 890 (11th Cir. 2010).

Plaintiff also fails to allege the other two elements of a claim under FDUTPA: a "deceptive act or unfair practice," and causation. *City First Mortg. Corp.*, 988 So. 2d at 86. As previously discussed, the Amendment presented Plaintiff with a transparent business decision—one that is short-term and readily terminable—which Plaintiff chose to decline in favor of submitting loans to Rocket and Fairway. The Second Amended Complaint contains no facts reflecting how this contractual choice was deceptive or unfair as to Plaintiff or caused Plaintiff damages in light of its election.

## H.     Plaintiff Fails to State a Claim for Declaratory Relief (Count IX)

Lastly, Count IX for declaratory relief is facially defective because it lacks plausible allegations of damages and is wholly derivative of Plaintiff's other claims.

The Magistrate Judge found it need not reach the claim for this reason. Report at 48 n.16. Plaintiff's declaratory relief claim should be dismissed as duplicative of its other claims. *See Del Prado Mall Pro. Condo. Ass'n, Inc. v. Voyager Indem. Ins. Co.*, No. 2:20-cv-838, 2021 WL 1578758, at *2 (M.D. Fla. Apr. 22, 2021) (dismissing declaratory relief claim as duplicative); *Auto Dealer Sols., Inc. v. S.-Owners Ins. Co.*, No. 8:17-cv-2525, 2018 WL 4600674, at *3 (M.D. Fla. Jan. 25, 2018). Moreover, Plaintiff seeks a declaration that the Amendment and Addendum are "illegal," "unlawful," and "unenforceable." SAC ¶ 152. Because Plaintiff is not a party to the Addendum, these requested declarations are meaningless and non-justiciable as to Plaintiff. *See Atlanta Gas Light Co. v. Aetna Cas. Sur. Co.*, 68 F.3d 409, 414 (11th Cir. 1995) (citation omitted) (noting justiciable controversy must "touch the legal relation of parties").

## V.   <u>Conclusion</u>

Wherefore, for the foregoing reasons, Defendants respectfully request that the Court grant this Motion; dismiss the Second Amended Complaint against UWM in its entirety with prejudice; dismiss the Second Amended Complaint with prejudice as to Mr. Ishbia; and grant Defendants any other relief it deems necessary including, without limitation, an award of attorneys' fees in accordance with the provisions of Section 542.22(1), Florida Statutes, and FDUTPA.

Dated: December 14, 2022

Respectfully submitted,

**GREENBERG TRAURIG, P.A.**
401 East Las Olas Boulevard
Suite 2000

Fort Lauderdale, Florida 33301
Telephone: 954-765-0500
Telefax: 954-765-1477

By:    */s/ Glenn E. Goldstein*
       **Glenn E. Goldstein, Esquire**
       Florida Bar No. 435260
       Email: GoldsteinG@gtlaw.com
              depasqualem@gtlaw.com
              FLService@gtlaw.com
       **Sabrina D. Niewialkouski**
       Florida Bar No. 0123630
       Email: Niewialkouskis@gtlaw.com
       Anastasiya.Karant@gtlaw.com
       FLService@gtlaw.com

       ***Attorneys for Defendants United
       Wholesale Mortgage, LLC and
       Mathew Ishbia***

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of December, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

                    */s/ Glenn E. Goldstein*
                    GLENN E. GOLDSTEIN

41