UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

THE OKAVAGE GROUP, LLC
on behalf of itself and all others
similarly situated,

     Plaintiff,               Case No. 3:21-cv-448-BJD-LLL

v.                            Hon. Brian J. Davis

UNITED WHOLESALE        Magistrate Judge Laura Lothman Lambert
MORTGAGE, LLC and
MATTHEW ISHBIA, individually

     Defendants.

**PLAINTIFF'S RESPONSE AND BRIEF IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS SECOND AMENDED CLASS
ACTION COMPLAINT**

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................i

TABLE OF AUTHORITIES .................................................................. iii

INTRODUCTION ......................................................................................... 1

STATEMENT OF ALLEGED FACTS ...................................................... 1

ARGUMENT & AUTHORITIES .............................................................. 8

I.    THE SECOND AMENDED COMPLAINT PROPERLY ALLEGES A *PER SE*
      VIOLATION OF THE ANTITRUST LAWS ................................... 8

      A.    There Was a Horizontal Agreement Between The Brokers ............... 8

            1.    Interbroker Communications Are A Compelling "Plus
                  Factor" Here .............................................................................10

            2.    The Fact That the Brokers Reversed Course and Acted
                  Against Their Individual Interests Is Another Strong Plus
                  Factor ........................................................................................14

            3.    The Fact that the Brokers Were Coerced Does Not Rebut
                  an Inference of Agreement ...................................................... 16

            4.    Defendants' Cases are Inapposite ........................................... 17

      B.    The Allegations in the SAC Demonstrate that the Boycotters
            Possess Sufficient Market Dominance to Support a *Per Se*
            Boycott Claim ...................................................................................18

II.   THE SAC PLAUSIBLY ALLEGES AN UNREASONABLE RESTRAINT OF
      TRADE IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT ...........22

III.  THE SAC STATES A CLAIM FOR ATTEMPTED MONOPOLIZATION.....27

IV.   THE SAC PLAUSIBLY ALLEGES VIOLATIONS OF THE FLORIDA
      ANTITRUST ACT AND FLORIDA'S DECEPTIVE AND UNFAIR TRADE
      PRACTICES ACT ............................................................................. 29

V.    THE SAC STATES A CLAIM FOR TORTIOUS INTERFERENCE WITH
      BUSINESS    CONTRACTS    AND    PROSPECTIVE    ECONOMIC
      ADVANTAGE ............................................................................ 31

VI.     THE SAC STATES A CLAIM FOR DECLARATORY RELIEF .....................32

VII.    MR. ISHBIA'S PERSONAL LIABILITY IS PLAINLY ALLEGED ON THE FACE OF THE SAC .....................................................................................34

VIII.   THIS COURT HAS PERSONAL JURISDICTION OVER MR. ISHBIA ......35

CONCLUSION ..........................................................................................................37

46642837.20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A & E Auto Body, Inc. v. 21st Century Centennial Ins. Co.*,
2015 WL 12867010 (M.D. Fla. Jan. 22, 2015) .................................................. 17

*Agudo, Penerio & Kates, P.A. v. Harbert Const. Co.*,
476 So.2d 1311 (Fla. Dist. Ct. App. 1985) ......................................................... 31

*American Prof'l Testing Serv. Inc. v. Harcourt Brace Jovanovich
Legal & Prof'l Pubs. Inc.*,
108 F.3d 1147 (9th Cir. 1997) .............................................................................. 19

*Ares Defense Systems, Inc. v. Karras*,
2016 WL 7042957 (M.D. Fla. Mar. 10, 2016) .................................................... 35

*Arnold Pontiac-GMC, Inc. v. General Motors Corp.*,
786 F.2d 564 (3d Cir. 1986) ................................................................................. 15

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
472 U.S. 585 (1985) ............................................................................................... 23

*Atlanta Gas Light Co. v. Aetna Cas. Sur. Co.*,
68 F.3d 409 (11th Cir. 1995) ........................................................................ 33, 34

*Auto Dealer Solutions, Inc. v. Southern-Owners Ins. Co.*,
2018 WL 4600674 (M.D. Fla. Jan. 25, 2018) ..................................................... 33

*Bell Atlantic v. Twombly*,
550 U.S. 544 (2007) ............................................................................................... 11

*Big Apple BMW, Inc. v. BMW of N. Am., Inc.*,
974 F.2d 1358 (3d Cir. 1992) ............................................................................... 15

*Blomkest Fertilizer, Inc. v. Potash Corp. of Sask.*,
203 F.3d 1028 (8th Cir. 2000) (*en banc*) ........................................................... 11

*Brown Shoe Co v. United States*,
370 U.S. 294 (1962) ............................................................................................... 27

*Brown v. Pro Football, Inc.*,
518 U.S. 231 (1996) ............................................................................................... 12

*Burge v. Ferguson,*
    619 F. Supp. 2d 1225 (M.D. Fla. 2008)............................................................. 31

*Chicago Bridge & Iron Co. N.V. v. F.T.C.,*
    534 F.3d 410 (5th Cir. 2008) ............................................................................ 29

*Cliff Food Stores, Inc. v. Kroger, Inc.,*
    417 F.2d 203 (5th Cir. 1969) ........................................................................... 27

*Danielson v. Tropical Shipping & Constr. Co.,*
    2019 WL 13183885 (S.D. Fla. June 25, 2019) ................................................ 29

*Del Prado Mall Prof'l Condo. Ass'n v. Voyager Indem. Ins. Co.,*
    2021 WL 1578758 (M.D. Fla. Apr. 22, 2021).................................................. 33

*In re Delta/Air Tran Baggage Fee Antitrust Litig.,*
    733 F. Supp. 2d 1348 (N.D. Ga. 2010) ........................................................... 10

*In re Delta/Airtran Baggage Fee Antitrust Litig.,*
    245 F. Supp. 3d 1343 (N.D. Ga. 2017) ............................................................ 11

*In re Disposable Contact Lens Antitrust Litigation,*
    215 F. Supp. 3d 1272 (M.D. Fla. 2016)......................................................... 9, 15

*Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.,*
    732 F.2d 480 (5th Cir. 1984)............................................................................ 28

*E-Z Pack Mfg., LLC v. RDK Truck Sales & Serv., Inc.,*
    2011 WL 4343790 (M.D. Fla. Aug. 10, 2011)................................................. 30

*Eastman Kodak Co. v. Image Technical Sys., Inc.,*
    504 U.S. 451 (1992) ......................................................................................... 19

*In re EpiPen Direct Purchaser Litigation,*
    2022 WL 1017770 (D. Minn. Apr. 5, 2022) .................................................... 17

*F.T.C. v. Indiana Fed'n of Dentists,*
    476 U.S. 447 (1986) .................................................................................... 22, 23

*Fishman v. Wirtz,*
    No. 78 C 3621, 1981 WL 2153 (N.D. Ill. Oct. 28, 1981).................................. 12

*Fortner Enters., Inc. v. United States Steel Corp.,*
    394 U.S. 495 (1969)......................................................................................... 21

iv

*General Motors LLC v. Royal Motors Corp.*,
   769 F. Supp. 2d 73 (D.P.R. 2011) ................................................................33

*Great Escape, Inc. v. Union City Body Co.*,
   791 F.2d 532 (7th Cir. 1986)................................................................ 29

*Hasbrouck v. Texaco, Inc.*,
   842 F.2d 1034 (9th Cir. 1987)...........................................................23

*In re High Fructose Corn Syrup Antitrust Litigation*,
   295 F.3d 651 (2002) ............................................................................ 15

*In re Insurance Brokerage Antitrust Litigation*,
   618 F.3d 300 (3d Cir. 2010)................................................... 14, 16, 17

*Internet Solutions Corp. v. Marshall*,
   39 So.3d 1201 (Fla. 2010)...................................................................35

*Isaksen v. Vt. Castings, Inc.*,
   825 F.2d 1158 (7th Cir. 1987) ........................................................... 16

*In re January 2021 Short Squeeze Trading Litig.*,
   2021 WL 5359731 (S.D. Fla. Nov. 17, 2021) ........................................9

*Kearney & Trecker Corp. v. Giddings & Lewis, Inc.*,
   452 F.2d 579 (7th Cir. 1971) ............................................................. 20

*Kitroser v. Hurt*,
   85 So. 3d 1084 (Fla. 2012) .................................................................36

*Klinger v. Weekly World News, Inc.*,
   747 F. Supp. 1477 (S.D. Fla. 1990) ................................................... 30

*Licciardello v. Lovelady*,
   544 F.3d 1280 (11th Cir. 2008).........................................................35

*Lorillard Tobacco Co. v. Virginia Carolina Corp., Inc.*,
   2012 WL 12872740 (S.D. Fla. Aug. 21, 2012) .................................. 30

*Lormand v. U.S. Unwired, Inc.*,
   565 F.3d 228 (5th Cir. 2009) ............................................................ 26

*M & M Med. Supplies & Serv. v. Pleasant Valley Hosp.*,
   981 F.2d 160 (4th Cir. 1992) (en banc).............................................. 29

*Marco Island Cable v. Comcast Cablevision of S., Inc.*,
    312 F. App'x 211 (11th Cir. 2009) ...................................................... 29

*McGahee v. Northern Propane Gas Co.*,
    858 F.2d 1487 (11th Cir. 1988) ......................................................... 28

*McWane, Inc. v. FTC*,
    783 F.3d 814 (11th Cir. 2015) ........................................................... 20

*Medimmune Inc. v. Genentech, Inc.*,
    549 U.S. 118 (2007) ........................................................................... 32

*Merck-Medco Managed Care, LLC v. Rite Aid Corp.*,
    201 F.3d 436 (4th Cir. 1999) ............................................................. 15

*MM Steel L.P. v. JSW Steel (USA) Inc.*,
    806 F.3d 835 (5th Cir. 2015) ............................................................. 15

*Monsanto Co. v. Spray-Rite Service Corp.*,
    465 U.S. 752 (1984) ........................................................................... 10

*NACM Tampa, Inc. v. Sunray Notices, Inc.*,
    2017 WL 2209970 (M.D. Fla. Feb. 8, 2017) ..................................... 30

*Northern Pac. Ry. Co. v. United States*,
    356 U.S. 1 (1958) ............................................................................... 21

*Northwest Wholesale Stationers, Inc. v. Pacific Stationery &*
*Printing Co.*,
    472 U.S. 284 (1985) ........................................................................... 18

*Ohio v. Am. Express Co.*,
    138 S. Ct. 2274 (2018) ....................................................................... 23

*Omni Healthcare, Inc. v. Health First, Inc.*,
    2015 WL 275806 (M.D. Fla. Jan. 22, 2015) ...................................... 34

*Phelan v. Lawhon*,
    229 So.3d 853 (Fla. Dist. Ct. App. 2017) .......................................... 35

*In re Plywood Antitrust Litig.*,
    655 F.2d 627 (5th Cir. 1981) ............................................................. 11

*In the Matter of ProMedica Health Sys., Inc.*,
    2012-1 Trade Cases P 77840 (F.T.C.) (2012), 2012 WL 1155392 ..................... 24

vi

*Quality Auto Painting Center of Roselle, Inc. v. State Farm*
*Indemnity Co.*,
917 F.3d 1249 (11th Cir. 2019)...............................................................17

*Realcomp II, Ltd. v. F.T.C.*,
635 F.3d 815 (6th Cir. 2011)..................................................................23

*Shahar v. Bauers*,
120 F.3d 211 (11th Cir. 1997) ...............................................................26

*Siegel v. Delta Air Lines, Inc.*,
714 F. App'x 986 (11th Cir. 2018) (per curiam) ................................. 11

*Silver v. New York Stock Exch.*,
373 U.S. 341 (1963)..................................................................................22

*Skypoint Advisors, LLC v. 3 Amigos Prods. LLC*,
2019 WL 3343933 (M.D. Fla. July 25, 2019) ....................................36

*In re Slamon*,
2021 WL 1109128 (S.D. Fla. Mar. 23, 2021)......................................13

*Spectators' Communication Network, Inc. v. Colonial Country Club*,
253 F.3d 215 (5th Cir. 2001) ...............................................................16

*Sticky Holsters, Inc. v. Ace Case Mfg., LLC*,
2016 WL 1436602 (M.D. Fla. Apr. 12, 2016).....................................36

*Tarrant Servs. Agency, Inc. v. Am. Standard, Inc.*,
12 F.3d 609 (6th Cir. 1993) ..................................................................27

*In re Terazosin Hydrochloride*,
220 F.R.D. 672 (S.D. Fla. 2004) ......................................................... 21

*Toys "R" Us, Inc. v. FTC*,
221 F.3d 928 (7th Cir. 2000) ...........................................................18, 20

*U.S. Anchor Mfg. v. Rule Indus., Inc.*,
7 F.3d 986 (11th Cir. 1993).....................................................19, 20, 21, 28

*United States v. Allen*,
831 F. App'x 580 (2d Cir. 2020) ............................................................10

*United States v. Apple, Inc.*,
791 F.3d 290 (2d Cir. 2015)..............................................................12, 13

*United States v. Colgate & Co.*,
  250 U.S. 300 (1919) ........................................................................... 17

*United States v. Dentsply*,
  399 F.3d 181 (3d Cir. 2005) ............................................................. 26

*United States v. H&R Block, Inc.*,
  833 F. Supp. 2d 36 (D.D.C. 2011) ....................................................23

*United States v. Visa USA, Inc.*,
  344 F.3d 229 (2d Cir. 2003) ............................................................. 20

*United States v. Wise*,
  370 U.S. 405 (1962)............................................................................34

*Valley Liquors, Inc. v. Renfield Importers, Ltd.*,
  822 F.2d 656 (7th Cir. 1987) ........................................................... 20

*Virgin Atl. Airways, Ltd. v. British Airways PLC*,
  257 F.3d 256 (2d Cir. 2001) ............................................................23

*Vitacost.com v. Oregon Freeze Dry, Inc.*,
  No. 09-80367-CIV, 2009 WL 10667820 (S.D. Fla. July 21, 2009)................. 17

*Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*,
  857 F.2d 55 (2d Cir. 1988) .............................................................. 29

*Wendt v. Horowitz*,
  822 So.2d 1252 (Fla. 2002)................................................................35

*Wiggins v. Tigrent, Inc.*,
  147 So.3d 76 (Fla. Dist. Ct. App. 2014) ...........................................35

*Yellow Cab Co. of Orlando v. Celebration Transp., Inc.*,
  2013 WL 656339 (M.D. Fla. Jan. 28, 2013) ..................................... 30

## Federal Statutes

Declaratory Judgment Act, 28 U.S.C. §2201(a) .....................................32

Sherman Act § 1 .................................................10, 16, 17, 19, 20, 22, 34

## State Statutes

Florida Antitrust Act..............................................................................30

Florida Antitrust Act and Florida's Deceptive and Unfair Trade
    Practices Act ............................................................................ 29

**Other Authorities**

Fed. R. Civ. P. 57 ........................................................................ 33

46642837.20

Plaintiff, The Okavage Group, LLC, ("Okavage"), files this Response and Brief in Opposition to Defendants' Motion to Dismiss [Doc. 73] the Second Amended Class Action Complaint (the "SAC"), filed November 8, 2022 [Doc. 69].

## **INTRODUCTION**

The SAC includes substantial new factual allegations that directly address the issues raised in Magistrate Judge Lambert's Report and Recommendation ("R&R"). These include new allegations relating to the agreement between brokers to boycott Rocket and Fairway, SAC ¶¶35-37, 40-46, 48-49, 51-53, 65-66; additional facts plausibly indicating the presence of market power and a dangerous probability of monopolization, SAC ¶¶27-28, 61-63, 83; factual allegations relating to competitive effects, SAC ¶¶31-35, 47, 61-63, 72-73, 77, 79, 81; a series of specific factual allegations relating to barriers to entry, SAC ¶¶84-85; new allegations concerning the expectation which was tortiously interfered with, SAC ¶¶31-35, 47, 72-82; and additional alleged facts relating to the personal liability of Mat Ishbia, SAC ¶¶36-37, 40, 47, 51, 61. With these new allegations, notwithstanding Defendants' arguments, the SAC states a valid claim for relief.

## **STATEMENT OF ALLEGED FACTS**

## **COMPETITION AMONG MORTGAGE BROKERS**

The following summarizes the facts alleged in the SAC that are most relevant to the Motion to Dismiss. Wholesale mortgage lenders offer loans through independent third parties, such as mortgage brokers. SAC ¶20. UWM, the largest

46642837.20

wholesale mortgage lender in the United States, has an approximately 34% share of the wholesale mortgage lending market. *Id.* ¶27. UWM's 2021 prospectus notes that "the mortgage business has experienced substantial consolidation." *Id.* ¶28. It also states that for the 12 months ended September 30, 2020, UWM experienced a "more than 84% increase year over year" in home loans closed. *Id.*

UWM has over 10,000 mortgage brokers under contract. *Id.* ¶27. Mortgage brokers deal directly with consumers and help them select the most appropriate lender. *Id.* ¶20.

## UWM'S DEFICIENCIES

UWM's competition for wholesale mortgage lending includes Rocket and Fairway. *Id.* ¶31. These firms also compete at "retail," providing products directly to consumers. *Id.* ¶¶30-31. Rocket Pro TPO offers a number of benefits to mortgage brokers and their customers not available through UWM. *Id.* ¶32(B) and (C). In particular, Rocket is less restrictive in the credit scores it requires than is UWM, and therefore Rocket provides an opportunity for loans to consumers who would be refused by UWM. *Id.* ¶32(B). Rocket also offers lower cost mortgage insurance than does UWM and is rated more highly by many firms that evaluate mortgage lenders. *Id.* ¶32(C).

Both UWM itself and numerous brokers have concluded that UWM was higher priced than its major competitors. UWM's CEO, Mr. Ishbia, has stated that UWM is "not trying to be the best priced." *Id.* ¶34. One broker has stated that Rocket "consistently beat[s] UWM in price across every product type offered." *Id.*

Another broker stated that UWM's "pricing is often higher than their competitors . . ." *Id.* ¶34. Another broker noted that in one illustrative case, Rocket's rate was less than 15% of UWM's rate. *Id.* ¶78.

## The Competitive Threats Faced By UWM

As of early 2021, UWM's leading position in the wholesale market was threatened by Fairway and Rocket. *Id.* ¶35. From 2018 to 2021 Rocket's wholesale business increased from 3,000 mortgage broker partners to 10,000, reflecting the fact that Rocket's products and prices were especially attractive to mortgage brokers and their customers. *Id.* ¶35.

## THE BOYCOTT

In response, Mr. Ishbia announced an ultimatum at a live virtual meeting with brokers on UWM's Facebook page. *Id.* ¶36. UWM introduced an addendum to its broker agreements that included a requirement that the signatory would not submit loans to either Rocket or Fairway. Any breach would result in substantial penalties. *Id.* ¶54. Mr. Ishbia said specifically that "[i]f you work with them [Rocket or Fairway], you can't work with UWM anymore, effective immediately." *Id.* ¶34. Okavage refused to agree to the ultimatum, and was terminated by UWM. *Id.* ¶70.

Mr. Ishbia attempted and succeeded in obtaining agreement to the addendum by the vast majority of UWM's brokers. This was a collective effort by brokers, facilitated by UWM. Brokers who supported the boycott persuaded other brokers to join in it. This included numerous statements in support of the boycott during the virtual meeting. These statements advocated collective action by the

3

brokers:

> One broker responded to Mr. Ishbia and his fellow brokers, saying: 'We are ALL IN' 'unstoppable together...' 'We are all family! Brokers are better when we work together'; 'Brokers are family. We don't go against our family'; 'All in....with us or out'; 'You're either with the captain [UWM] or off the boat'; 'with us or against us'; and 'all for one and one for all.'

> 'Team Broker!'; Let's kill it fam--- you know it's going to be good'; BROKERS---WAKE UP!!! Stop sending files to the enemy! Protect your book of business' 'This is what we have been waiting for broker community': 'We are ALL IN' 'unstoppable together'; 'We are all family! 'Sign on the line that is dotted'; 'All in'; 'With us or out' 'You're either with the captain [UWM] or off the boat'; 'with us or against us' and 'all for one and one for all.'

*Id.* ¶41.

Mr. Ishbia's statements and these brokers' communications took place in complete public view on a Facebook site accessible to thousands of brokers. *Id.* ¶42. Mr. Ishbia repeatedly referred to this collective action as the "'all in' initiative." Mr. Ishbia stated that "all of our current clients are aligned" with respect to this initiative. *Id.* Mr. Ishbia also stated that the participating brokers "have locked arms with us." *Id.*

Brokers also used UWM's Facebook page to discourage other brokers who disagreed with the boycott and to encourage agreement. *Id.* ¶43. For example, after Broker C expressed his opposition, Broker A castigated him and said that: "[you] don't care about the [broker] channel as a whole." *Id.* In one conversation, Broker A urged Broker B to engage with Rocket "no more! Sign the addendum." Broker B confirmed an hour later that she signed, to which Broker A replied, "great job!" *Id.* ¶49.

4

UWM provided forums for mortgage brokers to assist each other in terminating their relationships with Rocket and Fairway. *Id.* ¶50. Broker E asked other brokers "Where do we get the form to sign[?]" and received a response from another broker with instructions on how to access the addendum and how to terminate his broker agreement with Rocket. *Id.* ¶44.

On the same day as the live virtual meeting, the Association of Independent Mortgage Experts ("AIME") issued its own letter voicing support for the boycott. *Id.* ¶45. AIME describes itself as "a community" of "mortgage professionals" and says its members include "wholesale mortgage professionals", independent mortgage brokers and persons "affiliated with a company that does not underwrite its own loans." *Id.* ¶46. AIME states that its members "come from every region across the country." *Id.* ¶45. As part of the live chat, AIME supported the boycott and stated during the Facebook video: "Work with TRUE lender partners. Let's strengthen the challenge!" *Id.* Other trade groups have provided significant vehicles for communication and agreement between the mortgage brokers with regard to the boycott. *Id.* ¶48.

The boycott was a dramatic change in behavior by the boycotting brokers, who until that time had been utilizing Rocket Pro TPO and Fairway in increasing numbers because of Rocket's and Fairway's strong reputation, good prices and high quality service. *Id.* ¶65. The decision to boycott Rocket and Fairway was contrary to the brokers' unilateral self-interest. *Id.*

The decision to boycott Rocket and Fairway would have been contrary to the

interests of the brokers if they had not in overwhelming numbers agreed to the boycott. If an individual broker deprived itself of the availability of loans from Fairway and Rocket, it could expect to lose substantial business to other brokers who offered a broader range of alternatives, unless the brokers had agreed to be "all in". This is reflected in the comments of brokers, discussed above, that they were "unstoppable together". *Id.* ¶¶41, 65-66.

## ANTICOMPETITIVE MOTIVE

Mr. Ishbia stated that this initiative could deter retail lenders from competing aggressively in the wholesale space. *Id.* ¶47.

## EFFECT OF THE BOYCOTT

Mr. Ishbia predicted during the live virtual meeting that Rocket Mortgage and Fairway would lose 70%-90% of their business, as a result of the boycott. *Id.* ¶61. After the boycott was initiated, Mr. Ishbia indicated that the boycott exceeded his expectations, stating "I couldn't have imagined it going so well." UWM announced "93% of the brokers presented with the addendum agreed to join the boycott." *Id.* UWM later stated that more than 11,000 of 12,000 brokers participated in the initiative. *Id.* UWM stated that "not even 500" of its brokers declined to participate in the boycott. *Id.* The fact that there was opposition expressed to the boycott, *Id.* ¶79, does not change the fact that it was overwhelmingly successful.

## THE BOYCOTTERS' AND UWM'S MARKET DOMINANCE

UWM's brokers had a dominant market position, representing more than

60% of all brokers in the wholesale lending market. *Id.* ¶27. According to Mr. Ishbia, virtually all these brokers participated in the boycott. *Id.* ¶61. The fact that Mr. Ishbia estimated that these brokers represented 70-90% of Rocket's and Fairway's business also illustrates their dominance. *Id.*

UWM also had substantial market power, reflected in its ability to demand burdensome terms from its brokers. This is reflected in the fact that 93% of the brokers with whom it dealt agreed to accept its ultimatum, even though that deprived them of access to lower priced, innovative lenders. *Id.* ¶82.

By cutting Rocket and Fairway off from brokers representing, in Mr. Ishbia's own estimate, 70-90% of their business, *Id.* ¶61, Mr. Ishbia and UWM deprived Rocket and Fairway of business essential to their ability to effectively compete.

### DANGEROUS PROBABILITY OF MONOPOLIZATION BY UWM

UWM's belief that it would achieve market dominance is reflected in Mr. Ishbia's statement to the press in June of 2021 that it was "more than realistic" that UWM would pass Rocket in total mortgage loan business. *Id.* ¶62. For UWM to pass Rocket in total, it would need to increase its wholesale business by approximately 60%. *Id.* This would increase its market share in the wholesale submarket to between 50% and 60%. *Id.*

This likelihood is further supported by UWM's 20% increase in funded loans in 2021, and the expectation of market commentators that current conditions would lead to a "shakeout" of smaller mortgage lenders, leading to further share gains by larger firms such as UWM. *Id.* ¶63.

46642837.20

## BARRIERS TO ENTRY

There are substantial barriers to entry into wholesale mortgage lending, including the need to develop and achieve (a) a sophisticated electronic platform that can take years to complete and costs millions of dollars, (b) hundreds, if not thousands, of qualified personnel, including a significant training program to develop personnel with the requisite skills, (c) a substantial sales force and a significant reputation, and (d) satisfaction of licensing requirements on a state by state basis, as well as compliance with Fannie Mae/Freddie Mac and VA guidelines. *Id.* ¶83.

## ANTICOMPETITIVE EFFECTS

The boycott harmed consumers by reducing their access to the lower price, innovative, higher quality products offered by Fairway and Rocket. *Id.* ¶73. The boycott also prevented brokers from performing their stated function of reviewing all available sources of lending and providing their customers with the most suitable and lowest priced loans. *Id.* ¶72.

## ARGUMENT & AUTHORITIES

### I.    THE SECOND AMENDED COMPLAINT PROPERLY ALLEGES A *PER SE* VIOLATION OF THE ANTITRUST LAWS

#### A.    There Was a Horizontal Agreement Between The Brokers

As Magistrate Judge Lambert stated in her R&R, a "hub and spoke" conspiracy, involving agreement between competing brokers coordinated by UWM, would be a *per se* antitrust violation. Document 61 at 30. The allegations in

8

the SAC, including the numerous new allegations, provide a more than plausible basis for reasonably inferring such an agreement.

The first element is parallel conduct. Here, the signing of an agreement by 11,000 brokers to forego relationships with two low price lenders who had previously been gaining substantial business from these brokers clearly alleges such parallel conduct. As this Court stated in *In re Disposable Contact Lens Antitrust Litigation*, 215 F. Supp. 3d 1272, 1289 (M.D. Fla. 2016), an allegation of parallel conduct "gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility…"

The "plus factors" that create such enhancement

> may include: a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications, [as well as] speeches at industry conferences, announcements of future prices, statements on earnings calls, and in other public ways.

*In re January 2021 Short Squeeze Trading Litig.*, 2021 WL 5359731, at *17 (S.D. Fla. Nov. 17, 2021) (citations omitted). Here, the brokers' communications with each other, the facilitation of such communications by UWM, the fact that thousands of brokers dramatically changed their behavior, and the fact that such actions were against the brokers' interests unless they acted together, are all "plus factors" which are more than sufficient to make the conspiracy allegations eminently plausible.

9

### 1.    Interbroker Communications Are A Compelling "Plus Factor" Here

As described above, acquiescence in UWM's ultimatum did not simply result from communications between UWM and individual brokers. The ultimatum was proposed at a virtual meeting at which the brokers communicated at length with one another. Statements such as "unstoppable together," "brokers are better when we work together," "brokers are family. We don't go against our family," "All in... with us or out," SAC ¶41, are all statements indicating that numerous brokers agreed on a common course of action.

These statements constitute direct evidence of conspiracy: "all in" is no different than "we agree." At the very least, such statements more than plausibly suggest "a conscious commitment to a common scheme" or a "meeting of minds," which is all that is required under the antitrust laws. *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 764, 765 (1984) (quotations and citations omitted). It is established that "Plaintiffs need not allege the existence of collusive communications in 'smoke-filled rooms' in order to state a § 1 Sherman Act claim," *In re Delta/Air Tran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d 1348, 1360 (N.D. Ga. 2010), but the virtual discussions between brokers, facilitated by UWM, are the modern equivalent.

The fact that the SAC does not quote 9,000 brokers is certainly not disqualifying, especially at the pleading stage. Once a conspiracy is shown, only a slight amount of evidence is needed to link another defendant with it. *See United States v. Allen*, 831 F. App'x 580, 581 (2d Cir. 2020) (summary order) (*citing*

*United States v. Abelis*, 146 F.3d 73, 80 (2d Cir. 1998)). *Twombly* makes clear that a complaint "does not need detailed factual allegations." *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007). All *Twombly* requires at this stage is "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* at 556.

Even if these statements were not considered direct evidence, they are still more than enough to support liability. Numerous courts have held that the presence of parallel behavior coupled with such interfirm communications is sufficient to prove a conspiracy, even at the summary judgment stage. *Blomkest Fertilizer, Inc. v. Potash Corp. of Sask.*, 203 F.3d 1028, 1033 (8th Cir. 2000) (*en banc*) ("Courts have held that a high level of communications among competitors can constitute a plus factor which, when combined with parallel behavior, supports an inference of conspiracy."); *In re Plywood Antitrust Litig.*, 655 F.2d 627, 633, 634 (5th Cir. 1981) ("The parallel pricing conduct clearly demonstrated in the record plus the numerous items of direct evidence of communication between high-level personnel on pricing policy adequately support the jury's verdict" "that defendants were engaged . . . in a conspiracy to fix prices.").

These statements are even more compelling because they involve explicit invitations to collude. *See In re Delta/Airtran Baggage Fee Antitrust Litig.*, 245 F. Supp. 3d 1343, 1372 (N.D. Ga. 2017), aff'd sub nom. *Siegel v. Delta Air Lines, Inc.*, 714 F. App'x 986 (11th Cir. 2018) (per curiam) ("Numerous cases have recognized that an invitation to collude can serve as evidence of a conspiracy.");

46642837.20

*Fishman v. Wirtz*, No. 78 C 3621, 1981 WL 2153, at *59 (N.D. Ill. Oct. 28, 1981)

("One of the strongest circumstantial indicators of a conspiracy is the existence of

a common invitation or request to join into a concerted plan of action."). The

Supreme Court has noted that "[a]ntitrust law also sometimes permits judges or

juries to premise antitrust liability upon little more than uniform behavior among

competitors, preceded by conversations implying that later uniformity might prove

desirable . . ." *Brown v. Pro Football, Inc.*, 518 U.S. 231, 241 (1996).

The SAC alleges numerous examples of brokers attempting to persuade

others to agree to refuse to deal with Rocket and Fairway, as well as brokers

assisting other brokers in signing the agreement and accomplishing the results.

Phrases such as "all in," "unstoppable together," "work together," "don't go against

our family," "all in . . . with us or out," "you're either with the captain or off the

boat," and "with us or against us," SAC ¶41, are all unquestionably invitations from

brokers to other brokers to reach an agreement.

The decision in *United States v. Apple, Inc.*, 791 F.3d 290 (2d Cir. 2015), in

which a conspiracy was found involving the facilitation of an agreement between

competing publishers by Apple, is on all fours with the allegations here. In *Apple*,

the Second Circuit noted that "Apple coordinated phone calls between the

publishers who had agreed and those who remained on the fence." *Id.* at 319.

Similarly here, the SAC alleges that UWM responded specifically to brokers who

had concerns, SAC ¶43, established a digital forum for brokers to discuss the issue

with one another, *id.* ¶49, and worked with brokers who could assist other brokers

12

to sign the addendum, *id.* ¶44.

The Second Circuit also noted that Apple "endeavored to assure the publishers that they weren't going to be alone . . . ." *Apple*, 791 F. 3d at 319 (brackets omitted). The SAC similarly alleges that Mr. Ishbia said publicly that "all our current clients are aligned," *id.* ¶42, and that all the brokers "have locked arms with us." *Id.* ¶42. Mr. Ishbia also said in a public forum that "everybody is going to sign." *Id.* ¶51.

The facts alleged here are much stronger than in *Apple*, since the assurances were not only made by UWM, but by the brokers themselves. The statements regarding the "all in" nature of the brokers' actions provided assurances to other brokers that they were not going to be alone, and would be acting as part of a large group.

The new allegations in the SAC regarding statements by AIME and other trade associations also plausibly suggest an agreement by their members. After all, any trade association is a spokesman for its members. It is more than reasonable to expect that discovery will reveal a consensus by its members in support of AIME's statement. "[P]articipation in a trade association, where the defendants had opportunities to exchange information or make agreements, coupled with allegations of parallel conduct, are sufficient to tie the defendants to the conspiracies." *In re Slamon*, 2021 WL 1109128, at *10 (S.D. Fla. Mar. 23, 2021) (citations, quotations, and alterations omitted).

Defendants' references to "independent expressions of enthusiasm", Doc. 73

13

at p.30, thus misinterprets the alleged facts. The brokers interacted with one another and responded to one another. Taking all the alleged facts into account, including those contained in the SAC regarding cooperation and coordination, these actions cannot be characterized as "independent".

The Third Circuit in *In re Insurance Brokerage Antitrust Litigation*, 618 F.3d 300, 322 (3d Cir. 2010), previously relied upon by the Magistrate Judge, explained that "evidence implying a traditional conspiracy" requires "'proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan . . . .'" (citations omitted). Here, the statements regarding the parties' being "all in," "unstoppable together," "all family" and "all for one" are certainly "assurances of common action" and "a common plan." *Id.* And it was quite clear, based on Mr. Ishbia's statements referring to depriving Fairway and Rocket of 70%-90% of their business, that what was contemplated was an offer that would be accepted by most or all of the brokers.

### 2. The Fact That the Brokers Reversed Course and Acted Against Their Individual Interests Is Another Strong Plus Factor

The "further factual enhancement" also arises from the fact that the brokers who agreed to the ultimatum acted against their individual self-interests. Prior to UWM's meeting with its brokers, Fairway and Rocket (the lower priced, higher quality alternatives) were gaining wholesale share, necessarily implying that they were gaining additional business from the mortgage brokers. After the meeting, there was an abrupt "about face"; 93% of the brokers agreed not to deal any more

46642837.20

with these attractive alternatives. This is compelling evidence of conspiracy. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1365 (3d Cir. 1992). (discussing the holding in *Arnold Pontiac-GMC, Inc. v. General Motors Corp.*, 786 F.2d 564 (3d Cir. 1986), that evidence was sufficient to withstand summary judgment where "GM had favorably viewed Arnold Pontiac's franchise application until after the GM dealers collectively expressed disapproval and threatened non-cooperation."). *See also MM Steel L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 844 (5th Cir. 2015); *In re High Fructose Corn Syrup Antitrust Litigation*, 295 F.3d 651, 663 (2002).

Notwithstanding UWM's pressure, the conduct that occurred here also would have been contrary to the individual brokers' self-interests if not undertaken by most of the brokers. *See In re Disposable Contact Lens Antitrust Litigation*, 215 F. Supp. 3d at 1296 (a new pricing policy would only make sense if a manufacturer "can be confident that other manufacturers will be taking similar action, and won't be taking a competitive advantage."). This "is perhaps the strongest plus factor indicative of conspiracy." *Merck-Medco Managed Care, LLC v. Rite Aid Corp.*, 201 F.3d 436, 1999 WL 691840, at *10 (4th Cir. 1999). Here, if an individual broker deprived itself of the availability of alternative loans from Fairway and Rocket it could expect to lose business to other brokers who offered these alternatives, unless the brokers were "all in." SAC ¶66. As the brokers also said, they are "unstoppable together." *Id.* ¶¶ 46, 66. Quite clearly, the implication was that they were *not* unstoppable individually, and therefore collective action was necessary.

### 3.    The Fact that the Brokers Were Coerced Does Not Rebut an Inference of Agreement

Contrary to UWM's argument that the brokers cannot be both conspirators and victims, the case law makes clear that co-conspirators need not share the same motive or goal, and a conspiracy can involve coercion. In *Spectators' Communication Network, Inc. v. Colonial Country Club*, 253 F.3d 215, 222 (5th Cir. 2001), the Fifth Circuit held that the plaintiff had presented "sufficient evidence of a combination or conspiracy when one conspirator . . . is enticed or coerced into knowingly curtailing competition by another conspirator who has an anticompetitive motive." *See also Isaksen v. Vt. Castings, Inc.*, 825 F.2d 1158, 1163 (7th Cir. 1987) (holding that the fact that a party was "coerced into agreeing is of no moment; an agreement procured by threats is still an agreement for purposes of section 1"); *Insurance Brokerage*, 618 F.3d at 344 ("[T]he conspiracy was instigated, coordinated, and policed by Marsh, but this does not belie the alleged horizontal agreement. On the contrary, Marsh's influence could create a powerful incentive for exactly such an agreement . . . .").

Defendants argue that brokers expressed enthusiasm for the boycott. That does not change the fact that UWM imposed a penalty (no more access to its loans) for brokers who did not comply. Nor does it change the fact that, prior to the boycott, brokers had been utilizing Rocket and Fairway in ever-increasing numbers. The "enthusiasm" mentioned by Defendants reflects exhortations to act collectively, which would prevent any harm that could result from unilateral

16

action.[1] In any event, a boycott among competitors need not be coerced in order for *per se* liability to apply.

### 4. Defendants' Cases are Inapposite

Defendants' other cases do not suggest a contrary conclusion. The alleged facts in *In re Insurance Brokerage*, *supra,* were far different than those alleged in this case. In *Insurance Brokerage*, the Third Circuit noted that "there are no allegations that any insurer ever horizontally disclosed to its competitors the details of its vertical agreement with a broker." 618 F.3d at 329. *In re EpiPen Direct Purchaser Litigation*, 2022 WL 1017770, at *7 (D. Minn. Apr. 5, 2022) simply says that "[m]ere knowledge of the existence of other . . . agreements . . . does not constitute an agreement under § 1." But the discussion alleged here is far more than "mere knowledge;" it is active participation.

*United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919) and *Vitacost.com v. Oregon Freeze Dry, Inc.*, No. 09-80367-CIV, 2009 WL 10667820, at *6 (S.D. Fla. July 21, 2009), involve nothing more than a communication by the manufacturer. Indeed, in *Vitacost*, there was not even a claim of a horizontal conspiracy. Similarly, *A & E Auto Body, Inc. v. 21st Century Centennial Ins. Co.*, 2015 WL 12867010 (M.D. Fla. Jan. 22, 2015), included no factual allegations of communications between the defendants. The same is true of *Quality Auto*

---

[1] Defendants also argue that any broker is "free" to decline to sign the Addendum. But such "freedom" results in an inability to sell UWM loans. Similar forms of coercion, such as tying agreements, which require one purchase in order to be permitted to make another, are routinely found to be violations of the antitrust laws. *See* tying cases discussed *infra*.

*Painting Center of Roselle, Inc. v. State Farm Indemnity Co.*, 917 F.3d 1249 (11th
Cir. 2019).

### B. The Allegations in the SAC Demonstrate that the Boycotters Possess Sufficient Market Dominance to Support a *Per Se* Boycott Claim

The allegations in the SAC are also sufficient to meet the standards in
*Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472
U.S. 284, 294 (1985), for *per se* boycotts, *i.e.*, that "the boycott often cut off access
to a supply, facility or market necessary to enable the boycotted firm to
compete . . . and frequently the boycotting firms possessed a dominant position in
the relevant market."

The standard for dominance under *Northwest Stationers* is not demanding.
As the court held in *Toys "R" Us, Inc. v. FTC,* 221 F.3d 928, 936 (7th Cir. 2000),
"[w]e have found that this case satisfies the criteria the Court used in *Northwest
Stationers* for condemnation without any extensive inquiry into market power and
economic pros and cons . . . 'dominant' is an undefined term, but [is] plainly
chosen to stand for something different from antitrust's term of art 'monopoly.'"
In *Toys "R" Us*, another *per se* "hub and spoke" case, dominance was found even
though Toys "R" Us had only a 20% share of toy sales.

Under any standard, the boycotting brokers clearly represented a dominant
force. The SAC alleges that UWM's brokers represent more than 60% of the
brokers in the market. SAC ¶27. It also alleges (according to the defendant Mr.
Ishbia) that more than 90% of these brokers participated in the boycott. *Id.* ¶61.

By simple arithmetic, this represents more than half the market.

Moreover, to precisely quote Mr. Ishbia from the video of the live chat linked to the Complaint, Mr. Ishbia estimated that "80% to 90% of brokers are going to say, hey, we're sticking with UWM" and "10% [will] stay with them [Rocket and Fairway] … But like I said, these guys [Rocket and Fairway] just lost 70%, 80%, 90% of their business." This illustrates the brokers' dominance.

This Circuit held in *U.S. Anchor Mfg. v. Rule Indus., Inc.*, 7 F.3d 986, 1000 (11th Cir. 1993), that even "a dangerous probability of achieving monopoly power may be established by a 50% share." These figures therefore constitute market shares more than sufficient to establish market power under the lesser standard applicable to Section 1 of the Sherman Act. *Eastman Kodak Co. v. Image Technical Sys., Inc.*, 504 U.S. 451, 481 (1992) ("Monopoly power under § 2 requires, of course, something greater than market power under § 1.").

Defendants miss the mark entirely, conflating monopoly power with the kind of dominance that is required by *Northwest Stationers*. Indeed, they assert, citing to *American Prof'l Testing Serv. Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Pubs. Inc.*, 108 F.3d 1147, 1154 (9th Cir. 1997) that a showing of "substantial or even dominant market share alone cannot establish market power." But since the standard here is "dominance," *not* monopoly power, Defendants' argument is irrelevant.

While this is not necessary to meet the *Northwest Stationers* standard, since it is sufficient that the boycotters themselves (the brokers) are dominant, UWM

46642837.20

itself also possessed a dominant market position. While the 34% share alleged in the SAC may be insufficient by itself to establish the existence of monopoly power, courts have found it to be sufficient to satisfy the lesser requirements for a Section 1 claim, especially under the facts alleged here. *See, e.g.*, *Kearney & Trecker Corp. v. Giddings & Lewis, Inc.*, 452 F.2d 579, 598 (7th Cir. 1971) (holding that one-third market share was sufficient where the firm's conduct "would endanger the competitive process" and the "[f]ulfillment of its objectives would have significantly enhanced its market position"). *See also United States v. Visa USA, Inc.*, 344 F.3d 229, 239-40 (2d Cir. 2003) (26% share sufficient for market power under Section 1); *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 667 (7th Cir. 1987) ("17%-25% . . . is an absolute minimum necessary to establish market share" in a Section 1 case). The SAC also alleges that the market was substantially consolidating, *id.* ¶28, and that Mr. Ishbia's predictions were effectively that UWM would gain a share of more than 50%. SAC ¶62. Substantially diminishing the business available to UWM's two largest competitors would further enhance UWM's share.

Moreover, market share is not the only way to measure market dominance. The ability to exclude competition is itself sufficient to establish even monopoly power. *McWane, Inc. v. FTC*, 783 F.3d 814, 830 (11th Cir. 2015) ("Monopoly power is the ability 'to control prices or exclude competition.'" (citation omitted)). *See also Toys "R" Us*, 221 F.3d at 937. *Anchor Mfg., supra*, cited by Defendants, states only that market share is the "principal" device for assessing market power, not the

exclusive one. 7 F.3d at 994.

For example, the Supreme Court has held that there was sufficient market power to establish a *per se* tying violation when the conduct brought about an "appreciable restraint," *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 11 (1958), as well as where the defendant "has the power to raise prices or impose other burdens and terms such as a tie-in, with respect to any appreciable number of buyers," *Fortner Enters., Inc. v. United States Steel Corp.*, 394 U.S. 495, 503-4 (1969). *See also In re Terazosin Hydrochloride*, 220 F.R.D. 672, 696 (S.D. Fla. 2004) ("In determining whether a defendant has market power, a court must assess whether the 'seller has the power to raise prices, or impose other burdensome terms such as a tie-in, with respect to any appreciable number of buyers within the market.'" (quoting *Fortner*, 394 U.S. at 504).

The SAC alleges that UWM had sufficient power to successfully impose its ultimatum on 93% of its brokers, many of whom had previously chosen to utilize Rocket and Fairway. SAC ¶¶61, 82.[2] This imposed "burdensome terms" on an "appreciable number of buyers." This more than satisfies the "market dominance" requirement in *Northwest Stationers*.

The SAC also alleges that Mr. Ishbia stated that Rocket and Fairway would be cut off from 70-90% or more of the referrals they received from brokers, and subsequently confirmed that the result was even more successful than he expected.

---

[2] Defendants assert that the SAC does not identify "the percentage of brokers who joined the alleged 'boycott'", Doc. 73 at p.35, but of course, it does just that.

Certainly the loss of 70-90% of their business would be essential to effective competition by Rocket and Fairway. In *Silver v. New York Stock Exch.*, 373 U.S. 341, 348 (1963), cited by the *Northwest Stationers* court with regard to the "essentiality requirement," the Supreme Court found that the denied services were important because a party without them would be "hampered substantially in [their] crucial endeavor," and provided "important business advantages[.]" The loss of 70-90% of the competitors' business, more than meets this standard.

Defendants argue that the fact that UWM intended to exclude competition from retailers is somehow a "plausible procompetitive benefit". But a defendant cannot baldly label a practice as "procompetitive" and thereby obtain a dismissal. The SAC certainly does not allege that there are any procompetitive benefits from the boycott. Indeed, the alleged threat that Defendants claim was "procompetitively" prevented, "diverting wholesale mortgage borrowers to [Rocket's and Fairway's] retail mortgage divisions", is simply a description of competition. Eliminating this competition through an orchestrated refusal to deal, contrary to the brokers' previously free competitive choices, is not procompetitive.

## II. THE SAC PLAUSIBLY ALLEGES AN UNREASONABLE RESTRAINT OF TRADE IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

Even if the Court rejected *per se* treatment here, the allegations of the SAC are clearly sufficient to plausibly allege an unreasonable restraint of trade. To prove an unreasonable restraint of trade, a plaintiff must show either "actual detrimental effects" or market power plus "the potential for genuine adverse effects

46642837.20

on competition . . . ." *F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460 (1986).
R&R, Document 61 at 39.

Direct harm to competition can be proven by factors "such as reduced
output, increased prices, or decreased quality . . . ." *Ohio v. Am. Express Co.*, 138
S. Ct. 2274, 2284 (2018) (emphasis added). Courts recognize harm to competition
where a low price competitor is eliminated, since that reduces pricing pressure on
the other competitors. *See United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36,
79-80 (D.D.C. 2011). The reduction of high quality alternatives is also an
anticompetitive effect. In *Virgin Atl. Airways, Ltd. v. British Airways PLC*, 257
F.3d 256, 264-265 (2d Cir. 2001), the court found that "consumers experienced a
decrease in quality due to Virgin's delayed entry" because "Virgin offered higher
quality services than British Airways." *See also Aspen Skiing Co. v. Aspen
Highlands Skiing Corp.*, 472 U.S. 585, 605-606 (1985) (Evidence that product
preferred by consumers became less available was evidence that defendants
conduct "has impaired competition in an unnecessarily restrictive way"). "Clearly,
injury to competitors may be probative of harm to competition . . . ." *Hasbrouck v.
Texaco, Inc.*, 842 F.2d 1034, 1040 (9th Cir. 1987), *aff'd*, 496 U.S. 543 (1990).

Restrictions on choice can also constitute anticompetitive effects. The
"anticompetitive nature of the restraint" in *Realcomp II, Ltd. v. F.T.C.*, 635 F.3d
815, 827, 829-31 (6th Cir. 2011), was the reduction in competitive brokerage
options available to home sellers—circumstances quite analogous to the restriction
of consumers' lender options instigated by the conduct of UWM and Mr. Ishbia.

46642837.20

*See also F.T.C v. Indiana Fed'n of Dentists*, 476 U.S. 447, 459 (1986) (stating that "an agreement limiting consumer choice by impeding the 'ordinary give and take of the market place,' cannot be sustained under the Rule of Reason" (citation omitted)).

All of these actual anticompetitive effects are supported by specific factual allegations newly added to the SAC. In particular, the SAC alleges that Rocket and Fairway are higher rated than UWM in "affordability" by certain rating organizations, SAC ¶32(C), Mr. Ishbia has himself stated that UWM "is not trying to be the best priced," and brokers have stated that Rocket "consistently beats UWM in price," *id. See also*, *id.* ¶78.

Similarly, the SAC includes allegations indicating that Rocket and Fairway provide superior quality as compared to UWM, including allegations that Rocket accepts less restrictive credit scores, SAC ¶32(B), has higher satisfaction ratings, *id.* ¶32(C), and that UWM admits that some of its competitors "may have . . . more operational flexibility in approving loans." *Id.* ¶73.

The SAC also alleges that Rocket and Fairway are UWM's largest rivals and closest competitors. "Combining competitors for which consumers view the firms' products as significant substitutes may enable the merged firm profitability to increase prices," because it limits the choices to customers. *In the Matter of ProMedica Health Sys., Inc.*, 2012-1 Trade Cases P 77840 (F.T.C.) (2012), 2012 WL 1155392, at *36. Limiting competition from a close substitute will necessarily have similar effects.

24

The significant weakening "of two of the largest, and two leading wholesale mortgage lenders, who have been very highly rated, and have offered very competitive prices, significantly reduced competition . . . ." SAC ¶72. Additionally, the flexibility of independent mortgage brokers to "shop rates from multiple lenders . . . rather than any particular lender, was seriously disrupted by the boycott." *Id.* ¶76. This has "interfered with the traditional role of the mortgage broker," which is to act as an independent agent on behalf of their clients and to select for them the most competitive mortgage products available. *Id.* This is more than sufficient to make it plausible that anticompetitive effects may be shown here after discovery and trial.

Defendants argue that there are many other lenders available besides Rocket and Fairway. But the SAC alleges that there has been a consolidation of the market. *Id.* ¶28, and UWM expected a "shakeout" of smaller lenders. *Id.* ¶63. In any event, it is certainly more than plausible that harm to UWM's two largest and closest competitors, who offer significant price and quality advantages, will be found to have harmed overall competition.

While the SAC does not specifically allege Rocket's or Fairway's market shares after the boycott, it does allege that Mr. Ishbia predicted a 70-90% decline in their business, and then after the fact announced that the boycott was successful. It is certainly plausible to infer from Mr. Ishbia's statements that Rocket and Fairway suffered substantial losses in market share. It is not unreasonable to expect that discovery would confirm Defendants' own assertions.

25

Contrary to Defendants' assertions, the SAC also alleges facts more than sufficient to plausibly allege substantial foreclosure. A loss to Rocket and Fairway of 70-90% of their business due to the boycott would reflect substantial foreclosure. Additionally, the brokers participating in the boycott (and therefore not accessible to Rocket and Fairway) according to Mr. Ishbia would represent more than 50% of the market. *See* discussion *supra*.

Defendants argue that foreclosure is not significant here because of the short term of the Addendum. But it does not matter what the term of the Addendum is if the penalty – the denial of access to UWM's mortgages – still exists to deter a broker's exit from the Addendum. *See United States v. Dentsply*, 399 F.3d 181, 194 (3d Cir. 2005) ("[I]n spite of the legal ease with which the relationship can be terminated, the dealers have a strong economic incentive to continue carrying Dentsply's teeth.").

Defendants try to argue that Rocket and Fairway have not been harmed, asking the court to take judicial notice of the facts stated in certain press releases. However, the case they rely upon, *Shahar v. Bauers,* 120 F.3d 211, 214 n.5 (11th Cir. 1997), says exactly the opposite. Judicial notice of facts asserted in newspaper articles is not appropriate. Moreover, the cited data is not specific to the wholesale submarket. And in any event, it is not appropriate for the court to weigh evidence, as Defendants request, at the motion to dismiss phase. "[W]e are not authorized or required to determine whether the plaintiff's plausible inference . . . is equally or more plausible than other competing inferences . . . ." *Lormand v. U.S. Unwired,*

26

*Inc.*, 565 F.3d 228, 267 (5th Cir. 2009).[3]

## III.   THE SAC STATES A CLAIM FOR ATTEMPTED MONOPOLIZATION

The SAC also satisfies the "dangerous probability of success" element of attempted monopolization. A dangerous probability of success need not be proven solely by high market share. Indeed, this Circuit has cautioned that "one must be particularly wary of the numbers game of market percentage when considering an 'attempt to monopolize' suit." *Cliff Food Stores, Inc. v. Kroger, Inc.*, 417 F.2d 203, 207 n.2 (5th Cir. 1969). *See also Tarrant Servs. Agency, Inc. v. Am. Standard, Inc.,* 12 F.3d 609, 615-16 (6th Cir. 1993).

Here, UWM's dangerous probability of success is revealed by its own statements that it could cut off its two largest competitors' access to more than 70% of brokers thereby successfully imposing burdensome terms on a large number of brokers. SAC ¶61. *See* discussion, *supra*.

The SAC also newly alleges that UWM believed that it would achieve monopoly level shares. Mr. Ishbia opined that it was "more than realistic" that UWM would surpass Rocket and Fairway in total mortgage loan business, which would amount to an increase in UWM's wholesale business "by approximately 60%," resulting in a total market share of between 50% and 60% for UWM. *Id.* ¶

---

3 In passing, Defendants try to argue that the SAC does not properly allege a relevant market. But they ignore the fact that Plaintiffs allege that wholesale mortgage lending is a separate submarket, SAC ¶25, and that the factors identified precisely meet the requirements set forth in *Brown Shoe Co v. United States*, 370 U.S. 294, 325 (1962). Of course, the fact that Mr. Ishbia wanted to pass Rocket in total loans originated, Doc. 73 at p.43, does not in any way suggest that all loans are interchangeable as Defendants argue.

46642837.20

62. This is very different from the facts in *U.S. Anchor, supra* on which Defendants rely. There, the defendant had shares averaging 30% and was below 50% "throughout the time" predation occurred. 7 F.3d at 1001.

Indeed, the prospect of UWM substantially increasing its market share is already manifesting itself. As the SAC explains, UWM experienced a "20% increase in funded loans in 2021[.]" SAC ¶63. Moreover, commentators expect that current conditions will result in market consolidation. *Id.* ¶¶ 28, 63. This further increases the probability of successful monopolization. *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 490 (5th Cir. 1984) (holding that a "consolidation trend in the market" makes successful monopolization more likely). "[A] share of less than fifty percent generally required for actual monopolization may support a claim for attempted monopolization if other factors such as concentration of market, high barriers to entry, consumer demand, strength of the competition, or consolidation trend in the market are present." *Id.*

High barriers to entry into the wholesale mortgage lending industry also contribute to a dangerous likelihood of monopolization. As discussed *supra*, the SAC sets forth numerous new allegations illustrating the substantial obstacles facing new wholesale mortgage lenders. SAC ¶83A–E. These allegations plausibly suggest that new competitors could not easily enter and compete effectively with UWM. *See McGahee v. Northern Propane Gas Co.*, 858 F.2d 1487, 1495 n.11 (11th Cir. 1988) (reversing summary judgment because, in holding that there were no significant barriers to entry, the district court neglected to consider "factors, such

28

as large capital outlays required to start a new business"); *Danielson v. Tropical Shipping & Constr. Co.*, 2019 WL 13183885, at *4 (S.D. Fla. June 25, 2019) (barriers to entry include "legal license requirements"); *Chicago Bridge & Iron Co. N.V. v. F.T.C.*, 534 F.3d 410, 438 (5th Cir. 2008) (barriers to entry include "expertise," "regulatory experience," and "license requirements"). Defendants have no response other than to label these detailed statements as "conclusory."[4]

## IV. THE SAC PLAUSIBLY ALLEGES VIOLATIONS OF THE FLORIDA ANTITRUST ACT AND FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

Defendants argue that the SAC fails to adequately allege actual causation or damages under the FDUPTA. But the SAC specifically alleges that the Class Members participating in the boycott have been injured by their loss of an opportunity to offer their customers the choice of UWM, or Rocket or Fairway. SAC ¶¶76, 135, 136, 183. Those like Okavage who did not participate lost the opportunity to provide UWM's loans to their customers. *Id.* This, unsurprisingly, has cost it customers and commissions. *Id.* ¶144.

Contrary to Defendants' assertions, many cases have approved claims involving similar kinds of damages. *Marco Island Cable v. Comcast Cablevision of S., Inc.*, 312 F. App'x 211, 214 (11th Cir. 2009) (allowing recovery for diminution in value of plaintiffs' business due to defendant's "illegal actions" affect[ing] the MDU

---

[4] The SAC also properly alleges a specific intent to monopolize, since that can be inferred from anticompetitive conduct. *M & M Med. Supplies & Serv. v. Pleasant Valley Hosp.*, 981 F.2d 160, 166 (4th Cir. 1992) (en banc); *Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d 55, 74 (2d Cir. 1988); *Great Escape, Inc. v. Union City Body Co.*, 791 F.2d 532, 541 (7th Cir. 1986).

cable market . . . as a whole"); *Lorillard Tobacco Co. v. Virginia Carolina Corp.,
Inc.*, 2012 WL 12872740, at \*3 (S.D. Fla. Aug. 21, 2012) (holding that "irreparable
injury to [plaintiff's] valuable goodwill and reputation" was recoverable damages
under FDUTPA); *Klinger v. Weekly World News, Inc.*, 747 F. Supp. 1477, 1480
(S.D. Fla. 1990) (loss of business opportunities is a valid basis for a FDUTPA
claim); *NACM Tampa, Inc. v. Sunray Notices, Inc.*, 2017 WL 2209970, at \*11
(M.D. Fla. Feb. 8, 2017) ("Lost profits are compensable under [the FDUTPA].");
*Yellow Cab Co. of Orlando v. Celebration Transp., Inc.*, 2013 WL 656339 (M.D.
Fla. Jan. 28, 2013) (allowing recovery for lost business and damaged reputation
and goodwill under FDUTPA); *E-Z Pack Mfg., LLC v. RDK Truck Sales & Serv.,
Inc.*, 2011 WL 4343790 (M.D. Fla. Aug. 10, 2011) (allowing recovery for lost sales,
lost business goodwill and reputation, and lost business opportunities under
FDUTPA).

Nor does the SAC fail to adequately allege and a "deceptive act or unfair
practice." False statements are alleged in the SAC at ¶¶38-39 and ¶¶56-57. The
false statements, the persons making them and the time they were made are
alleged with reasonable particularity. The anticompetitive actions of UWM in
orchestrating a boycott are "unfair practices."

For the same reasons set forth above, Okavage's claims under the Florida
Antitrust Act should not be dismissed, since, as the parties agreed, the Florida
statute is governed by the same principles as the federal antitrust laws.

## V.  THE SAC STATES A CLAIM FOR TORTIOUS INTERFERENCE WITH BUSINESS CONTRACTS AND PROSPECTIVE ECONOMIC ADVANTAGE

The elements of tortious interference were properly alleged here. The SAC specifically alleges that Okavage and Class Members had and were likely to maintain contracts and advantageous business relationships with customers—known to UWM—who desired to work with mortgage brokers capable of offering their clients all leading mortgage lenders, including Rocket, Fairway, and UWM. SAC ¶¶133-134. The SAC alleges that Defendants' actions interfered with these relationships. *Id.* ¶135.

Defendants claim that Okavage "fails to allege an understanding or agreement not consummated because of Defendants' action." (ECF 73, PageID 962.) But that is not required. "[A] plaintiff may properly bring a cause of action alleging tortious interference with present or *prospective* customers . . . ." *Burge v. Ferguson*, 619 F. Supp. 2d 1225, 1239 (M.D. Fla. 2008) (emphasis added).

Defendants' claim that the SAC fails to allege tortious intent is similarly unsupported. SAC ¶¶7, 12, 37, 39, 40, 135, 139 and 186 all specifically refer to intentional and purposeful actions. The impropriety of a coerced boycott intending to cut off lower priced, higher quality competitors is evident, *See Agudo, Penerio & Kates, P.A. v. Harbert Const. Co.*, 476 So.2d 1311, 1317 (Fla. Dist. Ct. App. 1985), where the court upheld the plaintiffs' tortious interference claim alleging that the defendant used "threats, promises, economic coercion and intimidation" to induce a law firm client to abandon his contractual relationship with the firm. The alleged

fraudulent statements, *id.* ¶¶38-39, 56-57, were also improper. Defendants' argument that UWM's actions were somehow reasonable efforts to protect its business interests certainly cannot be resolved in its favor on a motion to dismiss where the SAC alleges nothing of the kind.

The fact that wholesale mortgage lenders do not work directly with a broker's clients is irrelevant to the question of whether Defendants' conduct tortiously interfered with that broker's business relationship with its clients. It is enough that Defendants interfered with the loan customers' choice of mortgage lenders.

## VI.    THE SAC STATES A CLAIM FOR DECLARATORY RELIEF

Contrary to Defendants' assertions, there is unquestionably an "actual controversy" here regarding the validity and enforceability of the Addendum. This is sufficient to state a claim under the federal Declaratory Judgment Act, 28 U.S.C. §2201(a). The requirements for a federal declaratory judgment action are satisfied where "the facts alleged, under all the circumstances, show that there is a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant issuance of a declaratory judgment." *Medimmune Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (citation and quotations omitted).

Okavage's contract with UWM was terminated because of his refusal to sign the Addendum. SAC ¶¶56, 64, 70. Okavage contends that was improper because the Addendum was unlawful. If Okavage is right, and the contract addendum is

null and void, UWM could not cut off Okavage for refusing to agree to an illegal contract. This is precisely what the declaratory judgment statute was designed to do. *See, e.g.*, *General Motors LLC v. Royal Motors Corp.*, 769 F. Supp. 2d 73, 76 (D.P.R. 2011) ("GM's right to terminate its contractual relationship with RMC is the exact type of dispute considered ripe for declaratory judgment."). Similarly, if the Addendum is void, class members who have signed it will be free to deal with Rocket and Fairway.

The mere fact that there exists some conceptual overlap between the SAC's antitrust claims and the request for declaratory relief is no reason to dismiss either as "duplicative." *See* Fed. R. Civ. P. 57 ("The existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate.").

Defendants' unpublished cases on this point are inapposite. In *Del Prado Mall Prof'l Condo. Ass'n v. Voyager Indem. Ins. Co.,* 2021 WL 1578758, at *1 (M.D. Fla. Apr. 22, 2021), the court declined to exercise jurisdiction over a declaratory judgment claim because it did nothing more than incorporate the breach of contract claim and sought "the same exact relief Count I seeks." In *Auto Dealer Solutions, Inc. v. Southern-Owners Ins. Co.,* 2018 WL 4600674, *3 (M.D. Fla. Jan. 25, 2018), the court dismissed the declaratory judgment action as not ripe under the specialized provisions related to insurance coverage disputes.

Defendants' suggestion that Plaintiffs' declaratory judgment claim is "meaningless and non-justiciable" because Okavage is "not a party to the Addendum" finds no support in *Atlanta Gas Light Co. v. Aetna Cas. Sur. Co.*, 68

33

F.3d 409 (11th Cir. 1995). The *Atlanta Gas* court dismissed the action because it had been brought prematurely. *Id.* at 414-15.

## VII.  MR. ISHBIA'S PERSONAL LIABILITY IS PLAINLY ALLEGED ON THE FACE OF THE SAC

Defendants repeatedly assert that the SAC "alleges no additional facts against Mr. Ishbia." (*See* ECF 73, PageID 952–53, 957, 960.) In fact, the new allegations in the SAC specifically allege that Mr. Ishbia personally announced the boycott on a Facebook video, SAC ¶¶36-37, 40, "stated that this initiative could deter retail lenders from competing aggressively in the wholesale space," *id.* ¶47, stated publicly that "everyone's going to sign an addendum that says 'hey listen, we're not working with those two lenders,'" *id.* ¶51 and "predicted on the video that Rocket Mortgage and Fairway would lose 70%-90% of their business," *id.* ¶61.

Mr. Ishbia's actions are more than enough to establish personal liability. "[A] corporate officer is subject to prosecution under § 1 of the Sherman Act whenever he knowingly participates in effecting the illegal contract, combination, or conspiracy—be he one who authorizes, orders, or helps perpetrate the crime— regardless of whether he is acting in a representative capacity." *United States v. Wise*, 370 U.S. 405, 416 (1962). *See also Omni Healthcare, Inc. v. Health First, Inc.*, 2015 WL 275806, at *15 (M.D. Fla. Jan. 22, 2015) (holding that allegations of a corporate officer's active participation in an anticompetitive scheme "suffice for individual antitrust liability").

For these reasons, Mr. Ishbia is personally liable for each of the offenses alleged against UWM discussed above.

34

## VIII. THIS COURT HAS PERSONAL JURISDICTION OVER MR. ISHBIA

Defendants' challenge to this Court's personal jurisdiction over Mr. Ishbia ignores binding case law construing Florida's long-arm statute. The Eleventh Circuit has made clear that courts may exercise personal jurisdiction under Florida's "long arm statute" over a non-resident defendant "who commits a tort outside of the state that causes injury inside the state." *See Licciardello v. Lovelady*, 544 F.3d 1280, 1283 (11th Cir. 2008). The Florida Supreme Court has held that to "commit a tortious act in Florida, a defendant's physical presence is not required." *Wiggins v. Tigrent, Inc.*, 147 So.3d 76, 86 (Fla. Dist. Ct. App. 2014) (citation and quotations omitted). The Florida Supreme Court has specifically concluded that "'committing a tortious act' in Florida under section 48.193(1)[(a)] can occur through the nonresident defendant's telephonic, electronic, or written communications into Florida." *Wendt v. Horowitz*, 822 So.2d 1252, 1260 (Fla. 2002). This principle has been applied repeatedly to internet posts accessible in Florida. *Internet Solutions Corp. v. Marshall*, 39 So.3d 1201, 1214-15 (Fla. 2010); *Licciardello*, 544 F.3d at 1283; *Ares Defense Systems, Inc. v. Karras*, 2016 WL 7042957, at *8 (M.D. Fla. Mar. 10, 2016). Of course, the SAC specifically alleges such internet communications by Mr. Ishbia here. *See* SAC ¶¶36-37, 40, 51.

There are a host of decisions finding jurisdiction over out of state defendants engaged in intentional wrongdoing on behalf of their company, notwithstanding the corporate shield doctrine. *Phelan v. Lawhon*, 229 So.3d 853, 860 (Fla. Dist. Ct. App. 2017) (holding that the defendant's out-of-state conduct directing a civil

46642837.20

conspiracy against Florida residents was sufficient to confer personal jurisdiction, and that the corporate defendants "may not claim the benefit of the corporate shield doctrine, in light of the unrebutted allegations of intentional misconduct against each of them"); *Skypoint Advisors, LLC v. 3 Amigos Prods. LLC*, 2019 WL 3343933, at *8, 9 (M.D. Fla. July 25, 2019) (holding that "the defendant does not have to be physically present in Florida for the tortious act to occur within that state," and that defendant's reliance on the corporate shield doctrine was "misplaced, as the doctrine does not apply to intentional torts"); *Sticky Holsters, Inc. v. Ace Case Mfg., LLC*, 2016 WL 1436602, at *3, 4 (M.D. Fla. Apr. 12, 2016) (holding that "Florida law excludes claims for fraud from the purview of the Corporate Shield Doctrine," and that "physical presence in Florida is not required").

Defendants' cases are not to the contrary. *Kitroser v. Hurt*, 85 So. 3d 1084, 1088 n.3 (Fla. 2012), specifically states that "a corporate officer who commits fraud or other intentional misconduct outside of Florida may be subject to personal jurisdiction." The court only held that "a nonresident employee-defendant who works only outside of Florida, commits no acts in Florida, and has no personal connection with Florida will not be subject to the personal jurisdiction of Florida courts *simply because* he or she is a corporate officer or employee." *Id.* at 1089 (emphasis added). Here, Mr. Ishbia is not being sued "simply because he is a corporate officer."

46642837.20

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully submits that Defendants'

Motion to Dismiss should be denied.

Date: February 1, 2023          Respectfully Submitted,
                                **PARRISH & GOODMAN, PLLC**
                                /s/ Robert H. Goodman
                                ROBERT H. GOODMAN
                                Florida Bar No.: 1008059
                                13031 McGregor Blvd., Suite 8
                                Fort Myers, Florida 33919
                                Phone: (813) 643-4529
                                Facsimile: (813) 315-6535
                                Primary: rgoodman@parrishgoodman.com
                                Secondary: admin@parrishgoodman.com
                                AND
                                JOSEPH E. PARRISH
                                Florida Bar No: 690058
                                Primary: jparrish@parrishgoodman.com
                                Secondary: admin@parrishgoodman.com
                                *Counsel for Plaintiffs*

46642837.20

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on this 1st day of February, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing Generated by CM/ECF.

/s/Robert H. Goodman
*Attorney for Plaintiffs*

46642837.20