## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

THE OKAVAGE GROUP, LLC
on behalf of itself and all others
similarly situated,

     Plaintiff,

                                 Case No. 3:21-CV-00448

v.


UNITED WHOLESALE MORTGAGE, LLC
and
MATHEW ISHBIA, individually,

     Defendants.

_____/

## SUPPLEMENTAL CLASS ACTION COMPLAINT

Plaintiff, The Okavage Group, LLC, ("The Okavage Group" or "Plaintiff"), on behalf of itself and all others similarly situated, by and through its attorneys, files this supplemental complaint against Defendants United Wholesale Mortgage LLC, a Michigan limited liability ("UWM") and Mathew Ishbia ("Ishbia"), reflecting new allegations based on facts occurring after the filing of its Second Amended Complaint on November 8, 2022. In support thereof, The Okavage Group states as follows:

1

1.     This is a class action brought by Plaintiff on behalf of all mortgage brokers ("the Class" or "Class Members") that currently are or have been clients of mortgage lenders UWM and either Fairway Independent Mortgage ("Fairway Mortgage") or Rocket Pro TPO (a division of Rocket Mortgage) and have been affected by Defendants' ultimatum (the "Ultimatum"). The Ultimatum and the resulting boycott required them to cease doing business with Fairway Mortgage and Rocket Pro TPO, or face termination of their business relationship with UWM and/or exorbitant and unconscionable monetary penalties in the minimum amount of $50,000.

2.     This case is brought to challenge the group boycott initiated and coerced by Defendants which cut off more than 9,000 mortgage brokers from an opportunity to refer their customers to the mortgage lender of their choice for their mortgages. Brokers who did so were harmed (and their customers were harmed) by the unavailability of lower priced, better quality mortgages from Rocket and Fairway. Brokers who refused to participate in the boycott were harmed because they no longer could utilize the services of UWM, the largest wholesale mortgage broker. This boycott therefore harmed the class as well as consumers and overall competition in the relevant wholesale mortgage lending submarket.

## PARTIES, JURISDICTION AND VENUE

3.      Plaintiff, The Okavage Group, LLC ("The Okavage Group"), is, and at all times relevant hereto has been, a Florida limited liability company organized under the laws of the State of Florida, with its principal place of business in St. Augustine, Florida.

4.      The Okavage Group, LLC's sole member is Daniel Okavage, who is a citizen of Florida, thereby making The Okavage Group, LLC a citizen of Florida.

5.      Defendant UWM, is a limited liability company organized July 16, 1986, under the laws of Michigan with its principal place of business in Pontiac Michigan.   During all times relevant hereto, UWM has conducted and continues to regularly conduct business in, and with mortgage brokers located in the State of Florida.

6.      Defendant, Mathew (Mat) Ishbia, is a citizen of the State of Michigan.   During all times relevant hereto, Ishbia has conducted and continues to regularly conduct business in and with mortgage brokers located in the State of Florida.

7.      Mr.    Ishbia,    knowingly    and    intentionally    directed communications announcing the unlawful Ultimatum and false statements

47281181.5

to mortgage brokers in order to coerce brokers to acquiesce to the Ultimatum and agree to boycott Rocket and Fairway.

8.     Mr. Ishbia's communications announcing the unlawful Ultimatum and false statements were received by mortgage brokers, including Plaintiff and Class Members located in the State of Florida.

9.     Plaintiff brings this private right of action for treble damages under Section 15(a) of the Clayton Act, 15 U.S.C. § 15(a), for violation of the federal antitrust laws, sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. This Court has direct federal question jurisdiction over these claims pursuant to 28 U.S.C. § 1331 and pendent and supplemental jurisdiction over all related claims pursuant to 28 U.S.C. § 1337.

10.    Plaintiff also brings this action under the Florida Antitrust Act, Fla. Stat. § 542, *et seq*., and Florida's Unfair and Deceptive Trade Practices Act, Fla. Stat. § 501.201, *et seq*., to obtain restitution, statutory damages and injunctive relief. This Court has supplemental jurisdiction over these pendant Florida state law claims under 28 U.S.C. §§ 1332(d) and 1367 because the claims arise from the same nucleus of operative facts as the federal antitrust law claims, and as such, are so related that they form the same case or controversy.

11.     The Court also has subject matter jurisdiction over Plaintiff's class claims pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) because the combined claims of the proposed class members exceed $5 million, Defendants and Plaintiff are citizens of different states, and there are at least 3,000 members of the putative class. Further, in determining whether the $5 million amount in controversy requirement of 28 U.S.C. § 1332(d)(2) is met, the claims of the putative class members are aggregated. 28 U.S.C. § 1332(d)(6).

12.     This Court has general and specific personal jurisdiction over the Defendants because they engage in substantial and not isolated activity in this State within the meaning of Florida's long-arm statute, Florida Statutes § 48.193(2), and both defendants intentionally committed the illegal and tortious conduct alleged herein within the State of Florida making them subject to personal jurisdiction under Florida's long-arm statute, Florida Statutes § 48.193(1)(b).

13.     Each of the Defendants named in this Amended Complaint either transacted business in the Middle District of Florida, Jacksonville Division, or has sufficient contacts with said district and division to confer jurisdiction thereupon or venue is otherwise proper as to each Defendant because the claim arose in such district or division.  The unlawful activities

alleged herein were carried out, in part, within the Middle District of Florida, Jacksonville Division, and the interstate trade and commerce alleged herein was carried on, in part, within the Middle District of Florida, Jacksonville Division.

14.    Venue is proper in this District pursuant to: (1) 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District; and (2) 28 U.S.C. § 1391(b)(3) in that Defendants are subject to personal jurisdiction in this District.

15.    All conditions precedent to this action have occurred, been performed, or have been waived.

## AFFECTED COMMERCE

16.    UWM markets, originates and sells its wholesale mortgages in interstate commerce in amounts of hundreds of millions of dollars annually. Similarly, Rocket Mortgage and Fairway market, originate and sell their wholesale mortgages in interstate commerce in amounts of at least hundreds of millions of dollars annually.

17.    Okavage and other class members arrange for their clients to obtain mortgages predominantly from mortgage lenders located in other states, and therefore through interstate commerce. This involves hundreds

6

of millions of dollars annually. The same is true of the mortgage brokers who participated in the boycott described above.

18.     Defendants' actions described here caused a shift in origination of mortgages in interstate commerce away from Rocket Mortgage and Fairway in the amount of at least tens of millions of dollars annually. They also caused consumers to pay higher prices and obtain lower quality mortgages, again, involving at least tens of millions of dollars of mortgages annually.

19.     Okavage and other brokers in the class located in the state of Florida ordered mortgages for their clients who contracted for them in Florida, with respect to Florida real estate, and therefore, their actions took place in, and affecting, Florida commerce. Similarly, UWM, Fairway and Rocket each market and originate at least tens of millions of dollars of wholesale mortgages annually to consumers in the state of Florida. Defendants' actions have diverted at least millions of dollars of wholesale mortgages away from Rocket Mortgage and Fairway in the state of Florida, and caused consumers to pay higher prices and obtain poorer quality mortgages for wholesale mortgages in the state of Florida with a value of at least millions of dollars annually.

47281181.5

## **FACTUAL BACKGROUND**

### I.   **THE WHOLESALE MORTGAGE BROKER MARKET**

20.   A relevant market or relevant sub-market in this case is the national market for wholesale lending for mortgages sold through mortgage brokers. UWM is a "Wholesale Mortgage Lender."  Wholesale mortgage lenders offer mortgage loans through independent third parties, such as mortgage brokers.  As such, wholesale mortgage lenders do not work directly with consumers/borrowers until after a loan has been funded, if at all.  Wholesale mortgage lenders generally fund and, in some instances, service loans, including collecting payments after funding. There is no substitute for mortgage lending for most consumers, who need to borrow money to be able to afford to buy a house, and need to offer the home as security (in a mortgage) in order to obtain reasonable credit terms.  This competition occurs throughout the State of Florida and the United States.

21.   By comparison, a "Retail Mortgage Lender" deals directly with consumers/prospective borrowers from the beginning of a transaction, including providing loan applications and collecting completed loan applications, performing income verification and collecting other required documentation, as well as quoting interest rates.

22.   For wholesale lending, third parties, such as mortgage brokers, provide loan applications to the consumer/prospective borrower, collect

47281181.5

completed loan applications, perform income verification and collect other required documentation. Additionally, mortgage brokers advise the customer of available interest rates and loan terms and select a particular wholesale mortgage lender in order to find the best mortgage loan product and pricing for their client. The central pillar of the mortgage broker business is independence – the ability of the broker to choose from a variety of wholesale lenders to select the mortgage product and experience that best matches the specific needs of the broker's client.

23.     Buyers may opt to hire an independent mortgage advisor or broker to search and match the buyer to a mortgage that satisfies his or her preferences. The broker's value rests in his or her sophistication and knowledge of mortgage options that lenders offer. The broker can often find mortgage options that are less expensive, but still meets the buyer's preferences, based on his or her knowledge of which lenders are suitable for each buyer. In general, brokers prefer to have more choices in lenders and more mortgage options because they have a larger menu from which they can find a suitable mortgage for their clients.

24.     Mortgage brokers compete with one another for the business of consumers seeking mortgages. All mortgage brokers thus operate at the same market level. They engage in this competition through advertising,

47281181.5

internet marketing, involvement in community activities, consumer mailings, and competition to obtain referrals from real estate brokers and agents.

25.    Factors supporting the conclusion that wholesale mortgage lending is a separate submarket include the following:

A.    A distinct group of customers (those who choose to utilize mortgage brokers) utilize wholesale lenders;

B.    The wholesale lending channel is recognized as separate and distinct by mortgage brokers and others in the industry;

C.    Mortgage brokers are specialized vendors (focused on local marketing to consumers and on surveying, and choosing among, mortgage lenders) with their own unique facilities in local communities;

D.    Wholesale mortgage lenders, unlike retail mortgage lenders, do not operate facilities for marketing directly to the consumer, and do not do so (unless they also operate in the retail channel); and

E.    The consumers who utilize mortgage brokers and therefore wholesale mortgage lenders would not readily

switch to a retail mortgage lender for a small difference in price, because of their desire to obtain advice from a mortgage broker professional regarding the proper choice of a mortgage.

F.     UWM itself maintains that the typical borrower who uses a mortgage broker will save $9,400 over the life of the loan, compared to a borrower who uses the standard retail shop.

26.     As of March 31, 2020, mortgage lending originated through independent brokers controlled 15.8% of residential mortgage loan originations in the U.S., while direct-to-buyer lending represented 57.5%. (*See* UWM Holdings Corporation Prospectus, Registration No. 333-252422, link ("UWMC Prospectus")), at Risk Factors, p. 14).

27.     UWM is the largest wholesale mortgage lender, with approximately 34% market share of the wholesale market. *Id.* at Summary of the Prospectus, p. 1.   UWM boasts that it has over 10,000 mortgage brokers under contract with it. This represents more than 60% of the wholesale mortgage brokers in the United States.

28.     UWM's prospects notes that "the mortgage business has experienced substantial consolidation."  It also states that for the 12 months

11

ended September 30, 2020, UWM experienced a "more than 84% increase year over year" in home loans closed.

29.     UWM regularly accepts and processes mortgage loan applications. Additionally, UWM regularly funds mortgage loans based on such mortgage loan applications.

30.     Fairway Mortgage offers retail mortgage lending through its retail mortgage lending division, as well as wholesale mortgage lending through its Fairway Wholesale Lending division.

31.     Rocket Mortgage offers retail mortgage lending through its retail mortgage lending division.  Rocket Mortgage also offers wholesale mortgage lending through its wholesale mortgage lending division, Rocket Pro TPO. Fairway and Rocket Pro TPO are direct competitors of UWM in the wholesale/broker channel. At the time of the Ultimatum, they had the largest market share in the wholesale space after UWM and were UWM's closest rivals.

32.     Rocket Mortgage through Rocket Pro TPO offered a number of benefits to mortgage brokers and their customers:

> A.     Rocket Mortgage is a very well-recognized national brand which is attractive to customers, and therefore provides a

benefit to the mortgage brokers who service those customers.

B.   Rocket Mortgage is less restrictive in the credit scores it requires than is UWM, and therefore provides an opportunity for loans to consumers who would be refused by UWM.

C.   Rocket Mortgage offers lower cost, better mortgage insurance than does UWM. For example, Rocket Mortgage outranked UWM (and was second among all mortgage lenders) in J. W. Powers 2022 Mortgage Servicers Satisfaction study. Bankrate scored both Rocket and Fairway higher than UWM in all three scoring components, affordability, availability, and borrower experience.

33.   Fairway Mortgage also offers many benefits to consumers:

A.   Fairway is also a very well recognized national brand, identified as the best mortgage lender for USDA loans by the Ascent. Fairway states it was number one in FHA mortgage purchase volume in 2019 and number four in VA mortgage purchase units and volume in 2020.

13

        B.     Fairway has over 750 branch and satellite locations.

34.     Mr. Ishbia has stated that UWM is "not trying to be the best priced." (*See* Video Link.)  One broker has stated that Rocket "consistently beat[s] UWM in price across every product type offered."  Another broker stated that UWM's "pricing is often higher than their competitors . . ."

35.     Prior to January 2021, UWMC's share price had been declining, and UWM's competitors in the wholesale lending market, including in particular Fairway Mortgage and Rocket Pro TPO, expanded their market share in part because of their innovative product offerings and better pricing.  From 2018 to 2021 Rocket's wholesale business increased from 3,000 mortgage broker partners to 10,000, reflecting the fact that Rocket's products and prices were especially attractive to mortgage brokers and their customers.  Rocket stated that it invested $100 million into the broker channel alone in 2021.  During the month prior to the issuance of his ultimatum by Mr. Ishbia, Rocket Pro TPO originated as many wholesale mortgage loans as did UWM. This, in turn led to lower rates for consumers/prospective borrowers.

## II.     THE ANTICOMPETITIVE SCHEME

36.     To mitigate the risk of losing more market share to Rocket Pro TPO and Fairway, and to increase its dominance in the wholesale market,

on March 4, 2021, UWM orchestrated an anticompetitive scheme.   At a virtual event hosted by UWM, UWM's CEO, Mat Ishbia publicly announced UWM's Ultimatum via a video posted on UWM's Facebook page. (*See* Video Link beginning at 9 min; 10 sec mark). In the video, Mr. Ishbia demanded that mortgage brokers boycott Rocket Pro TPO and Fairway. He stated that "if you work with them [Fairway Mortgage and Rocket Pro TPO], you can't work with UWM, effective immediately."

37.    Mr. Ishbia stated on the video chat on Facebook that one purpose of the boycott related to efforts to prevent Fairway's and Rocket Mortgage's competition at retail. He stated that "[w]e don't need to fund Fairway Independent or Rocket Mortgage to try to put brokers out of business."

38.    Ishbia falsely accused Rocket Mortgage of paying real estate agents to cut out competing brokers and instead refer clients to Rocket Mortgage. Additionally, Ishbia falsely accused Rocket Mortgage of soliciting mortgage brokers' past clients and dissuading them from working with those mortgage brokers.

39.    Ishbia made these statements intentionally, with knowledge that they were false.

40.    Mr. Ishbia personally directed and carried out the presentation of the Ultimatum and the demand that brokers refuse to deal with Rocket Pro TPO and Fairway. He made these demands through his virtual presentation to all of UWM's brokers located throughout the United States, including Florida. UWM is licensed to operate in Florida, and UWM interacts with mortgage brokers at events in Florida, including the FAMP Miami Mortgage Convention. Thus, Mr. Ishbia's anticompetitive conduct was directed specifically at Florida residents, as well as residents of many other states. Mr. Ishbia's actions make clear that he intentionally instigated the boycott.

41.    Many brokers in attendance at the event explicitly heeded Mr. Ishbia's clarion call to boycott UWM's closest competitors, providing public comments viewed by all other participating brokers as part of the live Facebook event. These communications included many expressions of agreement. The statements included:  "We are ALL IN"  "unstoppable together…" "We are all family! Brokers are better when we work together"; "Brokers are family.  We don't go against our family"; "All in…..with us or out"; "You're either with the captain [UWM] or off the boat"; "with us or against us"; and "all for one and one for all." Other comments reflecting an agreement to boycott were the following:   "Team Broker!"; Let's kill it fam-

16

--you know it's going to be good"; "BROKERS---WAKE UP!!! Stop sending files to the enemy!  Protect your book of business"  "This is what we have been waiting for broker community": "We are ALL IN" "unstoppable together"; "Sign on the line that is dotted"; "All in "; "With us or out."

42.    Mr. Ishbia's statements and these brokers' communications took place in complete public view on a forum (a Facebook site) accessible to thousands of brokers.  Mr. Ishbia repeatedly referred to this collective action as the "'all in' initiative."  Mr. Ishbia stated that "all of our current clients are aligned" with respect to this initiative.  Mr. Ishbia also stated that the participating brokers "have locked arms with us."

43.    Brokers also used UWM's Facebook page to discourage brokers who disagreed with the boycott. For example, Broker C joined the discussion to express his opposition to the boycott. Broker A castigated Broker C and accused Broker C: "[you] don't care about the [broker] channel as a whole."

44.    Brokers also facilitated and offered assistance to other brokers to sign UWM's addendum. Broker E asked other brokers "Where do we get the form to sign[?]" and received a response from another broker with instructions on how to access the addendum and advice for how to terminate his broker agreement with Rocket.

17

45.    That same day, the Association of Independent Mortgage Experts ("AIME") issued its own letter voicing support for the boycott. As part of the live chat, AIME stated during the Facebook video: "Work with TRUE lender partners. Let's strengthen the challenge!"  AIME receives significant funding from UWM and routinely works with UWM on its marketing efforts.  AIME states that its members "come from every region across the country."

46.    AIME describes itself as "a community" of "mortgage professionals" and says its members include "wholesale mortgage professionals", independent mortgage brokers and persons "affiliated with a company that does not underwrite its own loans." AIME says that it is "the only non-profit trade association dedicated exclusively to independent mortgage brokers." AIME encouraged its members, mortgage brokers, to join they boycott. AIME's actions reflected the collective agreement of its members, who it represents.

47.    UWM stated that brokers should take this action in order to retaliate against, and deter, retail competition.  AIME referred to the initiative as "brokers rallying against whole-tail lending" or BRAWL. "Whole-tail lending" refers to lenders who operate both in the wholesale

18

and retail segments.  Mr. Ishbia stated that this initiative could deter retail lenders from competing aggressively in the wholesale space.

48.   Mortgage brokers belong to a number of trade groups and collective organizations, including not only AIME but the National Association of Mortgage Brokers, Mortgage Brokers United, and Brokers Are Better. All these trade associations, which have regular meetings and, in the case of Brokers Are Better, had a private Facebook discussion page, have provided significant vehicles for communication and agreement between the mortgage brokers with regard to the boycott.

49.   Through its Facebook page, UWM hosted a digital forum where brokers could discuss, facilitate and organize the boycott. Brokers worked to persuade other brokers into joining the boycott. In one conversation, Broker A urged Broker B to engage with Rocket "no more! Sign the addendum." Broker B confirmed an hour later that she signed, to which Broker A replied, "great job!"

50.   UWM further facilitated the boycott by providing forums for mortgage brokers to join the boycott in plain sight, assisting each other with terminating their relationships with Rocket Pro TPO and Fairway. UWM joined in facilitating these terminations.

51.     Later in the day, following the Facebook Live announcement, Mr. Ishbia appeared in an interview conducted by mortgage news outlet HousingWire for their Spring Summit. This interview was broadcast live to registrants, many of whom were brokers. Ishbia repeated his announcement that UWM would cease working with any broker who continued to work with Rocket Pro TPO and Fairway. When the HousingWire interviewer asked Ishbia how UWM intended to "enforce" this boycott, Ishbia replied: "[E]veryone's going to sign an addendum that says 'hey listen, we're not working with those two lenders.'"

52.     As is customary, HousingWire's real-time chat feature also displayed comments made by viewers during the broadcasted interview. Brokers signaled their agreement to join the boycott with statements, such as "Let's go!" and "Dominate!", in plain view to other brokers.

53.     UWM employees were not mere hosts of broker discussions and agreements on Facebook; they were active facilitators. A UWM employee responded to a broker who expressed concern about the boycott, by stating that "every move we make is to protect UWM and the broker channel long term. Let's chat next week!" A different UWM employee, using Facebook's emoji feature, "liked" broker comments that indicated they had joined the boycott.

54.    To implement the Ultimatum and coerce the boycott of Fairway Mortgage and Rocket Pro TPO, Defendants advised their broker clients who also did business with Fairway Mortgage and Rocket Pro TPO that they were required to consent to a contract addendum ("Addendum"). The Addendum sent to the mortgage brokers provided, in pertinent part:

> United Wholesale Mortgage, LLC ("UWM") is amending its broker, correspondent and financial institution agreements by adding a representation and warranty that its clients will not submit loans to either Rocket Mortgage or Fairway Independent Mortgage. Client acknowledges and agrees, that until client provides written notice terminating its agreement with UWM, client and its employees will not submit mortgage loan applications or mortgage loans to either Rocket Mortgage or Fairway Independent Mortgage for review, underwriting, purchase and/or funding (unless such loan was locked with Rocket Mortgage or Fairway Independent Mortgage prior to March 15, 2021). If client or client's employees breach this representation and warranty, client agrees to pay liquidated damages to UWM of: (i) Five Thousand Dollars ($5,000.00) per loan closed with UWM, or (ii) Fifty Thousand Dollars ($50,000.00), whichever is greater.

55.    Plaintiff and Class Members were advised that they had until 11:59 P.M. on March 15, 2021 to accept Defendants' Ultimatum or face termination of their business relationship with UWM.

56.    In a further effort to pressure and induce mortgage brokers to accept Defendants' Ultimatum, UWM's Account Executives, whose job

21

involves communicating with mortgage brokers, contacted Plaintiff and other Class Members and falsely asserted that that mortgage broker was the only one who had not yet accepted Defendants' Ultimatum.

57.    After the Ultimatum deadline of March 15, 2021 passed, UWM, through its Account Executives, communicated other false statements to mortgage brokers, including Plaintiff and/or Class Members, that Rocket Mortgage "was stealing rate locks from mortgage brokers and transferring them to realtors" and it "literally STOLE the lock and pricing from my broker so the Realtor's loan would work."

58.    UWM, through its account executives, communicated to mortgage brokers, including Plaintiff and Class Members that Rocket Mortgage "was lying to them," and "is not to be believed."

59.    UWM, through its account executives, also communicated to mortgage brokers, including Plaintiff and Class Members, false statements that denigrated Rocket Mortgage corporate officers and even went so far as to denigrate Rocket Mortgage Chairman, Dan Gilbert's, health.

60.    UWM has also retaliated against brokers who signed this agreement but then did business with Rocket or Fairway.  Three such brokers have been sued by UWM.  One of the lawsuits claimed damages of

$2.8 million.  In at least one of those cases, UWM also froze more than 100 loans related to that broker's customers that were already in the pipeline.

61.    The boycott was highly successful.  UWM announced "93% of the brokers presented with the addendum agreed to join the boycott." UWM later stated that more than 11,000 of 12,000 brokers participated in the initiative.  UWM stated that "not even 500" of its brokers declined to participate in the boycott.  Mr. Ishbia stated to the press that "I couldn't have imagined it going so well."  UWM also stated that after the boycott was initiated, UWM received more than 17,000 more loan applications in April than it had in the month prior to the boycott.  Mr. Ishbia predicted on the video that Rocket Mortgage and Fairway would lose 70%-90% of their business.

62.    The success of the initiative and UWM's plans for market domination are reflected in Mr. Ishbia's statement in June of 2021 that it was "more than realistic" that UWM would pass Rocket in total mortgage loan business.  This is highly significant, since the bulk of Rocket's business is in the retail submarket.  For UWM to pass Rocket in total, it would need to increase its wholesale business by approximately 60%.  This would increase its market share in the wholesale submarket to between 50% and 60%.

63.    This prospect is further supported by UWM's 20% increase in funded loans in 2021, and the expectation of commentators that current conditions will lead to a "shakeout" of smaller mortgage lenders, leading to further share gains by larger firms such as UWM.  According to Mr. Ishbia, UWM enjoys significant competitive advantages because of its "scale."

64.    After the unilaterally imposed deadline passed for accepting Defendants' Ultimatum, the Class Members who had not acknowledged acceptance of Defendants' Ultimatum received notice from UWM that their UWM Wholesale Lending Agreement was terminated or that the mortgage broker was suspended from doing business with UWM.

65.    The boycott was a dramatic change in behavior by the boycotting brokers, who until that time had been utilizing Rocket Pro TPO and Fairway in increasing numbers because of their strong reputation, good prices and high quality service. It was therefore against the brokers' unilateral self-interest to refuse to use Rocket Pro TPO and Fairway, except for the facts of UWM's coercion and the brokers' agreement to collectively boycott Rocket Pro TPO and Fairway.

66.    Notwithstanding UWM's coercion, individual mortgage brokers would have suffered even greater harm through their agreement to not deal with Fairway or Rocket Pro TPO had it not been for the collective decision

24

of more than 9,000 brokers to refuse to use those wholesale mortgage alternatives. If an individual broker deprived itself of the availability of alternative loans from Fairway and Rocket Pro TPO it could expect to lose substantial business to other brokers who are offered these alternatives, unless large numbers of competing brokers were "all in", as they agreed to be. The brokers noted that they were "unstoppable together". Thus, when the brokers acted collectively, that reduced the harm to individual brokers from the refusal to deal. This provided strong motivation for them to act collectively.

### A.   <u>Plaintiff's Experiences Resulting from the Ultimatum</u>

67.   The experience of the named Plaintiff is representative of the uniform nature of Defendants' unlawful business practices as to the Class.

68.   The Okavage Group is a mortgage brokerage company that advises and assists clients (consumers/prospective borrowers) with applying for and obtaining residential mortgages. Like Class Members, The Okavage Group has regularly submitted mortgage loan applications on behalf of clients to UWM, Fairway Mortgage and Rocket Pro TPO since approximately October 2018.

69.   The Okavage Group has brought a substantial number of clients to UWM, Fairway, and Rocket Pro TPO. The Okavage Group refused

UWM's Ultimatum because of its need to offer what were often lower-priced, better-suited mortgages from Rocket Pro TPO and Fairway.

70.    Subsequent to March 15, 2021, after The Okavage Group refused to accept Defendants' Ultimatum, UWM arbitrarily terminated its Wholesale Lending Agreement with the Okavage Group, refusing to accept mortgage applications by customers of The Okavage Group.  Because of Defendants' Ultimatum, The Okavage Group has lost customers who were interested in loans from UWM.

71.    The Okavage Group has suffered direct financial injury, including lost sales and lost commissions.

## III.    ANTICOMPETITIVE    EFFECTS    OF    DEFENDANTS' CONDUCT AND HARM TO BROKERS AND CONSUMERS

72.    The boycott has had the effect of increasing the costs of mortgage loans and has increased the cost of operations of Plaintiff and other Class Members, to an artificially high, non-competitive level.  Those acquiescing in the Ultimatum are now prohibited from making application for and obtaining better-suited and/or lower-priced mortgage loan products from Fairway and Rocket Pro TPO. While there are other alternatives in the wholesale mortgage market, elimination of two of the largest, and two leading wholesale mortgage lenders, who have been very

47281181.5

highly rated, and have offered very competitive prices, significantly reduced competition in the relevant market.

73. The boycott harmed consumers utilizing the boycotting brokers by reducing their access to the lower priced, innovative, higher quality products offered by Fairway and Rocket Pro TPO. *See* UWM Holdings Corporation Prospectus ("Some of our competitors may have greater financial and other resources than we have [or] more operational flexibility in approving loans."). The boycott also harmed consumers utilizing terminated brokers such as Okavage because they did not have the opportunity to consider a UWM mortgage.

74. The boycott lessened competition with Rocket and Fairway on innovation, price and quality of product.   The choice imposed on mortgage brokers prevented mortgage brokers and prospective home buyers from achieving the lowest price and/or better suited loan products.  The boycott insulated UWM from the need to compete with Rocket or Fairway's wholesale products on price or quality.

75. AIME states on its website that brokers "are the wholesale lenders value client.  They compete for your business by providing top of the line service to make sure you are a repeat customer."  AIME on its website states that mortgage brokers "work for the borrower, not the bank.

Independent mortgage brokers have flexibility to shop rates from multiple lenders . . .” That flexibility, and that service to the borrower, rather than any particular lender, was seriously disrupted by the boycott.

76.     The Ultimatum and the boycott caused serious injury to the brokers and the class. All of those brokers were denied an opportunity to offer the full range of mortgage lending alternatives to their clients. All were deprived of the ability to offer all the leading mortgage lenders to their clients. Those who refused the Ultimatum were unable to offer UWM loans. Those who accepted the Ultimatum and joined the boycott were unable to offer lower priced, higher quality Rocket Pro TPO and Fairway loans to their customers. All these brokers were unable to satisfy their duties as agents of their customers who did their best to provide their customers with the best alternative in the market. This interfered with the traditional role of the mortgage broker, as described by mortgage brokers and by their trade associations. The Ultimatum and boycott interfered with that competition, and reduced incentives for UWM to provide “top line service” since it no longer had to fear competition from its greatest rivals, Rocket Pro TPO and Fairway.

77.     The Okavage Group and other brokers who refused the Ultimatum were further injured because of the large number of brokers

who accepted the Ultimatum and boycotted Rocket Pro TPO and Fairway. As a result, most of Okavage's competitors can offer UWM, and this can potentially provide them with an advantage in the marketplace for customers who desire to utilize UWM.

78.   These facts are reflected in the comments of a number of brokers. Some brokers who viewed UWM's Facebook Live broadcast were opposed to the boycott and believed it would harm brokers and result in worse loan offerings for consumers. As one commenter noted (emphasis added):

> Just like Thanos, Matt thinks **eliminating competition through force** will create a utopia. **As a broker, it's tough to work with a lender who wants to dictate the other lenders you can work with**.... Consider that today for a 30YR Fixed Refinance with a $320,000 loan amount at 80 LTV with an 800 Score, SFR, Primary, Lender Fee buyout, at a 2.75% Lender paid comp: UWM is at 2.99 with a 2.31 Cost to the borrower, while Rocket Pro is at a .43 Cost to the borrower. **If UWM wants to prevent us from using the best priced lender, maybe they should offer competitive pricing so we can compete for refis**."

Other commenters also complained about UWM's attempt to eliminate their free choice and reduce competition (emphasis added):

> Love UWM. Very happy with them. But change is too abrupt does not give us time to adjust. ***Having competition keeps everyone honest.***

> ***Concerned that if they have no competition, we The Brokers lose.*** It's a tough one.
>
> ***
>
> No. Please reconsider the quicken fee. **We need option! Do not restrict!!!! We need to stay open to give clients good competition good options!**

79.     Via a statement from President Bob Broeksmit, The Mortgage Bankers Association said it "does not condone activities designed to thwart competition in the mortgage market and limit loan options available to borrows."   Kimber White, president of the National Association of Mortgage Brokers, concurred, calling the move "counter to the spirit of freedom and independence that is the very foundation of our broker business.   You should be allowed to work with whomever you want, and who offers the best product and customer service, not a company who dictates your business model to you."

80.     Other brokers recognized that "[a]s independent brokers we need to be able to shop for the best terms and best programs for our clients, the American people."   Brokers recognized that UWM's actions involve "bullying" and "tyranny".   Brokers stated that the "mortgage broker channel is being harmed as a result of this UWM mandate."   Another broker stated that "UWM's true goal [is] seeking to control independent brokers to such an extent that they ultimately become effective arms of UWM."

30

81. Several commenters went further and recognized that the boycott was a plain violation of antitrust laws. For example, a commenter on the live chat responded, "Good luck with the antitrust lawsuits," while another joked: "I would love to see the legal team's notes on that addendum!" and another said: "So much for free markets." One put it succinctly: "having brokers sign this addendum is an Anti Trust violation."

## MARKET POWER AND BARRIERS TO ENTRY

82. UWM was able to force more than 9,000 brokers to agree to refuse to deal with Rocket Pro TPO and Fairway when they had previously often chosen to use those mortgage lenders because of their competitive price quality and service. This reflects UWM's market power. These brokers could not afford to cease offering UWM, the leading broker in the market. Therefore, they were forced to collectively agree not to deal with either Rocket Pro TPO or Fairway, foregoing significant benefits to them and to their customers.

83. There are significant barriers to entry into wholesale mortgage lending which further allows UWM to exercise its plan of monopolization. To be an effective competitor in the wholesale mortgage loan market, a firm needs to repeat each of the following requirements:

47281181.5

A.     Every successful competitor needs a sophisticated electronic platform that allows quick approval and closing of loans. This requires substantial technical expertise and software development that can take years to complete and cost millions of dollars.

B.     Effective competitors need at least hundreds, if not thousands, of qualified personnel working for them. Since there is no such pool of personnel available in the economy, to be an effective competitor a mortgage lender needs to have its own training program to develop personnel with the requisite skills. This takes substantial resources and time to develop.

C.     In order to attract large numbers of mortgage brokers, a wholesale mortgage lender needs a substantial sales force and needs to develop a significant reputation. It also needs to overcome entrenched preferences among mortgage brokers and consumers. This also requires significant time and substantial resources.

D.     A successful mortgage lender needs to satisfy licensing requirements on a state by state basis, as well as

47281181.5

compliance with Fannie Mae/Freddie Mac and VA guidelines for firms whose mortgages qualify for mortgage insurance. It requires substantial resources to meet all these requirements, which also takes substantial time to achieve.

E.   A mortgage lender needs substantial funds in order to provide loans at a sufficient scale to be an effective competitor. It also needs to possess sufficient funds to advance funds when borrowers do not make payments. This requires tens of millions of dollars of resources.

84.   For all these reasons, firms cannot enter and become successful competitors in the wholesale mortgage loan market without the expenditure of substantial resources and efforts over a substantial period of time, generally several years.

## CLASS ACTION ALLEGATIONS

85.   Plaintiff brings this action individually and as representative of all similarly situated mortgage brokers, pursuant to Federal Rule of Civil Procedure Rule 23, on behalf of the below-defined Class:

> All mortgage brokers who were subject to Defendants' Ultimatum requiring them to cease doing business with Fairway Mortgage and Rocket Pro TPO and imposing financial penalties for

47281181.5

> submitting any loan application to Fairway Mortgage or Rocket Pro TPO, or in the alternative, face termination of their business relationship with UWM.

86.     Excluded from the above-defined Class are Defendants and its officers, directors, and employees; any entity in which the Defendants have a controlling interest, Defendants' affiliates, legal representatives, attorneys, heirs or assigns; Defendants' immediate family members; any federal, state, or local government entity, any judge, justice, or judicial officer presiding over this matter, the members of their immediate families, their judicial staffs, persons whose claims in this matter have been finally adjudicated on the merits or otherwise released, Plaintiff's counsel and Defendants' counsel, and the legal representatives, successors, and assigns of any such excluded person.

87.     Plaintiff reserves the right to modify or amend the definition of the proposed class and/or sub-classes before the Court determines whether certification is appropriate.

88.     Cases such as this, which involve one ultimatum made to a group, are particularly well-suited for class treatment because the Class Members face the same common questions of fact and law which include, but are not limited to:

47281181.5

A.    Whether Defendants' actions and Ultimatum are violative of federal and state antitrust acts, including the Sherman Act and The Florida Antitrust Act;

B.    Whether Defendants' actions and Ultimatum tortiously interfered with business relationships;

C.    Whether Defendants' actions and Ultimatum are violative of various consumer protection acts and/or deceptive and unfair trade practices acts;

D.    Damages, including whether Defendants' violations allow Plaintiff and Class Members to recover treble damages, punitive damages and attorneys' fees.

89.    Upon information and belief, Defendants have utilized the same, identical form Addendum as the document Defendants demanded brokers, including Plaintiff and Class Members, accept as part of the Ultimatum.

90.    Plaintiff's claims are typical of the claims of other Class Members.  The factual and legal bases of Defendants' liability to Plaintiff and the other Class Members are the same inasmuch as Defendants violated the Sherman Act, the Florida Antitrust Act, the Florida Deceptive and Unfair Trade Practices Act and tortiously interfered with Plaintiff's and

Class Members' business relationships with known third parties as further described herein.

91.     Plaintiff will fairly and adequately protect the interests of the Class Members.

92.     Class action treatment is superior to the alternatives for the fair and efficient application of the controversy alleged herein.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without duplication of effort and expense that numerous individual actions would entail. There are, on information and belief, thousands of Class Members such that joinder of all Class Members is impracticable. The precise number of Class Members and their addresses are presently unknown to Plaintiff, but may be reasonably ascertained from UWM's records and files. Similarly, Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice. As such, class action is the more efficient procedure for determining liability and damages in a case such as this, where each Class Member acquiesced or refused to acquiesce to the same Ultimatum and where damages can be determined formulaically.

47281181.5

93.    Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of itself and the other Class Members. Similar or identical violations, business practices, and injuries are involved, and the contractual rights involve uniform, objective questions of fact and law, both for the prosecution and for the defense. The common questions of fact and law existing as to all Class Members predominate over questions affecting only individual Class Members. Such common questions of fact and law include, but are not limited to, the proper interpretation of the Ultimatum; whether Defendants can unilaterally enforce the provisions thereof; and whether Plaintiff is entitled to damages and other monetary relief and, if so, in what amount. Individual questions, if any, pale by comparison, both in quality and quantity, to the numerous common questions that predominate in this action. Thus, the elements of commonality and predominance are both met.

94.    No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy.

95.    Typicality exists inasmuch as class representatives who, in their role as mortgage brokers, have been forced to accept Defendants'

47281181.5

Ultimatum to cease doing business with Fairway Mortgage and Rocket Pro TPO, or face financial penalties imposed by UWM or termination of their business relationship with UWM. Furthermore, Plaintiff's claims are typical of those of the members of the Class because, among other things, all Class Members have been comparably injured through Defendants' common course of unlawful conduct and seek the same kind of relief.

96.     To be sure, there are no defenses available to Defendants that are unique to the Plaintiff. The injury and causes of actions are common to the Class Members as all arise from the same existing contractual relationship and involve the same unlawful Ultimatum.

97.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of its claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

98.     Defendants have acted and failed to act on grounds generally applicable to Plaintiff and other Class Members, thereby making relief appropriate with respect to the Class Members as a whole.  Prosecution of separate actions by individual Class Members, should they even realize that their rights have been violated, would likely create the risk of inconsistent or varying adjudications with respect to individual Class Members.

99.     Plaintiff will adequately represent the Class. It has no interests that are in conflict with those of the Class. In addition, Plaintiff has retained counsel competent and experienced in complex, as well as class action litigation, and will prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and its counsel.

100.    In the event unforeseen issues preclude class certification under Fed.R.Civ.P. 23(b)(3), the case is still appropriate for class certification under Fed.R.Civ.P. 23(c)(4), as to the particular issues of liability.

## SUPPLEMENTAL ALLEGATIONS

101.    UWM stated (in its Form 10-K annual report dated March 1, 2023) that it has agreements with more than 12,000 individual brokers.

102.    During UWM's Q4 2022 earnings call conducted on March 1, 2023, Mr. Ishbia indicated that 2022 was UWM's "eighth consecutive year as the number one wholesale lender". Mr. Ishbia has repeatedly referred to UWM in interviews in February and March as "dominant" or as "dominat[ing]" the wholesale markets.

103.    In a February 28, 2023 interview with the Detroit News, Mr. Ishbia explained why the boycott was successful:

> A.     "The penalty of working with Rocket … is you don't get to work with UWM. And nobody is willing to take that chance.";

B.   The lenders against whom UWM has filed lawsuits, including AML, "no longer work with UWM. That's the penalty. Once you have brokers that don't work [with] UWM, they lose out. That's why of the 12,000 brokers, 11,500 all stayed with UWM.";

104.   Data from the fourth quarter of 2022 indicates that UWM is the largest wholesale mortgage lender, with a most recent approximate 54% share of the wholesale market. This share increased from 34% in 2020. UWM boasts that it has over 12,000 mortgage brokers under contract with it. This represents significantly more than 60% of the wholesale mortgage brokers in the United States.

105.   Mr. Ishbia has directly linked UWM's growth to the success of the boycott, stating in his February 28 Detroit News interview that "[w]hen we announced the [Ultimatum], they [Rocket Mortgage] were more than twice my size overall, not wholesale, overall. Now I'm [UWM] bigger than them."

106.   UWM's dominance and market power have also been enhanced by the exit of many wholesale lenders from the market. A 2023 report indicated that at least 17 firms have exited the wholesale market since the filing of the Second Amended Complaint. Wells Fargo (which was at one time the market leader) has dramatically curtailed its role in the wholesale mortgage market, and now only serves existing customers and minority

communities. Another very significant firm, loandepot, also exited the market.

107.  Many of the firms exiting the market were smaller firms that were unable to compete effectively. According to Mr. Ishbia's recent statements, UWM enjoys significant competitive advantages because of its "scale."

108.  UWM stated in its March 1, 2023 annual report that: "[o]ur volume allows for significant investment in automating each step of the residential loan process, which in turn reduces error rates, improves customer service and enhances efficiency." Smaller wholesale lenders do not have the volumes to obtain these advantages.

109.  UWM's market power is also evidenced by Mr. Ishbia's statements in UWM's March 1, 2023 earnings call that UWM has "great control of our margins" and that "we do control the margins in this industry." Thus, UWM is able to control price in the market.

**COUNT I**
**PER SE VIOLATION OF ANTITRUST LAW**
**(SECTION 1 OF THE SHERMAN ACT)**
**(United Wholesale Mortgage)**

110.  Plaintiff repeats and realleges paragraphs 1-18, 20-37, 40-61 and 64-109 of this Complaint as though fully set forth herein.

47281181.5

111.   The conduct of UWM and its mortgage brokers constituted a per se illegal group boycott in violation of Section 1 of the Sherman Act. UWM and its participating brokers are jointly and severally liable for this conduct. The boycott amounted to a coerced, concerted refusal to deal with Rocket Pro TPO or Fairway by 93% of UWM's 10,000 brokers. These brokers represented the majority of brokers in the wholesale mortgage loan market, and therefore involved a dominant portion of the market.

112.   As a direct and proximate result of UWM's violation of Section 2 of the Act, Plaintiff and Class Members have been injured and financially damaged by the reduction in choice, lost customers and commissions and have been injured (and will continue to be injured) in their business and property in the millions of dollars prior to trebling.

113.   Plaintiff, and Class Members, are entitled to recover treble damages and attorneys' fees pursuant to statute in an amount to be determined, as provided for by 15 U.S.C. §15(a).

## COUNT II
## UNREASONABLE RESTRAINT OF TRADE
## IN VIOLATION OF 15 U.S.C. § 1
## (United Wholesale Mortgage)

114.   Plaintiff repeats and realleges paragraphs 1-18, 20-37 and 40-109 of this Complaint as if fully set forth herein.

115.   As described above, UWM has substantial market power.

116.   The conduct described above was undertaken pursuant to agreements between individual mortgage brokers and UWM, reflected in execution of the Addendum, by more than 9,000 mortgage brokers.

117.   Those agreements have unreasonably restrained trade in each of the relevant markets, in violation of Section 1 of the Sherman Act.

118.   The agreements between UWM and its mortgage brokers described above and the conduct undertaken as a result of that agreement caused substantial anticompetitive effects and increased prices and reduced quality, as described above. UWM and its participating mortgage brokers are jointly and severally liable for this conduct.

119.   As a direct and proximate result of UWM's violation of Section 2 of the Act, Plaintiff and Class Members have been injured and financially damaged by the reduction in choice, lost customers and commissions and have thereby been injured (and will continue to be injured) in their business and property in the millions of dollars prior to trebling.

120.   Plaintiff, and Class Members, are entitled to recover treble damages and attorneys' fees pursuant to statute in an amount to be determined, as provided for by 15 U.S.C. §15(a).

**COUNT III**
**VIOLATIONS OF SECTION 2 OF THE SHERMAN ACT –**
**ATTEMPT TO MONOPOLIZE**
**(United Wholesale Mortgage)**

121.   Plaintiff restates the allegations of paragraphs 1-18 and 20-109 of this Complaint, as if fully restated herein.

122.   By each of its actions described above, UWM specifically sought to attain monopoly power. Based on UWM's high market share and its market power as illustrated by its ability to coerce compliance with its Ultimatum, the high barriers to entry described above, and UWM's anticompetitive actions, there is a dangerous probability that UWM will achieve its goals and attain monopoly power. Such actions constitute unlawful attempted monopolization of the relevant wholesale mortgage lending market or submarket in violation of Section 2 of the Sherman Act, 15. U.S.C. § 2.

123.   The actions of UWM substantially harmed competition through its effects on mortgage rates, consumer choice.

124.   As a direct and proximate result of UWM's violation of Section 2 of the Act, including its enforcement of its illegal agreement, Plaintiff and Class Members have been injured and financially damaged by the reduction in choice, lost customers and commissions and have thereby been injured

47281181.5

(and will continue to be injured) in their business and property in the millions of dollars prior to trebling.

125.   Plaintiff, and Class Members, are entitled to recover treble damages and attorneys' fees pursuant to statute in an amount to be determined, as provided for by 15 U.S.C. §15(a).

**COUNT IV**
**RESTRAINT OF TRADE IN VIOLATION OF FLA. STAT. § 542.18**
**(FLORIDA ANTITRUST ACT – PER SE VIOLATION)**
**(United Wholesale Mortgage)**

126.   Plaintiff repeats and realleges paragraphs 1-15, 19, 20-37, 40-61, 64-109 and 111 of this Complaint as if fully set forth herein.

127.   As a direct and proximate result of UWM's and its brokers' per se violation of Fla. Stat. § 542.18, Plaintiff and Class Members have been injured and financially damaged by the reduction in choice, lost customers and commission and have thereby been injured (and will continue to be injured) in their business and property in the millions of dollars prior to trebling.

128.   Plaintiff, and by definition the Class, are persons who are entitled to commissions lost and/or or refunds of any financial penalties imposed by UWM.

129.   As a direct and proximate result of UWM's violation of Fla. Stat. § 542.18, Plaintiff and Class Members have suffered, and will continue to

45

suffer damages in the future, including compensatory and consequential damages, plus interest, in an amount in excess of $75,000.

130.   Plaintiff, and Class Members, are entitled to recover treble damages and attorneys' fees pursuant to statute in an amount to be determined, as provided for by Fla. Stat. § 542.22.

## COUNT V
## RESTRAINT OF TRADE IN VIOLATION OF FLA. STAT. § 542.18 (FLORIDA ANTITRUST ACT – UNREASONABLE RESTRAINT OF TRADE)
## (United Wholesale Mortgage)

131.   Plaintiff repeats and realleges paragraphs 1-15, 19, 20-37, 40-109 and 115-118 of this Complaint as if fully set forth herein.

132.   UWM's and its brokers' actions as described above are an unreasonable restraint of trade in violation of Florida Statute Section 542.18.

133.   As a direct and proximate result of UWM's violations of Fla. Stat. § 542.18, Plaintiff and Class Members have been injured and financially damaged by the reduction in choice, lost customers and commissions and have thereby been injured (and will continue to be injured) in their business and property in the millions of dollars prior to trebling.

47281181.5

134.   As a direct and proximate result of UWM's violation of Fla. Stat. Fla. Stat. § 542.18, Plaintiff and Class Members have suffered, and will continue to suffer damages in the future, including compensatory and consequential damages, plus interest, in an amount in excess of $75,000.

135.   Plaintiff, and Class Members, are entitled to recover treble damages and attorneys' fees pursuant to statute in an amount to be determined, as provided for by Fla. Stat. § 542.22.

**COUNT VI**
**VIOLATION OF FLA. STAT. § 542.19**
**(FLORIDA ANTITRUST ACT – ATTEMPT TO MONOPOLIZE)**
**(United Wholesale Mortgage)**

136.   Plaintiff repeats and realleges paragraphs 1-15, 19, 20-109 and 122-123 of this Complaint as if fully set forth herein.

137.   In violation of the Florida Antitrust Act, Fla. Stat. § 542.19, UWM has willfully, knowingly and with specific intent, attempted to monopolize the wholesale mortgage lending market or submarket.

138.   As a direct and proximate result of UWM's violation of Fla. Stat. § 542.19, Plaintiff and Class Members have been injured and financially damaged by the reduction in choice, lost customers and commissions and have thereby been injured (and will continue to be injured) in their business and property in the millions of dollars prior to trebling.

47281181.5

139.   As a direct and proximate result of UWM's violation of <u>Fla. Stat. § 542.19</u>, Plaintiff and Class Members have suffered, and will continue to suffer, damages in the future, including compensatory and consequential damages, plus interest, in an amount in excess of $75,000.

140.   Plaintiff, and Class Members, are entitled to recover treble damages and attorneys' fees pursuant to statute in an amount to be determined, as provided for by <u>Fla. Stat. § 542.19</u>.

## COUNT VII
## TORTIOUS INTERFERENCE WITH BUSINESS CONTRACTS AND PROSPECTIVE ECONOMIC ADVANTAGE
### (United Wholesale Mortgage)

141.   Plaintiff repeats and realleges paragraphs 1-15, 19 and 20-109 of this Complaint as if fully set forth herein.

142.   Plaintiff and Class Members had and were likely to maintain business relationships with borrowers desiring recommendation for the best source of mortgage loans, including choices among mortgage loans from Fairway, Rocket Pro TPO and UWM and with real estate brokers and others who referred customers to the mortgage brokers so that they could make such recommendations.

143.   UWM knew of these business relationships and contracts between mortgage brokers in the wholesale lending market and their clients.

48

144.   UWM's intentional false statements and anticompetitive and coercive acts described above, including the Ultimatum, interfered with these relationships and contracts by depriving brokers of either the opportunity to offer Rocket Pro TPO and Fairway mortgages (if they succumbed to UWM's boycott) or the opportunity to offer UWM (if they did not).

145.   As a direct and proximate result of UWM's actions, Plaintiff and Class Members were financially damaged by loss of business and disruption of those relationships and contracts because they could not offer the full choice of mortgage brokers to consumers.

146.   As a direct and proximate result of Defendants' actions, Plaintiff and Class Members have suffered, and will continue to suffer damages in the future, including compensatory and consequential damages, plus interest, in an amount in excess of $75,000.

147.   Plaintiff, and Class Members, are entitled to recover damages as a result of Defendants' actions.

148.   Defendants' actions were willful, knowing and intentional, entitling Plaintiff and Class Members to punitive damages.

**COUNT VIII**
**VIOLATION OF FLA. STAT § 501.201**
**(FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES**

49

**ACT)**
**(United Wholesale Mortgage)**

149.   Plaintiff repeats and realleges paragraphs 1-15, 19 and 20-109 of this Complaint as if fully set forth herein.

150.   Plaintiff and Class Members are "consumers" as defined under Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.203(7) which term is broadly defined to include business entities: "Consumer means an individual; ... *business*; firm; association; joint venture; partnership; estate; trust; business trust; syndicate; fiduciary; *corporation*; *any commercial entity, however denominated; or any other group or combination.*" (emphasis added).

151. UWM's actions described above are unlawful and unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct with any trade or commerce within the scope of Fla. Stat. § 501.204(1).

152.   To remedy these violations, it is requested that this Court award damages for the injuries and losses sustained by Plaintiff and Class Members as a result of Defendants' unlawful, deceptive and unfair trade practices and reasonable attorneys' fees pursuant to Florida's Deceptive and Unfair Trade Practices Act.

153.   As a direct and proximate result of Defendants' violation of Fla. Stat. § 501.204(1), Plaintiff and Class Members have been injured and financially damaged by the reduction in choice, lost customers and commissions and have thereby been injured in their business and property in the millions of dollars.

154.   As a direct and proximate result of Defendants' actions, Plaintiff and Class Members have suffered, and will continue to suffer damages in the future, including compensatory damages, plus interest, in an amount in excess of $75,000.

155.   Plaintiff, and Class Members, are entitled to recover damages and attorneys' fees pursuant to statute in an amount to be determined, as provided for by Fla. Stat. § 501.211(2).

## COUNT IX
## (DECLARATORY RELIEF, 28 U.S.C. §§ 2201-2202)
## (United Wholesale Mortgage)

Plaintiff, and Class Members, seek declaratory relief against Defendants and allege:

156.   Plaintiff repeats and realleges paragraphs 1 through 109 this Complaint as if fully set forth herein.

157.   An actual controversy now exists between Plaintiff and UWM regarding the validity and enforceability of Defendants' Addendum, and rights and liabilities related thereto.

158.   UWM has or has threatened to, terminate or suspend the business relationships with Plaintiff and Class Members who refuse to accept its Ultimatum and to impose exorbitant and unconscionable financial penalties for Plaintiff and Class Members who sign the UWM Addendum but subsequently submit a client's (consumer/prospective borrower) mortgage loan application to Fairway or Rocket.

159.   The exorbitant and unconscionable financial penalties called for in connection with the Addendum have been labelled by UWM as "Liquidated Damages" but have also been described by UWM as a "penalty" for failing to acquiesce to the Ultimatum and comply with the boycott against Fairway Mortgage and Rocket Pro TPO.

160.   The Liquidated Damages provided for in the Addendum are clearly designed as a penalty that bears no relationship to actual damages that may be incurred by UWM even if the Addendum itself was enforceable (which it is not).   The Liquidated Damages were arbitrarily and solely determined by UWM and are admittedly penalties.

47281181.5

161.  Plaintiff requests: 1) a declaration that the Ultimatum and Addendum are illegal under federal and Florida antitrust laws; 2) a declaration that the Addendum is unlawful and unenforceable; and 3) a declaration that the Liquidated Damages provision in the Addendum is a penalty and is therefore unenforceable by law.

### COUNT X
### PER SE VIOLATION OF ANTITRUST LAW
### (SECTION 1 OF THE SHERMAN ACT)
### (Mat Ishbia)

162.  Plaintiff repeats and realleges paragraphs 1-18, 20-37, 40-61, 64-109 and 111 of this Complaint as though fully set forth herein.

163.  All of UWM's actions described above were specifically directed, authorized and ordered by its CEO, Mat Ishbia.  Additionally, Mr. Ishbia personally orchestrated the boycott and announced the penalties that would be imposed on brokers who would not participate in the boycott, as described above.

164.  For these reasons Mr. Ishbia is personally liable for UWM's participation in the boycott.

165.  As a direct and proximate result of Mr. Ishbia's violation of Section 2 of the Act, Plaintiff and Class Members in choice, lost customers and commissions and have thereby been injured in their business and property in the millions of dollars prior to trebling.

47281181.5

166.   Plaintiff, and Class Members, are entitled to recover treble damages and attorneys' fees pursuant to statute in an amount to be determined, as provided for by 15 U.S.C. §15(a).

**COUNT XI**
**UNREASONABLE RESTRAINT OF TRADE**
**IN VIOLATION OF 15 U.S.C. § 1**
**(Mat Ishbia)**

167.   Plaintiff repeats and realleges paragraphs 1-18, 20-37, 40-109 and 115-118 of this Complaint as though fully set forth herein.

168.   All of UWM's actions described above were specifically directed, authorized and ordered by its CEO, Mat Ishbia.  Additionally, Mr. Ishbia personally orchestrated the boycott and announced the penalties that would be imposed on brokers who would not participate in the boycott, as described above.

169.   For these reasons Mr. Ishbia is personally liable for UWM's participation in the boycott.

170.   As a direct and proximate result of Mr. Ishbia's violation of Section 1 of the Act, Plaintiff and Class Members have been injured and financially damaged by the reduction in choice, lost customers and commissions, and have thereby been injured in their business and property in the millions of dollars prior to trebling.

171.   Plaintiff, and Class Members, are entitled to recover treble damages and attorneys' fees pursuant to statute in an amount to be determined, as provided for by 15 U.S.C. §15(a).

**COUNT XII**
**VIOLATIONS OF SECTION 2 OF THE SHERMAN ACT –**
**ATTEMPT TO MONOPOLIZE**
**(Mat Ishbia)**

172.   Plaintiff repeats and realleges paragraphs 1-18, 20-109 and 122-123 of this Complaint as though fully set forth herein.

173.   All of UWM's actions described above were specifically directed, authorized and ordered by its CEO, Mat Ishbia.  Additionally, Mr. Ishbia personally orchestrated the boycott and announced the penalties that would be imposed on brokers who would not participate in the boycott, as described above.

174.   For these reasons Mr. Ishbia is personally liable for the actions of UWM described above.

175.   As a direct and proximate result of Mr. Ishbia's violation of Section 2 of the Act, Plaintiff and Class Members in choice, lost customers and commissions and have thereby been injured in their business and property in the millions of dollars prior to trebling.

176.   Plaintiff, and Class Members, are entitled to recover treble damages and attorneys' fees pursuant to statute in an amount to be determined, as provided for by 15 U.S.C. §15(a).

## COUNT XIII
## RESTRAINT OF TRADE IN VIOLATION OF FLA. STAT. § 542.18
## (FLORIDA ANTITRUST ACT – PER SE VIOLATION)
## (Mat Ishbia)

177.   Plaintiff repeats and realleges paragraphs 1-15, 19, 20-37, 40-61, 64-109, 111 and 127-128 of this Complaint as though fully set forth herein.

178.   As a direct and proximate result of Mr. Ishbia's per se violation of Fla. Stat. § 542.18, Plaintiff and Class Members have been injured and financially damaged by the reduction in choice, lost customers and commission and have thereby been injured in their business and property in the millions of dollars prior to trebling.

179.   As a direct and proximate result of Mr. Ishbia's violation of Fla. Stat. § 542.18, Plaintiff and Class Members have suffered, and will continue to suffer damages in the future, including compensatory and consequential damages, plus interest, in an amount in excess of $75,000.

180.   Plaintiff, and Class Members, are entitled to recover treble damages and attorneys' fees pursuant to statute in an amount to be determined, as provided for by Fla. Stat. § 542.22.

56

## <u>COUNT XIV</u>
## <u>RESTRAINT OF TRADE IN VIOLATION OF FLA. STAT. § 542.18</u>
## <u>(FLORIDA ANTITRUST ACT – UNREASONABLE RESTRAINT OF</u>
## <u>TRADE)</u>
## <u>(Mat Ishbia)</u>

181.   Plaintiff repeats and realleges paragraphs 1-15, 19, 20-37, 40-109, 115-118 and 132 of this Complaint as though fully set forth herein.

182.   As a direct and proximate result of Mr. Ishbia's violation of Fla. Stat. § 542.18, Plaintiff and Class Members have been injured and financially damaged by the reduction in choice, lost customers and commissions and have thereby been injured in their business and property in the millions of dollars prior to trebling.

183.   As a direct and proximate result of Mr. Ishbia's violation of Fla. Stat. Fla. Stat. § 542.18, Plaintiff and Class Members have suffered, and will continue to suffer damages in the future, including compensatory and consequential damages, plus interest, in an amount in excess of $75,000.

184.   Plaintiff, and Class Members, are entitled to recover treble damages and attorneys' fees pursuant to statute in an amount to be determined, as provided for by Fla. Stat. § 542.22.

47281181.5

**COUNT XV**
**VIOLATION OF FLA. STAT. § 542.19**
**(FLORIDA ANTITRUST ACT – ATTEMPT TO MONOPOLIZE)**
**(Mat Ishbia)**

185.   Plaintiff repeats and realleges paragraphs 1-15, 19, 20-109, 122-123 and 137 of this Complaint as though fully set forth herein.

186.   As a direct and proximate result of Mr. Ishbia's violation of Fla. Stat. § 542.19, Plaintiff and Class Members have been injured and financially damaged by the reduction in choice, lost customers and commissions and have thereby been injured in their business and property in the millions of dollars prior to trebling.

187.   As a direct and proximate result of UWM's violation of Fla. Stat. § 542.19, Plaintiff and Class Members have suffered, and will continue to suffer damages in the future, including compensatory and consequential damages, plus interest, in an amount in excess of $75,000.

188.   Plaintiff, and Class Members, are entitled to recover treble damages and attorneys' fees pursuant to statute in an amount to be determined, as provided for by Fla. Stat. § 542.19.

**COUNT XVI**
**TORTIOUS INTERFERENCE WITH BUSINESS CONTRACTS**
**AND PROSPECTIVE ECONOMIC ADVANTAGE**
**(Mat Ishbia)**

189.   Plaintiff repeats and realleges paragraphs 1-15, 19, 20-100 and 133-139 of this Complaint as though fully set forth herein.

58

190.   All of UWM's actions described above were specifically directed, authorized and ordered by its CEO, Mat Ishbia.  Additionally, Mr. Ishbia personally orchestrated the boycott and announced the penalties that would be imposed on brokers who would not participate in the boycott, as described above.

191.   For these reasons Mr. Ishbia is personally liable for the actions of UWM described above.

192.   As a direct and proximate result of Mr. Ishbia's actions, Plaintiff and Class Members were financially damaged by loss of business and disruption of those relationships and contracts because they could not offer the full choice of mortgage brokers to consumers.

193.   As a direct and proximate result of Mr. Ishbia's actions, Plaintiff and Class Members have suffered, and will continue to suffer damages in the future, including compensatory and consequential damages, plus interest, in an amount in excess of $75,000.

194.   Plaintiff, and Class Members, are entitled to recover damages as a result of Mr. Ishbia's actions.

195.   Mr. Ishbia's actions were willful, knowing and intentional, entitling Plaintiff and Class Members to punitive damages.

## COUNT XVII
## VIOLATION OF FLA. STAT § 501.201

## (FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT)
## (Mat Ishbia)

196.   Plaintiff repeats and realleges paragraphs 1-15, 19, 20-109 and 150-151 of this Complaint as though fully set forth herein.

197.   All of UWM's actions described above were specifically directed, authorized and ordered by its CEO, Mat Ishbia.  Additionally, Mr. Ishbia personally orchestrated the boycott and announced the penalties that would be imposed on brokers who would not participate in the boycott, as described above.

198.   For these reasons Mr. Ishbia is personally liable for the actions of UWM described above.

199.   To remedy these violations, it is requested that this Court award damages for the injuries and losses sustained by Plaintiff and Class Members as a result of Mr. Ishbia's unlawful, deceptive and unfair trade practices and reasonable attorneys' fees pursuant to Florida's Deceptive and Unfair Trade Practices Act.

200.   As a direct and proximate result of Mr. Ishbia's violation of Fla. Stat. § 501.204(1), Plaintiff and Class Members have been injured and financially damaged by the reduction in choice, lost customers and commissions and have been injured in their business and property in the

60

millions of dollars, as alleged more specifically in paragraphs 43-47, 72, 75-76, 87-91, 98-101, 108-114, 120-124, 131-134, and 145-47 above.

201.   As a direct and proximate result of Defendants' actions, Plaintiff and Class Members have suffered, and will continue to suffer damages in the future, including compensatory damages, plus interest, in an amount in excess of $75,000.

202.   Plaintiff, and Class Members, are entitled to recover damages and attorneys' fees pursuant to statute in an amount to be determined, as provided for by <u>Fla. Stat. § 501.211(2)</u>.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff and the Class Members pray for relief and judgment as follows:

A.   For an order certifying the Class, appointing Plaintiff as representative for the Class, and appointing Plaintiff's counsel as Class counsel;

B.   That Defendants bear the cost of any notice sent to the Class;

C.   For an order awarding Plaintiff and the Members of the Class actual damages;

D.      For an order awarding Plaintiff and the Members of the Class treble damages;

E.      For an order awarding Plaintiff and the Members of the Class punitive damages;

F.      For an order awarding Plaintiff and the Members of the Class pre- and post-judgment interest and attorney fees;

G.      For an order declaring the Addendum to be unlawful and unenforceable;

H.      For an order declaring that the Liquidated Damages provision in the Addendum is a penalty and is therefore unenforceable by law;

I.      For an order awarding attorneys' fees and costs of suit, including experts' witness fees as permitted by law; and

J.      Such other and further relief as this Court may deem just and proper.

**<u>DEMAND FOR JURY TRIAL</u>**

Plaintiff demands a trial by jury.

Date: March 24, 2023         Respectfully Submitted,
**PARRISH & GOODMAN, PLLC**
/s/ Robert H. Goodman
ROBERT H. GOODMAN
Florida Bar No.: 1008059
13031 McGregor Blvd., Suite 8

Fort Myers, Florida 33919
Phone: (813) 643-4529
Facsimile: (813) 315-6535
Primary: rgoodman@parrishgoodman.com
Secondary: admin@parrishgoodman.com
AND
JOSEPH E. PARRISH
Florida Bar No: 690058
Primary: jparrish@parrishgoodman.com
Secondary: admin@parrishgoodman.com
*Counsel for Plaintiff*

47281181.5

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on this 24th day of March, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

/s/ Robert H. Goodman
*Attorney for Plaintiff*

47281181.5