# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA

## Case No. 3:21-cv-00448-BJD-LLL

THE OKAVAGE GROUP, LLC
on behalf of itself and all others
similarly situated,

       *Plaintiff*,

        v.

UNITED WHOLESALE MORTGAGE, LLC
and MATHEW ISHBIA, individually,

       *Defendants.*

_____/

## DEFENDANTS' MOTION TO DISMISS SUPPLEMENTAL CLASS ACTION COMPLAINT PURSUANT TO RULES 12(B)(2) AND 12(B)(6) AND MEMORANDUM OF LAW IN SUPPORT

# TABLE OF CONTENTS

**Page(s)**

I.     Introduction ................................................................................1

II.    Summary of Factual Allegations .................................................4

       A.    UWM's Share of the Residential Mortgage Lending Market ...............4
       B.    Plaintiff Is a Mortgage Broker in a Vertical Relationship with
             Wholesale Mortgage Lenders Like UWM, Rocket, and Fairway..........7
       C.    UWM Announced the All-In Initiative to Combat Practices It
             Believes Are Harmful to the Wholesale Mortgage Lending
             Channel..........................................................................................7
       D.    Brokers and Trade Associations Engaged in a Robust Discussion
             of the Amendment Following Its Announcement.................................9
       E.    Plaintiff and Other Brokers Remain Free to Choose Their
             Lenders. ......................................................................................10
       F.    Plaintiff's Allegations Regarding the Effects of the Amendment .........10
       G.    Procedural Background and the Magistrate Judge's Report. ..............12

III.   Standard of Review ....................................................................12

       A.    Rule 12(b)(2) ...............................................................................12
       B.    Rule 12(b)(6) ...............................................................................12

IV.    Argument ....................................................................................13

       A.    This Court Lacks Personal Jurisdiction Over Mr. Ishbia....................13
       B.    Plaintiff's Antitrust Claims Rest on a Legally Unsustainable
             Market Definition (Counts II-III, V-VI,  XI-XII, XIV-XV) .................15
       C.    Plaintiff Fails to State a Claim for a Per Se Illegal Group Boycott
             in Violation of Section 1 of the Sherman Act (Counts I and X)...........19

             1.    Plaintiff Does Not Plead a Per Se Illegal Group Boycott
                   Based on a Horizontal Agreement Between UWM and Its
                   Competitors..........................................................................19
             2.    Plaintiff Does Not Plead an Illegal Hub-and-Spoke
                   Conspiracy ...........................................................................22
             3.    Plaintiff's Allegations Do Not Demonstrate Market Power
                   Sufficient to Support a Per Se Violation of Section 1 ...............26
             4.    Plaintiff Fails to Plead a Claim Against Mr. Ishbia for Per
                   Se Violation of the Sherman Act .............................................29

D.    Plaintiff Fails to State a Claim for Unreasonable Restraint of Trade in Violation of Section 1 of the Sherman Act (Counts II and XI)......................................................................................29

    1.    Plaintiff's Allegations Do Not Plead the Potential for a Genuine Adverse Effect on Competition...................................30

    2.    Plaintiff Does Not Plead a Potential or Actual Detrimental Effect on Competition ....................................................32

    3.    Plaintiff Fails to Plead a Claim Against Mr. Ishbia for Unreasonable Restraint of Trade................................32

E.    Plaintiff Fails to State a Claim for Attempt to Monopolize in Violation of Section 2 of the Sherman Act (Counts III and XII)..........33

    1.    Plaintiff Fails to Allege a Dangerous Probability of Achieving Monopoly Power. ....................................................33

    2.    Plaintiff Fails to Allege Anticompetitive Conduct or a Specific Intent to Monopolize....................................................35

    3.    Plaintiff Fails to State a Claim Against Mr. Ishbia for Attempted Monopolization ....................................................36

F.    Plaintiff's Claims Under the Florida Antitrust Act Follow the Sherman Act Claims and Fail for the Same Reasons (Counts IV, V, VI, XIII, XIV, XV)..........................................................36

G.    Plaintiff Fails to State a Claim for Tortious Interference with Business Contracts and Prospective Economic Advantage (Counts VII and XVI) ..........................................................36

H.    Plaintiff Fails to State a Claim for Violation of Florida's Deceptive and Unfair Trade Practices Act (Counts VIII and XVII) ..........................................................38

I.    Plaintiff Fails to State a Claim for Declaratory Relief (Count IX) .......39

V.    Conclusion ..........................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A & E Auto Body, Inc. v. 21st Century Centennial Ins. Co.,*
No. 6:14-CV-310, 2015 WL 12867010 (M.D. Fla. Jan. 22, 2015)........................23

*All Care Nursing Serv. v. High Tech Staffing Servs.,*
135 F.3d 740 (11th Cir. 1998) ...............................................................15, 19, 36

*Am. Pro. Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Pro.
Publ'ns, Inc.,*
108 F.3d 1147 (9th Cir. 1997) ...........................................................................27

*Appleton v. Intergraph Corp.,*
627 F. Supp. 2d 1342 (M.D. Ga. 2008) .............................................................32

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ...........................................................................................12

*Atlanta Gas Light Co. v. Aetna Cas. Sur. Co.,*
68 F.3d 409 (11th Cir. 1995) .............................................................................40

*Auto Dealer Sols., Inc. v. S.-Owners Ins. Co.,*
No. 8:17-CV-2525, 2018 WL 4600674 (M.D. Fla. Jan. 25, 2018)........................39

*Bailey v. Allgas, Inc.,*
284 F.3d 1237 (11th Cir. 2002)..........................................................................27

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544 (2007) ...................................................................................... 13, 24

*Blue Water Int'l, Inc. v. Hattrick's Irish Sports Pub, LLC,*
No. 8:17-CV-1584-T-23AEP, 2017 WL 4182405 (M.D. Fla. Sep. 21,
2017) ..................................................................................................................15

*Bolinger v. First Multiple Listing Serv., Inc.,*
838 F. Supp. 2d 1340 (N.D. Ga. 2012) ...............................................................24

*Broadcast Music, Inc. v. Columbia Broadcast. Sys., Inc.,*
441 U.S. 1 (1979)...............................................................................................20

*Casa Dimitri Corp. v. Invicta Watch Co. of Am., Inc.,*
270 F. Supp. 3d 1340 (S.D. Fla. 2017).............................................................39

*Cha-Car, Inc. v. Calder Race Course, Inc.,*
752 F.2d 609 (11th Cir. 1985) ..........................................................................20

iii

*Chambers v. Nasa Fed. Credit Union*,
    222 F. Supp. 3d 1 (D.D.C. 2016)......................................................................12

*Chaparro v. Carnival Corp.*,
    693 F.3d 1333 (2012) ......................................................................................13

*City First Mortg. Corp. v. Barton*,
    988 So. 2d 82 (Fla. 4th DCA 2008) .................................................................39

*Del Prado Mall Pro. Condo. Ass'n, Inc. v. Voyager Indem. Ins. Co.*,
    No. 2:20-CV-838, 2021 WL 1578758 (M.D. Fla. Apr. 22, 2021)......................39

*Denan v. Trans Union LLC*,
    959 F.3d 290 (7th Cir. 2020) ..........................................................................12

*Dickson v. Microsoft Corp.*,
    309 F.3d 193 (4th Cir. 2002) ..........................................................................22

*In re Disposable Contact Lens Antitrust Litig.*,
    215 F. Supp. 3d 1272 (M.D. Fla. 2016) ..................................................... 22, 25

*Doe v. Thompson*,
    620 So. 2d 1004 (Fla. 1993)............................................................................14

*EnviroPak Corp. v Zenfinity Capital, LLC*,
    No. 4:14-CV-00754, 2015 WL 331807 (E.D. Mo. Jan. 23, 2015) ....................32

*In re EpiPen Direct Purchaser Litig.*,
    No. 20-CV-0827, 2022 WL 101770 (D. Minn. Apr. 5, 2022) ...........................23

*Ethan Allen, Inc. v. Georgetown Manor, Inc.*,
    647 So. 2d 812 (Fla. 1994) .............................................................................37

*F.T.C. v. Ind. Fed'n of Dentists*,
    476 U.S. 447 (1986) ......................................................................................19

*Fid. Nat'l Fin., Inc. v. Attachmate Corp.*,
    No. 3:15-CV-01400, 2017 WL 3726687 (M.D. Fla. Mar. 1, 2017) ..................38

*Fin. Sec. Assur., Inc. v. Stephens, Inc.*,
    500 F.3d 1276 (11th Cir. 2007)..........................................................................4

*Fla. Steel Corp. v. Whiting Corp.*,
    677 F. Supp. 1140 (M.D. Fla. 1988).................................................................37

*Greenberg, M.D. v. Mount Sinai Med. Ctr. of Greater Miami, Inc.*,
    629 So. 2d 252 (Fla. 3d DCA 1993) ................................................................38

*Gulf States Reorg. Grp., Inc. v. Nucor*,
    721 F.3d 1281 (11th Cir. 2013).......................................................................34

*Gulf States Reorganization Grp., Inc. v. Nucor*,
    822 F. Supp. 2d 1201 (N.D. Ala. 2011) ...........................................................34

iv

*Handicomp, Inc. v. U.S. Golf Ass'n*,
No. 99-5372, 2000 WL 426245 (3d Cir. 2000) ................................................27

*Hunter v. Bev Smith Ford, LLC*,
No. 07-80665-CIV, 2008 WL 1925265 (S.D. Fla. Apr. 29, 2008) ......................38

*In re Ins. Brokerage Antitrust Litig.*,
618 F.3d 300 (3d Cir. 2010) .................................................................... 23, 26

*Int'l Sales & Servs., Inc. v. Austral Insulated Prods., Inc.*,
262 F.3d 1152 (11th Cir. 2001)...............................................................37

*Internet Solutions Corp. v. Marshall*,
39 So. 3d 1201 (Fla. 2010) ...................................................................... 14, 15

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
626 F.3d 1327 (11th Cir. 2010)............................................................16, 17, 18

*In re January 2021 Short Squeeze Trading Litig.*,
2021 WL 5359731 (S.D. Fla. Nov. 17, 2021)...................................................24

*JES Props., Inc. v. USA Equestrian, Inc.*,
No. 8:02-CV-01585-T-24MAP, 2005 WL 1126665 (M.D. Fla. May
9, 2005) ..........................................................................................................38

*JES Props. v. USA Equestrian, Inc.*,
253 F. Supp. 2d 1273 (M.D. Fla. 2003) ...................................................... 16, 17

*Kitroser v. Hurt*,
85 So. 3d 1084 (Fla. 2012) ............................................................................14

*Lane v. XYZ Venture Partners, L.L.C.*,
322 F. App'x 675 (11th Cir. 2009).................................................................14

*Leon v. Cont'l AG*,
301 F. Supp. 3d 1203 (S.D. Fla. 2017)..........................................................15

*Levine v. Cent. Fla. Med. Affiliates*,
72 F.3d 1538 (11th Cir. 1996) ...........................................................15, 30, 34

*Levine v. Cent. Fla. Med. Affiliates*,
864 F. Supp. 1175 (M.D. Fla. 1994), *aff'd*, 72 F.3d 1538 (11th Cir.
1996) .......................................................................................................... 20, 21

*Living Color Enters., Inc. v. New Era Aquaculture, Ltd.*,
No. 14-62216-CIV, 2015 WL 1526177 (S.D. Fla. Apr. 3, 2015) ........................38

*Louis Vuitton Malletier, S.A. v. Mosseri*,
736 F.3d 1339 (11th Cir. 2013).................................................................. 13, 14

*M H Tire Co. v. Hoosier Racing Tire Corp.*,
733 F.2d 973 (1st Cir. 1984) ........................................................................20

v

*Maxon Hyundai Mazda v. Carfax, Inc.*,
   No. 13-CV-2680 (AJN), 2016 WL 7231941 (S.D.N.Y. Dec. 9, 2016),
   *aff'd*, 726 F. App'x 66 (2d Cir. 2018) .................................................................. 27

*McWane, Inc. v. Fed. Trade Comm'n*,
   783 F.3d 814 (11th Cir. 2015) ............................................................................ 31

*Mfg. Research Corp. v. Greenlee Tool Co.*,
   693 F.2d 1037 (11th Cir. 1982) .......................................................................... 34

*Moecker v. Honeywell Intern., Inc.*,
   144 F. Supp. 2d 1291 (M.D. Fla. 2001) ............................................................. 35

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
   465 U.S. 752 (1984) ........................................................................................... 23

*Morris v. SSE, Inc.*,
   843 F.2d 489 (11th Cir. 1988) ............................................................................ 12

*Mukamal v. Bakes*,
   No. 07-20793-CIV, 2008 WL 11391157 (S.D. Fla. May 20, 2008),
   *aff'd*, 378 F. App'x 890 (11th Cir. 2010) ........................................................... 39

*In re Musical Instruments and Equip. Antitrust Litig.*,
   798 F.3d 1186 (9th Cir. 2015) ............................................................................ 22

*Nw. Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.*,
   472 U.S. 284 (1985) ............................................................................... 20, 21, 26

*NYNEX Corp. v. Discon, Inc.*,
   525 U.S. 128 (1998) ........................................................................................... 21

*Ohio v. Am. Express Co.*,
   138 S. Ct. 2274 (2018) ....................................................................................... 30

*Paddock Pubs., Inc. v. Chicago Tribune Co.*,
   103 F.3d 42 (7th Cir. 1996) ............................................................................... 31

*Paycargo, LLC v. CargoSprint, LLC*,
   No. 3:19-CV-85-TCB, 2019 WL 5793113 (N.D. Ga. Nov. 4, 2019) .................. 35

*PNY Techs., Inc. v. Sandisk Corp.*,
   No. 11-CV-04689, 2014 WL 1677521 (N.D. Cal. Apr. 25, 2014) ...................... 31

*Pro Search Plus, LLC v. VFM Leonardo, Inc.*,
   No. 8:12-CV-02102, 2013 WL 3936394 (C.D. Cal. July 30, 2013) ................... 31

*Procaps S.A. v. Patheon, Inc.*,
   845 F.3d 1072 (11th Cir. 2016) .......................................................................... 32

*Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*,
   917 F.3d 1249 (11th Cir. 2019) .......................................................................... 24

vi

*Rebel Oil Co. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) ............................................................................17

*Retina Assocs., P.A. v. S. Baptist Hosp. of Fla., Inc.*,
   105 F.3d 1376 (11th Cir. 1997)............................................................19, 26, 29

*Richards v. Sen*,
   No. 07-14254-CIV, 2008 WL 4889623 (S.D. Fla. Nov. 12, 2008) ....................15

*Romika-USA, Inc. v. HSBC Bank USA, N.A.*,
   514 F. Supp. 2d 1334 (S.D. Fla. 2007)......................................................... 37, 38

*Rxstrategies, Inc. v. CVS Pharmacy, Inc.*,
   390 F. Supp. 3d 1341 (M.D. Fla. 2019) ............................................................27

*Seagood Trading Corp. v. Jerrico, Inc.*,
   924 F.2d 1555 (11th Cir. 1991)........................................................................20

*Sherr v. HealthEast Care Sys.*,
   262 F. Supp. 3d 869 (D. Minn. 2017) ..............................................................32

*Simpson v. Sanderson Farms, Inc.*,
   744 F.3d 702 (11th Cir. 2014) .........................................................................16

*Thorpe ex rel. Situated v. Walker Inv. Mgmt. Corp.*,
   111 F. Supp. 3d 1335 (S.D. Fla. 2015)............................................................12

*Snow v. DirecTV, Inc.*,
   450 F.3d 1314 (11th Cir. 2006)........................................................................14

*Spanish Broad. Sys. of Fla. v. Clear Channel Commc'ns, Inc.*,
   376 F.3d 1065 (11th Cir. 2004)........................................................30, 32, 33, 34

*St. Petersburg Yacht Charters, Inc. v. Morgan Yacht, Inc.*,
   457 So. 2d 1028 (Fla. 2d DCA 1984)...............................................................36

*State Oil Co. v. Khan*,
   522 U.S. 3 (1997)............................................................................................30

*Tampa Elec. Co. v. Nashville Coal Co.*,
   365 U.S. 320 (1961) ........................................................................................30

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) .................................................................................... 4, 11

*Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
   552 F.3d 430 (6th Cir. 2008) ..................................................................... 22, 26

*U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*,
   7 F.3d 986 (11th Cir. 1993) ..................................................................15, 26, 34

*United Am. Corp. v. Bitmain, Inc.*,
   530 F. Supp. 3d 1241 (S.D. Fla. 2021)........................................................ 20, 22

*United States v. Apple*,
    791 F.3d 290 (2d Cir. 2015) ............................................................................25

*United States v. Chandler*,
    388 F.3d 796 (11th Cir. 2004) .........................................................................22

*United States v. Colgate & Co.*,
    250 U.S. 300 (1919) .........................................................................................23

*United States v. E. I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956) .........................................................................................17

*Vacation Break, U.S.A. v. Mktg. Response Grp.*,
    169 F. Supp. 2d 1325 (M.D. Fla. 2001) ..........................................................20

*Vitacost.com v. Oregon Freeze Dry, Inc.*,
    No. 09-80367-CIV, 2009 WL 10667820 (S.D. Fla. July 21, 2009) .................23

*Wackenhut Corp. v. Maimone*,
    389 So. 2d 656 (Fla. 4th DCA 1980) ...............................................................38

*Wendt v. Horowitz*,
    822 So. 2d 1252 (Fla. 2002).............................................................................15

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012) ............................................................................32

## Statutes

Fla. Stat. § 48.193 ......................................................................................................13

Fla. Stat. § 501.201 ....................................................................................................38

Fla. Stat. § 542.22(1)..................................................................................................40

## Other Authorities

Fed. R. Civ. P. 9(b)......................................................................................................38

Fed. R. Civ. P. 12(b)(2)................................................................................................1

Fed. R. Civ. P. 12(b)(6)................................................................................................1

Herbert Hovenkamp, Federal Antitrust Policy § 10.8 (1994)...................................31

HousingWire.com, www.housingwire.com/articles/uwm-rocket-both-
    declare-victory-in-broker-war/ .......................................................................11

S&P Global Market Intelligence,
    https://www.spglobal.com/marketintelligence/en/news-
    insights/latest-news-headlines/nonbank-mortgage-originations-up-
    10-6-in-2021-yoy-71142930 ...........................................................................11

ACTIVE 689150078v3

Defendants United Wholesale Mortgage, LLC ("UWM") and Mathew Ishbia ("Mr. Ishbia") ("Defendants") submit their motion to dismiss Plaintiff's Supplemental Amended Class Action Complaint ("Supplemental Amended Complaint" or "SAC") filed by Plaintiff The Okavage Group, LLC ("Plaintiff"), pursuant to Rules 12(b)(2) and 12(b)(6), and their memorandum of law in support thereof, as follows:

## I.  <u>Introduction</u>

Far from shoring up its facially deficient pleadings, Plaintiff's Supplemental Amended Complaint—its *fourth* attempt to state a claim—merely confirms that this case is litigation theater aimed at generating headlines and not a credible claim of antitrust or state law violations. Like each prior pleading, the Supplemental Amended Complaint liberally deploys buzzwords and selective references to events and circumstances in an attempt to transform a simple choice between business rivals into a supposed "boycott" or "attempted monopolization." Neither theory holds water.

Plaintiff complains of UWM's amendment of the terms on which it does business with independent mortgage brokers, which UWM carried out to address its concerns regarding practices by Rocket Pro TPO ("Rocket") and Fairway Independent Mortgage ("Fairway"). UWM believes Rocket and Fairway harm the vibrant, pro-consumer network of wholesale mortgage brokers that originate loans with UWM, by originating loans through brokers on the wholesale side and then converting the brokers' customers to the retail side—all to the detriment of the wholesale channel.

To confront these practices, UWM announced its "All-In Initiative" on March 4, 2021, stating it had decided to end its business relationship with brokers who chose

1

to continue originating loans with Rocket and Fairway. UWM amended its Broker Agreement (the "Amendment") to that effect in accordance with its contractual right to amend.  UWM also asked some brokers to execute an "Addendum" indicating their intentions. The Amendment (which Plaintiff continues to describe falsely as an "ultimatum" and "boycott") did not require brokers to originate any loans with UWM. It is terminable at any time, with or without cause, and terminating brokers can immediately originate mortgages with Rocket or Fairway. Both brokers who opted into the Amendment and those who did not continue to have access to at least 50+ other lenders in the wholesale mortgage channel.

This is a simple case under governing law. UWM has the right to announce the terms on which it will conduct business with brokers. Brokers are free to accept or reject those terms. Plaintiff rejected UWM's terms in favor of Rocket and Fairway. Other brokers accepted UWM's terms but are free to change their minds. Consumers may choose any broker(s) or mortgage company(ies) they like. Choosing between business rivals is not anticompetitive; indeed it is the essence of competition. The Magistrate Judge concluded as much in a well-reasoned, 50-page Report and Recommendation entered on July 27, 2022 [DE 61] (the "Report"), recommending dismissal of Plaintiff's First Amended Complaint against Mr. Ishbia for lack of personal jurisdiction, and Plaintiff's claims against UWM for failure to state a claim.

The Supplemental Amended Complaint attempts to address the defects identified in the Report by adding references to financial reports, earnings calls, interviews, and other sources that Plaintiff insists demonstrate UWM's acquisition of

2

market power and supposed anticompetitive effects for the so-called "wholesale mortgage market." But Plaintiff's supplemental allegations, and the sources they incorporate by reference, only confirm the implausibility of Plaintiff's claims.

*First*, Plaintiff still fails to allege facts supporting this Court's personal jurisdiction over Mr. Ishbia. The corporate shield doctrine precludes application of Florida's long-arm statute, and the "intentional tort" exception does not apply because Mr. Ishbia is not alleged to have committed any tortious conduct in Florida.

*Second*, in light of Plaintiff's supplemental allegations and referenced sources, it is now incontrovertible that the properly defined market is not the "wholesale mortgage market," but the overall residential mortgage market. UWM has never held a market share above 11% of that market. Most of Plaintiff's antitrust claims (Counts II-III, V-VI, XI-XII, and XIV-XV) thus fail for lack of a properly defined market.

*Third*, Plaintiff has not cured any of the pleading deficiencies identified in the Report with respect to its antitrust claims. It has not alleged any horizontal agreement or "hub-and-spoke" conspiracy, any potential or actual anticompetitive effect, or any plausible risk of monopolization or specific intent to monopolize.

*Fourth*, Plaintiff's tortious interference claims (Counts VII and XVI) still fail to allege, among other defects, any interference with an actual and identifiable business relationship or any intentional or unjustified interference.

*Fifth*, Plaintiff's Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") claims (Counts VIII and XVII) fail to state a claim because they are derivative of the deficient antitrust claims and do not allege actual damages.

3

*Sixth*, Plaintiff's declaratory relief claim (Count IX) is duplicative and non-justiciable because it seeks a declaration as to an agreement Plaintiff did not sign.

The Court should therefore dismiss each of Plaintiff's claims with prejudice.

## II.    Summary of Factual Allegations

### A.    UWM's Share of the Residential Mortgage Lending Market

Plaintiff characterizes wholesale mortgage lending as a "separate submarket" of residential mortgage lending. SAC ¶ 25. But the materials incorporated by reference into the Supplemental Amended Complaint conclusively establish that the relevant market is overall residential mortgage lending; that wholesale mortgage lending is just one channel within that market; and that UWM's share is about 10% of the residential mortgage lending market, and about 38% of the wholesale channel.

Plaintiff cites UWM's 2022 annual report to show that UWM has agreements with more than 12,000 brokers. SAC ¶ 101. The same report, however, also states that UWM had "8% share of the overall mortgage market" in 2022, and "approximately 38% market share in the wholesale channel[.]" UWM 10-K (March 1, 2023), attached as **Exhibit A**, at 6.[1] It describes the "[c]ompetition for mortgage loan originations" in the "*residential mortgage market*," and states, "[m]any of our *competitors* are primarily Retail Mortgage Lenders" that participate in both the wholesale and retail channels. *Id*. at 4, 13-14 (emphasis added). The report acknowledges: "*Competition in the*

---

[1] This Court may take judicial notice of and rely on documents "referred to in the complaint" and "central to" Plaintiff's claims. *See Fin. Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1285 (11th Cir. 2007); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (documents incorporated in the complaint by reference may be considered by the court on a motion to dismiss).

4

*residential mortgage loan origination market is intense*," and includes all "[i]nstitutions offering to make residential mortgage loans, *regardless of the channel*," including "direct retail lenders who market directly to homeowners[.]" *Id*. at 13 (emphasis added). The report also reflects that the referenced 12,000 brokers are associated with just 45,000 out of 386,000 (11.6%) federally registered loan officers in the United States, of whom only about 33,000 (8.5%) submitted a loan to UWM during 2022. *Id*. at 5.[2]

Plaintiff next cites UWM's Q4 2022 earnings call to allege that UWM is the number one wholesale lender and had a 54% share of the wholesale market in the fourth quarter of 2022. SAC ¶¶ 102, 104. What Mr. Ishbia actually said on the earnings call was that UWM had a 54% share "of the *broker channel* in the fourth quarter," while acknowledging that this represented "about 11% of the *overall mortgage market*." Transcript of UWM Q4 2022 Earnings Call (March 1, 2023), attached as **Exhibit B**, at 3-4 (emphasis added). Mr. Ishbia also said he saw the trend likely to "peak[]" at "about 12%," that he did not think "UWM will stay 54% [of the broker channel] forever," and that he believed "11%, 12% of the *overall market* is very realistic." *Id*. at 7-8, 11 (emphasis added). The "Full Year 2022 Highlights" for the earnings call confirmed that, for the full year, UWM's share was "8% share of the overall mortgage market" and a 38% share "of the *wholesale channel*[.]" UWM Q4 2022 Earnings

---

[2] Plaintiff takes one sentence out of context from this discussion, suggesting UWM has advantages of "volume" not shared by other wholesale lenders. SAC ¶ 108. The report says nothing of the kind. It describes how the growth of the *entire wholesale channel* creates a "significant opportunity" for more registered loan officers to join the wholesale channel, benefiting borrowers, brokers, and lenders alike by, among many other benefits, leveraging greater volume to deliver efficiency. Ex. A, at 5-6.

Announcement (March 1, 2023), attached as **Exhibit C**, at 2 (emphasis added).

Plaintiff also cherry-picks and alters excerpts of a February 28, 2023 *Detroit News* interview with Mr. Ishbia, referencing a "penalty" for "working with Rocket," and referring to UWM being "bigger than" Rocket since UWM "announced the [Ultimatum.]" SAC ¶¶ 103, 105 (changing the word "initiative" to "[Ultimatum]" to fit Plaintiff's narrative). What Mr. Ishbia actually said was there was "*no penalty*" and "*no fine*" for working with Rocket, and that the only "penalty" is that UWM would not work with brokers that elected to work with Rocket. Q&A: Mat Ishbia, *Detroit News* (Feb. 25, 2023), attached as **Exhibit D**, at 12 (emphasis added). Indeed as the interview confirmed, "Brokers can stop working with UWM at any time *without penalty*." *Id.* (emphasis added). Mr. Ishbia also acknowledged that UWM was "competing" with retailers for consumers "shop[ping] for their mortgage." *Id.* at 13.[3]

Lastly, Plaintiff isolates and mischaracterizes Mr. Ishbia's statements in the Q4 2022 earnings call that UWM has "great control of our margins" and "we do control the margins" as a purported admission that UWM "is able to control price in the market." SAC ¶ 109. Again, Plaintiff is wrong.  Addressing potential investor concerns about the "Game On" initiative in which UWM temporarily cut its margins to 50 basis points in response to "extremely competitive" pricing, Mr. Ishbia stated that UWM viewed an "annualized margin" of "75 to 100 basis points" as "what you can expect

---

[3] Plaintiff also misquotes Mr. Ishbia as referring to UWM "'dominat[ing]' the wholesale markets." SAC ¶ 102. What he actually said, in response to a question about stock prices, is that he does not pay attention to stock prices, noting that "My job is to dominate every day at UWM, take care of our team members, take care of our clients, take care of our shareholders." Ex. D, at 13-14.

in a really purchase heavy market or a higher rate environment," and affirmed UWM's commitment to "control" its margins within that range to ensure "very, very competitive pricing" to brokers, while benefiting investors. Ex. B, at 6-8.

**B.  Plaintiff Is a Mortgage Broker in a Vertical Relationship with Wholesale Mortgage Lenders Like UWM, Rocket, and Fairway.**

Plaintiff is a mortgage broker who did business with UWM for less than a year pursuant to a Broker Agreement it signed with UWM on or about November 20, 2020. *See* SAC ¶¶ 17, 68-69; Broker Agreement, attached as **Exhibit E**. Plaintiff alleges it also has a business relationship with Rocket and Fairway. SAC ¶¶ 68-69. UWM is a wholesale residential mortgage lender, as are the wholesale divisions of Rocket and Fairway. SAC ¶¶ 16, 20, 27, 29. Unlike UWM, Rocket and Fairway also have retail mortgage lending divisions with captive loan officers that deal directly with consumers and bypass independent brokers. *Id.* ¶¶ 21, 30-31.  The relationship between Plaintiff and wholesale mortgage lenders like UWM is vertical: Plaintiff submits loans to its chosen lenders and acts as a commercial intermediary between the lender and the borrower. *Id.* ¶ 22.

**C.  UWM Announced the All-In Initiative to Combat Practices It Believes Are Harmful to the Wholesale Mortgage Lending Channel.**

This lawsuit arises out of the March 4, 2021 announcement by Mr. Ishbia, in his capacity as President and CEO of UWM, that UWM was amending its Broker Agreement to require a representation and warranty that mortgage brokers who submit loans to UWM will not also submit loans to Rocket or Fairway. SAC ¶ 36. Some brokers were asked to sign an Addendum confirming their assent to the Amendment.

7

*Id.* ¶¶ 44, 54-55. UWM had the contractual right to amend the Broker Agreement, and a broker's submission of any mortgage loan application to UWM after the date of the Amendment constitutes acceptance. Ex. E § 7.08.

The Supplemental Amended Complaint incorporates Mr. Ishbia's announcement of the All-In Initiative, as well as an interview he conducted on mortgage news outlet HousingWire later in the day. SAC ¶¶ 36-40, 51; *see also* Transcript of Mar. 4, 2021 Facebook Live Video Announcement, attached as **Exhibit F**. Mr. Ishbia stated that one purpose of the initiative was, "[w]e don't need to fund Fairway [] or Rocket [] to try to put brokers out of business." SAC ¶ 37. He explained UWM's view that Rocket and Fairway were "out there hurting the wholesale channel" by "soliciting loan officers," "talking negatively about brokers," "going after real estate agents," "trying to cut the loan officers," and "solicit[ing] your past clients." Ex. F at 12:14-16:11. He emphasized that "[w]hatever they want to do they can do [] as long as they play by the rules," but "that's not my business model," which is "helping you win" and "[b]eing all in for brokers." *Id.* at 13:18-24.

Mr. Ishbia said there would be "no hard feelings" and brokers could "close out your loans" and "take care of consumers [e]ven if you [] decline[.]" Ex. F at 15:10–15:18.  He emphasized this was a decision "going forward[.]" *Id.* at 15:23-16:4. He noted there were "73 other lenders," and brokers would "have options" with or without the "two [lenders] that are out there hurting the channel[.]" *Id.* at 16:9-18.

8

**D.    Brokers and Trade Associations Engaged in a Robust Discussion of the Amendment Following Its Announcement.**

Plaintiff alleges that Mr. Ishbia's announcement took place in public view and drew numerous public reactions. Plaintiff cites public comments made by brokers on digital forums, such as "We are ALL IN," "unstoppable together," "Let's go!" and descriptions of brokers as "family," and also describes instances of brokers responding to one another's comments or questions and encouraging one another to sign the Addendum. SAC ¶¶ 41-42, 44, 49-50, 52. Plaintiff alleges that other brokers expressed vigorous opposition to the Amendment. *Id*. ¶¶ 43, 78, 80-81.

Plaintiff alleges split views by trade associations. Plaintiff alleges the Association of Independent Mortgage Experts ("AIME") issued a letter of support and made supportive statements during the Facebook live chat. *Id*. ¶¶ 45-47. Plaintiff alleges The Mortgage Bankers Association and the National Association of Mortgage Brokers issued statements of opposition. *Id*. ¶ 79. Plaintiff alleges that AIME and other trade associations have regular meetings, and at least one private Facebook discussion page provided "significant vehicles for communication and agreement between the mortgage brokers with regard to the boycott." *Id*. ¶ 48.  Plaintiff cites no examples of such "communication and agreement" via trade associations.

Notwithstanding the many cited examples of vocal enthusiasm by brokers, Plaintiff insists the Amendment was "against the brokers' unilateral self-interest" and describes it as "coercion" reflecting UWM's "market power." *Id*. ¶¶ 65-66, 82-84. Plaintiff does not identify any broker "coerced" into signing the Amendment.

### E.    Plaintiff and Other Brokers Remain Free to Choose Their Lenders.

Plaintiff alleges it declined UWM's Amendment and opted instead to maintain its preferred relationship—with Rocket and Fairway. SAC ¶ 70. As a result, Plaintiff alleges its Broker Agreement with UWM was terminated and it suffered unspecified "direct financial injury" in the form of "lost sales and lost commissions." *Id.* ¶¶ 70-71. Plaintiff alleges other brokers who had not acknowledged acceptance of the Amendment received notices of termination or suspension from UWM. *Id.* ¶ 64.

Each broker had the same freedom as Plaintiff to accept or decline the Amendment.[4] *Id.*; Ex. F at 15:10–15:18. Either party can terminate the Broker Agreement "for any reason, with or without cause, breach or other justification, upon seven (7) days prior written notice[.]" Ex. A §§ 7.05, 7.06. A notice of termination immediately releases the broker from its commitment not to submit loans to Rocket or Fairway, without waiting for the notice period to elapse. *See* Amended Broker Agreement § 3.05, attached hereto as **Exhibit G**.

### F.    Plaintiff's Allegations Regarding the Effects of the Amendment

Plaintiff asserts in conclusory strokes that Defendants' actions purportedly caused a shift in origination of mortgages away from Rocket and Fairway, "caused consumers to pay higher prices and obtain lower quality mortgages," and resulted in higher costs of operation and reduced competition. SAC ¶¶ 18-19, 72-77. Plaintiff

---

[4] Of course, some lenders (like major retail banks) have ceased working with mortgage brokers altogether, offering mortgages only through their own captive loan officer employees. Plaintiff does not allege these lenders are engaged in anticompetitive conduct.

ACTIVE 689150078v3

alleges the so-called "boycott" was "highly successful," based on public statements from UWM estimating that 93% of brokers presented with the Addendum agreed to sign it, and 11,000 out of 12,000 of UWM's independent mortgage brokers participated. SAC ¶ 61. Plaintiff alleges that UWM's loan applications increased in April 2021 and its funded loans increased by 20% in 2021. *Id.* ¶¶ 61, 63. Plaintiff also cites UWM's 2022 annual report and Q4 2022 earnings call, and Mr. Ishbia's interviews, as evidence of the supposed success of the "boycott." *Id.* ¶¶ 62, 101-09.

Rocket's own press release following the announcement of the Amendment states, "Rocket Pro TPO has already grown its market share since UWM's announcement and will continue to do so in the weeks, months and years ahead," that "[m]ore than 9,000 brokers stood up and said no to UWM's ultimatum," and that Rocket "had hundreds of new brokers submit an application to partner with us yesterday[.]" *See* James Kleinman, "UWM & Rocket both declare victory in broker war," HousingWire.com (Mar. 18, 2021), available at www.housingwire.com/ articles/uwm-rocket-both-declare-victory-in-broker-war/ (last accessed Dec. 10, 2022).[5] Like UWM, Rocket and Fairway both experienced large increases in funded loans from 2020 to 2021; 8.5% and 9.8%, respectively. *See* Rica Dela Cruz & Syed Muhammad Ghaznai, "Nonbank mortgage originations up 10.6% in 2021 YOY," S&P Global Market Intelligence (July 13, 2022) available at https://www.spglobal.com/marketintelligence/en/news-insights/latest-news-

---

[5] The Court may consider Rocket's statement to HousingWire.com because the Supplemental Amended Complaint relies upon HousingWire's coverage by reference. *See Tellabs*, 551 U.S. at 322.

headlines/nonbank-mortgage-originations-up-10-6-in-2021-yoy-71142930                    (last

accessed Dec. 10, 2022) (based on Home Mortgage Disclosure Act data from

Consumer Financial Protection Bureau ("CFPB")).[6]

### G.    Procedural Background and the Magistrate Judge's Report.

Plaintiff filed its Complaint on April 23, 2021. [DE 1]. Defendants moved to

dismiss, and Plaintiff filed a First Amended Complaint. [DE 16, 32]. Defendants again

moved to dismiss, which was referred to the Magistrate Judge. [DE 46, 60]. The

Magistrate Judge entered the Report on July 27, 2022, recommending that the claims

against Mr. Ishbia be dismissed for lack of personal jurisdiction, and each of Plaintiff's

claims against UWM be dismissed without prejudice for failure to state a claim. [DE

61]. Plaintiff filed its Second Amended Complaint on November 8, 2022. [DE 69].

Plaintiff thereafter sought leave to and filed its Supplemental Amended Complaint on

July 19, 2023. [DE 96].

## III.   <u>Standard of Review</u>

### A.    Rule 12(b)(2)

Plaintiff "bears the burden of establishing a prima facie case of jurisdiction" over

a non-resident defendant. *Morris v. SSE, Inc.*, 843 F.2d 489, 492 (11th Cir. 1988). This

requires "sufficient evidence to defeat a motion for a directed verdict." *Id*.

### B.    Rule 12(b)(6)

Plaintiff must state a claim for relief that is "plausible on its face." *Ashcroft v.*

---

[6] The Court may take judicial notice of CFPB data. *See Denan v. Trans Union LLC*, 959 F.3d 290, 294
n.3 (7th Cir. 2020); *Chambers v. Nasa Fed. Credit Union*, 222 F. Supp. 3d 1, 7 (D.D.C. 2016); *Thorpe ex
rel. Situated v. Walker Inv. Mgmt. Corp.*, 111 F. Supp. 3d 1335, 1350 (S.D. Fla. 2015).

*Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Conclusory allegations are insufficient. *Twombly*, 550 U.S. at 55. "The plausibility standard 'calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' of the defendant's liability." *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (2012) (quoting *Twombly*, 550 U.S. at 556).

## IV.   <u>Argument</u>

### A.   **This Court Lacks Personal Jurisdiction Over Mr. Ishbia**

Plaintiff purports to assert eight counts (Counts X-XVII) against Mr. Ishbia individually based solely on his role in directing and announcing the Amendment, giving interviews about it, and making follow-up statements. *See* SAC ¶¶ 7-8, 36-40, 42, 47, 51, 61-62, 102-03, 105, 109, 162-202. Mr. Ishbia is a Michigan resident and Plaintiff alleges no separate connection between Mr. Ishbia and Florida. *See id.* ¶¶ 6-8. The Magistrate Judge recommended dismissal of Plaintiff's claims against Mr. Ishbia for lack of personal jurisdiction based on Plaintiff's failure to allege a personal connection to Florida outside of Mr. Ishbia's role as chief executive officer of UWM. Report at 18-21. The Supplemental Amended Complaint has not cured this defect.

This Court considers whether: (1) personal jurisdiction exists under Florida's long-arm statute, Fla. Stat. § 48.193; and (2) the exercise of that jurisdiction "would violate the Due Process Clause of the Fourteenth Amendment[.]" *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1350 (11th Cir. 2013) (additional citation omitted); *see also* Report at 18-19. Plaintiff's claims against Mr. Ishbia fail both tests.

Florida's corporate shield doctrine "prohibit[s] the exercise of jurisdiction under

ACTIVE 689150078v3

the Florida long-arm statute over corporate employees whose only conduct in Florida was in furtherance of a corporation's interests." *Lane v. XYZ Venture Partners, L.L.C.*, 322 F. App'x 675, 678 (11th Cir. 2009) (citing *Doe v. Thompson*, 620 So. 2d 1004, 1006 (Fla. 1993)). Plaintiff still does not allege any non-conclusory connection between Mr. Ishbia and Florida "outside of those that are part of his job as CEO of UWM," and thus has failed to allege personal jurisdiction under Florida's long-arm statute. Report at 20 (citing *Snow v. DirecTV, Inc.*, 450 F.3d 1314, 1318 (11th Cir. 2006)).

The Magistrate Judge noted that the corporate shield doctrine "does not protect a corporate officer who commits intentional torts," but found that Plaintiff had failed to allege an intentional tort against Mr. Ishbia. Report at 20-21 (citing *Louis Vuitton*, 736 F.3d at 1355). Plaintiff has not corrected these pleading infirmities. *See* §§ IV.B-H, *infra*. Regardless, the intentional tort exception does not apply to a "nonresident employee-defendant" like Mr. Ishbia, who "commits no [tortious] acts ***in Florida***[.]" *Kitroser v. Hurt*, 85 So. 3d 1084, 1089-90 (Fla. 2012) (emphasis added).

Plaintiff seeks to eviscerate the intentional tort exception altogether by expanding it to any person posting "internet posts accessible in Florida," insisting such posts comprise the requisite tortious acts "in Florida." DE 79, at 35-36. But the line of precedent on which Plaintiff relies holds only that internet posts "targeted" at Florida residents, such as "allegedly defamatory material ***about a Florida resident*** placed on the Web and accessible in Florida," may constitute tortious conduct "within Florida." *Internet Solutions Corp. v. Marshall*, 39 So. 3d 1201, 1211, 1214-15 (Fla. 2010) (emphasis

14

added). Plaintiff has made no such allegations of targeting here. Its proposed broader exception extending personal jurisdiction to any internet posting merely "accessible" in Florida would swallow the rule, and "would not comport with" the "more restrictive" requirements of due process. *Id*. at 1207, 1213 (quoting *Wendt v. Horowitz*, 822 So. 2d 1252, 1257 (Fla. 2002); *Richards v. Sen*, No. 07-14254-CIV, 2008 WL 4889623, at *5 (S.D. Fla. Nov. 12, 2008)). *See also Blue Water Int'l, Inc. v. Hattrick's Irish Sports Pub, LLC*, No. 8:17-CV-1584-T-23AEP, 2017 WL 4182405, at *4 (M.D. Fla. Sep. 21, 2017) (holding that exercise of personal jurisdiction based on creation of Internet content "accessible" in Florida "up-ends the protection of due process"); *Leon v. Cont'l AG*, 301 F. Supp. 3d 1203, 1229 n.16 (S.D. Fla. 2017) (noting "accessibility" of Internet content is insufficient to satisfy due process).

## B.  Plaintiff's Antitrust Claims Rest on a Legally Unsustainable Market Definition (Counts II-III, V-VI,  XI-XII, XIV-XV)

Turning to Plaintiff's claims against UWM, as a threshold matter, the Supplemental Amended Complaint fails to plead facts plausibly supporting Plaintiff's assertion that the relevant market or submarket is wholesale mortgage lending. That is fatal to all of Plaintiff's antitrust claims other than its per se theories (addressed in § IV.C, *infra*). *See All Care Nursing Serv. v. High Tech Staffing Servs.*, 135 F.3d 740, 749 (11th Cir. 1998) (holding that "defining the relevant market" is a "threshold question" necessary for plaintiff to satisfy the rule of reason under § 1 of the Sherman Act); *Levine v. Cent. Fla. Med. Affiliates*, 72 F.3d 1538, 1551 (11th Cir. 1996) (similar); *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 994 (11th Cir. 1993) (holding that "[d]efining

15

the market" is "a necessary step" and "an indispensable element in the consideration of any monopolization or attempt case" under § 2 of the Sherman Act).

The Court should dismiss an antitrust claim "for failure to plead [the] relevant market" where the plaintiff "fails to define its proposed relevant market with reference to [the] rule of reasonable interchangeability" or "alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products[.]" *JES Props. v. USA Equestrian, Inc.*, 253 F. Supp. 2d 1273, 1281-82 (M.D. Fla. 2003). The Court may not "absolve" Plaintiff of its "responsibility under *Twombly* to plead facts 'plausibly suggesting'" the relevant market's composition; "skimpy allegations" and "conclusory statement[s]" of the relevant market "do not meet this obligation." *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1338 (11th Cir. 2010) (affirming dismissal of antitrust claims where plaintiff failed to allege facts supporting its assertion that visco-elastic foam mattresses were a "separate relevant product submarket"). *See also Simpson v. Sanderson Farms, Inc.*, 744 F.3d 702, 711 (11th Cir. 2014) (holding complaint "must contain sufficient information to plausibly define" the market).

Plaintiff has never offered anything beyond "skimpy allegations" and "conclusory statements" asserting the existence of a "wholesale mortgage" market or submarket. Plaintiff refers to "wholesale mortgage lending" as the "relevant market or relevant sub-market" at issue. SAC ¶¶ 2, 20. But its only support for this characterization is a series of question-begging, equally conclusory assertions that wholesale mortgage lending: entails a "distinct group of customers"; is "recognized as separate" by the industry; involves "specialized vendors"; does not market "directly to

the consumer"; has customers that "would not readily switch to a retail mortgage lender for a small difference in price"; and is claimed to save customers money over the life of the loan. *Id.* ¶ 25. These bare assertions are insufficient.

Plaintiff's allegations are inadequate on their face because they do not address the reasonable interchangeability and substitutability of ***all*** residential mortgage loans—wholesale and retail. *JES Props.*, 253 F. Supp. at 1281-82; *Jacobs*, 626 F.3d at 1337. The bottom-line inquiry is simple: "If consumers view the products as substitutes, the products are part of the same market." *Jacobs*, 626 F.3d at 1337 (quoting *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1435 (9th Cir. 1995)). Where two products "are close substitutes for each other—that is, consumers derive comparable utility from equivalent consumption of either one," they "are reasonably interchangeable substitutes for each other and hence are part of the same market." *Id.* at 1337 n.13. Defining the relevant market requires the Court to consider all reasonably interchangeable commodities. *See United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 394-95 (1956). Yet Plaintiff has alleged no facts plausibly explaining why wholesale and retail residential mortgages are not interchangeable, or why the relevant residential loan market should conveniently be confined to wholesale loans.

To the contrary, Plaintiff's allegations point to the substitutability of wholesale and retail loans. Plaintiff alleges there is "no substitute for mortgage lending for most consumers," and what consumers "need" is "to borrow money" and "to offer the home as security." SAC ¶ 20. Wholesale and retail mortgages both readily fit this description. Indeed, Plaintiff alleges that its own preferred residential mortgage

17

lenders, Rocket and Fairway, originate their loans in both the wholesale and retail channels, thereby illustrating the reasonable substitutability of the same lenders' residential mortgage loan products to consumers across both channels. *Id.* ¶¶ 16, 30-33. Plaintiff itself has previously described Rocket's and Fairway's products as "close substitutes." DE 79, at 24. Plaintiff's perfunctory list of conclusory "[f]actors" supporting a "separate submarket" do not alter the analysis or plausibly suggest a different market composition, as *Twombly* requires. *See Jacobs*, 626 F.3d at 1338.

Plaintiff's new allegations in the Supplemental Amended Complaint further lay any lingering questions to rest by incorporating materials affirmatively demonstrating the only relevant market is the overall residential mortgage market. As detailed in § II.A, *supra*, Plaintiff's supplemental allegations incorporate, *inter alia*:

- UWM's 2022 annual report, which defines the relevant market as the "overall mortgage market" in which UWM has an 8% market share, describes the "[c]ompetition for mortgage loan originations" in the "residential mortgage market," and discusses the "intense" competition UWM encounters for "residential mortgage loan origination" from all institutions "offering to make residential mortgage loans, regardless of the channel," including "direct retail lenders";

- UWM's Q4 2022 earnings call, which refers to UWM's 11% share of the "overall mortgage market" in the fourth quarter of 2022, which was likely to "peak" at "11%, 12% of the overall market," with a market share for the full year of 8% of the "overall mortgage market"; and

- Mr. Ishbia's February 2023 *Detroit News* interview, in which he acknowledged "competing" with retail lenders for consumers "shop[ping] for their mortgage."

In sum, Plaintiff has not only failed to satisfy its burden of pleading facts plausibly suggesting the composition of its asserted market, but has affirmatively pled

ACTIVE 689150078v3

facts and incorporated materials demonstrating its asserted market is implausible.

### C.   Plaintiff Fails to State a Claim for a Per Se Illegal Group Boycott in Violation of Section 1 of the Sherman Act (Counts I and X)

Counts I and X of the Supplemental Amended Complaint purport to assert claims of per se illegality against UWM and Mr. Ishbia for a supposed "group boycott" against Rocket and Fairway. The Magistrate Judge correctly found that Plaintiff failed to state a claim for a per se violation of Section 1 of the Sherman Act because: (1) Plaintiff does not allege a per se illegal horizontal agreement between UWM and its competitors; (2) Plaintiff does not supply sufficient facts to plausibly allege a hub-and-spoke conspiracy; and (3) Plaintiff does not allege adequate market power to support a per se violation. Report at 28-38. Plaintiff has not cured any of these defects.

#### 1.   Plaintiff Does Not Plead a Per Se Illegal Group Boycott Based on a Horizontal Agreement Between UWM and Its Competitors

Plaintiff alleges that Defendants "initiated and coerced" a "per se illegal group boycott" that "amounted to a coerced concerted refusal to deal" with Rocket and Fairway. SAC ¶¶ 2, 111. Plaintiff's factual allegations, however, fall far short of its claim. The U.S. Supreme Court and the Eleventh Circuit have cautioned "against the haphazard expansion of the 'group boycott label' and the concomitant imposition of per se liability." *Retina Assocs., P.A. v. S. Baptist Hosp. of Fla., Inc.*, 105 F.3d 1376, 1381 (11th Cir. 1997) (quoting *F.T.C. v. Ind. Fed'n of Dentists*, 476 U.S. 447, 458 (1986)). "[E]asy labels do not always supply ready answers," and the Court should be wary of "pigeonhole[s]" to invoke the per se rule. *All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.*, 135 F.3d 740, 746 (11th Cir. 1998) (quotation marks and citations omitted).

19

A rule of per se illegality may be applied only to challenged conduct that "fits into a proscribed category without distortion[.]" *Cha-Car, Inc. v. Calder Race Course, Inc.*, 752 F.2d 609, 612-13 (11th Cir. 1985) (quoting *M H Tire Co. v. Hoosier Racing Tire Corp.*, 733 F.2d 973, 977 (1st Cir. 1984)). Courts "should apply the per se label 'infrequently and with caution.'" *United Am. Corp. v. Bitmain, Inc.*, 530 F. Supp. 3d 1241, 1272 (S.D. Fla. 2021) (quoting *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1567 (11th Cir. 1991)). The Supplemental Amended Complaint, like its predecessor, is "confusing and laden with buzz words," but does not plausibly allege a boycott. Report at 26.

A per se claim requires Plaintiff to allege agreements that "because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal[.]" *Vacation Break, U.S.A. v. Mktg. Response Grp.*, 169 F. Supp. 2d 1325, 1335 (M.D. Fla. 2001) (quoting *Nw. Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.*, 472 U.S. 284, 289 (1985)). There are "very few classes of conduct that are illegal per se." *Levine v. Cent. Fla. Med. Affiliates*, 864 F. Supp. 1175, 1181 (M.D. Fla. 1994), *aff'd*, 72 F.3d 1538 (11th Cir. 1996). "The mere allegation of a concerted refusal to deal does not suffice because not all concerted refusals to deal are predominantly anticompetitive." *Nw. Wholesale*, 472 U.S. at 298. The decision to apply a per se rule turns on "whether the practice facially appears to be one that would always or almost always tend to restrict competition[.]" *Id.* at 289 (quoting *Broadcast Music, Inc. v. Columbia Broadcast. Sys., Inc.*, 441 U.S. 1, 19-20 (1979)).

Here, notwithstanding Plaintiff's endless repetition of the word "boycott," the

"facts presented" are not "consistent with the traditional group boycott situation." *Levine*, 864 F. Supp. at 1182. As the Magistrate Judge previously noted, the U.S. Supreme Court has limited the per se rule in the group boycott context "to cases involving horizontal agreements among direct competitors." *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998) (rejecting application of per se rule to "an agreement by a buyer to purchase goods or services from one supplier rather than another" because the "freedom to switch suppliers lies close to the heart of the competitive process that the antitrust laws seek to encourage"); *see also* Report at 28. Plaintiff again "has not pleaded factual matter" suggesting that UWM's Amendment "was a horizontal agreement between UWM and its direct competitors." Report at 29. "UWM is a wholesale mortgage lender; there is no allegation in the amended complaint that UWM conspired with one of its direct competitors, such as another wholesale lender, to push Rocket and Fairway out of the market." *Id*. at 29-30.

Plaintiff also alleges facts plausibly identifying a procompetitive purpose for UWM's actions: to preserve the wholesale lending channel. Plaintiff affirmatively identifies the advantages to consumers of this channel, including access to experienced and knowledgeable brokers and money-saving loan products. SAC ¶¶ 20-25. Plaintiff also acknowledges that the stated purpose of UWM's All-In Initiative was to confront the problem of Rocket and Fairway putting independent brokers out of business. SAC ¶ 37; Ex. F at 12:14-16:11. This plausible procompetitive rationale for UWM's actions prevents application of the per se rule. *See Nw. Wholesale*, 472 U.S. at 289.

2.   <u>Plaintiff Does Not Plead an Illegal Hub-and-Spoke Conspiracy</u>

Plaintiff attempts to salvage its per se claims by alleging the so-called "boycott" was a "hub-and-spoke" conspiracy orchestrated by UWM to facilitate an agreement among brokers to boycott Rocket and Fairway. *See* SAC ¶¶ 41-60. *See Bitmain*, 530 F. Supp. 3d at 1255-56 (describing a hub-and-spoke conspiracy); *In re Disposable Contact Lens Antitrust Litig.*, 215 F. Supp. 3d 1272, 1294 (M.D. Fla. 2016) (same). The Magistrate Judge rejected this theory, finding the First Amended Complaint lacked facts plausibly suggesting brokers agreed to a boycott among themselves. Report at 32. At most, Plaintiff established vertical agreements between UWM and each broker, but no agreement among brokers, rendering the "hub-and-spoke" a "rimless wheel," which "does not amount to a per se restraint-of-trade" under Section 1. *Id.* (quoting *In re Musical Instruments and Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 n.3 (9th Cir. 2015)); *see also United States v. Chandler*, 388 F.3d 796, 807 (11th Cir. 2004); *Dickson v. Microsoft Corp.*, 309 F.3d 193, 203-04 (4th Cir. 2002); *In re Disposable Contact Lens Antitrust Litig.*, 215 F. Supp. 3d at 1291.

The Supplemental Amended Complaint fares no better. "The critical issue for establishing a *per se* violation with the hub and spoke system is how the spokes are connected to each other." *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 436 (6th Cir. 2008). Plaintiff establishes no such connection, instead repeating more of the same kinds of allegations already found insufficient. Plaintiff again alleges and provides additional examples of brokers who purportedly "heeded Mr. Ishbia's clarion call to boycott UWM's closest competitors" by

22

expressing support and enthusiasm, answering one another's questions, and criticizing others who voiced opposition. SAC ¶¶ 41-44, 49-50, 52-53, 78, 80-81. Plaintiff adds a trade association, AIME, to the list of supporters. *Id.* ¶¶ 45-47 Plaintiff also alleges that UWM and its supporters facilitated information-sharing through Facebook forums, trade association forums, and industry publication live chats. *Id.* ¶¶ 42-43, 48-52.

As the Magistrate Judge already concluded, neither "independent expressions of enthusiasm and encouragement among brokers" nor allegations that UWM "provid[ed] forums" or "joined in facilitating these terminations" plausibly suggest "concerted actions" or "an agreement among the brokers sufficient to form the rim of a conspiracy." Report at 33 (citing *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 329-30 (3d Cir. 2010)). Likewise, it is not "sufficient that the brokers knew they were all accepting" UWM's Amendment. *Id.* (citing *In re EpiPen Direct Purchaser Litig.*, No. 20-CV-0827 (ECT/JFD), 2022 WL 101770, at *7 (D. Minn. Apr. 5, 2022)). Antitrust law "does not restrict the long recognized right of [a party] engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal; and, of course, he may announce in advance the circumstances under which he will refuse to sell." *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919). A party "has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984). Here, UWM announced its Amendment, and mortgage brokers are "free to acquiesce" or, like Plaintiff, to decline. *Vitacost.com v. Oregon Freeze Dry, Inc.*, No. 09-80367-CIV, 2009 WL 10667820, at *6 (S.D. Fla. July 21, 2009); *see also A & E Auto Body, Inc. v. 21st*

23

*Century Centennial Ins. Co.*, No. 6:14-CV-310, 2015 WL 12867010, at *9-10 (M.D. Fla. Jan. 22, 2015) (dismissing Section 1 claims because parties may exercise independent discretion regarding with whom they deal).

Plaintiff's additional examples of broker enthusiasm and identification of online forums where these expressions took place come no closer to alleging a connection among the brokers to form the rim of the wheel. Widespread enthusiasm and participation does not constitute a horizontal agreement to restrain trade. Plaintiff has alleged no facts demonstrating any "uniformity that would be unexpected or idiosyncratic" or "rule out the possibility" that the brokers "were acting independently" for their individual best interests. *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1271-72 (11th Cir. 2019) (quoting *Twombly*, 550 U.S. at 553-54). "The Court cannot infer such an agreement from what is simply a unilateral business decision." *Bolinger v. First Multiple Listing Serv., Inc.*, 838 F. Supp. 2d 1340, 1361 (N.D. Ga. 2012).

Plaintiff has urged the Court to apply a "parallel conduct" and "plus factors" analysis to find a per se conspiracy. DE 79, at 8-15. That model is inapposite, as Plaintiff's cases involve alleged "conscious parallelism" in *price fixing* conspiracies, in which "firms in a concentrated market might in effect share monopoly power" by "setting their prices at a profit-maximizing, supracompetitive level[.]" *In re January 2021 Short Squeeze Trading Litig.*, 2021 WL 5359731, at *17 n.16 (S.D. Fla. Nov. 17, 2021). It is characterized by "complex and historically unprecedented changes in pricing structure made at the same time by multiple competitors" for "no other

24

discernible reason," accompanied by "economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action." *In re Disposable Contact Lens Antitrust Litig.*, 215 F. Supp. 3d 1272, 1294-95 (M.D. Fla. 2016) (quoting *United States v. Apple*, 791 F.3d 290, 315 (2d Cir. 2015)).

Plaintiff's attempt to apply this model to the decisions of thousands of brokers to accept UWM's Amendment defies plausibility. A market alleged to comprise tens of thousands of wholesale mortgage brokers across the United States, *see* SAC ¶ 27, is not "concentrated," and even a large number of such brokers choosing to sign an Amendment terminable at will are not plausibly "shar[ing] monopoly power." Nor is there any allegation of "complex and historically unprecedented changes in pricing structure," or indeed any changes in pricing structure, as a result of the Amendment. Nor are Plaintiff's allegations "largely inconsistent with unilateral conduct"; if anything, the enthusiastic support of UWM's announcement among brokers is highly consistent with an inference that brokers unilaterally shared UWM's concerns about Rocket's and Fairway's practices and viewed the Amendment as good for them individually. SAC ¶¶ 41-52.

Plaintiff's attempt to portray the brokers that entered into the so-called "boycott" as *both* conspirators *and* victims highlights the incoherence of Plaintiff's "hub-and-spoke" theory. On the one hand, Plaintiff alleges that "UWM *and its participating brokers* are jointly and severally liable" for the alleged boycott. SAC ¶¶ 111, 118 (emphasis added). On the other hand, Plaintiff insists these same participating brokers are *members of the putative class* it seeks to represent. *Id.* ¶ 85. The inextricable

conflict of Plaintiff naming its own putative class members as co-conspirators liable to the class to which they belong confirms Plaintiff's conspiracy is a "rimless wheel." *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 327 (3d Cir. 2010) (rejecting "rimless wheel" conspiracy as "nothing more than a series of vertical relationships"); *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 435-36 (6th Cir. 2008) ("the rim holding everything together is missing").

### 3. Plaintiff's Allegations Do Not Demonstrate Market Power Sufficient to Support a Per Se Violation of Section 1

Plaintiff also fails to correct the third deficiency identified by the Magistrate Judge—lack of market power. To guard against capricious attempts to invoke the "group boycott" label where *per se* treatment "is not warranted," courts limit its application to cases in which "the conspirators imposing the group boycott possess 'market power or exclusive access to an element essential to effective competition[.]'" *Retina Assocs.*, 105 F.3d at 1381 (quoting *Nw. Wholesale*, 472 U.S. at 296). The Magistrate Judge concluded that Plaintiff failed to allege sufficient market power for UWM's alleged anticompetitive conduct to cut off consumer or broker access to the wholesale mortgage channel. Report at 33-38. Plaintiff has not cured this defect.

The "principal judicial device for measuring actual or potential market power remains market share[.]" *U.S. Anchor Mfg.*, 7 F.3d 986 at 994. Plaintiff alleges that mortgage lending through independent brokers comprises 15.8% of residential mortgage loan originations and UWM has "approximately 34% market share" of the wholesale channel. SAC ¶¶ 26-27. Plaintiff's new supplemental allegations incorporate

ACTIVE 689150078v3

UWM's 2022 annual report and Q4 2022 earnings call, both of which reflect UWM's 8% share of the overall mortgage market in 2022 and approximately 38% share of the wholesale channel. *See* § II.A, *supra*.; Exs. A-C. Even Mr. Ishbia's most optimistic assessment foresaw a "peak[]" of "11%, 12% of the overall market," with UWM's share of the wholesale channel expected to decline from its year-end high. *Id*.

The Magistrate Judge previously assumed without deciding that the relevant market is the wholesale mortgage market. Report at 36. As discussed in § IV.B, *supra*, such an assumption is no longer necessitated, as Plaintiff has not only failed to plead the relevant market, but has affirmatively alleged facts and incorporated sources demonstrating the relevant market is all residential mortgage loans. UWM's 8% market share of the overall residential mortgage market facially confirms the absence of sufficient market power. *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1250 (11th Cir. 2002) (holding a market share of 50% or less "inadequate as a matter of law").[7]

But even retaining the earlier assumption of a wholesale mortgage market, the Magistrate Judge concluded that UWM's 34% share of the wholesale channel did not establish market power sufficient to assert a per se theory because Plaintiff: (1) does not plead what percentage of the brokers in the wholesale market as a whole "joined the boycott"; and (2) does not plead what the effect of the alleged boycott was on the

---

[7] *See also Am. Pro. Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Pro. Publ'ns, Inc.*, 108 F.3d 1147, 1154 (9th Cir. 1997) ("[a] mere showing of substantial or even dominant market share alone cannot establish market power..."); *Handicomp, Inc. v. U.S. Golf Ass'n*, No. 99-5372, 2000 WL 426245, at *3-4 (3d Cir. 2000) (72% insufficient); *Maxon Hyundai Mazda v. Carfax, Inc.*, No. 13-CV-2680 (AJN), 2016 WL 7231941, at *14-15 (S.D.N.Y. Dec. 9, 2016) (90% insufficient), *aff'd*, 726 F. App'x 66 (2d Cir. 2018); *Rxstrategies, Inc. v. CVS Pharmacy, Inc.*, 390 F. Supp. 3d 1341, 1351 (M.D. Fla. 2019).

relevant market. Report at 37. These defects remain.

Plaintiff has added a section captioned "Anticompetitive Effects of Defendants' Conduct and Harm to Brokers and Consumers," but it consists of nothing more than conclusory assertions regarding supposed anti-competitive effects from something that *never happened*—the "elimination of two of the largest" wholesale mortgage lenders— followed by a parade of conclusory assertions regarding lessened competition and injury to brokers. SAC ¶¶ 72-77. These assertions are based on nothing more than unsubstantiated posts and statements made by a handful of brokers and trade associations opposed to the initiative. *Id*. ¶¶ 78-81. To be sure, Plaintiff agrees there was no "elimination" of Rocket or Fairway. Although Plaintiff seeks to make much of UWM's broker agreements, asserting they represent a "majority" of brokers and "a dominant portion of the market" (*id*. ¶ 111), the 2022 annual report incorporated into the Supplemental Amended Complaint reflects that these relationships cover just 45,000 out of 386,000 (11.6%) federally registered loan officers in the United States, leaving Rocket and Fairway with access to the vast majority of loan officers. *See* § II.A, *supra*.; Ex. A. Plaintiff also alleges that Rocket has 10,000 mortgage broker partners. SAC ¶ 35. And Rocket has publicly stated that more than 9,000 brokers declined UWM's Amendment and that Rocket gained "hundreds of new brokers" following the announcement. *See* § II.F, *supra*.[8]

---

[8] Plaintiff has also added a section captioned "Market Power and Barriers to Entry," which asserts in circular fashion that UWM's ability to "force" brokers to "refuse to deal" with Rocket and Fairway "reflects UWM's market power." SAC ¶ 82. An equally plausible inference, however, is that the *willing* participation of 12,000 brokers in the All-In Initiative evidences that many brokers consider the

In addition, Plaintiff does not address the at least 50+ other wholesale mortgage lenders in the market who continue to service all brokers—those who signed the Addendum and those who did not. *See* § II.D, *supra*. Plaintiff has also never addressed the brokers' freedom to terminate their Broker Agreements with UWM at any time, with or without cause, and to immediately originate loans with Rocket or Fairway upon giving notice of termination. *See* § II.G, *supra*.

What Plaintiff's new allegations do not provide, and what Plaintiff has never provided, are the two things the Magistrate Judge said were needed: a factual allegation of the actual percentage of brokers in the wholesale channel who "joined the boycott," and factual allegations regarding the effect on the market.

4.   Plaintiff Fails to Plead a Claim Against Mr. Ishbia for Per Se Violation of the Sherman Act

Plaintiff alleges no new or additional facts against Mr. Ishbia; it simply asserts that he "directed, authorized, and ordered" UWM's actions and is therefore "personally liable" for UWM's participation. SAC ¶¶ 162-66. Plaintiff's per se claim against Mr. Ishbia therefore fails for the same reasons as the claim against UWM.

D.   **Plaintiff Fails to State a Claim for Unreasonable Restraint of Trade in Violation of Section 1 of the Sherman Act (Counts II and XI)**

Counts II and XI set forth Plaintiff's "rule of reason" claims against UWM and Mr. Ishbia for an alleged unreasonable restraint of trade. The rule of reason requires a court to "decide whether the questioned practice imposes an unreasonable restraint on

---

Amendment to be in their self-interest. It is Plaintiff's obligation to allege *facts* excluding this inference. *Retina Assocs.*, 105 F.3d at 1381; *see also* Report at 33-38. Plaintiff has never done so.

competition[.]" *State Oil Co. v. Khan,* 522 U.S. 3, 10 (1997). The rule entails a three-step, burden-shifting analysis, with Plaintiff having "the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018). To fulfill its burden, Plaintiff may either show "the potential for genuine adverse effects on competition" or "an actual detrimental effect on competition." *Levine*, 72 F.3d at 1551 (citations and additional quotations omitted).

The Magistrate Judge found the rule of reason analysis need not proceed past the first step, because Plaintiff did not carry its initial burden. Report at 38-41. In particular: (1) Plaintiff did not allege sufficient facts to support its claim that the alleged conduct had the potential for genuine adverse effects on competition; and (2) Plaintiff failed to offer a clear picture of UWM's total market power or how UWM's conduct harmed competition. *Id.* The same pleading deficiencies apply here.

### 1. Plaintiff's Allegations Do Not Plead the Potential for a Genuine Adverse Effect on Competition

To plead the potential for a genuine adverse effect on competition, Plaintiff must allege that UWM exercises market power in a properly defined market. *Spanish Broad. Sys. of Fla. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1073 (11th Cir. 2004). It must further allege that the Amendment substantially foreclosed competition in that market. *See Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961). As already discussed, Plaintiff has not sufficiently alleged the relevant market, or that UWM held market power in the relevant market. *See* §§ IV.B, IV.C.3, *supra*.

Plaintiff also has not alleged that the Amendment has foreclosed competition in the relevant market. "[F]or exclusive dealing to run afoul of the antitrust statutes," the exclusivity arrangements must substantially foreclose the relevant market—*i.e.*, they must significantly limit the ability of other competitors to enter or remain in the market. *McWane, Inc. v. Fed. Trade Comm'n*, 783 F.3d 814, 837 (11th Cir. 2015). Plaintiff alleges in conclusory fashion that there are "barriers to entry" to wholesale lending, and asserts based on an unidentified "2023 report" that "at least 17 firms" (out of more than 70) have recently exited the wholesale channel. SAC ¶¶ 83, 106. But Plaintiff does not allege the Amendment has substantially foreclosed the market— especially with at least 50+ other wholesale lenders remaining, not to mention an entire retail channel. *See* Herbert Hovenkamp, *Federal Antitrust Policy* § 10.8 at 391 (1994) (foreclosure of even "a large percentage of one mode of distribution will have little anticompetitive effect if another mode is available").

Competition also cannot be foreclosed where, as here, the Amendment is "of relatively short duration and, crucially, can be terminated upon short notice"; such terms "do not—by themselves—sustain the Sherman Act claims." *Pro Search Plus, LLC v. VFM Leonardo, Inc.*, No. 8:12-CV-02102, 2013 WL 3936394, at *4 (C.D. Cal. July 30, 2013); *see also Paddock Pubs., Inc. v. Chicago Tribune Co.*, 103 F.3d 42, 44 (7th Cir. 1996); *PNY Techs., Inc. v. Sandisk Corp.*, No. 11-CV-04689, 2014 WL 1677521, at *8 (N.D. Cal. Apr. 25, 2014). The Amendment, which includes no obligation to submit loans to UWM, permits brokers to submit loans to at least 50+ other wholesale lenders, and allows brokers to terminate at will and immediately submit loans to Rocket and

31

Fairway, is a facially lawful relationship that "generally pose[s] little threat to competition." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012).

> ### 2.   Plaintiff Does Not Plead a Potential or Actual Detrimental Effect on Competition

Plaintiff likewise does not plead potential or actual detrimental effects on competition. The Complaint fails to allege an "actual increase in the price of the good or service, a decrease in output, or a decline in quality," the hallmarks of an actual detrimental effect. *EnviroPak Corp. v Zenfinity Capital, LLC*, No. 4:14-CV-00754, 2015 WL 331807, at *13-14 (E.D. Mo. Jan. 23, 2015). As discussed above, Plaintiff's new allegations of competitive harm are conclusory and implausible, backed by nothing more than unsubstantiated statements online and in press releases. *See* § II.C.3, *supra*. Such "[b]road, unsupported allegations of actual detrimental effects" are "inadequate to withstand a motion to dismiss." *Sherr v. HealthEast Care Sys.*, 262 F. Supp. 3d 869, 884 (D. Minn. 2017); *see also Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1084 (11th Cir. 2016) ("[A] plaintiff may not meet its burden of showing actual anticompetitive effects with mere conclusory assertions" and must "point to specific facts demonstrating harm to competition"); *Spanish Broad. Sys. of Fla.*, 376 F.3d at 1074. As the Magistrate Judge found, Plaintiff still has not plausibly connected Defendants' alleged conduct to possible harm to competition. Report at 40 (citing *Appleton v. Intergraph Corp.*, 627 F. Supp. 2d 1342, 1355 (M.D. Ga. 2008)).

> ### 3.   Plaintiff Fails to Plead a Claim Against Mr. Ishbia for Unreasonable Restraint of Trade

Plaintiff again asserts that Mr. Ishbia is "personally liable" for UWM's actions,

and its claim against Mr. Ishbia thus fails for the same reasons. SAC ¶¶ 167-71.

### E. Plaintiff Fails to State a Claim for Attempt to Monopolize in Violation of Section 2 of the Sherman Act (Counts III and XII)

Counts III and XII assert claims against UWM and Mr. Ishbia for an alleged attempt to monopolize in violation of Section 2 of the Sherman Act. The Magistrate Judge found that Plaintiff failed to state a claim for attempted monopolization because UWM's alleged 34% market share of the putative wholesale mortgage market did not establish a dangerous probability of achieving monopoly power. Report at 42-45. That defect applies again here, and Plaintiff has also failed to allege anticompetitive conduct or a specific intent to monopolize. *See Spanish Broad. Sys.*, 376 F.3d at 1074 (identifying three "distinct elements" of claim for attempted monopolization: (1) predatory or anticompetitive conduct; (2) specific intent to monopolize; and (3) a dangerous probability of achieving monopoly power).

### 1. Plaintiff Fails to Allege a Dangerous Probability of Achieving Monopoly Power.

Plaintiff alleges that UWM has a 34% market share of the wholesale channel of the residential mortgage market. SAC ¶ 27. The 2022 annual report and earnings call incorporated into the Supplemental Amended Complaint reflect an overall market share of 8% of all residential mortgages, and a share of 38% of the wholesale channel. *See* § II.A, *supra*. As discussed above, *see* § IV.B, *supra*, the properly defined market is all residential mortgages. But even assuming, as the Magistrate Judge assumed without deciding, that the relevant market is confined to the wholesale channel, UWM's 38% market share falls far short of evidencing a dangerous probability of

ACTIVE 689150078v3

achieving monopoly power. *See* Report at 43-44. A "dangerous probability of success arises when the defendant comes close to achieving monopoly power in the relevant market." *Gulf States Reorg. Grp., Inc. v. Nucor*, 721 F.3d 1281, 1285 (11th Cir. 2013) (citing *Levine*, 72 F.3d at 1555). A 38% market share does not plausibly indicate such a dangerous probability. *See U.S. Anchor Mfg.*, 7 F.3d at 1001 (holding that market share of "less than 50 percent" indicated "no dangerous probability of success"); *see also Gulf States Reorganization Grp., Inc. v. Nucor*, 822 F. Supp. 2d 1201, 1237 (N.D. Ala. 2011).

The Supplemental Amended Complaint still contains no allegations plausibly indicating that UWM has come anywhere close to achieving a "dangerous probability" of monopoly power. Although Plaintiff attempts to bolster his claim by altering quotes from Mr. Ishbia's interviews, *see* SAC ¶¶ 62, 102-03, 105, 109, Mr. Ishbia himself has said he foresees a "peak" market share of 11% or 12%, and anticipates a decline from UWM's high in the last quarter of 2022. *See* § II.A, *supra*. One competitor passing another in market share, even by "unfair means," does not indicate a dangerous probability of monopolization. *Spanish Broad. Sys.*, 376 F.3d at 1076 (citing *Mfg. Research Corp. v. Greenlee Tool Co.,* 693 F.2d 1037, 1043 (11th Cir. 1982)). And, as already shown, Plaintiff has cherry-picked Mr. Ishbia's use of the word "dominate" and references to "control of our margins" improperly to infer a power to "control price in the market"—when in fact Mr. Ishbia was explaining why *UWM had to cut its prices* in response to "extremely competitive" pricing. *Id*.

Even were it assumed that UWM might achieve a 50% to 60% market share,

that still would not establish a dangerous probability of success in the absence of significant barriers to entry. *See Moecker v. Honeywell Intern., Inc.*, 144 F. Supp. 2d 1291, 1308 (M.D. Fla. 2001) (citations and quotations omitted) (stating that even "high market share" will not raise an inference of monopoly power "in a market with low entry barriers"); *Paycargo, LLC v. CargoSprint, LLC*, No. 3:19-CV-85-TCB, 2019 WL 5793113, at *5 (N.D. Ga. Nov. 4, 2019) (collecting cases). Plaintiff has added conclusory assertions of supposed "barriers to entry" such as a sophisticated electronic platform, qualified personnel, licensing requirements, and substantial funds. SAC ¶¶ 83-84. But Plaintiff also alleges that wholesale mortgages account for "hundreds of millions of dollars" in loans annually, providing strong motives to enter even at high cost. *Id.* ¶¶ 16-17. And Plaintiff has never disputed that there are 50+ other competitors already in the market, even crediting its claim of 17 recent exits. Ex. F at 16:9-18. Plaintiff thus lacks a plausible allegation of barriers to entry.

## 2. Plaintiff Fails to Allege Anticompetitive Conduct or a Specific Intent to Monopolize.

Plaintiff's monopolization claim also fails on its other elements. As discussed above, Plaintiff has failed to allege that Defendants' conduct was anticompetitive. *See* §§ IV.D.1-2, *supra*. Plaintiff also has failed to allege, beyond a boilerplate recitation, that Defendants had a specific intent to monopolize the wholesale channel. SAC ¶ 137. Indeed, Plaintiff concedes it and every other broker remain free to submit loans to 50+ other lenders regardless of whether they agree to the Amendment, and every broker who consents to the Amendment can terminate at will. *See* § II.F, *supra*.

35

3.    Plaintiff Fails to State a Claim Against Mr. Ishbia for Attempted Monopolization

Plaintiff again alleges that Mr. Ishbia is "personally liable" for UWM's actions, and its claim against Mr. Ishbia thus fails for the same reasons. SAC ¶¶ 163-67.

**F.    Plaintiff's Claims Under the Florida Antitrust Act Follow the Sherman Act Claims and Fail for the Same Reasons (Counts IV, V, VI, XIII, XIV, XV)**

Counts IV, V, VI, XIII, XIV, and XV assert violations of the Florida Antitrust Act against UWM and Mr. Ishbia, mirroring Plaintiff's Sherman Act claims. In interpreting the Florida Antitrust Act, federal precedent interpreting the Sherman Act is determinative. *See All Care*, 135 F.3d at 745 n.11 ("Federal and Florida antitrust laws are analyzed under the same rules and case law."); *St. Petersburg Yacht Charters, Inc. v. Morgan Yacht, Inc.*, 457 So. 2d 1028, 1032 (Fla. 2d DCA 1984) ("The Florida legislature has, in effect, adopted as the law of Florida the body of antitrust law developed by the federal courts under the Sherman Act."). Accordingly, Plaintiff fails to state a claim under the Florida Antitrust Act, and Counts IV, V, VI, XIII, XIV, and XV should be dismissed. *See* Report at 6 n.4.

**G.    Plaintiff Fails to State a Claim for Tortious Interference with Business Contracts and Prospective Economic Advantage (Counts VII and XVI)**

Counts VII and XVI assert claims for tortious interference. The Magistrate Judge recommended dismissal of Plaintiff's tortious interference claim because Plaintiff failed to allege that existing customers ended their business with Plaintiff as a result of Defendants' alleged conduct. Report at 45-48. Plaintiff has still made no such

36

allegations, dooming its amended claims. SAC ¶¶ 141-48, 189-95.

*First*, under Florida law,[9] Plaintiff has not alleged Defendants' interference with "a business relationship evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered." *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 815 (Fla. 1994) (citation omitted); *see also Int'l Sales & Servs., Inc. v. Austral Insulated Prods., Inc.*, 262 F.3d 1152 (11th Cir. 2001). Plaintiff does not allege that any identified existing or potential customers ended their business with Plaintiff due to UWM's actions.

*Second*, Plaintiff's claim is incoherent because Plaintiff alleges that wholesale mortgage lenders "do not work directly with consumers/borrowers"; but rather, that mortgage brokers "choose from a variety of wholesale lenders" to "select the mortgage product" fitting the customer's needs. SAC ¶¶ 20, 22. Plaintiff does not plausibly allege a "disruption" of its business relationships with consumers based on the unavailability of one lender.

*Third*, Plaintiff fails to allege facts demonstrating Defendants' "intent to damage [Plaintiff's] business relationship and a lack of justification for doing so." *Romika-USA, Inc. v. HSBC Bank USA, N.A.*, 514 F. Supp. 2d 1334, 1339 (S.D. Fla. 2007) (quotation marks omitted). Plaintiff incorporates UWM's March 15, 2021 announcement in which Mr. Ishbia enumerated UWM's lawful justifications for its actions. Ex. F at

---

[9] Defendants assume, without conceding, that Florida law governs Plaintiff's tortious interference claim. *See* SAC ¶¶ 15, 17-18; *Fla. Steel Corp. v. Whiting Corp.*, 677 F. Supp. 1140, 1141 (M.D. Fla. 1988).

ACTIVE 689150078v3

12:14-16:11. A company "may take steps to protect its business interests without liability for tortious interference" so long as it "does not engage in improper conduct." *Romika-USA, Inc.*, 514 F. Supp. 2d at 1339; *Living Color Enters., Inc. v. New Era Aquaculture, Ltd.*, No. 14-62216-CIV, 2015 WL 1526177, at *7 (S.D. Fla. Apr. 3, 2015).

*Fourth*, "an action for tortious interference will not lie where a party tortiously interferes with a contract terminable at will." *Greenberg, M.D. v. Mount Sinai Med. Ctr. of Greater Miami, Inc.*, 629 So. 2d 252, 255 (Fla. 3d DCA 1993); *see also Wackenhut Corp. v. Maimone*, 389 So. 2d 656, 658 (Fla. 4th DCA 1980).

## H. Plaintiff Fails to State a Claim for Violation of Florida's Deceptive and Unfair Trade Practices Act (Counts VIII and XVII)

Counts VIII and XVII assert claims for violation of FDUTPA, Fla. Stat. § 501.201. The Magistrate Judge recommended dismissal because the FDUTPA claim was predicated on insufficient antitrust violations. Report at 48-49. The same result applies here, because Plaintiff's FDUPTA claims remain entirely derivative of its antitrust claims. *See* SAC ¶¶ 151, 196; *see also Hunter v. Bev Smith Ford, LLC*, No. 07-80665-CIV, 2008 WL 1925265, at *7 (S.D. Fla. Apr. 29, 2008) (dismissing derivative FDUTPA claims); *JES Props., Inc. v. USA Equestrian, Inc.*, No. 8:02-CV-01585-T-24MAP, 2005 WL 1126665, at *19, n.23 (M.D. Fla. May 9, 2005) (similar).[10]

The Magistrate Judge also expressed "reservations" as to whether Plaintiff

---

[10] To the extent the Court finds Plaintiff's FDUTPA claim sounds in fraud by virtue of Plaintiff's allegation that Defendants made "false statements" to mortgage brokers (*see* SAC ¶¶ 7-8, 38-39, 56-57, 59, 135), Plaintiff's failure to comply with Rule 9(b) presents additional grounds for dismissal. *See Fid. Nat'l Fin., Inc. v. Attachmate Corp.*, No. 3:15-CV-01400, 2017 WL 3726687, at *3 (M.D. Fla. Mar. 1, 2017) (requiring claims arising under FDUTPA to satisfy Rule 9(b) where they sound in fraud).

sufficiently pled damages to support a FDUTPA claim. Report at 49 n.17. It has not. FDUTPA requires "actual damages." *City First Mortg. Corp. v. Barton*, 988 So. 2d 82, 86 (Fla. 4th DCA 2008). "Actual damages" does not include "consequential damages," and "competitive harm, diverted or lost sales, and harm to the goodwill and reputation" are consequential damages. *Casa Dimitri Corp. v. Invicta Watch Co. of Am., Inc.*, 270 F. Supp. 3d 1340, 1352 (S.D. Fla. 2017) (citations and quotations omitted). Plaintiff only alleges consequential damages, and does so only in conclusory terms. SAC ¶¶ 153-54, 200-01. Plaintiff's failure to plead actual damages requires dismissal. *See Mukamal v. Bakes*, No. 07-20793-CIV, 2008 WL 11391157, at *5 (S.D. Fla. May 20, 2008), *aff'd*, 378 F. App'x 890 (11th Cir. 2010).

Plaintiff also fails to allege a "deceptive act or unfair practice" or causation. *City First Mortg. Corp.*, 988 So. 2d at 86. The Amendment presented Plaintiff with a business choice, and Plaintiff declined it in favor of submitting loans to Rocket and Fairway. Plaintiff alleges no facts reflecting how this contractual choice was deceptive or unfair to Plaintiff or caused Plaintiff damages in light of its own election.

## I.    Plaintiff Fails to State a Claim for Declaratory Relief (Count IX)

Count IX for declaratory relief is wholly derivative of Plaintiff's other claims. The Magistrate Judge did not reach the claim for this reason. Report at 48 n.16. It should be dismissed as duplicative. *See Del Prado Mall Pro. Condo. Ass'n, Inc. v. Voyager Indem. Ins. Co.*, No. 2:20-CV-838, 2021 WL 1578758, at *2 (M.D. Fla. Apr. 22, 2021); *Auto Dealer Sols., Inc. v. S.-Owners Ins. Co.*, No. 8:17-CV-2525, 2018 WL 4600674, at *3 (M.D. Fla. Jan. 25, 2018). Moreover, because Plaintiff is not a party to the

39

Amendment or Addendum, its requested declaration that they are "illegal," "unlawful," and "unenforceable," SAC ¶ 152, is non-justiciable. *See Atlanta Gas Light Co. v. Aetna Cas. Sur. Co.*, 68 F.3d 409, 414 (11th Cir. 1995) (citation omitted) (justiciable controversy must "touch the legal relation of parties").

## V.   <u>Conclusion</u>

For the foregoing reasons, Defendants respectfully request that the Court dismiss the Supplemental Amended Complaint against Mr. Ishbia and UWM in its entirety with prejudice; and grant Defendants any other relief it deems necessary including, without limitation, an award of attorneys' fees in accordance with the provisions of Section 542.22(1), Florida Statutes, and FDUTPA.

Dated: August 14, 2023                     Respectfully submitted,

**GREENBERG TRAURIG, P.A.**
401 East Las Olas Boulevard
Suite 2000
Fort Lauderdale, Florida 33301
Telephone: 954-765-0500
Telefax: 954-765-1477

By:     */s/ Glenn E. Goldstein*
        **Glenn E. Goldstein, Esquire**
        Florida Bar No. 435260
        Email: GoldsteinG@gtlaw.com
              depasqualem@gtlaw.com
              FLService@gtlaw.com
        **Sabrina D. Niewialkouski**
        Florida Bar No. 0123630
        Email: Niewialkouskis@gtlaw.com
        Jennifer.Shiner@gtlaw.com
        FLService@gtlaw.com

*Attorneys for Defendants United Wholesale*
*Mortgage, LLC and Mathew Ishbia*

40

**CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of August, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ Glenn E. Goldstein*
GLENN E. GOLDSTEIN

41

# EXHIBIT A

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549
## FORM 10-K

(Mark One)

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2022**

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission file number 001-39189

# UWM HOLDINGS CORPORATION
### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **84-2124167** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **585 South Boulevard E.**   **Pontiac,**   **MI** | **48341** |
| (Address of Principal Executive Offices) | (Zip Code) |

**(800) 981-8898**
Registrant's telephone number, including area code
**N/A**
(Former name, former address and former fiscal year, if changed since last report)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Class A Common Stock, par value $0.0001 per share | UWMC | New York Stock Exchange |
| Warrants, each warrant exercisable for one share of Class A Common Stock | UWMCWS | New York Stock Exchange |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports); and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒   No  ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).    Yes ☒   No  ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☒ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☒

The aggregate market value of the registrant's voting stock held by non-affiliates on June 30, 2022 was $326,829,162, based on the closing price on the New York Stock Exchange on that date of $3.54. (Does not include shares issuable upon exercise of warrants).

As of February 24, 2023, the registrant had 93,101,971 shares of Class A common stock outstanding and 1,502,069,787 shares of Class D common stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the registrant's definitive proxy statement for use in connection with its 2023 Annual Meeting of Stockholders, which is to be filed no later than 120 days after December 31, 2022, are incorporated by reference into Part III of this Annual Report on Form 10-K.

Table of Contents

## Table of Contents

| Section Name | Page |
|---|---|
| Cautionary Note Regarding Forward-Looking Statements | 2 |
| Risk Factor Summary | 2 |

**PART I**

| | |
|---|---|
| Item 1. Business | 3 |
| Item 1A. Risk Factors | 16 |
| Item 1B. Unresolved Staff Comments | 43 |
| Item 2. Properties | 43 |
| Item 3. Legal Proceedings | 43 |
| Item 4. Mine Safety Disclosures | 43 |

**PART II**

| | |
|---|---|
| Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 44 |
| Item 6. Reserved | 45 |
| Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations | 46 |
| Item 7A. Quantitative and Qualitative Disclosures about Market Risk | 64 |
| Item 8. Financial Statements and Supplementary Data | 66 |
| Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 97 |
| Item 9A. Controls and Procedures | 97 |
| Item 9B. Other Information | 98 |
| Item 9C. Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 98 |

**PART III**

| | |
|---|---|
| Item 10. Directors, Executive Officers and Corporate Governance | 98 |
| Item 11. Executive Compensation | 98 |
| Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 98 |
| Item 13. Certain Relationships and Related Transactions, and Director Independence | 99 |
| Item 14. Principal Accountant Fees and Services | 99 |

**PART IV**

| | |
|---|---|
| Item 15. Exhibits and Financial Statement Schedules | 100 |
| Item 16. Form 10-K Summary | 104 |

| | |
|---|---|
| Signatures | 105 |

Table of Contents

## GLOSSARY OF TERMS

| Terms | Definitions |
|---|---|
| "Fannie Mae" | The Federal National Mortgage Association is a government-sponsored enterprise that purchases qualifying mortgage loans from mortgage lenders, packages them together, and sells them as a mortgage-backed security to investors on the secondary market. |
| "FHA" | The Federal Housing Administration is a governmental agency that provides mortgage insurance on loans made by FHA-approved lenders. |
| "Forward-settling Loan Sale Commitment" or "FLSC" or "TBA" | A forward-settling Loan Sale Commitment (also referred to as a FLSC or a TBA) is a forward derivative that requires a mortgage lender to commit to deliver at a specific future date a mortgage-backed security issued by Fannie Mae, Freddie Mac or guaranteed by Ginnie Mae which is collateralized by an undesignated pool of mortgage loans. |
| "Freddie Mac" | The Federal Home Loan Mortgage Corporation is a government-sponsored enterprise that purchases qualifying mortgage loans from mortgage lenders, packages them together, and sells them as a mortgage-backed security to investors on the secondary market. |
| "Ginnie Mae" | Government National Mortgage Association is a government-owned corporation that guarantees mortgage-backed securities that have been guaranteed by a government agency, mainly the Federal Housing Administration and the Veterans Administration. |
| "GSE" | Government-sponsored enterprises, such as Fannie Mae and Freddie Mac. |
| "interest rate lock commitment" or "IRLC" | An interest rate lock commitment is a binding agreement by a mortgage lender with a borrower to extend a mortgage loan at a specified interest rate and term within a specified period of time. |
| "loan officers" | We use the term loan officers to refer to the individual employees of our clients. Each loan officer is licensed, or exempt from licensure, in the state or states in which he or she operates. |
| "mortgage-backed security" or "MBS" | Mortgage-backed securities, or MBSs, are securities that are secured by a pool of mortgage loans, which does not include the MSRs which are separated from the mortgage loan prior to the mortgage loan being placed in the pool and are therefore not part of the collateral. |
| "mortgage servicing rights" or "MSRs" | Mortgage servicing rights, or MSRs, are the right to service a mortgage loan for a fee, which rights are separated from the mortgage loan once the mortgage loan is sold in the secondary market. |
| "To Be Announced market" | The To Be Announced market is a secondary market where FLSCs or TBAs are sold by lenders seeking to hedge the risk that market interest rates may change and lock in a price for the mortgages they are in the process of originating. |

1

Table of Contents

**Cautionary Note Regarding Forward-Looking Statements**

This report contains "forward-looking statements" within the meaning of Section 27A of the Securities Act and Section 21E of the Exchange Act. These forward-looking statements relate to expectations for future financial performance, business strategies or expectations for our business. Specifically, forward-looking statements in this report include statements relating to:

- the future financial performance of our business;
- our future growth, including our loan originations and position in the industry compared to our peers;
- our client-based business strategies, strategic initiatives, technological developments and product pipeline;
- expectations regarding the impact and timing of discontinuation of LIBOR on our warehouse and other facilities;
- the impact of interest rate risk on our business;
- our ability to renew our sale and repurchase agreements, and the impacts of counterparty risks on our business;
- our mitigation of credit risks and the impacts of defaults on our business, as well as our risk mitigation strategies;
- our accounting policies and recent amendments to the FASB rules regulations;
- macroeconomic conditions that may affect our business and the mortgage industry in general;
- political and geopolitical conditions that may affect our business and the mortgage industry in general;
- our utilization of our warehouse facilities, MSR Facility, and Revolving Credit Facility, including outstanding borrowings through 2023;
- the impact of litigation on our financial position;
- our repurchase and indemnification obligations; and
- other statements preceded by, followed by or that include the words "may," "can," "should," "will," "estimate," "plan," "project," "forecast," "intend," "expect," "anticipate," "believe," "seek," "target" or similar expressions.

These forward-looking statements involve estimates and assumptions which may be affected by risks and uncertainties in the Company's business, as well as other external factors, which could cause future results to materially differ from those expressed or implied in any forward-looking statement including those risks set forth below in Risk Factor Summary and the other risks and uncertainties indicated in this report, including those set forth under the section entitled "Risk Factors."

All forward-looking statements speak only as of the date of this report and should not be relied upon as representing our views as of any subsequent date. We do not undertake any obligation to update forward-looking statements to reflect events or circumstances after the date they were made, whether as a result of new information, future events or otherwise, except as may be required under applicable securities laws.

**RISK FACTOR SUMMARY**

An investment in our securities involves substantial risk. Our ability to execute on our strategy also is subject to certain risks. The risks described under the heading "Risk Factors" immediately following the Summary below may cause us not to realize the full benefits of our competitive strengths or may cause us to be unable to successfully execute all or part of our strategy. Some of the more significant challenges and risks we face include the following:

- our dependence on macroeconomic and U.S. residential real estate market conditions, including changes in U.S. monetary policies that affect interest rates;
- our reliance on our warehouse facilities to fund mortgage loans and otherwise operate our business, leveraging of assets under these facilities and the risk of a decrease in the value of the collateral underlying certain of our facilities causing an unanticipated margin call;
- our ability to sell loans in the secondary market, including to government sponsored enterprises, and to securitize our loans into mortgage-backed securities through the GSEs and Ginnie Mae, and our ability to sell MSRs in the bulk MSR secondary market;
- our dependence on the GSEs and the risk of changes to these entities and their roles, including, as a result of GSE reform, termination of conservatorship or efforts to increase the capital levels of the GSEs;
- changes in the GSEs', FHA, USDA and VA guidelines or GSE and Ginnie Mae guarantees;
- our dependence on licensed residential mortgage officers or entities, including brokers that arrange for funding of mortgage loans, or banks, credit unions or other entities that use their own funds or warehouse

2

Table of Contents

facilities to fund mortgage loans, but in any case do not underwrite or otherwise make the credit decision with regard to such mortgage loans to originate mortgage loans;

• the unique challenges posed to our business by the COVID-19 pandemic and the impact of governmental actions taken in response to the pandemic on our ability to originate mortgages, our servicing operations, our liquidity and our team members;

• the risk that an increase in the value of the MBSs we sell in forward markets to hedge our pipeline may result in an unanticipated margin call;

• our inability to continue to grow, or to effectively manage the growth of, our loan origination volume;

• our ability to continue to attract and retain our Independent Mortgage Broker relationships;

• the occurrence of a data breach or other failure of our cybersecurity;

• loss of key management;

• reliance on third-party software and services;

• reliance on third-party sub-servicers to service our mortgage loans or our mortgage servicing rights;

• intense competition in the mortgage industry;

• our ability to implement technological innovation;

• our ability to continue to comply with the complex state and federal laws, regulations or practices applicable to mortgage loan origination and servicing in general, including maintaining the appropriate state licenses, managing the costs and operational risk associated with material changes to such laws;

• fines or other penalties associated with the conduct of Independent Mortgage Brokers;

• errors or the ineffectiveness of internal and external models or data we rely on to manage risk and make business decisions;

• loss or inability to enforce intellectual property rights or contractual rights;

• risk of counterparty terminating servicing rights and contracts;

• the possibility that we may be adversely affected by other economic, business, and/or competitive factors; and

• the requirements of being a public company may strain our resources, divert management's attention and affect our ability to attract and retain qualified board members and team members.

## PART I

### Item 1. Business

*Unless otherwise indicated or the context otherwise requires, when used in this Annual Report, the term "UWMC" means UWM Holdings Corporation, "UWM" means United Wholesale Mortgage, LLC and "the Company," "we," "our" and "us" refer to UWM Holdings Corporation and our subsidiaries.*

### Overview

We are the publicly traded indirect parent of United Wholesale Mortgage, LLC ("UWM"). Commencing in the third quarter of 2022, UWM is the largest overall residential mortgage lender in the U.S., despite originating mortgage loans exclusively through the wholesale channel. For the last eight years, including the year ended December 31, 2022, we have been the largest Wholesale Mortgage Lender in the U.S. by closed loan volume. We originate primarily conforming and government loans across all 50 states and the District of Columbia.

We are focused on propelling the wholesale mortgage broker channel forward. During 2022, as interest rates rose and the mortgage industry experienced a slow-down of refinancings, we continued to make significant strides to provide Independent Mortgage Brokers with a variety of product offerings to address market conditions and bring more awareness to the broker channel overall and the value that this channel provides to consumers. With a culture of continuous innovation of technology, enhanced client experience, and market responsive pricing and profitability enhancements, our main goal has been to ensure the Independent Mortgage Broker community, and therefore UWM, is set up to win.

Table of Contents

Founded in 1986 and headquartered in Pontiac, Michigan, we have built a client-focused, team-oriented culture that strives to bring superior customer service, efficiency and operational stability to our clients, the Independent Mortgage Brokers. UWM completed its business combination with Gores Holdings IV, Inc. ("Gores IV") on January 21, 2021, pursuant to which UWM became an indirect subsidiary of Gores IV. Upon consummation of the business combination, Gores IV changed its name to UWM Holdings Corporation. We began trading on the New York Stock Exchange on January 22, 2021 under the ticker symbol UWMC.

**Strategy**

Our principal strategy that has driven our substantial growth over the past years, is our strategic decision to operate solely as a Wholesale Mortgage Lender—thereby avoiding conflict with our partners, the Independent Mortgage Brokers and their direct relationship with borrowers. We believe that by not competing for the borrower connection and relationship, we are able to generate significantly higher loyalty and satisfaction from our clients (the Independent Mortgage Brokers) who, in turn, armed with our partnership tools are positioned to direct a growing share of the residential mortgage volume nationwide.

Integral components of our strategy are (1) continuing our leadership position in the growing wholesale channel by investing in technology and partnership tools designed to meet the needs of Independent Mortgage Brokers and their customers, (2) capitalizing on our strategic advantages which include a singular focus on the wholesale channel, that can quickly adapt to market conditions and opportunities, and ample capital and liquidity, (3) employing our six pillars (see below) to drive a unique culture that we believe results in a durable competitive advantage and (4) originating high quality loans, the vast majority of which are backed directly or indirectly by the federal government, to minimize market risks and to maximize opportunity in different macroeconomic environments.

The residential mortgage loan financing process typically involves three stages:



- *Initiate Borrower Connection.* A broker or other party is approached by a potential borrower for a mortgage loan. This party advises the borrower on loan options, runs the initial credit check, gathers the borrower's information for the loan application and submits the loan application.

- *Underwrite, Close and Fund.* The borrower's loan application is reviewed, the mortgage loan is underwritten, the borrower is approved, the closing is arranged and the loan is funded, collectively referred to as loan origination.

- *Portfolio or Package and Sell mortgage loan into Secondary Market Sales.* The loan is either placed into an investment portfolio (in the case of banks and typically only for certain loans tied to shorter term interest rates) or packaged together with other loans and sold as MBS to investors in the secondary market.

We operate exclusively as a Wholesale Mortgage Lender and only originate, underwrite and close mortgage loans arranged by an Independent Mortgage Broker. We believe that by focusing only on the wholesale channel, we can be a true partner to our clients (all of which are Independent Mortgage Brokers). Unlike "Retail Mortgage Lenders" that both offer mortgage loans directly to individual borrowers and underwrite the mortgage loans, we do not work directly with the borrower during the mortgage loan financing process.

Many of our competitors are primarily Retail Mortgage Lenders that also compete in the wholesale channel as Wholesale Mortgage Lenders. We believe that by competing in both channels, these competitors have an inherent conflict that makes them a less attractive option for Independent Mortgage Brokers when deciding which lender to work with when originating a mortgage loan. We further believe that this competitive advantage is a major reason that has and will continue to drive market share growth and loan production as the wholesale channel grows.

Table of Contents

*Leading in the Growing Wholesale Channel*

    According to the Nationwide Multistate Licensing System ("NMLS"), as of September 30, 2022, there were approximately 386,000 federally registered mortgage loan officers in the U.S. Our exclusive focus on the wholesale channel has resulted in relationships with over 12,000 independent broker businesses throughout the U.S., with over 45,000 associated loan officers—of which approximately 33,000 have submitted a loan to us during the year 2022. As the wholesale channel continues to grow, especially in a rising interest rate environment, we see a significant opportunity for these mortgage loan officers to join the wholesale channel.

*Benefits to Borrower*

- *Provides Trusted Advisor in Complex Financial Instruments.* Independent Mortgage Brokers serve as advisors to borrowers, leveraging their deep knowledge base of complex financial products to help borrowers make informed decisions. Independent Mortgage Brokers assist prospective borrowers in analyzing their financial situation, assessing his or her credit history and current mortgage and making an informed decision based on their personal circumstances.

- *Maximizes Optionality.* Independent Mortgage Brokers are able to provide borrowers with multiple options on product structure and pricing rather than being rooted in a single platform offering, which we believe empowers borrowers and enhances their borrowing experience. We believe that Independent Mortgage Brokers are able to deliver borrowers access to better rates than their Retail Mortgage Lender counterparts. As a partner to our clients, we continually strive to provide a range of residential loan options, so that our clients can match the needs of their borrowers with our product offerings.

- *Streamlines and Enhances the Experience.* Independent Mortgage Brokers are best positioned to be the single personalized point-of-contact for the loan process and provide borrowers a superior customer service experience.

- *Aligns Interest.* In the wholesale channel, the interests of the Independent Mortgage Broker and the borrower are aligned to achieve the best outcome for the borrower—which increases borrower loyalty to the Independent Mortgage Broker and provides a greater likelihood that the borrower will retain the advisor for future transactions.

*Benefits to Independent Mortgage Broker*

- *Drives Brand Recognition and Loyalty.* We believe that allowing Independent Mortgage Brokers to "own" the relationship with the borrower drives client brand recognition and loyalty. When borrowers view their Independent Mortgage Brokers as the person who delivered the superior results, rather than just as a conduit to funding, they are more likely to return to that Independent Mortgage Broker for their next residential mortgage loan, whether it is a new purchase or a refinance. Our technology provides Independent Mortgage Brokers with advanced personalized marketing tools to establish and maintain their borrower relationships.

- *Offers Flexibility.* We believe that Independent Mortgage Brokers and their loan officers are better served by the wholesale channel as it provides them the flexibility of matching their borrowers' needs with the most applicable lender and lender program. A Wholesale Mortgage Lender needs to earn business every day. If the Wholesale Mortgage Lender is not faster, easier and more affordable, it will not be successful in earning that business.

- *Develops and Protects Relationship with Borrower.* Utilizing the wholesale channel with a true Wholesale Mortgage Lender allows Independent Mortgage Brokers to both cultivate new borrower relationships and maintain their relationships with borrowers throughout the mortgage lending process and beyond with less risk of being replaced by the lender in the next new purchase or a refinance. Retail Mortgage Lenders that dabble in the wholesale channel do not afford this protected relationship.

- *Ability to Provide Superior Sophisticated and Personalized Service.* The wholesale channel allows Independent Mortgage Brokers to offer a diverse set of product options and capitalize on the benefits of scale to offer superior service, such as turn times and pull through rates, with the focus on personal service. Our suite of full-service technology platforms positions Independent Mortgage Brokers to effectively compete with banks and other non-bank loan originators by delivering a closely managed end-to-end experience for the borrower from origination through closing.

Table of Contents

*Benefits to UWM*

- *Access to Extensive Network.* The wholesale channel offers us access to a broad network of Independent Mortgage Brokers, reducing reliance on any one entity or any geographic region.

- *Volume Levels Supports Significant Automation.* Our volume allows for significant investment in automating each step of the residential loan process, which in turn reduces error rates, improves customer service and enhances efficiency.

- *Distribute Fixed Cost Across Wider Network.* Our exclusive focus on the wholesale channel reduces our fixed costs by allowing us to distribute costs across a wider network of clients. We invest in the personnel and technology resources to underwrite, close, fund and sell residential mortgage loans. This results in a minimal fixed cost base for origination and high marginal profitability.

- *Supports Scalability.* We believe that our exclusive focus on the wholesale channel coupled with our efficient and centralized processes, cost structure and technology platform has resulted in a business that is highly scalable with minimal incremental investment.

*Capitalizing on our Strategic Advantages*

We believe that our exclusive focus on the wholesale channel along with our business model, team members, technologies and competitive position provide us with some significant strategic advantages.

- *Strong Brand Recognition.* Our leading position as a Wholesale Mortgage Lender and ability to deliver superior client service provides us strong brand recognition with Independent Mortgage Brokers. Starting in the third quarter 2022, we were the largest residential mortgage lender in the U.S. For the year ended December 31, 2022, we had approximately 38% market share in the wholesale channel (based on data released by Inside Mortgage Finance ("IMF")) and 8% share of the overall mortgage market.

- *Operational Excellence.* We believe our exclusive focus on the wholesale channel provides us with a differentiated, client-centric business model that enables us to invest in, and deliver to our clients, a full suite of technology and workflow solutions that allow for industry-leading closing times for our clients. For the year ended December 31, 2022, we originated approximately 348,000 loans, down from approximately 654,000 loans for the year ended December 31, 2021. For the year ended December 31, 2022, our average application to clear to close time was 18 business days, compared to management's estimate of the industry average of 50 calendar days for 2022. During 2022, we closed an average of 5.9 loans per month per production team member, well above the industry average of 1.7 during the nine months ended September 30, 2022 (based on a Mortgage Bankers Association report). Furthermore, we delivered this speed while receiving an 89% average monthly client Net Promoter Score ("NPS") for the year ended December 31, 2022, as well as an 86% average monthly client NPS for the past six years.

- *Innovative Technology Platforms.* Leveraging our culture of continuous technological innovation, we have built proprietary technology platforms and exclusively license technology that support our clients and borrowers to provide what we believe to be a best-in-class client experience. We believe that our technology platforms provide us with a competitive advantage, driving client retention and offering the ability to efficiently and quickly achieve closings on loan originations. We offer our clients a complete platform with a highly efficient, external-facing interface that includes required regulatory and compliance mechanisms. We seek to continuously improve and innovate our technology platforms and have a team of over 1,100 full time team members as of December 31, 2022 committed to our information systems and technologies.

6

Table of Contents

*Employing Our Six Pillars to Drive a Durable Competitive Advantage*



We were founded with a simple goal in mind: attract great people, to a great workplace, and give them the tools they need to do great work. Our culture is based on six pillars:

- *People*—our people are the secret to our success. We invest in our team members with continuous and real-time training so they can continue to set the standard. Team members are given a path to succeed and are rewarded for that success.

- *Service*—We pride ourselves on creating a memorable service experience for every partner. Internal service among team members is critical.

- *Relationship driven*—Our long-term reputation is more important than short-term gains. We place a premium on creating lasting relationships with our clients and counterparties, such as our Independent Mortgage Brokers, warehouse banks, vendors, regulators and other agencies.

- *Thumb pointers*—Team members are focused on accountability and personal responsibility. Our team members concentrate on taking ownership, improving and delivering results.

- *Continuous improvement*—We develop and introduce cutting-edge, industry leading technology and information processes.

- *Fun and friendship*—We are a big believer that work can (and should) be fun. It's about finding your passion and purpose—but always leaving time for friendship and camaraderie. UWM is consistently recognized as a great place to work, winning Top Workplaces USA in 2022 along with its 10th year in-a-row of both Best and Brightest Metro Detroit and Best and Brightest National.

These core principles influence everything we do and form the basis of our client-focused culture.

*Originating High Quality Loans Backed Directly or Indirectly by the Federal Government to Minimize Risks and to Maximize Opportunity in Different Macroeconomic Environments*

An integral component to our strategy is to originate high quality loans throughout the U.S. For the year ended December 31, 2022, our borrowers had a weighted average FICO score of approximately 738 as compared to a weighted average FICO score of 750 for the year ended December 31, 2021. The following charts illustrate our loan originations portfolio by type and FICO score mix for the year ended December 31, 2022:

Table of Contents



**Residential Mortgage Loans by Type**
**For the Year Ended December 31, 2022**



**Percentage of UWM's Loan Production by Borrower's FICO Score**
**For the Year Ended December 31, 2022**

Our model is focused on the origination business, with a specific focus on purchase loans. Historically, residential purchase mortgage loan origination volume has experienced less volatility in response to interest rate movements than the refinancing mortgage loan origination volume. Consequently, we believe that by focusing on the purchase business we will be better positioned to deliver more consistent volume in increasing and decreasing interest rate environments. In rising interest rate environments, we believe that our demonstrated reputation for excellent client service and short loan closing times will drive continued purchase mortgage volume, our broad client base will allow us to capitalize on lead generation and our cost structure will allow us to be more competitive on margins.

We currently retain the majority of the mortgage servicing rights ("MSRs") associated with our production, but we have, and intend to continue to opportunistically sell MSRs depending on market conditions. This nimble approach has provided us funding flexibility, and reduced legacy MSR asset exposure. In addition, our wholesale-only business is uniquely positioned to capture a greater share of purchase originations and, we believe, provides a competitive advantage relative to correspondent or various retail origination models.

**Our Loan Programs**

Over the past 10 years we have developed technologies and processes that allow us to quickly introduce and market new loan programs or to adjust for existing loan programs and to adapt services and offerings to ever-changing markets for home financing. These technologies allow us to quickly and efficiently build guidelines, rules, pricing, and controls into our loan origination platforms and workflows; generate new loan documents, disclosures and program descriptions from our systems; and efficiently distribute internal communications. By having nimble and flexible systems that are controlled internally, we believe we are better positioned to take advantage of market opportunities when they present themselves and change the direction of loan programs when the market dictates.

*Conventional agency-conforming mortgage loans*

Since 2012, we have been primarily focused on originating conventional, agency-eligible loans that can be sold to Fannie Mae, Freddie Mac or transferred to Ginnie Mae pools for sale in the secondary market. Our conventional agency-conforming loans meet the general underwriting guidelines established by Fannie Mae and Freddie Mac. Loans that are written under the FHA program, the VA program or the USDA program are guaranteed by the governmental agencies and then transferred to Ginnie Mae pools for sale in the secondary market. Substantially all of our mortgage loans are underwritten to the "Qualified Mortgage" underwriting standards established by the Consumer Financial Protection Bureau ("CFPB"). For the year ended December 31, 2022, 94% of loans originated were sold to Fannie Mae or Freddie Mac, or were transferred to Ginnie Mae pools in the secondary market, while the remainder were primarily jumbo loans that are underwritten to the same "Qualified Mortgage" underwriting standards and have a similar risk profile but are sold to third party investors purely due to loan size.

Table of Contents

The following table summarizes our loan production by loan type for the periods indicated.

| ($ in thousands)<br>Loan Type | For the year ended December 31, 2022 | | For the year ended December 31, 2021 | | For the year ended December 31, 2020 | |
|---|---|---|---|---|---|---|
| **Purchase:** | | | | | | |
| Conventional | $ | 62,274,030 | $ | 63,026,794 | $ | 33,717,939 |
| Government | | 23,773,422 | | 14,833,808 | | 8,619,874 |
| Jumbo and other | | 4,782,879 | | 9,395,143 | | 583,299 |
| **Total purchase** | $ | 90,830,331 | $ | 87,255,745 | $ | 42,921,112 |
| **Refinance:** | | | | | | |
| Conventional | $ | 27,059,252 | $ | 120,152,065 | $ | 119,807,647 |
| Government | | 7,834,636 | | 12,034,583 | | 18,921,473 |
| Jumbo and other | | 1,561,242 | | 7,061,299 | | 897,409 |
| **Total refinance** | | 36,455,130 | | 139,247,947 | | 139,626,529 |
| Total Loan Production | $ | 127,285,461 | $ | 226,503,692 | $ | 182,547,641 |
| Production volume (closest '000) | | 348,000 | | 654,000 | | 561,000 |
| Average initial loan balance | $ | 365 | $ | 346 | $ | 325 |

## Our Mortgage Lending Process

We believe that our highly scaled, efficient and centralized mortgage lending processes are key to our success. Utilizing our proprietary system, "Easiest Application System Ever" (EASE™), and our dedicated team members we focus on client service, and loan quality throughout the entire loan origination, underwriting and closing processes. EASE™ automates the process and, based on the jurisdictional requirements of the client and borrower, automatically generates the necessary documents required by us and by the clients for applications. The entire origination, underwriting and preparation of closing documents takes place in our centralized, paperless work environment where documents and data are entered into EASE™ and are reviewed, processed and analyzed based on a set of pre-determined, rules-based workflows. We focus on speed to close as it is one of the primary metrics for client satisfaction. We believe our closing process is the most efficient in the industry and results in shorter application to clear-to-close times than any of the other major Retail Mortgage Lenders or Wholesale Mortgage Lenders. For both the years ended December 31, 2022 and December 31, 2021, we delivered an average of 18 business days from loan application to clear to close, as compared to management's estimates of the industry averages of 50 and 46 calendar days, respectively.

Our rules-based mortgage loan origination system, or LOS allows multiple teams to work on the same loan at the same time, to track and be alerted to missing or incomplete items, to flag items in order to alert other team members of possible deficiencies and to have visibility into the history, status and progress of loans in process. We use advanced technologies and workflow systems to assist all underwriting and operations team members in prioritizing which loans require their immediate attention and to monitor each team's progress so workload-balancing decisions can be made among the operation teams in real time and avoid bottlenecks.

## Underwriting

Our underwriting process is one of our key strategic advantages as our extensive training program and technology platforms allow us to produce a portfolio of high-quality loans, with an industry-leading time from application to clear to close and maintain the superior level of client service that allows us to attract and retain our clients. All mortgage loans that we originate are underwritten in-house by our underwriting team. We invest significant time and resources in our underwriters through our robust training process to help them and us succeed. We believe that our intensive training program is an integral component of our scalability as we are able to materially increase our underwriting resources, at a consistent quality, with less labor constraints and complications than our competitors.

Our clients, the Independent Mortgage Brokers, have the initial communication with a potential borrower and they receive from the borrower the relevant financial and property information to run a credit check and obtain a pre-approval through one of the automated underwriting systems. Once a pre-approval has been received, an Independent Mortgage Broker is able to seamlessly import the borrower's information and documentation into our EASE™ LOS without the need for extra data entry. One of our senior underwriters then reviews the file and, based on the loan product and the financial and other information provided, makes an underwriting decision. If the mortgage loan is approved, our system generates a "conditions to

Table of Contents

close" list based on the specifics of the borrower, the property and the loan product and a junior underwriter who generally takes ownership of the file ensuring that each of these conditions is met prior to granting a "clear-to-close."

We utilize technology and automated processes throughout the underwriting process, to provide our underwriters "guard rails" and allow us to efficiently and effectively underwrite loans while mitigating risk. For example, if a loan product requires an 80% loan-to-value or a family gift is providing a portion of a deposit, our systems are programmed to automatically populate the appropriate conditions and not permit the loan to move on to the next step in the underwriting process until the appropriate documents are uploaded into the system. We also recently launched BOLT, which allows mortgage brokers to obtain initial underwriting approval for qualified borrowers in as little as 15 minutes, which we believe will enable brokers to close loans faster.

### Loan closings

UWM UClose™, our document closing tool, allows clients to facilitate and easily control the closing process, including document generation, title company interaction and the timing of closing. In addition, we structure our closing process such that all conditions are satisfied prior to the generation of closing documents and therefore are able to provide clients and borrowers automatic funding for all closings. Once a title agent uploads the executed documents into UClose™, the funds are automatically wired to the appropriate parties. We believe that eliminating the hours of waiting in a title office leads to more satisfied borrowers and repeat business for us and our clients.

We believe we have achieved industry leading close times through the use of proprietary technology and process innovations such as DocHub, UClose and BOLT (described in the "Advanced technologies and systems" section below). Additionally, in 2021, we recognized that one of the pain points in timely closings were the delays in obtaining appraisals. Consequently, we launched UWM Appraisal Direct. Appraisal Direct provides mortgage brokers a streamlined, transparent process for the scheduling, execution and delivery of an appraisal that they can easily track, which we believe will deliver faster appraisals to offer a better experience and relieve a key pain point in the mortgage industry.

Loan closing speeds are also positively impacted for clients who select our innovative Title Review and Closing ("TRAC") program, which provides an alternative to utilizing a traditional lender title policy. By leveraging in-house title counsel to review title related documents and issue attorney title opinion letters ("ATOL(s)") UWM is able to streamline the title review process and facilitate a faster and easier experience for the borrower.

### Capital Markets and Secondary Marketing

Our capital markets team is dedicated to maximizing loan sale profitability while at the same time minimizing operational, interest rate and market risks. This team manages the interest rate risk for the business and is responsible for interest rate lock management policies and procedures, hedging the pipeline, managing warehouse facilities and associated facility utilization and managing risk and sales of mortgage servicing rights on the balance sheet. We aggregate our loan production into pools that are (i) sold to Fannie Mae or Freddie Mac or securitized through the issuance of Fannie Mae or Freddie Mac bonds, (ii) transferred into Ginnie Mae pools and securitized by us into government-insured mortgage-backed securities, or (iii) sold outright or securitized to investors in the secondary mortgage market. Our primary access to the secondary market comes from pooling and selling eligible loans that we originate through Fannie Mae, Freddie Mac, and Ginnie Mae's securitization programs. The goal of the capital markets team is to protect margin at origination, and to maximize execution at sale. We believe that our technologies, automated workflow and experienced capital markets team allow us to quickly aggregate and sell the pools of loans in order to make efficient use of our capital and warehouse facilities. Our focus on agency deliverable originations and speed to sale reduces our exposure to market volatility, liquidity risk and credit risk.

When we have identified a pool of mortgage loans to sell to the agencies, non-governmental entities, or through our private label securitization transactions, we repurchase such loans from our warehouse lender and sell the pool of mortgage loans into the secondary market, but generally retain the mortgage servicing rights, or MSRs, associated with those loans. To the extent we generate non-agency loans, these loans are typically sold under an incentive-based servicing structure which permits us to retain servicing and control the borrower experience. We retain MSRs for a period of time depending on business and liquidity considerations. When we sell MSRs, we typically sell them in the bulk MSR secondary market.

### Repurchase and indemnification risks

Although we do not retain credit risk on the loans we sell into the secondary market, we (i) have repurchase and indemnification obligations to purchasers of mortgage loans for breaches under our loan sale agreements and (ii) are

10

Table of Contents

contractually obligated, in certain circumstances, to refund to the purchasers certain premiums paid to us on the sale if the mortgagor prepays the loan within a specified period of time.

Loan sale agreements, including Fannie Mae and Freddie Mac master agreements, require us to make certain representations and warranties related to, among other things, the quality of the loans, underwriting of the loans in conformity with the applicable agency, FHA or VA guidelines, and origination in compliance with applicable federal, state and local laws and regulations. Generally, liability only arises if there is a breach of the representations and warranties in a material respect based on standards set forth under the terms of the related loan sale agreement. While some of the representations and warranties in our loan sale agreements may extend over the life of the loan, most of our historical repurchase activity has involved loans which defaulted within the first few years after origination. We attempt to limit the risk of repurchase and indemnification by structuring our operations to ensure that we originate high-quality mortgages that are compliant with the representations and warranties given in the loan sale agreements.

**Infrastructure, Systems and Technologies**

*Advanced technologies and systems*

We are a technology driven company that continuously seeks to innovate and provide superior systems to our clients, with over 1,100 highly trained team members dedicated to our technology and information systems located in our Pontiac, Michigan headquarters as of December 31, 2022.

We focus on automating and providing sophisticated tools for loan origination functions, but also with respect to automating the infrastructure that supports those core operations, such as training, capital markets, human resources and facilities functions. Our integrated technology platforms create an automated, scalable, standardized and controlled end-to-end loan origination process that incorporates government/agency guidelines and loan program requirements into rules-based workflows, to ensure loans progress to closing only as conditions, guidelines and requirements are met and required information is provided and verified, and accounts for variations in state laws, loan programs and property type, among other variables.

Our client facing systems are generally proprietary (other than Blink+$^{TM}$), developed in-house and were built to be scalable and readily modified, which allows us to quickly introduce enhanced features and to change loan program guidelines in response to market, industry and regulatory changes without excessive complex programming or dependency on outside entities. Our client facing systems are as follows:

- Boost - Our exclusive platform which provides independent mortgage brokers with streamlined access to purchase tailored leads, stay in touch with past clients, connect with real estate agents and opt into live call transfers.

- BOLT – Allows mortgage brokers to obtain initial underwriting approval for qualified borrowers in as little as 15 minutes, which we believe will enable brokers to close loans faster. We also believe that BOLT will unlock underwriter capacity and ultimately drive down our cost-per-loan.

- DocHub$^{TM}$ – Our custom-built document management system that allows team members to control the way they view, interact with, and deliver the documents required to close and fund loans. The program allows us to scale business without increasing costs associated with document storage, and processes can be designed in conjunction with the document management system for maximum efficiency.

- Blink+$^{TM}$ – A client facing point of sale (POS) system white-labeled for our clients. Blink+$^{TM}$ allows clients to access our products and pricing, automated underwriting system and fee templates. This solution syncs loan application data, including fees, with our EASE$^{TM}$ program, and replaces a client's costly existing system free of charge while encouraging lead conversion. Blink+$^{TM}$ integrates with Brand 360$^{TM}$ to convert leads into applications.

- InTouch Mobile App – A mobile app that allows our clients to handle virtually every aspect of the lending process, from underwriting through clear-to-close, without need for a desktop computer.

- Brand 360$^{TM}$ – Our all-encompassing marketing platform supports our clients' growth and brand building capabilities. It provides useful communications tools to help our clients stay connected to borrowers and monitors home equity, new home listings, and rates to provide relevant market updates to ensure clients stay connected with potential new or repeat borrowers.

Table of Contents

- UClose™ – Our tool that allows clients to facilitate and easily control the closing process, notably timing, document generation, and title company interaction and the autonomous nature of the tool promotes more timely and efficient closings.
- EASE™ – Our "Easiest Application System Ever" is our primary LOS that allows clients to interact with us and to select products, lock rates and run the Automated Underwriting System (AUS).

Our Blink+™ (POS) system was developed by a third party and has been white-labeled for our clients and integrated into our technology suite to provide Independent Mortgage Brokers a direct online method for communicating with us the information required for residential loan applications. We pay the Blink+™ developer per unit transaction fees, subject to a minimum monthly fee. Pursuant to our agreement with the Blink+™ developer, the developer has agreed to not make its online platform available to other wholesale lenders for a term that extends until November 2023 (or November 2024 to the extent that we have closed at least 25,000 loans using the platform during 2023), subject to a de minimis exception that includes our prior written consent for new participants.

In addition, we have internally developed enterprise level systems that:

- provide automated work queue prioritization, operational visibility and relevant metrics which allow us to readily detect and address bottlenecks and inefficiencies in the loan origination process,
- use custom electronic interfaces with vendors and transaction partners, which allow us to quickly obtain and import data into our systems in a form which does not require re-keying of information; and
- deliver desktop computer based training to efficiently and effectively train clients and internal operations teams on new programs and changes in guidelines.

We also maintain an enterprise data/metrics warehouse which provides our team with the ability to interface with statistical, analytical and reporting tools that provides senior management with visibility into key performance indicators in real time.

### Data security & safeguards

The Gramm-Leach-Bliley Act ("GLBA") and other state and federal laws require that financial institutions take measures to safeguard the security and confidentiality of the personal financial information of their clients. Some states have passed laws to further protect client information, including laws that regulate the use of Social Security numbers as identifiers, require notifications to clients if the security of their personal information has been breached and/or require us to encrypt personal information when it is transmitted electronically. We employ various in-house and third-party technologies, and network administration policies, that are designed to:

- protect our computer network and network-accessible resources from unauthorized access;
- protect information stored on our computer network from losses, viruses, external threats and data corruption;
- protect the privacy of information on our computer network and with respect to transfers of information to and from our computer network; and
- protect our computer network and system availability from malicious attacks.

In light of constantly changing threats and vulnerabilities, no computer network can be said to be impervious from attack. However, we believe that the technologies and the information security program that we have adopted are appropriate to the size, complexity and scope of services we provide, as well as the nature of the information that we handle. Our network and information security team members are dedicated to monitoring security systems, evaluating the effectiveness of technologies against known risks and adjusting systems accordingly. In addition, we have outside firms specializing in network security perform periodic penetration testing and periodic internal audits of various information security functions. We also perform periodic audits of our systems for identity and access management.

### Loan Servicing

In addition to loan origination, we derive revenue from MSRs related to our loan originations. After a loan is originated, loan servicers manage payments, delinquencies, and other administrative functions of mortgages for third party investors. Servicers derive contractual revenue from servicing fees on the UPB of the loans in their servicing portfolio as well as other ancillary income. The net present value of these expected future cash flows is represented on the balance sheet as

Table of Contents

MSRs. MSR valuations have traditionally increased with increased interest rates because higher rates lead to decreased prepayments, thereby extending the average life of the asset and increasing related expected cash flows. Conversely, decreases in long term interest rates generally result in a decrease in the value of the MSR portfolio due to the expectation of higher prepayments. As such, MSR cash flows provide a natural hedge to originations, as volumes tend to decline in rising interest rate environments and increase in declining interest rate environments.

We retain MSRs for a period of time depending on business and liquidity considerations. When we sell MSRs, we typically sell them in the bulk MSR secondary market. We utilize two sub-servicers to service the loans for which we have retained servicing rights, one of which is a bank and one is a non-bank lender. By diversifying the type of sub-servicer, as well as splitting the MSR portfolio between two well recognized and capitalized sub-servicers, we believe it mitigates against certain risks inherent in the servicing business (whether done internally or outsourced to a sub-servicer). Our team of approximately 40 servicing oversight professionals is responsible for monitoring our sub-servicers. We have a robust sub-servicer oversight program to ensure a high level of borrower satisfaction and to support the relationships between those borrowers and our clients. Our in-house servicing team performs daily, monthly and quarterly testing to determine performance metrics and ensure agency and regulatory compliance and provides regular updates to our executive leadership team. We contractually obligate our sub-servicers to maintain appropriate licenses where required, maintain their approved servicer status with the applicable agencies and adhere to the applicable agency, investor or credit owner servicing guidelines and requirements in their servicing of mortgage loans for us.

Our servicing, quality control, internal audit, vendor relations, and legal and compliance teams perform various reviews of our servicing oversight program and operations. Our servicing team addresses any deficiencies with sub-servicers to ensure corrective action and controls are implemented.

As of December 31, 2022, our servicing portfolio consisted of 967,050 loans with an aggregate UPB of approximately $312.5 billion, a weighted average service fee of 0.2862% and weighted average note rate of 3.64%. As of December 31, 2021, our servicing portfolio consisted of 1,017,027 loans with an aggregate UPB of approximately $319.8 billion, a weighted average service fee of 0.2624% and a weighted average note rate of 2.94%.

We have experienced delinquency rates in our servicing portfolio that are lower than the industry average, with the percentage of UPB of mortgage loans that are 60 or more days delinquent in payments (referred to as the "60+ delinquency rate") of approximately 0.85% and 0.81% as of December 31, 2022 and 2021, respectively, compared to the industry average of 2.04% and 3.38%, based on data released by the Mortgage Bankers Association. We attribute this to both our commitment to high quality originations and our focus on client service within the servicing portfolio.

*Advance obligations*

As a servicer, we are obligated to service the loans according to the applicable agency, investor or credit owner guidelines and law. These obligations may require that we advance certain funds to securitization trusts and to others in the event that the borrowers are delinquent on their monthly mortgage payments. When a borrower remains delinquent, we may be required to advance principal and interest payments to the securitization trusts on the scheduled remittance date. We may also be required to advance taxes, insurance payments, legal fees, and maintenance and preservation costs with respect to property that is subject to foreclosure proceedings. These advances create a receivable due to us from the securitization trusts and/or borrower, and we recover these funds from the securitization trusts, from the borrower or from the proceeds of the sale of property in foreclosure. We had receivables of $135.4 million and $135.1 million as of December 31, 2022 and December 31, 2021, respectively, which are due to us from the securitization trusts and/or borrowers.

**Competition**

Competition in the residential mortgage loan origination market is intense. Institutions offering to make residential mortgage loans, regardless of the channel, include regional and community banks, thrifts, credit unions, mortgage banks, mortgage brokers, brokerage firms, insurance companies, and other financial institutions.

Some of our competitors may have more name recognition and greater financial and other resources than we have (including access to capital). Other competitors, such as lenders who originate mortgage loans using their own funds, or direct retail lenders who market directly to homeowners, may have more operational flexibility in approving loans, may have advantages in soliciting home loans from their clients or have access to capital through deposits at lower costs than our warehouse facilities. Additionally, we operate at a competitive disadvantage in some respects to U.S. federal banks and thrifts and their subsidiaries because they enjoy federal preemption and, as a result, conduct their business under relatively uniform U.S. federal rules and standards and are generally not subject to the laws of the states in which they do business (including state

Table of Contents

"predatory lending" laws). Unlike our federally chartered competitors, we are generally subject to all state and local laws applicable to lenders in each jurisdiction in which we originate and service loans. To compete effectively, we must have a very high level of operational, technological and managerial expertise, as well as access to capital at a competitive cost.

Competition for mortgage loan originations takes place on various levels, including brand awareness, marketing, convenience, pricing, and range of products offered. We have increased our share of the residential mortgage market over time due to a client-centric, disciplined, centralized approach to origination. In the face of significant changes in the mortgage market, we have maintained our commitment to high credit quality loans. Our focus on technology and process improvements creates a more efficient origination system for both us and our clients. This has been rewarded with strong client service scores, via our net promoter scores, which we believe is a significant competitive advantage.

**Government Regulations Affecting Loan Originations and Servicing**

We operate in a heavily regulated industry that is highly focused on consumer protection. Our business is subject to extensive oversight and regulation by federal, state and local governmental authorities. Both the scope of the laws and regulations and the intensity of the supervision to which we are subject have increased in recent years, initially in response to the financial crisis, and more recently in light of other factors such as technological and market changes. We expect to continue to face regulatory scrutiny as a participant in the mortgage sector.

Our loan origination and loan servicing operations are primarily regulated at the state level by state financial services authorities and administrative agencies, and at the federal level by the CFPB. The CFPB has federal regulatory, supervisory and enforcement authority over the residential mortgage loan origination and servicing industry, including residential mortgage lenders and servicers, such as UWM. Specifically, the CFPB has rulemaking authority with respect to the federal consumer financial services laws applicable to mortgage lenders and servicers. These laws include (i) the Truth-In-Lending Act (TILA), (ii) the Homeowners Protection Act (HPA), (iii) the Real Estate Settlement Procedures Act (RESPA), (iv) the Home Mortgage Disclosure Act (HMDA) and Regulation C, and (v) the Fair Debt Collections Practices Act (FDCPA). The CFPB's enforcement jurisdiction is broad, and it has the ability to initiate investigations and enforcement actions against mortgage lenders and servicers for violations of applicable consumer financial services laws, including, but not limited to, the Dodd-Frank Act's prohibitions on unfair, deceptive or abusive acts and practices. In addition, the CFPB shares jurisdiction with the FTC with respect to (i) the Equal Credit Opportunity Act (ECOA) and Regulation B issued by the CFPB pursuant to ECOA, (ii) the Fair Housing Act (FHA) and (iii) the GLBA.

As part of its enforcement authority, the CFPB can order, among other things, rescission or reformation of contracts, the refund of moneys or the return of real property, restitution, disgorgement or compensation for unjust enrichment, the payment of damages or other monetary relief, public notifications regarding violations, remediation of practices, external compliance monitoring and civil money penalties. Since its inception in 2011, the CFPB has exercised its enforcement jurisdiction aggressively with respect to mortgage industry participants, initiating investigations, entering into consent orders with significant monetary and injunctive relief, and initiating litigation. Often these matters have involved differing theories and interpretations of long-existing laws without first issuing industry guidance or rules.

In addition to the CFPB, we are subject to a variety of regulatory and contractual obligations imposed by credit owners, insurers and guarantors of the mortgages we originate and service including, but not limited to, Fannie Mae, Freddie Mac, Ginnie Mae, FHFA, FHA, VA and USDA. We periodically receive requests from federal, state and local agencies for records, documents and information relating to the policies, procedures and practices of our loan servicing, origination and collection activities. The agencies as well as GSEs and Ginnie Mae, and various investors and lenders also subject us to periodic reviews and audits and examinations. We are also subject to the Bank Secrecy Act (BSA) and related regulations including the Office of Foreign Assets Control (OFAC) and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act.

As noted above, we are also subject to the laws, regulations and rules of the fifty states in which we operate. These laws, regulations and rules may differ by state and sometimes differ from federal standards, are sometimes vague and subject to differing interpretations – all of which exposes us to legal and compliance risks. For example, many states have adopted regulations that prohibit various forms of "predatory" lending and place obligations on lenders to substantiate that a borrower will derive a tangible benefit from the proposed home financing transaction and/or have the ability to repay the loan. These laws have required most lenders to devote considerable resources to building and maintaining automated systems to perform loan-by-loan analysis of points, fees and other factors set forth in the laws, which often vary depending on the location of the mortgaged property.

14

Table of Contents

Our clients, the Independent Mortgage Brokers, are also subject to extensive regulation at the state level by state licensing authorities and administrative agencies. In certain circumstances, we can be held potentially liable for the acts and practices of our clients for violations of various federal and state consumer protection and other laws and regulations, including but not limited to (i) RESPA and Regulation X, (ii) the Federal Trade Commission Act (FTC Act), the FTC Credit Practices Rules and the FTC Telemarketing Sales Rule, each of which prohibit unfair or deceptive acts or practices and certain related practices; and (iii) the Telephone Consumer Protection Act (TCPA), which restricts telephone solicitations and the use of certain automatic telephone equipment. As a part of our enterprise risk management approach, we monitor our clients' compliance with applicable laws and regulations.

The federal and state laws, rules and regulations to which we or our clients are subject affect nearly all aspects of our lending and servicing operations as well as those of our clients and partners. Given the extensive, complex and sometimes vague nature and scope of the laws, rules and regulations applicable to us, our clients and our partners and the judicial and administrative decisions and other actions interpreting them, we are subject to significant legal and compliance risks that could arise merely from inadvertent errors and omissions that we may not be able to eliminate entirely from our operations and activities or from the inadvertent errors of clients or partners that we may not be able to control for or address proactively. Consequently, we devote substantial resources to regulatory compliance and collaborate across our legal, operations, underwriting and IT teams to maintain our compliance management systems. However, we believe that the complexity of governmental regulations and the cost of compliance is a competitive advantage insofar as it imposes barriers to entry, limiting market participants to those whose volume supports such costs. Laws, rules and regulations that affect participants in the residential mortgage lending process, such as Independent Mortgage Brokers, also afford us an opportunity to leverage our technology platform to develop processes that are faster, easier and more affordable for such participants and ultimately for consumers.

*Cyclicality and Seasonality*

The demand for loan originations is affected by consumer demand for home loans and the market for buying, selling, financing or re-financing residential real estate, which is primarily driven by interest rates and employment levels. Interest rates and employment levels are, in turn, affected by the national economy, regional trends, property valuations, and socio-economic trends, and by state and federal regulations and programs which may encourage or discourage certain real estate trends.

**Human Capital Management**

We are more than just a mortgage company, we are a team of focused professionals making dreams come true for hopeful homebuyers across the country. We have created a culture that celebrates team spirit and an environment where work-life balance is more than lip-service.

*Team Members*

Our team members are the secret to our success, and we believe our team is only as strong as we make it. As of December 31, 2022, we had approximately 6,000 team members, substantially all of whom are based in our corporate campus in Pontiac, Michigan. We celebrate our team members and all of their accomplishments through various events throughout the year. From our annual company-wide family fair with thousands of smiling faces to afternoon dance parties, we believe that it is important to focus on the health and happiness of our team members and their families.

We provide a combination of health and retirement benefits to our eligible team members, including but not limited to coverage for medical care, vision, dental, life insurance, disability, 401(k) and paid time off. Our campus also offers team members easy ways to manage their health and welfare with a full-size indoor basketball court, an outdoor sand volleyball court, a large, state-of-the-art fitness center with a variety of fitness classes, a game room, featuring arcade games and table tennis, a primary care doctor's office, physical therapy studio, chiropractor and a full-time massage therapist.

We believe this commitment to our team members is why we have been recognized again in 2022 by numerous organizations for being a top employer and a great place to work. In a 2022 employee engagement survey, 95.28% of team members responded that they felt they belonged at UWM from a diversity and inclusion standpoint.

*Diversity and Inclusion*

We strive to foster a culture of diversity and inclusion so all team members feel respected and no team member feels discriminated against. Our diverse, inclusive culture was built to promote positive attitudes, strong work ethics and individual authenticity. We believe a diverse workforce fosters innovation and cultivates an environment of unique perspectives. As of December 31, 2022, approximately 42% of our team members were female and 31% of our team members that choose to identify their ethnicity identified as ethnically diverse.

### Engagement and Opportunities

Continuous improvement is a primary focus of our strategic plan and one of our core pillars. We believe personal and professional growth accelerates careers while promoting productivity and innovation. We heavily invest in the development of each team member. We have approximately 200 training team members dedicated to providing our new hires and existing team members with the trainings and resources necessary to pursue their career paths and ensure compliance with our policies. In 2022, approximately 1.6 million total training hours were delivered to team members. We are dedicated to increasing team member engagement by strategically aligning talent within UWM. As a result, we promoted approximately 1,300 team members during 2022.

### Community Outreach

We recognize that our team members are part of the greater community in which they live and work and we are committed to giving back and making a positive impact on these communities around us and supporting our team members in their efforts to do the same. We believe in providing our team members the opportunity to do a lot of good and support the causes they care about. Team members receive paid-time off that they can use to volunteer. We and our team members partner with charities such as Adopt-A-Family, Breast Cancer Awareness and the American Red Cross, and sponsor local backpack, bike and coat drives to provide opportunities to give back. Our unique Pay It Forward program allows everyone the chance to earn points that direct where our Company charity dollars are spent — ensuring that even small gestures can be turned into generous contributions, and the opportunity to choose where our charitable dollars go.

### Available Information

Our annual reports on Form 10-K, quarterly reports on From 10-Q, current reports on Form 8-K, proxy statements and amendments to those reports filed with or furnished to the SEC pursuant to Section 13(a) or 15(d) of the Exchange Act are available free of charge through the investor relations section of our website at www.uwm.com as soon as reasonably practicable after electronically filing such material with the SEC. The SEC maintains an internet site that contains reports, proxy and information statements and other information regarding our filings at www.sec.gov. The above references to our website and the SEC's website do not constitute incorporation by reference of the information contained on those websites and should not be considered part of this Annual Report.

### Item 1A. Risk Factors

*You should carefully review and consider the following risk factors and the other information contained in this Annual Report, including the financial statements and notes to the financial statements included herein. The following risk factors apply to our business and operations. The occurrence of one or more of the events or circumstances described in these risk factors, alone or in combination with other events or circumstances, may have an adverse effect on our business, cash flows, financial condition and results of operations. You should also carefully consider the following risk factors in addition to the other information included in this Annual Report, including matters addressed in the section entitled "Cautionary Note Regarding Forward-Looking Statements; Risk Factor Summary." We may face additional risks and uncertainties that are not presently known to us, or that we currently deem immaterial, which may also impair our business or financial condition.*

### Risks Related to Our Business

***Our loan origination and servicing revenues are highly dependent on macroeconomic and U.S. residential real estate market conditions.***

Our success depends largely on the health of the U.S. residential real estate industry, which is seasonal, cyclical, and affected by changes in general economic conditions beyond our control. Economic factors such as increased interest rates, slow economic growth or inflationary conditions, the pace of home price appreciation or the lack of it, changes in household debt levels, and increased unemployment, stagnant or declining wages or decreased purchasing power due to inflation affect our borrowers' income and thus their ability and willingness to make loan payments.

Table of Contents

National or global events affect all such macroeconomic conditions. Weak or a significant deterioration in economic conditions reduce the amount of disposable income consumers have, which in turn reduces consumer spending and the willingness of qualified potential borrowers to take out loans. It is uncertain what impact the recent American Rescue Plan, other actions that the new Biden administration may adopt or steps that may be implemented by the Treasury Department may have on the macroeconomic conditions of the U.S. Furthermore, several state and local governments in the U.S. are experiencing, and may continue to experience, budgetary strain. One or more states or significant local governments could default on their debt or seek relief from their debt under the U.S. bankruptcy code or by agreement with their creditors. Any or all of the circumstances described above may lead to further volatility in or disruption of the credit markets at any time and could adversely affect our financial condition. Such economic factors typically affect buyers' demand for new homes or their willingness or ability to refinance their current mortgages which could adversely affect the wholesale loan origination market and our financial condition or results of operations.

Any uncertainty or deterioration in market conditions that leads to a decrease in loan originations will likely result in lower revenue on loans sold into the secondary market. Lower loan origination volumes generally place downward pressure on margins, thus compounding the effect of the deteriorating market conditions. Moreover, any deterioration in market conditions that leads to an increase in loan delinquencies will result in higher expenses for loans we service for the GSEs and Ginnie Mae. The increased cost to service loans could decrease the estimated value of our MSRs. In addition, an increase in delinquencies lowers the interest income we receive on cash held in collection and other accounts and may increase our obligation to advance certain principal, interest, tax and insurance obligations owed by the delinquent mortgage loan borrower. While increased delinquencies generate higher ancillary revenues, including late fees, these fees are likely not sufficient to offset the increased cost of servicing the loans. An increase in delinquencies could therefore be detrimental to our business. Recently, financial markets have experienced significant volatility. There may be a significant increase in the rate and number of mortgage payment delinquencies, and house sales, home prices and multifamily fundamentals may be adversely affected, which could lead to a material adverse decrease of our mortgage origination activities.

Any of the circumstances described above, alone or in combination, could lead to volatility in or disruption of the credit markets at any time and have a detrimental effect on our business. For additional information on macroeconomic and U.S. residential real estate market conditions, please consider the matters addressed in the section below entitled "—The COVID-19 pandemic and the actions taken by local, state and federal governments have and are expected to continue to adversely affect the national economy and the macroeconomic environment which could adversely affect our current operations and our ability to continue to grow."

***Our financial performance is directly affected by, and subject to substantial volatility from changes in prevailing interest rates.***

Our financial performance is directly affected by, and subject to substantial volatility from changes in prevailing interest rates. During 2022, in order to address rising inflation, the Federal Reserve began to aggressively raise interest rates. As a result, mortgage interests have significantly increased which has significantly adversely affected the volume of refinancings and new mortgage originations. Rising interest rates and inflation will likely decrease the demand for new mortgage originations and refinancings and increase competition for borrowers. This has and is expected to continue to adversely pressure our margins origination volumes, especially our refinance volume.

With regard to the portion of our business that is centered on refinancing existing mortgages, generally, the refinance market experiences more significant fluctuations than the purchase market as a result of interest rate changes. As interest rates rise, refinancing, has and is expected to continue to generally become a smaller portion of the market as fewer consumers are interested in refinancing their mortgages. With regard to our purchase mortgage loan business, higher interest rates may also reduce demand for purchase mortgages as home ownership becomes more expensive. This has and is expected to continue to adversely affect our revenues or require us to increase marketing expenditures in an attempt to increase or maintain our volume of mortgages.

Changes in interest rates are also a key driver of the performance of our servicing portfolio, particularly because our portfolio includes MSRs, the values of which are highly sensitive to changes in interest rates. Historically, the value of MSRs has increased when interest rates rise as higher interest rates lead to decreased prepayment rates, and has decreased when interest rates decline as lower interest rates lead to increased prepayment rates. In addition, increased prepayment rates may lead to increased asset decay and a decrease in servicing fees. As a result, decreases in interest rates could have a detrimental effect on our business.

Borrowings under some of our finance and warehouse facilities are at variable rates of interest based on short term rate indexes, whereas our mortgage loans that serve as collateral for such facilities are generally based on long-term interest rates, which also exposes us to interest rate risk. If short term interest rates increase, our debt service obligations on certain of our

17

Table of Contents

variable-rate indebtedness will increase and if long-term rates do not increase in kind (i.e., the yield curve flattens or inverts) our net income and cash flows, including cash available for servicing our indebtedness, could correspondingly decrease.

***Our business is highly dependent on Fannie Mae and Freddie Mac and certain U.S. government agencies, and any changes in these entities or their current roles could be detrimental to our business.***

We primarily originate loans eligible for sale to Fannie Mae and Freddie Mac, and government insured or guaranteed loans, such as the FHA, the Veteran Affairs ("VA") and the U.S. Department of Agriculture ("USDA") loans eligible for Ginnie Mae securities issuance.

In 2008, the Federal Housing Finance Agency ("FHFA") placed Fannie Mae and Freddie Mac into conservatorship and, as their conservator, controls and directs their operations. There is significant uncertainty regarding the future of the GSEs, including with respect to how long they will continue to be in existence, the extent of their roles in the market and what forms they will have, and whether they will be government agencies, government-sponsored agencies or private for-profit entities. Since they have been placed into conservatorship, many legislative and administrative plans for GSE reform have been put forth, but all have been met with resistance from various constituencies.

The extent and timing of any regulatory reform regarding the GSEs and the U.S. housing finance market, as well as any effect they may have on our business operations and financial results, are uncertain. It is not yet possible to determine whether such proposals will be enacted and, if so, when they will be enacted, what form any final legislation or policies might take or how proposals, legislation or policies may impact the MBS market and our business. Our inability to make the necessary adjustments to respond to these changing market conditions or loss of our approved seller/servicer status with the GSEs could have a material adverse effect on our mortgage origination operations and our mortgage servicing operations. If those agencies cease to exist, wind down, or otherwise significantly change their business operations or if we lose approvals with those agencies or our relationships with those agencies is otherwise adversely affected, we would need to seek alternative secondary market participants to acquire our mortgage loans at a volume sufficient to sustain our business. If such participants are not available or available on reasonably comparable economic terms, the above changes could have a material effect on our ability to profitably sell loans we originate that are securitized through Fannie Mae, Freddie Mac or Ginnie Mae.

***Changes in the GSEs, FHA, VA, and USDA guidelines or GSE and Ginnie Mae guarantees could adversely affect our business.***

We are required to follow specific guidelines and eligibility standards that impact the way we service and originate GSE and U.S. government agency loans, including guidelines and standards with respect to:

- credit standards for mortgage loans;
- our staffing levels and other servicing practices;
- the servicing and ancillary fees that we may charge;
- our modification standards and procedures;
- the amount of reimbursable and non-reimbursable advances that we may make; and
- the types of loan products that are eligible for sale or securitization.

These guidelines provide the GSEs and other government agencies with the ability to provide monetary incentives for loan servicers that perform well and to assess penalties for those that do not. At the direction of the FHFA, Fannie Mae and Freddie Mac have aligned their guidelines for servicing delinquent mortgages, which could result in monetary incentives for servicers that perform well and to assess compensatory penalties against servicers in connection with the failure to meet specified timelines relating to delinquent loans and foreclosure proceedings, and other breaches of servicing obligations. We generally cannot negotiate these terms with the agencies and they are subject to change at any time without our specific consent. A significant change in these guidelines, that decreases the fees we charge or requires us to expend additional resources to provide mortgage services, could decrease our revenues or increase our costs.

In addition, changes in the nature or extent of the guarantees provided by Fannie Mae, Freddie Mac, Ginnie Mae, the USDA or the VA, or the insurance provided by the FHA, or coverage provided by private mortgage insurers, could also have broad adverse market implications. Any future increases in guarantee fees or changes to their structure or increases in the premiums borrowers are required to pay to the FHA or private mortgage insurers for insurance or to the VA or the USDA for

18

Table of Contents

guarantees could increase mortgage origination costs. These industry changes could negatively affect demand for our mortgage services and consequently our origination volume, which could be detrimental to our business.

***To the extent that mortgage loans originated and sold by us do not comply with GSE, FHA or VA guidelines, we are required to repurchase or substitute mortgage loans or indemnify for losses related to our mortgage loans.***

A significant majority of our mortgage loans are conforming loans sold to GSEs such as Fannie Mae and Freddie Mac or insured by FHA or VA and sold into GNMA securities. In connection with such sales and insuring, we make representations and warranties to the GSE, FHA or VA that the mortgage loans conform to their respective standards. These standards include, among other items, compliance with origination guidelines, underwriting, appraisals, insurance and legal documents. In 2021, we launched a new program, UWM Appraisal Direct, in which we directly engage with appraisers rather than utilizing an appraisal management company. While we believe that this new program meets all of the GSE guidelines, there is a risk that the GSEs could decide that our implementation of this new process did not meet their standards.

If a mortgage loan does not comply with the representations and warranties that we made with respect to it at the time of our sale or insuring, we are required to repurchase the loan, replace it with a substitute loan and/or indemnify the applicable agency for losses. In the case of repurchases, we typically repurchase such loan and resell it into a non-conforming market at a discount to the repurchase price. As of December 31, 2022, we had accrued a $60.5 million reserve for repurchase and indemnification obligations. Actual repurchase and indemnification obligations could materially exceed the reserves recorded in our consolidated financial statements. Any significant repurchases, substitutions, indemnifications or premium recapture could be detrimental to our business.

***Our business is dependent on our ability to maintain and expand our relationships with our clients, the Independent Mortgage Brokers.***

Our clients are the Independent Mortgage Brokers who refer us mortgage loans to originate. Consequently, our results of operations are dependent, in large part, on our ability to maintain and expand our relationships with Independent Mortgage Brokers. If we are unable to attract Independent Mortgage Brokers to join our network and to provide a level of service such that our clients remain with the network or refer a greater number of their mortgage loans to us, our ability to originate loans will be significantly impaired. The willingness of Independent Mortgage Brokers to originate mortgage loans with us is dependent on (i) the rates that we are able to offer our clients' borrowers for mortgage loans, (2) our customer service, and (3) compensation. In determining with whom to partner, Independent Mortgage Brokers are also focused on the technological services and platforms we can provide so that the Independent Mortgage Brokers can best attract and serve consumers. In early 2021, we adopted our "All-In" policy of requiring that Independent Mortgage Brokers that generate mortgage loans with us not generate business with certain other market participants. To the extent that a material number of our Independent Mortgage Brokers are unwilling to commit to such requirement, it could reduce the volume of mortgage loans that we are able to originate which could adversely affect our results of operations. In addition, the policy, which has generated significant publicity and a legal proceeding, could adversely affect our reputation or affect our ability to attract new Independent Mortgage Brokers. If our clients are dissatisfied with our services or platform or technological capabilities, or they cannot offer prospective borrowers competitive rates, we could lose a number of clients which would have a negative impact on our business, operating results and financial condition.

***All of our mortgage loans are initiated by third parties, which exposes us to business, competitive and underwriting risks.***

As a Wholesale Mortgage Lender, we market and originate mortgage loans exclusively through independent third-parties, comprised of Independent Mortgage Brokers. While we believe using Independent Mortgage Brokers best serves mortgage consumers, our reliance on third parties presents risks and challenges, including the following:

- Our business depends in large part on the marketing efforts of our clients and on our ability to offer loan products and services that meet the requirements of our clients and their borrowers. However, loan officers are not obligated to sell or promote our products and many sell or promote competitors' loan products in addition to our products. Some of our competitors have higher financial strength ratings, offer a larger variety of products, and/or offer higher incentives than we do. Therefore, we may not be able to continue to attract and retain clients to originate loans for us. The failure or inability of our clients to successfully market our mortgage products could, in turn, have a material adverse impact on our business, financial condition and results of operations.

- Because of our focus exclusively on the wholesale channel, communication with borrowers is primarily made through loan officers employed by third parties. Consequently, we rely on our clients and their loan officers to

Table of Contents

provide us accurate information on behalf of borrowers, including financial statements and other financial information, for us to use in deciding whether to approve loans. If any of this information is intentionally or negligently misrepresented and such misrepresentation is not detected prior to loan funding, the fair value of the loan may be significantly lower than expected. Whether a misrepresentation is made by the borrower, the loan officer or one of our team members, we generally bear the risk of loss associated with the misrepresentation. Our controls and processes may not have detected or may not detect all misrepresented information in our loan originations. Likewise, our clients may also lack sufficient controls and processes. Any such misrepresented information could have a material adverse effect on our business and results of operations.

- Because borrowers rely on their loan officer through the entire mortgage process, and some borrowers do not differentiate between their loan officer (or the employer of the loan officer) and their mortgage lender, (i) developing brand recognition can be challenging and requires us to coordinate with our clients and (ii) poor customer service, customer complaints or negative word-of-mouth or publicity resulting from the performance of our clients could severely diminish consumer confidence in and use of our services. To maintain good customer relations, we must ensure that our clients provide prompt, accurate and differentiated customer service. Effective customer service requires significant personnel expense and investment in developing programs and technology infrastructure to help our clients carry out their functions. These expenses, if not managed properly, could significantly impact our profitability. Failure to properly manage our clients could compromise our ability to handle customer complaints effectively. If we do not handle borrower complaints effectively, our reputation and brand may suffer and we may lose our borrowers' confidence which could have a material adverse impact on our results of operations and profitability.

- Growth in our market share is principally dependent on growth in the market share controlled by the wholesale channel. Independent Mortgage Brokers controlled 20.3% of mortgage loan originations in the U.S. as of December 31, 2022, while direct-to-consumer activity represented 79.7% of the loan originations in the U.S. as of that date (based on data released by IMF). Consequently, more competitors have focused on "direct-to-the-consumer" distribution models that market digital ease and technological efficiencies. Continued advancements or the perception of efficiency in "direct-to-the-consumer" distribution models may impact the overall market share controlled by our clients and make it more difficult for us to grow, or require us to establish relationships with more clients.

***The conduct of the Independent Mortgage Brokers through whom we originate mortgage loans could subject us to fines or other penalties.***

We depend exclusively on Independent Mortgage Brokers for our loan originations. These clients are subject to parallel and separate legal obligations. While these laws may not explicitly hold the originating lenders responsible for the legal violations of such entities, U.S. federal and state agencies increasingly have sought to impose such liability. For example, the U.S. Department of Justice ("DOJ"), through its use of a disparate impact theory under the Fair Housing Act, has held home loan lenders responsible for the pricing practices of third parties, alleging that the lender is directly responsible for the total fees and charges paid by the borrower even if the lender neither dictated what the third party could charge nor kept the money for its own account. See "—Regulatory agencies and consumer advocacy groups are becoming more aggressive in asserting claims that the practices of lenders and loan servicers result in a disparate impact on protected classes." In addition, under the TILA-RESPA Integrated Disclosure ("TRID") rule, we may be held responsible for improper disclosures made to borrowers by our clients. While we seek to use technology, such as our LOS, to monitor whether these clients and their loan officers are complying with their obligations, our ability to enforce such compliance is extremely limited. Consequently, we may be subject to claims for fines or other penalties based upon the conduct of our clients and their loan officers with whom we do business, which could have a material effect on our operating results and financial condition.

***The mortgage industry can be very cyclical, with loan origination volumes varying materially based on macroeconomic conditions. If we are unable to effectively manage our team members during periods of volatility, it could adversely affect our current business operations and our growth.***

The mortgage industry can be very cyclical, with loan origination volumes varying materially based on macroeconomic conditions. For example, in response to significant increases in interests rates, our loan origination volume in 2022 decreased by 44% and our number of team members decreased by 25% as compared to the prior year end. However, during 2021, our loan origination volume increased by 24% while our number of team members increased by 7%, as compared to the prior year end. Our ability to effectively manage significant increases and decreases in loan origination volume will depend on our ability to hire, integrate, train and retain highly-qualified personnel for all areas of our organization during these periods of changing volume. Any talent acquisition and retention challenges or mismanagement of our personnel needs in these

20

Table of Contents

situations could reduce our operating efficiency, increase our costs of operations and harm our overall financial condition. As the pool of qualified candidates has continued to be limited and there continues to be significant competition for talent, we may face challenges to hire and retain highly qualified personnel in changing environments. Additionally, we invest heavily in training our team members, which increases their value to competitors who may seek to recruit them. If we do not effectively manage our pool of team members in times of volatility, it could disrupt our business operations and have a negative impact on our long-term growth.

***The COVID-19 pandemic and the actions taken by local, state and federal governments have and are expected to continue to adversely affect the national economy and the macroeconomic environment which could adversely affect our current operations and our ability to continue to grow.***

The COVID-19 pandemic has had, and continues to have, a significant impact on the national economy and the communities in which we operate. While the pandemic's effect on the macroeconomic environment has yet to be fully determined and could continue for months or years, we expect that the pandemic and governmental programs created as a response to the pandemic will affect the core aspects of our business and the business of our clients, including the origination of mortgages, our servicing operations, our liquidity and our team members. Such effects, if they continue for a prolonged period, may have a material adverse effect on our business and results of operations. These effects may be exacerbated should there be another wave of infections or if the pandemic otherwise intensifies.

Moreover, the FHFA establishes certain liquidity requirements for agency and Ginnie Mae loan servicers that are generally tied to the unpaid principal balance of loans serviced by such loan servicer for Fannie Mae, Freddie Mac, Ginnie Mae, FHA and VA. To the extent that the percentage of seriously delinquent loans ("SDQ"), i.e., loans that are 90 days or more delinquent, exceeds defined thresholds, the liquidity requirements for loan servicers could increase materially. Exceeding such SDQ thresholds would result in substantially higher liquidity requirements, which could materially impact our results of operations and financial condition.

In addition, our business could be disrupted if we are unable to operate due to changing governmental restrictions such as travel bans and quarantines placed on our team members, other measures that ensure the protection of our team members' health, measures aimed at maintaining our information technology infrastructure, or if an outbreak occurs in our headquarters that prevents us from operating.

As a result of the COVID-19 pandemic, many of the major purchasers in the bulk MSR secondary market experienced liquidity constraints; consequently, the liquidity of the bulk MSR market has been, and may continue to be, adversely affected. This market disruption may adversely affect our ability to sell MSRs and the pricing that we are able to achieve, which in turn could adversely affect our liquidity and reduce our margins. If we are unable to access sources of capital or liquidity as a result of the impact of the COVID-19 pandemic on the financial markets, our ability to maintain or grow our business could be limited.

***We may not be able to detect or prevent cyberattacks and other data and security breaches, which could adversely affect our business and subject us to liability to third parties.***

We are dependent on information technology networks and systems, particularly for our loan origination systems and other technology-driven platforms, designed to provide best-in-class service and experience for clients and to ensure adherence to regulatory compliance, operational governance, training and security. In the ordinary course of our business, we receive, process, retain and transmit proprietary information and sensitive or confidential data, including the public and non-public personal information of our team members, clients and loan applicants. Despite devoting significant time and resources to ensure the integrity of our information technology systems, we have not always been able to, and may not be able to in the future, anticipate or implement effective preventive measures against all security breaches or unauthorized access of our information technology systems or the information technology systems of third-party vendors that receive, process, retain and transmit electronic information on our behalf.

Cybersecurity risks for lenders have significantly increased in recent years, in part, because of the proliferation of new technologies, the use of the internet and telecommunications technologies to conduct financial transactions, and the increased sophistication and activities of computer hackers, organized crime, terrorists, and other external parties, including foreign state actors. We, our clients, borrowers and loan applicants, regulators and other third parties have been subject to, and are likely to continue to be the target of, cyberattacks and other security breaches. Security breaches, cyberattacks such as computer viruses, malicious or destructive code, phishing attacks, denial of service or information, acts of vandalism, natural disasters, fire, power loss, telecommunication failures, team member misconduct, human error and developments in computer intrusion capabilities

Table of Contents

could result in a compromise or breach of the technology that we or our third-party vendors use to collect, process, retain, transmit and protect the personal information and transaction data of our team members, clients, borrowers and loan applicants. Similar events outside of our control can also affect the demands we and our vendors may make to respond to any security breaches or similar disruptive events. We invest in industry-standard security technology designed to protect our data and business processes against risk of a data security breach and cyberattack. Our data security management program includes identity, trust, vulnerability and threat management business processes as well as the adoption of standard data protection policies. We measure our data security effectiveness through industry-accepted methods and remediate significant findings. The technology and other controls and processes designed to secure our team member, client, borrower and loan applicant information and to prevent, detect and remedy any unauthorized access to that information were designed to obtain reasonable, but not absolute, assurance that such information is secure and that any unauthorized access is identified and addressed appropriately. Such controls have not always detected, and may in the future fail to prevent or detect, unauthorized access to our team member, client, borrower and loan applicant information.

The techniques used to obtain unauthorized, improper or illegal access to our systems and those of our third-party vendors, our data, our team members', clients', borrowers' and loan applicants' data or to disable, degrade or sabotage service are constantly evolving, and have become increasingly complex and sophisticated. Furthermore, such techniques change frequently and are often not recognized or detected until after they have been launched. Therefore, we may be unable to anticipate these techniques and may not become aware of such a security breach in a timely manner, which could exacerbate any damage we experience. Security attacks can originate from a wide variety of sources, including third parties such as computer hackers, persons involved with organized crime or associated with external service providers, or foreign state or foreign state-supported actors. Those parties may also attempt to fraudulently induce team members, clients, borrowers and loan applicants or other users of our systems to disclose sensitive information in order to gain access to our data or that of our team members, clients, borrowers and loan applicants. Our failure to detect or prevent a cyberattack or other data or security breach could adversely affect our business.

The occurrence of any of the foregoing events could subject us to increased costs, litigation, disputes, damages, and other liabilities. In addition, the foregoing events could result in violations of applicable privacy and other laws. If this information is inappropriately accessed and used by a third party or a team member for illegal purposes, such as identity theft, we may be responsible for the affected individuals for any losses they may have incurred as a result of such misappropriation. In such an instance, we may also be subject to regulatory action, investigation or liability to a governmental authority for fines or penalties associated with a lapse in the integrity and security of our team members', clients', borrowers' and loan applicants' information. We may be required to expend significant capital and other resources to protect against and remedy any potential or existing security breaches and their consequences. In addition, our remediation efforts may not be successful and we may not have adequate insurance to cover these losses. Furthermore, any publicized security problems affecting our businesses and/or those of such third parties may negatively impact the market perception of our products and discourage clients or borrowers from doing business with us.

***Technology disruptions or failures, including a failure in our operational or security systems or infrastructure, or those of third parties with whom we do business, could disrupt our business, cause legal or reputational harm and adversely impact our results of operations and financial condition.***

We are dependent on the secure, efficient, and uninterrupted operation of our technology infrastructure, including computer systems, related software applications and data centers, as well as those of certain third parties and affiliates. Our websites and computer/telecommunication networks must accommodate a high volume of traffic and deliver frequently updated information, the accuracy and timeliness of which is critical to our business. Our technology must be able to facilitate a loan application experience that equals or exceeds the experience provided by our competitors. We have or may in the future experience service disruptions and failures caused by system or software failure, fire, power loss, telecommunications failures, team member misconduct, human error, computer hackers, computer viruses and disabling devices, malicious or destructive code, denial of service or information, as well as natural disasters, health pandemics and other similar events and our disaster recovery planning may not be sufficient for all situations. The implementation of technology changes and upgrades to maintain current and integrate new technology systems may also cause service interruptions. Any such disruption could interrupt or delay our ability to provide services to our clients and could also impair the ability of third parties to provide critical services to our business.

Additionally, the technology and other controls and processes we have created to help us identify misrepresented information in our loan origination operations were designed to obtain reasonable, not absolute, assurance that such information is identified and addressed appropriately. Accordingly, such controls may not have detected, and may fail in the future to detect, all misrepresented information in our loan origination operations. If our operations are disrupted or otherwise negatively

Table of Contents

affected by a technology disruption or failure, this could result in client dissatisfaction and damage to our reputation and brand, and have a material impact on our business.

***Loss of our key management could result in a material adverse effect on our business.***

Our future success depends to a significant extent on the continued services of our senior management, including Mat Ishbia, our President and Chief Executive Officer. The experience of our senior management is a valuable asset to us and would be difficult to replace. The loss of the services of our President and Chief Executive Officer or other members of senior management could disrupt and have a detrimental effect on our business.

***Our products rely on software and services from third-party vendors and if any of these services became unavailable or unreliable, it could adversely affect the quality and timeliness of our mortgage origination process.***

In addition to our proprietary software, we license third-party software and depend on services from various third parties for use in our products. For example, we rely on third-party vendors for our online mortgage application services, to generate the documents required for closing the document, to generate flood certifications and to confirm employment. While there are other providers of these services in the market, any loss of the right to use any of the software or services could result in decreased functionality of our products until equivalent technology is either developed by us or, if available from another provider, is identified, obtained and integrated, which could adversely affect our reputation and our future financial condition and results of operations.

Furthermore, we remain responsible for ensuring our loans are originated in compliance with applicable laws. Despite our efforts to monitor such compliance, any errors or failures of such third-party vendors or their software to perform in the manner intended could result in loan defects potentially requiring repurchase. In addition, any errors or defects in or failures of the other software or services we rely on, whether maintained by us or by third parties, could result in errors or defects in our products or cause our products to fail, which could adversely affect our business and be costly to correct. Many of our third-party vendors attempt to impose limitations on their liability for such errors, defects or failures, and if enforceable, we may have additional liability to our clients, borrowers or other third parties that could harm our reputation and increase our operating costs. Any failure to do so could adversely affect our ability to deliver effective products to our clients, borrowers and loan applicants and adversely affect our business.

***We rely on third party sub-servicers who service all the mortgage loans on which we hold MSRs, and our financial performance may be adversely affected by their inability to adequately perform their servicing functions.***

We contract with third party sub-servicers for the servicing of the portion of the mortgage loans in our portfolio for which we retain MSRs. Although we use third-party servicers, we, as master servicer, retain primary responsibility to ensure these loans are serviced in accordance with the contractual and regulatory requirements.

Therefore, the failure of our sub-servicers to adequately perform their servicing obligations may subject us to liability for their improper acts or omissions and adversely affect our financial performance. Specifically, we may be adversely affected:

- if our sub-servicers breach their servicing obligations or are unable to perform their servicing obligations properly, which may subject us to damages or termination of the servicing rights, and cause us to lose loan servicing income and/or require us to indemnify an investor or securitization trustee against losses as a result of any such breach or failure;

- by regulatory actions taken against any of our sub-servicers, which may adversely affect their licensing and, as a result, their ability to perform their servicing obligations under GSE and U.S. government agency loans which require such licensing;

- by a default by any of our sub-servicers under their debt agreements, which may impact their access to capital to be able to perform their obligations;

- if any of our sub-servicers were to face adverse actions from the GSEs and are terminated as servicer under their agreements with the GSEs;

- if our sub-servicers fail to meet their obligations due to economic or other circumstances that are difficult to anticipate, including as a result of the impact of the COVID-19 pandemic;

23

Table of Contents

- if as a result of poor performance by our sub-servicers, we experience greater than expected delinquencies and foreclosures on the mortgage loans being serviced, which could lead to liability from third party claims or adversely affect our ability to access the capital and secondary markets for our loan funding requirements;
- if any of our sub-servicers become subject to bankruptcy proceedings; or
- if one or more of our sub-servicers terminate their agreement with us.

We rely on two nationally-recognized sub-servicers to service all of our mortgage loans for which we have retained MSRs. This sub-servicer counterparty concentration subjects us to a potentially greater impact if any of the risks described above were to occur, and any delay in transferring servicing to a new sub-servicer could further adversely affect servicing performance and cause financial losses. Any of these risks could adversely affect our results of operations, including our loan servicing income and the cash flow generated by our MSR portfolio. Any of these risks may be further exacerbated to the extent we materially increase our MSR portfolio in the future.

***We are required to make servicing advances that can be subject to delays in recovery or may not be recoverable in certain circumstances and could have a material adverse effect on our cash flows, business and financial condition.***

During any period in which one of our borrowers is not making payments on a loan we service, we are required under most of our servicing agreements to advance our own funds to meet some combination of contractual principal and interest remittance requirements, pay property taxes and insurance premiums, legal expenses and other protective advances. We also advance funds to maintain, repair and market real estate properties. In certain situations, our contractual obligations may require us to make certain advances for which we may not be reimbursed. In addition, in the event a loan serviced by us defaults or becomes delinquent, or the mortgagee is allowed to enter into a forbearance, the repayment of advances may be delayed, which may adversely affect our liquidity. Any significant increase in required servicing advances or delinquent loan repurchases, could have an adverse impact on our cash flows, even if they are reimbursable.

With delinquent VA guaranteed loans, the VA guarantee may not make us whole on losses or advances we may have made on the loan. In addition, for certain loans sold to Ginnie Mae, we, as the servicer, have the unilateral right to repurchase any individual loan in a Ginnie Mae securitization pool if that loan meets defined criteria, including being delinquent for longer than 90 days. Once we have the unilateral right to repurchase the delinquent loan, we have effectively regained control over the loan and we must recognize the loan on our balance sheet and recognize a corresponding financial liability. Any significant increase in seriously delinquent Ginnie Mae loans could have an adverse impact on our balance sheet, as well as our borrowing covenants that are based on balance sheet ratios.

Servicers of mortgage loans are often times contractually bound to advance monthly payments to investors, insurers and taxing authorities regardless of whether the borrower actually makes those payments. While Fannie Mae and Freddie Mac issued guidance limiting the number of payments a servicer must advance in the case of a forbearance, we expect that a borrower who has experienced a loss of employment or a reduction of income may not repay the forborne payments at the end of the forbearance period. Additionally, pursuant to the amended rules announced by the CFPB on June 28, 2021, we are now subject to new requirements on our ability to collect servicing related fees, such as late fees, and initiating foreclosure proceedings. The new rules implemented by the CFPB create additional procedures which servicers must follow, and the costs and administrative burden associated with complying with these regulations may have a material adverse effect on our cash flows, business, and financial condition. Even though delinquencies generate higher ancillary revenues, including late fees, it is unlikely that we will be able to collect such ancillary fees for delinquencies relating to the COVID-19 pandemic as the federal and state legislation and regulations as well as administrative enforcement response to the COVID-19 pandemic continue to evolve. Approximately 0.65% of our serviced loans are in forbearance as of December 31, 2022.

Much like what has occurred in response to the COVID-19 pandemic, government intervention also occurs periodically as a result of natural disasters or other events that cause widespread borrower harm. Similar challenges and risks to servicers, including us, will likely occur when such events transpire in the future.

***We face intense competition that could adversely affect our business.***

Competition in the mortgage lending space is intense. In addition, the mortgage business has experienced substantial consolidation. As we depend solely on third parties to deliver us mortgage loans, we may be at a competitive disadvantage to financial institutions or direct-to-consumer mortgage lenders that market to, and have a direct relationship with, the borrower. In addition, some of our competitors may have greater financial and other resources than we have (including access to capital) and may have locked in low borrowing costs which will provide a competitive advantage in a rising interest rate environment. Other of our competitors, such as financial institutions who originate mortgage loans using their own funds, may have more

24

Table of Contents

flexibility in holding loans. Additionally, we operate at a competitive disadvantage to U.S. federal banks and thrifts and their subsidiaries because they enjoy federal preemption and, as a result, conduct their business under relatively uniform U.S. federal rules and standards and are generally not subject to the laws of the states in which they do business (including state "predatory lending" laws). Unlike our federally chartered competitors, we are generally subject to all state and local laws applicable to lenders in each jurisdiction in which we originate and service loans. To compete effectively, we must have a very high level of operational, technological and managerial expertise, as well as access to capital at a competitive cost.

Competition in our industry can take many forms, including the variety of loan programs being made available, interest rates and fees charged for a loan, convenience in obtaining a loan, client service levels, the amount and term of a loan, as well as access to marketing and distribution channels, including Independent Mortgage Brokers that generate mortgage loan applications. Claims of collusion and other anti-competitive conduct have also become more common, and many financial institutions and lenders have been the subject of legal claims by regulatory agencies and consumers. For example, on March 4, 2021, we announced a new policy that we would no longer enter into new transactions with Independent Mortgage Brokers who also sold mortgage loans to two certain market participants, but still allowed these Independent Mortgage Brokers to engage with any of the more than 70 other mortgage loan originators or lenders. If our policy or any other actions were found to be anti-competitive or non-compliant with state or federal antitrust laws or other regulations it could result in state or federal governmental actions or private civil claims, including class actions, being brought against us. Such litigation would cause us to incur costs, fines and legal expenses in connection with these matters, regardless of any eventual ruling in our favor, and could also harm the reputation of our brand, any of which could have a material adverse effect on our business, financial condition or results of operations.

***The success and growth of our business will depend upon our ability to be a leader in technological innovation in our industry.***

We operate in an industry experiencing rapid technological change and frequent product introductions. In order to succeed, we must lead our peers in designing, innovating and introducing new technology and product offerings. The process of developing new technologies and products is complex, and if we are unable to successfully innovate and continue to deliver a superior client experience, the demand for our products and services may decrease, we may lose market share and our growth and operations may be harmed.

The origination process is increasingly dependent on technology, and our business relies on our continued ability to process loan applications over the internet, accept electronic signatures, provide instant process status updates and other client- and loan applicant-expected conveniences. Our proprietary and exclusively licensed technology is integrated into all steps of the loan origination process, from the original submission, to the underwriting to the closing. Our dedication to incorporating technological advancements into our loan origination and servicing platforms requires significant financial and personnel resources. For example, we have, and will continue to, expend significant capital expenditures on our proprietary technology platforms. Maintaining and improving this technology will require significant capital expenditures.

To the extent we are dependent on any particular technology or technological solution, we may be harmed if such technology or technological solution (1) becomes non-compliant with existing industry standards, (2) fails to meet or exceed the capabilities of our competitors' equivalent technologies or technological solutions, (3) becomes increasingly expensive to service, retain and update, (4) becomes subject to third-party claims of intellectual property infringement, misappropriation or other violation, or (5) malfunctions or functions in a way we did not anticipate or that results in loan defects potentially requiring repurchase. Additionally, new technologies and technological solutions are continually being released. As such, it is difficult to predict the problems we may encounter in improving our websites' and other technologies' functionality.

***We could be adversely affected if we do not adequately obtain, maintain, protect and enforce our intellectual property and proprietary rights and may encounter disputes from time to time relating to our use of the intellectual property of third parties.***

Our proprietary technology platforms and other proprietary rights are important to our success and our competitive position. We rely on intellectual property to protect our proprietary rights. Despite these measures, third parties may attempt to disclose, obtain, copy or use intellectual property rights owned or licensed by us and these measures may not prevent misappropriation, infringement, reverse engineering or other violation of intellectual property or proprietary rights owned or licensed by us. Furthermore, confidentiality procedures and contractual provisions can be difficult to enforce and, even if successfully enforced, may not be entirely effective. In addition, we cannot guarantee that we have entered into confidentiality agreements with all team members, partners, independent contractors or consultants that have or may have had access to our trade secrets and other proprietary information. Any issued or registered intellectual property rights owned by or licensed to us may be challenged, invalidated, held unenforceable or circumvented in litigation or other proceedings, and such intellectual

25

Table of Contents

property rights may be lost or no longer provide us meaningful competitive advantages. Third parties may also independently develop products, services and technology similar to or duplicative of our products and services.

Our success and ability to compete also depends in part on our ability to operate without infringing, misappropriating or otherwise violating the intellectual property or proprietary rights of third parties. We may encounter disputes from time to time concerning intellectual property rights of others, including our competitors, and we may not prevail in these disputes. Third parties may raise claims against us alleging an infringement, misappropriation or other violation of their intellectual property rights, including trademarks, copyrights, patents, trade secrets or other intellectual property or proprietary rights. An assertion of an intellectual property infringement, misappropriation or other violation claim against us could result in adverse judgments, settlement on unfavorable terms or cause us to spend significant amounts to defend the claim, even if we ultimately prevail and we may have to pay significant money damages, lose significant revenues, be prohibited from using the relevant systems, processes, technologies or other intellectual property, cease offering certain products or services, or incur significant license, royalty or technology development expenses.

*Fraud could result in significant financial losses and harm to our reputation.*

We use automated underwriting engines from Fannie Mae and Freddie Mac to assist us in determining if a loan applicant is creditworthy, as well as other proprietary and third-party tools and safeguards to detect and prevent fraud. We are unable, however, to prevent every instance of fraud that may be engaged in by our clients, borrowers or team members, and any seller, real estate broker, notary, settlement agent, appraiser, title agent, or third-party originator that misrepresents facts about a loan, including the information contained in the loan application, property valuation, title information and employment and income stated on the loan application. If any of this information was intentionally or negligently misrepresented and such misrepresentation was not detected prior to the acquisition or closing of the loan, the value of the loan could be significantly lower than expected, resulting in a loan being approved in circumstances where it would not have been, had we been provided with accurate data. A loan subject to a material misrepresentation is typically unsalable or subject to repurchase if it is sold before detection of the misrepresentation. In addition, the persons and entities making a misrepresentation are often difficult to locate and it is often difficult to collect from them any monetary losses we have suffered.

High profile fraudulent activity also could negatively impact our brand and reputation, which could impact our business. In addition, significant increases in fraudulent activity could lead to regulatory intervention, which could increase our costs and also negatively impact our business.

*Our counterparties may terminate our servicing rights, which could have a material adverse effect on our revenues.*

The majority of the mortgage loans we service are serviced on behalf of Fannie Mae, Freddie Mac and Ginnie Mae. These entities establish the base service fee to compensate us for servicing loans as well as the assessment of fines and penalties that may be imposed upon us for failing to meet servicing standards.

As is standard in the industry, under the terms of our master servicing agreements with the GSEs, the GSEs have the right to terminate us as servicer of the loans we service on their behalf at any time and also have the right to cause us to sell the MSRs to a third party. In addition, failure to comply with servicing standards could result in termination of our agreements with the GSEs with little or no notice and without any compensation. If any of Fannie Mae, Freddie Mac or Ginnie Mae were to terminate us as a servicer, or increase our costs related to such servicing by way of additional fees, fines or penalties, such changes could have a material adverse effect on the revenue we derive from servicing activity, as well as the value of the related MSRs. These agreements, and other servicing agreements under which we service mortgage loans for non-GSE loan purchasers, also require that we service in accordance with GSE servicing guidelines and contain financial covenants. If we were to have our servicing rights terminated on a material portion of our servicing portfolio, this could adversely affect our business.

*If we cannot maintain our corporate culture, we could lose the innovation, collaboration and focus on the mission that contributes to our business.*

We believe that a critical component of our success is our corporate culture and our deep commitment to our mission. We believe this mission-based culture fosters innovation, encourages teamwork and cultivates creativity. Our mission defines our business philosophy as well as the emphasis that it places on our clients, our people and our culture and is consistently reinforced to and by our team members. As we have significantly increased our team members it may be harder to maintain our corporate culture. If we are unable to preserve our culture, this could negatively impact our future success, including our ability

26

Table of Contents

to attract and retain team members, encourage innovation and teamwork, and effectively focus on and pursue our mission and corporate objectives.

***Substantially all of our operations are housed on one campus, and if the facilities are damaged or rendered inoperable by natural or man-made disasters, our business may be negatively impacted.***

Substantially all of our operations are housed on one campus in Pontiac, Michigan. Our campus could be harmed or rendered inoperable by natural or man-made disasters, including earthquakes, fires, power shortages, telecommunications failures, water shortages, floods, extreme weather conditions, medical epidemics, and other natural or man-made disasters, pandemics, epidemics, or other business interruptions. If due to such disaster a significant portion of our team members must work remotely for an extended period of time, our business may be negatively impacted. See "—If we cannot maintain our corporate culture, we could lose the innovation, collaboration and focus on the mission that contribute to our business." In addition, it could be costly and time-consuming to repair or replace our campus.

***In certain circumstances, Holdings LLC will be required to make distributions to us and SFS Corp. and the distributions that Holdings LLC will be required to make may be substantial and in excess of our tax liabilities and obligations under the tax receivable agreement. To the extent we do not distribute such excess cash, SFS Corp. would benefit from any value attributable to such cash balances as a result of their ownership of Class B common stock (or Class A common stock, as applicable) following an exchange of Holdings LLC Common Units and the stapled shares of Common Stock.***

Holdings LLC is treated as a partnership for U.S. federal income tax purposes and, as such, will not be subject to any entity-level U.S. federal income tax. Instead, taxable income will be allocated to us and SFS Corp., as holders of membership interests in Holdings LLC (the "Holdings LLC Common Units"). Accordingly, we will incur income taxes on our allocable share of any net taxable income of Holdings LLC. Under the Holdings LLC Second Amended & Restated Limited Liability Company Agreement (the "Holdings LLC A&R Company Agreement"), Holdings LLC will generally be required from time to time to make pro rata distributions in cash to its equityholders, SFS Corp. and us, in amounts sufficient to cover the taxes on their allocable share of the taxable income of Holdings LLC. As a result of (i) potential non pro rata allocations of net taxable income allocable to us and SFS Corp., (ii) the lower tax rate applicable to corporations as compared to individuals and (iii) the favorable tax benefits that we anticipate receiving from (a) the exchange of Holdings LLC Common Units from SFS Corp. and (b) payments under the tax receivable agreement, we expect that these tax distributions will be in amounts that exceed our tax liabilities and obligations to make payments under the tax receivable agreement. Our Board of Directors will determine the appropriate uses for any excess cash so accumulated, which may include, among other uses, any potential dividends, stock buybacks, the payment obligations under the tax receivable agreement and the payment of other expenses. We will have no obligation to distribute such cash (or other available cash other than any declared dividend) to our stockholders. No adjustments to the exchange ratio for Holdings LLC Common Units and the stapled shares of Common Stock will be made as a result of (x) any cash distribution by Holdings LLC or (y) any cash that we retain and do not distribute to our stockholders, and in any event the ratio will remain one-to-one.

***We are required to pay SFS Corp. for certain tax benefits we may claim, and the amounts we may pay could be significant.***

We entered into a tax receivable agreement with SFS Corp. that provides for the payment by us to SFS Corp. (or its transferees or other assignees) of 85% of the amount of cash savings, if any, in U.S. federal, state and local income tax or franchise tax that we actually realize as a result of (i) certain increases in tax basis resulting from exchanges of Holdings LLC Common Units; (ii) imputed interest deemed to be paid by us as a result of payments we make under the tax receivable agreement; (iii) certain increases in tax basis resulting from payments we make under the tax receivable agreement; and (iv) disproportionate allocations (if any) of tax benefits to us which arise from, among other things, the sale of certain assets such as MSRs as a result of section 704(c) of the Internal Revenue Code of 1986 (the "Code") (the tax attributes in clauses "(i)" through "(iv)" collectively referred to as the "Covered Tax Attributes"). The tax receivable agreement will make certain simplifying assumptions regarding the determination of the cash savings that we realize or are deemed to realize from the Covered Tax Attributes, which may result in payments pursuant to the tax receivable agreement in excess of those that would result if such assumptions were not made.

The actual tax benefit, as well as the amount and timing of any payments under the tax receivable agreement, will vary depending upon a number of factors, including, among others, the timing of exchanges by or purchases from SFS Corp., the price of our Class A common stock at the time of the exchanges or purchases, the extent to which such exchanges are taxable, the amount and timing of the taxable income we generate in the future and the tax rate then applicable, and the portion of our payments under the tax receivable agreement constituting imputed interest.

27

Table of Contents

Future payments under the tax receivable agreement could be substantial. The payments under the tax receivable agreement are not conditioned upon SFS Corp.'s continued ownership of us.

We are not required to make a payment of the 85% applicable tax savings to SFS Corp. unless and until at least one of the payment conditions has been satisfied (the "Payment Conditions"). One condition is a requirement that we have received a tax opinion that provides that the applicable assets of Holdings LLC giving rise to the payment are "more likely than not" amortizable (the "Indemnifiable Condition"). If we determine that none of the Payment Conditions have been satisfied with respect to all or a portion of such applicable tax savings, we will pay such applicable tax savings (or portion thereof) at the time we reasonably determine a Payment Condition has been satisfied.

If we make a payment and the applicable tax savings are subsequently disallowed, we may deposit future payments due under the tax receivable agreement in an escrow account up to an amount necessary to cover 85% of the estimated additional taxes due by us as a result of the disallowance until such time as there has been a conclusive determination as to the validity of the disallowance. Upon a conclusive determination of the validity of the disallowance, we may recover from the escrow account any excess payments paid to SFS Corp. (or its transferees or assignees), and to the extent the amounts in the escrow account are insufficient, we may net any additional excess payments paid to SFS Corp. (or its transferees or assignees) against future payments that would otherwise be made under the tax receivable agreement. In addition, if we make a payment pursuant to the satisfaction of the Indemnifiable Condition and the applicable tax savings are subsequently disallowed, SFS Corp. will be required to indemnify us for 85% of the taxes and any additional losses attributable to the disallowance. At our election, SFS Corp. may satisfy all or a portion of this indemnity by transferring Holdings LLC Common Units held by it. There is no guarantee that SFS Corp. will hold Holdings LLC Common Units with a value sufficient to satisfy this indemnity or that the escrow account will hold sufficient funds to cover the cost of any disallowed tax savings. We could make payments to SFS Corp. under the tax receivable agreement that are greater than our actual cash tax savings and may not be able to recoup those payments, which could negatively impact our liquidity.

In addition, the tax receivable agreement will provide that in the case of a change in control of UWMC or a material breach of our obligations under the tax receivable agreement, we will be required to make a payment to SFS Corp. in an amount equal to the present value of future payments (calculated using a discount rate equal to the lesser of 6.50% or LIBOR plus 100 basis points, which may differ from our, or a potential acquirer's, then-current cost of capital) under the tax receivable agreement, which payment would be based on certain assumptions, including those relating to our future taxable income. For additional discussion of LIBOR, see "—Risks Related to our Financing—We are exposed to risk relating to the transition from LIBOR and the volatility of LIBOR or any replacement reference rate, which can result in higher than market interest rates and may have a detrimental effect on our business." In these situations, our obligations under the tax receivable agreement could have a substantial negative impact on our, or a potential acquirer's, liquidity and could have the effect of delaying, deferring, modifying or preventing certain mergers, asset sales, other forms of business combinations or other changes of control. These provisions of the tax receivable agreement may result in situations where SFS Corp. has interests that differ from or are in addition to those of our other stockholders. In addition, we could be required to make payments under the tax receivable agreement that are substantial, significantly in advance of any potential actual realization of such further tax benefits, and in excess of our, or a potential acquirer's, actual cash savings in income tax.

Decisions we make in the course of running our business, such as with respect to mergers, asset sales, other forms of business combinations or other changes in control, may influence the timing and amount of payments made under the tax receivable agreement. For example, the earlier disposition of assets following an exchange or purchase of Holdings LLC Common Units (along with the stapled shares of Class D common stock or Class C common stock) may accelerate payments under the tax receivable agreement and increase the present value of such payments, and the disposition of assets before such an exchange or purchase may increase the tax liability of SFS Corp. (or its direct or indirect owners) without giving rise to any rights to receive payments under the tax receivable agreement. Such effects may result in differences or conflicts of interest between the interests of SFS Corp. and the interests of other stockholders.

Finally, because we are a holding company with no operations of our own, our ability to make payments under the tax receivable agreement is dependent on the ability of our subsidiaries to make distributions to us. Our debt agreements restrict the ability of our subsidiaries to make distributions to us, which could affect our ability to make payments under the tax receivable agreement. To the extent that we are unable to make payments under the tax receivable agreement as a result of restrictions in our debt agreements, such payments will be deferred and will accrue interest until paid, which could negatively impact our results of operations and could also affect our liquidity in periods in which such payments are made.

**Risks Related to our Financing**

Table of Contents

*We rely on our warehouse facilities, structured as repurchase agreements, to finance our loan originations. These instruments are short-term and subject us to various risks different from other types of credit facilities.*

We fund a vast majority of the mortgage loans we originate through borrowings under our short-term warehouse facilities and funds generated by our operations. Our ability to fund our loan originations may be impacted by our ability to secure further such borrowings on acceptable terms. Our warehouse facilities typically renew annually, although as of December 31, 2022, three of our facilities ($4.0 billion in available credit) had a two year renewal term. However, as of December 31, 2022, all but $401.0 million of our warehouse facilities were uncommitted and can be terminated by the applicable lender at any time. Our warehouse facilities are generally structured in the form of repurchase agreements. We currently leverage and, to the extent available, intend to continue to leverage the mortgage loans we originate with borrowings under these repurchase agreements. When we enter into repurchase agreements, we sell mortgage loans to other lenders, which are the repurchase agreement counterparties, and receive cash from these lenders. These lenders are obligated to resell the same assets back to us at the end of the term of the transaction, which typically ranges from 30 to 90 days, but which may have terms of up to 364 days or longer. These repurchase agreements subject us to various risks:

- The warehouse facilities subject us to counterparty risk. The amount of cash that we receive from a lender when we initially sell the mortgage loans to that lender is less than the fair value of those loans (this difference is referred to as the "haircut"). If the lender defaults on its obligation to resell the loans back to us, we could incur a loss on the transaction equal to the amount of the haircut (assuming that there was no change in the fair value of the loans, which the lenders are generally permitted to revalue to reflect current market conditions).

- We incur losses on a repurchase transaction if the value of the underlying loans has declined as of the end of the transaction term (including as a result of a lender counterparty revaluing the loans), as we would have to repurchase the loans for their initial value but would receive loans worth less than that amount if the loans have not been effectively hedged.

- If we default on one of our obligations under a repurchase transaction, the lender will be able to terminate the transaction and cease entering into any other repurchase transactions with us. Our repurchase agreements also typically contain cross default provisions, so that if a default occurs under any one agreement, the lenders under our other agreements could also declare a default. If a default occurs under any of our repurchase agreements and the lenders terminate one or more of our repurchase agreements, we may need to enter into replacement agreements with different lenders.

- If the market value of the loans pledged or sold by us under a repurchase agreement borrowing to a counterparty lender declines, the lender may initiate a margin call and require us to either post additional collateral to cover such decrease or repay a portion of the outstanding borrowing. We may not have the funds available to do so, and we may be required to liquidate assets at a disadvantageous time to avoid a default, which could cause us to incur further losses and limit our ability to leverage our assets. If we are unable to satisfy a margin call, our counterparty may accelerate repayment of our indebtedness, increase interest rates, liquidate the collateral (which may result in significant losses to it) or terminate our ability to borrow. Such a situation would likely result in a rapid deterioration of our financial condition and possibly necessitate a filing for bankruptcy protection. A rapidly rising interest rate environment may increase the likelihood of additional margin calls that could adversely impact our liquidity.

Our warehouse lenders also may revise their eligibility requirements for the types of assets they are willing to finance or the terms of such financings, based on, among other factors, the regulatory environment and their management of perceived risk, particularly with respect to assignee liability. Moreover, the amount of financing we receive under our warehouse facilities will be directly related to the lenders' valuation of our assets that cover the outstanding borrowings.

Our use of this short-term financing exposes us to the risk that our lenders may respond to market conditions by making it more difficult for us to renew or replace on a continuous basis our maturing short-term warehouse facility borrowings. If we are not able to renew our then existing warehouse facilities or arrange for new financing on terms acceptable to us, or if we default on our covenants or are otherwise unable to access funds under this type of financing, we may have to curtail our loan origination activities and/or dispose of assets.

*We depend on our ability to sell loans in the secondary market to a limited number of investors and to the GSEs, and to securitize our loans into MBS. If our ability to sell or securitize mortgage loans is impaired, we may not be able to originate mortgage loans, and if the GSEs and Ginnie Mae become less competitive, it could affect our volume and margins.*

Table of Contents

Substantially all of our loan originations are sold into the secondary market. We securitize loans into MBS through Fannie Mae, Freddie Mac and Ginnie Mae. Loans originated outside of the guidelines of Fannie Mae, Freddie Mac, and the FHA, USDA, or VA (for loans securitized with Ginnie Mae), such as jumbo loans are sold individually or in bulk to private investors, through mortgage conduits and through our own private label securitizations into MBS. GSE-eligible products are also sold through private label securitization transactions, in certain situations, such as when the GSE's limit the volume of certain products they will purchase.

The gain recognized from producing and subsequent sales in the secondary market represents a significant portion of our revenues and net earnings. A decrease in the prices paid to us upon sale of our loans could be detrimental to our business, as we are dependent on the cash generated from such sales to fund our future loan closings and repay borrowings under our warehouse facilities. If it is not possible or economical for us to complete the sale or securitization of certain of our mortgage loans, we may lack liquidity to continue to fund such loans and our revenues and margins on new loan originations could be materially and negatively impacted.

The severity of the impact would be most significant to the extent we were unable to sell conforming home loans to the GSEs or securitize such loans pursuant to the GSEs and government agency-sponsored programs. We also derive other material financial benefits from these relationships, including the assumption of credit risk on securitized loans in exchange for our payment of guarantee fees and the ability to avoid certain loan inventory finance costs through streamlined loan funding and sale procedures, which benefits we would lose if we were unable to complete the sale or securitization of our loans.

We sell those loans that we originate that are non-GSE products, such as jumbo mortgage loans, or for which the GSEs may have imposed limitations, directly to either private investors or into the market through private label securitizations. These non-GSE sales typically take longer to execute which can increase the amount of time that a mortgage loan is on our books, which exposes us to additional market risk and increased liquidity requirements. Furthermore, the availability and pricing of these alternative distribution markets can fluctuate materially and external macroeconomic factors could result in reduced demand or pricing for our non-GSE products. For example, in March 2020 at the beginning of the COVID-19 pandemic many private and non-GSE investors significantly reduced their demand, as a result we had certain non-GSE products in our portfolio longer than anticipated and were unable to continue to originate jumbo loans due to liquidity constraints. If such a market shift were to occur again, we may need to change our business model to accommodate such shifts and our origination volume, margins and liquidity would likely be adversely affected.

***The value of our MSRs can fluctuate significantly and these changes in value, or inaccuracies in the estimates of their value, could adversely affect our financial condition.***

The value of our MSRs is based on the cash flows projected to result from the right to service of the related mortgage loans and continually fluctuates due to a number of factors. The primary factor driving the value of MSRs is interest rates, which impact the likelihood of loan prepayments through refinancing. In periods of rising interest rates, the fair value of the MSRs generally increases as prepayment expectations decrease, consequently extending the average estimated life of the MSRs resulting in expected increases in cash flows. In a declining interest rate environment, the fair value of MSRs generally decreases as prepayment expectations increase consequently truncating the average estimated life of the MSRs resulting in expected decreases in cash flows. Other market conditions also affect the number of loans that are refinanced and thus no longer result in cash flows, and the number of loans that become delinquent.

***A substantial portion of our assets are measured at fair value, and if our estimates with respect to the determination of the fair value of those assets prove to be incorrect, we may be required to write down the value of such assets, which could adversely affect our earnings, financial condition and liquidity.***

We measure the fair value of our mortgage loans, derivatives and MSRs on a recurring basis. Fair value determinations require many assumptions, especially to the extent there are not active markets for identical assets. For example, we generally estimate the fair value of loans based on quoted market prices for securities backed by similar types of loans. If quoted market prices are not available, fair value is estimated based on other relevant factors, including dealer price quotations and prices available for similar instruments, to approximate the amounts that would be received from a third party. In addition, the fair value of interest rate lock commitments, or IRLCs, are measured based upon the difference between the current fair value of similar loans (as determined generally for mortgages at fair value) and the price at which we have committed to originate the loans, subject to the pull-through factor. Further, MSRs do not trade in an active market with readily observable prices and, therefore, their fair value is determined using a valuation model that calculates the present value of estimated net future cash flows, using estimates of prepayment speeds, discount rate, cost to service, float earnings, contractual servicing fee income and ancillary income, and late fees. If our estimates of fair value prove to be incorrect, we may be required to write down the value of such assets, which could adversely affect our financial condition and results of operations.

30

Table of Contents

***Our outstanding Warrants are accounted for as liabilities and the changes in value of our outstanding Warrants could have an adverse effect on our financial results and thus may have an adverse effect on the market price of our securities.***

As described in this Annual Report, we account for our outstanding Warrants as liabilities at fair value on the balance sheet. The Warrants are subject to remeasurement at each balance sheet date and any change in fair value is recognized as a component of earnings in each period for which our earnings are reported. We will continue to adjust the liability for changes in fair value until the earlier of exercise or expiration of the Warrants. The volatility introduced by changes in fair value on earnings may have an adverse effect on our quarterly and annual financial results.

***Our hedging strategies may not be successful in mitigating our risks associated with changes in interest rates.***

Our profitability is directly affected by changes in interest rates. The market value of closed mortgage loans and interest rate locks generally change along with interest rates. The value of such assets moves opposite of interest rate changes. For example, as interest rates rise, the value of existing mortgage assets falls.

We employ various economic hedging strategies to mitigate the interest rate and the anticipated loan financing probability or "pull-through risk" inherent in such mortgage assets. Our use of these hedge instruments may expose us to counterparty risk as they are not traded on regulated exchanges or guaranteed by an exchange or our clearinghouse and, consequently, there may not be the same level of protections with respect to margin requirements and positions and other requirements designed to protect both us and our counterparties. Furthermore, the enforceability of agreements underlying hedging transactions may depend on compliance with applicable statutory, commodity and other regulatory requirements and, depending on the domicile of the counterparty, applicable international requirements. Consequently, if a counterparty fails to perform under a derivative agreement we could incur a significant loss.

Our hedge instruments are accounted for as free-standing derivatives and are included on our consolidated balance sheet at fair value. Our operating results could be negatively affected because the losses on the hedge instruments we enter into may not be offset by a change in the fair value of the related asset or liability.

Our hedging strategies also require us to provide cash margin to our hedging counterparties from time to time. The Financial Industry Regulatory Authority (FINRA) requires us to provide daily cash margin to (or receive daily cash margin from, depending on the daily value of related instrument) our hedging counterparties from time to time. The collection of daily margins between us and our hedging counterparties could, under certain market conditions, adversely affect our short-term liquidity and cash-on-hand. Additionally, our hedge instruments may expose us to counterparty risk—the possibility that a loss may occur from the failure of another party to perform in accordance with the terms of the contract, which loss exceeds the value of existing collateral, if any.

Our hedging activities in the future may include entering into interest rate swaps, caps and floors, options to purchase these items, purchasing or selling U.S. Treasury securities, and/or other tools and strategies. These hedging decisions will be determined in light of the facts and circumstances existing at the time and may differ from our current hedging strategy. These hedging strategies may be less effective than our current hedging strategies in mitigating the risks described above, which could be detrimental to our business and financial condition.

***Our rights under our repurchase agreements may be subject to the effects of bankruptcy laws in the event of the bankruptcy or insolvency of us or our lenders under the repurchase agreements, which may allow our lenders to repudiate our repurchase agreements.***

In the event of insolvency or bankruptcy, repurchase agreements normally qualify for special treatment under the U.S. bankruptcy code, the effect of which, among other things, would be to allow the lender under the applicable repurchase agreement to avoid the automatic stay provisions of the U.S. bankruptcy code and to foreclose on the collateral agreement without delay. In the event of the insolvency or bankruptcy of a lender during the term of a repurchase agreement, the lender may be permitted, under applicable insolvency laws, to repudiate the contract, and our claim against the lender for damages may be treated simply as an unsecured creditor. In addition, if the lender is a broker or dealer subject to the Securities Investor Protection Act of 1970, or an insured depository institution subject to the Federal Deposit Insurance Act, our ability to exercise our rights to recover our securities under a repurchase agreement or to be compensated for any damages resulting from the lender's insolvency may be further limited by those statutes. These claims would be subject to significant delay and, if and when received, may be substantially less than the damages we actually incur.

31

Table of Contents

***Our financing arrangements contain, and the government agencies impose, certain financial and restrictive covenants that limit our ability to operate our business and a default under such agreements or requirements could have a material adverse effect on our business, liquidity, financial condition, cash flows and results of operations.***

Our warehouse facilities contain, and our other current or future debt agreements may contain, covenants imposing operating and financial restrictions on our business, including requirements to maintain a certain minimum tangible net worth, minimum liquidity, maximum total debt or liabilities to net worth ratio, profitability requirements, litigation judgment thresholds, and other customary debt covenants. We are also subject to minimum financial eligibility requirements established by the FHA, VA, GSEs and Ginnie Mae, including net worth, capital ratio and/or liquidity criteria in order to set a minimum level of capital needed to adequately absorb potential losses and a minimum amount of liquidity needed to service such agency mortgage loans and MBS and cover the associated financial obligations and risks, and these minimum requirements will be increased in 2023 and 2024 upon the effectiveness of new rules adopted by the GSEs and Ginnie Mae. In addition, the indentures governing our 2025 Senior Notes, 2029 Senior Notes, and 2027 Senior Notes contain covenants imposing operating and financial restrictions on our business. As a result, we may not be able to leverage our assets as fully as we would choose, which could reduce our return on equity, and could significantly impede us from growing our business and place us at a competitive disadvantage in relation to federally chartered banks and certain other financial institutions.

A breach of the covenants under our warehouse facilities, Senior Notes, or other debt agreements can result in an event of default under these facilities and as such allow the lenders to pursue certain remedies. In addition, each of these facilities includes cross default or cross acceleration provisions that could result in most, if not all, facilities terminating if an event of default or acceleration of maturity occurs under any facility. To the extent that the minimum financial requirements imposed by the agencies are not met, the agencies may suspend or terminate our agency approvals or agreements, which could cause us to cross default under our warehouse facilities arrangements, could have an adversely effect on our ability to access these markets and could have a material adverse effect on our liquidity and future growth.

In addition, the covenants and restrictions in our warehouse facilities, indentures governing our Senior Notes, and other debt agreements may restrict our ability to, among other things:

- make certain investments;
- declare or pay dividends on capital stock;
- redeem or purchase capital stock and certain debt obligations;
- incur liens;
- enter into transactions with affiliates;
- enter into certain agreements restricting our subsidiaries' ability to pay dividends;
- incur indebtedness; and
- consolidate, merge, make acquisitions and sell assets.

These restrictions may interfere with our ability to obtain financings or to engage in other business activities, which could have a material adverse effect on our business, liquidity, financial condition, cash flows and results of operations. In addition, if we are unable to meet or maintain the necessary covenant requirements or satisfy, or obtain waivers for, the continuing covenants, we may lose the ability to borrow under all of our financing facilities, which could be detrimental to our business.

**Risks Related to our Regulatory Environment**

***We operate in a heavily regulated industry, and our mortgage loan origination and servicing activities expose us to risks of noncompliance with an increasing and inconsistent body of complex laws and regulations at the U.S. federal, state and local levels.***

Due to the heavily regulated nature of the mortgage industry, we and our clients are required to comply with a wide array of U.S. federal, state and local laws, rules and regulations that concern, among other things, the manner in which we conduct our loan origination and servicing businesses and the fees that we may charge, and the collection, use, retention, protection, disclosure, transfer and other processing of personal information by us and our clients. Governmental authorities and various U.S. federal and state agencies have broad oversight and supervisory authority over our business.

Table of Contents

Because we originate mortgage loans and provide servicing activities nationwide, we must be licensed in all relevant jurisdictions that require licensure and comply with each such jurisdiction's respective laws and regulations, as well as with judicial and administrative decisions applicable to us. Such licensing requirements also generally require the submission of information regarding any person who has 10% or more of the combined voting power of our outstanding equity interests. In addition, we and our clients are currently subject to a variety of, and may in the future become subject to additional U.S. federal, state and local laws that are continuously evolving and developing, including, but not limited to, laws on advertising, as well as privacy laws, including the Telephone Consumer Protection Act ("TCPA"), the Gramm-Leach-Bliley Act ("GLBA"), the CAN-SPAM Act, the California Consumer Privacy Act ("CCPA"), the California Privacy Rights Act ("CPRA"), the Virginia Consumer Data Protection Act and the Colorado Privacy Act. We expect more states to enact legislation similar to the CCPA and CPRA, which provide consumers with privacy rights such as the right to request deletion of their data, the right to receive data on record for them and the right to know what categories of data (generally) are maintained about them, and increases the privacy and security obligations of entities handling certain personal information of such consumers. These regulations directly impact our business and require ongoing compliance, monitoring and internal and external audits as they continue to evolve, and may result in ever-increasing public scrutiny and escalating levels of enforcement and sanctions. Subsequent changes to data protection and privacy laws could also impact how we process personal information, and therefore limit the effectiveness of our products or services or our ability to operate or expand our business, including limiting strategic partnerships that may involve the sharing of personal information. Additionally, the interpretation of such data protection and privacy laws is rapidly evolving, making implementation and enforcement, and thus compliance requirements, ambiguous, uncertain, and potentially inconsistent. Although we make reasonable efforts to comply with all applicable data protection laws and regulations, our interpretations and such measures may have been or may prove to be insufficient or incorrect.

We and our clients must also comply with a number of federal, state and local consumer financial services, laws and regulations including, among others, the Truth in Lending Act ("TILA"), the Real Estate Settlement Procedures Act ("RESPA"), the Equal Credit Opportunity Act, the Fair Credit Reporting Act, the Fair Housing Act, the TCPA, the GLBA, the Servicemembers Civil Relief Act, the Homeowners Protection Act, the Home Mortgage Disclosure Act, the SAFE Act, the Federal Trade Commission Act, the TRID rules, the Dodd-Frank Act, the Appraisal Independence Rule, the Bank Secrecy Act, U.S. federal and state laws prohibiting unfair, deceptive, or abusive acts or practices, and state foreclosure laws. These laws and regulations apply to loan origination, home appraisal, marketing, use of credit reports, safeguarding of non-public, personally identifiable information about borrowers, foreclosure and claims handling, investment of and interest payments on escrow balances and escrow payment features, and mandate certain disclosures and notices to borrowers. The Appraisal Independence Rule requires that there be a separation of duties to ensure no conflicts of interest. In 2021, we launched a new program, UWM Appraisal Direct, in which we directly engage appraisers rather than utilizing an appraisal management company. While we believe that this new program meets all of the regulatory and legal requirements, there is a risk that a regulatory agency could decide that our program does not meet all of the regulatory and legal requirements or that the new process could expose us to additional liability.

In particular, various federal, state and local laws have been enacted that are designed to discourage predatory lending and servicing practices. The Home Ownership and Equity Protection Act of 1994 ("HOEPA") prohibits inclusion of certain provisions in residential loans that have mortgage rates or origination costs in excess of prescribed levels and requires that borrowers be given certain disclosures prior to origination. Some states have enacted, or may enact, similar laws or regulations, which in some cases impose restrictions and requirements greater than those in HOEPA. In addition, under the anti-predatory lending laws of some states, the origination of certain residential loans, including loans that are not classified as "high cost" loans under applicable law, must satisfy a net tangible benefits test with respect to the related borrower. This test may be highly subjective and open to interpretation. As a result, a court may determine that a residential loan, for example, does not meet the test even if the related originator reasonably believed that the test was satisfied. Our failure to comply with these laws, or the failure of residential loan originators or servicers to comply with these laws, to the extent any of their residential loans are or become part of our mortgage-related assets, could subject us, as an originator or a servicer, as applicable, or, in the case of acquired loans, as an assignee or purchaser, to monetary penalties and could result in the borrowers rescinding the affected loans. Lawsuits have been brought in various states making claims against originators, servicers, assignees and purchasers of high cost loans for violations of state law. Named defendants in these cases have included numerous participants within the secondary mortgage market. If our loans are found to have been originated in violation of predatory or abusive lending laws, we could be subject to lawsuits or governmental actions, or could be fined or incur losses.

Both the scope of the laws, rules and regulations and the intensity of the regulatory oversight to which our business is subject continue to increase over time. Regulatory enforcement and fines have also increased across the financial services sector. We expect that our business and that of our clients will remain subject to extensive regulation and supervision. These regulatory changes could result in an increase in our regulatory compliance burden and associated costs and place restrictions on our origination and servicing operations. Our failure to comply with applicable U.S. federal, state and local consumer protection and data privacy laws could lead to:

33

Table of Contents

- loss of our licenses and approvals to engage in our servicing and lending businesses;
- damage to our reputation in the industry;
- governmental investigations and enforcement actions;
- administrative fines and penalties and litigation;
- civil and criminal liability, including class action lawsuits;
- increased costs of doing business;
- diminished ability to sell loans that we originate or purchase, requirements to sell such loans at a discount compared to other loans or repurchase or address indemnification claims from purchasers of such loans, including the GSEs;
- reduced payments by borrowers;
- modification of the original terms of mortgage loans;
- permanent forgiveness of debt;
- delays in the foreclosure process;
- increased servicing advances;
- inability to raise capital; and
- inability to execute on our business strategy, including our growth plans.

As these U.S. federal, state and local laws evolve, it may be more difficult for us to identify these developments comprehensively, to interpret changes accurately and to train our team members effectively with respect to these laws and regulations. These difficulties potentially increase our exposure to the risks of noncompliance with these laws and regulations, which could be detrimental to our business. In addition, our failure to comply with these laws, regulations and rules may result in reduced payments by borrowers, modification of the original terms of loans, permanent forgiveness of debt, delays in the foreclosure process, increased servicing advances, litigation, enforcement actions, and repurchase and indemnification obligations. A failure to adequately supervise our clients, service providers and vendors, including outside foreclosure counsel, may also have these negative results.

The laws and regulations applicable to us are subject to administrative or judicial interpretation, but some of these laws and regulations have been enacted only recently and may not yet have been interpreted or may be interpreted infrequently. Ambiguities in applicable laws and regulations may leave uncertainty with respect to permitted or restricted conduct and may make compliance with laws, and risk assessment decisions with respect to compliance with laws difficult and uncertain. In addition, ambiguities make it difficult, in certain circumstances, to determine if, and how, compliance violations may be cured. The adoption by industry participants of different interpretations of these statutes and regulations has added uncertainty and complexity to compliance. If we are deemed to have violated applicable statutes or regulations, it could result in regulatory investigations, state or federal governmental actions or private civil claims, including class actions, being brought against us. Such litigation would cause us to incur costs, fines and legal expenses in connection with these matters, regardless of any eventual ruling in our favor, and could also harm the reputation of our brand, any of which could have a material adverse effect on our business, financial condition or results of operations.

To resolve issues raised in examinations or other governmental actions, we may be required to take various corrective actions, including changing certain business practices, making refunds or taking other actions that could be financially or competitively detrimental to us. We expect to continue to incur costs to comply with governmental regulations. In addition, certain legislative actions and judicial decisions can give rise to the initiation of lawsuits against us for activities we conducted in the past. Furthermore, provisions in our mortgage loan documentation, including but not limited to the mortgage and promissory notes we use in loan originations, could be construed as unenforceable by a court. We have been, and expect to continue to be, subject to regulatory enforcement actions and private causes of action from time to time with respect to our compliance with applicable laws and regulations.

The recent influx of new laws, regulations, and other directives adopted in response to the recent COVID-19 pandemic exemplifies the ever-changing and increasingly complex regulatory landscape we operate in. While some regulatory reactions to COVID-19 relaxed certain compliance obligations, the forbearance requirements imposed on mortgages servicers in the recently passed CARES Act added new regulatory responsibilities. The GSEs and the FHFA, Ginnie Mae, the U.S. Department

Table of Contents

of Housing and Urban Development ("HUD"), various investors and others have also issued guidance relating to COVID-19. Future regulatory scrutiny and enforcement resulting from COVID-19 is unknown.

Although we have compliance management systems and procedures to comply with these legal and regulatory requirements, we cannot assure you that more restrictive laws and regulations will not be adopted in the future, or that governmental bodies or courts will not interpret existing laws or regulations in a more restrictive manner, which could render our current business practices non-compliant or which could make compliance more difficult or expensive. Any of these, or other, changes in laws or regulations could have a detrimental effect on our business.

***The CFPB continues to be active in its monitoring of the loan origination and servicing sectors, and its recently issued rules and heightened examination and enforcement scrutiny increase our regulatory compliance burden and associated costs.***

We are subject to the regulatory, supervisory and enforcement authority of the CFPB, which has oversight of federal and state non-depository lending and servicing institutions, including residential mortgage originators and loan servicers. With the change in Presidential Administrations and, in turn, CFPB leadership, the CFPB is heightening its examination and enforcement scrutiny of the consumer finance, including mortgage, industry. The CFPB has rulemaking authority with respect to most of the federal consumer protection laws applicable to mortgage lenders and servicers, including TILA and RESPA and the FDCPA. The CFPB has issued a number of regulations under the Dodd-Frank Act relating to loan origination and servicing activities, including ability-to-repay, "Qualified Mortgage" standards and other origination standards and practices as well as guidance addressing relationships with brokers, communication with borrowers, secondary market transactions, servicing requirements that address, among other things, periodic billing statements, certain notices and acknowledgments, prompt crediting of borrowers' accounts for payments received, additional notice, review and timing requirements with respect to delinquent borrowers, loss mitigation, prompt investigation of complaints by borrowers, and lender-placed insurance notices. These regulations and guidance may adversely impact our ability or the cost to develop new products which respond to market conditions, subject us to additional requirements under the ECOA, for example with respect to valuations, including appraisals and automated valuation models, may subject us to additional rules and potential liability arising from our role as an originator, lender or loan servicer and potentially increase our lender liability, vendor management risk or other risks.

For example, the CFPB has iteratively adopted rules over the course of several years regarding mortgage servicing practices that has required us to make modifications and enhancements to our mortgage servicing processes and systems. In 2021, the CFPB issued a final rule amending RESPA Regulation X to provide additional protections relating to loss mitigation and foreclosures to mortgage borrowers impacted by the COVID-19 pandemic as well as a supervisory bulletin 2021-02 warning that companies "unable to adequately manage loss mitigation can expect the Bureau to take enforcement or supervisory action to address violations under Regulation X, CFPA, or other authorities." The intersection of the CFPB's mortgage servicing rules and COVID-19 continues to evolve and poses new challenges to the servicing industry.

Beyond these mortgage-specific initiatives, the CFPB is generally increasing its scrutiny of fee-based business models and so-called "junk fees," fair lending and servicing, and potential misuse of consumer data – all of which could subject players in the mortgage industry to additional rules or supervisory or enforcement scrutiny.

Pursuant to its supervisory authority, the CFPB has conducted routine examinations of our business and will conduct future examinations. The CFPB's examinations have increased, and will likely continue to increase, our administrative and compliance costs. They could also greatly influence the availability and cost of residential mortgage credit and increase servicing costs and risks. These increased costs of compliance, the effect of CFPB rules on the lending and loan servicing industries, and any failure in our ability, or our clients' ability, to comply with new rules could be detrimental to our business. The CFPB also issued guidelines on sending examiners to banks and other institutions that service and/or originate mortgages to assess whether consumers' interests are protected. The CFPB has conducted routine examinations of our business and will conduct future examinations.

The CFPB has broad enforcement powers, and continues to use them aggressively to police mortgage lenders and servicers as well as other players in the mortgage ecosystem. Our failure to comply with the federal consumer protection laws, rules and regulations to which we are subject, whether actual or alleged, could expose us to investigations, enforcement actions or potential litigation liabilities.

In addition, the occurrence of one or more of the foregoing events or a determination by any court or regulatory agency that our policies and procedures do not comply with applicable law could impact our business operations. For example, if the violation is related to our servicing operations it could lead to a transfer of our servicing responsibilities, increased delinquencies on mortgage loans we service or any combination of these events. Such a determination could also require us to

Table of Contents

modify our servicing standards. The expense of complying with new or modified servicing standards may be substantial. Any such changes or revisions may have a material impact on our servicing operations, which could be detrimental to our business.

***We are required to hold various agency approvals in order to conduct our business and there is no assurance that we will be able to obtain or maintain those agency approvals or that changes in agency guidelines will not materially and adversely affect our business, financial condition, liquidity and results of operations.***

We are required to hold certain agency approvals in order to sell mortgage loans to GSEs and service such mortgage loans on their behalf. Our failure to satisfy the various requirements necessary to obtain and maintain such agency approvals over time would restrict our direct business activities and could materially and adversely impact our business, financial condition, liquidity and results of operations.

We are also required to follow specific guidelines that impact the way that we originate and service such agency loans. A significant change in these guidelines that has the effect of decreasing the fees we charge or requiring us to expend additional resources in providing mortgage services could decrease our revenues or increase our costs, which would also adversely affect our business, financial condition, liquidity and results of operations.

In addition, the FHFA has directed the GSEs to align their guidelines for servicing delinquent mortgages and assess compensatory penalties against servicers in connection with the failure to meet specified timelines relating to delinquent loans and foreclosure proceedings, and other breaches of servicing obligations. Our failure to operate efficiently and effectively within the prevailing regulatory framework and in accordance with the applicable origination and servicing guidelines and/or the loss of our seller/servicer license approval or approved issuer status with the agencies could result in our failure to benefit from available monetary incentives and/or expose us to monetary penalties and curtailments, all of which could materially and adversely affect our business, financial condition, liquidity and results of operations.

***The executive, legislative and regulatory reaction to COVID-19, including the passage of the CARES Act, poses evolving compliance obligations on our business, and we may experience unfavorable changes in or failure to comply with existing or future regulations and laws adopted in response to COVID-19.***

Due to the unprecedented pause of major sectors of the U.S. economy from COVID-19, numerous states and the federal government adopted measures requiring mortgage servicers to work with consumers negatively impacted by COVID-19. The CARES Act imposes several new compliance obligations on our mortgage servicing activities, including, but not limited to mandatory forbearance offerings, altered credit reporting obligations, and moratoriums on foreclosure actions and late fee assessments. Many states have taken similar measures to provide mortgage payment and other relief to consumers, which create additional complexity around our mortgage servicing compliance activities.

With the urgency to help consumers, the expedient passage of the CARES Act increases the likelihood of unintended consequences from the legislation. For example, certain provisions of the CARES Act are subject to interpretation given the existing ambiguities in the legislation, which creates class action and other litigation risk.

Although much of the executive, legislative and regulatory actions stemming from COVID-19 are servicing-centric, regulators are adjusting compliance obligations impacting our mortgage origination activities. Many states have adopted temporary measures allowing for otherwise prohibited remote mortgage loan origination activities. While these temporary measures allow us to continue to do business remotely, they impose notice, procedural, and other compliance obligations on our origination activity. As jurisdictions begin to roll back COVID-19 related measures, inconsistencies in the modification of regulations could also impose notice, procedural, and other compliance obligations on our origination activity.

Federal, state, and local executive, legislative and regulatory responses to COVID-19 are still evolving, not consistent in scope or application, and subject to change without advance notice. Such efforts may impose additional compliance obligations, which may negatively impact our mortgage origination and servicing business. Any additional legal or regulatory responses to COVID-19 may unfavorably restrict our business, our established business practices, and otherwise raise our compliance costs.

***The state regulatory agencies, GSEs and others continue to be active in their supervision of the loan origination and servicing sectors and the results of these examinations may be detrimental to our business.***

State attorneys general, state licensing regulators, and state and local consumer financial protection offices have authority to examine us and/or investigate consumer complaints and to commence investigations and other formal and informal proceedings regarding our operations and activities. In addition, the GSEs and the FHFA, Ginnie Mae, the FTC, HUD, various

36

Table of Contents

investors, non-agency securitization trustees and others subject us to periodic reviews and audits. A determination of our failure to comply with applicable law could lead to enforcement action, administrative fines and penalties, or other administrative action.

***If we do not obtain and maintain the appropriate state licenses, we will not be allowed to originate or service loans in some states, which would adversely affect our operations.***

Our operations are subject to regulation, supervision and licensing under various federal, state and local statutes, ordinances and regulations. In most states in which we operate, a regulatory agency regulates and enforces laws relating to mortgage lenders and mortgage loan servicing companies such as us. In most states, we are subject to periodic examination by state regulatory authorities. Some states in which we operate require special licensing or provide extensive regulation of our business.

As part of licensing requirements, we are typically required to designate individual licensees of record. We cannot ensure that we are, and will always remain, in full compliance with all state licensing laws and regulations, and we may be subject to fines or penalties, including license revocation, for any non-compliance. If we lose a license or are otherwise found to be in violation of a law or regulation, our business operations in that state may be suspended until we obtain the license or otherwise remedy the compliance issue.

We may not be able to maintain all requisite licenses and permits, and the failure to satisfy those and other regulatory requirements could restrict our ability to originate, purchase, sell or service loans. In addition, our failure to satisfy any such requirements relating to servicing of loans could result in a default under our servicing agreements and have a material adverse effect on our operations. Those states that currently do not provide extensive regulation of our business may later choose to do so, and if such states so act, we may not be able to obtain or maintain all requisite licenses and permits. The failure to satisfy those and other regulatory requirements could limit our ability to originate, purchase, sell or service loans in a certain state, or could result in a default under our financing and servicing agreements and have a material adverse effect on our operations. Furthermore, the adoption of additional, or the revision of existing, rules and regulations could have a detrimental effect on our business.

***If new laws and regulations lengthen foreclosure times or introduce new regulatory requirements regarding foreclosure procedures, our operating costs could increase and we could be subject to regulatory action.***

When a mortgage loan we service is in foreclosure, we are generally required to continue to advance delinquent principal and interest to the securitization trust and to make advances for delinquent taxes and insurance and foreclosure costs and the upkeep of vacant property in foreclosure to the extent that we determine that such amounts are recoverable. These servicing advances are generally recovered when the delinquency is resolved. Regulatory actions that lengthen the foreclosure process will increase the amount of servicing advances that we are required to make, lengthen the time it takes for us to be reimbursed for such advances and increase the costs incurred during the foreclosure process.

The CARES Act paused all foreclosures from March 18, 2020 until May 17, 2020. Many state governors issued orders, directives, guidance or recommendations halting foreclosure activity including evictions. As noted above, in 2021, the CFPB finalized amendments to RESPA, Regulation X and issued guidance focused on supporting the housing market's smooth and orderly transition to post-pandemic operation and implementing a bar on certain new foreclosure filings until December 31, 2021. These regulatory actions and similar responses to the COVID-19 pandemic that may be passed in the future could increase our operating costs and negatively impact our liquidity, as they may extend the period for which we are required to make advances for delinquent principal and interest, taxes and insurance, and could delay our ability to seek reimbursement from the investor to recoup some or all of the advances.

Increased regulatory scrutiny and new laws and procedures could cause us to adopt additional compliance measures and incur additional compliance costs in connection with our foreclosure processes. We may incur legal and other costs responding to regulatory inquiries or any allegation that we improperly foreclosed on a borrower. We could also suffer reputational damage and could be fined or otherwise penalized if we are found to have breached regulatory requirements.

***Our servicing policies and procedures are subject to examination by our regulators, and the results of these examinations may be detrimental to our business.***

As a loan servicer, we are examined for compliance with U.S. federal, state and local laws, rules and guidelines by numerous regulatory agencies. It is possible that any of these regulators will inquire about our servicing practices, policies or

37

Table of Contents

procedures and require us to revise them in the future. The occurrence of one or more of the foregoing events or a determination by any court or regulatory agency that our servicing policies and procedures do not comply with applicable law could lead to penalties and fines, changes to our servicing practices and standards, transfer of our servicing responsibilities, increased delinquencies on mortgage loans we service or any combination of these events.

***Regulatory agencies and consumer advocacy groups are becoming more aggressive in asserting claims that the practices of lenders and loan servicers violate anti-discrimination laws.***

Antidiscrimination statutes, such as the FHA and the ECOA, prohibit creditors from discriminating against loan applicants and borrowers based on certain characteristics, such as race, ethnicity, sex, religion and national origin. States have analogous anti-discrimination laws that extend protections beyond the protected classes under federal law, extending protections, for example, to gender identity. Various federal regulatory agencies and departments, including the DOJ and CFPB, take the position that these laws apply not only to intentional discrimination, but also to neutral practices that have a disparate impact on a group that shares a characteristic that a creditor may not consider in making credit decisions (i.e., creditor or servicing practices that have a disproportionate negative effect on a protected class of individuals).

These regulatory agencies, as well as consumer advocacy groups and plaintiffs' attorneys, are focusing greater attention on "disparate impact" claims. The U.S. Supreme Court has confirmed that the "disparate impact" theory applies to cases brought under the FHA, while emphasizing that a causal relationship must be shown between a specific policy of the defendant and a discriminatory result that is not justified by a legitimate, non-discriminatory business objective of the defendant. Although it is still unclear whether disparate impact theory applies under the ECOA, regulatory agencies and private plaintiffs can be expected to continue to apply it to both the FHA and the ECOA in the context of home loan lending and servicing. Application of disparate impact theory to our activities exposes us to significant administrative burdens and risks potential liability for noncompliance.

Furthermore, many industry observers believe that the "ability to repay" rule issued by the CFPB, will have the unintended consequence of having a disparate impact on protected classes. Specifically, it is possible that lenders that make only qualified mortgages may be exposed to discrimination claims under a disparate impact theory.

Beyond exposure to potential fair lending or servicing claims under disparate impact theory, lenders face increasing regulatory, enforcement and litigation risk under the FHA and ECOA from claims of "redlining" and "reverse redlining." Redlining is the practice of denying a creditworthy applicant a loan for housing in a certain neighborhood even though the applicant may be otherwise qualified. Reverse redlining is targeting an applicant in a certain neighborhood for a higher cost products or services. In late 2021, the DOJ launched a "combating redlining initiative" and partnership with other federal and state agencies, including the CFPB, to police these practices, making clear they are a high priority across the financial services regulatory ecosystem. The Biden Administration, in June 2021, also formed an interagency task force to address concerns around improper bias in home appraisals. The CFPB, HUD and FHFA all have been clear that policing such bias and working to develop new guidance for industry as to how it can reduce human discretion in the home appraisal and valuation process are key agency priorities in 2022. Such efforts could result in a change in our appraisal practices or expose us to liability under the FHA or ECOA.

In addition to reputational harm, violations of the ECOA and the FHA can result in actual damages, punitive damages, injunctive or equitable relief, attorneys' fees and civil money penalties.

***From time to time, we are subject to various legal actions that if decided adversely, could be detrimental to our business.***

From time to time, we are named as a defendant in legal proceedings alleging improper lending, servicing or marketing practices, abusive loan terms and fees, disclosure violations, quiet title actions, improper foreclosure practices, violations of consumer protection, securities or other laws, breach of contract and other related matters. In addition, we have grown our number of team members materially in recent years and have increased our profile in the community and nationally. As a result, the number of lawsuits against us regarding alleged violation of employment laws, including wage and hour, and other employment issues, has and may continue to increase. In recent years there has been an increase in the number of collective and class actions with respect to employment matters against employers generally. Coupled with the expansion of social media platforms and similar devices that allow individuals access to a broad audience, these claims, whether or not they have merit, could result in reputational risk, negative publicity, out-of-pockets costs and distraction to our management team.

Table of Contents

*We are subject to various consumer protection regulatory regimes which expose us to liability directly from consumers.*

We operate in an industry that is highly sensitive to consumer protection, and we and our clients are subject to numerous local, state and federal laws that are continuously changing. Remediation for non-compliance with these laws can be costly and significant fines may be incurred. We are routinely involved in consumer complaints, regulatory actions and legal proceedings in the ordinary course of our business and may become subject to class action suits alleging non-compliance with these laws. If we were to become involved in a lengthy litigation, we could incur substantial costs and our resources and the attention of management could be diverted from our business. We are also routinely involved in state regulatory audits and examinations, and occasionally involved in other governmental proceedings arising in connection with our respective businesses. Negative public opinion can result from our actual or alleged conduct in any number of activities. Negative public opinion can also result from actions taken by government regulators and community organizations in response to our activities, from consumer complaints, including in the CFPB complaints database, and from media coverage, whether accurate or not. Any of these types of matters could cause us to incur costs, loss of business, fines and legal expenses, regardless of any eventual ruling in our favor, and could also harm the reputation of our brand, any of which could have a material adverse effect on our business, financial condition or results of operations.

## Risks Associated with Our Corporate Structure and Common Stock

*We are controlled by SFS Corp., whose interests may conflict with our interests and the interests of other stockholders.*

SFS Corp. holds all of our issued and outstanding Class D common stock, which has ten votes per share, and controls approximately 79% of the combined voting power of our Common Stock (our Class A common stock, Class B common stock, Class C common stock and Class D common stock collectively, the "Common Stock") (based on the Voting Limitation). Without the Voting Limitation, SFS Corp. would have 99% of the combined voting power of our capital stock. As long as SFS Corp. owns at least 10% of the outstanding Common Stock, SFS Corp. will have the ability to determine all corporate actions requiring stockholder approval, including the election and removal of directors and the size of our Board, any amendment to our certificate of incorporation or bylaws, or the approval of any merger or other significant corporate transaction, including a sale of substantially all of our assets. This could have the effect of delaying or preventing a change in control or otherwise discouraging a potential acquirer from attempting to obtain control of us, which could cause the market price of our Class A common stock to decline or prevent stockholders from realizing a premium over the market price for our Class A common stock. SFS Corp.'s interests may conflict with our interests as a company or the interests of our other stockholders.

*Resales of the outstanding shares of Class A common stock or shares issuable upon Holdings LLC Unit Exchanges, exercise of Warrants or in connection with the Earn-Out could depress the market price of our Class A common stock or result in dilution.*

As of February 24, 2023, there were 93,101,971 shares of our Class A common stock outstanding. In addition, (1) 1,502,069,787 shares of Class A common stock (or approximately 1,592,831,471 shares of Class A common stock if the full amount of the Earn-Out Shares is earned) may be issued to SFS Corp. or its transferees or assignees in connection with future Holdings LLC Unit Exchanges and (2) 15,874,987 shares may be issued upon exercise of our outstanding Warrants with a strike price of $11.50 per share. Currently, all of the shares of Class A common stock outstanding are freely tradable. In addition, we have the obligation to register for resale, at any time, all of the Shares of Class A Common Stock issuable to SFS Corp. upon Holdings LLC Unit Exchanges, of which 500 million shares have been currently registered. Shares of Class A common stock issuable upon the exercise of our Warrants or in connection with the Earn-Out or upon Holdings LLC Unit Exchanges may result in dilution to the then existing holders of our Class A common stock and increase the number of shares eligible for resale in the public market. Such sales of shares of Class A common stock or the perception that such sales may occur could depress the market price of our Class A common stock.

*As a "controlled company" within the meaning of NYSE listing rules, we qualify for exemptions from certain corporate governance requirements. We have the opportunity to elect any of the exemptions afforded a controlled company.*

Because SFS Corp. controls more than a majority of our total voting power, we are a "controlled company" within the meaning of NYSE listing rules. Under NYSE rules, a company of which more than 50% of the voting power is held by another person or group of persons acting together is a "controlled company" and may elect not to comply with the following NYSE rules regarding corporate governance:

- the requirement that a majority of our Board of directors consist of independent directors;

Table of Contents

- the requirement that compensation of our executive officers be determined by a majority of the independent directors of the Board or a compensation committee comprised solely of independent directors with a written charter addressing the committee's purpose and responsibilities; and

- the requirement that director nominees be selected, or recommended for the Board's selection, either by a majority of the independent directors of the Board or a nominating committee comprised solely of independent directors with a written charter addressing the committee's purpose and responsibilities.

Three of our nine directors are independent directors and our Board has an independent audit committee. However, our Board does not have a majority of independent directors, or a compensation committee comprised of solely independent directors or a nominating committee. Rather, actions with respect to executive compensation will be taken by the compensation committee on which Mr. Mat Ishbia sits, and compensation decisions with respect to Mr. Ishbia's compensation will be taken by a special subcommittee, and director nominations will be made by our full Board. Our Board has determined that Kelly Czubak, Isiah Thomas and Robert Verdun are "independent directors," as defined in the NYSE listing rules and applicable SEC rules.

***We may experience volatility in the trading price of our shares due to fluctuations in our quarterly operating results or other factors.***

Significant fluctuations in the price of our securities could contribute to the loss of all or part of your investment. Since the consummation of our Business Combination, trading in the shares of our Class A common stock has been extremely volatile and subject to wide fluctuations in response to various factors, some of which are beyond our control. Accordingly, the valuation ascribed to us and our Class A common may not be indicative of the price of that will prevail in the trading market in the future. Any of the factors in this Annual Report could have a material adverse effect on your investment in our securities and our securities may trade at prices significantly below the price you paid for them. In such circumstances, the trading price of our securities may not recover and may experience a further decline.

In addition, broad market and industry factors may materially harm the market price of our securities irrespective of our operating performance. The stock market in general and NYSE have experienced price and volume fluctuations that have often been unrelated or disproportionate to the operating performance of the particular companies affected. In addition, the trading prices of companies that were formerly special purpose acquisition companies have, and may continue to, experience volatility unrelated to the operating performance of the specific company. The trading prices and valuations of these stocks, and of our securities, may not be predictable. A loss of investor confidence in the market for the stocks of other companies that investors perceive to be similar to our business could depress our stock price regardless of our business, prospects, financial condition or results of operations. A decline in the market price of our securities also could adversely affect our ability to issue additional securities and our ability to obtain additional financing in the future.

In the past, securities class action litigation has often been initiated against companies following periods of volatility in their stock price. This type of litigation could result in substantial costs and divert our management's attention and resources, and could also require us to make substantial payments to satisfy judgments or to settle litigation.

***Anti-takeover provisions contained in our Charter and Amended and Restated Bylaws, as well as provisions of Delaware law, could impair a takeover attempt.***

Our Charter contains provisions that may discourage unsolicited takeover proposals that stockholders may consider to be in their best interests. We are also subject to anti-takeover provisions under Delaware law, which could delay or prevent a change of control. Together, these provisions may make more difficult the removal of management and may discourage transactions that otherwise could involve payment of a premium over prevailing market prices for our securities. These provisions include:

- a capital structure where holders of Class B common stock and holders of Class D common stock each have ten votes per share of Class B common stock and Class D common stock (as compared with holders of Class A common stock and holders of Class C common stock, who each have one vote per share of Class A common stock and Class C common stock, respectively) and consequently have a greater ability to control the outcome of matters requiring stockholder approval, even when the holders of Class B common stock and Class D common stock own significantly less than a majority of the outstanding shares of Common Stock;

- no cumulative voting in the election of directors, which limits the ability of minority stockholders to elect candidates to serve as a director of our Board;

Table of Contents

- a classified Board with three-year staggered terms, which could delay the ability of stockholders to change the membership of a majority of our Board;

- the requirement that, at any time from and after the Voting Rights Threshold Date, directors elected by the stockholders generally entitled to vote may be removed from our Board solely for cause;

- the exclusive right of our Board, from and after the Voting Rights Threshold Date, to fill newly created directorships and vacancies with respect to directors elected by the stockholders generally entitled to vote, which prevents stockholders from being able to fill vacancies on our Board;

- the prohibition on stockholder action by written consent from and after the Voting Rights Threshold Date, which forces stockholder action from and after the Voting Rights Threshold Date to be taken at an annual or special meeting of stockholders;

- the requirement that special meetings of stockholders may only be called by the Chairperson of our Board, our Chief Executive Officer or our Board, which may delay the ability of our stockholders to force consideration of a proposal or to take action, including the removal of directors;

- the requirement that, from and after the Voting Rights Threshold Date, amendments to certain provisions of our Charter and amendments to the Amended and Restated Bylaws must be approved by the affirmative vote of the holders of at least seventy-five percent (75%) in voting power of our then outstanding shares generally entitled to vote;

- our authorized but unissued shares of Common Stock and Preferred Stock, par value $0.0001 per share, are available for future issuances without stockholder approval and could be utilized for a variety of corporate purposes, including future offerings to raise additional capital, acquisitions and employee benefit plans; the existence of authorized but unissued and unreserved shares of Common Stock and Preferred Stock could render more difficult or discourage an attempt to obtain control of us by means of a proxy contest, tender offer, merger or otherwise;

- advance notice procedures set forth in the Amended and Restated Bylaws that stockholders must comply with in order to nominate candidates to our Board or to propose other matters to be acted upon at a meeting of stockholders, which may discourage or deter a potential acquirer from conducting a solicitation of proxies to elect the acquirer's own slate of directors or otherwise attempting to obtain control of us; and

- an exclusive forum provision which provides that, unless we consent in writing to the selection of an alternative forum, (i) any derivative action brought on our behalf, (ii) any action asserting a claim of breach of a fiduciary duty owed by any director, officer, or employee of ours to our business or our stockholders, (iii) any action asserting a claim arising pursuant to any provision of the General Corporation Law of the State of Delaware (the "DGCL"), our Charter or the Amended and Restated Bylaws, or (iv) any action asserting a claim governed by the internal affairs doctrine of the State of Delaware, in each case, will be required to be filed in either (x) the Sixth Judicial Circuit, Oakland County, Michigan (or, if the Sixth Judicial Circuit, Oakland County, Michigan lacks jurisdiction over any such action or proceeding, then another state court of the State of Michigan, or if no state court of the State of Michigan has jurisdiction over any such action or proceeding, then the United States District Court for the Eastern District of Michigan) or (y) the Court of Chancery of the State of Delaware (or, if the Court of Chancery of the State of Delaware lacks jurisdiction over any such action or proceeding, then the Superior Court of the State of Delaware, or, if the Superior Court of the State of Delaware lacks jurisdiction then the U.S. District Court for the District of Delaware).

***Our Charter contains a provision renouncing our interest and expectancy in certain corporate opportunities.***

Our Charter provides that we have no interests or expectancy in, or being offered an opportunity to participate in any corporate opportunity, to the fullest extent permitted by applicable law, with respect to any lines of business or business activity or business venture conducted by any UWM Related Persons as of the date of the filing of our Charter with the Secretary of State of the State of Delaware or received by, presented to or originated by UWM Related Persons after the date of the filing of our Charter with the Secretary of State of the State of Delaware in such UWM Related Person's capacity as a UWM Related Person (and not in his, her or its capacity as a director, officer or employee of ours), in each case, other than any corporate opportunity with respect to residential mortgage lending. These provisions of our Charter create the possibility that a corporate opportunity of ours may be used for the benefit of the UWM Related Persons.

***The provision of our Charter requiring exclusive forum in the state courts in the State of Michigan or the State of Delaware for certain types of lawsuits may have the effect of discouraging lawsuits against our directors and officers.***

41

Table of Contents

Our Charter requires that, unless we consent in writing to the selection of an alternative forum, (i) any derivative action brought on our behalf, (ii) any action asserting a claim of breach of a fiduciary duty owed by any director, officer, or employee of our business to us or our stockholders, (iii) any action asserting a claim arising pursuant to any provision of the DGCL, our Charter or Amended and Restated Bylaws, or (iv) any action asserting a claim governed by the internal affairs doctrine of the State of Delaware, in each case, to be filed in either (x) the Sixth Judicial Circuit, Oakland County, Michigan (or, if the Sixth Judicial Circuit, Oakland County, Michigan lacks jurisdiction over any such action or proceeding, then another state court of the State of Michigan, or if no state court of the State of Michigan has jurisdiction over any such action or proceeding, then the United States District Court for the Eastern District of Michigan) or (y) the Court of Chancery of the State of Delaware (or, if the Court of Chancery of the State of Delaware lacks jurisdiction over any such action or proceeding, then the Superior Court of the State of Delaware, or, if the Superior Court of the State of Delaware lacks jurisdiction then the U.S. District Court for the District of Delaware). The exclusive forum provision described above does not apply to actions arising under the Securities Act or the Exchange Act. Section 27 of the Exchange Act creates exclusive federal jurisdiction over all suits brought to enforce any duty or liability created by the Exchange Act or the rules and regulations thereunder, and Section 22 of the Securities Act creates concurrent jurisdiction for federal and state courts over all suits brought to enforce any duty or liability created by the Securities Act or the rules and regulations thereunder.

Although we believe these exclusive forum provisions benefit us by providing increased consistency in the application of Delaware law, the exclusive forum provisions may limit a stockholder's ability to bring a claim in a judicial forum that it finds favorable for disputes with us or any of our directors, officers or stockholders, which may discourage lawsuits with respect to such claims. Further, in the event a court finds the exclusive forum provision contained in our Charter to be unenforceable or inapplicable in an action, we may incur additional costs associated with resolving such action in other jurisdictions, which could harm our business, operating results and financial condition.

## General Risk Factors

*If we fail to maintain an effective system of internal controls, we may not be able to accurately determine our financial results or prevent fraud. As a result, our stockholders could lose confidence in our financial results, which could harm our business and the market value of our common stock.*

Effective internal controls are necessary for us to provide reliable financial reports and effectively prevent fraud. We may in the future discover areas of our internal controls that need improvement. Section 404 of the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act") requires that we evaluate and report on our internal control over financial reporting. We cannot be certain that we will be successful in maintaining adequate control over our financial reporting and financial processes. Furthermore, as we rapidly grow our businesses, our internal controls will become more complex, and we will require significantly more resources to ensure our internal controls remain effective. Section 404(b) of the Sarbanes-Oxley Act requires our auditors to formally attest to and report on the effectiveness of our internal control over financial reporting.

If we cannot maintain effective internal control over financial reporting, or our independent registered public accounting firm cannot provide an unqualified attestation report on the effectiveness of our internal control over financial reporting, investor confidence and, in turn, the market price of our common stock could decline. Additionally, the existence of any material weakness or significant deficiency could require management to devote significant time and incur significant expense to remediate any such material weakness or significant deficiency, and management may not be able to remediate any such material weakness or significant deficiency in a timely manner, or at all. Accordingly, our failure to maintain effective internal control over financial reporting could result in misstatements of our financial results or restatements of our financial statements or otherwise have a material adverse effect on our business, financial condition, liquidity and results of operations.

*Unanticipated changes in effective tax rates or adverse outcomes resulting from examination of our income or other tax returns could adversely affect our financial condition and results of operations.*

We are subject to income taxes in the U.S. at the federal, state and local levels. Our future effective tax rates could be subject to volatility or adversely affected by a number of factors, including:

- changes in the valuation of our deferred tax assets and liabilities;

- expected timing and amount of the release of any tax valuation allowances;

- tax effects of stock-based compensation;

- changes in tax laws, regulations or interpretations thereof;

- increases in UWMC's ownership of Holdings LLC resulting from Holdings LLC Unit Exchanges; or

Table of Contents

- lower than anticipated future earnings in jurisdictions where we have lower statutory tax rates and higher than anticipated future earnings in jurisdictions where we have higher statutory tax rates.

In addition, we may be subject to audits of our income, sales and other transaction taxes by taxing authorities. Outcomes from these audits could have an adverse effect on our financial condition and results of operations.

## Item 1b. Unresolved Staff Comments

None

## Item 2. Properties

Our corporate headquarters, located in Pontiac, Michigan, is comprised of five separately leased buildings with approximately 1.4 million square feet of occupied space, that house substantially all of our operations. In addition, we have two land leases, one providing parking space for our team members and the other an outdoor food court pavilion. We lease the space from entities controlled by Mat Ishbia, our CEO and Jeff Ishbia, a director and our founder. We believe that our corporate headquarters is suitable and adequate to meet the needs of our business.

## Item 3. Legal Proceedings

We operate in a heavily regulated industry that is highly sensitive to consumer protection, and we are subject to numerous federal, state and local laws. We are routinely involved in consumer complaints, regulatory actions and legal proceedings in the ordinary course of our business. We are also routinely involved in state regulatory audits and examinations, and occasionally involved in other governmental proceedings arising in connection with our respective business. The resolution of these matters, including the matters specifically described below, is not currently expected to have a material adverse effect on our financial position, financial performance or cash flows.

On April 23, 2021, a complaint was filed in the U.S. District Court for the Middle District of Florida against the Company and Mat Ishbia, individually by The Okavage Group, LLC ("Okavage") on behalf of itself and all other mortgage brokers who are, or have been clients of UWM and either Fairway Independent Mortgage or Rocket Pro TPO. After the Company and Mat Ishbia filed a motion to dismiss the complaint, Okavage filed a motion for leave to amend its complaint on August 2, 2021, and on August 3, 2021, the Court granted Okavage's motion and ordered the clerk to file Plaintiff's First Amended Class Action Complaint with its corresponding attachments. In its amended complaint, Okavage dropped the Company as a defendant and added UWM as a defendant. Okavage purports to represent the same set of mortgage brokers as in its original complaint and alleges that UWM's new policy to no longer enter into new transactions with Independent Mortgage Brokers who also sold mortgage loans to these two market participants amounted to anticompetitive conduct under federal and Florida antitrust laws. Okavage seeks class certification, treble damages, attorneys' fees and injunctive relief. We filed a renewed motion to dismiss on September 7, 2021. On July 27, 2022, the magistrate judge assigned to consider our motion to dismiss recommended that the amended complaint be dismissed in its entirety without prejudice. In response, Okavage filed a second amended class action complaint on November 8, 2022. On December 14, 2022, UWM and its CEO filed a motion to dismiss the second amended complaint, and that motion remains pending.

On February 3, 2022, UWM filed a complaint against America's Moneyline, Inc. ("AML"), a former client, in the U.S. District Court for the Eastern District of Michigan, seeking monetary damages and injunctive relief. The complaint alleges that AML breached the parties' wholesale broker agreement by submitting mortgage loans and mortgage loan applications to certain select retail lenders. On February 25, 2022, AML filed its answer to the complaint and included certain counterclaims, including fraud and misrepresentation, against UWM. UWM filed a motion to dismiss AML's counterclaims, and on December 12, 2022, the court granted UWM's motion in large part, dismissing all of AML's counterclaims except for its declaratory judgment claim. The case remains pending.

## Item 4. Mine Safety Disclosures

Not applicable.

43

Table of Contents

**PART I**

**Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities**

**Market Price and Ticker Symbol**

Our Class A common stock and Warrants are currently listed on the NYSE under the symbols "UWMC" and "UWMCWS," respectively. The closing price of the Class A common stock and Warrants as of February 24, 2023 was $4.19 and $0.17, respectively.

**Holders**

As of February 24, 2023, there were 45 holders of record of our Class A common stock and 3 holders of record of our Warrants. Such numbers do not include beneficial owners holding our securities through nominee names. There is no public market for our Class B common stock, Class C common stock, or Class D common stock.

**Dividend Policy**

We initiated a quarterly dividend on shares of our Class A common stock in the first quarter of 2021. The dividend amount is reviewed each quarter and declared by our Board of Directors quarterly based on a number of factors, including, among other things, our earnings, our financial condition, growth outlook, the capital required to support ongoing growth opportunities and compliance with other internal and external requirements. In connection with the declaration of a dividend on our shares of Class A common stock, the Board, in its capacity as the Manager of Holdings LLC (UWMC's consolidated subsidiary and UWM's direct parent), is required pursuant to the terms of the Holdings LLC Second Amended and Restated Operating Agreement, to determine whether to (a) make distributions from Holdings LLC to only UWMC, as the owner of the Class A Units of Holdings LLC with the proportional amount due to SFS Corp. as the owner of the Class B Units of Holdings LLC, being distributed upon the sooner to occur of (i) the Board making a determination to do so or (ii) the date on which Class B Units of Holdings LLC are converted into shares of Class B common stock of UWMC or (b) make proportional and simultaneous distributions from Holdings LLC to both UWMC, as the owner of the Class A Units of Holdings LLC and to SFS Corp. as the owner of the Class B Units of Holdings LLC.

**Share Repurchase Program**

On May 9, 2021, the Company's Board of Directors authorized a share repurchase program of up to $300.0 million in aggregate value of the Company's Class A common stock effective May 11, 2021. The share repurchase program authorizes the Company to repurchase shares of the Company's Class A common stock from time to time, in the open market or through privately negotiated transactions, at management's discretion based on market and business conditions, applicable legal and regulatory requirements as well as other factors. Shares purchased will be retired. The new plan will expire on May 11, 2023 unless otherwise modified or terminated by the Company's Board of Directors at any time in the Company's sole discretion.

There were no repurchases of the Company's shares of its outstanding Class A common stock during the year ended December 31, 2022. As of December 31, 2022, the remaining amount authorized under the share repurchase program was $218.4 million.

Table of Contents

**Performance Graph**

The graph below compares the cumulative total return for our common stock for the period from the closing of the Business Combination transaction on January 21, 2021 through December 31, 2022 with the comparable cumulative returns of two indices: the Russell 2000 Index and the Dow Jones US Mortgage Finance Index, which is an industry index comprised of mortgage financing companies. The graph assumes $100 invested on January 21, 2021 and reflects the cumulative total return on that investment, including the reinvestment of all dividends where applicable, through December 31, 2022.



**Item 6. Reserved**

45

Table of Contents

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations**

*The following management's discussion and analysis of our financial condition and results of operations should be read in conjunction with, and is qualified in its entirety by reference to, our consolidated financial statements and the related notes and other information included elsewhere in this Annual Report on Form 10-K (the "Form 10-K"). This discussion and analysis contains forward-looking statements that involve risks and uncertainties which could cause our actual results to differ materially from those anticipated in these forward-looking statements, including, but not limited to, risks and uncertainties discussed under the heading "Cautionary Note Regarding Forward-Looking Statements," in this report and in Part I. Item 1A. "Risk Factors" and elsewhere in this Form 10-K.*

**Business Overview**

We are the largest overall residential mortgage lender in the U.S., despite originating mortgage loans exclusively through the wholesale channel. With a culture of continuous innovation of technology and enhanced client experience, we lead our market by building upon our proprietary and exclusively licensed technology platforms, superior service and focused partnership with the independent mortgage broker community. We originate primarily conforming and government loans across all 50 states and the District of Columbia. For the last eight years, including the year ended December 31, 2022, we have also been the largest wholesale mortgage lender in the U.S. by closed loan volume, with approximately 38% market share of the wholesale channel for the year ended December 31, 2022 (based on the most recent data released by Inside Mortgage Finance).

Our mortgage origination business derives revenue from originating, processing and underwriting primarily Government-sponsored enterprises ("GSE") conforming mortgage loans, along with FHA, USDA and VA mortgage loans, which are subsequently pooled and sold in the secondary market. During the second quarter of 2021, we began selling pools of originated mortgage loans through private label securitization transactions, although there have been no loan sales through our private label securitization transactions in 2022. The mortgage origination process generally begins with a borrower entering into an IRLC with us that is arranged by an independent mortgage advisor, pursuant to which we have committed to enter into a mortgage at specified interest rates and terms within a specified period of time with a borrower who has applied for a loan and met certain credit and underwriting criteria. As we have committed to providing a mortgage loan at a specific interest rate, we hedge that risk by selling forward-settling mortgage-backed securities and FLSCs in the To Be Announced ("TBA") market. When the mortgage loan is closed, we fund the loan with approximately 2-3%, on average, of our own funds and the remainder with funds drawn under one of our warehouse facilities (except when we opt to "self-warehouse" in which case we use our cash to fund the entire loan). As of December 31, 2022, the self-warehouse amount was $181.3 million, and our daily average self-warehouse balances were $185.1 million and $184.1 million for the years ended December 31, 2022 and 2021, respectively. At that point, the mortgage loan is legally owned by our warehouse facility lender and is subject to our repurchase right (other than when we self-warehouse). When we have identified a pool of mortgage loans to sell to the agencies, non-governmental entities, or through our private label securitization transactions, we repurchase loans not already owned by us from our warehouse lender and sell the pool of mortgage loans into the secondary market, but in most instances retain the mortgage servicing rights, or MSRs, associated with those loans. We retain MSRs for a period of time depending on business and liquidity considerations. When we sell MSRs, we typically sell them in the bulk MSR secondary market.

Our unique model, focusing exclusively on the wholesale channel, results in what we believe to be complete alignment with our clients and superior customer service arising from our investments in people and technology that has driven demand for our services from our clients.

**New Accounting Pronouncements Not Yet Effective**

See *Note 1 — Organization, Basis of Presentation and Summary of Significant Accounting Policies* to the consolidated financial statements for details of recently issued accounting pronouncements and their expected impact on the Company's consolidated financial statements.

**Components of Revenue**

We generate revenue from the following three components of the loan origination business: (i) loan production income, (ii) loan servicing income, and (iii) interest income.

*Loan production income.* Loan production income includes all components related to the origination and sale of mortgage loans, including:

Table of Contents

- primary gain, which represents the premium we may receive in excess of the loan principal amount adjusted for previous fair value adjustments, and certain fees charged by investors upon sale of loans into the secondary market. When the mortgage loan is sold into the secondary market, any difference between the proceeds received and the current fair value of the loan is recognized in current period earnings;

- loan origination fees we charge to originate a loan, which generally represent flat, per-loan fee amounts;

- provision for representation and warranty obligations, which represent the reserves initially established for our estimated liabilities associated with the potential repurchase or indemnity of purchasers of loans previously sold due to representation and warranty claims by investors. Included within these reserves are amounts for estimated liabilities for requirements to repay a portion of any premium received from investors on the sale of certain loans if such loans are repaid in their entirety within a specified time period after the sale of the loans;

- the change in fair value of IRLCs, FLSCs and recorded loans on the balance sheet, due to changes in estimated fair value, driven primarily by interest rates but also influenced by other assumptions; and

- capitalization of MSRs, representing the estimated fair value of newly originated MSRs when loans are sold and the associated servicing rights are retained.

Compensation earned by our clients, Independent Mortgage Brokers, is included in the cost of the loans we originate, and therefore netted within loan production income.

*Loan servicing income.* Loan servicing income consists of the contractual fees earned for servicing the loans and includes ancillary revenue such as late fees and modification incentives. Loan servicing income is recorded upon collection of payments from borrowers.

*Interest income.* Interest income represents interest earned on mortgage loans at fair value.

## Components of Operating Expenses

Our operating expenses include salaries, commissions and benefits, direct loan production costs, marketing, travel and entertainment, depreciation and amortization, servicing costs, general and administrative (including professional services, occupancy and equipment), interest expense, and other expense/(income) (primarily related to the increase or decrease, respectively, in the fair value of the liability for the Public and Private Warrants, the increase or decrease, respectively, in the Tax Receivable Agreement liability, and the decrease or increase, respectively, in the fair value of retained investment securities).

## Years Ended December 31, 2022, 2021 and 2020 Summary

For the year ended December 31, 2022, we originated $127.3 billion in residential mortgage loans, which was a decrease of $99.2 billion, or 44%, from the year ended December 31, 2021. We generated $931.9 million of net income during the year ended December 31, 2022, which was a decrease of $636.5 million, or 40.6%, compared to net income of $1.57 billion for the year ended December 31, 2021. Adjusted EBITDA for the year ended December 31, 2022 was $282.4 million as compared to $1.42 billion for the year ended December 31, 2021. Refer to the "*Non-GAAP Financial Measures*" section below for a detailed discussion of how we define and calculate Adjusted EBITDA.

For the year ended December 31, 2021, we originated $226.5 billion in residential mortgage loans, which was an increase of $44.0 billion, or 24%, from the year ended December 31, 2020. We generated $1.57 billion of net income during the year ended December 31, 2021, which was a decrease of $1.81 billion, or 53.6%, compared to net income of $3.38 billion for the year ended December 31, 2020. Adjusted EBITDA for the year ended December 31, 2021 was $1.42 billion as compared to $3.45 billion for the year ended December 31, 2020. Refer to the "*Non-GAAP Financial Measures*" section below for a detailed discussion of how we define and calculate Adjusted EBITDA.

## Non-GAAP Financial Measures

To provide investors with information in addition to our results as determined by U.S. GAAP, we disclose Adjusted EBITDA as a non-GAAP measure, which our management believes provides useful information on our performance to investors. This measure is not a measurement of our financial performance under U.S. GAAP, and it may not be comparable to a similarly titled measure reported by other companies. Adjusted EBITDA has limitations as an analytical tool, and it should not

47

Table of Contents

be considered in isolation or as an alternative to revenue, net income or any other performance measures derived in accordance with U.S. GAAP or as an alternative to cash flows from operating activities as a measure of our liquidity.

We define Adjusted EBITDA as earnings before interest expense on non-funding debt, provision for income taxes, depreciation and amortization, stock-based compensation expense, the change in fair value of MSRs due to valuation inputs or assumptions (for periods subsequent to the election of the fair value method accounting for MSRs - see Note 1 to the consolidated financial statements), and the impairment or recovery of MSRs (for periods prior to the election of the fair value method of accounting for MSRs), the impact of non-cash deferred compensation expense, the change in fair value of the Public and Private Warrants, the change in the Tax Receivable Agreement liability, and the change in fair value of retained investment securities. We exclude the change in the Tax Receivable Agreement liability, the change in fair value of the Public and Private Warrants, the change in fair value of retained investment securities, and the change in fair value of MSRs due to valuation inputs or assumptions, or impairment or recovery of MSRs prior to the election of the fair value method of accounting for MSRs, as these represent non-cash, non-realized adjustments to our earnings, which is not indicative of our performance or results of operations. Adjusted EBITDA includes interest expense on funding facilities, which are recorded as a component of interest expense, as these expenses are a direct operating expense driven by loan origination volume. By contrast, interest expense on non-funding debt is a function of our capital structure and is therefore excluded from Adjusted EBITDA. Non-funding debt includes the Company's senior notes, lines of credit, borrowings against investment securities, equipment notes payable, and finance leases.

We use Adjusted EBITDA to evaluate our operating performance, and it is one of the measures used by our management for planning and forecasting future periods. We believe the presentation of Adjusted EBITDA is relevant and useful for investors because it allows investors to view results in a manner similar to the method used by our management and may make it easier to compare our results with other companies that have different financing and capital structures.

The following table presents a reconciliation of net income, the most directly comparable U.S. GAAP financial measure, to Adjusted EBITDA:

| | For the year ended December 31, | | |
|---|---|---|---|
| ($ in thousands) | 2022 | 2021 | 2020 |
| Net income | $ 931,858 | $ 1,568,400 | $ 3,382,510 |
| Interest expense on non-funding debt | 132,647 | 86,086 | 28,062 |
| Provision for income taxes | 2,811 | 9,841 | 2,450 |
| Depreciation and amortization | 45,235 | 35,098 | 16,820 |
| Stock-based compensation expense | 7,545 | 6,467 | — |
| Change in fair value of MSRs due to valuation inputs or assumptions [1] | (868,803) | (286,348) | — |
| (Recovery)/Impairment of MSRs [2] | — | — | 19,584 |
| Deferred compensation, net[3] | 7,370 | 21,900 | 4,665 |
| Change in fair value of Public and Private Warrants [4] | (7,683) | (36,105) | — |
| Change in Tax Receivable Agreement liability [5] | 3,200 | 11,937 | — |
| Change in fair value of investment securities [6] | 28,222 | 1,061 | — |
| Adjusted EBITDA | $ 282,402 | $ 1,418,337 | $ 3,454,091 |

(1) Reflects the change ((increase)/decrease) in fair value of MSRs due to changes in valuation inputs or assumptions, including discount rates and prepayment speed assumptions, primarily due to changes in market interest rates. Refer to *Note 5 - Mortgage Servicing Rights* to the consolidated financial statements.

(2) Reflects temporary impairments recorded as a valuation allowance against the value of MSRs, and corresponding subsequent recoveries.

(3) Reflects management incentive bonuses under our long-term incentive plan that are accrued when earned, net of cash payments.

(4) Reflects the change (increase/(decrease)) in the fair value of the Public and Private Warrants.

(5) Reflects the change (increase/(decrease)) in the Tax Receivable Agreement liability. Refer to *Note 1 - Organization, Basis of Presentation and Summary of Significant Accounting Policies* to the consolidated financial statements for additional information related to the Tax Receivable Agreement.

(6) Reflects the change (decrease/(increase)) in the fair value of the retained investment securities.

48

Table of Contents

**Results of Operations for the Years Ended December 31, 2022, 2021 and 2020**

| ($ in thousands) | For the year ended December 31, | | |
| --- | --- | --- | --- |
| | 2022 | 2021 | 2020 |
| **Revenue** | | | |
| Loan production income | $ 981,988 | $ 2,585,807 | $ 4,551,415 |
| Loan servicing income | 792,072 | 638,738 | 288,304 |
| Change in fair value of mortgage servicing rights | 284,104 | (587,813) | — |
| Gain on sale of mortgage servicing rights | — | 1,791 | (62,285) |
| Interest income | 314,462 | 331,770 | 161,160 |
| **Total revenue, net** | 2,372,626 | 2,970,293 | 4,938,594 |
| **Expenses** | | | |
| Salaries, commissions and benefits | 552,886 | 697,680 | 552,143 |
| Direct loan production costs | 90,369 | 72,952 | 54,459 |
| Marketing, travel, and entertainment | 74,168 | 62,472 | 20,367 |
| Depreciation and amortization | 45,235 | 35,098 | 16,820 |
| General and administrative | 179,549 | 133,334 | 98,856 |
| Servicing costs | 166,024 | 108,967 | 70,835 |
| Amortization, impairment and pay-offs of mortgage servicing rights | — | — | 573,118 |
| Interest expense | 305,987 | 304,656 | 167,036 |
| Other expense/(income) | 23,739 | (23,107) | — |
| **Total expenses** | 1,437,957 | 1,392,052 | 1,553,634 |
| **Earnings before income taxes** | 934,669 | 1,578,241 | 3,384,960 |
| **Provision for income taxes** | 2,811 | 9,841 | 2,450 |
| **Net income** | 931,858 | 1,568,400 | 3,382,510 |
| **Net income attributable to non-controlling interest** | 890,143 | 1,469,955 | N/A |
| **Net income attributable to UWM Holdings Corporation** | $ 41,715 | $ 98,445 | N/A |

Table of Contents

*Loan production income*

The table below provides details of the composition of our loan production for each of the periods presented:

| Loan Production Data: | For the year ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| (\$ in thousands) | | 2022 | | 2021 | | 2020 |
| **Loan origination volume by type** | | | | | | |
| **Purchase:** | | | | | | |
| Conventional | \$ | 62,274,030 | \$ | 63,026,794 | \$ | 33,717,939 |
| Government | | 23,773,422 | | 14,833,808 | | 8,619,874 |
| Jumbo and other | | 4,782,879 | | 9,395,143 | | 583,299 |
| **Total purchase** | \$ | 90,830,331 | \$ | 87,255,745 | \$ | 42,921,112 |
| **Refinance:** | | | | | | |
| Conventional | \$ | 27,059,252 | \$ | 120,152,065 | \$ | 119,807,647 |
| Government | | 7,834,636 | | 12,034,583 | | 18,921,473 |
| Jumbo and other | | 1,561,242 | | 7,061,299 | | 897,409 |
| **Total refinance** | | 36,455,130 | | 139,247,947 | | 139,626,529 |
| **Total loan origination volume** | \$ | 127,285,461 | \$ | 226,503,692 | \$ | 182,547,641 |
| **Portfolio metrics** | | | | | | |
| Average loan amount | \$ | 365 | \$ | 346 | \$ | 325 |
| Weighted average loan-to-value ratio | | 79.67 % | | 71.68 % | | 71.01 % |
| Weighted average credit score | | 738 | | 750 | | 758 |
| Weighted average note rate | | 4.82 % | | 2.90 % | | 3.01 % |
| **Percentage of loans sold** | | | | | | |
| To GSEs | | 94 % | | 90 % | | 99 % |
| To other counterparties | | 6 % | | 10 % | | 1 % |
| Servicing-retained | | 97 % | | 99 % | | 100 % |
| Servicing-released | | 3 % | | 1 % | | — % |

The components of loan production income for the periods presented were as follows:

| (\$ in thousands) | For the year ended December 31, | | | | Change | | Change % |
|---|---|---|---|---|---|---|---|
| | | 2022 | | 2021 | | Change | |
| Primary gain (loss) | \$ | (1,479,762) | \$ | (244,134) | \$ | (1,235,628) | 506.1 % |
| Loan origination fees | | 278,594 | | 477,759 | | (199,165) | (41.7)% |
| Provision for representation and warranty obligations | | (30,416) | | (45,301) | | 14,885 | (32.9)% |
| Capitalization of MSRs | | 2,213,572 | | 2,397,483 | | (183,911) | (7.7)% |
| Loan production income | \$ | 981,988 | \$ | 2,585,807 | \$ | (1,603,819) | (62.0)% |
| | | | | | | | |
| Gain margin[(1)] | | 0.77 % | | 1.14 % | | | (0.37)% |

| (\$ in thousands) | For the year ended December 31, | | | | Change | | Change % |
|---|---|---|---|---|---|---|---|
| | | 2021 | | 2020 | | Change | |
| Primary gain (loss) | \$ | (244,134) | \$ | 2,291,731 | \$ | (2,535,865) | (110.7)% |
| Loan origination fees | | 477,759 | | 399,996 | | 77,763 | 19.4 % |
| Provision for representation and warranty obligations | | (45,301) | | (36,510) | | (8,791) | 24.1 % |
| Capitalization of MSRs | | 2,397,483 | | 1,896,198 | | 501,285 | 26.4 % |
| Loan production income | \$ | 2,585,807 | \$ | 4,551,415 | \$ | (1,965,608) | (43.2)% |
| | | | | | | | |
| Gain margin[(1)] | | 1.14 % | | 2.49 % | | | (1.35)% |

(1) Represents total loan production income divided by total loan origination volume for the applicable period.

Loan production income was \$982.0 million for the year ended December 31, 2022, a decrease of \$1.60 billion, or 62.0%, as compared to \$2.59 billion for the year ended December 31, 2021. The decrease in loan production income was

Table of Contents

primarily driven by a decrease in loan production volume, along with a decrease of 37 basis points in gain margin, from 114 basis points for the year ended December 31, 2021 to 77 basis points for the same period in 2022. Loan production volume declined $99.2 billion, or 44%, from $226.5 billion to $127.3 billion during the year ended December 31, 2022, as compared to the same period in 2021, primarily due to lower refinance volume as a result of the higher primary mortgage interest rate environment during 2022, partially offset by an increase in purchase volume despite the higher interest rate environment and an overall decline in purchase volume for the industry. The decrease in gain margin from the prior year period was primarily due to an increase in primary loss due to the increasing interest rate and the competitive mortgage pricing environments in 2022, impacted by a pricing initiative launched by UWM in the second half of 2022 aimed at long-term growth of the wholesale channel and our market share. Management believes that the pricing initiative has been successful, as evidenced by the Company becoming the largest residential mortgage lender in the country for the second half of 2022 and the increased market share of the wholesale channel.

Loan production income was $2.59 billion for the year ended December 31, 2021, a decrease of $1.97 billion, or 43.2%, as compared to $4.55 billion for the year ended December 31, 2020. The decrease in loan production income was primarily driven by a decrease of 135 basis points in gain margin, from 249 basis points during the year ended December 31, 2020 to 114 basis points for the same period in 2021. The decrease in gain margin was due to a decline in the primary/secondary mortgage interest rate spread, driven by a rising interest rate environment in 2021 as well as increased marketplace competition. The effects of the decrease in gain margin were partially offset by an increase of $44.0 billion, or 24%, in loan production volume (from $182.5 billion to $226.5 billion) during the year ended December 31, 2021, as compared to the same period in 2020.

### *Loan servicing income and Servicing costs*

The table below summarizes loan servicing income and costs for each of the periods presented (servicing costs include amounts paid to sub-servicers and other direct costs of servicing, but exclude the costs of team members that oversee UWM's servicing operations):

| ($ in thousands) | For the year ended December 31, | | Change $ | Change % |
| | 2022 | 2021 | | |
| --- | --- | --- | --- | --- |
| Contractual servicing fees | $ 781,109 | $ 632,276 | $ 148,833 | 23.5 % |
| Late, ancillary and other fees | 10,963 | 6,462 | 4,501 | 69.7 % |
| Loan servicing income | $ 792,072 | $ 638,738 | $ 153,334 | 24.0 % |
| | | | | |
| Servicing costs | 166,024 | 108,967 | 57,057 | 52.4 % |

| ($ in thousands) | For the year ended December 31, | | Change $ | Change % |
| | 2021 | 2020 | | |
| --- | --- | --- | --- | --- |
| Contractual servicing fees | $ 632,276 | $ 284,257 | $ 348,019 | 122.4 % |
| Late, ancillary and other fees | 6,462 | 4,047 | 2,415 | 59.7 % |
| Loan servicing income | $ 638,738 | $ 288,304 | $ 350,434 | 121.6 % |
| | | | | |
| Servicing costs | 108,967 | 70,835 | 38,132 | 53.8 % |

| ($ in thousands) | For the year ended December 31, | | |
| | 2022 | 2021 | 2020 |
| --- | --- | --- | --- |
| Average UPB of loans serviced | $ 309,141,653 | $ 256,130,021 | $ 121,467,440 |
| Average number of loans serviced | 961,140 | 821,406 | 387,791 |

Loan servicing income was $792.1 million for the year ended December 31, 2022, an increase of $153.3 million, or 24.0%, as compared to $638.7 million for the year ended December 31, 2021. The increase in loan servicing income during the year ended December 31, 2022 was primarily driven by the increased average servicing portfolio.

Servicing costs increased $57.1 million for the year ended December 31, 2022 from the year ended December 31, 2021 as a result of the increase in the average servicing portfolio and Ginnie Mae loan loss mitigation expenses in 2022.

Loan servicing income was $638.7 million for the year ended December 31, 2021, an increase of $350.4 million, or 121.6%, as compared to $288.3 million for the year ended December 31, 2020. The increase in loan servicing income during

Table of Contents

the year ended December 31, 2021 was driven by the growing servicing portfolio as a result of the additional origination volume, offset slightly by one bulk sale of MSRs in 2021 (total UPB of $22.7 billion).

Servicing costs increased $38.1 million during the year ended December 31, 2021 as compared to the same period in prior year due to the increase in the servicing portfolio, partially offset by gains in 2021 from the repurchase, modification and re-delivery of Ginnie Mae loans eligible for repurchase.

For the periods presented below, our loan servicing portfolio consisted of the following:

| ($ in thousands) | December 31, 2022 | December 31, 2021 |
|---|---|---|
| UPB of loans serviced | 312,454,025 | 319,807,457 |
| Number of loans serviced | 967,050 | 1,017,027 |
| MSR portfolio delinquency count (60+ days) as % of total | 0.85 % | 0.81 % |
| Weighted average note rate | 3.64 % | 2.94 % |
| Weighted average service fee | 0.2862 % | 0.2624 % |

### Change in Fair Value of Mortgage Servicing Rights

The change in fair value of MSRs was a net increase of $284.1 million for the year ended December 31, 2022 as compared with a net decrease of $587.8 million for the year ended December 31, 2021. The change in fair value for the year ended December 31, 2022 was primarily attributable to an increase in fair value of approximately $868.8 million due to changes in valuation inputs/assumptions, mainly as a result of higher interest rates, partially offset by a decline in fair value of approximately $556.9 million due to realization of cash flows and decay (including loans paid in full) and approximately $27.8 million of net reserves and transaction costs for bulk MSR sales. The net decrease in fair value for the year ended December 31, 2021 of approximately $587.8 million was attributable to declines of approximately $859.3 million due to realization of cash flows and decay (including loans paid in full) and approximately $14.9 million of net reserves and transaction costs for bulk MSR sales, offset by an increase of approximately $286.3 million resulting from changes in valuation inputs/assumptions, such as changes in interest rates.

### Interest income and Interest expense

For the periods presented below, interest income and the components of and total interest expense were as follows:

| ($ in thousands) | December 31, 2022 | December 31, 2021 | December 31, 2020 |
|---|---|---|---|
| Interest income | $ 314,462 | $ 331,770 | $ 161,160 |
| Less: Interest expense on funding facilities | 173,340 | 218,570 | 138,974 |
| Net interest income | $ 141,122 | $ 113,200 | $ 22,186 |
| | | | |
| Interest expense on non-funding debt | $ 132,647 | $ 86,086 | $ 28,062 |
| Total interest expense | 305,987 | 304,656 | 167,036 |

Net interest income (interest income less interest expense on funding facilities) was $141.1 million for the year December 31, 2022, an increase of $27.9 million, or 25%, as compared to $113.2 million for the year ended December 31, 2021. This increase was primarily driven by a decrease in interest expense on funding facilities, due to lower average warehouse borrowing balances (due to lower production volume in 2022) and higher escrow credits provided by warehouse lenders, offset by higher interest rates on warehouse facilities (all of which are based on variable interest rate benchmarks plus a spread). Interest income decreased by a lesser amount due to decreases in the average balances of mortgage loans at fair value (due to lower production volume in 2022), offset by higher average note rates on loans at fair value.

Interest expense on non-funding debt was $132.6 million for the year December 31, 2022, an increase from $86.1 million for the year ended December 31, 2021, due to additional interest in 2022 on the $700.0 million of 2029 Senior Notes issued in April 2021, and the $500.0 million of 2027 Senior Notes issued in November 2021, as well as interest on borrowings on the the MSR Facility established at the end of the third quarter of 2022.

Net interest income was $113.2 million for the year ended December 31, 2021, an increase of $91.0 million as compared to $22.2 million for the year ended December 31, 2020. This increase was primarily driven by increased interest

52

Table of Contents

income due to increased loan production and longer loan hold times for certain loans during the fourth quarter, which increased our average balances of loans at fair value, partially offset by a slight decline in average loan interest rates. This was partially offset by higher interest expense on warehouse facilities resulting from increased loan production and longer loan hold times during 2021.

Interest expense on non-funding debt was $86.1 million for the year December 31, 2021, an increase from $28.1 million for the year ended December 31, 2020. The increase was primarily due to additional interest in 2021 on the $800.0 million of 2025 Senior Notes issued in November of 2020, $700.0 million of 2029 Senior Notes issued in April 2021, and $500.0 million of 2027 Senior Notes issued in November 2021, offset slightly by lower interest on the operating lines of credit which were paid off and terminated in early 2021.

*Other expenses*

Other expenses (excluding servicing costs and interest expense, explained above) for the periods presented were as follows:

| | For the year ended December 31, | | Change $ | Change % |
| | 2022 | 2021 | | |
|---|---|---|---|---|
| Salaries, commissions and benefits | $ 552,886 | $ 697,680 | $ (144,794) | (20.8)% |
| Direct loan production costs | 90,369 | 72,952 | 17,417 | 23.9 % |
| Marketing, travel, and entertainment | 74,168 | 62,472 | 11,696 | 18.7 % |
| Depreciation and amortization | 45,235 | 35,098 | 10,137 | 28.9 % |
| General and administrative | 179,549 | 133,334 | 46,215 | 34.7 % |
| Other expense/(income) | 23,739 | (23,107) | 46,846 | (202.7)% |
| **Other expenses** | $ 965,946 | $ 978,429 | $ (12,483) | (1.3)% |

| | For the year ended December 31, | | Change $ | Change % |
| | 2021 | 2020 | | |
|---|---|---|---|---|
| Salaries, commissions and benefits | $ 697,680 | $ 552,143 | $ 145,537 | 26.4 % |
| Direct loan production costs | 72,952 | 54,459 | 18,493 | 34.0 % |
| Marketing, travel, and entertainment | 62,472 | 20,367 | 42,105 | 206.7 % |
| Depreciation and amortization | 35,098 | 16,820 | 18,278 | 108.7 % |
| General and administrative | 133,334 | 98,856 | 34,478 | 34.9 % |
| Amortization, impairment and pay-offs of mortgage servicing rights | — | 573,118 | (573,118) | (100.0)% |
| Other (income)/expense | (23,107) | — | (23,107) | — % |
| **Other expenses** | $ 978,429 | $ 1,315,763 | $ (337,334) | (25.6)% |

Other expenses were $965.9 million for the year ended December 31, 2022, a decrease of $12.5 million, or 1.3%, as compared to $978.4 million for the year ended December 31, 2021. The decrease in other expenses was primarily due to a decrease in salaries, commissions and benefits of $144.8 million, or 20.8%, due to decreases in incentive compensation (primarily bonuses and commissions) attributable to decreased loan production and a decrease in the average number of team members. The decrease salaries, commissions and benefits was partially offset by an increase in other expense of $46.8 million, primarily due to decline in fair value of retained investment securities and a smaller decline in the fair value of the Public and Private Warrants. Additionally, general and administrative expenses increased $46.2 million, primarily as a result of a reduction of a contingency reserve which was recorded in the year ended December 31, 2021, and an increase in the representations and warranties reserve recorded in the year ended December 31, 2022 resulting from changes in estimates. Direct loan production costs increased $17.4 million primarily due to a change in presentation whereby certain loan origination fees are being presented on a gross basis (within loan production income and direct loan production costs) beginning in the fourth quarter of 2021, offset by a decrease in production volume. Marketing, travel and entertainment expenses increased $11.7 million due to increased broker promotions, advertising and brand marketing costs.

Other expenses were $978.4 million for the year ended December 31, 2021, a decrease of $337.3 million, or 25.6%, as compared to $1.32 billion for the year ended December 31, 2020. Effective January 1, 2021, we made an election to account for all classes of MSRs using the fair value method. Under this new accounting policy for MSRs, the change in fair value of MSRs is reported as part of total revenue, net, and MSRs are no longer amortized and subject to periodic impairment testing. Therefore, there is no similar amount recorded for the amortization, impairment and pay-offs of MSRs for the year ended

December 31, 2021, as compared to amortization, impairment and pay-offs of MSRs of $573.1 million for the year ended December 31, 2020.

Excluding the $573.1 million of amortization, impairment and pay-offs of MSRs in 2020, total other expenses increased by $235.8 million for the year ended December 31, 2021 compared to the year ended December 31, 2020. The increase was primarily due to an increase in salaries, commissions and benefits of $145.5 million, or 26.4%, for the year ended December 31, 2021 as compared to the prior year, primarily due to an increase in the average number of team members to support our growth and increased loan production in 2021. Marketing, travel and entertainment increased $42.1 million during the year ended December 31, 2021 as compared to the same period in the prior year, which was primarily attributable to increased advertising costs and brand marketing. In addition, the Company recorded $23.1 million of other income for the year ended December 31, 2021 which represents a $36.1 million decrease in the fair value of the liability for the Public and Private Warrants from the closing date of the business combination transaction through December 31, 2021, partially offset by an increase of $11.9 million in the Tax Receivable Agreement liability resulting from sales of MSRs and the valuation of certain intangible assets for tax purposes in connection with the business combination transaction, and a $1.1 million decrease in the fair value of the retained investment securities.

**Income Taxes**

We recorded a $2.8 million provision for income taxes during the year ended December 31, 2022, compared to a provision for income taxes of $9.8 million for the year ended December 31, 2021 and $2.5 million for the year ended December 31, 2020. The decrease in income tax provision for the year ended December 31, 2022, as compared to the same period in 2021, was primarily due to the decrease in pre-tax income attributable to the Company. The increase in the provision for income taxes for the year ended December 31, 2021, as compared to the same period in 2020, was primarily due to the change in the Company's tax status upon completion of the business combination transaction. The variations between the Company's effective tax rate and the U.S. statutory rate in 2022 and 2021 are primarily due to the portion (approximately 94%) of the Company's earnings attributable to non-controlling interests, and the fact that the Company's interest in Holdings LLC was acquired as part of the business combination transaction on January 21, 2021. The effective tax rate calculation for 2021 includes income only from January 21, 2021 to December 31, 2021, which represents the period in which the Company had an ownership interest in Holdings LLC.

**Net income**

Net income was $931.9 million for the year ended December 31, 2022, a decrease of $636.5 million or 40.6%, as compared to $1.57 billion for the year ended December 31, 2021. The decrease in net income was primarily the result of a decrease in total revenue, net of $597.7 million, and an increase in total expenses (including income taxes) of $38.9 million, as further described above.

Net income was $1.57 billion for the year ended December 31, 2021, a decrease of $1.81 billion or 53.6%, as compared to $3.38 billion for the year ended December 31, 2020. The decrease was primarily the result of the decrease in total revenue, net of $1.97 billion, partially offset by a decrease in total expenses of $161.6 million, as further described above.

Net income attributable to the Company of $41.7 million for the year ended December 31, 2022 reflects the net income of UWM attributable to the Company due to its approximate 6% ownership interest in Holdings LLC for this period. Net income attributable to the Company of $98.4 million for the year ended December 31, 2021 reflects the net income of UWM attributable to the Company due to its approximate 6% ownership interest in Holdings LLC for the period from January 21, 2021 through December 31, 2021.

**Liquidity and Capital Resources**

*Overview*

Historically, our primary sources of liquidity have included:

- borrowings including under our warehouse facilities and other financing facilities;
- cash flow from operations and investing activities, including:
  - sale or securitization of loans into the secondary market;
  - loan origination fees;

Table of Contents

- servicing fee income;
- interest income on mortgage loans; and
- sale of MSRs.

Historically, our primary uses of funds have included:

- origination of loans;
- retention of MSRs from our loan sales;
- payment of interest expense;
- payment of operating expenses; and
- dividends on, and repurchases of, our Class A common stock and distributions to SFS Corp.

We are also subject to contingencies which may have a significant impact on the use of our cash.

To originate and aggregate loans for sale or securitization into the secondary market, we use our own working capital and borrow or obtain funding on a short-term basis primarily through uncommitted and committed warehouse facilities that we have established with large global banks, regional or specialized banks and certain agencies.

We continually evaluate our capital structure and capital resources to optimize our leverage and profitability and take advantage of market opportunities. As part of such evaluation, we regularly review our levels of indebtedness and available equity, our strategic investments, including technology and growth of the wholesale channel, the availability or desirability of growth through the acquisition of other companies or other mortgage portfolios, the repurchase or redemption of our outstanding indebtedness, or repurchases of our common stock or common stock derivatives.

### Recent Developments

In accordance with the National Housing Act (NHA), as amended by the Housing and Economic Recovery Act of 2008, the FHA and FHFA are required to annually set single family forward mortgage loan limits based on median house prices. To allow our Independent Mortgage Brokers to provide borrowers with higher loan amounts with better pricing, in anticipation of the increase for 2023, we raised the loan limits on conforming loans that we originate to $715,000 effective September 7, 2022. We adopted a similar strategy in 2021 with respect to the increased loan limits for 2022. As a result of our early adoption of the higher loan size limits, we held conforming loans originated with principal balances between $625,000 (the 2022 cap) and $715,000 through January 2023 when these loans were sold to the GSEs. As a result of this strategy, our outstanding loan balances and the amounts outstanding under our warehouse lines materially increased through the fourth quarter of 2022 (as they did in the fourth quarter of 2021). However, these balances and amounts returned to more normalized levels when the loans accumulated during the fourth quarters of 2022 and 2021 were sold to the GSEs in early 2023 and 2022, respectively.

### Loan Funding Facilities

### Warehouse facilities

Our warehouse facilities, which are our primary loan funding facilities used to fund the origination of our mortgage loans, are primarily in the form of master repurchase agreements. Loans financed under these facilities are generally financed, on average, at approximately 97% to 98% of the principal balance of the loan, which requires us to fund the remaining 2-3% of the unpaid principal balance from cash generated from our operations. Once closed, the underlying residential mortgage loan is pledged as collateral for the borrowing or advance that was made under these loan funding facilities. In most cases, the loans we originate will remain in one of our warehouse facilities for less than one month, until the loans are pooled and sold. During the time we hold the loans pending sale, we earn interest income from the borrower on the underlying mortgage loan note. This income is partially offset by the interest and fees we have to pay under the warehouse facilities. Interest rates under the warehouse facilities are typically based on a reference interest rate benchmark plus a spread. As of December 31, 2022, eleven of our warehouse facility agreements had been amended to change the reference interest rate from LIBOR to variants of SOFR or other alternative index. We expect the remaining warehouse facilities to transition from LIBOR to a different reference interest rate at some point in 2023 due to the pending discontinuation of LIBOR.

When we sell or securitize a pool of loans, the proceeds we receive from the sale or securitization of the loans are used to pay back the amounts we owe on the warehouse facilities. The remaining funds received then become available to be re-

Table of Contents

advanced to originate additional loans. We are dependent on the cash generated from the sale or securitization of loans to fund future loans and repay borrowings under our warehouse facilities. Delays or failures to sell or securitize loans in the secondary market could have an adverse effect on our liquidity position.

From a cash flow perspective, the vast majority of cash received from mortgage originations occurs at the point the loans are sold or securitized into the secondary market. The vast majority of servicing fee income relates to the retained servicing fee on the loans, where cash is received monthly over the life of the loan and is typically a product of the borrowers' current unpaid principal balance multiplied by the weighted average service fee. For a given mortgage loan, servicing revenue from the retained servicing fee declines over time as the principal balance of the loan is reduced.

The amount of financing advanced to us under our warehouse facilities, as determined by agreed upon advance rates, may be less than the stated advance rate depending, in part, on the fair value of the mortgage loans securing the financings and premium we pay the broker. Each of our warehouse facilities allows the bank extending the advances to evaluate regularly the market value of the underlying loans that are serving as collateral. If a bank determines that the value of the collateral has decreased, the bank can require us to provide additional collateral (e.g., initiate a margin call) or reduce the amount outstanding with respect to the corresponding loan. Our inability to satisfy the request could result in the termination of the facility and, depending on the terms of our agreements, possibly result in a default being declared under our other warehouse facilities.

Warehouse lenders generally conduct daily evaluations of the adequacy of the underlying collateral for the warehouse loans based on the fair value of the mortgage loans. As the loans are generally financed at 97% to 98% of principal balance and our loans are typically outstanding on warehouse lines for short periods (e.g., less than one month), significant increases in market interest rates would be required for us to experience margin calls or requirements to reduce the amount outstanding with respect to the corresponding loan from a majority of our warehouse lenders. Four of our warehouse lines advance based on the fair value of the loans, rather than principal balance. For those lines, we exchange collateral for modest changes in value. As of December 31, 2022, there were no outstanding exchanges of collateral.

The amount owed and outstanding on our warehouse facilities fluctuates based on our origination volume, the amount of time it takes us to sell the loans we originate, our cash on hand, and our ability to obtain additional financing. From time to time, we will increase or decrease the size of the lines to reflect anticipated increases or decreases in volume, strategies regarding the timing of sales of mortgages to the GSEs or secondary markets and costs associated with not utilizing the lines. We reserve the right to arrange for the early payment of outstanding loans and advances from time to time. As we accumulate loans, a significant portion of our total warehouse facilities may be utilized to fund loans.

The table below reflects the current line amounts of our principal warehouse facilities and the amounts advanced against those lines as of December 31, 2022:

56

Table of Contents

57

Table of Contents

| Facility Type | Collateral | Line Amount as of December 31, 2022[1] | Date of Initial Agreement With Warehouse Lender | Current Agreement Expiration Date | Total Advanced Against Line as of December 31, 2022 (in thousands) |
|---|---|---|---|---|---|
| **MRA Funding:** | | | | | |
| Master Repurchase Agreement | Mortgage Loans | $400 Million[2] | 8/21/2012 | 1/18/2023 | $ 188,607 |
| Master Repurchase Agreement | Mortgage Loans | $500 Million[3] | 3/7/2019 | 3/22/2023 | 236,462 |
| Master Repurchase Agreement | Mortgage Loans | $500 Million | 4/23/2021 | 4/23/2023 | 185,502 |
| Master Repurchase Agreement | Mortgage Loans | $150 Million | 2/29/2012 | 5/23/2023 | 142,570 |
| Master Repurchase Agreement | Mortgage Loans | $3.0 Billion | 5/9/2019 | 7/28/2023 | 2,239,591 |
| Master Repurchase Agreement | Mortgage Loans | $700 Million | 7/24/2020 | 8/30/2023 | 642,544 |
| Master Repurchase Agreement | Mortgage Loans | $200 Million | 3/30/2018 | 9/6/2023 | 170,478 |
| Master Repurchase Agreement | Mortgage Loans | $200 Million | 10/30/2020 | 9/26/2023 | 97,216 |
| Master Repurchase Agreement | Mortgage Loans | $300 Million | 8/19/2016 | 11/8/2023 | 235,804 |
| Master Repurchase Agreement | Mortgage Loans | $250 Million | 2/26/2016 | 12/21/2023 | 193,023 |
| Master Repurchase Agreement | Mortgage Loans | $1.0 Billion | 7/10/2012 | 1/8/2024 | 521,440 |
| Master Repurchase Agreement | Mortgage Loans | $2.5 Billion[3] | 12/31/2014 | 2/21/2024 | 1,588,787 |
| **Early Funding:** | | | | | |
| Master Repurchase Agreement | Mortgage Loans | $600 Million (ASAP+ - see below) | | No expiration | — |
| Master Repurchase Agreement | Mortgage Loans | $750 Million (EF - see below) | | No expiration | 1,968 |
| | | | | | $ 6,443,992 |

[1] An aggregate of $401.0 million of these line amounts is committed as of December 31, 2022.

[2] This warehouse line of credit agreement expired pursuant to its terms subsequent to December 31, 2022.

[3] Represents the current agreement expiration date pursuant to an amendment entered into subsequent to December 31, 2022.

*Early Funding Programs*

We are an approved lender for loan early funding facilities with Fannie Mae through its As Soon As Pooled Plus ("ASAP+") program and Freddie Mac through its Early Funding ("EF") program. As an approved lender for these early funding programs, we enter into an agreement to deliver closed and funded one-to-four family residential mortgage loans, each secured by related mortgages and deeds of trust, and receive funding in exchange for such mortgage loans in some cases before the lender has grouped them into pools to be securitized by Fannie Mae or Freddie Mac. All such mortgage loans must adhere to a set of eligibility criteria to be acceptable. As of December 31, 2022, no amount was outstanding through the ASAP+ program and $2.0 million was outstanding under the EF program.

*Covenants*

Our warehouse facilities generally require us to comply with certain operating and financial covenants and the availability of funds under these facilities is subject to, among other conditions, our continued compliance with these covenants. These financial covenants include, but are not limited to, maintaining (i) a certain minimum tangible net worth, (ii) minimum liquidity, (iii) a maximum ratio of total liabilities or total debt to tangible net worth, and (iv) pre-tax net income requirements. A breach of these covenants can result in an event of default under these facilities and as such would allow the lenders to pursue certain remedies. In addition, each of these facilities, as well as our unsecured lines of credit, includes cross default or cross acceleration provisions that could result in all facilities terminating if an event of default or acceleration of maturity occurs under any facility. We were in compliance with all covenants under these facilities as of December 31, 2022.

*Other Financing Facilities*

*Senior Notes*

On November 3, 2020, our consolidated subsidiary, UWM, issued $800.0 million in aggregate principal amount of senior unsecured notes due November 15, 2025 (the "2025 Senior Notes"). The 2025 Senior Notes accrue interest at a rate of 5.500% per annum. Interest on the 2025 Senior Notes is due semi-annually on May 15 and November 15 of each year, beginning on May 15, 2021. We used approximately $500.0 million of the net proceeds from the offering of 2025 Senior Notes for general corporate purposes to fund future growth and distributed the remainder to SFS Corp. for tax distributions.

58

Table of Contents

On or after November 15, 2022, we may, at our option, redeem the 2025 Senior Notes in whole or in part during the twelve-month period beginning on the following dates at the following redemption prices: November 15, 2022 at 102.750%; November 15, 2023 at 101.375%; or November 15, 2024 until maturity at 100.000%, of the principal amount of the 2025 Senior Notes to be redeemed on the redemption date plus accrued and unpaid interest.

On April 7, 2021, our consolidated subsidiary, UWM, issued $700.0 million in aggregate principal amount of senior unsecured notes due April 15, 2029 (the "2029 Senior Notes"). The 2029 Senior Notes accrue interest at a rate of 5.500% per annum. Interest on the 2029 Senior Notes is due semi-annually on April 15 and October 15 of each year, beginning on October 15, 2021. We used a portion of the proceeds from the issuance of the 2029 Senior Notes to pay off and terminate the $400.0 million line of credit, effective April 20, 2021, and the remainder for general corporate purposes.

On or after April 15, 2024, we may, at our option, redeem the 2029 Senior Notes in whole or in part during the twelve-month period beginning on the following dates at the following redemption prices: April 15, 2024 at 102.750%; April 15, 2025 at 101.375%; or April 15, 2026 until maturity at 100.000%, of the principal amount of the 2029 Senior Notes to be redeemed on the redemption date plus accrued and unpaid interest. Prior to April 15, 2024, we may, at our option, redeem up to 40% of the aggregate principal amount of the 2029 Senior Notes originally issued at a redemption price of 105.500% of the principal amount of the 2029 Senior Notes to be redeemed on the redemption date plus accrued and unpaid interest with the net proceeds of certain equity offerings. In addition, we may, at our option, redeem the 2029 Senior Notes prior to April 15, 2024 at a price equal to 100% of the principal amount redeemed plus a "make-whole" premium, plus accrued and unpaid interest.

On November 22, 2021, our consolidated subsidiary, UWM, issued $500.0 million in aggregate principal amount of senior unsecured notes due June 15, 2027 (the "2027 Senior Notes"). The 2027 Senior Notes accrue interest at a rate of 5.750% per annum. Interest on the 2027 Senior Notes is due semi-annually on June 15 and December 15 of each year, beginning on June 15, 2022. We used the proceeds from the issuance of the 2027 Senior Notes for general corporate purposes.

On or after June 15, 2024, we may, at our option, redeem the 2027 Senior Notes in whole or in part during the twelve-month period beginning on the following dates at the following redemption prices: June 15, 2024 at 102.875%; June 15, 2025 at 101.438%; or June 15, 2026 until maturity at 100.000%, of the principal amount of the 2027 Senior Notes to be redeemed on the redemption date plus accrued and unpaid interest. Prior to June 15, 2024, we may, at our option, redeem up to 40% of the aggregate principal amount of the 2027 Senior Notes originally issued at a redemption price of 105.75% of the principal amount of the 2027 Senior Notes redeemed on the redemption date plus accrued and unpaid interest with the net proceeds of certain equity offerings. In addition, we may, at our option, redeem the 2027 Senior Notes prior to June 15, 2024 at a price equal to 100% of the principal amount redeemed plus a "make-whole" premium, plus accrued and unpaid interest.

The indentures governing the 2025 Senior Notes, the 2029 Senior Notes, and the 2027 Senior Notes contain certain operating covenants and restrictions, subject to a number of exceptions and qualifications, including restrictions on our ability to (1) incur additional non-funding indebtedness unless either (y) the Fixed Charge Coverage Ratio (as defined in the applicable indenture) is no less than 3.0 to 1.0 or (z) the Debt-to-Equity Ratio (as defined in the applicable indenture) does not exceed 2.0 to 1.0, (2) merge, consolidate or sell assets, (3) make restricted payments, including distributions, (4) enter into transactions with affiliates, (5) enter into sale and leaseback transactions and (6) incur liens securing indebtedness. We were in compliance with the terms of these indentures as of December 31, 2022.

### MSR Facility

On September 30, 2022, the Company's consolidated subsidiary, UWM, entered into a Loan and Security Agreement with Citibank, N.A. ("Citibank"), providing UWM with up to $1.5 billion of uncommitted borrowing capacity to finance the origination, acquisition or holding of certain mortgage servicing rights (the "MSR Facility"). The MSR Facility is collateralized by all of UWM's mortgage servicing rights that are appurtenant to mortgage loans pooled in securitizations by Fannie Mae or Freddie Mac that meet certain criteria. Available borrowings under the MSR Facility are based on the fair market value of the collateral, and borrowings under the MSR Facility will bear interest based on one-month term SOFR plus an applicable margin. As of December 31, 2022, $750.0 million was outstanding under the MSR Facility.

The MSR Facility contains covenants which include certain financial requirements, including maintenance of minimum tangible net worth, minimum liquidity, maximum debt to net worth ratio, and net income as defined in the agreement. As of December 31, 2022, the Company was in compliance with all applicable covenants.

On January 30, 2023, UWM entered into Amendment No. 1 to the Loan and Security Agreement with Citibank, permitting UWM, with the prior consent of Citibank, to enter into Excess Yield Transactions (as defined in the Loan and Security Agreement) whereby Citibank will release its security interest in that portion of the collateral involved with each transaction.

Table of Contents

*Revolving Credit Facility*

On August 8, 2022, UWM entered into the Revolving Credit Agreement, between UWM, as the borrower, and SFS Corp., as the lender. The Revolving Credit Agreement provides for, among other things, a $500.0 million unsecured revolving credit facility (the "Revolving Credit Facility"). The Revolving Credit Facility has an initial maturity date of August 8, 2023. Amounts borrowed under the Revolving Credit Facility may be borrowed, repaid and reborrowed from time to time, and accrue interest at the Applicable Prime Rate (as defined in the Revolving Credit Agreement). UWM may utilize the Revolving Credit Facility in connection with: (i) operational and investment activities, including but not limited to funding and/or advances related to (a) servicing rights, (b) 'scratch and dent' loans, (c) margin requirements, and (d) equity in loans held for sale; and (ii) general corporate purposes.

The Revolving Credit Agreement contains certain financial and operating covenants and restrictions, subject to a number of exceptions and qualifications, and the availability of funds under the Revolving Credit Facility is subject to our continued compliance with these covenants. The Company was in compliance with these covenants as of December 31, 2022. No amounts were outstanding under the Revolving Credit Facility as of December 31, 2022.

*Borrowings Against Investment Securities*

In 2021, the Company's consolidated subsidiary, UWM, began selling some of the mortgage loans that it originates through private label securitization transactions. In executing these transactions, the Company sells mortgage loans to a securitization trust for cash and, in some cases, retained interests in the trust. The securitization entities are funded through the issuance of beneficial interests in the securitized assets. The beneficial interests take the form of trust certificates, some of which are sold to investors and some of which may be retained by the Company due to regulatory requirements. The Company entered into sale and repurchase agreements for a portion of the retained beneficial interests in the securitization trusts established to facilitate its private label securitization transactions which have been accounted for as borrowings against investment securities. As of December 31, 2022, we had $101.3 million outstanding under individual trades executed pursuant to a master repurchase agreement with a counterparty which is collateralized by the investment securities (beneficial interests in the trusts) that we retained due to regulatory requirements. The borrowings against investment securities have remaining terms ranging from four to eight months as of December 31, 2022, and interest rates based on twelve-month LIBOR or SOFR plus a spread. We intend to renew these sale and repurchase agreements upon their maturity during the required holding period for the retained investment securities.

The counterparty under these sale and repurchase agreements conducts daily evaluations of the adequacy of the underlying collateral based on the fair value of the retained investment securities less specified haircuts. These investment securities are financed on average at approximately 80% of the outstanding principal balance, and exchanges of cash collateral are required if the fair value of the retained investment securities less the haircut is less than the principal balance plus accrued interest on the secured borrowings. As of December 31, 2022, the Company had delivered $5.3 million of collateral to counterparty under these sale and repurchase agreements.

*Finance Leases*

As of December 31, 2022, our finance lease liabilities were $43.5 million, $27.9 million of which relates to leases with related parties. The Company's financing lease agreements have remaining terms ranging from approximately three months to thirteen years.

*Cash flow data for the year ended December 31, 2022, 2021 and 2020*

| | | For the year ended December 31, | | | | |
|---|---|---|---|---|---|---|
| ($ in thousands) | | **2022** | | **2021** | | **2020** |
| Net cash provided by (used in) operating activities | $ | **8,268,182** | $ | (9,956,963) | $ | 56,412 |
| Net cash provided by investing activities | | **1,290,346** | | 199,751 | | 231,882 |
| Net cash (used in) provided by financing activities | | **(9,584,718)** | | 9,264,463 | | 802,260 |
| Net (decrease) increase in cash and cash equivalents | $ | **(26,190)** | $ | (492,749) | $ | 1,090,554 |
| Cash and cash equivalents at the end of the period | | **704,898** | | 731,088 | | 1,223,837 |

*Net cash provided by operating activities*

Net cash provided by operating activities was $8.27 billion for the year ended December 31, 2022 compared to net cash used in operating activities of $9.96 billion for the same period in 2021. The increase in cash flows from operating

60

Table of Contents

activities was primarily driven by the decrease in mortgage loans at fair value as of December 31, 2022, notwithstanding the early roll-out of the increased loan size limits discussed above, offset by a decrease in net income 2022, adjusted for non-cash items, including the capitalization and change in fair value of MSRs.

Net cash used in operating activities was $9.96 billion for the year ended December 31, 2021 compared to net cash provided by operating activities of $56.4 million for the same period in 2020. The decrease in cash flows from operating activities was primarily driven by the early roll-out of the increased loan size limits and the aggregation of loans for private label securitization transactions discussed above which materially increased our mortgage loans at fair value as of December 31, 2021, as well as a decrease in net income in 2021, adjusted for non-cash items, including an increase in the capitalization of MSRs (due to increased loan sale volume).

*Net cash provided by investing activities*

Net cash provided by investing activities was $1.29 billion for the year ended December 31, 2022 compared to $199.8 million of net cash provided by investing activities for the same period in 2021. The increase in cash flows provided by investing activities was primarily driven by an increase in proceeds from the sales of MSRs.

Net cash provided by investing activities was $199.8 million for the year ended December 31, 2021 compared to $231.9 million of net cash provided by investing activities for the same period in 2020. The decrease in cash flows provided by investing activities was primarily driven by an increase in purchases of premises and equipment, and a decrease in proceeds from the sale of MSRs.

*Net cash used in financing activities*

Net cash used in financing activities was $9.58 billion for the year ended December 31, 2022 compared to cash provided by financing activities of $9.26 billion for the same period in 2021. The change year over year was primarily driven by net repayments under the warehouse lines of credit for the year ended December 31, 2022, primarily attributable to the decrease in loans at fair value, as compared to net borrowings under the warehouse lines of credit for the year ended December 31, 2021 due to the increase in loans at fair value. Net secured line of credit borrowings were $750.0 million in 2022, compared to net repayments of $320.3 million in 2021, and Class A common stock dividends and distributions to SFS Corp. decreased $711.5 million in 2022 as compared to 2021. The year ended December 31, 2021 also included the impacts of the business combination transaction (net proceeds and higher distributions to SFS Corp.), proceeds from the issuance of the 2029 Senior Notes and the repayment of the secured line of credit.

The early roll-out of increased conforming loan size limits and the aggregation of loans for private label securitization transactions materially increased the warehouse line of credit balances as of December 31, 2021, which were paid down in early January 2022 in connection with the sale of these mortgage loans.

Net cash provided by financing activities was $9.3 billion for the year ended December 31, 2021 compared to cash provided by financing activities of $802.3 million for the same period in 2020. The increase in cash flows provided by financing activities in 2021 was primarily driven by an increase in net borrowings under warehouse lines of credit (due to increased mortgage loans at fair value as a result of increased loan production and the early roll-out of the increase in loan size limits discussed above), additional net proceeds from the issuance of Senior Notes in 2021, proceeds from borrowings against investment securities in 2021, net proceeds from the business combination transaction in 2021, and a decrease in distributions to SFS Corp. in 2021, partially offset by 2021 dividends paid to Class A common stockholders, an increase in net repayments under operating lines of credit, Class A common stock repurchases, and increases in net repayments under equipment notes payable and finance lease liabilities.

**Contractual Obligations**

*Cash requirements from contractual and other obligations*

As of December 31, 2022, our material cash requirements from known contractual and other obligations include interest and principal payments under our Senior Notes, principal payments under our borrowings against investment securities, and payments under our financing and operating lease agreements. In addition, in the third quarter of 2022, UWM entered into the MSR Facility, which has a one-year term and provides for up to $1.5 billion of available borrowing capacity secured by certain MSRs, and the Revolving Credit Agreement with SFS Corp., which also has a one-year term and provides for up to $500 million of unsecured borrowing capacity. As of December 31, 2022, $750.0 million was outstanding under the MSR Facility and no amount was outstanding under the Revolving Credit Agreement. Annual cash payments for interest under our

Table of Contents

Senior Notes total approximately $111.3 million and the Senior Notes are due in 2025 ($800.0 million), 2027 ($500.0 million), and 2029 ($700.0 million). The principal amount of the borrowings against investment securities of $118.8 million is due within one year of December 31, 2022, but we intend to renew the applicable sale and repurchase agreements upon their maturity during the required holding period for the retained investment securities. Our weighted average remaining lease term for operating leases is approximately 13.6 years, and remaining contractual operating leases payments totaled $175.4 million as of December 31, 2022, of which $12.9 million is due in 2023. Our weighted average remaining lease term for financing leases is approximately 8.8 years, and remaining contractual financing lease payments totaled $51.1 million as of December 31, 2022, of which $14.1 million is due in 2023. We do not have material commitments for capital expenditures as of December 31, 2022 given the nature of our business.

We declared dividends of $0.10 per share on its Class A common stock each quarter in 2022. In connection with its decision to declare a dividend on its Class A common stock, our Board of Directors, in its capacity as the Manager of Holdings LLC, under the Holdings LLC Second Amended and Restated Operating Agreement, can determine whether to (a) make distributions from Holdings LLC to only UWM Holdings Corporation, as the owner of the Class A Units of Holdings LLC with the proportional amount due to SFS Corp. as the owner of the Class B Units of Holdings LLC, being distributed upon the sooner to occur of (i) the Board making a determination to do so or (ii) the date on which Class B Units of Holdings LLC are converted into shares of our Class B common stock or (b) make proportional and simultaneous distributions from Holdings LLC to UWM Holdings Corporation, as the owner of the Class A Units of Holdings LLC and to SFS Corp. as the owner of the Class B Units of Holdings LLC.

During 2022, the Company paid cash dividends of $36.9 million to its Class A common stockholders, representing $0.10 per share of Class A Common Stock declared in the fourth quarter of 2021 and the first three quarters of 2022, and declared a dividend for the fourth quarter of 2022 of $0.10 per share of Class A common stock which was paid on January 6, 2023. In early January 2022, the Board declared and Holdings LLC paid cumulative proportional distributions to SFS Corp. of approximately $300.4 million related to the third and fourth quarter 2021 Class A common stock dividends. Additionally, for each of the first, second and third quarters of 2022, the Board determined to make proportional and simultaneous distributions totaling $450.6 million to SFS Corp., representing $0.10 per Holdings LLC Class B Unit. The proportional distribution to SFS Corp. related to the fourth quarter 2022 Class A common stock dividend of approximately $150.2 million was declared by Holdings LLC, and was paid on January 6, 2023.

The sources of funds needed to satisfy these cash requirements include cash flows from operations and investing activities, including cash flows from sales of MSRs, sale or securitization of loans into the secondary market, loan origination fees, servicing fee income, and interest income on mortgage loans.

*Repurchase and indemnification obligations*

Loans sold to investors which we believe met investor and agency underwriting guidelines at the time of sale may be subject to repurchase in the event of specific default by the borrower or subsequent discovery that underwriting or documentation standards were not explicitly satisfied. We establish a reserve which is estimated based on an assessment of our contingent and non-contingent obligations, including expected losses, expected frequency, the overall potential remaining exposure, as well as an estimate for a market participant's potential readiness to stand by to perform on such obligations. See *Note 10 - Commitments and Contingencies* to the consolidated financial statements for further information.

*Interest rate lock commitments, loan sale and forward commitments*

In the normal course of business, we are party to financial instruments with off-balance sheet risk. These financial instruments include commitments to extend credit to borrowers at either fixed or floating interest rates. IRLCs are binding agreements to lend to a borrower at a specified interest rate within a specified period of time as long as there is no violation of conditions established in the contract. Forward commitments generally have fixed expiration dates or other termination clauses which may require payment of a fee. As many of the commitments expire without being drawn upon, the total commitment amounts do not necessarily represent future cash requirements. In addition, we have contracts to sell mortgage loans into the secondary market at specified future dates (commitments to sell loans), and forward commitments to sell MBS at specified future dates and interest rates. The blended average pullthrough rate was 77% and 86%, as of December 31, 2022 and December 31, 2021, respectively. Management believes that the decrease in pullthrough rates year over year is primarily attributable to market volatility as well as a shift to primarily a purchase mortgage market in 2022 as a result of significant increases in primary mortgage interest rates observed throughout most of the year.

Following is a summary of the notional amounts of commitments as of dates indicated:

62

Table of Contents

| ($ in thousands) | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Interest rate lock commitments—fixed rate (a) | $ 5,350,845 | $ 13,402,401 |
| Interest rate lock commitments—variable rate (a) | 8,839 | 48,566 |
| Commitments to sell loans | 608,703 | 3,130,203 |
| Forward commitments to sell mortgage-backed securities | 10,336,172 | 25,756,975 |

(a)    Adjusted for pullthrough rates of 77% and 86%, respectively.

As of December 31, 2022, we had sold $1.2 billion of loans to a global insured depository institution and assigned the related trades to deliver the applicable loans into securities for end investors for settlement in January 2023.

**Critical Accounting Estimates and Use of Significant Estimates**

Preparation of financial statements in accordance with U.S. GAAP requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenues and expenses during the reporting period. We have identified certain accounting estimates as being critical because they require management's judgement to make difficult, subjective or complex judgements about matters that are uncertain. Actual results could differ and the use of other assumptions or estimates could result in material differences in our consolidated financial statements. Our critical accounting policies and estimates are discussed below and primarily relate to the fair value and other estimates.

*Mortgage loans held at fair value and revenue recognition*

We record mortgage loans at estimated fair value. Mortgage loans at fair value is comprised of loans that are expected to be sold into the secondary market. When we have the unilateral right to repurchase Ginnie Mae pool loans we have previously sold (generally loans that are more than 90 days past due) and the call option results in a more than trivial benefit to us, the previously sold assets are required to be re-recognized on the balance sheet. We record our potential purchase obligation at the gross amount of the loan eligible to be repurchased. The related asset and liability for the Ginnie Mae pool loans eligible for repurchase are presented separately on the consolidated balance sheet.

The fair value of mortgage loans is estimated using observable market information including pricing from current cash commitments from government sponsored enterprises, recent market commitment prices, or broker quotes, as if the loans were to be sold currently into the secondary market. Loans at fair value for which there is little to no observable trading activity of similar instruments (e.g., scratch and dent buyers) are valued using dealer price quotations which typically results in purchase price discounts. We also factor our loans' readiness to be sold to loan outlets and adjust the fair value accordingly.

A majority of the revenues from mortgage loan originations are recognized as a component of "*loan production income*" in the consolidated statements of operations when the loan is originated, which is the primary revenue recognition event as the loans are recorded at estimated fair value upon origination. Loan production income also includes the unrealized gains and losses associated with the changes in the fair value of mortgage loans at fair value and the realized and unrealized gains and losses from derivative assets and liabilities. Other companies recognize a majority of the revenue related to lending activity when they make an interest rate lock commitment with a borrower.

Mortgage loans at fair value were $7.1 billion at December 31, 2022, compared to $16.9 billion as of December 31, 2021.

*Mortgage servicing rights*

MSRs represent the fair value assigned to the rights to the contracts that obligate us to service the loans sold in exchange for a servicing fee. At the date the loan is sold with servicing retained, the fair value of the MSR is capitalized and recognized as a component of "*loan production income*" in the consolidated statements of operations.

For purposes of both initial and subsequent measurement, the fair value of MSRs is determined using a valuation model that calculates the present value of estimated net future servicing fee income. The model includes estimates of prepayment speeds, discount rate, cost to service, float earnings, contractual servicing income, and ancillary income and late fees, among others. Changes in the estimates used to value MSRs could materially change the estimated fair value. Judgement is made when determining these assumptions, however, these estimates are supported by market and economic data collected from various outside sources. The key unobservable inputs used in determining the fair value of our MSRs include the discount rate, prepayment speeds, and the cost of servicing.

63

Table of Contents

Changes in economic and other relevant conditions could cause actual results to differ from assumptions used to determine fair value. Markets, specifically buyers of MSRs, may change perspective on assumptions or MSR value entirely which can lead to different values and outcomes. Assumptions emanate from recent market transactions as well as current expectations and vary over time. There are also differences between assumptions used to determine fair value (what a buyer would pay) and what we can achieve in its operations. Prepayment speeds can change quickly and be materially different between buyers. Consequently, prepayment speed assumptions often differ from our estimates. Increases in prepayment speeds generally have an adverse effect on the fair value of MSRs. Discount rates imply a rate of return. Similarly, discount rates are subjective and, in practice, are often imputed to reconcile to current trades. Increases in the discount rate result in a lower MSR value and decreases in the discount rate result in a higher MSR value. The cost to service assumption can vary based upon buyer expectation, bidding strategy, and can depend upon the cost structure of a potential bidder. The higher the servicing cost assumption, the lower the MSR value. If we are unable to achieve the cost assumption, the MSRs' operational economics will lag fair value. Other assumptions used, while not as significant, have similar impacts to fair value of MSRs. Refer to *Note 5 - Mortgage Servicing Rights* to the consolidated financial statements for additional detail regarding the quantitative impact on the fair value of MSRs as a result of adverse changes in key unobservable inputs.

MSRs were $4.5 billion as of December 31, 2022, compared to $3.3 billion as of December 31, 2021. For the year ended December 31, 2022, we recognized $868.8 million of income due to changes in the fair value of MSRs as a result of changes in valuation inputs and assumptions, primarily as a result of increases in market interest rates, compared to $286.3 million for the same period in the prior year.

### *Derivative Financial Instruments*

Derivatives are recognized as assets or liabilities on the balance sheets and are measured at estimated fair value with changes recorded in the consolidated statements of operations within "*loan production income*" in the period in which they occur. IRLCs on mortgage loans to be originated or purchased which are intended to be sold are considered derivative financial instruments and are the primary basis of our interest rate or pricing risk. We enter into FLSCs to mitigate risk of IRLCs as well as loans, and to efficiently facilitate sale of loans into the secondary market. IRLCs and FLSCs are free standing derivative financial instruments.

We estimate the value of derivatives based on estimates of the price that would be received to sell an asset or paid to transfer a liability. Each individual contract is the basis for the determination. FLSCs are firm commitments and the value is almost exclusively determined based upon the underlying difference in interest rates between the contract's terms and current market. Similarly, we value IRLCs based upon the difference between the terms of the individual contract and the current market interest rates. Fair value estimates of IRLCs also take into account the probability that loan commitments may not be expected to be exercised by borrowers (the "pullthrough" rate), which is estimated based on historical experience. We consider the value of net future cash flows related to the associated servicing right of the eventual loan (however, the loan must first be originated, then the loan would need to be sold, with servicing retained or contractually separated, for MSR cash flows to distinctively exist), because if we did not, in most market conditions, IRLCs would result in a somewhat arbitrary loss recognition at inception. For valuation of IRLCs, we prioritize determination of exit price (what a buyer would pay) of the contract in its current form, over future components or elements. This approach results in revenue recognition for relative changes in the fair value of IRLCs during the interest rate lock period (as opposed to the primary revenue recognition event of accepting an interest rate lock), and full revenue recognition when the loan is originated.

IRLCs and loans at fair value expose us to the risk that the price of the existing loans and future loans to be made, which underlie the commitments, might decline in value due to increases in mortgage interest rates. To protect against this risk, we use FLSCs to economically hedge the risk of potential changes in the value of the loans and IRLCs (future loans). We expect that the changes in fair value of the forward commitments will either substantially or partially offset the changes in fair value of the loans and IRLCs.

Derivative assets and liabilities were $82.9 million and $49.7 million, respectively, as of December 31, 2022, as compared to $67.4 million and $36.7 million, respectively, as of December 31, 2021.

### *Representations and warranties reserve*

Loans sold to investors which we believe met investor and agency underwriting guidelines at the time of sale may be subject to repurchase in the event of specific default by the borrower or subsequent discovery that underwriting or documentation standards were not explicitly satisfied. We establish a reserve which is estimated based on our assessment of our contingent and non-contingent obligations, including the universe of loans which may still be at risk for indemnity, expected

Table of Contents

frequency, appeal rate success, expected loss severity, expected economic conditions, as well as an estimate for the cost of a market participant's potential readiness to stand by to perform on such obligations. We also consider our historical repurchase and loss experience when making these estimates. The reserve includes amounts for repurchase demands received but still under review as well as a reserve for the expected future losses on loans sold to investors for which no request for repurchase or indemnification demand has yet been received. The initial estimated provision for these losses is included in "*loan production income*" in the consolidated statements of operations, with subsequent changes in estimates recorded as part of "*general and administrative*" expenses.

The maximum exposure under our representations and warranties obligations would be the outstanding principal balance, any premium received on all loans ever sold by us that are not subject to agency certainty clauses, as well as potential costs associated with repurchasing or indemnifying the buyers, less any loans that have already been paid in full by the borrower, loans that have defaulted without a breach of representations and warranties, that have been indemnified via settlement or make whole, or that have been repurchased. The Company repurchased $355.8 million, $133.4 million and $53.1 million in UPB of loans during the years ended December 31, 2022, 2021 and 2020, respectively, related to its representations and warranties obligations.

## Item 7A. Quantitative and Qualitative Disclosures About Market Risk

In the normal course of business, we are subject to a variety of risks which can affect our operations and profitability. We broadly define these areas of risk as interest rate, credit and counterparty risk.

### Interest rate risk

We are subject to interest rate risk which may impact our origination volume and associated revenue, MSR valuations, IRLCs and mortgage loans at fair value valuations, and the net interest margin derived from our funding facilities. The fair value of MSRs is driven primarily by interest rates, which impact expected prepayments. In periods of rising interest rates, the fair value of the MSRs generally increases as expected prepayments decrease, consequently extending the estimated life of the MSRs resulting in expected increases in cash flows. In a declining interest rate environment, the fair value of MSRs generally decreases as expected prepayments increase consequently truncating the estimated life of the MSRs resulting in expected decreases in cash flows. Because origination volumes tend to increase in declining interest rate environments and decrease in increasing rate environments, we believe that servicing provides a natural hedge to our origination business. We do not specifically hedge MSRs but manage the economic risk through partially offsetting impact of servicing and mortgaging originations.

Our IRLCs and mortgage loans at fair value are exposed to interest rate volatility. During the origination, pooling, and delivery process, this pipeline value rises and falls with changes in interest rates. Because substantially all of our production is deliverable to Fannie Mae, Freddie Mac, and Ginnie Mae, we predominately utilize forward agency or Ginnie Mae To Be Announced ("TBA") securities as our primary hedge instrument. The TBA market is a secondary market where FLSCs or TBAs are sold by lenders seeking to hedge the risk that market interest rates may change and lock in a price for the mortgages they are in the process of originating.

We assess our market risk based on changes in interest rates utilizing a sensitivity analysis. The sensitivity analysis measures the potential impact on fair values based on hypothetical changes (increases and decreases) in interest rates. Our total market risk is influenced by a wide variety of factors including market volatility and the liquidity of the markets. There are certain limitations inherent in the sensitivity analysis presented, including the necessity to conduct the analysis based on a single point in time and the inability to include the complex market reactions that normally would arise from the market shifts modeled. We used December 31, 2022 market rates on our instruments to perform the sensitivity analysis. These sensitivities are hypothetical and presented for illustrative purposes only. Changes in fair value based on variations in assumptions generally cannot be extrapolated to our performance because the relationship of the change in fair value may not be linear nor does it factor ongoing operations. The following table summarizes the estimated change in the fair value of our mortgage loans at fair value, MSRs, IRLCs and FLSCs as of December 31, 2022 given hypothetical instantaneous parallel shifts in the yield curve. Actual results could differ materially.

Table of Contents

| ($ in thousands) | December 31, 2022 | | | |
|---|---|---|---|---|
| | Down 25 bps | | Up 25 bps | |
| Increase (decrease) in assets | | | | |
| Mortgage loans at fair value | $ | 51,981 | $ | (57,344) |
| MSRs | | (88,322) | | 82,026 |
| IRLCs | | 38,856 | | (45,731) |
| Total change in assets | $ | 2,515 | $ | (21,049) |
| Increase (decrease) in liabilities | | | | |
| FLSCs | $ | (97,967) | $ | 103,382 |
| Total change in liabilities | $ | (97,967) | $ | 103,382 |

### Credit risk

We are subject to credit risk, which is the risk of default that results from a borrower's inability or unwillingness to make contractually required mortgage payments. While our loans are sold into the secondary market without recourse, we do have repurchase and indemnification obligations to investors for breaches under our loan sale agreements. For loans that were repurchased or not sold in the secondary market, we are subject to credit risk to the extent a borrower defaults and the proceeds upon ultimate foreclosure and liquidation of the property are insufficient to cover the amount of the mortgage loan plus expenses incurred. We believe that this risk is mitigated through the implementation of stringent underwriting standards, strong fraud detection tools and technology designed to comply with applicable laws and our standards. In addition, we believe that this risk is mitigated through the quality of our loan portfolio. For the year ended December 31, 2022, our originated loans had a weighted average loan to value ratio of 79.67%, and a weighted average FICO score of 738. For the year ended December 31, 2021, our originated loans had a weighted average loan to value ratio of 71.68%, and a weighted average FICO score of 750. Management believes that the increase in the weighted average loan to value ratio year over year is primarily due to the increase in the percentage of purchase volume to total loan origination volume in 2022.

### Counterparty risk

We are subject to risk that arises from our financing facilities and interest rate risk hedging activities. These activities generally involve an exchange of obligations with unaffiliated banks or companies, referred to in such transactions as "counterparties." If a counterparty were to default, we could potentially be exposed to financial loss if such counterparty were unable to meet its obligations to us. We manage this risk by selecting only counterparties that we believe to be financially strong, spreading the risk among many such counterparties, limiting singular credit exposures on the amount of unsecured credit extended to any single counterparty, and entering into master netting agreements with the counterparties as appropriate.

In accordance with the best practices outlines by The Treasury Market Practices Group, we execute Securities Industry and Financial Markets Association trading agreements with all material trading partners. Each such agreement provides for an exchange of margin money should either party's exposure exceed a predetermined contractual limit. Such margin requirements limit our overall counterparty exposure. The master netting agreements contain a legal right to offset amounts due to and from the same counterparty. We incurred no losses due to nonperformance by any of our counterparties during the years ended December 31, 2022 or December 31, 2021.

Also, in the case of our financing facilities, we are subject to risk if the counterparty chooses not to renew a borrowing agreement and we are unable to obtain financing to originate mortgage loans. With our financing facilities, we seek to mitigate this risk by ensuring that we have sufficient borrowing capacity with a variety of well-established counterparties to meet our funding needs as well as fostering long-term relationships.

Table of Contents

**Item 8. Financial Statements and Supplementary Data**

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

| | |
|---|---|
| Reports of Deloitte & Touche LLP (PCAOB No. 34) | 67 |
| Consolidated Balance Sheets as of December 31, 2022 and 2021 | 70 |
| Consolidated Statements of Operations for the Years Ended December 31, 2022, 2021 and 2020 | 71 |
| Consolidated Statements of Changes in Equity for the Years Ended December 31, 2022, 2021 and 2020 | 72 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2022, 2021 and 2020 | 73 |
| Notes to the Consolidated Financial Statements | 74 |

67

Table of Contents

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the shareholders and the Board of Directors of UWM Holdings Corporation

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of UWM Holdings Corporation and subsidiaries (the "Company") as of December 31, 2022 and 2021, the related consolidated statements of operations, changes in equity, and cash flows, for each of the three years in the period ended December 31, 2022, and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2022 and 2021, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2022, in conformity with accounting principles generally accepted in the United States of America.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2022, based on criteria established in Internal Control — Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated March 1, 2023, expressed an unqualified opinion on the Company's internal control over financial reporting.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matter**

The critical audit matter communicated below is a matter arising from the current-period audit of the financial statements that was communicated or required to be communicated to the audit committee and that (1) relates to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the accounts or disclosures to which it relates.

*Mortgage Servicing Rights — Refer to Notes 1 and 5 to the financial statements*

*Critical Audit Matter Description*

The Company has elected to account for its mortgage servicing rights ("MSRs") at fair value. Subsequent to initial recognition, the fair value of MSRs is estimated with the assistance of an independent third-party valuation expert based upon a valuation model that calculates the estimated present value of future cash flows. The valuation model incorporates market estimates of prepayment speeds, discount rate, cost to service, and other assumptions. The Company's MSRs balance was $4.453 billion at December 31, 2022.

We identified the valuation of MSRs as a critical audit matter because of (i) the significant judgments made in determining the prepayment speeds and discount rate assumptions ("significant valuation assumptions") given the limited market observability of these assumptions, and (ii) the high degree of auditor judgment and an increased extent of effort when performing audit procedures to evaluate the appropriateness of these significant valuation assumptions.

Table of Contents

*How the Critical Audit Matter Was Addressed in the Audit*

Our audit procedures related to the significant valuation assumptions used by management to estimate the fair value of the Company's MSRs included the following, among others:

- We tested the design and operating effectiveness of controls over management's valuation of MSRs including management's evaluation of the reasonableness of the significant assumptions used in the valuation expert's model.

- We inquired of the Company's third-party valuation expert regarding the reasonableness of the significant valuation assumptions and the appropriateness of the valuation model.

- We assessed the reasonableness of the significant valuation assumptions used within the valuation model by comparing the assumptions used by the Company to the assumptions used by other third-party valuation experts as well as comparable entities.

- With the assistance of our fair value specialists, we evaluated the MSRs fair value by comparing it against a fair value range that was independently developed using market data.

- We performed a retrospective review of MSR sales in comparison to the MSR fair value estimates of the Company's third-party valuation expert.

/s/ Deloitte & Touche LLP

Detroit, Michigan
March 1, 2023

We have served as the Company's auditor since 2020.

Table of Contents

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the shareholders and the Board of Directors of UWM Holdings Corporation

**Opinion on Internal Control over Financial Reporting**

We have audited the internal control over financial reporting of UWM Holdings Corporation and subsidiaries (the "Company") as of December 31, 2022, based on criteria established in *Internal Control — Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2022, based on criteria established in *Internal Control — Integrated Framework (2013)* issued by COSO.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheet as of December 31, 2022, and statements of operations, changes in equity, and cash flows, for the year ended December 31, 2022, of the Company and our report dated March 1, 2023, expressed an unqualified opinion on those financial statements.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying *Management's Report on Internal Control over Financial Reporting*. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ Deloitte & Touche LLP

Detroit, Michigan
March 1, 2023

Table of Contents

**UWM HOLDINGS CORPORATION**
**CONSOLIDATED BALANCE SHEETS**
**(in thousands, except shares and per share amounts)**

| | December 31, 2022 | December 31, 2021 |
|---|---|---|
| **Assets** | | |
| Cash and cash equivalents | $ 704,898 | $ 731,088 |
| Mortgage loans at fair value | 7,134,960 | 16,909,901 |
| Derivative assets | 82,869 | 67,356 |
| Investment securities at fair value, pledged | 113,290 | 152,263 |
| Accounts receivable, net | 383,147 | 415,691 |
| Mortgage servicing rights | 4,453,261 | 3,314,952 |
| Premises and equipment, net | 152,477 | 151,687 |
| Operating lease right-of-use asset, net (includes $102,322 and $104,595 with related parties) | 104,181 | 104,828 |
| Finance lease right-of-use asset (includes $26,867 and $28,619 with related parties) | 42,218 | 57,024 |
| Loans eligible for repurchase from Ginnie Mae | 345,490 | 563,423 |
| Other assets | 83,834 | 60,145 |
| **Total assets** | $ 13,600,625 | $ 22,528,358 |
| **Liabilities and equity** | | |
| Warehouse lines of credit | $ 6,443,992 | $ 15,954,938 |
| Derivative liabilities | 49,748 | 36,741 |
| Secured line of credit | 750,000 | — |
| Borrowings against investment securities | 101,345 | 118,786 |
| Accounts payable, accrued expenses and other | 439,719 | 523,988 |
| Accrued distributions and dividends payable | 159,465 | 9,171 |
| Senior notes | 1,984,336 | 1,980,112 |
| Operating lease liability (includes $109,473 and $111.999 with related parties) | 111,332 | 112,231 |
| Finance lease liability (includes $27,857 and $29,087 with related parties) | 43,505 | 57,967 |
| Loans eligible for repurchase from Ginnie Mae | 345,490 | 563,423 |
| **Total liabilities** | 10,428,932 | 19,357,357 |
| **Equity** | | |
| Preferred stock, $0.0001 par value - 100,000,000 shares authorized, none issued and outstanding as of December 31, 2022 or 2021 | — | — |
| Class A common stock, $0.0001 par value - 4,000,000,000 shares authorized, 92,575,974 and 91,612,305 shares issued and outstanding as of December 31, 2022 and December 31, 2021, respectively | 9 | 9 |
| Class B common stock, $0.0001 par value - 1,700,000,000 shares authorized, none issued and outstanding as of December 31, 2022 or 2021 | — | — |
| Class C common stock, $0.0001 par value - 1,700,000,000 shares authorized, none issued and outstanding as of December 31, 2022 or 2021 | — | — |
| Class D common stock, $0.0001 par value - 1,700,000,000 shares authorized, 1,502,069,787 shares issued and outstanding as of December 31, 2022 and December 31, 2021 | 150 | 150 |
| Additional paid-in capital | 903 | 437 |
| Retained earnings | 142,500 | 141,805 |
| Non-controlling interest | 3,028,131 | 3,028,600 |
| **Total equity** | 3,171,693 | 3,171,001 |
| **Total liabilities and equity** | $ 13,600,625 | $ 22,528,358 |

See accompanying Notes to the Consolidated Financial Statements.

71

Table of Contents

**UWM HOLDINGS CORPORATION**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**(in thousands, except shares and per share amounts)**

| | For the year ended December 31, | | |
| --- | --- | --- | --- |
| | 2022 | 2021 | 2020 |
| **Revenue** | | | |
| Loan production income | $ 981,988 | $ 2,585,807 | $ 4,551,415 |
| Loan servicing income | 792,072 | 638,738 | 288,304 |
| Change in fair value of mortgage servicing rights (see Note 5) | 284,104 | (587,813) | — |
| Gain (loss) on sale of mortgage servicing rights | — | 1,791 | (62,285) |
| Interest income | 314,462 | 331,770 | 161,160 |
| Total revenue, net | 2,372,626 | 2,970,293 | 4,938,594 |
| **Expenses** | | | |
| Salaries, commissions and benefits | 552,886 | 697,680 | 552,143 |
| Direct loan production costs | 90,369 | 72,952 | 54,459 |
| Marketing, travel, and entertainment | 74,168 | 62,472 | 20,367 |
| Depreciation and amortization | 45,235 | 35,098 | 16,820 |
| General and administrative | 179,549 | 133,334 | 98,856 |
| Servicing costs | 166,024 | 108,967 | 70,835 |
| Amortization, impairment and pay-offs of mortgage servicing rights (see Note 5) | — | — | 573,118 |
| Interest expense | 305,987 | 304,656 | 167,036 |
| Other expense/(income) | 23,739 | (23,107) | — |
| Total expenses | 1,437,957 | 1,392,052 | 1,553,634 |
| **Earnings before income taxes** | 934,669 | 1,578,241 | 3,384,960 |
| **Provision for income taxes** | 2,811 | 9,841 | 2,450 |
| **Net income** | 931,858 | 1,568,400 | 3,382,510 |
| **Net income attributable to non-controlling interest** | 890,143 | 1,469,955 | N/A |
| **Net income attributable to UWM Holdings Corporation** | $ 41,715 | $ 98,445 | N/A |
| | | | |
| **Earnings per share of Class A common stock (see Note 19):** | | | |
| Basic | $ 0.45 | $ 0.98 | N/A |
| Diluted | $ 0.45 | $ 0.66 | N/A |
| **Weighted average shares outstanding:** | | | |
| Basic | 92,475,170 | 100,881,094 | N/A |
| Diluted | 92,475,170 | 1,603,157,640 | N/A |

See accompanying Notes to the Consolidated Financial Statements.

72

Table of Contents

**UWM HOLDINGS CORPORATION**
**CONSOLIDATED STATEMENTS OF CHANGES IN EQUITY**
**(in thousands, except shares and per share amounts)**

| | Class A Common Stock Shares | Class A Common Stock Amount | Class D Common Stock Shares | Class D Common Stock Amount | Additional Paid-in Capital | Retained Earnings | Non-controlling Interest | Total |
|---|---|---|---|---|---|---|---|---|
| Balance, January 1, 2020 | — | $ — | — | $ — | $ 24,839 | $ 636,484 | $ — | $ 661,323 |
| Net income | — | — | — | — | — | 3,382,510 | — | 3,382,510 |
| Member contributions | — | — | — | — | — | 300,000 | — | 300,000 |
| Member distributions | — | — | — | — | — | (1,969,553) | — | (1,969,553) |
| Balance, December 31, 2020 | — | $ — | — | $ — | $ 24,839 | $ 2,349,441 | $ — | $ 2,374,280 |
| Cumulative effect of change to fair value accounting for mortgage servicing rights (See Note 1) | — | — | — | — | — | 3,440 | — | 3,440 |
| Net income prior to business combination transaction | — | — | — | — | — | 183,756 | — | 183,756 |
| Member distribution to SFS Corp. prior to business combination transaction | — | — | — | — | — | (1,100,000) | — | (1,100,000) |
| Net proceeds received from business combination transaction | — | — | — | — | — | 879,122 | — | 879,122 |
| Cumulative effect of reorganization post business combination transaction | 103,104,205 | 10 | 1,502,069,787 | 150 | (24,839) | (2,164,975) | 2,189,654 | — |
| Opening net liabilities of Gores Holdings IV, Inc. acquired | — | — | — | — | — | (75,380) | — | (75,380) |
| Net income subsequent to business combination transaction | — | — | — | — | — | 98,445 | 1,286,199 | 1,384,644 |
| Class A common stock dividends | — | — | — | — | — | (39,805) | — | (39,805) |
| Member distributions to SFS Corp. subsequent to business combination transaction | — | — | — | — | — | — | (368,832) | (368,832) |
| Stock-based compensation expense | 6,430 | — | — | — | 437 | — | 6,030 | 6,467 |
| Class A common stock repurchased | (11,498,330) | (1) | — | — | — | (5,065) | (76,561) | (81,627) |
| Re-measurement of non-controlling interest due to change in parent ownership and other | — | — | — | — | — | 12,826 | (7,890) | 4,936 |
| Balance, December 31, 2021 | 91,612,305 | $ 9 | 1,502,069,787 | $ 150 | $ 437 | $ 141,805 | $ 3,028,600 | $ 3,171,001 |
| Net income | — | — | — | — | — | 41,715 | 890,143 | 931,858 |
| Class A common stock dividends | — | — | — | — | — | (37,023) | — | (37,023) |
| Member distributions to SFS Corp. | — | — | — | — | — | — | (901,242) | (901,242) |
| Stock-based compensation expense | 963,669 | — | — | — | 466 | — | 7,079 | 7,545 |
| Re-measurement of non-controlling interest due to change in parent ownership and other | — | — | — | — | — | (3,997) | 3,551 | (446) |
| Balance, December 31, 2022 | 92,575,974 | $ 9 | 1,502,069,787 | $ 150 | $ 903 | $ 142,500 | $ 3,028,131 | $ 3,171,693 |

See accompanying Notes to the Consolidated Financial Statements.

Table of Contents

**UWM HOLDINGS CORPORATION**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(in thousands)**

| | For the year ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | 2020 |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | |
| Net income | $ 931,858 | $ 1,568,400 | $ 3,382,510 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Reserve for representations and warranties | 57,415 | 45,301 | 36,510 |
| Capitalization of mortgage servicing rights | (2,213,572) | (2,397,483) | (1,896,638) |
| Amortization and pay-offs of mortgage servicing rights | — | — | 553,534 |
| Impairment of mortgage servicing rights, net | — | — | 19,584 |
| Change in fair value of mortgage servicing rights | (284,104) | 587,813 | — |
| Depreciation & amortization | 49,404 | 38,025 | 17,172 |
| Stock-based compensation expense | 7,545 | 6,467 | — |
| Retention of investment securities | — | (154,794) | — |
| Decrease in fair value of investment securities | 28,227 | 1,061 | — |
| Decrease in fair value of warrants liability | (7,683) | (36,105) | — |
| (Increase) decrease in: | | | |
| Mortgage loans at fair value | 9,774,941 | (9,444,476) | (2,040,817) |
| Derivative assets | (15,512) | (6,284) | (36,384) |
| Other assets | 56,626 | (166,250) | (119,627) |
| Increase (decrease) in: | | | |
| Derivative liabilities | 13,007 | (29,496) | 43,828 |
| Other liabilities | (129,970) | 30,858 | 96,740 |
| Net cash provided by (used in) operating activities | 8,268,182 | (9,956,963) | 56,412 |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | |
| Purchases of premises and equipment | (26,615) | (65,384) | (57,288) |
| Net proceeds from sale of mortgage servicing rights | 1,311,282 | 264,028 | 289,170 |
| Proceeds from principal payments on investment securities | 10,987 | 1,107 | — |
| Margin calls on borrowings against investment securities | (5,308) | — | — |
| Net cash provided by investing activities | 1,290,346 | 199,751 | 231,882 |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | |
| Net (repayments) borrowings under warehouse lines of credit | (9,510,946) | 9,013,541 | 1,751,810 |
| Repayments of finance lease liabilities | (17,323) | (13,704) | (5,049) |
| Borrowings under equipment notes payable | — | 1,078 | 2,165 |
| Repayments under equipment notes payable | (1,037) | (25,560) | (5,637) |
| Borrowings under lines of credit | 1,250,000 | 79,700 | 412,295 |
| Repayments under lines of credit | (500,000) | (400,000) | (467,995) |
| Proceeds from issuance of senior notes | — | 1,200,000 | 800,000 |
| Discount and direct issuance costs on senior notes | — | (12,159) | (11,030) |
| Borrowings against investment securities | 101,345 | 118,786 | — |
| Repayments of borrowings against investment securities | (118,786) | — | — |
| Proceeds from business combination transaction | — | 895,134 | — |
| Costs incurred related to business combination transaction | — | (11,260) | (4,745) |
| Dividends paid to Class A common stockholders | (36,936) | (30,634) | — |
| Member contributions from SFS Corp. | — | — | 300,000 |
| Member distributions paid to SFS Corp. | (751,035) | (1,468,832) | (1,969,554) |
| Class A common stock repurchased | — | (81,627) | — |
| Net cash (used in) provided by financing activities | (9,584,718) | 9,264,463 | 802,260 |
| **INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS** | (26,190) | (492,749) | 1,090,554 |
| **CASH AND CASH EQUIVALENTS, BEGINNING OF THE PERIOD** | 731,088 | 1,223,837 | 133,283 |
| | $ 704,898 | $ 731,088 | $ 1,223,837 |
| **SUPPLEMENTAL INFORMATION** | | | |
| Cash paid for interest | $ 241,732 | $ 287,295 | $ 161,803 |
| Cash paid for taxes | — | 1,776 | — |

See accompanying Notes to the Consolidated Financial Statements.

74

Table of Contents

**UWM HOLDINGS CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE 1 – ORGANIZATION, BASIS OF PRESENTATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

**Organization**

UWM Holdings Corporation, through its consolidated subsidiaries (collectively, the "Company"), engages in the origination, sale and servicing of residential mortgage loans. The Company is organized in Delaware but based in Michigan, and originates and services loans throughout the U.S. The Company is approved as a Title II, non-supervised direct endorsement mortgagee with the U.S. Department of Housing and Urban Development (or "HUD"). In addition, the Company is an approved issuer with the Government National Mortgage Association (or "Ginnie Mae"), as well as an approved seller and servicer with the Federal National Mortgage Association (or "Fannie Mae") and the Federal Home Loan Mortgage Corporation (or "Freddie Mac").

The Company (f/k/a Gores Holdings IV, Inc.) was incorporated in Delaware on June 12, 2019. The Company was formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses. On September 22, 2020, the Company entered into a Business Combination Agreement (the "Business Combination Agreement") by and among the Company, SFS Holding Corp., a Michigan corporation ("SFS Corp."), United Wholesale Mortgage, LLC, a Michigan limited liability company ("UWM"), and UWM Holdings, LLC, a newly formed Delaware limited liability company ("Holdings LLC" and, together with UWM, the "UWM Entities"). The business combination with the UWM Entities closed on January 21, 2021.

Prior to the closing of the business combination with the UWM Entities, SFS Corp. was the sole member of UWM, which had one unit authorized, issued and outstanding. On January 21, 2021, SFS Corp. contributed its equity interest in UWM to Holdings LLC and adopted the Amended and Restated Operating Agreement to admit Holdings LLC as UWM's sole member and its manager. Upon completion of the business combination transaction, (i) Holdings LLC issued approximately 6% of its units (Class A Common Units) to the Company, (ii) SFS Corp. retained approximately 94% of the units (Class B Common Units) in Holdings LLC and accordingly retained approximately 94% of the economic ownership interest of the combined company and (iii) Holdings LLC became a consolidated subsidiary of the Company, as the Company is the sole managing member of Holdings LLC. The economic interest in Holdings LLC owned by SFS Corp. is presented as a non-controlling interest in these consolidated financial statements (see *Note 12 - Non-Controlling Interests* for further information).

Following the consummation of the transactions contemplated by the Business Combination Agreement, the Company is organized in an "Up-C" structure in which UWM (the operating subsidiary) is held directly by Holdings LLC, and the Company's only material direct asset consists of Class A Common Units in Holdings LLC. The Company's current capital structure authorizes Class A common stock, Class B common stock, Class C common stock and Class D common stock. The Class A common stock and Class C common stock each provide holders with one vote on all matters submitted to a vote of stockholders, and the Class B common stock and Class D common stock each provide holders with 10 votes on all matters submitted to a vote of stockholders. The holders of Class C common stock and Class D common stock do not have any of the economic rights (including rights to dividends and distributions upon liquidation) provided to holders of Class A common stock and Class B common stock. Immediately following the business combination transaction, there were 103,104,205 shares of Class A common stock outstanding, and 1,502,069,787 shares of non-economic Class D common stock outstanding (all of which were held by SFS Corp.), and no shares of Class B or Class C common stock outstanding. As of December 31, 2022, there were 92,575,974 shares of Class A common stock outstanding and 1,502,069,787 shares of Class D common stock outstanding. Each Holdings LLC Class B Common Unit held by SFS Corp. may be exchanged at the option of the Company, along with its stapled share of Class D common stock, for either, (a) cash or (b) one share of the Company's Class B common stock. Each share of Class B Stock is convertible into one share of Class A Stock upon the transfer or assignment of such share from SFS Corp. to a non-affiliated third-party. See *Note 12 - Non-Controlling Interests* for further information. Pursuant to the Business Combination Agreement, SFS Corp. is entitled to receive an aggregate of up to 90,761,687 earn-out shares in the form of Class B Common Units in Holdings LLC and Class D common shares upon attainment of certain stock price targets prior to January 2026. There are four different triggering events that affect the number of earn-out shares that will be issued based upon the per share price of Class A common stock ranging from $13.00 to $19.00 per share. The Company accounts for the potential earn-out shares as a component of stockholders' equity in accordance with the applicable guidance in U.S. GAAP. See *Note 19 - Earnings Per Share* for further information.

Table of Contents

**Basis of Presentation and Consolidation**

The business combination transaction was accounted for as a reverse recapitalization in accordance with U.S. GAAP as UWM was determined to be the accounting acquirer, primarily due to the fact that SFS Corp. continues to control the Company through its ownership of the Class D common stock. Under this method of accounting, while the Company was the legal acquirer, it was treated as the acquired company for financial reporting purposes. Accordingly, the business combination transaction was treated as the equivalent of UWM issuing stock for the net assets of the Company, accompanied by a recapitalization, with the net assets of the Company stated at historical cost, with no goodwill or other intangible assets recorded. The net proceeds received from Gores Holdings IV, Inc. in the business combination transaction approximated $895.1 million, and the Company incurred approximately $16.0 million in costs related to the transaction which were charged to stockholders' equity upon the closing of the transaction. As part of the business combination transaction, the Company assumed the liability related to the Public and Private Warrants (described below) of $45.6 million. The Company's financial statement presentation included in these consolidated financial statements include the consolidated financial statements of UWM and its subsidiaries for periods prior to the completion of the business combination transaction with the UWM Entities and of the Company for periods from and after the business combination transaction.

The Company's consolidated financial statements have been prepared in accordance with U.S. GAAP and pursuant to the rules and regulations of the Securities and Exchange Commission ("SEC").

**Use of Estimates**

The preparation of consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements, and the reported amounts of revenue and expenses during the reporting period. Actual results could differ from those estimates.

**Dividend Policy**

In connection with its decision to declare a dividend on its Class A common stock, the Company's Board of Directors (the "Board"), in its capacity as the Manager of Holdings LLC, under the Holdings LLC Second Amended and Restated Operating Agreement, can determine whether to (a) make distributions from Holdings LLC to only the Company, as the owner of the Class A Units of Holdings LLC with the proportional amount due to SFS Corp. as the owner of the Class B Units of Holdings LLC, being distributed upon the sooner to occur of (i) the Board making a determination to do so or (ii) the date on which Class B Units of Holdings LLC are converted into shares of Class B common stock of the Company or (b) make proportional and simultaneous distributions from Holdings LLC to both the Company, as the owner of the Class A Units of Holdings LLC and to SFS Corp. as the owner of the Class B Units of Holdings LLC.

**Operating Segments**

The Company operates as one segment. Operating segments are defined as components of an enterprise for which separate financial information is regularly evaluated by the chief operating decision maker (or "CODM"), which is the Company's chief executive officer, in deciding how to allocate resources and assess performance. The Company's CODM evaluates the Company's financial information on a consolidated basis.

**Cash and Cash Equivalents**

The Company considers cash and temporary investments with original maturities of three months or less to be cash and cash equivalents. The Company typically maintains cash balances in financial institutions in excess of Federal Deposit Insurance Corporation limits. The Company evaluates the creditworthiness of these financial institutions in determining the risk associated with these balances.

**Mortgage Loans at Fair Value and Revenue Recognition**

Mortgage loans are recorded at estimated fair value. Fair value of mortgage loans are estimated using observable market information including pricing from current cash commitments from government sponsored enterprises, recent market commitment prices, or broker quotes, as if the loans were to be sold currently into the secondary market. See *Note 2 - Mortgage Loans at Fair Value* for further information.

Loans are considered to be sold when the Company surrenders control over the financial assets. Control is considered to have been surrendered when the transferred assets have been isolated from the Company, beyond the reach of the Company and its creditors; the purchaser obtains the right, free of conditions that constrain it from taking advantage of that right, to pledge or exchange the transferred assets; and the Company does not maintain effective control over the transferred assets

76

Table of Contents

through an agreement that entitles or obligates the Company to repurchase or redeem the transferred assets before their maturity. The Company typically considers the above criteria to have been met when transferring title to another party where no substantive repurchase rights or obligations exist.

The Company generates revenue from the following three components of the loan origination business: (i) loan production income, (ii) loan servicing income, and (iii) interest income. A majority of the revenues from mortgage loan originations are recognized when the loan is originated which is the primary revenue recognition event as the loans are recorded at fair value upon origination.

*Loan production income.* Loan production income includes all components related to the origination and sale of mortgage loans, including (1) primary gain, which represents the premium the Company receives in excess of the loan principal amount adjusted for previous fair value adjustments, and certain fees charged by investors upon sale of loans into the secondary market; when the mortgage loan is sold into the secondary market, any difference between the proceeds received and the current fair value of the loan is recognized in current period earnings; (2) loan origination fees the Company charges to originate a loan, which generally represent flat, per-loan fee amounts, which are recognized as revenue at the time loans are originated; (3) provision for representation and warranty obligations, which represent the reserves initially established for the Company's estimated liabilities associated with the potential repurchase or indemnity of purchasers of loans previously sold due to representation and warranty claims by investors; included within these reserves are amounts for estimated liabilities for requirements to repay a portion of any premium received from investors on the sale of certain loans if such loans are repaid in their entirety within a specified time period after the sale of the loans; (4) the change in fair value of interest rate lock commitments, forward loan sale commitments, and recorded loans on the balance sheet, due to changes in estimated fair value, driven primarily by interest rates but also influenced by other assumptions; and (5) capitalization of MSRs, representing the estimated fair value of newly originated MSRs when loans are sold and the associated servicing rights are retained. Compensation earned by the Company's Independent Mortgage Brokers is included in the cost of the loans the Company originates, and therefore netted within loan production income.

*Loan servicing income.* Loan servicing income represents revenue earned for servicing loans for various investors. The loan servicing income is primarily based on a contractual percentage of the outstanding principal balance and servicing revenue is recognized as the related mortgage payments are received by the Company's sub-servicer. Loan servicing expenses are charged to expense as incurred.

*Interest income.* Interest income on mortgage loans at fair value is accrued based upon the principal amount outstanding and contractual interest rates. Income recognition is discontinued when loans become 90 days delinquent or when, in management's opinion, the collectability of principal and interest becomes doubtful and the specific loan is put on non-accrual status.

**Mortgage Servicing Rights and Revenue Recognition**

When a loan is sold the Company typically retains the MSRs. Specifically, the Company retains the right and obligation to service the loan and receives a fee for collecting payments and transmitting collected payments to the purchasers of the loan. At the date the loan is sold with servicing retained, the fair value of the MSR is capitalized and recognized within loan production income. MSRs are initially recorded at estimated fair value. To determine the fair value of the servicing right created, the Company uses third party estimates of fair value at the time of initial recognition.

On January 1, 2021, the Company adopted the fair value method to measure its servicing assets and liabilities for all current classes of servicing assets and liabilities subsequent to initial recognition. Management believes that the fair value method more directly reports the current expected benefits and obligations of the Company's servicing rights. The adoption of the fair value method for a particular class of servicing assets is irrevocable. Prior to January 1, 2021, the Company measured its servicing assets and liabilities after initial recognition using the amortized cost method. This change in accounting resulted in a $3.4 million increase to retained earnings and the MSR asset as of January 1, 2021. Subsequent to the adoption of the fair value method of accounting for MSRs, changes in fair value of MSRs are reported as a component of "Total revenue, net" within the consolidated statements of operations.

Prior to the adoption of the fair value method, MSRs were amortized in proportion to the estimated future net servicing revenue, and periodically evaluated for impairment. For this purpose, the Company stratified its MSRs based on the interest rate of the underlying loans. The Company recorded a valuation allowance when the fair value of the mortgage servicing asset strata was less than its amortized book value. Valuation allowances were recorded as a temporary impairment to the affected strata effectively reducing recorded MSRs and incurring a charge to operations. When a mortgage prepays, the Company permanently reduces the associated MSR in the period of prepayment with a charge to operations.

Table of Contents

Under both the fair value and amortization accounting methods, the fair value of MSRs is estimated with the assistance of a third party broker based upon a valuation model that calculates the estimated present value of future cash flows. The valuation model incorporates market estimates of prepayment speeds, discount rates, cost to service, float value, ancillary income, inflation, and delinquency and default rates.

Sales of MSRs are recognized when the risk and rewards of ownership have been transferred to a buyer, and a substantive non-refundable down payment is received. Also, any risks retained by the Company must be reasonably quantifiable to be eligible for sale accounting. See *Note 5 – Mortgage Servicing Rights, net* for further information.

**Representations and Warranties Reserve**

Loans sold to investors which the Company believes met investor and agency underwriting guidelines at the time of sale may be subject to repurchase in the event of specific default by the borrower or subsequent discovery that underwriting or documentation standards were not explicitly satisfied. The Company may, upon mutual agreement, indemnify the investor against future losses on such loans or be subject to other guaranty requirements and subject to loss. The Company initially records its exposure under such guarantees at estimated fair value upon the sale of the related loan, within accounts payable, accrued expenses and other, as well as within loan production income, and continues to evaluate its on-going exposures in subsequent periods, with subsequent changes in estimates recorded as part of general and administrative expenses. The reserve is estimated based on the Company's assessment of its contingent and non-contingent obligations, including expected losses, expected frequency, the overall potential remaining exposure, as well as an estimate for a market participant's potential readiness to stand by to perform on such obligations. See *Note 10 - Commitments and Contingencies* for further information.

**Derivatives**

Derivatives are recognized as assets or liabilities on the consolidated balance sheets and measured at fair value with changes in fair value recorded within the consolidated statements of operations in the period in which they occur. The Company enters into derivative instruments to reduce its risk exposure to fluctuations in interest rates. The Company accounts for derivative instruments as free-standing derivative instruments and does not designate any for hedge accounting. IRLCs on mortgage loans to be originated or purchased which are intended to be sold are considered to be derivatives with changes in fair value recorded in the consolidated statements of operations as part of loan production income. Fair value is estimated primarily based on relative changes in interest rates for the underlying mortgages to be originated or purchased. Fair value estimates also take into account the probability that loan commitments may not be exercised by customers. The Company uses forward mortgage backed security contracts, which are known as FLSCs, to economically hedge the IRLCs. See *Note 3 – Derivatives* for further information.

**Loans Eligible for Repurchase from Ginnie Mae**

When the Company has the unilateral right to repurchase Ginnie Mae pool loans it has previously sold (generally loans that are more than 90 days past due), the previously sold assets are required to be re-recognized on the consolidated balance sheets as assets and corresponding liabilities at the loan's unpaid principal balance, regardless of the Company's intent to exercise the option to repurchase. The recognition of previously sold loans does not impact the accounting for the previously recognized mortgage servicing rights (or "MSRs"). As of December 31, 2022, the Company changed the balance sheet presentation of Ginnie Mae loans eligible for repurchase and the corresponding liabilities to report these assets and liabilities separately from "Mortgage loans at fair value" and "Accounts payable, accrued expenses, and other," where they were previously reported. Prior periods have been updated to conform with the current period presentation.

**Leases**

The Company enters into contracts to lease real estate (land and buildings), furniture and fixtures, and information technology equipment. Leases that meet one of the finance lease criteria are classified as finance leases, while all others are classified as operating leases. The Company determines if an arrangement is a lease at inception and has made an accounting policy election to capitalize leases with initial terms in excess of 12 months. At lease commencement, a lease liability and right-of-use asset are calculated and recognized for operating and finance leases. Lease liabilities represent the Company's obligation to make lease payments arising from the lease and lease right-of-use assets represent the Company's right to use an underlying asset for the lease term. The lease term used in the calculation includes any options to extend that the Company is reasonably certain to exercise. The lease liability is equal to the present value of future lease payments. The right-of-use asset is equal to the lease liability, plus any initial direct costs and prepaid lease payments, less any lease incentives received. Operating and finance lease right-of-use assets and liabilities are recorded separately on the consolidated balance sheets. In determining the present value of future lease payments, the Company uses estimated incremental borrowing rates based on information available at the lease commencement date when an implicit rate is not readily determinable for a given lease. The incremental borrowing rate is the rate of interest that a lessee would have to pay to borrow on a collateralized basis over a similar term an

Table of Contents

amount equal to the lease payments in a similar economic environment. The Company uses an incremental borrowing rate estimated by referencing the Company's collateralized borrowings.

The Company's leases do not contain any material residual value guarantees or material restrictive covenants. The Company's lease agreements include both lease and non-lease components which are generally accounted for as a single component to the extent that the costs are fixed. If the non-lease components are not fixed, the costs are treated as variable lease costs. Subsequent to lease commencement, lease liabilities recorded for finance leases are measured using the effective interest method and the related right-of-use assets are amortized on a straight-line basis over the lease term. For finance leases, interest expense and amortization expense are recorded separately in the consolidated statements of operations as part of "Interest expense" and "Depreciation and amortization," respectively. For operating leases, total lease cost is comprised of lease expense and variable lease cost. Lease expense includes lease payments, which are recognized on a straight-line basis over the lease term. Variable lease cost includes common area maintenance charges, real estate taxes, insurance and other expenses, where applicable, which are expensed as incurred. Total lease cost for operating leases is recorded as part of "General and administrative" expense in the consolidated statements of operations. See *Note 7 - Leases* for further information.

**Income Taxes**

The Company follows the asset and liability method of accounting for income taxes under applicable U.S. GAAP. Our income tax expense, deferred tax assets and liabilities, and reserves for unrecognized tax benefits reflect management's best assessment of estimated current and future taxes to be paid. We are subject to income taxes in the U.S. and various state and local jurisdictions. The tax laws are often complex and may be subject to different interpretations. To determine the financial statement impact of accounting for income taxes, the Company must make assumptions and judgements about how to interpret and apply complex tax laws to numerous transactions and business events, as well as make judgements regarding the timing of when certain items may affect taxable income.

Deferred income taxes arise from temporary differences between the financial statement carrying amount and the tax basis of assets and liabilities. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized as income in the period that includes the enactment date. In evaluating our ability to recover our deferred tax assets within the jurisdiction from which they arise, we consider all available positive and negative evidence including future reversals of existing taxable temporary differences, projected future taxable income, tax planning strategies and recent results of operations. If based upon all available positive and negative evidence, it is more likely than not that the deferred tax assets will not be realized, a valuation allowance is established. The valuation allowance may be reversed in a subsequent reporting period if the Company determines that it is more likely than not that all or part of the deferred tax asset will become realizable.

Our interpretations of tax laws are subject to review and examination by various taxing authorities and jurisdictions where the Company operates, and disputes may occur regarding our view on a tax position. These disputes over interpretations with the various tax authorities may be settled by audit, administrative appeals or adjudication in the court systems of the tax jurisdictions in which the Company operates. We regularly review whether we may be assessed additional income taxes as a result of the resolution of these matters, and the Company records additional reserves as appropriate. In addition, the Company may revise its estimate of income taxes due to changes in income tax laws, legal interpretations, and business strategies. We recognize the financial statement effects of uncertain income tax positions when it is more likely than not, based on the technical merits, that the position will be sustained upon examination. We record interest and penalties related to uncertain tax positions as a component of the income tax provision. See *Note 17 – Income Taxes* for further information.

**Tax Receivable Agreement**

In connection with the Business Combination Agreement, the Company entered into a Tax Receivable Agreement with SFS Corp. that will obligate the Company to make payments to SFS Corp. of 85% of the amount of cash savings, if any, in U.S. federal, state and local income tax that the Company actually realizes as a result of (i) certain increases in tax basis resulting from exchanges of Holdings LLC Common Units; (ii) imputed interest deemed to be paid by the Company as a result of payments it makes under the tax receivable agreement; (iii) certain increases in tax basis resulting from payments the Company makes under the tax receivable agreement; and (iv) disproportionate allocations (if any) of tax benefits to the Company which arise from, among other things, the sale of certain assets as a result of section 704(c) of the Internal Revenue Code of 1986. The Company will retain the benefit of the remaining 15% of these tax savings. The Company recognized a liability of approximately $1.9 million for estimated amounts due under the Tax Receivable Agreement in connection with the business combination transaction. Subsequently, the liability is accounted for as a loss contingency, with changes in the liability measured and recorded when estimated amounts due under the Tax Receivable Agreement are probable and can be reasonably estimated, and reported as part of other expense/(income) in the consolidated statements of operations. During the year ended

Table of Contents

December 31, 2022, the Company recorded an additional liability of $3.2 million. As of December 31, 2022, the total liability recorded for the Tax Receivable Agreement was approximately $17.1 million.

**Related Party Transactions**

The Company enters into various transactions with related parties. See *Note 16 – Related Party Transactions* for further information.

**Public and Private Warrants**

As part of Gores Holdings IV, Inc.'s initial public offering ("IPO") in January 2020, Gores Holdings IV, Inc. issued to third party investors 42.5 million units, consisting of one share of Class A common stock of Gores Holdings IV, Inc. and one-fourth of one warrant, at a price of $10.00 per unit. Each whole warrant entitles the holder to purchase one share of Class A common stock at an exercise price of $11.50 per share (the "Public Warrants"). Simultaneously with the closing of the IPO, Gores Holdings IV, Inc. completed the private sale of 5.25 million warrants to Gores Holdings IV, Inc.'s sponsor at a purchase price of $2.00 per warrant (the "Private Warrants"). Each Private Warrant allows the sponsor to purchase one share of Class A common stock at $11.50 per share. Upon the closing of the business combination transaction, the Company had 10,624,987 Public Warrants and 5,250,000 Private Warrants outstanding.

The Private Warrants and the shares of common stock issuable upon the exercise of the Private Warrants were not transferable, assignable or salable until after the completion of the business combination, subject to certain limited exceptions. Additionally, the Private Warrants are exercisable for cash or on a cashless basis, at the holder's option, and are non-redeemable so long as they are held by the initial purchasers or their permitted transferees. If the Private Warrants are held by someone other than the initial purchasers or their permitted transferees, the Private Warrants will be redeemable by the Company and exercisable by such holders on the same basis as the Public Warrants.

The Company evaluated the Public and Private Warrants under applicable U.S. GAAP and concluded that they do not meet the criteria to be classified in stockholders' equity due to certain terms of the warrants. Since the Public and Private Warrants meet the definition of derivatives, the Company recorded these warrants as liabilities on the balance sheet at fair value upon the closing of the business combination transaction and subsequently (recorded within "Accounts payable, accrued expenses and other"), with the change in their respective fair values recognized in the consolidated statement of operations (recorded within "Other expense/(income)"). During the years ended December 31, 2022 and 2021, the Company recognized $7.7 million and $23.1 million, respectively, of other income related to the change in fair value of warrants.

**Stock-Based Compensation**

Effective upon the closing of the business combination transaction, the Company adopted the UWM Holdings Corporation 2020 Omnibus Incentive Plan (the "2020 Plan") which was approved by stockholders on January 20, 2021. The 2020 Plan allows for the grant of stock options, restricted stock, restricted stock units ("RSUs"), and stock appreciation rights. Pursuant to the 2020 Plan, the Company reserved a total of 80,000,000 shares of common stock for issuance of stock-based compensation awards. Stock-based compensation expense is recognized on a straight-line basis over the requisite service period based on the fair value of the award on the date of grant and is included in "Salaries, commissions and benefits" on the consolidated statements of operations. The Company made a policy election to recognize the effects of forfeitures as they occur. See *Note 18 – Stock-based Compensation* for further information.

**Servicing Advances**

Servicing advances represent advances on behalf of borrowers and investors to cover delinquent balances for property taxes, insurance premiums and other out-of-pocket costs. Advances are made in accordance with the servicing agreements and are recoverable upon liquidation. The Company periodically evaluates the advances for collectability and amounts are written-off when they are deemed uncollectible. Servicing advances are included in accounts receivable, net on the consolidated balance sheets.

**Advertising and Marketing**

Advertising and marketing is expensed as incurred and amounted to $29.0 million, $21.8 million and $7.9 million for the years ended December 31, 2022, 2021 and 2020, respectively, and is included in marketing, travel, and entertainment expenses in the consolidated statements of operations.

**Escrow and Fiduciary Funds**

Table of Contents

The Company maintains segregated bank accounts in trust for investors and escrow balances for mortgagors. The balances of these accounts amounted to $1.58 billion and $1.61 billion at December 31, 2022 and December 31, 2021, respectively, and are excluded from the consolidated balance sheets.

**Contingencies**

The Company evaluates contingencies based on information currently available and establishes an accrual for those matters when a loss contingency is considered probable and the related amount is reasonably estimable. For matters where a loss is believed to be reasonably possible but not probable, no accrual is established but the nature of the loss contingency and an estimate of the reasonably possible range of loss in excess of amount accrued, when such estimate can be made, is disclosed. In deriving an estimate, the Company is required to make assumptions about matters that are, by their nature, highly uncertain. The assessment of loss contingencies involves the use of critical estimates, assumptions and judgments. It is not possible to predict or determine the outcome of all loss contingencies. Accruals are periodically reviewed and may be adjusted as circumstances change.

**Risks and Uncertainties**

The Company encounters certain economic and regulatory risks inherent in the consumer finance business. Economic risks include interest rate risk and credit risks. The Company is subject to interest rate risk to the extent that in a rising interest rate environment, the Company may experience a decrease in loan production, as well as decreases in the value of mortgage loans at fair value and in commitments to originate loans, which may negatively impact the Company's operations. Credit risk is the risk of default that may result from the borrowers' inability or unwillingness to make contractually required payments during the period in which mortgage loans are being held at fair value or subsequently under any representation and warranty provisions within the Company's sale agreements. The Company is subject to substantial regulation as it directly provides financing to consumers acquiring residential real estate.

The Company sells loans to investors without specific recourse. As such, the investors have assumed the risk of loss of default by the borrower. However, the Company is usually required by these investors to make certain standard representations and warranties relating to credit information, loan documentation and collateral. To the extent that the Company does not comply with such representations, or there are early payment defaults, the Company may be required to repurchase the loans or indemnify these investors for any losses from borrower defaults. In addition, if loans pay-off within a specified time frame, the Company may be required to refund a portion of the sales proceeds to the investors.

**Recently Adopted Accounting Pronouncements**

In March 2020, the Financial Accounting Standards Board ("FASB") issued ASU 2020-4, *Reference Rate Reform (Topic 848): Facilitation of the Effects of Reference Rate Reform on Financial Reporting*, which was subsequently amended by ASU No. 2021-1, *Reference Rate Reform (Topic 848): Scope*, which was issued in January 2021 and will remain effective through December 31, 2024. This guidance provides practical expedients to address existing guidance on contract modifications due to the expected market transition from the London Inter-bank Offered Rate ("LIBOR") and other interbank offered rates to alternative reference rates, such as the Secured Overnight Financing Rate ("SOFR"). The ASU was effective upon issuance on a prospective basis beginning January 1, 2020 and the Company may elect certain practical expedients as reference rate activities occur. The Company will evaluate its debt and other applicable contracts that are modified in the future to ensure they are eligible for modification relief and apply the practical expedients as needed. The Company does not anticipate this will have a material impact on its consolidated financial statements and related disclosures.

**NOTE 2 – MORTGAGE LOANS AT FAIR VALUE**

The table below includes the estimated fair value and unpaid principal balance ("UPB") of mortgage loans that have contractual principal amounts and for which the Company has elected the fair value option. The fair value option has been elected for mortgage loans, as this accounting treatment best reflects the economic consequences of the Company's mortgage origination and related hedging and risk management activities. The difference between the UPB and estimated fair value is made up of the premiums paid on mortgage loans, as well as the fair value adjustment as of the balance sheet date. The change in fair value adjustment is recorded in the "Loan production income" line item of the consolidated statements of operations.

Table of Contents

| (In thousands) | December 31, 2022 | | December 31, 2021 |
|---|---|---|---|
| Mortgage loans, unpaid principal balance | $ | 7,128,131 | $ | 16,630,907 |
| Premiums paid on mortgage loans | | 70,914 | | 238,963 |
| Fair value adjustment | | (64,085) | | 40,031 |
| Mortgage loans at fair value | $ | 7,134,960 | $ | 16,909,901 |

## NOTE 3 – DERIVATIVES

The Company enters into IRLCs to originate residential mortgage loans at specified interest rates and terms within a specified period of time with customers who have applied for a loan and may meet certain credit and underwriting criteria. To determine the fair value of the IRLCs, each contract is evaluated based upon its stage in the application, approval and origination process for its likelihood of consummating the transaction (or "pullthrough"). Pullthrough is estimated based on changes in market conditions, loan stage, and actual borrower behavior using a historical analysis of IRLC closing rates. Generally, the further into the process the more likely that the IRLC will convert to a loan. The blended average pullthrough rate was 77% and 86%, as of December 31, 2022 and December 31, 2021, respectively. The Company primarily uses FLSCs to economically hedge the IRLCs.

The notional amounts and fair values of derivative financial instruments not designated as hedging instruments were as follows (in thousands):

| | December 31, 2022 | | | | December 31, 2021 | | | |
|---|---|---|---|---|---|---|---|---|
| | Fair value | | | | Fair value | | | |
| | Derivative assets | | Derivative liabilities | Notional Amount | Derivative assets | | Derivative liabilities | Notional Amount |
| IRLCs | $ 7,872 | $ | 32,294 | $ 5,359,684 (a) | $ 24,899 | $ | 11,138 | $ 13,450,967 (a) |
| FLSCs | 74,997 | | 17,454 | 10,944,875 | 42,457 | | 25,603 | 28,887,178 |
| Total | $ 82,869 | $ | 49,748 | | $ 67,356 | $ | 36,741 | |

(a)   Notional amounts have been adjusted for pullthrough rates of 77% and 86%, respectively.

## NOTE 4 – ACCOUNTS RECEIVABLE, NET

The following summarizes accounts receivable, net (in thousands):

| | December 31, 2022 | | December 31, 2021 |
|---|---|---|---|
| Servicing advances | $ | 162,896 | $ | 135,117 |
| Servicing fees | | 110,891 | | 136,981 |
| Receivables from sales of servicing | | 56,019 | | 13,503 |
| Investor receivables | | 25,701 | | 44,192 |
| Origination receivables | | 24,179 | | 56,569 |
| Derivative settlements receivable | | 8,204 | | 21,987 |
| Warehouse bank receivable | | 199 | | 8,510 |
| Other receivables | | 179 | | 127 |
| Provision for current expected credit losses | | (5,121) | | (1,295) |
| Total accounts receivable, net | $ | 383,147 | $ | 415,691 |

The Company periodically evaluates the carrying value of accounts receivable balances with delinquent receivables being written-off based on specific credit evaluations and circumstances of the debtor.

## NOTE 5 – MORTGAGE SERVICING RIGHTS

Mortgage servicing rights are recognized on the consolidated balance sheets when loans are sold and the associated servicing rights are retained. The Company elected the fair value option for all current classes of its MSRs effective January 1, 2021. The Company determined its classes of MSRs based on how the Company manages risk. The Company's MSRs are measured at fair value, which is determined using a valuation model that calculates the present value of estimated future net servicing cash flows. The model includes estimates of prepayment speeds, discount rate, cost to service, float earnings,

Table of Contents

contractual servicing fee income, and ancillary income and late fees, among others. These estimates are supported by market and economic data collected from various external sources.

The unpaid principal balance of mortgage loans serviced for others approximated $312.5 billion and $319.8 billion at December 31, 2022 and December 31, 2021, respectively. Conforming conventional loans serviced by the Company have previously been sold to Fannie Mae and Freddie Mac on a non-recourse basis, whereby credit losses are generally the responsibility of Fannie Mae and Freddie Mac, and not the Company. Loans serviced for Ginnie Mae are insured by the FHA, guaranteed by the VA, or insured by other applicable government programs. While the above guarantees and insurance are the responsibility of those parties, the Company is still subject to potential losses related to its servicing of these loans. Those estimated losses are incorporated into the valuation of MSRs.

The following table summarizes changes in the MSR assets for the years ended December 31, 2022 and 2021 (in thousands):

|  | For the year ended December 31, | |
|---|---|---|
|  | 2022 | 2021 |
| Fair value, beginning of period | $ 3,314,952 | 1,760,304 |
| Capitalization of MSRs | 2,213,572 | 2,397,483 |
| MSR sales | (1,387,180) | (269,925) |
| Changes in fair value: | | |
| Due to changes in valuation inputs or assumptions | 868,803 | 286,348 |
| Due to collection/realization of cash flows/other | (556,886) | (859,258) |
| Fair value, end of period | $ 4,453,261 | $ 3,314,952 |

The following is a summary of the components of change in fair value of servicing rights as reported in the consolidated statements of operations (in thousands):

|  | For the year ended December 31, | |
|---|---|---|
|  | 2022 | 2021 |
| Changes in fair value: | | |
| Due to changes in valuation inputs and assumptions | $ 868,803 | $ 286,348 |
| Due to collection/realization of cash flows and other | (556,886) | (859,258) |
| Net reserves and transaction costs on sales of servicing rights | (27,813) | (14,903) |
| Changes in fair value of mortgage servicing rights | $ 284,104 | $ (587,813) |

During the years ended December 31, 2022 and 2021, the Company sold MSRs on loans with an aggregate UPB of approximately $112.9 billion and $22.7 billion, respectively, for proceeds of approximately $1.4 billion and $269.9 million, respectively. In connection with the sales of these MSRs, the Company recorded a net $27.8 million and $14.9 million, respectively, for its estimated obligation for protection provisions granted to the buyer and transaction costs, which is reflected as part of the change in fair value of MSRs in the consolidated statements of operations.

Prior to the election of the fair value option on January 1, 2021, the Company accounted for MSRs based on the lower cost or market using the amortization method. The following table summarizes changes to the MSR assets for the year ended December 31, 2020 under the amortization method (in thousands):

|  | For the year ended December 31, |
|---|---|
|  | 2020 |
| Balance, beginning of period | $ 731,353 |
| Additions | 1,896,638 |
| Amortization | (252,421) |
| Loans paid in full | (301,113) |
| Sales | (298,009) |
| Recovery/(Impairment) | (19,584) |
| Balance, end of period | $ 1,756,864 |

Table of Contents

The following table summarizes the loan servicing income recognized during the years ended December 31, 2022, 2021 and 2020, respectively (in thousands):

| | For the year ended December 31, | | |
| --- | --- | --- | --- |
| | **2022** | **2021** | **2020** |
| Contractual servicing fees | $ 781,109 | $ 632,276 | $ 284,257 |
| Late, ancillary and other fees | 10,963 | 6,462 | 4,047 |
| Loan servicing income | $ 792,072 | $ 638,738 | $ 288,304 |

The key unobservable inputs used in determining the fair value of the Company's MSRs were as follows at December 31, 2022 and December 31, 2021, respectively:

| | December 31, 2022 | | | December 31, 2021 | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Range | | Weighted Average | Range | | Weighted Average |
| Discount rates | 9.5 % — | 15.0 % | 10.1 % | 9.0 % — | 14.5 % | 9.6 % |
| Annual prepayment speeds | 6.7 % — | 14.0 % | 7.9 % | 8.3 % — | 45.4 % | 10.5 % |
| Cost of servicing | $75 — | $108 | $80 | $74 — | $162 | $81 |

The hypothetical effect of adverse changes in these key assumptions would result in a decrease in fair values as follows at December 31, 2022 and December 31, 2021, respectively, (in thousands):

| | December 31, 2022 | December 31, 2021 |
| --- | --- | --- |
| **Discount rate:** | | |
| + 10% adverse change – effect on value | $ (183,972) | $ (107,992) |
| + 20% adverse change – effect on value | (353,120) | (208,567) |
| **Prepayment speeds:** | | |
| + 10% adverse change – effect on value | $ (143,483) | $ (138,807) |
| + 20% adverse change – effect on value | (277,992) | (267,964) |
| **Cost of servicing:** | | |
| + 10% adverse change – effect on value | $ (39,362) | $ (37,370) |
| + 20% adverse change – effect on value | (78,724) | (74,741) |

These sensitivities are hypothetical and should be used with caution. As the table demonstrates, the Company's methodology for estimating the fair value of MSRs is highly sensitive to changes in assumptions. For example, actual prepayment experience may differ, and any difference may have a material effect on MSR fair value. Changes in fair value resulting from changes in assumptions generally cannot be extrapolated because the relationship of the change in assumption to the change in fair value may not be linear. Also, in this table, the effect of a variation in a particular assumption of the fair value of the MSRs is calculated without changing any other assumption; in reality, changes in one factor may be associated with changes in another (for example, decreases in market interest rates may indicate higher prepayments; however, this may be partially offset by lower prepayments due to other factors such as a borrower's diminished opportunity to refinance), which may magnify or counteract the sensitivities. Thus, any measurement of MSR fair value is limited by the conditions existing and assumptions made as of a particular point in time. Those assumptions may not be appropriate if they are applied to a different point in time.

## NOTE 6 - PREMISES AND EQUIPMENT, NET

Premises and equipment is recorded at cost and depreciated or amortized using the straight line method over the estimated useful lives of the assets, which primarily range from 3 to 10 years for office furniture, equipment and software. Leasehold improvements are amortized over the shorter of the related lease term or the estimated useful life of the assets. The following is a summary of premises and equipment, net (in thousands):

Table of Contents

| | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Leasehold improvements | $ 160,947 | $ 140,287 |
| Furniture and equipment | 38,583 | 33,074 |
| Software, including internally-developed | 25,491 | 20,176 |
| Construction in process | 1,323 | 4,503 |
| Accumulated depreciation and amortization | (73,868) | (46,353) |
| Premises and equipment, net | $ 152,477 | $ 151,687 |

## NOTE 7 – LEASES

**Lease Right-of-Use Assets and Liabilities**

The Company has operating and finance lease arrangements related to its facilities, furniture and fixtures, and information technology equipment. A substantial portion of the Company's lease arrangements are with related party entities. See *Note 16 - Related Party Transactions* for further information.

The Company's operating lease agreements have remaining terms ranging from five to fifteen years. Certain lease agreements have renewal options. Total lease expense under all operating leases amounted to $12.3 million, $11.9 million and $10.9 million for the years ended December 31, 2022, 2021 and 2020, respectively. Lease expense for related party leases was $12.0 million, $11.6 million and $10.9 million for the years ended December 31, 2022, 2021 and 2020, respectively. Variable lease expense amounted to $4.5 million, $0.7 million and $0.6 million for the years ended December 31, 2022, 2021 and 2020, respectively.

The Company's financing lease agreements have remaining terms ranging from three months to thirteen years. For the year ended December 31, 2022, total interest expense and amortization expense under finance leases amounted to $1.9 million and $17.7 million, respectively, of which $1.0 million of interest expense and $2.1 million of amortization expense was attributed to related party finance leases. For the year ended December 31, 2021, total interest expense and amortization expense under finance leases amounted to $2.2 million and $14.4 million, respectively, of which $0.9 million of interest expense and $2.0 million of amortization expense was attributed to related party finance leases. For the year ended December 31, 2020, total interest expense and amortization expense under finance leases amounted to $0.8 million and $5.2 million, respectively, all of which was attributed to third party leases.

Supplemental cash flow information related to leases is as follows (in thousands):

| | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Cash paid for amounts included in the measurement of operating lease liabilities – operating cash flows | $ 12,537 | $ 15,926 |
| Cash paid for amounts included in the measurement of finance lease liabilities - financing and operating cash flows | 19,218 | 15,876 |
| Operating lease right-of-use assets obtained in exchange for operating leases liabilities | 3,984 | 20,134 |
| Financing lease right-of-use assets obtained in exchange for finance lease liabilities | 2,861 | 48,539 |

Additional supplemental information related to leases is as follows:

| | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Weighted average remaining lease term – operating leases | 13.6 years | 14.7 years |
| Weighted average remaining lease term – finance leases | 8.8 years | 7.9 years |
| Weighted average discount rate – operating leases | 7.4 % | 7.4 % |
| Weighted average discount rate – finance leases | 3.6 % | 3.8 % |

The maturities of the Company's operating lease liabilities are summarized below (in thousands):

85

Table of Contents

| December 31, 2022 | | Amounts |
|---|---|---|
| 2023 | $ | 12,873 |
| 2024 | | 12,873 |
| 2025 | | 12,990 |
| 2026 | | 12,996 |
| 2027 | | 12,959 |
| Thereafter | | 110,717 |
| Total lease payments | | 175,408 |
| Less imputed interest | | (64,076) |
| Total | $ | 111,332 |

The maturities of the Company's financing lease liabilities are summarized below (in thousands):

| December 31, 2022 | | Amounts |
|---|---|---|
| 2023 | $ | 14,146 |
| 2024 | | 6,581 |
| 2025 | | 3,057 |
| 2026 | | 2,665 |
| 2027 | | 2,668 |
| Thereafter | | 21,940 |
| Total lease payments | | 51,057 |
| Less imputed interest | | (7,552) |
| Total | $ | 43,505 |

Table of Contents

## NOTE 8 – WAREHOUSE AND OTHER SECURED LINES OF CREDIT

**Warehouse Lines of Credit**

The Company had the following warehouse lines of credit with financial institutions as of December 31, 2022 and December 31, 2021, respectively, (in thousands):

| Warehouse Lines of Credit [1] | Date of Initial Agreement With Warehouse Lender | Current Agreement Expiration Date | December 31, 2022 | December 31, 2021 |
|---|---|---|---|---|
| **Master Repurchase Agreement ("MRA") Funding Limits as of December 31, 2022:** | | | | |
| N/A[2] | 9/8/2020 | N/A[2] | $ — | $ 913,247 |
| $400 Million[3] | 8/21/2012 | 1/18/2023 | 188,607 | 372,895 |
| $500 Million[4] | 3/7/2019 | 3/22/2023 | 236,462 | 1,230,017 |
| $500 Million | 4/23/2021 | 4/23/2023 | 185,502 | 755,539 |
| $150 Million | 2/29/2012 | 5/23/2023 | 142,570 | 144,534 |
| $3.0 Billion | 5/9/2019 | 7/28/2023 | 2,239,591 | 4,482,245 |
| $700 Million | 7/24/2020 | 8/30/2023 | 642,544 | 673,471 |
| $200 Million | 3/30/2018 | 9/6/2023 | 170,478 | 197,976 |
| $200 Million | 10/30/2020 | 9/26/2023 | 97,216 | 1,163,447 |
| $300 Million | 8/19/2016 | 11/8/2023 | 235,804 | 280,637 |
| $250 Million | 2/26/2016 | 12/21/2023 | 193,023 | 192,614 |
| $1.0 Billion | 7/10/2012 | 1/8/2024 | 521,440 | 963,495 |
| $2.5 Billion[4] | 12/31/2014 | 2/21/2024 | 1,588,787 | 3,349,395 |
| **Early Funding:** | | | | |
| $600 Million (ASAP + - see below) | | No expiration | — | 516,889 |
| $750 Million (EF - see below) | | No expiration | 1,968 | 718,537 |
| | | | $ 6,443,992 | $ 15,954,938 |

All interest rates are variable based upon a spread to SOFR or other alternative index.

[1] An aggregate of $401.0 million of these line amounts is committed as of December 31, 2022.

[2] The Company elected to not renew this warehouse line of credit agreement prior to December 31, 2022. As of December 31, 2021, this warehouse line of credit agreement had a funding limit of $1.5 billion.

[3] This warehouse line of credit agreement expired pursuant to its terms subsequent to December 31, 2022.

[4] Represents the current agreement expiration date pursuant to an amendment entered into subsequent to December 31, 2022.

We are an approved lender for loan early funding facilities with Fannie Mae through its As Soon As Pooled Plus ("ASAP+") program and Freddie Mac through its Early Funding ("EF") program. As an approved lender for these early funding programs, we enter into an agreement to deliver closed and funded one-to-four family residential mortgage loans, each secured by related mortgages and deeds of trust, and receive funding in exchange for such mortgage loans in some cases before we have grouped them into pools to be securitized by Fannie Mae or Freddie Mac. All such mortgage loans must adhere to a set of eligibility criteria to be acceptable. As of December 31, 2022, there was no amount outstanding through the ASAP+ program and $2.0 million was outstanding under the EF program.

As of December 31, 2022, the Company had pledged mortgage loans at fair value as collateral under the above warehouse lines of credit. The above agreements also contain covenants which include certain financial requirements, including maintenance of minimum tangible net worth, minimum liquidity, maximum debt to net worth ratio, and net income, as defined in the agreements. The Company was in compliance with all of these covenants as of December 31, 2022.

**MSR Facility**

In the third quarter of 2022, the Company's consolidated subsidiary, UWM, entered into a Loan and Security Agreement with Citibank, N.A., providing UWM with up to $1.5 billion of uncommitted borrowing capacity to finance the

Table of Contents

origination, acquisition or holding of certain mortgage servicing rights (the "MSR Facility"). The MSR Facility is collateralized by all of UWM's mortgage servicing rights that are appurtenant to mortgage loans pooled in securitization by Fannie Mae or Freddie Mac that meet certain criteria. Available borrowings under the MSR Facility are based on the fair market value of the collateral. Borrowings under the MSR Facility will bear interest based on SOFR plus an applicable margin. The MSR Facility contains covenants which include certain financial requirements, including maintenance of minimum tangible net worth, minimum liquidity, maximum debt to net worth ratio, and net income as defined in the agreement. As of December 31, 2022, the Company was in compliance with all applicable covenants. The MSR Facility has an initial maturity date of September 26, 2023. As of December 31, 2022, $750.0 million was outstanding under the MSR Facility.

## NOTE 9 – OTHER BORROWINGS

### Senior Notes

The following is a summary of the senior unsecured notes issued by the Company (in thousands):

| Facility Type | Maturity Date | Interest Rate | Outstanding Balance at Outstanding Principal at December 31, 2022 | Outstanding Balance at Outstanding Principal at December 31, 2021 |
|---|---|---|---|---|
| 2025 Senior unsecured notes[1] | 11/15/2025 | 5.50 % | $ 800,000 | $ 800,000 |
| 2029 Senior unsecured notes[2] | 04/15/2029 | 5.50 % | 700,000 | 700,000 |
| 2027 Senior unsecured notes[3] | 06/15/2027 | 5.75 % | 500,000 | 500,000 |
| Total Senior Unsecured Notes | | | $ 2,000,000 | $ 2,000,000 |
| Weighted average interest rate | | | 5.56 % | 5.56 % |

[1] Unamortized debt issuance costs and discounts are presented net against the 2025 Senior Notes reducing the amount reported on the consolidated balance sheets by $6.3 million and $8.5 million as of December 31, 2022 and December 31, 2021, respectively.

[2] Unamortized debt issuance costs and discounts are presented net against the 2029 Senior Notes reducing the amount reported on the consolidated balance sheets by $5.5 million and $6.4 million as of December 31, 2022 and December 31, 2021, respectively.

[3] Unamortized debt issuance costs and discounts are presented net against the 2027 Senior Notes reducing the amount reported on the consolidated balance sheets by $3.9 million and $5.0 million as of December 31, 2022 and December 31, 2021, respectively.

2025 Senior Notes

On November 3, 2020, the Company's consolidated subsidiary, UWM, issued $800.0 million in aggregate principal amount of senior unsecured notes due November 15, 2025 (the "2025 Senior Notes"). The 2025 Senior Notes accrue interest at a rate of 5.500% per annum. Interest on the 2025 Senior Notes is due semi-annually on May 15 and November 15 of each year, beginning on May 15, 2021.

On or after November 15, 2022, the Company may, at its option, redeem the 2025 Senior Notes in whole or in part during the twelve-month period beginning on the following dates at the following redemption prices: November 15, 2022 at 102.750%; November 15, 2023 at 101.375%; or November 15, 2024 until maturity at 100%, of the principal amount of the 2025 Senior Notes to be redeemed on the redemption date plus accrued and unpaid interest.

2029 Senior Notes

On April 7, 2021, the Company's consolidated subsidiary, UWM, issued $700.0 million in aggregate principal amount of senior unsecured notes due April 15, 2029 (the "2029 Senior Notes"). The 2029 Senior Notes accrue interest at a rate of 5.500% per annum. Interest on the 2029 Senior Notes is due semi-annually on April 15 and October 15 of each year, beginning on October 15, 2021.

On or after April 15, 2024, the Company may, at its option, redeem the 2029 Senior Notes in whole or in part during the twelve-month period beginning on the following dates at the following redemption prices: April 15, 2024 at 102.750%;

Table of Contents

April 15, 2025 at 101.375%; or April 15, 2026 until maturity at 100%, of the principal amount of the 2029 Senior Notes to be redeemed on the redemption date plus accrued and unpaid interest. Prior to April 15, 2024, the Company may, at its option, redeem up to 40% of the aggregate principal amount of the 2029 Senior Notes originally issued at a redemption price of 105.500% of the principal amount of the 2029 Senior Notes to be redeemed on the redemption date plus accrued and unpaid interest with the net proceeds of certain equity offerings. In addition, the Company may, at its option, redeem the 2029 Senior Notes prior to April 15, 2024 at a price equal to 100% of the principal amount redeemed plus a "make-whole" premium, plus accrued and unpaid interest.

<u>2027 Senior Notes</u>

On November 22, 2021, the Company's consolidated subsidiary, UWM, issued $500.0 million in aggregate principal amount of senior unsecured notes due June 15, 2027 (the "2027 Senior Notes"). The 2027 Senior Notes accrue interest at a rate of 5.750% per annum. Interest on the 2027 Senior Notes is due semi-annually on June 15 and December 15 of each year, beginning on June 15, 2022.

On or after June 15, 2024, the Company may, at its option, redeem the 2027 Senior Notes in whole or in part during the twelve-month period beginning on the following dates at the following redemption prices: June 15, 2024 at 102.875%; June 15, 2025 at 101.438%; or June 15, 2026 until maturity at 100.000%, of the principal amount of the 2027 Senior Notes to be redeemed on the redemption date plus accrued and unpaid interest. Prior to June 15, 2024, the Company may, at its option, redeem up to 40% of the aggregate principal amount of the 2027 Senior Notes originally issued at a redemption price of 105.75% of the principal amount of the 2027 Senior Notes redeemed on the redemption date plus accrued and unpaid interest with the net proceeds of certain equity offerings. In addition, the Company may, at its option, redeem the 2027 Senior Notes prior to June 15, 2024 at a price equal to 100% of the principal amount redeemed plus a "make-whole" premium, plus accrued and unpaid interest.

The indentures governing the 2025, 2029 and 2027 Senior Notes contain operating covenants and restrictions, subject to a number of exceptions and qualifications. The Company was in compliance with the terms of the indentures as of December 31, 2022.

***Revolving Credit Facility***

On August 8, 2022, UWM entered into the Revolving Credit Agreement (the "Revolving Credit Agreement") between UWM, as the borrower, and SFS Corp., as the lender. The Revolving Credit Agreement provides for, among other things, a $500.0 million unsecured revolving credit facility (the "Revolving Credit Facility"). The Revolving Credit Facility has an initial maturity date of August 8, 2023. Amounts borrowed under the Revolving Credit Facility may be borrowed, repaid and reborrowed from time to time, and accrue interest at the Applicable Prime Rate (as defined in the Revolving Credit Agreement). UWM may utilize the Revolving Credit Facility in connection with: (i) operational and investment activities, including but not limited to funding and/or advances related to (a) servicing rights, (b) 'scratch and dent' loans, (c) margin requirements, and (d) equity in loans held for sale; and (ii) general corporate purposes.

The Revolving Credit Agreement contains certain financial and operating covenants and restrictions, subject to a number of exceptions and qualifications, and the availability of funds under the Revolving Credit Facility is subject to our continued compliance with these covenants. The Company was in compliance with these covenants as of December 31, 2022. No amounts were outstanding under the Revolving Credit Facility as of December 31, 2022.

## NOTE 10 – COMMITMENTS AND CONTINGENCIES

**Representations and Warranties Reserve**

Loans sold to investors which the Company believes met investor and agency underwriting guidelines at the time of sale may be subject to repurchase by the Company in the event of specific default by the borrower or upon subsequent discovery that underwriting or documentation standards were not explicitly satisfied. The Company may, upon mutual agreement, indemnify the investor against future losses on such loans or be subject to other guaranty requirements and subject to loss. The Company initially records its exposure under such guarantees at estimated fair value upon the sale of the related loan, within "Accounts payable, accrued expenses, and other" as well as within loan production income, and continues to evaluate its on-going exposures in subsequent periods. The reserve is estimated based on the Company's assessment of its contingent and non-contingent obligations, including expected losses, expected frequency, the overall potential remaining exposure, as well as an estimate for a market participant's potential readiness to stand by to perform on such obligations. The Company repurchased $355.8 million, $133.4 million and $53.1 million in UPB of loans during the years ended December 31, 2022, 2021 and 2020, respectively, related to its representations and warranties obligations.

Table of Contents

The activity of the representations and warranties reserve was as follows (in thousands):

| | For the year ended December 31, | | |
| | 2022 | 2021 | 2020 |
|---|---|---|---|
| Balance, beginning of period | $ 86,762 | $ 69,542 | $ 46,322 |
| Additions | 57,415 | 45,301 | 36,510 |
| Losses realized, net | (83,682) | (28,081) | (13,290) |
| Balance, end of period | $ 60,495 | $ 86,762 | $ 69,542 |

**Commitments to Originate Loans**

As of December 31, 2022, the Company had agreed to extend credit to potential borrowers for approximately $14.1 billion. These contracts represent off balance sheet credit risk where the Company may be required to extend credit to these borrowers based on the prevailing interest rates and prices at the time of execution.

**NOTE 11 – VARIABLE INTEREST ENTITIES**

Upon completion of the business combination transaction described in Note 1, the Company became the managing member of Holdings LLC with 100% of the management and voting power in Holdings LLC. In its capacity as managing member, the Company has the sole authority to make decisions on behalf of Holdings LLC and bind Holdings LLC to signed agreements. Further, Holdings LLC maintains separate capital accounts for its investors as a mechanism for tracking earnings and subsequent distribution rights.

Management concluded that the Company is Holdings LLC's primary beneficiary. As the primary beneficiary, the Company consolidates the results and operations of Holdings LLC for financial reporting purposes under the variable interest entity ("VIE") consolidation model.

The Company's relationship with Holdings LLC results in no recourse to the general credit of the Company. Holdings LLC and its consolidated subsidiaries represent the Company's sole investment. The Company shares in the income and losses of Holdings LLC in direct proportion to the Company's ownership interest. Further, the Company has no contractual requirement to provide financial support to Holdings LLC.

The Company's financial position, performance and cash flows effectively represent those of Holdings LLC and its consolidated subsidiaries as of and for the year ended December 31, 2022.

In 2021, UWM began selling some of the mortgage loans that it originates through private label securitization transactions. There were no loan sales through UWM's private label securitization transactions during 2022. In executing these transactions, the Company sells mortgage loans to a securitization trust for cash and, in some cases, retained interests in the trust. The securitization entities are funded through the issuance of beneficial interests in the securitized assets. The beneficial interests take the form of trust certificates, some of which are sold to investors and some of which may be retained by the Company due to regulatory requirements. Retained beneficial interests consist of a 5% vertical interest in the assets of the securitization trusts, in order to comply with the risk retention requirements applicable to certain of the Company's securitization transactions. The Company has elected the fair value option for subsequently measuring the retained beneficial interests in the securitization trusts, and these investments are presented as "Investment securities at fair value, pledged" in the consolidated balance sheet as of December 31, 2022 and December 31, 2021. Changes in the fair value of these retained beneficial interests are reported as part of "Other expense/(income)" in the consolidated statements of operations. The Company also retains the servicing rights on the securitized mortgage loans. The Company has accounted for these transactions as sales of financial assets.

The securitization trusts that purchase the mortgage loans from the Company and securitize those mortgage loans are VIEs, and the Company holds variable interests in certain of these entities. Because the Company does not have the obligation to absorb the VIEs' losses or the right to receive benefits from the VIEs that could potentially be significant to the VIEs, the Company is not the primary beneficiary of these securitization trusts and is not required to consolidate these VIEs. The Company separately entered into sale and repurchase agreements for a portion of the retained beneficial interests in the securitization trusts, which have been accounted for as borrowings against investment securities. As of December 31, 2022, $111.7 million of the $113.3 million of investment securities at fair value have been pledged as collateral for these borrowings against investment securities. The outstanding principal balance of these borrowings was approximately $101.3 million with remaining maturities ranging from approximately four to eight months as of December 31, 2022, and interest rates based on LIBOR or SOFR plus a spread. The Company's maximum exposure to loss in these non-consolidated VIEs is limited to the retained beneficial interests in the securitization trusts.

90

Table of Contents

## NOTE 12 – NON-CONTROLLING INTERESTS

The non-controlling interest balance represents the economic interest in Holdings LLC held by SFS Corp. The following table summarizes the ownership of units in Holdings LLC as of:

| | December 31, 2022 | | December 31, 2021 | |
|---|---|---|---|---|
| | Common Units | Ownership Percentage | Common Units | Ownership Percentage |
| UWM Holdings Corporation ownership of Class A Common Units | 92,575,974 | 5.81 % | 91,612,305 | 5.75 % |
| SFS Corp. ownership of Class B Common Units | 1,502,069,787 | 94.19 % | 1,502,069,787 | 94.25 % |
| Balance at end of period | 1,594,645,761 | 100.00 % | 1,593,682,092 | 100.0 % |

The non-controlling interest holders have the right to exchange Class B Common Units, together with a corresponding number of shares of our Class D common stock or Class C common stock (together referred to as "Stapled Interests"), for, at the Company's option, (i) shares of the Company's Class B common stock or Class A common stock or (ii) cash from a substantially concurrent public offering or private sale (based on the price of the Company's Class A common stock). As such, future exchanges of Stapled Interests by non-controlling interest holders will result in a change in ownership and reduce or increase the amount recorded as non-controlling interest and increase or decrease additional paid-in-capital or retained earnings when Holdings LLC has positive or negative net assets, respectively. As of December 31, 2022, SFS Corp. has not exchanged any Stapled Interests.

During the year ended December 31, 2022, the Company issued 963,772 shares of Class A common stock which primarily related to the vesting of RSUs under its stock-based compensation plan and grants to the Company's non-employee directors. This resulted in an equivalent increase in the number of Class A Common Units of Holdings LLC held by the Company, and a re-measurement of the non-controlling interest in Holdings LLC due to the change in relative ownership of Holdings LLC with no change in control. The impact of the re-measurement of the non-controlling interest is reflected in the consolidated statement of changes in equity.

## NOTE 13 – REGULATORY NET WORTH REQUIREMENTS

Certain secondary market agencies and state regulators require UWM to maintain minimum net worth and capital requirements to remain in good standing with the agencies. Noncompliance with an agency's requirements can result in such agency taking various remedial actions up to and including terminating UWM's ability to sell loans to and service loans on behalf of the respective agency.

UWM is required to maintain certain minimum net worth, minimum capital ratio and minimum liquidity requirements, including those established by HUD, Ginnie Mae, Freddie Mac and Fannie Mae. As of December 31, 2022, the most restrictive of these requirements require UWM to maintain a minimum net worth of $783.6 million, liquidity of $101.8 million and a minimum capital ratio of 6%. At December 31, 2022, UWM was in compliance with these requirements.

## NOTE 14 – EMPLOYEE BENEFIT PLAN

The Company maintains a defined contribution 401(k) plan covering substantially all team members. Team members can make elective contributions to the plan as allowed by the Internal Revenue Service and plan limitations. The Company makes discretionary matching contributions of 50% of team members' contributions to the plan, up to an annual maximum of approximately $2,500 per team member. Matching contributions to the plan totaled approximately $5.5 million, $6.8 million and $4.8 million for the years ended December 31, 2022, 2021 and 2020, respectively, and are included in salaries, commissions and benefits in the consolidated statements of operations.

## NOTE 15 – FAIR VALUE MEASUREMENTS

Fair value is defined under U.S. GAAP as the price that would be received if an asset were sold or the price that would be paid to transfer a liability in an orderly transaction between willing market participants at the measurement date. Required disclosures include classification of fair value measurements within a three-level hierarchy (Level 1, Level 2 and Level 3). Classification of a fair value measurement within the hierarchy is dependent on the classification and significance of the inputs used to determine the fair value measurement. Observable inputs are those that are observed, implied from, or corroborated with externally available market information. Unobservable inputs represent the Company's estimates of market participants' assumptions.

Fair value measurements are classified in the following manner:

91

Table of Contents

*Level 1*—Valuation is based on quoted prices in active markets for identical assets or liabilities at the measurement date.

*Level 2*—Valuation is based on either observable prices for identical assets or liabilities in inactive markets, observable prices for similar assets or liabilities, or other inputs that are derived directly from, or through correlation to, observable market data at the measurement date.

*Level 3*—Valuation is based on the Company's or others' models using significant unobservable assumptions at the measurement date that a market participant would use.

In determining fair value measurements, the Company uses observable inputs whenever possible. The level of a fair value measurement within the hierarchy is dependent on the lowest level of input that has a significant impact on the measurement as a whole. If quoted market prices are available at the measurement date or are available for similar instruments, such prices are used in the measurements. If observable market data is not available at the measurement date, judgement is required to measure fair value.

The following is a description of measurement techniques for items recorded at fair value on a recurring basis. There were no material items recorded at fair value on a nonrecurring basis as of December 31, 2022 or December 31, 2021.

<u>Mortgage loans at fair value</u>: The Company has elected the fair value option for mortgage loans. Accordingly, the fair values of mortgage loans are based on valuation models that use the market price for similar loans sold in the secondary market. As these prices are derived from market observable inputs, they are categorized as Level 2.

<u>IRLCs</u>: The Company's interest rate lock commitments are derivative instruments that are recorded at fair value based on valuation models that use the market price for similar loans sold in the secondary market. The interest rate lock commitments are then subject to an estimated loan funding probability, or "pullthrough rate." Given the significant and unobservable nature of the pullthrough rate assumption, IRLC fair value measurements are classified as Level 3.

<u>MSRs</u>: The fair value of MSRs is determined using a valuation model that calculates the present value of estimated future net servicing cash flows. The model includes estimates of prepayment speeds, discount rate, cost to service, float earnings, contractual servicing fee income, and ancillary income and late fees, among others. These estimates are supported by market and economic data collected from various outside sources. These fair value measurements are classified as Level 3.

<u>FLSCs</u>: The Company enters into forward loan sales commitments to sell certain mortgage loans which are recorded at fair value based on valuation models. The Company's expectation of the amount of its interest rate lock commitments that will ultimately close is a factor in determining the position. The valuation models utilize the fair value of related mortgage loans determined using observable market data, and therefore, the fair value measurements of these commitments are categorized as Level 2.

<u>Investment securities at fair value, pledged</u>: The Company occasionally sells mortgage loans that it originates through private label securitization transactions. In executing these securitizations, the Company sells mortgage loans to a securitization trust for cash and, in some cases, retained interests in the trust. The Company has elected the fair value option for subsequently measuring the retained beneficial interests in the securitization trusts. The fair value of these investment securities is primarily based on observable market data and therefore categorized as Level 2.

<u>Public and Private Warrants</u>: The fair value of Public Warrants is based on the price of trades of these securities in active markets and therefore categorized as Level 1. The fair value of the Private Warrants is based on observable market data and therefore categorized as Level 2.

Table of Contents

**Financial Instruments - Assets and Liabilities Measured at Fair Value on a Recurring Basis**

The following are the major categories of financial assets and liabilities measured at fair value on a recurring basis (in thousands):

| Description | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| | | December 31, 2022 | | |
| Assets: | | | | |
| Mortgage loans at fair value | $ — | $ 7,134,960 | $ — | $ 7,134,960 |
| IRLCs | — | — | 7,872 | 7,872 |
| FLSCs | — | 74,997 | | 74,997 |
| Investment securities at fair value, pledged | — | 113,290 | — | 113,290 |
| Mortgage servicing rights | — | — | 4,453,261 | 4,453,261 |
| Total assets | $ — | $ 7,323,248 | $ 4,461,133 | $ 11,784,381 |
| Liabilities: | | | | |
| IRLCs | $ — | $ — | $ 32,294 | $ 32,294 |
| FLSCs | — | 17,454 | | 17,454 |
| Public and Private Warrants | 1,328 | 445 | — | 1,773 |
| Total liabilities | $ 1,328 | $ 17,899 | $ 32,294 | $ 51,521 |

| Description | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| | | December 31, 2021 | | |
| Assets: | | | | |
| Mortgage loans at fair value | $ — | $ 16,909,901 | $ — | $ 16,909,901 |
| IRLCs | — | — | 24,899 | 24,899 |
| FLSCs | — | 42,457 | | 42,457 |
| Investment securities at fair value, pledged | — | 152,263 | — | 152,263 |
| Mortgage servicing rights | — | | 3,314,952 | 3,314,952 |
| Total assets | $ — | $ 17,104,621 | $ 3,339,851 | $ 20,444,472 |
| Liabilities: | | | | |
| IRLCs | $ — | $ — | $ 11,138 | $ 11,138 |
| FLSCs | — | 25,603 | | 25,603 |
| Public and Private warrants | 6,286 | 3,170 | — | 9,456 |
| Total liabilities | $ 6,286 | $ 28,773 | $ 11,138 | $ 46,197 |

The following table presents quantitative information about the inputs used in recurring Level 3 fair value financial instruments and the fair value measurements for IRLCs:

| Unobservable Input - IRLCs | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Pullthrough rate (weighted avg) | 77 % | 86 % |

Refer to *Note 5 - Mortgage Servicing Rights* for further information on the unobservable inputs used in measuring the fair value of the Company's MSRs and for the roll-forward of MSRs for the year ended December 31, 2022.

**Level 3 Issuances and Transfers**

The Company enters into IRLCs which are considered derivatives. If the contract converts to a loan, the implied value, which is solely based upon interest rate changes, is incorporated in the basis of the fair value of the loan. If the IRLC does not convert to a loan, the basis is reduced to zero as the contract has no continuing value. The Company does not track the basis of the individual IRLCs that convert to a loan, as that amount has no relevance to the presented consolidated financial statements.

**Other Financial Instruments**

The following table presents the carrying amounts and estimated fair value of the Company's financial liabilities that are not measured at fair value on a recurring or nonrecurring basis (in thousands):

Table of Contents

| | December 31, 2022 | | December 31, 2021 | |
|---|---|---|---|---|
| | Carrying Amount | Estimated Fair Value | Carrying Amount | Estimated Fair Value |
| 2025 Senior Notes, due 11/15/25 | $ 793,703 | $ 724,928 | $ 791,513 | $ 820,232 |
| 2029 Senior Notes, due 4/15/29 | 694,496 | 565,607 | 693,623 | 686,623 |
| 2027 Senior Notes, due 6/15/27 | 496,137 | 430,920 | 494,976 | 500,860 |
| | $ 1,984,336 | $ 1,721,455 | $ 1,980,112 | $ 2,007,715 |

The fair value of the 2025, 2029 and 2027 Senior Notes was estimated using Level 2 inputs, including observable trading information from independent sources.

Due to their nature and respective terms (including the variable interest rates on warehouse and other lines of credit and borrowings against investment securities), the carrying value of cash and cash equivalents, receivables, payables, equipment notes payable, borrowings against investment securities and warehouse and other lines of credit approximate their fair value as of December 31, 2022 and December 31, 2021, respectively.

## NOTE 16 – RELATED PARTY TRANSACTIONS

In the normal course of business, the Company engages in the following significant related party transactions:

- The Company's corporate campus is located in buildings and on land that are owned by entities controlled by the Company's founder and its CEO and leased by the Company from these entities. The Company also makes leasehold improvements to these properties for the benefit of the Company, for which the Company is responsible pursuant to the terms of the lease agreements;

- Legal services are provided to the Company by a law firm in which the Company's founder is a partner;

- The Company leases aircraft owned by entities controlled by the Company's CEO to facilitate travel of Company executives for business purposes;

- Home appraisal contracting and review services are provided by home appraisal management companies, one of which was partially owned by the Company's CEO (prior to March 31, 2021). An executive of the Company and a member of the Company's board of directors was also on the board of directors of this home appraisal management company prior to March 31, 2021, the second of which is owned by the CEO's brother who is also a member of the Company's board of directors. Each agreement with the home appraisal management companies is for an initial twelve-month term which automatically renews for successive twelve month periods unless sooner terminated by the Company upon prior notice. Additionally, each such agreement is on substantially similar terms and conditions, including with regard to pricing, as the Company's other agreements for such services;

- Employee lease agreements, pursuant to which the Company's team members provide certain administrative services to entities controlled by the Company's founder and its CEO in exchange for fees paid by these entities to the Company.

For the years ended December 31, 2022, 2021 and 2020, the Company made payments of approximately $26.4 million, $21.1 million and $15.0 million, respectively, to various companies related through common ownership. Such related party payments were comprised of, (i) with respect to the year ended December 31, 2022, approximately $24.9 million in rent and other occupancy related fees, $0.6 million in legal fees, and $0.9 million in other general and administrative expenses, (ii) with respect to the year ended December 31, 2021, approximately $19.4 million in rent and other occupancy related fees, $0.6 million in legal fees, $0.2 million in direct origination costs and $0.9 million in other general and administrative expenses and (iii) with respect to the year ended December 31, 2020, approximately $13.4 million in rent and other occupancy related fees, $0.6 million in legal fees, $0.4 million in direct origination costs and $0.6 million in other general and administrative expenses.

UWM entered into a $500.0 million unsecured Revolving Credit Facility with SFS Corp. as the lender during the third quarter of 2022. Refer to *Note 9 - Other borrowings* for further details.

## NOTE 17 – INCOME TAXES

A reconciliation of the statutory federal income tax expense to the income tax expense from continuing operations provided is as follows:

94

Table of Contents

| | For the year ended December 31, | | |
| --- | --- | --- | --- |
| | 2022 | 2021 | 2020 |
| Income tax expense at the federal statutory rate | $ 196,400 | $ 331,431 | $ 710,842 |
| Income attributable to non-controlling interest | (186,931) | (308,995) | — |
| Income attributable to pass-through members | — | — | (710,842) |
| Other | (6,658) | (12,595) | 2,450 |
| Total income tax expense | $ 2,811 | $ 9,841 | $ 2,450 |

Income taxes for the Company at the consolidated level are primarily federal, state, and local taxes. The following table details the Company's provision for income taxes for the years ended December 31, 2022, 2021 and 2020.

| | For the year ended December 31, | | |
| --- | --- | --- | --- |
| | 2022 | 2021 | 2020 |
| Current income tax expense: | | | |
| Federal | $ (118) | $ 73 | $ — |
| State | (569) | 1,424 | 2,450 |
| Total current income tax expense | (687) | 1,497 | 2,450 |
| Deferred income tax expense: | | | |
| Federal | 3,916 | 7,494 | — |
| State | (418) | 850 | — |
| Total deferred income tax expense | 3,498 | 8,344 | — |
| Total provision for income taxes | $ 2,811 | $ 9,841 | $ 2,450 |

The Company's income tax expense varies from the expense that would be expected based on statutory rates due primarily to its past and current organizational structure. Prior to the business combination transaction, UWM, as a limited liability company ("LLC"), was not directly subject to taxes on its net taxable income. Rather, UWM's net taxable income was passed through to its members and included in its members' tax returns. A provision for state income taxes was required for certain state and local tax jurisdictions where UWM is a taxable entity.

Following the closing of the Business Combination Agreement, UWM is treated as single member LLC owned by Holdings LLC. As a single member LLC, all taxable income or loss generated by UWM will pass through and be included in the income or loss of Holdings LLC. Holdings LLC is treated as a partnership for federal and most state and local income tax jurisdictions. As a partnership, Holdings LLC is not subject to U.S. federal or most state and local incomes taxes. Any taxable income or loss generated by Holdings LLC after the Company's acquisition of its portion of Holdings LLC is passed through and included in the taxable income or loss of its members, including the Company. The Company is a C Corporation and is subject to U.S. federal, state and local income taxes with respect to its attributable share of any taxable income of Holdings LLC. Pursuant to the Holdings LLC Second Amended & Restated Limited Liability Company Agreement, Holdings LLC will generally be required to make pro-rata distributions in cash to the Company and to SFS Corp. in amounts sufficient to cover the expected taxes resulting from their allocable share of the taxable income of Holdings LLC.

*Deferred Tax Assets and Liabilities*

Deferred income taxes arise from temporary differences between the financial statement carrying amount and the tax basis of assets and liabilities. The company's deferred tax assets (liabilities) arise from the following components of temporary differences and carryforwards:

95

Table of Contents

|  | December 31, | | | |
|  | 2022 | | 2021 | |
|---|---|---|---|---|
| Deferred tax assets: | | | | |
| Net operating losses | $ | 17,775 | $ | 10,831 |
| Other | | 483 | | 104 |
| Total deferred tax assets | | 18,258 | | 10,935 |
| Deferred tax liabilities: | | | | |
| Investment in partnership | | (54,589) | | (40,817) |
| Other | | — | | (2,502) |
| Total deferred tax liabilities | | (54,589) | | (43,319) |
| Net deferred tax liabilities | $ | (36,331) | $ | (32,384) |

As of December 31, 2022, the Company has a deferred tax asset of $18.3 million and a deferred tax liability of $54.6 million, the net of which is included in accounts payable, accrued expenses and other. This deferred tax liability relates primarily to the difference in tax and book basis of the Company's investment in Holdings LLC. The Company recognizes deferred tax assets to the extent it believes these assets are more-likely-than-not to be realized. In making such a determination, the Company considers all available positive and negative evidence, including future reversals of existing taxable temporary differences, projected future taxable income, tax planning strategies and recent results of operations.

Of the total deferred tax assets, $17.8 million relates to the net operating loss carryforwards at December 31, 2022, $1.4 million of which will expire between 2032 and 2042 and $16.4 million has no expiration.

The Company reserves for uncertain income tax positions when it is not more-likely-than-not a tax position will be sustained upon examination. As the Company has no unrecognized tax benefits, no interest or penalties were recognized in income tax expense. The Company may be subject to potential examination by U.S. federal or state jurisdiction authorities in the areas of income taxes. These potential examinations may include questioning the timing and amount of deductions, the nexus of income amounts in various tax jurisdictions and compliance with U.S. federal or state tax laws.

The Company is subject to taxation in the U.S. and various state and local tax jurisdictions. As of December 31, 2022, tax years 2019 and forward are subject to examination by the tax authorities.

*Tax Receivable Agreement*

Holdings LLC intends to make an election under Section 754 of the Internal Revenue Code (the "Code") for the first taxable year in which a redemption or exchange of LLC Interests occurs. Pursuant to Holdings LLC's election under Section 754 of the Code, the Company expects to obtain an increase in its share of the tax basis in the net assets of Holdings LLC when LLC Interests are redeemed or exchanged by SFS Corp. The Company intends to treat any exchanges of LLC Interests by SFS Corp. as direct purchases of LLC Interests for U.S. federal income tax purposes. These increases in tax basis may reduce the amounts that the Company would otherwise pay in the future to various tax authorities. They may also decrease gains (or increase losses) on future dispositions of certain capital assets to the extent tax basis is allocated to those capital assets.

In connection with the business combination transaction, the Company entered into the Tax Receivable Agreement with SFS Corp. that will provide for the payment by the Company to SFS Corp. of 85% of the amount of tax benefits, if any, that the Company actually realizes (or in some circumstances is deemed to realize) as a result of (1) the Company's allocable share of existing tax basis acquired in connection with the Transactions (including the Company's share of existing tax basis) and increases to such allocable share of existing tax basis; (2) increases in tax basis resulting from (a) the Company's purchase of LLC Interests directly from Holdings LLC, (b) future exchanges (or deemed exchanges in certain circumstances) of LLC Interests for Class A common stock or cash, and (c) certain distributions (or deemed distributions) by Holdings LLC; and (3) certain additional tax benefits arising from payments made under the Tax Receivable Agreement. The Company may additionally benefit or retain the remaining 15% of any tax benefits that the Company actually realizes.

The amounts payable under the Tax Receivable Agreement will vary depending upon a number of factors, including the amount, character, and timing of the taxable income of the Company in the future. As of December 31, 2022 and December 31, 2021, the Company had recognized a liability of $17.1 million and $13.9 million, respectively, included in accounts payable, accrued expenses and other, related to the Tax Receivable Agreement arising from the business combination transaction and subsequent sales of certain assets. No payments were made to SFS Corp. pursuant to the Tax Receivable Agreement during the years ended December 31, 2022 or December 31, 2021.

Table of Contents

## NOTE 18 – STOCK-BASED COMPENSATION

The following is a summary of RSU activity for the years ended December 31, 2022 and 2021:

| | For the year ended December 31, 2022 | | For the year ended December 31, 2021 | |
| --- | --- | --- | --- | --- |
| | Shares | Weighted Average Grant Date Fair Value | Shares | Weighted Average Grant Date Fair Value |
| Unvested - beginning of period | 2,812,320 | $ 7.75 | — | $ — |
| Granted | 2,458,883 | 3.61 | 3,193,510 | 7.75 |
| Vested | (963,772) | 7.72 | (6,430) | 7.75 |
| Forfeited | (301,630) | 6.57 | (374,760) | 7.75 |
| Unvested - end of period | 4,005,801 | $ 5.30 | 2,812,320 | $ 7.75 |

Stock-based compensation expense recognized for the years ended December 31, 2022 and 2021 was $7.5 million and $6.5 million, respectively. As of December 31, 2022 and 2021 there was $14.7 million and $15.4 million of unrecognized compensation expense, respectively, related to unvested awards which is expected to be recognized over a weighted average period of 2.5 years and 2.1 years, respectively. On September 1, 2022, the Company granted 2.5 million RSUs to team members with a grant date fair value of $3.60 per share, which vest 25% each year over four years.

## NOTE 19 – EARNINGS PER SHARE

As of December 31, 2022, the Company had two classes of economic shares authorized - Class A and Class B common stock. The Company applies the two-class method for calculating earnings per share for Class A common stock and Class B common stock. In applying the two-class method, the Company allocates undistributed earnings equally on a per share basis between Class A and Class B common stock. According to the Company's certificate of incorporation, the holders of the Class A and Class B common stock are entitled to participate in earnings equally on a per-share basis, as if all shares of common stock were of a single class, and in such dividends as may be declared by the board of directors. RSUs awarded as pat of the Company's stock compensation plan are included in weighted-average Class A shares outstanding in the calculation of basic earnings per share once the RSUs are vested and shares are issued.

Basic earnings per share of Class A common stock and Class B common stock is computed by dividing net income attributable to UWM Holdings Corporation by the weighted-average number of shares of Class A common stock and Class B common stock outstanding during the period. Diluted earnings per share of Class A common stock and Class B common stock is computed by dividing net income by the weighted-average number of shares of Class A common stock or Class B common stock, respectively, outstanding adjusted to give effect to potentially dilutive securities. See Note 12, Non-Controlling Interests for a description of the Stapled Interests. Refer to Note 1 - Organization, Basis of Presentation and Summary of Significant Accounting Policies - for additional information related to the Company's capital structure.

Prior to the business combination transaction with the Company, UWM's ownership structure included equity interests held solely by SFS Corp. The Company analyzed the calculation of earnings per unit for periods prior to the business combination transaction and determined that it resulted in values that would not be meaningful to the users of these consolidated financial statements. Therefore, earnings per share information has not been presented for the years ended December 31, 2020.

Earnings per share for the year ended December 31, 2021 is based on earnings for the period from January 21, 2021 to December 31, 2021, which represents the period in which the Company had outstanding Class A common stock. There was no Class B common stock outstanding as of December 31, 2022 or December 31, 2021.

The following table sets forth the calculation of basic and diluted earnings per share for the periods ended December 31, 2022 and 2021 (in thousands, except shares and per share amounts):

Table of Contents

| | | For the year ended December 31, | | |
|---|---|---|---|---|
| | | **2022** | | **2021** |
| Net income | $ | **931,858** | $ | 1,568,400 |
| Net income attributable to non-controlling interests | | **890,143** | | 1,469,955 |
| Net income attributable to UWMC | | **41,715** | | 98,445 |
| **Numerator:** | | | | |
| Net income attributable to Class A common shareholders | $ | **41,715** | $ | 98,445 |
| Net income attributable to Class A common shareholders - diluted | $ | **41,715** | $ | 1,064,606 |
| **Denominator:** | | | | |
| Weighted average shares of Class A common stock outstanding - basic | | **92,475,170** | | 100,881,094 |
| Weighted average shares of Class A common stock outstanding - diluted | | **92,475,170** | | 1,603,157,640 |
| Earnings per share of Class A common stock outstanding - basic | $ | **0.45** | $ | 0.98 |
| Earnings per share of Class A common stock outstanding - diluted | $ | **0.45** | $ | 0.66 |

For purposes of calculating diluted earnings per share, it was assumed that the 1,502,069,787 shares of Class D common stock were exchanged for Class B common stock and converted to Class A common stock under the if-converted method, and it was determined that the conversion would be anti-dilutive for the year ended December 31, 2022. Under the if-converted method, all of the Company's net income for the applicable periods is attributable to Class A common shareholders. The net income of the Company under the if-converted method is calculated including an estimated income tax provision which is determined using a blended statutory effective tax rate.

The Public and Private Warrants were not in the money and the triggering events for the issuance of earn-out shares were not met during the years ended December 31, 2022 or 2021. Therefore, these potentially dilutive securities were excluded from the computation of diluted earnings per share. Unvested RSUs have been considered in the calculations of diluted earnings per share for the years ended December 31, 2022 and 2021 using the treasury stock method and the impact was either anti-dilutive or immaterial.

**NOTE 20 – SUBSEQUENT EVENTS**

Subsequent to December 31, 2022, the Board declared a cash dividend of $0.10 per share on the outstanding shares of Class A common stock. The dividend is payable on April 11, 2023 to stockholders of record at the close of business on March 10, 2023. Additionally, the Board approved a proportional distribution to SFS Corp. of $150.2 million which is payable on April 11, 2023 .

Subsequent to December 31, 2022, the Company sold excess servicing cash flows on certain agency loans with a total UPB of approximately $33.2 billion for proceeds of approximately $156.0 million, and MSRs on certain agency loans with a total UPB of approximately $23.5 billion for gross proceeds of approximately $269.8 million.

**Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

None.

**Item 9A. Controls and Procedures**

**Management's Evaluation of Disclosure Controls and Procedures**

We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our reports filed under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosures.

As required by Rules 13a-15(e) and 15d-15(e) under the Exchange Act, our Chief Executive Officer and Chief Financial Officer carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as of December 31, 2022. Based upon their evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) were effective.

Table of Contents

**Management's Report on Internal Control over Financial Reporting**

Management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rule 13a-15(f) under the Exchange Act. Internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. GAAP.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate due to changes in conditions, or that the degree of compliance with existing policies or procedures may deteriorate.

With the participation of the Chief Executive Officer and Chief Financial Officer, management conducted an assessment of the effectiveness of our internal control over financial reporting as of December 31, 2022, based on the framework and criteria established in Internal Control-Integrated Framework (2013), issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). Based on this assessment, as of December 31, 2022 we assert that we maintained effective internal control over financial reporting.

The effectiveness of our internal control over financial reporting as of December 31, 2022 has been audited by Deloitte & Touche LLP, our independent registered public accounting firm, as stated in their report, included herein.

**Changes in Internal Control over Financial Reporting**

There were no changes in our internal control over financial reporting during the quarter ended December 31, 2022 that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Item 9B. Other Information**

**Item 1.01. Entry into a Material Definitive Agreement.**

On January 30, 2023, UWM, entered into Amendment No. 1 to the Loan and Security Agreement with Citibank, N.A. ("Citibank") permitting UWM, with the prior consent of Citibank, to enter into Excess Yield Transactions (as defined in the Loan and Security Agreement) whereby Citibank will release its security interest in that portion of the collateral involved with each transaction.

Citibank and certain affiliates of Citibank have performed commercial banking, investment banking, or advisory services for UWM or the Company from time to time for which they have received customary fees and reimbursement of expenses. In addition, these entities may, from time to time, engage in transactions with and perform services for UWM or the Company in the ordinary course of its business for which they may receive customary fees and reimbursement of expenses.

**Item 9C. Disclosure Regarding Foreign Jurisdictions that Prevent Inspections**

Not applicable.

## PART III

**Item 10. Directors, Executive Officers and Corporate Governance**

The information required by this Item 10 is hereby incorporated by reference from our Proxy Statement pertaining to our 2023 Annual Meeting of Shareholders to be filed with the SEC within 120 days of the Company's fiscal year end covered by this Annual Report on Form 10-K.

**Item 11. Executive Compensation**

The information required by this Item 11 is hereby incorporated by reference from our Proxy Statement pertaining to our 2023 Annual Meeting of Shareholders to be filed with the SEC within 120 days of the Company's fiscal year end covered by this Annual Report on Form 10-K.

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

**Equity Compensation Plan**

Table of Contents

The following table summarizes information as of December 31, 2022 concerning our shares of Class A common stock authorized for issuance under our equity incentive plan.

| | Equity Compensation Plan Information As of December 31, 2022 | | |
| --- | --- | --- | --- |
| | Number of Securities to be Issued Upon Exercise of Outstanding Options, Warrants and Rights | Weighted Average Exercise Price of Outstanding Options, Warrants and Rights (1) | Number of Securities Remaining Available for Future Issuance Under Equity Compensation Plans (Excluding Securities Reflected in first column (a)) |
| | (a) | (b) | (c) |
| Equity compensation plans approved by security holders 2021 Plan (2) | 4,005,801 | $ — | 77,181,250 |
| Equity compensation plans not approved by security holders | — | — | — |
| Total | 4,005,801 | $ — | 77,181,250 |

(1) The securities included in column (a) of this table are time-based restricted stock units, for which no exercise price applies.
(2) The securities included in column (a) includes unvested restricted stock units granted from the Omnibus Incentive Plan. Column (c) reflects the remaining share reserve under the Omnibus Incentive Plan attributable to the initial 80,000,000 shares reserved for issuance.

Other information required by this Item 12 is hereby incorporated by reference from our Proxy Statement pertaining to our 2023 Annual Meeting of Shareholders to be filed with the SEC within 120 days of the Company's fiscal year end covered by this Annual Report on Form 10-K.

**Item 13. Certain Relationships and Related Transactions, and Director Independence**

The information required by this Item 13 is hereby incorporated by reference from our Proxy Statement pertaining to our 2023 Annual Meeting of Shareholders to be filed with the SEC within 120 days of the Company's fiscal year end covered by this Annual Report on Form 10-K.

**Item 14. Principal Accountant Fees and Services**

The information required by this Item 14 is hereby incorporated by reference from our Proxy Statement pertaining to our 2023 Annual Meeting of Shareholders to be filed with the SEC within 120 days of the Company's fiscal year end covered by this Annual Report on Form 10-K.

Table of Contents

**PART IV**

**Item 15. Exhibits and Financial Statement Schedules**

| Exhibit Number | Description |
|---|---|
| 2.1* | Business Combination Agreement, dated as of September 22, 2020, by and among Gores Holdings IV, Inc., United Shore Financial Services, LLC and SFS Holding Corp. (incorporated by reference to the Company's Current Report on Form 8-K filed on September 23, 2020). |
| 2.2 | Amendment to Business Combination Agreement, dated December 14, 2020, by and among Gores Holdings IV, Inc., United Shore Financial Services, LLC d/b/a United Wholesale Mortgage and SFS Holding Corp. (incorporated by reference to the Company's Current Report on Form 8-K filed on January 22, 2021). |
| 3.1 | Amended and Restated Certificate of Incorporation of UWM Holdings Corporation (incorporated by reference to the Company's Current Report on Form 8-K/A filed on January 25, 2021). |
| 3.2 | Amended and Restated Bylaws of UWM Holdings Corporation (incorporated by reference to the Company's Current Report on Form 8-K/A filed on January 25, 2021). |
| 3.3 | Second Amended and Restated Limited Liability Company Agreement of UWM Holdings, LLC. (incorporated by reference to the Company's Current Report on Form 8-K filed with the SEC on February 9, 2021). |
| 4.1 | Indenture, dated November 3, 2020, by and between United Shore Financial Services, LLC and U.S. Bank National Association, as trustee (incorporated by reference to the Company's Current Report on Form 8-K filed on January 22, 2021). |
| 4.2 | Form of 5.500% Senior Notes due 2025 (included in Exhibit 4.1) (incorporated by reference to the Company's Current Report on Form 8-K filed on January 22, 2021). |
| 4.3 | Specimen Class A common stock Certificate (incorporated by reference to the Company's Form S-1 filed on December 5, 2019). |
| 4.4 | Specimen Warrant Certificate (incorporated by reference to the Company's Form S-1 filed on December 5, 2019). |
| 4.5 | Warrant Agreement, dated January 23, 2020, between the Company and Continental Stock Transfer & Trust Company, as warrant agent (incorporated by reference to the Company's Current Report on Form 8-K filed on January 30, 2020). |
| 4.7 | Indenture, dated April 7, 2021, by and between United Wholesale Mortgage, LLC and U.S. Bank National Association, as trustee (incorporated by reference to the Company's Quarterly Report on Form 10-Q filed on May 13, 2021). |
| 4.8 | Form of 5.500% Senior Notes due 2029 (included in Exhibit 4.7) (incorporated by reference to the Company's Quarterly Report on Form 10-Q filed on May 13, 2021). |
| 4.9 | Indenture, dated November 22, 2021, by and between United Wholesale Mortgage, LLC and U.S. Bank National Association, as trustee (incorporated by reference from the Company's Current Report on Form 8-K filed on November 23, 2021). |
| 4.10 | Form of 5.750% Senior Notes due 2027 (included in Exhibit 4.9) (incorporated by reference from the Company's Current Report on Form 8-K filed on November 23, 2021). |
| 10.1 | Amended and Restated Registration Rights and Lock-Up Agreement, dated January 21, 2021, by and between UWM Holdings Corporation, Gores Sponsor IV LLC, Randall Bort, William Patton, Jeffrey Rea and SFS Holding Corp. (incorporated by reference to the Company's Current Report on Form 8-K filed on January 22, 2021). |
| 10.2 | Tax Receivable Agreement, dated January 21, 2021, by and among SFS Holding Corp. and UWM Holdings Corporation (incorporated by reference to the Company's Current Report on Form 8-K filed on January 22, 2021). |
| 10.3† | UWM Holdings Corporation 2020 Omnibus Incentive Plan (incorporated by reference to the Company's Current Report on Form 8-K filed on January 22, 2021). |

101

Table of Contents

| 10.4† | Employment Agreement, dated September 26, 2012, by and between, United Shore Financial Services, Inc. and Timothy Forrester (incorporated by reference to the Company's Current Report on Form 8-K filed on January 22, 2021). |
| --- | --- |
| 10.5*# | Master Repurchase Agreement, dated September 8, 2020, by and between Barclays Bank PLC and UWM (incorporated by reference to the Company's Current Report on Form 8-K filed on January 22, 2021). |
| 10.6* | Lease Agreement, dated June 28, 2017, by and between UWM, as tenant, and Pontiac Center Investment, LLC, as landlord (incorporated by reference to the Company's Current Report on Form 8-K filed on January 22, 2021). |
| 10.6.1 | First Amendment to Lease, dated May 11, 2018, by and between UWM, as tenant, and Pontiac Center Investment, LLC, as landlord (incorporated by reference to the Company's Current Report on Form 8-K filed on January 22, 2021). |
| 10.6.2 | Second Amendment to Lease, dated June 20, 2018, by and between UWM, as tenant, and Pontiac Center Investment, LLC, as landlord (incorporated by reference to the Company's Current Report on Form 8-K filed on January 22, 2021). |
| 10.6.3 | Third Amendment to Lease, dated September 28, 2018, by and between UWM, as tenant, and Pontiac Center Investment, LLC, as landlord (incorporated by reference to the Company's Current Report on Form 8-K filed on January 22, 2021). |
| 10.6.4 | Fourth Amendment to Lease, dated February 21, 2019, by and between UWM, as tenant, and Pontiac Center Investment, LLC, as landlord (incorporated by reference to the Company's Current Report on Form 8-K filed on January 22, 2021). |
| 10.7 | Parking Area Lease Agreement, dated January 1, 2019, by and between UWM, as tenant, and Pontiac Center Parking, LLC, as landlord (incorporated by reference to the Company's Current Report on Form 8-K filed on January 22, 2021). |
| 10.8* | Lease Agreement, dated January 1, 2020, by and between UWM, as tenant, and Pontiac South Boulevard, LLC, as landlord (incorporated by reference to the Company's Current Report on Form 8-K filed on January 22, 2021). |
| 10.9*# | Master Repurchase Agreement, dated December 31, 2014, by and between UWM and Bank of America, N.A. (incorporated by reference to the Company's Current Report on Form 8-K filed on January 22, 2021). |
| 10.9.1 | Amendment No. 1 to Master Repurchase Agreement, dated October 20, 2015, by and between UWM and Bank of America, N.A. (incorporated by reference to the Company's Current Report on Form 8-K filed on January 22, 2021). |
| 10.9.2 | Amendment No. 2 to Master Repurchase Agreement, dated December 30, 2015, by and between UWM and Bank of America, N.A. (incorporated by reference to the Company's Current Report on Form 8-K filed on January 22, 2021). |
| 10.9.3 | Amendment No. 3 to Master Repurchase Agreement, dated July 28, 2016, by and between UWM and Bank of America, N.A. (incorporated by reference to the Company's Current Report on Form 8-K filed on January 22, 2021). |
| 10.9.4 | Amendment No. 4 to Master Repurchase Agreement, dated December 16, 2016, by and between UWM and Bank of America, N.A. (incorporated by reference to the Company's Current Report on Form 8-K filed on January 22, 2021). |
| 10.9.5 | Amendment No. 5 to Master Repurchase Agreement, dated December 15, 2017, by and between UWM and Bank of America, N.A. (incorporated by reference to the Company's Current Report on Form 8-K filed on January 22, 2021). |
| 10.9.6* | Amendment No. 6 to Master Repurchase Agreement, dated December 14, 2018, by and between UWM and Bank of America, N.A. (incorporated by reference to the Company's Current Report on Form 8-K filed on January 22, 2021). |
| 10.9.7* | Amendment No. 7 to Master Repurchase Agreement, dated December 14, 2018, by and between UWM and Bank of America, N.A. (incorporated by reference to the Company's Current Report on Form 8-K filed on January 22, 2021). |

Table of Contents

| | |
|---|---|
| 10.9.8 | Amendment No. 8 to Master Repurchase Agreement, dated January 13, 2020, by and between UWM and Bank of America, N.A. (incorporated by reference to the Company's Current Report on Form 8-K filed on January 22, 2021). |
| 10.9.9 | Amendment No. 9 to Master Repurchase Agreement, dated February 24, 2020, by and between UWM and Bank of America, N.A. (incorporated by reference to the Company's Current Report on Form 8-K filed on January 22, 2021). |
| 10.9.10 | Amendment No. 10 to Master Repurchase Agreement, dated April 6, 2020, by and between UWM and Bank of America, N.A. (incorporated by reference to the Company's Current Report on Form 8-K filed on January 22, 2021). |
| 10.9.11 | Omnibus Amendment to Master Repurchase Agreement, dated December 16, 2020, by and between UWM and Bank of America, N.A. (incorporated by reference to the Company's Current Report on Form 8-K filed on January 22, 2021). |
| 10.9.12 | Amendment, dated as of June 30, 2021, by and among UWM, United Shore Repo Seller 2 LLC and Bank of America, N.A. (incorporated by reference to the Company's Quarterly Report on Form 10-Q filed on August 16, 2021). |
| 10.10* | Amended and Restated Master Repurchase Agreement, dated May 8, 2017, by and among UWM, Credit Suisse First Boston Mortgage Capital LLC, Credit Suisse AG, and Alpine Securitization Ltd. (incorporated by reference to the Company's Current Report on Form 8-K filed on January 22, 2021). |
| 10.10.1 | Omnibus Amendment to Amended and Restated Master Repurchase Agreement, dated January 19, 2021, by and among UWM, Credit Suisse First Boston Mortgage Capital LLC, Credit Suisse AG, Alpine Securitization Ltd., and Credit Suisse Securities (USA) LLC (incorporated by reference to the Company's Current Report on Form 8-K filed on January 22, 2021). |
| 10.11*# | Master Repurchase Agreement, dated March 7, 2019, by and between UWM and Jefferies Funding LLC (incorporated by reference to the Company's Current Report on Form 8-K filed on January 22, 2021). |
| 10.11.1 | Omnibus Amendment to Master Repurchase Agreement, dated December 14, 2020, by and between UWM and Jefferies Funding LLC (incorporated by reference to the Company's Current Report on Form 8-K filed on January 22, 2021). |
| 10.12*# | Amendment No. 11 to Master Repurchase Agreement, dated December 23, 2020, by and among UWM, United Shore Repo Seller 1 LLC, United Shore Repo Trust 1 and JPMorgan Chase Bank (incorporated by reference to the Company's Current Report on Form 8-K filed on January 22, 2021). |
| 10.13*# | Master Repurchase Agreement, dated November 5, 2014, by and between UWM and UBS AG (as successor in interest to UBS BANK USA) (incorporated by reference to the Company's Current Report on Form 8-K filed on January 22, 2021). |
| 10.13.1* | Amendment No. 1 to Master Repurchase Agreement, dated November 4, 2015, by and between UWM and UBS BANK USA (incorporated by reference to the Company's Current Report on Form 8-K filed on January 22, 2021). |
| 10.13.2* | Assignment and Amendment No. 2 to Master Repurchase Agreement, dated August 16, 2016, by and among UWM, UBS Bank USA, and UBS AG (incorporated by reference to the Company's Current Report on Form 8-K filed on January 22, 2021). |
| 10.13.3* | Amendment No. 3 to Master Repurchase Agreement, dated November 2, 2016, by and between UWM and UBS AG (incorporated by reference to the Company's Current Report on Form 8-K filed on January 22, 2021). |
| 10.13.4 | Amendment No. 4 to Master Repurchase Agreement, dated January 2, 2018, by and between UWM and UBS AG (incorporated by reference to the Company's Current Report on Form 8-K filed on January 22, 2021). |
| 10.13.5 | Amendment No. 5 to Master Repurchase Agreement, dated May 30, 2018, by and between UWM and UBS AG (incorporated by reference to the Company's Current Report on Form 8-K filed on January 22, 2021). |
| 10.13.6 | Amendment No. 6 to Master Repurchase Agreement, dated January 14, 2019, by and between UWM and UBS AG (incorporated by reference to the Company's Current Report on Form 8-K filed on January 22, 2021). |
| 10.13.7 | Amendment No. 7 to Master Repurchase Agreement, dated February 21, 2019, by and between UWM and UBS AG (incorporated by reference to the Company's Current Report on Form 8-K filed on January 22, 2021). |

Table of Contents

| 10.13.8 | Amendment No. 8 to Master Repurchase Agreement, dated January 13, 2020, by and between UWM and UBS AG (incorporated by reference to the Company's Current Report on Form 8-K filed on January 22, 2021). |
| --- | --- |
| 10.13.9 | Amendment No. 9 to Master Repurchase Agreement, dated April 15, 2020, by and between UWM and UBS AG (incorporated by reference to the Company's Current Report on Form 8-K filed on January 22, 2021). |
| 10.13.10 | Amendment No. 10 to Master Repurchase Agreement, dated August 3, 2020, by and between UWM and UBS AG (incorporated by reference to the Company's Current Report on Form 8-K filed on January 22, 2021). |
| 10.13.11 | Amendment No. 11 to Master Repurchase Agreement and Amendment No. 24 to Pricing Letter, dated December 14, 2020, by and between UWM and UBS AG (incorporated by reference to the Company's Current Report on Form 8-K filed on January 22, 2021). |
| 10.14* | Lease Agreement, dated as of January 1, 2021, by and between Pontiac Center East, LLC and United Wholesale Mortgage, LLC (incorporated by reference to the Company's Current Report on Form 8-K filed on January 22, 2021). |
| 10.14.1 | Amendment to Lease Agreement dated August 12, 2021 by and between Pontiac Center East LLC and United Wholesale Mortgage, LLC. (incorporated by reference to of the Company's Quarterly Report on Form 10-Q filed on November 9, 2021). |
| 10.15*# | Master Repurchase Agreement, dated as of April 23, 2021, by and among Goldman Sachs Bank USA, A National Banking Institution, United Shore Repo Seller 4 LLC, and United Wholesale Mortgage, LLC (incorporated by reference to the Company's Quarterly Report on Form 10-Q filed on May 13, 2021). |
| 10.16 | Purchase Agreement, dated March 30, 2021, among United Wholesale Mortgage and J.P. Morgan Securities LLC, as representative of the several initial purchasers listed on Schedule A thereto (incorporated by reference to the Company's Current Report on Form 8-K filed on March 31, 2021). |
| 10.17 | Master Repurchase Agreement, dated as of October 30, 2021, by and among United Shore Financial Services, LLC, United Shore Repo Seller 3 LLC and Citibank, N.A., as amended by the Amendment, dated as of May 26, 2021, by and among Citibank, N.A., UWM, and United Shore Repo Seller 3 LLC (incorporated by reference to the Company's Current Report on Form 8-K filed on March 31, 2021). |
| 10.18 | Amendment, dated as of June 30, 2021, by and among UWM, United Shore Repo Seller 2 LLC and Bank of America, N.A. (incorporated by reference from the Company's Quarterly Report on Form 10-Q filed on August 16, 2021). |
| 10.19 | Purchase Agreement, dated November 15, 2021, between United Wholesale Mortgage, LLC and J.P. Morgan Securities LLC and BofA Securities, Inc., as representative of the several initial purchasers listed on Schedule A thereto (incorporated by reference from the Company's Current Report on Form 8-K filed on November 23, 2021). |
| 10.20† | Form of UWM Holdings Corporation Restricted Stock Unit Agreement (incorporated by reference from the Company's Annual Report on Form 10-K filed on March 1, 2022) |
| 10.21# | Revolving Credit Agreement, dated August 8, 2022, between United Wholesale Mortgage, LLC, as borrower, and SFS Holding Corp., as lender (incorporated by reference from the Company's Quarterly Report on Form 10-Q filed on August 9, 2022). |
| 10.22# | Amended and Restated Loan and Security Agreement, dated September 30, 2022, between United Wholesale Mortgage, LLC, as borrower, and Citibank, N.A., as lender (incorporated by reference from the Company's Current Report on Form 8-K filed on October 4, 2022). |
| 10.22.1#% | Amendment No. 1 to the Amended and Restated Loan and Security Agreement, dated January 20, 2023, between United Wholesale Mortgage, LLC and Citibank, N.A. |
| 21 | List of Subsidiaries (incorporated by reference to Exhibit 21 of the Company's Current Report on Form 8-K filed on January 22, 2021). |
| 23.1% | Consent of Deloitte & Touche LLP |
| 31.1% | Certification of CEO, pursuant to SEC Rule 13a-14(a) and 15d-14(a) |
| 31.2% | Certification of CFO, pursuant to SEC Rule 13a-14(a) and 15d-14(a) |

Table of Contents

| 32.1% | Certification by the CEO, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
|---|---|
| 32.2% | Certification by the CFO, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 101.0 INS | XBRL Instance Document - the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document. |
| 101.SCH | XBRL Taxonomy Extension Schema Document. |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document. |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document |
| 104.0 | Cover Page Interactive Data File (formatted as Inline XBRL and contained in Exhibit 101). |
| * | Certain of the exhibits and schedules to this Exhibit have been omitted in accordance with Regulation S-K Item 601(a)(5) or Item 601(b)(2). The Registrant agrees to furnish a copy of all omitted exhibits and schedules to the SEC upon its request. |
| % | Filed herewith. |
| † | Indicates a management contract or compensatory plan, contract or arrangement. |
| # | Certain confidential portions of this exhibit were omitted by means of marking such portions with brackets and asterisks because the identified confidential portions (i) are not material and (ii) would be competitively harmful if publicly disclosed, or constituted personally identifiable information that is not material. |

**Item 16. Form 10-K Summary**

None.

105

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**UWM HOLDINGS CORPORATION**

Date: March 1, 2023

By:     /s/ Mathew Ishbia
            Mathew Ishbia
            Chairman, President and Chief Executive Officer

Pursuant to the requirements of the Securities Exchange Act of 1934, this Report has been signed below by the following persons on behalf of the Registrant and in the capacities indicated on the 1st day of March, 2023.

| Name | Position | Date |
|---|---|---|
| /s/ Mathew Ishbia<br>Mathew Ishbia | Chairman, President and Chief Executive Officer<br>(Principal Executive Officer) | March 1, 2023 |
| /s/ Andrew Hubacker<br>Andrew Hubacker | Executive Vice President, Chief Financial Officer and Chief Accounting Officer<br>(Principal Financial Officer) | March 1, 2023 |
| /s/ Kelly Czubak<br>Kelly Czubak | Director | March 1, 2023 |
| /s/ Alex Elezaj<br>Alex Elezaj | Director | March 1, 2023 |
| /s/ Jeffrey A. Ishbia<br>Jeffrey A. Ishbia | Director | March 1, 2023 |
| /s/ Justin Ishbia<br>Justin Ishbia | Director | March 1, 2023 |
| /s/ Laura Lawson<br>Laura Lawson | Director | March 1, 2023 |
| /s/ Isiah Thomas<br>Isiah Thomas | Director | March 1, 2023 |
| /s/ Robert Verdun<br>Robert Verdun | Director | March 1, 2023 |
| /s/ Melinda Wilner<br>Melinda Wilner | Director | March 1, 2023 |

**Exhibit 10.22.1\***

AMENDMENT NUMBER ONE

to the

AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT

Dated as of September 30, 2022, among

UNITED WHOLESALE MORTGAGE, LLC,

and CITIBANK, N.A.

---

\* Certain portions of this exhibit have been redacted in accordance with Item 601(b)(10) of Regulation S-K. This information is not material and would likely cause competitive harm to the registrant if publicly disclosed. "[***]" indicates that information has been redacted.

This AMENDMENT NUMBER ONE (this "Amendment") is made this 20th day of January, 2023, to the Amended and Restated Loan and Security Agreement, dated as of September 30, 2022 (as amended, restated, supplemented or otherwise modified as of the date hereof, the "Original Loan and Security Agreement"; as amended by this Amendment and as may be further amended, restated, supplemented or otherwise modified from time to time, the "Loan and Security Agreement"), between CITIBANK, N.A., a national banking association, as lender ("Lender"), and UNITED WHOLESALE MORTGAGE, LLC, a Michigan limited liability company, as borrower ("Borrower"). Any capitalized term used but not defined herein shall have the meaning assigned to such term in the Loan and Security Agreement.

## RECITALS

WHEREAS, Borrower and Lender have agreed to amend the Original Loan and Security Agreement as more specifically set forth herein; and

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and for the premises and covenants herein contained, the parties hereto hereby, intending to be legally bound hereby, agree as follows:

SECTION 1. Amendments. Effective as of the date hereof (the "Amendment Effective Date"), the Original Loan and Security Agreement is hereby amended to delete the stricken text (indicated textually in the same manner as the following example: stricken text) and to add the double-underlined text (indicated textually in the same manner as the following example: double-underlined text) as set forth in the conformed copy of the Loan and Security Agreement attached as Exhibit A hereto.

SECTION 2. Fees and Expenses. Borrower agrees to pay to Lender all of the out- of-pocket costs and expenses incurred by Lender in connection with this Amendment (including, but not limited to, all of the reasonable fees, disbursements and expenses of counsel to Lender) in accordance with Sections 3 and 10 of the Loan and Security Agreement.

SECTION 3. Representations and Warranties. In order to induce Lender to execute and deliver this Amendment, Borrower hereby represents and warrants to Lender that as of the Amendment Effective Date:

(a)     the financial covenants under each of its other agreements evidencing indebtedness of each Seller (the "Other Debt Agreements") have been waived or amended as needed in such a manner such that no default exists under the Other Debt Agreements as of the Amendment Effective Date;

(b)     it has the requisite power and authority, and legal right, to execute and deliver this Amendment and to perform its obligations under this Amendment, the Loan and Security Agreement and the other Program Documents to which it is a party;

(c)     each of this Amendment, the Loan and Security Agreement and the other Program Documents to which it is a party constitutes a legal, valid and binding obligation of it enforceable against it in accordance with its respective terms;

(d)     each representation and warranty of it contained in the Loan and Security Agreement and the other Program Documents to which it is a party is true and correct and is hereby restated and affirmed;

(e)     each covenant and each other agreement of it contained in the Loan and Security Agreement and the other Program Documents to which it is a party is hereby restated and affirmed; and

(f)    no Default or Event of Default has occurred and is continuing under the Loan and Security Agreement or any other Program Document.

SECTION 4. <u>Ratification</u>. The parties hereto ratify all terms of the Original Loan and Security Agreement other than those amended hereby, and ratify those provisions as amended hereby.

SECTION 5. <u>Severability</u>. If any provision of this Amendment is declared invalid by any court of competent jurisdiction, such invalidity shall not affect any other provision of this Amendment or any other Program Document, and this Amendment and each other Program Document shall be enforced to the fullest extent permitted by law.

SECTION 6. <u>Captions</u>. The captions and section headings appearing herein are included solely for convenience of reference and are not intended to affect the interpretation of any provision of this Amendment.

SECTION 7. <u>Binding Effect; Governing Law</u>. This Amendment shall be binding on and inure to the benefit of the parties hereto and their respective successors and permitted assigns. THIS AMENDMENT SHALL BE CONSTRUED IN ACCORDANCE WITH, AND GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF (EXCEPT FOR SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, WHICH SHALL GOVERN).

SECTION 8. <u>SUBMISSION TO JURISDICTION; WAIVERS</u>. **EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY:**

(a)    **SUBMITS FOR ITSELF AND ITS PROPERTY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AMENDMENT AND/OR ANY OTHER PROGRAM DOCUMENT, OR FOR RECOGNITION AND ENFORCEMENT OF ANY JUDGMENT IN RESPECT THEREOF, TO THE NON-EXCLUSIVE GENERAL JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK, THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK, AND APPELLATE COURTS FROM ANY THEREOF;**

(b)    **CONSENTS THAT ANY SUCH ACTION OR PROCEEDING MAY BE BROUGHT IN SUCH COURTS AND, TO THE EXTENT PERMITTED BY LAW, WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH ACTION OR PROCEEDING IN ANY SUCH COURT OR THAT SUCH ACTION OR PROCEEDING WAS BROUGHT IN AN INCONVENIENT COURT AND AGREES NOT TO PLEAD OR CLAIM THE SAME;**

(c)    **AGREES THAT SERVICE OF PROCESS IN ANY SUCH ACTION OR PROCEEDING MAY BE EFFECTED BY MAILING A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL (OR ANY SUBSTANTIALLY SIMILAR FORM OF MAIL), POSTAGE PREPAID, TO ITS ADDRESS SET FORTH UNDER ITS SIGNATURE TO THE LOAN AND SECURITY AGREEMENT OR AT SUCH OTHER ADDRESS OF WHICH THE OTHER PARTIES HERETO SHALL HAVE BEEN NOTIFIED; <u>PROVIDED</u> THAT, AT THE TIME OF SUCH MAILING AN ELECTRONIC COPY OF SUCH SERVICE OF PROCESS IS ALSO SENT BY ELECTRONIC MAIL TO THE PERSONS SPECIFIED IN THE ADDRESS FOR NOTICES FOR SUCH PARTY ON THE SIGNATURE PAGE TO THE LOAN AND SECURITY AGREEMENT (OR SUCH OTHER PERSONS OF WHICH THE OTHER PARTIES HERETO SHALL HAVE BEEN NOTIFIED); AND**

(d)   **AGREES THAT NOTHING HEREIN SHALL AFFECT THE RIGHT TO EFFECT SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT TO SUE IN ANY OTHER JURISDICTION.**

SECTION 9. <u>**WAIVER OF JURY TRIAL.**</u> **BORROWER AND LENDER HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY ANY REQUIREMENTS OF LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AMENDMENT, ANY OTHER PROGRAM DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.**

SECTION 10. <u>Counterparts; Electronic Signatures</u>. This Amendment may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument, and any of the parties hereto may execute this Amendment by signing any such counterpart. Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument. The parties agree that this Amendment, any documents to be delivered pursuant to this Amendment and any notices hereunder may be transmitted between them by e-mail and/or by facsimile. The parties intend that with respect to the Amendment Documents, faxed signatures and electronically imaged signatures, such as .pdf files and signatures executed using third party electronic signature capture service providers, which comply with E- Sign, the New York State Electronic Signatures and Records Act or any other similar state law based on the Uniform Electronic Transactions Act, shall constitute original signatures and are binding on all parties. The parties intend that subsequent certifications and other documentation delivered by Borrower in connection with the Amendment Documents may be delivered in accordance with, and shall be governed by E-Sign, the New York State Electronic Signatures and Records Act or any other similar state law based on the Uniform Electronic Transactions Act, and shall be binding on such parties. The original documents shall be promptly delivered, if requested.

SECTION 11. <u>Limited Effect</u>. Except as expressly amended hereby, the Original Loan and Security Agreement shall continue in full force and effect in accordance with its terms. Reference to this Amendment need not be made in the Original Loan and Security Agreement, any other Program Document or any other instrument or document executed in connection therewith, or in any certificate, letter or communication issued or made pursuant to, or with respect to, the Original Loan and Security Agreement, any reference in any of such items to the Original Loan and Security Agreement being sufficient to refer to the Original Loan and Security Agreement as amended hereby on and after the Amendment Effective Date.

IN WITNESS WHEREOF, Borrower and Lender have caused this Amendment to be executed and delivered by their duly authorized officers as of the day and year first above written.

**UNITED WHOLESALE MORTGAGE, LLC,** as
Borrower


By: <u>/s/ Blake Kolo</u>
Name: <u>Blake Kolo</u>
Title: <u>EVP, Chief Business Officer</u>


**CITIBANK, N.A.,** as Lender


By: <u>/s/ Arunthathi Theivakumaran</u>

Name: <u>Arunthathi Theivakumaran</u>
Title: <u>Vice President</u>

Conformed Version
through Amendment No. 1,
dated as of January 20, 2023

AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT
dated as of September 30, 2022

between

UNITED WHOLESALE MORTGAGE, LLC
as Borrower,

and

CITIBANK, N.A.,
as Lender

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| ARTICLE I DEFINITIONS, ACCOUNTING MATTERS, APPLICABILITY |  | 1 |
| Section 1.01 | Definitions; Construction | 1 |
| Section 1.02 | Accounting Matters | 2 |
| ARTICLE II LOANS, BORROWING, PREPAYMENT |  | 2 |
| Section 2.01 | Loans | 2 |
| Section 2.02 | Note | 2 |
| Section 2.03 | Funding Requests and Collateral Reporting | 3 |
| Section 2.04 | Borrowing Base Reports | 4 |
| Section 2.05 | Interest | 4 |
| Section 2.06 | Increased Capital Costs | 5 |
| Section 2.07 | [Reserved]. | 6 |
| Section 2.08 | Mandatory Repayment of Loans | 6 |
| Section 2.09 | Optional Prepayment | 7 |
| Section 2.10 | Commitment Fee | 7 |
| Section 2.11 | Determination of Interest Rate. | 7 |
| ARTICLE III PAYMENTS; COMPUTATIONS; TAXES; FEES |  | 9 |
| Section 3.01 | Payments and Computations, Etc | 9 |
| Section 3.02 | Taxes | 10 |
| Section 3.03 | Fees and Expenses | 13 |
| ARTICLE IV SECURITY INTEREST |  | 13 |
| Section 4.01 | Security Interest | 13 |
| Section 4.02 | Provisions Regarding Pledge of Eligible Servicing Rights to Be Included In Financing Statements | 13 |
| Section 4.03 | Authorization of Financing Statements | 14 |
| Section 4.04 | Lender's Appointment as Attorney In Fact | 14 |
| Section 4.05 | Release of Security Interest | 15 |
| ARTICLE V CONDITIONS PRECEDENT |  | 16 |
| Section 5.01 | Conditions Precedent | 16 |
| Section 5.02 | Further Conditions Precedent | 16 |
| ARTICLE VI REPRESENTATIONS AND WARRANTIES |  | 16 |
| Section 6.01 | Representations and Warranties of the Borrower | 16 |
| Section 6.02 | Representations Concerning the Collateral | 22 |
| ARTICLE VII COVENANTS |  | 23 |
| Section 7.01 | Affirmative Covenants of Borrower | 23 |
| Section 7.02 | Negative Covenants of the Borrower | 31 |
| Section 7.03 | Notice of Certain Occurrences | 32 |
| ARTICLE VIII EVENTS OF DEFAULT |  | 35 |
| Section 8.01 | Events of Default | 35 |
| Section 8.02 | Remedies | 37 |

i

ARTICLE IX ASSIGNMENT ................................................................................... 39
Section 9.01   Restrictions on Assignments ................................................................ 39
Section 9.02   Evidence of Assignment; Endorsement on Notes ................................ 39
Section 9.03   Rights of Assignee ............................................................................... 39
Section 9.04   Permitted Participants; Effect .............................................................. 39
Section 9.05   Voting Rights of Participants. ............................................................. 40
ARTICLE X INDEMNIFICATION ....................................................................... 41
Section 10.01   Indemnities by the Borrower .............................................................. 41
Section 10.02   General Provisions ............................................................................. 41
ARTICLE XI MISCELLANEOUS .......................................................................... 42
Section 11.01   Amendments, Etc. .............................................................................. 42
Section 11.02   Notices, Etc. ....................................................................................... 42
Section 11.03   No Waiver; Remedies ......................................................................... 42
Section 11.04   Binding Effect; Assignability ............................................................ 42
Section 11.05   Agreement Constitutes Security Agreement; Governing Law; Submission To Jurisdiction; Waivers ....... 42
Section 11.06   Entire Agreement ............................................................................... 43
Section 11.07   Acknowledgement .............................................................................. 43
Section 11.08   Captions and Cross References ........................................................... 43
Section 11.09   Execution in Counterparts .................................................................. 43
Section 11.10   Confidentiality .................................................................................... 44
Section 11.11   Survival ............................................................................................... 44
Section 11.12   Set-Off ................................................................................................ 45
Section 11.13   Erroneous Payments ........................................................................... 45
Section 11.14   Provisions Applicable to Freddie Mac and the Collateral .................. 46

**Schedules**

Schedule I    Definitions
Schedule II    Collateral Account
Schedule III    [Reserved]
Schedule IV    [Reserved]
Schedule V    [Reserved]
Schedule VI    [Reserved]
Schedule VII    Agency Consent Agreements
Schedule 5.01    Conditions Precedent to the Effectiveness of this Agreement
Schedule 5.02    Conditions Precedent to each Loan
Schedule 6.01(t)    Borrower's Existing Financing Facilities
Schedule 6.01(z)    Agency Financial Covenants
Schedule 6.02    Eligibility Criteria with respect to the Mortgage Loans
Schedule 7.01(g)    Borrower's Accounts
Schedule 7.01(i)    Citibank, N.A. Required Investor Reports
Schedule 11.02    Notices

**Exhibits**

Exhibit 2.02(a)    Form of Note
Exhibit 2.03    Form of Borrower Funding Request
Exhibit 2.09    Form of Prepayment Notice
Exhibit 3.02-1    Form of U.S. Tax Compliance (For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)
Exhibit 3.02-2    Form of U.S. Tax Compliance (For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)
Exhibit 3.02-3    Form of U.S. Tax Compliance (For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)
Exhibit 3.02-4    Form of U.S. Tax Compliance (For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)
Exhibit 4.04    Form of Power of Attorney
Exhibit 7.01    Form of Compliance Certificate

iii

This AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT (as amended or supplemented from time to time, this "Agreement") dated as of September 30, 2022, is between UNITED WHOLESALE MORTGAGE, LLC, a Michigan limited liability company, in its capacity as borrower and servicer ("Borrower"), and CITIBANK, N.A., a national banking association, (the "Lender").

BACKGROUND

The Borrower wishes to obtain financing from time to time to provide funding for the origination, acquisition or holding of certain Eligible Servicing Rights, which Eligible Servicing Rights shall secure Loans (as defined herein) to be made by the Lender hereunder.

The Lender has agreed, subject to the terms and conditions of this Agreement (as defined herein), to provide such financing to the Borrower.

The parties previously entered into a Loan and Security Agreement, dated as of September 30, 2022 (as amended or supplemented from time to time, the "Existing LSA").

The parties hereto have requested that the Existing LSA be amended and restated, in its entirety, subject to the terms and conditions of this Agreement.

Accordingly, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

ARTICLE I
DEFINITIONS, ACCOUNTING MATTERS, APPLICABILITY

Section 1.01   Definitions; Construction.

(a)   Capitalized terms used herein and not otherwise defined herein shall have the meanings specified in Schedule I.

(b)   All terms used in Article 9 of the UCC, and not specifically defined herein, are used herein as defined in such Article 9.

(c)   The following rules of this subsection (c) apply unless the context requires otherwise. A gender includes all genders. Where a word or phrase is defined, its other grammatical forms have a corresponding meaning. A reference to a subsection, Section, Annex or Exhibit is, unless otherwise specified, a reference to a Section of, or annex or exhibit to, this Agreement. A reference to a party to this Agreement or another agreement or document includes the party's successors and permitted substitutes and assigns. A reference to an agreement or document (including any Facility Document) is to the agreement or document as amended, modified, novated, supplemented or replaced, except to the extent prohibited thereby or by any Facility Document and in effect from time to time in accordance with the terms thereof. A reference to legislation or to a provision of legislation includes a modification or re-enactment of it, a legislative provision substituted for it and a regulation or statutory instrument issued under it. A reference to writing includes an electronic or a facsimile transmission and any means of reproducing words in a tangible and permanently visible form. A reference to conduct includes, without limitation, an omission, statement or undertaking, whether or not in writing. The words "hereof", "herein", "hereunder" and similar words refer to this Agreement as a whole and not to any particular provision of this Agreement. The term "including" is not limiting and means "including without limitation". In the computation of periods of time from a specified date to a

1

later specified date, the word "from" means "from and including", the words "to" and "until" each mean "to but excluding", and the word "through" means "to and including".

(d)     Except where otherwise provided in this Agreement, any determination, consent, approval, statement or certificate made or confirmed in writing with notice to Borrower by Lender or an authorized officer of Lender provided for in this Agreement is conclusive and binds the parties in the absence of manifest error. A reference to an agreement includes a security interest, guarantee, agreement or legally enforceable arrangement whether or not in writing related to such agreement. Any Event of Default hereunder shall be deemed to be continuing unless explicitly waived in writing by Lender in its sole and absolute discretion and once waived in writing by Lender shall be deemed to be not continuing, subject to and in accordance with the terms and conditions of any applicable waiver.

(e)     A reference to a document includes an agreement (as so defined) in writing or a certificate, notice, instrument or document, or any information recorded in computer disk form. Where the Borrower is required to provide any document to Lender under the terms of this Agreement, the relevant document shall be provided in writing or printed form unless Lender requests otherwise. At the request of Lender, the document shall be provided in computer disk form or both printed and computer disk form.

(f)     This Agreement is the result of negotiations among, and has been reviewed by counsel to, Lender and Borrower, and is the product of all parties. In the interpretation of this Agreement, no rule of construction shall apply to disadvantage one party on the ground that such party proposed or was involved in the preparation of any particular provision of this Agreement or this Agreement itself. Except where otherwise expressly stated, Lender may give or withhold, or give conditionally, approvals and consents and may form opinions and make determinations at its absolute discretion. Any requirement of good faith, discretion or judgment by Lender shall not be construed to require Lender to request or await receipt of information or documentation not available when required from or with respect to Borrower or the Collateral.

(g)     Any determination of materiality made by Lender pursuant to this Agreement shall be in its sole discretion acting in good faith.

Section 1.02    Accounting Matters. Except as otherwise expressly provided herein, all accounting terms used herein shall be interpreted, and all financial statements and certificates and reports as to financial matters required to be delivered to the Lender hereunder shall be prepared in accordance with GAAP.

## ARTICLE II
## LOANS, BORROWING, PREPAYMENT

Section 2.01    Loans. On the terms and subject to the conditions set forth in this Agreement, the Lender (i) shall make loans in an aggregate amount not to exceed the Committed Amount, and (ii) in the event that the Outstanding Aggregate Loan Amount is equal to the Committed Amount, may, in its sole discretion, make loans on an uncommitted basis in an aggregate amount not to exceed the Uncommitted Amount (each loan under the preceding subclauses (i) and (ii), a "Loan") to the Borrower from time to time. The Lender shall distribute the proceeds of such Loan to the Borrower on the related Funding Date in accordance with Section 2.03.

Section 2.02    Note.

2

(a)    The Loans made by the Lender shall be evidenced by a single promissory note of the Borrower, substantially in the form of Exhibit 2.02(a) hereto (the "<u>Note</u>"), dated the date hereof, payable to the Lender in a principal amount equal to the sum of the Committed Amount plus the Uncommitted Amount.

(b)    The date, amount, and interest rate of each Loan made by the Lender to the Borrower, and each payment made on account of the principal thereof, shall be recorded by the Lender on its books and, prior to any transfer of the Note, noted by the Lender on the grid attached to the Note or any continuation thereof, provided, that failure of the Lender to make any such recordation or notation shall not affect the obligations of the Borrower to make a payment when due of any amount hereunder or under the Note in respect of the Loans.

Section 2.03   <u>Funding Requests and Collateral Reporting</u>.

(a)    On any Funding Notice Date, Borrower may request Lender to make a Loan on the related Funding Date by delivering to Lender a Borrower Funding Request no later than 3:00 p.m. (New York City time) on such Funding Notice Date which shall become irrevocable by Borrower on or after 2:00 p.m. (New York City time) [***] Business Day prior to the related Funding Date. The amount of any Loan requested pursuant to a Borrower Funding Request shall be not greater than the related Available Loan Amount and shall not result in the Outstanding Aggregate Loan Amount exceeding the lesser of (i) the Borrowing Base and (ii) the sum of the Committed Amount plus the Uncommitted Amount. Lender shall have the obligation, subject to the terms and conditions of the Facility Documents, to enter into Loans with an aggregate outstanding amount of up to the Committed Amount and shall have no obligation to enter into Loans with respect to the Uncommitted Amount; provided that Lender shall provide Borrower with at least [***] Business Days' prior written notice before exercising its discretion to cease entering into Loans with Borrower for all or any portion the Uncommitted Amount. Unless otherwise agreed to between Lender and Borrower in writing, all outstanding Loans at any one time shall be first deemed committed up to the Committed Amount and then the remainder, if any, shall be deemed uncommitted up the Uncommitted Amount. Lender shall not have the right, however, to terminate any Loans with respect to the Uncommitted Amount after the related Funding Date until the related Loan Repayment Date.

No later than [***] Business Days prior to each Funding Date (including the Initial Funding Date) where new Eligible Servicing Rights are to be added to the Collateral, Borrower shall deliver to Lender a Servicing Schedule (as of the related cut-off date) identifying all Eligible Servicing Rights to be pledged to Lender as Collateral under the terms and conditions of this Agreement and all Agency Obligations outstanding on the related Funding Date. Regardless of whether Borrower delivers a Borrower Funding Request during any calendar month, Borrower shall deliver to Lender or its designee (including any Person identified on Schedule 7.01(a) no later than the [***] Business Day of each month or as otherwise agreed to by Lender and Borrower (any such Business Day, the "<u>Collateral Reporting Date</u>"), (x) an Agency Obligations report, in a form mutually agreed to by Lender and Borrower, identifying all Agency Obligations outstanding on the date such report is submitted to Lender and (y) additional updated Servicing Schedules (as of the related cut-off date) with respect to all Eligible Servicing Rights that constitute the Collateral under the terms and conditions of this Agreement, which shall include all updates to the Collateral as reasonably requested by Lender since the delivery of the preceding Servicing Schedule. Notwithstanding anything contained herein to the contrary, all delivery requirements (including without limitation the Servicing Schedule) described above shall apply to each Borrower Funding Request.

In Lender's determination of Collateral Value for any of the Eligible Servicing Rights hereunder, it shall apply the Market Value of the Eligible Servicing Rights in a related

3

Borrowing Base Report. Any excess of the amount funded on such Loan over the Borrowing Base as reflected in the related Borrowing Base Report shall result in a Borrowing Base Deficiency as set forth in Section 2.08(b) of this Agreement.

Notwithstanding anything to the contrary contained in this <u>Section 2.03(a)</u>, Lender shall have the right to determine Market Value at any time in its sole discretion, exercised in good faith, and deliver an updated Borrowing Base Report to Borrower, reflecting such determination at any time. For purposes of preparing each Borrowing Base Report, Lender shall calculate the Collateral Value of the Eligible Servicing Rights described in the Servicing Schedule. Upon reasonable request by the Borrower, the Lender shall, from time to time, provide reasonable information regarding the Valuation Assumptions made for purposes of its determination of Market Value in any Borrowing Base Report, as well as is necessary to demonstrate that such Market Value has been determined in accordance with the MV Criteria.

(b) By delivering a Borrower Funding Request, Borrower represents and warrants to Lender that, after taking into account the amount of the requested Loan, all conditions precedent to such Loan specified in Section 5.02 of this Agreement have been satisfied.

Notwithstanding anything to the contrary contained in this <u>Section 2.03</u> or <u>Section 2.04</u>, the Lender shall have the right to determine Market Value at any time in its sole discretion, acting in good faith. For purposes of preparing each Borrowing Base Report, the Lender shall calculate the Collateral Value of the Eligible Servicing Rights described in the related Servicing Schedule using the Market Value of such Eligible Servicing Rights determined in accordance with the terms hereof.

Section 2.04 <u>Borrowing Base Reports</u>.

(a) With respect to each Funding Date, the Lender shall determine the Market Value of the Eligible Servicing Rights to be pledged as security for a Loan on such Funding Date. In connection with such determination, Borrower shall provide to Lender the most recent servicing valuation conducted by a Valuation Agent with respect to the value of Borrower's servicing portfolio in accordance with GAAP, on a quarterly basis (or more frequently, at Borrower's sole discretion) upon such valuation becoming available. In addition to the foregoing, in connection with the determination of the Borrowing Base on each Funding Date, the Lender shall obtain a third party valuation by a Valuation Agent of the related Eligible Servicing Rights to be included in the Borrowing Base on such Funding Date; provided, that the Lender shall have no obligation to use any valuation obtained or delivered by Borrower as set forth above and shall have the right to determine the Market Value of the related Eligible Servicing Rights at any time in its sole discretion in accordance with the MV Criteria.

Section 2.05 <u>Interest</u>. Interest shall accrue on each Loan for each day during a related Interest Period at a per annum rate equal to the product of (x) the outstanding principal balance of such Loan on such day, multiplied by (y) the Interest Rate. Interest on the Loans and other amounts outstanding hereunder is due on each Monthly Settlement Date and shall accrue daily from the applicable Funding Date at the Interest Rate or such other rate provided for hereunder (including the Post-Default Rate, if applicable), until repaid in accordance with the applicable terms and conditions hereof. The Lender shall determine the Benchmark for each Loan, which may be calculated or reset on a daily basis by the Lender, and provide notice of such determination to the Borrower. The Lender shall also calculate the amount of interest or other amounts due, to be paid by the Borrower from time to time hereunder (including in connection with any prepayment or repayment of Loans permitted hereunder) and shall provide a written statement thereof to the Borrower at least [***] Business Days prior to the due date of such

payments (or the relevant repayment or prepayment after having received a notice thereof); provided, that failure to provide such statements on a timely basis shall not relieve the Borrower of the obligation to pay any interest and principal due on the applicable payment date (based upon its good faith calculation of the amount due, such amount to be promptly reconciled after receipt of a subsequent statement from the Lender) and other such amounts hereunder promptly upon receipt of such statement.

Section 2.06    Increased Capital Costs. If any change to a Requirement of Law (other than with respect to any amendment made to Lender's organizational or governing documents) or any change in the interpretation or application thereof or compliance by Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority made subsequent to the date hereof:

(a)    shall subject Lender to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (f) of the definition of Excluded Taxes and (C) Connection Income Taxes) with respect to this Agreement or any Loans made pursuant to it;

(b)    shall impose, modify or hold applicable any reserve, special deposit, compulsory advance or similar requirement against assets held by deposits or other liabilities in or for the account of the Loans or extensions of credit by, or any other acquisition of funds by any office of Lender; or

(c)    shall impose on Lender any other condition;

and the result of any of the foregoing is to increase the cost to Lender, by an amount which Lender deems to be material, of effecting or maintaining any loans or transactions hereunder, or to reduce any amount receivable hereunder in respect thereof, then, in any such case, Lender shall give Borrower prompt notice thereof by delivering to Borrower a certificate with reasonable detail as to any additional amounts payable pursuant to this subsection as calculated by Lender in good faith (a "Yield Protection Notice"), which shall be conclusive in the absence of manifest error. Borrower shall, at its option, within [***] Business Days of its receipt of any such Yield Protection Notice, either (A) (1) notify Lender of its intent to terminate this Agreement (without the imposition of any form of penalty, breakage costs or exit fees) and (2) pay all Obligations hereunder within [***] days of such notice to Lender or (B) pay Lender such additional amount or amounts as will compensate Lender for such increased cost or reduced amount receivable thereafter incurred; provided that, with respect to the immediately preceding clause (B), Borrower shall only be obligated to pay those amounts pursuant to this Section 2.06(c) to the extent incurred by Lender (1) within [***] days prior to delivery of the Yield Protection Notice to Borrower or (2) on or after delivery of such Yield Protection Notice to Borrower. In the event Borrower elects to terminate this Agreement and pay all Obligations hereunder pursuant to clause (A) above, in no event shall Borrower pay (i) any increased costs specified in the Yield Protection Notice or (ii) any increased costs accrued during the [***] days prior to receipt of such Yield Protection Notice.

If Lender shall have determined in good faith that either (A) the adoption of or any change in any Requirement of Law regarding capital adequacy or in the interpretation or application thereof or compliance by Lender or any corporation controlling Lender with any request or directive regarding capital adequacy (whether or not having the force of law) from any Governmental Authority or Official Body made subsequent to the date hereof; or (B) compliance by Lender or any corporation controlling Lender with: (1) any directive or request from any Governing Authority or Official Body (whether or not having the force of law) imposed after the date hereof or (2) the requirements of, whether such compliance is commenced prior to or after the date hereof, any of (x) Basel III or (y) the Dodd-Frank Act, or any existing rules, regulations,

5

guidance, interpretations or directives from the United States bank regulatory agencies relating to Basel III or the Dodd–Frank Act; shall have the effect of reducing the rate of return on Lender's or such corporation's capital to a level below that which Lender or such corporation (taking into consideration Lender's or such corporation's policies with respect to capital adequacy) by an amount deemed by Lender to be material to the extent Lender or such corporation determines such increase in capital to be attributable to the existence of the obligations or agreements of Lender hereunder, then, in any such case, Lender shall give Borrower prompt notice thereof by delivering to Borrower a certificate with reasonable detail as to any additional amounts payable pursuant to this subsection as calculated by Lender in good faith (a "<u>Capital Adequacy Notice</u>"), which shall be conclusive in the absence of manifest error. Borrower shall, at its option, within [***] Business Days of its receipt of any such Capital Adequacy Notice, either (A) (1) notify Lender of its intent to terminate this Agreement (without the imposition of any form of penalty, breakage costs or exit fees) and (2) pay all Obligations hereunder within [***] days of such notice to Lender or (B) pay Lender such additional amount or amounts as will compensate Lender for such reduction; provided that, with respect to the immediately preceding clause (B), Borrower shall only be obligated to pay those amounts pursuant to this Section 2.06(c) to the extent incurred by Lender (1) within [***] days prior to delivery of the Capital Adequacy Notice to Borrower or (2) on or after delivery of such Capital Adequacy Notice to Borrower. In the event Borrower elects to terminate this Agreement and pay all Obligations hereunder pursuant to clause (A) above, in no event shall Sellers pay (i) any increased costs specified in the Capital Adequacy Notice or (ii) any increased costs accrued during the [***] days prior to receipt of such Capital Adequacy Notice.

If Lender becomes entitled to claim any additional amounts pursuant to this Section, it shall promptly notify the Borrower of the event by reason of which it has become so entitled; provided that Borrower shall only be obligated to pay such additional amounts to the extent Lender provides written notice of such amounts to the Borrower within [***] days following Lender becoming aware of the incurrence of any such increased costs. A certificate as to any additional amounts payable pursuant to this subsection submitted by Lender to the Borrower shall be conclusive in the absence of manifest error.

Section 2.07    [Reserved].

Section 2.08    Mandatory Repayment of Loans.

(a)    The Borrower shall repay the Outstanding Aggregate Loan Amount with respect to all Loans and all other amounts due under this Agreement in full on the Loan Repayment Date. Loans may be prepaid in accordance with the terms of <u>Section 2.09</u> hereof and, to the extent prepaid, may be re-borrowed hereunder in accordance with the terms hereof (including satisfaction of all conditions precedent contained in <u>Section 5.02</u>).

(b)    If, on any Business Day (a "<u>Borrowing Base Shortfall Day</u>"), the Lender provides written notice to the Borrower that the Lender has determined in its sole reasonable discretion based on the Borrowing Base Report most recently delivered by the Lender pursuant to <u>Section 2.04</u> that the Outstanding Aggregate Loan Amount on such day exceeds the lesser of (i) the Borrowing Base and (ii) the Committed Amount plus the Uncommitted Amount on such day by an amount (such circumstance, a "<u>Borrowing Base Deficiency</u>"), the Borrower shall no later than 5:00 p.m. (New York City time) on the next succeeding Business Day following the Borrowing Base Shortfall Day repay outstanding Loans (including accrued interest thereon), in an amount equal to the amount of the Borrowing Base Deficiency specified in the notice provided to the Borrower by the Lender (such requirement a "<u>Margin Call</u>"). Notwithstanding the prior sentence, Lender shall not require a Margin Call to be cured unless the related Borrowing Base Deficiency exceeds the Deficiency Threshold, either individually or on an

aggregate basis with any other Borrowing Base Deficiencies that have occurred hereunder unless (i) there is a Margin Deficit in existence under the Master Repurchase Agreement or (ii) a Default or Event of Default has occurred. Any Borrowing Base Deficiency shall be cured, and the related Margin Call satisfied, in cash. Notwithstanding the foregoing, any Fannie Stop-Loss Cap Failure Borrowing Base Deficiency or Freddie Mac Claims Cap Failure Borrowing Base Deficiency shall not be subject to the Deficiency Threshold or other provisions set forth in the preceding sentence.

(c)    Borrower may request that Lender consent to Borrower entering into an Excess Yield Transaction by delivering notice to Lender (an "EYT Notice"), at least [***] Business Days prior to the closing date of such Excess Yield Transaction (the "Excess Yield Transaction Date"). Each EYT Notice shall identify the Excess Yield Transaction Date and the proposed Released Excess Yield Mortgages and request that Lender (i) releases its Lien on the portion of the Collateral that will be defined as Excess Yield upon consummation of the Excess Yield Transaction, solely with respect to Released Excess Yield Mortgages, and (ii) consent to the filing of an applicable UCC-3 reflecting such release. Following receipt of an EYT Notice, Lender shall deliver a Borrowing Base Report to Borrower with respect to the Collateral related to the Retained Citi Covered Mortgages. To the extent Lender determines, in its sole reasonable discretion based on such Borrowing Base Report, and as otherwise permitted by Section 2.01 herein, that the Outstanding Aggregate Loan Amount on such day is less than the Borrowing Base on such day, Lender shall release its Lien on the portion of the Collateral that will be defined as Excess Yield upon consummation of the Excess Yield Transaction and consent to the filing of an applicable UCC-3 reflecting such release, solely with respect to the Released Excess Yield Mortgages identified in the Partial Release (Excess Yield); unless, (1) there is any Margin Deficit in existence as of the Excess Yield Transaction Date, (2) any Default or Event of Default has occurred, (3) any Margin Deficit, Default or Event of Default would occur due to Lender releasing such portion of its Lien on the Collateral or (4) the Excess Yield Transaction fails to close.

Section 2.09    Optional Prepayment. The Borrower may, at its option, prepay without penalty or premium any Loan advanced hereunder in full or in part on any Business Day (each an "Optional Prepayment Date"). Any such prepayment received by the Lender by 1:00 p.m. (New York City time) together with a Prepayment Notice on such Optional Prepayment Date shall be applied by the Lender on such Business Day. Any such prepayment received by the Lender after 1:00 p.m. (New York City time) on such Optional Prepayment Date shall be applied by the Lender on the following Business Day.

For the avoidance of doubt, except with respect to a payment in full pursuant to Section 2.06, any optional prepayment in full shall not result in the termination of this Agreement unless such termination is declared in writing by the Borrower, acting in its discretion.

Section 2.10    Commitment Fee/Adjustment to Uncommitted Amount. The Borrower agrees to pay to the Lender the Commitment Fee, if any, in accordance with the terms set forth in the Pricing Side Letter. Provided that no Default or Event of Default has occurred or is continuing, Borrower shall have the right, from time to time, to adjust the Uncommitted Amount hereunder in accordance with Section 3 of the Pricing Side Letter.

Section 2.11    Determination of Interest Rate.

(a)    Interest Rate. The Interest Rate of the Loan shall be based on: (A) the SOFR Rate with respect to the applicable Interest Period if the Loan is a SOFR Loan or (B) the Alternate Rate with respect to the applicable Interest Period if the Loan is an Alternate Rate Loan.

7

      (b)   <u>Term SOFR Conforming Changes</u>. In connection with the use or administration of Term SOFR, Lender will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Facility Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of Borrower or any other party to this Loan Agreement or any other Facility Document. Lender will promptly notify Borrower of the effectiveness of any Conforming Changes in connection with the use or administration of Term SOFR.

      (c)   <u>Benchmark Unavailability Period</u>. During a Benchmark Unavailability Period, the component of the Interest Rate based on Term SOFR (or the then-current Benchmark if the Loan is then an Alternate Rate Loan) shall during such Benchmark Unavailability Period be replaced with the Prime Rate.

      (d)   Subject to the terms and conditions hereof, the Loan shall be either a SOFR Loan or an Alternate Rate Loan, as applicable, and Borrower shall pay interest on the outstanding principal balance of the Loan at the SOFR Rate or at the Alternate Rate, as applicable, for each day in the applicable Interest Period. Each determination by Lender of the Interest Rate shall be conclusive and binding upon Borrower for all purposes, absent manifest error. If and to the extent part of the Conforming Changes, any change in the rate of interest hereunder due to a change in the Benchmark shall become effective as of the opening of business on the first day on which such change in the Benchmark shall become effective.

      (e)   <u>Effect of Benchmark Transition</u>.

      (i)   Notwithstanding anything to the contrary herein or in any other Facility Document, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior to the Periodic Term SOFR Determination Day (or if the Benchmark is not the Term SOFR Reference Rate, the Determination Date for such other Benchmark) for any day in any Interest Period, the Benchmark Replacement will replace the then-current Benchmark for all purposes hereunder or under any Facility Document in respect of such determination and all determinations on all subsequent dates (without any amendment to, or further action or consent of any other party to, this Agreement).

      (ii)   <u>Benchmark Replacement Conforming Changes</u>. In connection with the use, administration, adoption, or implementation of a Benchmark Replacement, Lender will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Facility Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of Borrower or any other party to this Agreement or any other Facility Document.

      (iii)   Lender will promptly notify Borrower of (i) the Benchmark Replacement Date, (ii) the implementation of any Benchmark Replacement, (iii) the effectiveness of any Conforming Changes, and/or (iv) any Benchmark Unavailability Period. Any determination, decision or election that may be made by Lender pursuant to this <u>Section 2.11</u>, including any determination with respect to a rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its sole discretion and without consent from Borrower.

(iv)   Notwithstanding any provision of this Agreement to the contrary, in no event shall Borrower have the right to convert the Loan to an Alternate Rate Loan.

(f)   Disclaimer. Lender does not warrant or accept any responsibility for, and shall not have any liability with respect to (i) the administration, submission or any other matter related to Term SOFR or with respect to any alternative or successor rate thereto, or replacement rate thereof (including, without limitation any Benchmark Replacement implemented hereunder), (ii) the composition or characteristics of any Benchmark Replacement, including whether it is similar to, or produces the same value or economic equivalence to Term SOFR (or any other Benchmark) or have the same volume or liquidity as did Term SOFR (or any other Benchmark), (iii) any actions or use of its discretion or other decisions or determinations made with respect to any matters covered by this Section 2.11 including, without limitation, whether or not a Benchmark Transition Event has occurred, the removal or lack thereof of unavailable or non-representative tenors, the implementation or lack thereof of any Conforming Changes, the delivery or non-delivery of any notices required by this Section 2.11 or otherwise in accordance herewith, and (iv) the effect of any of the foregoing provisions of this Section 2.11 on Borrower, its shareholders or any Affiliates Borrower or on any financial products or agreements in effect or offered by the Borrower or any Affiliates of the Borrower.

(g)   Borrower Repayment. In the event that Borrower determines that the Benchmark Replacement is unacceptable, Borrower shall provide notice of same to Lender within [***] Business Days of receipt of notice from Lender of the Benchmark Replacement and Borrower shall have the right to terminate this Agreement, on or prior to the date that is [***] Business Days following receipt of such notice (such date, the "Optional Repayment Date"), without the imposition of any form of penalty, breakage costs or exit fees. In the event that Borrower elects to terminate this Agreement in accordance with the foregoing, it shall pay the outstanding Obligations, including all unpaid fees and expenses due to Lender, on or prior to the Optional Repayment Date.

## ARTICLE III
## PAYMENTS; COMPUTATIONS; TAXES; FEES

Section 3.01   Payments and Computations, Etc.

(a)   Unless otherwise expressly stated herein, all amounts to be paid or deposited hereunder shall be paid or deposited in accordance with the terms hereof no later than 5:00 p.m. (New York time) on the day when due in lawful money of the United States of America in same day funds.

(b)   The Borrower shall, to the extent permitted by law, pay interest on all amounts (including principal, accrued interest and fees) due but not paid on the date such payment is due hereunder as provided herein, for the period from, and including, such due date until, but excluding, the date paid, at the applicable Default Rate, payable on demand; provided, however that such interest rate shall not at any time exceed the maximum rate permitted by applicable law.

(c)   All computations of interest and fees hereunder shall be made on the basis of a year of 360 days for the actual number of days elapsed (including the first day but excluding the last day) occurring in the period for which payable.

(d)   The Borrower agrees that the principal of and interest on the Loans shall be a recourse obligation of the Borrower.

(e)      All payments made by the Borrower under this Agreement shall be made without set-off or counterclaim.

Section 3.02   Taxes.

(a)      Payments Free of Taxes; Obligation to Withhold; Payments on Account of Taxes.

(i)      Any and all payments by or on account of any obligation of the Borrower hereunder or under any other Facility Document shall to the extent permitted by Applicable Law be made free and clear of and without reduction or withholding for any Taxes. If, however, Applicable Law requires the Borrower to withhold or deduct any Tax, such Tax shall be withheld or deducted in accordance with Applicable Law as determined by the Borrower upon the basis of the information and documentation to be delivered pursuant to subsection (d) below.

(ii)      If the Borrower shall be required by Applicable Law to withhold or deduct any Taxes, including both United States federal backup withholding and withholding taxes, from any payment, then (A) the Borrower shall withhold or make such required deductions, (B) the Borrower shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with Applicable Law, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes or Other Taxes, the sum payable by the Borrower shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions for Indemnified Taxes and Other Taxes applicable to additional sums payable under this Section) the Lender receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(b)      Tax Indemnification. Without limiting the provisions of subsection (a) above or duplicating the payment obligations set forth therein, the Borrower shall, and does hereby, indemnify the Lender and shall make payment in respect thereof within [***] days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) otherwise imposed on the Lender, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority; provided that the Lender gives the Borrower written evidence of the imposition or assertion of such Indemnified Taxes or Other Taxes and/or the incurrence of such penalties, interest or expenses, as the case may be; provided further that if the Lender fails to give notice to Borrower of the imposition of any Indemnified Taxes or Other Taxes within [***] days following its receipt of actual written notice of the imposition of such Indemnified Taxes or Other Taxes, there will be no obligation for Borrower to pay interest or penalties attributable to the period beginning after such [***] day and ending [***] days after Borrower receives notice from the Lender.

(c)      Evidence of Payments. As soon as practicable, after any payment of Taxes by the Borrower to a Governmental Authority as provided in this Section 3.02, the Borrower shall deliver to the Lender the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return required by Applicable Law to report such payment or other evidence of such payment reasonably satisfactory to the Lender.

(d)      Status of Lenders; Tax Documentation.

10

(i)      The Lender shall deliver to the Borrower, at the time or times prescribed by Applicable Law or when reasonably requested by the Borrower, such duly and properly completed and executed documentation prescribed by Applicable Law or by the taxing authorities of any jurisdiction and such other reasonably requested information as will permit the Borrower to determine (A) whether or not payments made hereunder or under any other Facility Document are subject to Taxes, (B) if applicable, the required rate of withholding or deduction, and (C) the Lender's entitlement to any available exemption from, or reduction of, applicable Taxes in respect of all payments to be made to such Lender by the Borrower pursuant to this Agreement or any other Facility Document or otherwise to establish such Lender's status for withholding tax purposes in the applicable jurisdiction.

(ii)      Without limiting the generality of the foregoing, if the Borrower is a "United States person" as defined in section 7701(a)(30) of the Code,

(1)      any Lender that is a "United States person" within the meaning of section 7701(a)(30) of the Code shall deliver to the Borrower duly completed and executed originals of Internal Revenue Service Form W-9 or such other documentation or information prescribed by applicable Laws or reasonably requested by the Borrower as will enable the Borrower to determine whether or not such Lender is subject to backup withholding or information reporting requirements; and

(2)      any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower (in such number of copies as shall be requested by the Borrower) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower, whichever of the following is applicable:

(I)      in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, duly completed and executed copies of the IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding tax pursuant to the "business profits" or "other income" article of such tax treaty,

(II)      duly completed and executed originals of Internal Revenue Service Form W-8ECI,

(III)      to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W 8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit 3.02-2 or Exhibit 3.02-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit 3.02-4 on behalf of each such direct and indirect partner,

(IV)      in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit 3.02-1 to the effect that such Foreign Lender is not

(A) a "bank" within the meaning of section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Borrower within the meaning of section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Code and (y) duly completed and executed originals of Internal Revenue Service Form W-8BEN-E, or

(V)     duly completed and executed originals of any other form prescribed by applicable Laws as a basis for claiming exemption from or a reduction in United States Federal withholding tax together with such supplementary documentation as may be prescribed by Applicable Law to permit the Borrower to determine the withholding or deduction required to be made.

(iii)     If a payment made to a Lender hereunder or under any Facility Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower at the time or times prescribed by law and at such time or times reasonably requested by the Borrower such documentation prescribed by Applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower as may be necessary for the Borrower to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment. Solely for purposes of this clause (iii), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(e)     The Lender shall (A) promptly notify the Borrower of any change in circumstances which would modify or render invalid any claimed exemption or reduction, and (B) cooperate, in its reasonable discretion, with the Borrower to mitigate any requirement of Applicable Law of any jurisdiction in which the Borrower may be required to withhold or deduct any taxes from amounts payable to Lender hereunder.

(f)     Treatment of Certain Refunds. If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section (including by the payment of additional amounts pursuant to this Section), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (f) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (f), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (f) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

12

Section 3.03    Fees and Expenses. The Borrower agrees to pay to the Lender all of Lender's reasonable, documented and out-of-pocket costs and expenses (including reasonable fees and expenses of Lender's counsel) incurred in connection with the development, preparation, negotiation, administration, enforcement and execution of, and any amendment, waiver, supplement or modification to, this Agreement, any other Facility Document or any other documents prepared in connection herewith or therewith and consummation and administration of the Loans contemplated hereby and thereby including, without limitation, (i) all the reasonable fees, disbursements and expenses of counsel to Lender, and (ii) all the due diligence, valuation, inspection, testing and review expenses (including but not limited to any asset level review of any Collateral and all on-going due diligence and valuation costs) incurred by Lender with respect to the Collateral under this Agreement subject to the terms and provisions set forth in Section 7.01(d) regarding the Diligence Expenses subject to the Pre-Default Diligence Cap.

**ARTICLE IV**

**SECURITY INTEREST**

Section 4.01    Security Interest. As security for the prompt payment and performance of all of its Obligations, the Borrower hereby assigns and pledges to the Lender, and grants a security interest, subject and subordinate to Freddie Mac's Superior Interest and the interests of Fannie Mae and Freddie Mac as set forth in Section 4.02 and in the related Acknowledgement Agreement, but only to the extent that a related Acknowledgment Agreement has been executed, to the Lender, all of the Borrower's right, title and interest, in, to, and under, whether now held, owned or hereafter acquired, in all of the following, whether now or hereafter existing and wherever located, as applicable: (i) the Pledged Servicing Rights whether or not yet accrued, earned due or payable as well as all other present and future rights and interests of the Borrower in such Pledged Servicing Rights, (ii) all books and records, including computer disks and other records or physical or virtual data or information, related to the foregoing (but excluding computer programs) and (iii) all monies due or to become due with respect to the foregoing and all proceeds of the foregoing (collectively, the "Collateral"); provided that the Borrower shall not assign or pledge to the Lender, or grant a security interest in any of the Borrower's right, title and interest, in, to or under the Borrower's rights to reimbursement for any servicing advances related to mortgage contract servicing rights subject to a Servicing Contract or Excess Yield.

Section 4.02    Provisions Regarding Pledge of Eligible Servicing Rights to Be Included In Financing Statements.

(a)    [Reserved].

(b)    Notwithstanding anything to the contrary in the Agreement or any of the other Facility Documents, the security interest of the Lender created hereby with respect to the Pledged Servicing Rights is subject to the following provisions to be included in each financing statement filed in respect hereof:

*For Fannie Mae Servicing Rights*: The Security Interest described herein is subordinate to all rights of Fannie Mae under (i) the terms of an Acknowledgment Agreement, with respect to the Security Interest among Fannie Mae, United Wholesale Mortgage, LLC (the "Debtor") and Citibank, N.A., and (ii) the Mortgage Selling and Servicing Contract, the Fannie Mae Selling Guide, the Fannie Mae Servicing Guide and all supplemental servicing instructions or directives provided by Fannie Mae, all applicable master agreements, recourse agreements, repurchase agreements, indemnification agreements, loss-sharing agreements, and any other agreements between Fannie Mae and the Debtor, and all as amended, restated or supplemented from time to time (collectively, the "Fannie Mae Lender Contract"), which rights include the right of

13

Fannie Mae to terminate the Fannie Mae Lender Contract with or without cause and the right to sell, or have transferred, the Servicing Rights.

*For Freddie Mac Servicing Contract Rights*: Notwithstanding anything to the contrary herein, the security interest publicized or perfected by this financing statement is subject and subordinate in each and every respect to (a) all rights, powers and prerogatives of the Federal Home Loan Mortgage Corporation ("Freddie Mac") under and in connection with the Acknowledgment Agreement among Freddie Mac, the debtor and the secured party (as amended, modified, restated or supplemented from time to time, the "AA"), and the Purchase Documents (as defined in the AA), which include, without limitation, the right of Freddie Mac to disqualify (in whole or in part) the debtor as a Freddie Mac-approved Seller/Servicer, with or without cause, and the right to terminate (in whole or in part) the Servicing Contract (as defined in the AA) and to transfer and sell all or any portion of the Servicing Contract Rights (as defined in the AA), as provided in the Purchase Documents, (b) all of Freddie Mac's Claims (as defined in the AA), and (c) the first-priority security interest of Freddie Mac in the Freddie Mac Collateral (as defined in the AA).

Section 4.03   Authorization of Financing Statements. To the extent permitted by applicable law, the Borrower hereby authorizes the Lender to file any financing or continuation statements required to perfect, protect, or more fully evidence the Lender's security interest in the Collateral granted hereunder. The Lender will notify the Borrower of any such filing (but the failure to deliver such notice shall not prejudice any rights of the Lender under this Section 4.03).

Section 4.04   Lender's Appointment as Attorney In Fact.

(a)   Subject to the Freddie Mac Requirements, the Borrower hereby irrevocably constitutes and appoints the Lender and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of the Borrower and in the name of the Borrower or in its own name, from time to time in the Lender's discretion, if an Event of Default, shall have occurred and be continuing, for the purpose of carrying out the terms of this Agreement, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary or desirable to accomplish the purposes of this Agreement to the extent such actions are permitted to be taken by the Lender under any Acknowledgement Agreement, and, without limiting the generality of the foregoing, the Borrower hereby gives the Lender the power and right, on behalf of the Borrower, without assent by, but with prior written notice to, the Borrower, if an Event of Default shall have occurred and be continuing, to do the following (subject to the Freddie Mac Requirements and the terms of each Acknowledgement Agreement):

(i)   in the name of the Borrower or its own name, or otherwise, to take possession of and endorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due under any mortgage insurance or with respect to any other Collateral and to file any claim or to take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by the Lender for the purpose of collecting any and all such moneys due under any such mortgage insurance or with respect to any other Collateral whenever payable;

(ii)   (A) to direct any party liable for any payment under any Collateral to make payment of any and all moneys due or to become due thereunder directly to the Lender or as the Lender shall direct; (B) to ask or demand for, collect, receive payment of and receipt for, any and all moneys, claims and other amounts due or to become due at any time in respect of or arising out of any Collateral; (C) to sign and endorse any invoices, assignments, verifications,

14

notices and other documents in connection with any of the Collateral; (D) to commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Collateral or any part thereof and to enforce any other right in respect of any Collateral; (E) in connection with the above, to give such discharges or releases as the Lender may deem appropriate; and (F) generally, to sell, transfer, pledge and make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though the Lender were the absolute owner thereof for all purposes, and to do, at the Lender's option and the Borrower's expense, at any time, or from time to time, all acts and things which the Lender deems necessary to protect, preserve or realize upon the Collateral and the Lender's Liens thereon and to effect the intent of this Agreement, all as fully and effectively as the Borrower might do;

(iii)     perform or cause to be performed, the Borrower's obligations under any Servicing Contract to the extent permitted by the Freddie Mac Requirements and the related Acknowledgement Agreement.

The Borrower hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof. This power of attorney is a power coupled with an interest and shall be irrevocable but shall terminate upon release of the Lender's security interest as provided in Section 4.05. This power of attorney shall not revoke any prior powers of attorney granted by the Borrower.

(b)     The Borrower also authorizes the Lender, at any time and from time to time, to execute, in connection with the sale provided for in Section 8.02(c) hereof, any endorsements, assignments or other instruments of conveyance or transfer with respect to the Collateral; provided that the exercise of such powers are in accordance with the Freddie Mac Requirements and the Acknowledgement Agreements.

(c)     The powers conferred on the Lender are solely to protect the Lender's interest in the Collateral and shall not impose any duty upon the Lender to exercise any such powers. The Lender shall be accountable only for amounts that it actually receives as a result of the exercise of such powers, and neither the Lender nor any of its officers, directors, or employees shall be responsible to the Borrower for any act or failure to act hereunder, except for its own gross negligence or willful misconduct; provided that the Lender shall exercise such powers only in accordance with this Agreement, the Freddie Mac Requirements and the Acknowledgement Agreements.

Section 4.05   Release of Security Interest.

In connection with an Excess Yield Transaction and to the extent permitted in accordance with the provisions of Section 2.08(c) hereof, the Lender shall release its security interest in that portion of the Collateral that will be defined as Excess Yield upon consummation of the Excess Yield Transaction solely with respect to the Released Excess Yield Mortgages identified in the Partial Release (Excess Yield). Lender shall execute the Partial Release (Excess Yield) in favor of Freddie Mac, which evidences inter alia, the full release by the Lender of its Security Interest in, to and under the Excess Yield identified in such Partial Release (Excess Yield) and the Acknowledgement Agreement. Lender's release will be effective on the Excess Yield Transaction Date. Notwithstanding anything contained herein to the contrary, in no event shall any release (referenced above or in Section 2.08(c)) of Lender include any Collateral pledged hereunder related to any Retained Citi Covered Mortgage.

Upon termination of this Agreement and repayment to the Lender of all Obligations and the performance of all obligations under the Facility Documents, the Lender shall release its security

15

interest in any remaining Collateral; provided that if any payment, or any part thereof, of any of the Obligations is rescinded or must otherwise be restored or returned by the Lender upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower, or upon or as a result of the appointment of a receiver, intervener or conservator of, or a trustee or similar officer for the Borrower or any substantial part of its Property, or otherwise, this Agreement, all rights hereunder and the Liens created hereby shall continue to be effective, or be reinstated, until such payments have been made.

The Lender shall, upon [***] Business Days (or, to the extent no Loans are outstanding and no other amounts are payable to Lender hereunder, [***] Business Day) advance written request from the Borrower accompanied by an updated Servicing Schedule, release its interest in a pool of Pledged Servicing Rights; provided, however, that prior to such release, Lender shall have been paid the full amount of any Loans outstanding and any accrued interest and other Obligations hereunder with respect to such Pledged Servicing Rights. Notwithstanding the foregoing, the Lender shall have no obligation to release any Collateral hereunder to the extent (a) any Default, Event of Default or Borrowing Base Deficiency has occurred and is continuing or (b) such release would result in a (i) Borrowing Base Deficiency or (ii) a Default or an Event of Default.

If requested by Freddie Mac, Lender shall promptly execute such further documentation as requested by Freddie Mac in order to further effectuate the terms and provisions of this Section 4.05 (including but not limited to any request pursuant to Section 14 of the Freddie Mac Acknowledgment Agreement). Freddie Mac shall be an express and intended third party beneficiary of this Section 4.05 and shall be entitled to rely upon this Section 4.05 in all respects. This Section 4.05 shall not be amended or modified without the express written consent of Freddie Mac.

## ARTICLE V
## CONDITIONS PRECEDENT

Section 5.01   Conditions Precedent. The effectiveness of this Agreement is subject to the condition precedent that the Lender shall have received each of the items set forth in Schedule 5.01 (unless otherwise indicated) dated such date, and in such form and substance, as is satisfactory to the Lender.

Section 5.02   Further Conditions Precedent. The funding of each Loan hereunder, and the automatic continuation of each Loan after the termination of the immediately preceding calendar month related to any Loan, shall in all events be subject to satisfaction of the further conditions precedent set forth in Schedule 5.02 as of the making of such Loan and as of each day on which any Loan remains outstanding.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES

Section 6.01   Representations and Warranties of the Borrower. The Borrower represents and warrants to the Lender that throughout the term of this Agreement (except to the extent any such representation or warranty is stated to relate solely to an earlier date, in which case, such representation or warranty shall have been true or correct as of such date):

(a)   Organization and Good Standing. Borrower (a) is duly organized, validly existing and in good standing as a limited liability company, under the laws of the jurisdiction in which it was formed, (b) has all requisite corporate or other power, and has all governmental

16

licenses, authorizations, consents and approvals, necessary to own its assets and carry on its business as now being or as proposed to be conducted, (c) is qualified to do business and is in good standing in all other jurisdictions in which the nature of the business conducted by it makes such qualification necessary, except where failure so to qualify would not be reasonably likely (either individually or in the aggregate) to have a Material Adverse Effect, and (d) is in compliance in all material respects with all Requirements of Law and its Governing Documents.

(b)  Government and Authority, Due Authorization. Borrower (i) has all necessary power and authority and legal right to (A) execute and deliver each of the Facility Documents to be executed and delivered by it in connection herewith, (B) carry out the terms of the Facility Documents to which it is a party, and (C) with respect to the Borrower, borrow the Loans and grant a security interest in the Collateral on the terms and conditions herein provided, and (ii) has taken all necessary corporate action to duly authorize (A) such borrowing and grant and (B) the execution, delivery, and performance of this Agreement and all of the Facility Documents to which it is a party.

(c)  Binding Obligations. Each Facility Document to which Borrower is a party, when duly executed and delivered by it will constitute, legal, valid and binding obligations of Borrower enforceable against it in accordance with its respective terms, except as enforceability may be limited by bankruptcy, insolvency, moratorium, receivership and reorganization, or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity, regardless of whether such enforceability is considered in a proceeding in equity or at law.

(d)  No Breach. Neither (i) the execution and delivery of the Facility Documents, nor (ii) the consummation of the transactions therein contemplated in compliance with the terms and provisions thereof will conflict with or result in a breach of the applicable Governing Documents or any Requirement of Law, or other material agreement or instrument or Contractual Obligation, to which Borrower, or any of its Subsidiaries or Affiliates, is a party or by which any of them or any of their property is bound or to which any of them or their property is subject, or constitute a default under any such material agreement or instrument, or (except for the Liens created pursuant to this Agreement) result in the creation or imposition of any Lien upon any property of Borrower or any of its Subsidiaries or Affiliates, pursuant to the terms of any such agreement or instrument.

(e)  No Proceedings. There are no actions, suits, arbitrations, investigations or proceedings pending or, to its knowledge, threatened against Borrower or any of its Subsidiaries or Affiliates or Subservicer affecting any of the property thereof before any Governmental Authority, (i) as to which individually or in the aggregate there is a reasonable likelihood of an adverse decision which would be reasonably likely to exceed the TNW Threshold, (ii) which questions the validity or enforceability of any of the Facility Documents or any action to be taken in connection with the transactions contemplated thereby, or (iii) which seeks to prevent the consummation of any transaction.

(f)  Government and Agency Approvals. No authorization, consent, approval, or other action by, and no notice to or filing with, any Governmental Authority, including Fannie Mae, Freddie Mac, HUD or Ginnie Mae, is required for Borrower's due execution, delivery and performance of any Facility Document to which it is a party except for (i) consents that have been obtained in connection with transactions contemplated by the Facility Documents, including consents obtained from Freddie Mac and Fannie Mae pursuant to the Acknowledgment Agreements, (ii) filings to perfect the security interest created by this Agreement, (iii) consents and approvals that may be required by Fannie Mae, Freddie Mac, HUD or Ginnie Mae from time to time after the Closing Date, and (iv) authorizations, consents, approvals, filings, notices, or

17

other actions the failure to make is not reasonably likely, individually or in the aggregate, to have a Material Adverse Effect.

(g)     <u>Solvency; Fraudulent Conveyance</u>. As of the date hereof and immediately after giving effect to each Loan, the fair value of the assets of Borrower is greater than the fair value of the liabilities (including, without limitation, contingent liabilities if and to the extent required to be recorded as a liability on the financial statements of Borrower in accordance with GAAP) of Borrower, and, to the knowledge of Borrower, the related Servicer (if not Borrower) or the related Subservicer, as applicable, is and will be Solvent, is able and will be able to pay and is paying its debts as they mature and does not and will not have an unreasonably small amount of capital to engage in the business in which it is engaged and proposes to engage. Neither Borrower nor, to the knowledge of Borrower, the related Servicer (if not Borrower) or the related Subservicer, as applicable, intends to incur, or believes that it has incurred, debts beyond its ability to pay such debts as they mature. Neither Borrower nor, to the knowledge of Borrower, the related Servicer (if not Borrower) or the related Subservicer, as applicable, is contemplating the commencement of insolvency, bankruptcy, liquidation or consolidation proceedings or the appointment of a receiver, liquidator, conservator, trustee or similar official in respect of Borrower, such Servicer or such Subservicer, as applicable, or any of its respective assets. Borrower is not transferring any Eligible Servicing Rights with any intent to hinder, delay or defraud any of its creditors

(h)     <u>Margin Regulations</u>. Borrower is not and will not be engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation T, U or X), and no proceeds of any Loan will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock or for any purpose that violates, or is inconsistent with, the provisions of Regulation T, U and X.

(i)     <u>Accurate Reports</u>. The information, reports, financial statements, exhibits and schedules furnished in writing by or on behalf of Borrower or any of its Subsidiaries or Affiliates to Lender in connection with the negotiation, preparation or delivery of this Agreement and the other Facility Documents or included herein or therein or delivered pursuant hereto or thereto, when taken as a whole, do not contain any untrue statement of material fact or omit to state any material fact necessary to make the statements herein or therein, in light of the circumstances under which they were made, not misleading. All written information furnished after the date hereof by or on behalf of Borrower or any of its Subsidiaries or Affiliates to Lender in connection with this Agreement and the other Facility Documents and the transactions contemplated hereby and thereby will be true, complete and accurate in every material respect, or (in the case of projections) based on reasonable estimates, on the date as of which such information is stated or certified. With respect to any compliance certificate delivered pursuant to the terms of this Agreement, each item or field shall be complete except to the extent of any relevant information that has previously been provided to Lender and except as otherwise agreed by Lender. With respect to any other reports, certifications or any information provided in response to a reasonably specific request by Lender, such reports, certifications or other information shall be complete in all material respects. There is no fact known to a Responsible Officer of Borrower that, after due inquiry, would reasonably be likely to have a Material Adverse Effect that has not been disclosed herein, in the other Facility Documents or in a report, financial statement, exhibit, schedule, disclosure letter or other writing furnished to Lender for use in connection with the transactions contemplated hereby or thereby, unless Borrower notifies Lender in writing of any such fact within [***] Business Days of notice to, or knowledge of, a Responsible Officer. Notwithstanding the foregoing, this representation shall not apply to Agency Obligations reporting or any Servicing Schedule, each of which shall be covered by the covenant set forth in Section 6.02(c).

18

(j)     No Default. Borrower is not in default under or with respect to any of its Contractual Obligations in any respect which should reasonably be expected to have a Material Adverse Effect. No Default or Event of Default has occurred and is continuing.

(k)     Investment Company Act. Neither Borrower nor any of its Subsidiaries is an "investment company", or a company "controlled" by an entity that is required to be registered under the Investment Company Act. Borrower is not subject to any Federal or state statute or regulation which limits its ability to incur indebtedness.

(l)     Taxes. Borrower and its Subsidiaries and Affiliates have filed all federal income tax returns and all other material tax returns that are required to be filed by it and has paid all taxes due pursuant to such returns or pursuant to any assessment received by any of them, except for any such taxes, if any, that are being appropriately contested in good faith by appropriate proceedings diligently conducted and with respect to which adequate reserves have been provided. The charges, accruals and reserves on the books of Borrower and its Subsidiaries and Affiliates in respect of taxes and other governmental charges are, in the opinion of Borrower, adequate. Any taxes, fees and other governmental charges payable by Borrower in connection with the Loans and the execution and delivery of the Facility Documents have been or will be paid when due.

(m)     No Adverse Actions. Neither Borrower nor the related Subservicer has received a written notice (which may include notice via e-mail or other electronic communication) from any of Fannie Mae, Freddie Mac and Ginnie Mae indicating any adverse fact or circumstance in respect of Borrower or Subservicer which adverse fact or circumstance may reasonably be expected to entitle any of Fannie Mae, Freddie Mac, and Ginnie Mae, as the case may be, to terminate Borrower or Subservicer as an approved seller/servicer (as applicable) with cause or with respect to which such adverse fact or circumstance has caused any of Fannie Mae, Freddie Mac, and Ginnie Mae to threaten to terminate, or consider the termination of, Borrower or Subservicer in such notice.

(n)     Financial Statements. On or prior to the Effective Date, Borrower has furnished to Lender a copy of its audited consolidated balance sheet, as of December 31, 2021 with the opinion thereon of Deloitte & Touche LLP. Borrower has also furnished to the Lender the related consolidated statements of operations and changes in member's equity and of cash flows for Borrower and its consolidated Subsidiaries for the one year period ending December 31, 2021, setting forth in comparative form the figures for the previous year. All such financial statements are complete and correct in all material respects and fairly present the consolidated financial condition of Borrower and its Subsidiaries and the consolidated results of their operations for the fiscal year ended on said date all in accordance with GAAP applied on a consistent basis.

(o)     Chief Executive Office. Borrower's chief executive office and chief operating office on the Effective Date is located at 585 South Boulevard East, Pontiac, Michigan 48341.

(p)     Applicable Agency Set Off Rights. Except as set forth in the Freddie Mac Requirements, Borrower has no actual notice, including any notice received from any Applicable Agency, or any reason to believe, that, other than in the normal course of Borrower's business, any circumstances exist that would result in Borrower being liable to any Applicable Agency for any material amount due by reason of: (i) any breach of servicing or subservicing obligations or breach of mortgage selling warranty to such Applicable Agency under the related Servicing Contract or any other similar contracts relating to Borrower's entire Applicable Agency servicing or subservicing portfolio (including without limitation any unmet mortgage repurchase

19

obligation), (ii) any unperformed obligation with respect to mortgages in an MBS pool that Borrower is servicing or subservicing for an Applicable Agency under the regular servicing or subservicing option, (iii) any loss or damage to any Applicable Agency by reason of any inability to transfer to a purchaser of the Servicing Rights Borrower's (as applicable) selling, servicing or subservicing representations, warranties and obligations, as well as any existing MBS recourse (regular servicing option) obligations, or other recourse obligations, and (iv) any other unmet obligations to an Applicable Agency under any Servicing Contract or any other similar contracts relating to the Pledged Servicing Rights.

      (q)    <u>Reserved</u>.

      (r)    <u>Financial Representations and Warranties</u>. The Borrower has been in compliance at all times with the representation and warranty set forth in Section 2(a) of the Pricing Side Letter.

      (s)    <u>Fannie Mae/Freddie Mac/Ginnie Mae/HUD</u>. Borrower is a seller approved by and has all consents and licenses necessary to originate, deliver and service loans on behalf of Fannie Mae, Ginnie Mae, HUD and Freddie Mac, in good standing to originate, deliver and service mortgages and has remained at all times in compliance with the guidelines of Fannie Mae, Ginnie Mae, HUD and Freddie Mac and has not been suspended as a mortgagee or seller/servicer by Fannie Mae, Ginnie Mae, HUD or Freddie Mac on and after the date on which Borrower first obtained such approval from Fannie Mae, Ginnie Mae, HUD or Freddie Mac, as applicable. Neither Borrower nor Subservicer is under review or investigation (other than routine reviews and investigations in the ordinary course of business) and has no knowledge of imminent or future investigations (other than routine reviews and investigations in the ordinary course of business), by Fannie Mae, Ginnie Mae, HUD or Freddie Mac on and after the date on which Borrower became a Fannie Mae, Ginnie Mae, HUD or Freddie Mac approved seller/servicer or lender, as the context may require.

      (t)    <u>Borrower's Existing Financing Facilities</u>. As of the date of this Agreement, Borrower is not a party to any other financing facilities for the financing of any mortgage servicing rights or servicing advances held by the Borrower; provided however, Borrower shall promptly notify Lender of any financing facilities related to the financing of any mortgage servicing rights or servicing advances it becomes a party to as part of its Compliance Certificate.

      (u)    <u>Anti-Money Laundering Laws</u>. Neither Borrower, nor any of its Affiliates, is a Prohibited Person and Borrower is in full compliance with all applicable orders, rules, regulations and recommendations of OFAC. None of Borrower, any of its members, directors, executive officers, parents or Subsidiaries: (1) is subject to U.S. or multilateral economic or trade sanctions currently in force; (2) is owned or controlled by, or acts on behalf of, any governments, corporations, entities or individuals that are subject to U.S. or multilateral economic or trade sanctions currently in force; (3) is a Prohibited Person or is otherwise named, identified or described on any blocked persons list, designated nationals list, denied persons list, entity list, debarred party list, unverified list, sanctions list or other list of individuals or entities with whom U.S. Persons may not conduct business, including but not limited to lists published or maintained by OFAC, lists published or maintained by the U.S. Department of Commerce, and lists published or maintained by the U.S. Department of State. Borrower has established an anti-money laundering compliance program as required by all applicable anti-money laundering laws and regulations, including, without limitation, the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56) (the "<u>USA Patriot Act</u>") (collectively, the "<u>Anti-Money Laundering Laws</u>").

      (v)    <u>Sanctions</u>. Neither Borrower nor any of its Subsidiaries nor, to the knowledge of the Borrower, any director, officer, agent, employee or affiliate of any Borrower, or any of their Subsidiaries (i) is, or is controlled or 50% or more owned in the aggregate by or is acting on behalf of, one or more individuals or entities that are currently the subject of any sanctions administered or enforced by the United States (including any administered or enforced by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State or the Bureau of Industry and Security of the U.S. Department of Commerce), the United Nations Security Council to the extent adopted by the United States, or other relevant sanctions authority (collectively, "Sanctions" and such persons, "Sanctioned Persons" and each such person, a "Sanctioned Person"), (ii) is located, organized or resident in a country or territory that is, or whose government is, the subject of Sanctions that broadly prohibit dealings with that country or territory (collectively, "Sanctioned Countries" and each, a "Sanctioned Country") or (iii) will, directly or indirectly, use the proceeds of this Agreement, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other individual or entity in any manner that would result in a violation of any Sanctions by, or could result in the imposition of Sanctions against, any individual or entity (including any individual or entity participating in the offering, whether as underwriter, advisor, investor or otherwise).

      (w)    <u>Anti-Money Laundering</u>. As of the date of this Agreement, and at all times until this Agreement has been terminated and all Obligations hereunder have been paid in full: (A) no Covered Entity (1) is a Sanctioned Person; (2) has any of its assets in a Sanctioned Country or in the possession, custody or control of a Sanctioned Person in violation of any Anti-Terrorism Law; (3) does business in or with, or derives any of its income from investments in or transactions with, any Sanctioned Country or Sanctioned Person in violation of any Anti-Terrorism Law; or (4) engages in any dealings or transactions prohibited by any Anti-Terrorism Law; (B) the proceeds of any Program Document will not be used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Country or Sanctioned Person in violation of any law; (C) the funds used to pay the Lender are not derived from any unlawful activity; and (D) each Covered Entity is in compliance with, and no Covered Entity engages in any dealings or transactions prohibited by, any Requirements of Law, including but not limited to any Anti-Terrorism Laws. Borrower covenants and agrees that it shall promptly notify Lender in writing upon the occurrence of a Reportable Compliance Event.

      (x)    <u>Foreign Corrupt Practices Act</u>. Borrower and all Affiliates thereof are in compliance with the Foreign Corrupt Practices Act of 1977, as may be amended, and any similar law of any other relevant jurisdiction, or the rules or regulations thereunder applicable to the Borrower and/or its Affiliates and have instituted and maintain policies and procedures to ensure compliance therewith. Neither Borrower nor any of its Subsidiaries nor, to the knowledge of Borrower any director, officer, agent, employee, affiliate or other person acting on behalf of Borrower or any of its Subsidiaries is aware of or has taken any action, directly or indirectly, that could result in a violation or a sanction for violation by such persons of the Foreign Corrupt Practices Act of 1977, as may be amended, or similar law of any other relevant jurisdiction, or the rules or regulations thereunder as applicable to the Borrower and/or its Subsidiaries. Neither Borrower nor any Affiliate thereof has made, offered, promised or authorized a payment of money or anything else of value (i) in order to assist in obtaining or retaining business for or with, or directing business to, any foreign official, foreign political party, party official or candidate for foreign political office, (ii) to any foreign official, foreign political party, party official or candidate for foreign political office, or (iii) with the intent to induce the recipient to misuse his or her official position to direct business wrongfully to Borrower or any Affiliate thereof or any other Person, in violation of the Foreign Corrupt Practices Act, as may be amended, and any similar law of any other relevant jurisdiction, or the rules or regulations thereunder applicable to the Borrower and/or its Affiliates.

(y)    ERISA. Each Plan, and, to the knowledge of Borrower, each Multiemployer Plan, is in compliance in all material respects with, and has been administered in all material respects in compliance with, the applicable provisions of ERISA, the Code and any other Federal or State law. No event or condition has occurred and is continuing as to which Borrower would be under an obligation to furnish a report to Lender under Section 7.01(bb). The present value of all accumulated benefit obligations under each Plan (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of such Plan. Borrower and its Subsidiaries do not provide any material medical or health benefits to former employees other than as required by the Consolidated Omnibus Budget Reconciliation Act, as amended, or other applicable law at no cost to the employer (collectively, "COBRA").

(z)    Agency Financial Covenants. As of the date of this Agreement, Schedule 6.01(z) accurately sets forth all Agency Financial Covenants applicable to Borrower under its Servicing Contracts.

(aa)   Use of Subservicers. Borrower shall not use a subservicer, other than the Subservicer, with respect to any Mortgage Loan without Lender's prior written consent and unless such Subservicer is approved to subservice by an Applicable Agency. Borrower shall provide prior notice to Lender with respect to the use of any subservicer other than Borrower or the Subservicer, or a change in Subservicer with respect to the Mortgage Loans.

Section 6.02    Representations Concerning the Collateral. The Borrower represents and warrants to the Lender that as of each day that a Loan is outstanding pursuant to this Agreement:

(a)    Except as set forth in the Freddie Mac Requirements, the Borrower has not assigned, pledged, conveyed, or encumbered any Collateral to any other Person or any right to any Collateral to any Person (including without limitation any right to control or transfer or otherwise effectuate any remedy relating to any Collateral), and immediately prior to the pledge of any such Collateral, the Borrower was the sole owner of such Collateral and had good and marketable title thereto (subject to the rights of the Applicable Agency with respect to the Collateral), free and clear of all Liens other than Freddie Mac's Superior Interest, and no Person, other than the Lender and Freddie Mac has any Lien on any Collateral. No Eligible Servicing Rights are related to Mortgage Loans owned by a third-party (including without limitation any Affiliates or Subsidiaries of Borrower) other than the Applicable Agency and no Person has any interest in any Eligible Servicing Rights or any related Mortgage Loans, other than Lender, Borrower, the Applicable Agency (including without limitation any right to control or transfer or otherwise effectuate any remedy relating to any Eligible Servicing Rights).

(b)    The provisions of this Agreement are effective to create in favor of the Lender a valid security interest in all right, title (as applicable), and interest of the Borrower in, to and under the Collateral, subject only to the interests of the Applicable Agency.

(c)    All Agency Obligations have been identified as such in a schedule attached to the Servicing Schedule most recently delivered to the Lender. All information concerning all Servicing Rights set forth on the Servicing Schedule pursuant to which such Servicing Rights were, are or will be (as applicable) pledged to the Lender will not contain any material misstatement of fact or omit to state a material fact or any fact necessary to make the statements contained therein, in light of the circumstances under which they were made, not misleading as of the date of delivery of such Servicing Schedule.

22

(d)      Upon the filing of financing statements on Form UCC-1 naming the Lender as "Secured Party" and the Borrower as "Debtor", and describing the Collateral, in the appropriate jurisdictions, the Lender has a duly perfected security interest under the UCC in all right, title (as applicable), and interest of the Borrower in, to and under, subject to Freddie Mac's Superior Interest and the other interests of each Applicable Agency, the Pledged Servicing Rights.

(e)      Subject to the Freddie Mac Requirements, the Borrower is the legal and beneficial owner of the Collateral free and clear of any Lien, except for Freddie Mac's Superior Interest and the Liens created or permitted under the Facility Documents.

(f)      Subject only to the Freddie Mac Requirements (including the rights of Freddie Mac as set forth in Section 4.02) and the terms of the related Acknowledgement Agreement, the Borrower has the full right, power and authority, to pledge the related Servicing Rights, and the pledge of such Servicing Rights may be further assigned in accordance with and subject to the Fannie Mae Guides or the Freddie Mac Requirements, as applicable.

(g)      In connection with any repurchase agreement, loan and security agreement or similar credit facility or agreement for borrowed funds entered into by the Borrower or any of its Affiliates or Subsidiaries on the one hand and any third party (including an Affiliate or Subsidiary of the Borrower or any of its Subsidiaries or Affiliates but excluding the Lender or any Affiliate of Lender) on the other, including without limitation, any other facility for the funding of servicing advances, no such third party has the right pursuant to the terms of such repurchase agreement, loan and security agreement or similar credit facility or agreement, to cause a Borrower to terminate, rescind, cancel, pledge, hypothecate, liquidate or transfer any of the Collateral.

(h)      There are no co-investor or similar arrangements providing for any transfer, assignment, pledge, lien or encumbrance on any portion of the Pledged Servicing Rights related to any Mortgage Loans pooled in securitizations by Freddie Mac.

(i)      There are no co-investor or similar arrangements providing for any transfer, assignment, pledge, lien or encumbrance on any portion of the Pledged Servicing Rights.

(j)      Following the execution of any applicable Acknowledgement Agreement, such Acknowledgment Agreement is in full force and effect and neither Fannie Mae nor Freddie Mac has provided written notice to any Borrower or Lender that it will terminate or revoke the related Acknowledgement Agreement or its consent to the pledge of the Pledged Servicing Rights by Borrower to Lender. Each Agency Consent Agreement is in full force and effect and neither Fannie Mae nor Freddie Mac has provided written notice to any Borrower that it will terminate or revoke the related Agency Consent Agreement (as applicable), except in each case to the extent that a failure of any Agency Consent Agreement to be in full force and effect or any such termination or revocation would not be reasonably likely to have a Material Adverse Effect.

## ARTICLE VII
## COVENANTS

Section 7.01      Affirmative Covenants of Borrower. The Borrower covenants and agrees with the Lender that, so long as any Loan is outstanding and until all Obligations have been paid in full:

(a)      Existence, Etc. Each of Borrower and its Subsidiaries will:

23

(i)　　(A) preserve and maintain its legal existence and all of its material rights, privileges, franchises; (B) maintain all licenses (including, but not limited to, any FHA, VA or RHS licenses), permits or other approvals necessary to conduct its business and to perform its obligations under the Facility Documents; (C) except as would not be reasonably likely to have a Material Adverse Effect, or would have a material adverse effect on the Pledged Servicing Rights or Lender's interest therein, remain in good standing under the laws of each state in which it conducts business and (D) not change its tax identification number, fiscal year or method of accounting without prior written notice to the Lender;

(ii)　　comply with the requirements of and conduct its business in accordance with all Requirements of Law (including, without limitation, truth in lending, real estate settlement procedures and all environmental laws) if failure to comply with such requirements would be reasonably likely (either individually or in the aggregate) to have a Material Adverse Effect;

(iii)　　keep adequate records and books of account, in which complete entries will be made in accordance with GAAP consistently applied;

(iv)　　not move its chief executive office or chief operating office from the addresses referred to in Section 6.01(o) unless it shall have provided Lender [***] days prior written notice of such change;

(v)　　pay and discharge all taxes, assessments and governmental charges or levies imposed on it or on its income or profits or on any of its Property or upon any part thereof, as well as any other lawful claims which, if unpaid, might become a Lien upon such properties or any part thereof, prior to the date on which penalties attach thereto, except for any such tax, assessment, charge or levy the payment of which is being contested in good faith and by proper proceedings and against which adequate reserves are being maintained; and

(vi)　　subject to the Freddie Mac Requirements, permit representatives of Lender, during normal business hours upon [***] Business Days' prior written notice at a mutually desirable time, or at any time with prior notice during the continuance of an Event of Default, to examine, copy and make extracts from its or Subservicer's books and records in its possession, to inspect any of its Properties, and to discuss its business and affairs with its officers, all to the extent reasonably related to the Pledged Servicing Rights related to the Loans hereunder.

(b)　　<u>Performance and Compliance with Servicing Contracts/Subservicing Agreements</u>. Borrower will comply with all terms, provisions, covenants and other promises required to be observed by it under each of the Facility Documents to which it is a party in full force and effect in all material respects and enforce the Servicing Contracts in all material respects in accordance with the terms thereof. To the extent Lender has approved any Subservicer and such Subservicer services any Mortgage Loan as to which the Pledged Servicing Rights are derived, Borrower shall not amend or permit the amendment of any sections of any Subservicing Agreement which would negatively affect in any material respect any Subservicer's servicing of the Mortgage Loans relating to Pledged Assets, without Lender's prior written consent, which shall not be unreasonably withheld. Borrower shall diligently enforce its rights under any Subservicing Agreement while any Pledged Asset is serviced by such Subservicer, including all rights to terminate and replace such Subservicer upon the occurrence of a Subservicer Termination Event or otherwise pursuant to such Subservicing Agreement. Borrower shall not waive any material default or other material failure to perform under or breach of the Servicing Contracts or Subservicing Agreement without Lender's prior written consent. For the avoidance of doubt, any default, failure or breach by any Subservicer that would

24

permit the termination and replacement of such Subservicer under the Subservicing Agreement shall be deemed "material" and shall not be waived by any Borrower Party or its Affiliates without Lender's prior written consent.

(c)     Taxes. Borrower shall pay and discharge or cause to be paid and discharged on or before the date they become delinquent, all taxes, assessments and governmental charges or levies imposed upon Borrower or upon its income and profits or upon any of its property, real, personal or mixed or upon any part thereof, as well as any other lawful claims which, if unpaid, become a Lien upon such properties or any part thereof, except for any such taxes, assessments and governmental charges, levies or claims as are appropriately contested in good faith by appropriate proceedings diligently conducted and with respect to which adequate reserves are provided. Borrower shall file, on a timely basis, all federal, and material state and local tax and information returns, reports and any other information statements or schedules required to be filed by or in respect of it.

(d)     Due Diligence. Borrower acknowledges that the Lender, at the cost and expense of the Borrower, has the right to perform and/or appoint a third party (including without limitation, any Valuation Agent) to perform, reasonable continuing due diligence and valuation reviews with respect to Borrower, any Subservicer through Borrower, the Servicing Rights and the other Collateral, for purposes of verifying compliance with the representations, warranties, and specifications made hereunder and under the other Facility Documents, or otherwise (the "Diligence Expenses"). The Borrower agrees that the Lender and its Authorized Representatives will be permitted during normal business hours upon prior written notice to examine, inspect, make copies of, and make extracts of, any and all documents, records, agreements, instruments or information relating to the Collateral or Fannie Mae, Freddie Mac, HUD or Ginnie Mae in the possession of the Borrower or any Subservicer through a request to Borrower; provided, however, the foregoing shall not apply with respect to any information that the Borrower or any Subservicer is required by Fannie Mae, Freddie Mac, HUD or Ginnie Mae to keep confidential. Notwithstanding anything to the contrary herein, prior to the occurrence of a Default, Borrower shall reimburse the Lender for any and all reasonable and documented, out-of-pocket Diligence Expenses up to the Pre-Default Diligence Cap incurred by the Lender and its respective designees and appointees in connection with the ongoing due diligence and auditing activities with respect to Borrower's origination and servicing business. Notwithstanding the foregoing, upon the occurrence and during the continuation of a Default, Borrower shall reimburse the Lender for any and all Diligence Expenses incurred by Lender following such Default without regard to the Pre-Default Diligence Cap. The Borrower further agrees that the Lender and its Authorized Representatives will be permitted during normal business hours upon [***] Business Days' prior written notice at a mutually desirable time or at any time during the continuance of an Event of Default, to examine, copy and make extracts from the Servicing Records, any and all documents, records, agreements, instruments or information relating to the Pledged Servicing Rights and related Loans in the possession of, or under the control of, Borrower or any Subservicer through a request to Borrower, or Borrower's or any Subservicer's books and records, to inspect any of its Properties, and to discuss its business and affairs with its officers, all to the extent reasonably requested by Lender. Borrower agrees to cooperate with Lender and any third party due diligence agent or underwriter in connection with any such due diligence performed hereunder, including, but not limited to, providing Lender and any third party diligence agent or underwriter with access to any and all documents, records, agreements, instruments or information relating to the Pledged Servicing Rights, any Subservicer and related Loans in the possession of, or under the control of, Borrower.

(e)     Changes in Servicing Contracts. The Borrower shall provide written notice to the Lender of any changes in any Servicing Contracts or the Applicable Agency Guides

25

that may materially affect the Servicing Rights within [***] Business Days after the Borrower receives notice thereof.

      (f)   <u>Records</u>. Borrower shall keep adequate records and books of account, in which complete entries will be made in accordance with GAAP consistently applied.

      (g)   <u>Reserved.</u>

      (h)   <u>Financial Statements</u>. Borrower shall deliver to Lender:

      (i)   As soon as available and in any event within [***] days after the end of each quarter, the consolidated balance sheet of Borrower and its consolidated Subsidiaries as at the end of such quarter, the related unaudited consolidated statements of operations and changes in member's equity and of cash flows for Borrower and its consolidated Subsidiaries for such period and the portion of the fiscal year through the end of such period, setting forth in each case in comparative form the figures for the previous year, accompanied by a certificate of a Responsible Officer of Borrower, which certificate shall state that said consolidated financial statements (excluding financial statement footnotes) fairly present the consolidated financial condition and results of operations of Borrower and its Subsidiaries in accordance with GAAP, consistently applied as at the end of, and for, such quarter (subject to normal year-end audit adjustments);

      (ii)   As soon as available and in any event within [***] days after the end of each fiscal year of Borrower, the audited consolidated balance sheet of Borrower and its consolidated Subsidiaries as at the end of such fiscal year and the related audited consolidated statements of operations and changes in member's equity and of cash flows for Borrower and its consolidated Subsidiaries for such year, setting forth in each case in comparative form the figures for the previous year, accompanied by an opinion thereon of independent certified public accountants of recognized national standing, which opinion shall not be qualified as to scope of audit or going concern and shall state that said consolidated financial statements fairly present the consolidated financial condition and results of operations of Borrower and its consolidated Subsidiaries at the end of, and for, such fiscal year in accordance with GAAP;

      (iii)   Together with each set of the financial statements delivered pursuant to clauses (i) through (iii) above, a certificate of a Responsible Officer of Borrower in the form of <u>Exhibit 7.01</u> attached hereto;

      (iv)   Upon Lender's request, Borrower shall deliver to Lender an accountant's opinion that Borrower is in compliance with the Uniform Single Attestation Program for Mortgage Bankers, subject to qualifications and exceptions, in form and substance reasonably acceptable to Lender in good faith; and

      (v)   From time to time, in the event that Lender requests additional information regarding the financial condition, operations, well-being or business of Borrower or Subservicer (including but not limited to any information regarding any repurchase and indemnity requests or demands made upon Borrower by any third party investors (including any Agency)), Borrower shall (i) provide a written response to Lender within [***] Business Days, which response shall include an estimated time period in which Borrower, in its commercially reasonable judgment acting in good faith, expects to provide such additional requested information, and (ii) provide such additional requested information to Lender within the time period specified in such written response; provided that Lender and Borrower shall cooperate in good faith to agree on an extended time frame for delivery of such additional requested

26

information if reasonably requested by Borrower and Lender determines in good faith that Borrower is diligently attempting to provide such additional requested information.

(i)       Applicable Agency Approval. The Borrower shall at all times maintain copies of relevant portions of all final written Fannie Mae, Freddie Mac, HUD and Ginnie Mae audits, examinations, evaluations, monitoring reviews and reports of its origination and servicing and subservicing operations (including those prepared on a contract basis for any such agency) in which there are material adverse findings, including without limitation notices of defaults, notices of termination of approved status, notices of imposition of supervisory agreements or interim servicing agreements, and notices of probation, suspension, or non-renewal, and all necessary approvals from each of Fannie Mae, Freddie Mac, HUD and Ginnie Mae. Borrower shall not, nor to the extent reasonably in its control, permit Subservicer to take any action, or fail to take any action, that would be reasonably likely to cause Fannie Mae, Freddie Mac, HUD or Ginnie Mae to terminate or threaten to terminate its right to service loans for Fannie Mae, Freddie Mac, HUD or Ginnie Mae with cause.

(j)       Quality Control. Borrower shall conduct and shall cause each Subservicer to conduct quality control reviews of Borrower's and such Subservicer's servicing and origination operations in accordance with industry standards and Agency and HUD requirements. Upon the reasonable request of Lender and to the extent Borrower is not prohibited by any Agency, regulator, or Governmental Authority or Requirement of Law from disclosing its findings, Borrower shall promptly report to Lender quality control findings upon written request from time to time.

(k)       Special Affirmative Covenants Concerning Servicing Rights. Subject to the Freddie Mac Requirements:

(l)       The Borrower warrants and shall defend the right and interest of the Lender in and to the Pledged Servicing Rights against the claims and demands of all Persons whomsoever.

(m)       The Borrower shall preserve the security interests granted hereunder and upon request by the Lender undertake all actions which are necessary or appropriate, in the reasonable judgment of the Lender, to (x) maintain the Lender's security interest (including the priority thereof) in the Collateral in full force and effect at all times prior to the satisfaction of all obligations under this Agreement and the release of the Lender's lien in accordance with the terms and provisions of this Agreement (including upon a Change of Control with respect to the Borrower), and (y) preserve and protect the Collateral and protect and enforce the rights of the Lender to the Collateral, including the making or delivery of all filings and recordings (of financing or continuation statements), or amendments thereto or assignments thereof, and such other instruments or notices, as may be necessary or appropriate, cause to be marked conspicuously its master data processing records with a legend, acceptable to the Lender, evidencing that such security interest has been granted in accordance with this Agreement.

(i)       Borrower shall diligently fulfill its duties and obligations under the Servicing Contracts in all material respects and shall not default in any material respect under any Servicing Contract and any Acknowledgement Agreement.

(n)       Financial Covenants. The Borrower shall be in compliance with the Financial Covenants on any date on which the relevant financial calculations used to determine compliance with the Financial Covenants are determined or tested by the Borrower, as applicable.

27

(o)    Use of Proceeds. The Borrower shall not use the proceeds of the Loans in contravention of the requirements, if any, of the Applicable Agency.

(p)    Monthly Compliance Certificate. No later than the times set forth in Section 7.01(h)(4), the Borrower shall deliver to the Lender a completed Officer's Certificate in the form of Exhibit 7.01 attached hereto, which shall include any updates to Schedule 6.01(t) since the previously delivered Compliance Certificate.

(q)    Borrowing Base Deficiency. If at any time there exists a Borrowing Base Deficiency, the Borrower shall cure the same in accordance with Section 2.08(b) hereof.

(r)    Advance Facilities. Prior to entering into any loan facility or similar arrangement with a third party secured by Borrower's right and interest in any rights to reimbursement for any servicing advances made under the Servicing Contracts, Borrower shall provide the Lender with [***] Business Days advance notice and shall cooperate with Lender to enable Lender to give such third party notice of Lender's interest hereunder, including without limitation, by providing to Lender the name and contact information for delivery of such notice to the third party to whom such rights are or will be pledged.

(s)    Maintenance of Property; Insurance. Borrower shall keep and shall require Subservicer to keep all property useful and necessary in its business in good working order and condition. Borrower shall maintain, and shall require any other Subservicer to maintain, errors and omissions insurance and/or mortgage impairment insurance and blanket bond coverage, each naming Lender as "lender loss payee" in such amounts as are customarily required by Fannie Mae, Freddie Mac, Ginnie Mae, FHA, VA and RHS and shall also maintain and require any other Subservicer to maintain such other insurance with financially sound and reputable insurance companies, and with respect to property and risks of a character usually maintained by entities engaged in the same or similar business similarly situated, against loss, damage and liability of the kinds and in the amounts customarily maintained by such entities. Borrower will deliver to Lender on or before the date hereof, a certificate from Borrower's insurance broker dated such date showing the amount of coverage as of such date, and that such policies will include effective waivers (whether under the terms of any such policy or otherwise) by the insurer of all claims for insurance premiums against all loss payees and additional insureds and all rights of subrogation against all loss payees and additional insureds, and that if all or any part of such policy is canceled, terminated or expires, the insurer will forthwith give notice thereof to each additional insured and loss payee and that no cancellation, reduction in amount or material change in coverage thereof shall be effective until at least [***] days after receipt by each additional insured and loss payee of written notice thereof.

(t)    Stop-Loss Cap Failure; Agency Obligations. Borrower shall promptly, but in any event within [***] Business Days after the occurrence of any Stop-Loss Cap Failure, deliver to Lender an updated Agency Obligations report identifying all Agency Obligations.

(u)    Notice of Disposal of Servicing Rights. In the event that the Borrower sells or otherwise disposes of any of the Pledged Servicing Rights, it shall give the Lender [***] Business Days' prior written notice of such sale or disposition, during which time the Lender shall recalculate the Collateral Value for the Collateral remaining after such sale or disposition. Lender shall have no obligation to release its interest in any Pledged Servicing Rights until all amounts required to be paid pursuant to Section 4.05 have been paid, except as determined by Freddie Mac pursuant to a Freddie Mac VPC Agreement.

(v)    Requests for Information. The Borrower shall furnish to the Lender within [***] Business Days after the Lender's request, any reasonable information, documents,

28

records or reports with respect to the Collateral, Borrower's or any Subservicer's origination or servicing business, Borrower's or any Subservicer's relationship with any Agency (unless prohibited by the Applicable Agency, any regulator, a Governmental Authority or a Requirement of Law from sharing with Lender due to confidentiality restrictions), as the Lender may from time to time request.

(w)     Agency Collateral Account. In the event that an Applicable Agency requires Borrower to use a Collateral Account, Borrower shall deliver a notice to the Lender in each Compliance Certificate delivered while such requirement remains in effect, setting forth the amount on deposit in each Collateral Account (if applicable) established by Borrower at each Agency to the extent applicable; provided that if any such date is not a Business Day, such notice shall be delivered to the Lender on the next succeeding Business Day. With respect to any Collateral Account, if applicable, and to the extent not prohibited by the related Agency, Borrower shall promptly (and in any event within [***] Business Days thereof) notify the Lender (and provide a copy of any written request) of any request it receives from any Agency indicating either (i) that Borrower or Subservicer must deposit additional amounts in the related Collateral Account or (ii) that Borrower or Subservicer is entitled to withdraw amounts from the related Collateral Account and such notice shall include the amount required to be deposited or withdrawn, as applicable.

(x)     Applicable Agency Information. Upon reasonable notice during normal business hours, the Borrower shall make available the Chief Financial Officer or any other applicable officers of Borrower to participate in discussions with Lender and provide information with respect to the following: (i) a projection of the obligations of Borrower in connection with (A) all Agency Obligations and (B) amounts that may have been required to be deposited or withdrawn from any Collateral Account with any Agency (the "Collateral Account Activity"), (ii) a projection of the impact the Agency Obligations may have on the operations of Borrower, including but not limited to, the net impact on liquidity, statements of income, retained earnings and cash flows, (iii) the projected date of resolution of the Agency Obligations, (iv) a summary of all repurchase obligations and indemnity claims with respect to mortgages originated or serviced by Borrower, and (v) such other information as may be reasonably requested by the Lender, in all cases to the extent Borrower is not prohibited from disclosing such information under the Freddie Mac Requirements or otherwise.

(y)     Subservicer Acknowledgement Letters. Prior to permitting any Subservicer, other than Borrower, to service any Mortgage Loans related to the Pledged Servicing Rights pledged hereunder, Borrower shall cause such Subservicer to become a party to a subservicer side letter with Lender, pursuant to which such Subservicer shall acknowledge Lender's rights hereunder and the Applicable Agency's rights under the Servicing Contract and Acknowledgement Agreement, and agree to follow all instructions of Lender upon the occurrence of a default hereunder, which side letter shall be acceptable to Lender and the Applicable Agency (each such side letter, a "Subservicer Acknowledgement Letter").

(z)     Agency Obligations Report. Unless the Borrower is prohibited by the Freddie Mac Requirements, the Applicable Agency, any regulator, a Governmental Authority or a Requirement of Law from sharing due to confidentially restrictions, the Borrower shall deliver to Lender such reports as Lender may reasonably request from time to time with respect to all amounts (i) previously paid by the Borrower to any Applicable Agency as of the date of such report to and (ii) outstanding and not yet paid by the Borrower to any Applicable Agency as of the date of such report, and in each case which report includes the amount of each payment, the Applicable Agency to which such payment was or is to be made and the nature of such payment. In addition, unless the Borrower is prohibited by the Freddie Mac Requirements, the Applicable Agency, any regulator, a Governmental Authority or a Requirement of Law from sharing due to

29

confidentially restrictions, the Borrower shall provide the Lender a monthly report summarizing in sufficient detail any demands by any Agency or an insurer for the repurchase of or indemnification with respect to a Mortgage Loan, the form and substance of such monthly report to be agreed upon between Borrower and Lender.

(aa)     Quality Control. Unless the Borrower is prohibited by the Applicable Agency, any regulator, a Governmental Authority or a Requirement of Law from disclosing due to confidentiality restrictions, Borrower shall and shall require Subservicer to conduct quality control reviews of Borrower's and Subservicer's servicing operations in accordance with industry standards and Fannie Mae, Freddie Mac, Ginnie Mae and HUD requirements. Borrower shall provide to Lender photocopies or electronic copies of any quality control findings relating, in whole or in part, to the Collateral as such applicable quality control reports are produced.

(ab)     Valuation Report. The Borrower shall deliver to Lender servicing valuations conducted by a Valuation Agent with respect to the value of Borrower's servicing portfolio in accordance with Section 2.04 hereof.

(ac)     OFAC. At all times throughout the term of this Agreement, Borrower (a) shall be in full compliance with all applicable orders, rules, regulations and recommendations of OFAC and (b) shall not permit any Assets to be maintained, insured, traded, or used (directly or indirectly) in violation of any United States statutes, rules or regulations, in a Prohibited Jurisdiction or by a Prohibited Person.

(ad)     ERISA. As soon as reasonably possible, and in any event within [***] days after a Responsible Officer knows or has reason to believe, that any of the events or conditions specified below with respect to any Plan or Multiemployer Plan has occurred or exists, a statement signed by a senior financial officer of Borrower setting forth details respecting such event or condition and the action, if any, that Borrower or its ERISA Affiliate proposes to take with respect thereto (and a copy of any report or notice required to be filed with or given to PBGC by Borrower or an ERISA Affiliate with respect to such event or condition):

(i)     any Reportable Event and any request for a waiver under Section 412(c) of the Code for any Plan;

(ii)     the distribution under Section 4041(c) of ERISA of a notice of intent to terminate any Plan or any action taken by Borrower or an ERISA Affiliate to terminate any Plan;

(iii)     the institution by PBGC of proceedings under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan, or the receipt by Borrower or any ERISA Affiliate of a notice from a Multiemployer Plan that such action has been taken by PBGC with respect to such Multiemployer Plan;

(iv)     the complete or partial withdrawal from a Multiemployer Plan by Borrower or any ERISA Affiliate that results in liability under Section 4201 or 4204 of ERISA (including the obligation to satisfy secondary liability as a result of a purchaser default) or the receipt by Borrower or any ERISA Affiliate of notice from a Multiemployer Plan that it is in insolvency pursuant to Section 4241 or 4245 of ERISA or that it intends to terminate or has terminated under Section 4041A of ERISA; and

(v)     the institution of a proceeding by a fiduciary of any Multiemployer Plan against Borrower or any ERISA Affiliate to enforce Section 515 of ERISA, which proceeding is not dismissed within [***] days; and

30

(vi)     the adoption of an amendment to any Plan that, pursuant to Section 401(a)(29) of the Code or Section 307 of ERISA, would result in the loss of tax-exempt status of the trust of which such Plan is a part if Borrower or an ERISA Affiliate fails to timely provide security to such Plan in accordance with the provisions of said Sections.

(ae)     Freddie Mac Consent/Notice. Borrower shall provide prior written notice to Freddie Mac of any pending or proposed amendments to any Facility Documents or FC Modifications. Borrower shall provide Lender with evidence of Freddie Mac's consent to any such amendment prior to executing such amendment.

Section 7.02     Negative Covenants of the Borrower. The Borrower covenants and agrees with the Lender that, so long as any Loan is outstanding and until all Obligations have been paid in full, Borrower shall not:

(a)     other than in accordance with Section 7.02(c), take any action or allow any Subservicer to take any action that would directly or indirectly materially impair or materially adversely affect the Borrower's title to, or the value of, the Collateral;

(b)     create, incur or permit to exist any Lien in or on the Collateral or assign any right to receive income in respect thereof except (i) the security interest granted hereunder in favor of the Lender or (ii) the rights of any Applicable Agency or under the Servicing Contracts;

(c)     sell, lease or otherwise dispose of any Pledged Servicing Rights (other than sales or dispositions of Servicing Rights, including bulk sales, in the ordinary course of Borrower's servicing business) or allow any Subservicer to sell, lease or otherwise dispose of any Pledged Servicing Rights, in each case, other than as required by Freddie Mac (including but not limited to sales or dispositions pursuant to a Freddie Mac VPC Agreement);

(d)     engage in any change in the nature of its business as carried on at the date hereof that is reasonably likely to result in a Material Adverse Effect;

(e)     (i) cancel or terminate any Facility Documents to which it is a party or consent to or accept any cancellation or termination thereof without Lender's prior consent, (ii) amend, amend and restate, supplement or otherwise modify any Facility Document if any such amendment, supplement or modification could in any way affect any term or provisions hereunder, Lender's security interest or any of Lender's rights or Borrower's obligations hereunder, without Lender's prior consent, (iii) consent to any amendment, modification or waiver of any term or condition of any Facility Document if any such amendment, supplement or modification could in any way affect any term or provisions hereunder, Lender's security interest or any of Lender's rights or Borrower's obligations hereunder, without the prior written consent of the Lender, which consent shall not be unreasonably withheld, provided that if the amendment of a Servicing Contract is done unilaterally by the Applicable Agency, the prior written consent of the Lender is not required, (iv) waive any material default under or breach of any Servicing Contracts, or (v) take any other action or allow any Subservicer to take any action in connection with any such Facility Documents that would impair in any material respect the value of the interests or rights of the Borrower thereunder or that would impair in any material respect the interests or rights of the Lender;

(f)     change the state of its organization unless the Borrower shall have given the Lender at least [***] days' prior written notice thereof and unless, prior to any such change, Borrower shall have filed, or caused to be filed, such financing statements or amendments as the Lender determines may be reasonably necessary to continue the perfection of the Lender's interest in the Collateral;

31

(g)     at any time, directly or indirectly, (i) acquire any other entity in a transaction pursuant to which Borrower is not the surviving entity or which would have a Material Adverse Effect or enter into any transaction of merger or consolidation or amalgamation or liquidate, wind up or dissolve itself (or suffer any liquidation, winding up or dissolution) or sell all or substantially all of its assets (other than servicing rights sales, whole loan sales and securitization transactions in the normal course of business) without Lender's prior consent; or (ii) form or enter into any partnership, joint venture, syndicate or other combination, which would have a Material Adverse Effect without Lender's prior consent;

(h)     appoint or use any Subservicer with respect to any Servicing Rights pledged to the Lender pursuant to this Agreement, (i) without Lender's consent, which consent shall not be unreasonably withheld and (ii) without executing a Subservicer Acknowledgment Letter regarding the addition of any such Subservicer;

(i)     take any action or allow Subservicer to take any action that would directly or indirectly materially impair or materially adversely affect the Borrower's title to, or the value, of the Eligible Servicing Rights;

(j)     without Lender's consent, following the occurrence of a Default or an Event of Default, make any payment on account of, or set apart assets for a sinking or other analogous fund for the purchase, redemption, defeasance, retirement or other acquisition of, any stock or senior or subordinate debt of the Borrower, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or property or in obligations of Borrower;

(k)     make any Restricted Payments following the occurrence of a Default or an Event of Default;

(l)     enter into any transaction, including, without limitation, any purchase, sale, lease or exchange of property or the rendering of any service, with any Affiliate or Subsidiary unless such transaction is (i) not otherwise prohibited under this Agreement and (ii) either (A) in the ordinary course of the Borrower's business or (B) upon fair and reasonable terms no less favorable to the Borrower than it would obtain in a comparable arm's length transaction with a Person which is not an Affiliate or Subsidiary;

(m)     enter into any other financing facility with a lender other than the Lender to provide for the financing of mortgage servicing rights subject to a Servicing Contract with a particular Applicable Agency, to the extent that any mortgage servicing rights of such Applicable Agency are Pledged Servicing Rights hereunder;

(n)     [reserved];

(o)     [reserved];

(p)     create, incur or permit to exist any rights, interests, liens or other encumbrances on the Pledged Servicing Rights in favor of any party; and

(q)     Sell or otherwise dispose of any Pledged Servicing Rights unless such sale or disposition is in accordance with Section 7.02(c).

Section 7.03   <u>Notice of Certain Occurrences</u>. The Borrower covenants and agrees with the Lender that, so long as any Loan is outstanding and until all Obligations have been paid in full:

32

(a)      <u>Defaults</u>. As soon as possible, but in any event within [***] Business Days after the Borrower has knowledge of any Default, Event of Default or event which, upon the expiration of any applicable cure period, would become an Event of Default, the Borrower shall furnish to the Lender a written statement of a Responsible Officer of the applicable Borrower setting forth details of such Default, Event of Default, or other event, and no more than [***] Business Days after a Responsible Officer of Borrower has knowledge of any Default, a written statement from a Responsible Officer of Borrower setting forth the action that the Borrower has taken or proposes to take with respect to such Default.

(b)      <u>Litigation</u>. The Borrower shall furnish to the Lender notice of any material action, suit or proceeding instituted by or against Borrower or any of its Affiliates or Subsidiaries or any Subservicer in any federal or state court or before any commission, regulatory body or Governmental Authority (i) as to which there is a reasonable likelihood of an adverse decision that is reasonably likely to have a Material Adverse Effect, promptly upon a Responsible Officer of Borrower obtaining knowledge thereof, or (ii) that questions the validity or enforceability of the Facility Documents, or seeks to prevent the consummation of any of the transactions contemplated by the Facility Documents, as soon as possible, but in any event within [***] Business Days, upon a Responsible Officer of Borrower obtaining knowledge thereof.

(c)      <u>Material Adverse Effect on Collateral</u>. The Borrower shall furnish the Lender notice promptly upon Borrower becoming aware of any default related to any Collateral which should reasonably be expected to have a Material Adverse Effect.

(d)      <u>Change of Control</u>. The Borrower shall furnish the Lender notice of any Change of Control of Borrower promptly following the occurrence of such event.

(e)      <u>Servicing Contract Transfer</u>. The Borrower shall notify the Lender of the transfer, termination or other loss of all or any part of any Servicing Contract related to any Pledged Servicing Rights (or the termination or replacement of the Borrower thereunder), the reason for such transfer, loss or replacement, if known to it and the effects that such transfer, loss or replacement will have (or will likely have) on the prospects for full and timely collection of all amounts owing to the Borrower under or in respect of the Borrower's Servicing Contracts.

(f)      <u>Agency Notices</u>. Unless the Borrower is prohibited by the Freddie Mac Requirements, the Applicable Agency, any regulator, a Governmental Authority or a Requirement of Law from sharing due to confidentially restrictions, the Borrower shall promptly furnish the Lender, within [***] Business Day of receipt, (i) a copy of any notices it receives from Fannie Mae or Freddie Mac indicating any adverse fact or circumstance in respect of the Borrower or Subservicer with respect to which adverse fact or circumstance Fannie Mae or Freddie Mac, respectively, announce its intention to terminate or threatens in writing to terminate the Borrower or Subservicer with cause and (ii) a copy of any notice from an Applicable Agency indicating material breach, default or material non-compliance by the Borrower or Subservicer. For the avoidance of doubt, to the extent the Borrower or Subservicer is prohibited from sharing any of the notices referenced in clauses (i) and (ii) above but is not prohibited from sharing the substance of such notices, the Borrower shall promptly notify the Lender of the substance of such notices.

(g)      <u>Cash Reserves</u>. To the extent any Agency imposes any minimum cash reserve requirement upon a Borrower, within [***] Business Days after Borrower receives notice of the same.

(h)  Other Information. The Borrower will furnish to the Lender within a commercially reasonable timeframe such other information, documents, records or reports with respect to the Collateral or the corporate affairs, conditions or operations, financial or otherwise, of Borrower as the Lender may from time to time reasonably request.

(i)  Agency Requirements. Notice of any change in any Applicable Agency's requirements regarding the Borrower's minimum consolidated tangible net worth or any change in any Applicable Agency's requirements regarding the Borrower's consolidated liquidity or any change in any other financial covenant required by an Applicable Agency of the Borrower, in each case within [***] Business Days after the Borrower receives notice thereof.

(j)  Credit Default. The Borrower shall furnish the Lender notice upon, and in any event within [***] Business Days after, any involuntary termination or acceleration of any repurchase agreement, loan and security agreement or similar credit facility or agreement for borrowed funds entered into by Borrower and any third party.

(k)  Use of Subservicer. Each Borrower shall provide prior notice to Lender with respect to the use of a subservicer, other than the Subservicer, or a change in subservicer.

(l)  Advance Facilities. [***] Business Day following (i) the occurrence of any event of default under any Advance Facility, (ii) notice from any Agency declining to renew, terminating or revoking its consent to any Advance Facility or (iii) notice from any party to an Advance Facility declining to renew or terminating an Advance Facility.

(m)  Insurance. The Borrower shall maintain all of its insurance policies in full force and effect in an amount and with coverage at least equal to that required by any Agency, and shall furnish copies of such policies to Lender if requested.

(n)  Accounting. The Borrower shall furnish the Lender notice upon any material change in accounting policies or financial reporting practices of Borrower or its Affiliates or Subsidiaries, unless such change is required by GAAP.

(o)  Disputes. Unless the Borrower is prohibited by the Freddie Mac Requirements, the Applicable Agency, any regulator, a Governmental Authority or a Requirement of Law from disclosing due to confidentiality restrictions, upon a Responsible Officer of Borrower obtaining knowledge thereof, the Borrower shall furnish the Lender notice of any material dispute, audit, sanctions, penalties, investigation proceeding or suspension (other than routine investigations occurring in the ordinary course of business or other audit, review or investigation that could reasonably be expected in connection with the residential mortgage servicing business), between Borrower and any regulator or Governmental Authority.

(p)  Amendment to any Servicing Contract/Servicing Agreement. Within [***] Business Days after Borrower enters into any amendment to the terms of any Servicing Contract or Servicing Agreement, the Borrower shall furnish notice and a copy of any such amendment, unless such amendment could not in any way affect any term or provisions hereunder, Lender's security interest or any of Lender's rights or Borrower's obligations hereunder in any material respect.

(q)  Subservicer Termination Event. Borrower shall furnish the Lender notice of any Subservicer Termination Event within [***] Business Days following notice or knowledge thereof by a Responsible Officer.

(r)  [***].

(s)     VPC Servicing Transfer Date. As soon as possible, but in any event within [***] Business Day, of any Freddie Mac Servicing Contract Rights being included by Borrower on a (i) Prospective Mortgage Loan List or (ii) Transfer List (as such terms are defined in the related Freddie Mac VPC Agreement), in each case, delivered to Freddie Mac pursuant to a Freddie Mac VPC Agreement, Borrower shall furnish to Lender a schedule of such Freddie Mac Servicing Contract Rights and the proposed VPC Servicing Transfer Date.

Each notice pursuant to this Section 7.03 shall be accompanied by a statement of a Responsible Officer of the Borrower (which may include a statement provided through email if such statement is delivered in accordance with Section 11.02), setting forth details of the occurrence referred to therein and stating what action Borrower has taken or proposes to take with respect thereto.

## ARTICLE VIII
## EVENTS OF DEFAULT

Section 8.01   Events of Default. The following events shall be "Events of Default":

(a)     The Borrower fails to make a payment in respect of Interest when due or the Borrower fails to cure a Borrowing Base Deficiency, which failure shall continue unremedied for a period of [***] Business Days of the applicable due date, as provided under Section 2.08(b) in each case solely to the extent Borrower provides Lender with written evidence reasonably satisfactory to Lender that such failure is solely the result of an administrative error;

(b)     The Borrower shall fail to make any payment or deposit to be made by it hereunder when due, other than as set forth in clause (a) above (whether of principal or interest at stated maturity, upon acceleration, or at mandatory prepayments), which failure shall continue unremedied for a period of [***] Business Days;

(c)     Borrower shall fail to comply with the requirements of Section 7.01(a)(i)(A), Section 7.01(a)(i)(C), Section 7.01(g), Section 7.01(h)(1) through (4), Section 7.01(l), Section 7.01(cc), Section 7.02(b), Section 7.02(c), Section 7.02(g), Section 7.02(h), Section 7.02(i), Section 7.02(j) or Section 7.03(c) hereof, and such default shall continue unremedied for a period of [***] Business Day; or Borrower shall otherwise fail to observe or perform any other obligation or covenant contained in this Agreement or any other Facility Document and such failure to observe or perform shall continue unremedied for a period of [***] Business Days following knowledge of, or notice to, Borrower;

(d)     Any representation, warranty or certification made or deemed made herein or in any other Facility Document by Borrower or any certificate furnished to Lender pursuant to the provisions thereof, shall prove to have been false or misleading in any material respect as of the time made or furnished (other than the representations and warranties set forth in Section 6.02 which shall be considered solely for the purpose of determining the Market Value of the Eligible Servicing Rights; unless (i) Borrower shall have made any such representations, warranties or certifications with knowledge that they were materially false or misleading at the time made or (ii) any such representations, warranties or certifications have been determined by Lender in its reasonable discretion to be materially false or misleading on a regular basis), and which false or misleading representation, warranty or certification shall continue unremedied for a period of [***] Business Days;

(e)     (1) The failure of the Borrower to be an approved servicer under the guidelines of each Applicable Agency with respect to which any Eligible Servicing Rights pledged under this Agreement relate, (2) the Borrower fails to service or subservice, as

35

applicable, in accordance with any Applicable Agency Guide (subject to any cure right provided by the Agency) and the Lender determines in its good faith discretion that such failure is reasonably likely to have a Material Adverse Effect, (3) the Borrower is terminated as servicer with respect to any Eligible Servicing Rights by any Applicable Agency, (4) the Borrower shall at any time be terminated, revoked or suspended as servicer, for cause, with respect to any whole loan servicing or subservicing rights that make up a material portion of Borrower's servicing portfolio, (5) Borrower shall cease to be approved by or its approval shall be revoked, suspended, rescinded, halted, eliminated, withdrawn, annulled, repealed, voided or terminated by any Agency as an approved seller/servicer or lender, (6) all or a portion of Borrower's servicing or subservicing portfolio consisting of loans of any Agency is seized, (7) any Agency shall at any time cease to accept delivery of any loan or loans from Borrower under any program or notifies Borrower that any Agency shall cease accepting loan deliveries from Borrower or (8) receipt by Borrower of an unqualified or unconditional notice in writing (including e-mail or other electronic notice) from any Agency indicating material breach, default or material non-compliance by Borrower which entitles such Agency to terminate a Servicing Contract, which notice has not been rescinded or nullified within [***] Business Days of its receipt by Borrower;

(f)       A Subservicer Termination Event shall have occurred and the Borrower shall fail to (i) terminate and identify a replacement Subservicer within [***] days (or such longer period as may be agreed to by Lender) after the occurrence of such Subservicer Termination Event and (ii) replace such Subservicer within [***] days after the occurrence of such Subservicer Termination Event;

(g)       The Lender does not, or ceases to, have a perfected security interest in the Collateral or any material part thereof, subject only to the interests of the Applicable Agency with respect to Eligible Servicing Rights, other than as a result of a release of such security interest by the Lender and such default continues unremedied for a period of [***] Business Day after the earlier of (i) a Responsible Officer of the Borrower having actual knowledge thereof and (ii) written notice of such default from the Lender;

(h)       The Borrower shall cease to be approved by or its approval shall be revoked, suspended, rescinded, halted, eliminated, withdrawn, annulled, repealed, voided or terminated by (i) Ginnie Mae as an approved issuer, (ii) HUD, pursuant to Sections 203 and 211 of the National Housing Act, (iii) FHA, as an FHA Approved Mortgagee or servicer, (iv) VA as a VA Approved Lender, (v) Fannie Mae as an approved seller/servicer or lender, or (vi) Freddie Mac as an approved seller/servicer or lender;

(i)       (i) Borrower shall default under, or fail to perform as required under, or shall otherwise breach the terms of any instrument, agreement or contract between Borrower, on the one hand, and Lender or any of Lender's Affiliates on the other; in each case subject to any applicable grace or cure period; or (ii) Borrower shall have triggered an event of default (howsoever defined under the applicable agreement) under the terms of any repurchase agreement, loan and security agreement, MSFTA/derivatives agreement, or similar credit facility or agreement for borrowed funds entered into by Borrower and any third party which facility or agreement provides for an aggregate borrowing capacity at least equal to the TNW Threshold.

(j)       [Reserved];

(k)       The failure of the Borrower to maintain any net worth requirements, liquidity or other minimum financial covenant requirements of any Applicable Agency;

(l)       Any final judgment or judgments or order or orders for the payment of money in excess of the TNW Threshold in the aggregate shall be rendered against Borrower by

one or more courts, administrative tribunals or other bodies having jurisdiction over them and the same shall not be satisfied (unless said final judgment or judgments shall contain allegations of fraud), discharged (or provisions shall not be made for such discharge), or a stay of execution thereof shall not be procured, within [***] days from the date of entry thereof;

(m)     An Insolvency Event shall occur to Borrower or any of its Affiliates or Subsidiaries;

(n)     Any Governmental Authority (other than an Agency) acting or purporting to act under Governmental Authority shall have taken (A) any action to condemn, seize or appropriate, or to assume custody or control of, all or any substantial part of the property of Borrower, or (B) any action to displace the management of Borrower or to curtail its authority in the conduct of the business of Borrower or (C) any action in the nature of enforcement to remove or restrict, or limit in any material respect, the conduct of the business of Borrower;

(o)     [Reserved];

(p)     A Change of Control of Borrower shall have occurred without the prior consent of Lender;

(q)     This Agreement, the Note, the Pricing Side Letter, any Servicing Contract (but excluding any agreement described in clause (iii) of the definition of "Servicing Contract" herein), any Acknowledgement Agreement shall for whatever reason (including an event of default thereunder) be terminated or shall cease to be in full force and effect, or the enforceability thereof shall be contested by Borrower; or

(r)     (i) Borrower shall engage in any non-exempt "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Plan, (ii) a determination that a Plan is "at risk" (within the meaning of Section 302 of ERISA) or any Lien in favor of the PBGC or a Plan shall arise on the assets of Borrower or any ERISA Affiliate, (iii) a Reportable Event shall occur with respect to, or proceedings shall commence to have a trustee appointed, or a trustee shall be appointed, to administer or to terminate, any Plan, which Reportable Event or commencement of proceedings or appointment of a trustee is, in the reasonable opinion of Lender, likely to result in the termination of such Plan for purposes of Title IV of ERISA, (iv) any Plan shall terminate for purposes of Title IV of ERISA, (v) Borrower or any ERISA Affiliate shall incur any liability in connection with a withdrawal from, or the insolvency of, a Multiemployer Plan, (vi) Borrower or any ERISA Affiliate shall file an application for a minimum funding waiver under Section 302 of ERISA or Section 412 of the Code with respect to any Plan, or (vii) any obligation for post-retirement medical costs (other than as required by COBRA) exists, and in each case in clauses (i) through (vii) above, such event or condition, together with all other such events or conditions, if any, is likely to subject Borrower to any tax, penalty or other liabilities in the aggregate which would reasonably be expected to have a Material Adverse Effect.

Section 8.02   Remedies.

(a)     Optional Acceleration. Upon the occurrence of an Event of Default (other than an Event of Default described in Section 8.01(m)), the Lender may by written notice to the Borrower, terminate the Facility and declare all Loans and all other Obligations to be immediately due and payable.

(b)     Automatic Acceleration. Upon the occurrence of an Event of Default described in Section 8.01(m), the Facility shall be automatically terminated and the Loans and all

37

other Obligations shall be immediately due and payable upon the occurrence of such event, without demand or notice of any kind.

(c)     Remedies. Upon any acceleration of the Loans pursuant to this Section 8.02, the Lender, in addition to all other rights and remedies under this Agreement or otherwise, shall have all other rights and remedies provided under the UCC of each applicable jurisdiction and other Applicable Laws, which rights shall be cumulative. The Borrower agrees, upon the occurrence of an Event of Default and notice from the Lender, to assemble, at its expense, all of the Collateral that is in its possession (whether by return, repossession, or otherwise) at a place designated by the Lender. All out-of-pocket costs incurred by the Lender in the collection of all Obligations, and the enforcement of its rights hereunder, including reasonable attorneys' fees and legal expenses, shall be paid out of the Collateral. Without limiting the foregoing, upon the occurrence of an Event of Default and the acceleration of the Loans pursuant to this Section 8.02, the Lender may, to the fullest extent permitted by Applicable Law, without notice, advertisement, hearing or process of law of any kind, but subject to the terms of any applicable Acknowledgment Agreement, (i) enter upon any premises where any of the Collateral which is in the possession of the Borrower (whether by return, repossession, or otherwise) may be located and take possession of and remove such Collateral, (ii) sell any or all of such Collateral, free of all rights and claims of the Borrower therein and thereto, at any public or private sale, and (iii) bid for and purchase any or all of such Collateral at any such sale. Any such sale shall be conducted in a commercially reasonable manner and in accordance with Applicable Law. The Borrower hereby expressly waives, to the fullest extent permitted by applicable law, any and all notices, advertisements, hearings or process of law in connection with the exercise by the Lender of any of its rights and remedies upon the occurrence of an Event of Default. Each of the Lender and the Borrower shall have the right (but not the obligation) to bid for and purchase any or all Collateral at any public or private sale. The Borrower hereby agrees that in any sale of any of the Collateral, the Lender is hereby authorized to comply with any limitation or restriction in connection with such sale as it may be advised by counsel is necessary in order to avoid any violation of Applicable Law (including, without limitation, compliance with such procedures as may restrict the number of prospective bidders and purchasers, require that such prospective bidders and purchasers have certain qualifications, and restrict such prospective bidders and purchasers to Persons who will represent and agree that they are purchasing for their own account for investment and not with a view to the distribution or resale of such Collateral), or in order to obtain any required approval of the sale or of the purchaser by any Governmental Authority, and the Borrower further agrees that such compliance shall not result in such sale being considered or deemed not to have been made in a commercially reasonable manner. The Lender shall not be liable for any sale, private or public, conducted in accordance with this Section 8.02(c). If an Event of Default occurs, and upon acceleration of the Loans hereunder, the Loans and all other Obligations shall be immediately due and payable, and Collections on the Eligible Servicing Rights and proceeds of sales and securitizations of Eligible Servicing Rights, and other Collateral will be used to pay the Obligations. The terms set forth in this Section 8.02(c) are subject to the Freddie Mac Requirements and Freddie Mac's Superior Interest.

(d)     In the event that the Borrower receives a notice from any Applicable Agency indicating a material breach, material default or material non-compliance by the Borrower that the Lender reasonably determines may entitle an Applicable Agency to terminate such Borrower as servicer pursuant to the related Servicing Contracts, which breach, default or non-compliance has not been satisfactorily cured or remedied within [***] Business Days of the receipt by the Borrower of such notice, or such lesser time as Lender believes is necessary to protect its interest and provides the Borrower with written notice thereof, as the case may be, the Lender may by written notice to the Borrower, terminate the Facility and declare all Loans and all other Obligations to be immediately due and payable.

38

## ARTICLE IX
## ASSIGNMENT

Section 9.01    <u>Restrictions on Assignments</u>. The Borrower shall not assign its rights hereunder or any interest herein without the prior written consent of the Lender. The Lender may, in the ordinary course of its business and in accordance with applicable law, assign any or all of its rights and obligations under this Agreement, under any Loan pursuant to this Agreement or under the other Facility Documents, to any of its Affiliates or Subsidiaries and, with the prior written consent of the Borrower, any bank or other entity; provided, that (i) such assignment is approved by the Applicable Agency, (ii) the Borrower, the Applicable Agency and the related assignee enter into an acknowledgement agreement in which the Applicable Agency acknowledges the related security interest of such assignee in the Servicing Rights, (iii) with respect to any assignment to any of its Affiliates or Subsidiaries, the Lender shall provide the Borrower with notice of such assignment and (iv) with respect to any assignment to a bank or other entity other than to an Affiliate or Subsidiary of Lender, Lender shall provide the Borrower with notice of such assignment and Borrower shall incur no greater liability to such bank or other entity than the liability of Borrower to Lender provided hereunder. The foregoing shall not limit Lender's ability to pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of Lender pursuant to Section 9.04(b). This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. Each Participant (as defined below) and each Lender assignee shall be subject to the requirements set forth in the confidentiality agreement in the form of Exhibit E attached hereto. Notwithstanding anything herein to the contrary, following the occurrence and during the continuance of an Event of Default, Lender shall be entitled to assign its rights and obligations under this Agreement or issue one or more participation interests to any Person without the consent of Borrower.

Section 9.02    <u>Evidence of Assignment; Endorsement on Notes</u>. The Lender hereby agrees that it shall endorse the Notes to reflect any assignments made pursuant to this <u>Article IX</u> or otherwise. In the event that Lender assigns its rights in accordance with Section 9.01, Lender shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain at one of its offices a copy of each assignment and assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the commitments of, and principal amounts (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "<u>Register</u>"). The entries in the Register shall be conclusive absent manifest error, and the Borrower and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

Section 9.03    <u>Rights of Assignee</u>. Upon the assignment the Lender of all of its rights and obligations hereunder, under the Notes and under the other Facility Documents to an assignee in accordance with <u>Section 9.01</u>, such assignee shall have all such rights and obligations of the Lender as set forth in such assignment or delegation, as applicable, and all references to the Lender in this Agreement or any Facility Document shall be deemed to apply to such assignee to the extent of such interest. If any interest in any Facility Document is transferred to any assignee which is organized under the laws of any jurisdiction other than the United States or any State thereof, the transferor Lender shall cause such assignee, concurrently with the effectiveness of such transfer, to comply with the provisions of <u>Section 3.02</u>.

Section 9.04    <u>Permitted Participants; Effect</u>. (a)    Lender may, in accordance with applicable law, at any time, upon at least [***] Business Days' prior written notice to the Borrower, sell to one or more entities ("Participants") participating interests in this Agreement,

its agreement to make Advances, or any other interest of Lender hereunder and under the other Facility Documents; provided that Lender shall not be required to provide advance notice to Borrower with respect to participating interests to the Federal Reserve Bank. In the event of any such sale by Lender of participating interests to a Participant, Lender's obligations under this Agreement to Borrower shall remain unchanged, Lender shall remain solely responsible for the performance thereof and Borrower shall continue to deal solely and directly with Lender in connection with Lender's rights and obligations under this Agreement and the other Facility Documents. Borrower agrees that if amounts outstanding under this Agreement are due or unpaid, or shall have been declared or shall have become due and payable upon the occurrence of an Event of Default, each Participant shall be deemed to have the right of set-off in respect of its participating interest in amounts owing under this Agreement to the same extent as if the amount of its participating interest were owing directly to it as a Lender under this Agreement; provided, that such Participant shall only be entitled to such right of set-off if it shall have agreed in the agreement pursuant to which it shall have acquired its participating interest to share with Lender the proceeds thereof. For the avoidance of doubt, any amounts that are set-off pursuant to the foregoing shall pay, prepay, repay, discharge or otherwise satisfy the obligations owed to the applicable Participant and Lender by the Borrower in an amount equal to the amount of such set-off. Lender, acting solely for this purpose as an agent of Borrower, shall maintain a register on which it enters the name and address of each Participant and each Lender assignee and the principal amounts (and stated interest) of each Participant's and each Lender assignee, assignee's interest in the rights and obligations under this Agreement and related Facility Documents (the "Register") The entries in the Register shall be conclusive absent manifest error, and Borrower and its Affiliates and Lender shall treat each person whose name is recorded in the Register as the owner of the related participation or assignment for purposes of this Agreement. The Register shall be available for inspection by Borrower, Lender and other parties hereto at any reasonable time and from time to time upon reasonable prior notice.

(a)     Lender may furnish any information concerning a Borrower or any of its Subsidiaries in the possession of Lender from time to time to assignees and Participants (including prospective assignees and Participants) only after notifying Borrower in writing and securing signed confidentiality agreements and only for the sole purpose of evaluating assignments or participations and for no other purpose. For the avoidance of doubt, no signed confidentiality agreements shall be required in the event information concerning a Borrower or any of its Subsidiaries in the possession of Lender from time to time is furnished to the Federal Reserve Bank in connection with a repledge or rehypothecation or other financing of Advances to the Federal Reserve Bank.

(b)     Borrower agrees to reasonably cooperate with Lender in connection with any such assignment and/or participation, to execute and deliver replacement notes, and to enter into such restatements of, and amendments, supplements and other modifications to, this Agreement and the other Facility Documents in order to give effect to such assignment and/or participation, with any related expenses incurred by Borrower prior to the occurrence of an Event of Default to be paid by Lender.

Section 9.05   Voting Rights of Participants.

The Lender shall retain the sole right to approve, without the consent of any Participant, any amendment, modification or waiver of any provision of the Facility Documents other than any amendment, modification, or waiver with respect to any Loan or Committed Amount in which such Participant has an interest which forgives principal, interest, or fees or reduces the interest rate or fees payable with respect to any such Loan or Committed Amount, extends the Loan Repayment Date, postpones any date fixed for any regularly scheduled payment of principal of, or interest or fees on, any such Loan or Committed Amount or releases all or

substantially all of the Collateral (other than as expressly permitted pursuant to the Facility Documents).

## ARTICLE X
## INDEMNIFICATION

Section 10.01    Indemnities by the Borrower. Without limiting any other rights which any such Person may have hereunder or under Applicable Law, the Borrower hereby agrees to indemnify, the Lender, its Affiliates, successors, permitted transferees and assigns and all officers, directors, shareholders, controlling persons, employees and agents of any of the foregoing (each an "Indemnified Party"), forthwith on demand, from and against any and all damages, losses, claims, liabilities and related out-of-pocket costs and expenses, including reasonable attorneys' fees and disbursements (all of the foregoing being collectively referred to as "Indemnified Amounts") awarded against or incurred by any of them arising out of or as a result of this Agreement, the other Facility Documents, or any transaction contemplated hereby or thereby excluding, however, (a) Indemnified Amounts to the extent a court of competent jurisdiction determines that they resulted from gross negligence, bad faith or willful misconduct on the part of such Indemnified Party, (b) in the event that the Lender has assigned its rights or delegated its obligations in respect of this Agreement, and the Indemnified Amounts with respect to such assignee exceed the Indemnified Amounts that would otherwise have been payable by the Borrower to the Lender, the amount of such excess, (c) any lost profits or indirect, exemplary, punitive or consequential damages of any Indemnified Party and (d) any other amounts specifically identified herein as to which Borrower's liability is expressly limited, but only to the extent of such express limitation. In any suit, proceeding or action brought by the Lender in connection with any Collateral for any sum owing thereunder, or to enforce any provisions of any Collateral, the Borrower will save, indemnify and hold the Lender harmless from and against all expense, loss or damage suffered by reason of any defense, set-off, counterclaim, recoupment or reduction or liability whatsoever of the account debtor or obligor thereunder, arising out of a breach by Borrower of any obligation thereunder or arising out of any other agreement, indebtedness or liability at any time owing to or in favor of such account debtor or obligor or its successors from the Borrower. The Borrower also agrees to reimburse the Lender as and when billed by the Lender for all the Lender's documented out-of-pocket costs and expenses incurred in connection with the enforcement or the preservation of the Lender's rights under this Loan Agreement, the Note, any other Facility Document or any transaction contemplated hereby or thereby, including without limitation the reasonable fees and disbursements of its counsel. The Borrower hereby acknowledges that, notwithstanding the fact that the Note is secured by the Collateral, the obligation of the Borrower under the Note is a recourse obligation of the Borrower. Under no circumstances shall any Indemnified Party be liable to the Borrower for any lost profits or indirect, exemplary, punitive or consequential damages. This Section 10.01 shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

Section 10.02    General Provisions. If for any reason the indemnification provided above in Section 10.01 (and subject to the limitations on indemnification contained therein) is unavailable to an Indemnified Party or is insufficient to hold an Indemnified Party harmless on the basis of public policy, then the Borrower shall contribute to the amount paid or payable by such Indemnified Party as a result of such loss, claim, damage or liability in such proportion as is appropriate to reflect not only the relative benefits received by such Indemnified Party on the one hand and the Borrower on the other hand but also the relative fault of such Indemnified Party as well as any other relevant equitable considerations.

The provisions of this Article X shall survive the termination of this Agreement and the payment of the Obligations.

41

**ARTICLE XI**
**MISCELLANEOUS**

Section 11.01    Amendments, Etc.

Neither this Agreement nor any provision hereof may be amended, supplemented, or modified except pursuant to an agreement or agreements in writing entered into by the Borrower and the Lender and in accordance with the Freddie Mac Acknowledgment Agreement.

Section 11.02    Notices, Etc.

All notices and other communications provided for hereunder shall, unless otherwise stated herein, be in writing (including electronic or facsimile communication) and shall be personally delivered or sent by certified mail or overnight air courier, postage prepaid, or by email or facsimile, to the intended party at the address or email address of such party set forth opposite its name on Schedule 11.02 or at such other address or email address as shall be designated by such party in a written notice to the other parties hereto. All such notices and communications shall be effective, (i) if personally delivered, when received, (ii) if sent by overnight air courier, the next Business Day after delivery to the related air courier service, if delivery is guaranteed as of the next Business Day, (iii) if sent by certified mail, three Business Days after having been deposited in the mail, postage prepaid, and (iv) if transmitted by email, when sent, if sent during business hours (if sent after business hours, then on the next Business Day) except that notices and communications pursuant to Article II shall not be effective until received. In addition to the available means of delivering notice above, all notices and other communication provided for hereunder shall, unless stated otherwise herein, be in writing and shall be effective when sent via email during business hours to the Borrower at legalnotices@uwm.com, and to the Lender at bobbie.theivakumaran@citi.com (if sent via email after business hours, then on the next Business Day).

Section 11.03    No Waiver; Remedies

. No failure on the part of the Lender to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

Section 11.04    Binding Effect; Assignability

. This Agreement shall be binding upon and inure to the benefit of the Borrower and the Lender, and their respective successors and assigns, provided, however, that nothing in the foregoing shall be deemed to authorize any assignment not permitted in Section 9.01.

Section 11.05    Agreement Constitutes Security Agreement; Governing Law; Submission To Jurisdiction; Waivers.

(a)    This Agreement shall constitute a security agreement within the meaning of the Uniform Commercial Code.

(b)    This Agreement shall be governed by and construed in accordance with the laws of the state of New York without regard to conflicts of laws principles (other than section 5-1401 of the New York General Obligations Law, which by its terms applies to this agreement).

42

(c)      each party hereto hereby irrevocably and unconditionally:

(i)      submits for itself and its property in any legal action or proceeding relating to this Agreement, the Note and the other Facility Documents, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive general jurisdiction of the courts of the state of New York, the federal courts of the United States Of America for the southern district of New York, and appellate courts from any thereof;

(ii)      consents that any such action or proceeding may be brought in such courts and, to the extent permitted by law, waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(iii)      agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to its address set forth under its signature below or at such other address of which the lender shall have been notified; provided that, at the time of such mailing an electronic copy of such service of process is also sent by electronic mail to the persons specified in the address for notices for such party on the signature page hereto (or such other persons of which the other parties hereto shall have been notified);

(iv)      agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction; and

(v)      waives any and all right to a trial by jury with respect to any legal proceeding arising out of or relating to this Agreement.

Section 11.06   <u>Entire Agreement</u>. This Agreement the Freddie Mac Acknowledgment Agreement, and the Facility Documents embodies the entire agreement and understanding of the parties hereto with respect to the matters set forth herein and supersedes any and all prior agreements, arrangements and understanding relating to the matters provided for herein.

Section 11.07   <u>Acknowledgement</u>. The Borrower and the Lender each hereby acknowledges that:

(a)      it has been advised by counsel in the negotiation, execution and delivery of this Agreement, the Note and other Facility Documents to which it is a party;

(b)      neither the Lender nor the Borrower, as the case may be, has a fiduciary relationship to the other, and the relationship between the Borrower and the Lender is solely that of debtor and creditor; and

(c)      no joint venture exists among or between the Lender and the Borrower.

Section 11.08   <u>Captions and Cross References</u>. The various captions (including, without limitation, the table of contents) in this Agreement are included for convenience only and shall not affect the meaning or interpretation of any provision of this Agreement. References in this Agreement to any underscored Section or Exhibit are to such Section or Exhibit of this Agreement, as the case may be.

Section 11.09   <u>Execution in Counterparts</u>. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so

executed shall be deemed to be an original and all of which when taken together shall constitute one and the same agreement. The parties agree that this Agreement, any documents to be delivered pursuant to this Agreement and any notices hereunder may be transmitted between them by e-mail. The parties intend that electronically imaged signatures such as .pdf files shall constitute original signatures and are binding on all parties.

Section 11.10    Confidentiality. The Facility Documents and their respective terms, provisions, supplements and amendments, and transactions and notices thereunder (the "Confidential Information") are proprietary to Lender and shall be held by Borrower in strict confidence and shall not be disclosed to any third party without the consent of Lender except for (a) disclosure to such party's Affiliates, directors, attorneys, agents or accountants; provided that such attorneys or accountants likewise agree to be bound by this covenant of confidentiality, or are otherwise subject to confidentiality restrictions, or (b) upon prior written notice to Lender, disclosure required by law, rule, regulation or order of a court or other regulatory body, or (c) upon prior written notice to Lender, disclosure to any approved hedge counterparty to the extent necessary to obtain any interest rate protection agreement hereunder, or (d) when circumstances reasonably permit, any disclosures or filing of this Agreement required under Securities and Exchange Commission ("SEC") or state securities' laws; provided that in no event shall any Confidential Information other than this Agreement (excluding in all cases the Pricing Side Letter and all terms set forth therein) be disclosed or filed publicly; and provided further that in the case of disclosure by any party pursuant to the foregoing clauses (b), (c), (d), (e) such disclosure is made in any party's financial statements or footnotes as required by such party's accountants, and Lender receives prior notice of such disclosure, in accordance with GAAP, and (f) such disclosures are made to buyers or prospective buyers of such party's business, and its counsel, accountants, representatives and agents; provided that such disclosure is made pursuant to a non-disclosure agreement acceptable to the non-disclosing party and the disclosing party is responsible for the breach of such non-disclosure agreement. Lender agrees that neither Confidential Information nor any Confidential Borrower Financials shall be disclosed to any third party without the consent of Borrower; provided, that Lender shall be authorized to disclose Confidential Information and Confidential Borrower Financials, where such disclosure is made (i) in connection with the exercise of rights of Lender under any existing or proposed agreement or transaction between Lender and Borrower, (ii) with the consent of Borrower, (iii) in order to comply with any subpoena, order, regulation, ruling or request of any judicial, administrative or legislative body or committee or any self-regulatory body (including any securities or commodities exchange or the Financial Industry Regulatory Authority), (iv) at the request of a bank examiner in connection with an examination of Lender or its affiliates, or (v) otherwise as required by applicable law or regulation. Notwithstanding anything herein to the contrary, each party (and each employee, representative, or other agent of each party) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the transaction and all materials of any kind (including opinions or other tax analyses) that are provided to it relating to such tax treatment and tax structure. For this purpose, tax treatment and tax structure shall not include (i) the identity of any existing or future party (or any Affiliate of such party) to this Agreement or (ii) any specific pricing information or other commercial terms, including the amount of any fees, expenses, rates or payments arising in connection with the transactions contemplated by this Agreement. Each of Buyer and each Seller acknowledges and agrees that portions of the Information may be subject to the Gramm-Leach-Bliley Act of 1999 (the "GLB") and each party agrees to treat such information as required by the GLB for financial institutions and as required by applicable state and local privacy laws notwithstanding the termination or expiration of this Agreement.

Section 11.11    Survival. The obligations of the Borrower under Sections 3.02, 10.01, 11.01 and 11.10 hereof shall survive the repayment of the Loans and the termination of this Agreement. The obligations of the Lender under Section 11.10 shall survive for a period of two (2) years

following the termination of this Agreement. In addition, each representation and warranty made, or deemed to be made by a request for a borrowing, herein or pursuant hereto shall survive the making of such representation and warranty, and the Lender shall not be deemed to have waived, by reason of making any Loan, any Default that may arise by reason of such representation or warranty proving to have been false or misleading, notwithstanding that the Lender may have had notice or knowledge or reason to believe that such representation or warranty was false or misleading at the time such Loan was made.

Section 11.12   Set-Off. In addition to any rights and remedies of the Lender provided by this Agreement and by law, the Lender shall have the right, following the occurrence and during the continuance of an Event of Default, without prior notice to the Borrower, any such notice being expressly waived by the Borrower to the extent permitted by applicable law, upon any amount becoming due and payable by the Borrower hereunder (whether at the stated maturity, by acceleration or otherwise) to set-off and appropriate and apply against such amount any and all Property and deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by the Lender or any Affiliate thereof to or for the credit or the account of the Borrower. Following the occurrence and during the continuance of an Event of Default, the Lender may set-off cash, the proceeds of the liquidation of any Collateral and all other sums or obligations owed by the Lender or its Affiliates to the Borrower against all of the Borrower's obligations to the Lender or its Affiliates, whether under this Loan Agreement or under any other agreement between the parties or between the Borrower and any affiliate of the Lender, or otherwise, whether or not such obligations are then due, without prejudice to the Lender's or its Affiliate's right to recover any deficiency. The Lender agrees promptly to notify the Borrower after any such set-off and application made by the Lender; provided that the failure to give such notice shall not affect the validity of such set-off and application.

Section 11.13   Erroneous Payments.

(a)      (i) If Lender notifies Borrower, Participant, assignee of any party hereto or other recipient that Lender has determined in its sole discretion that any funds received by such recipient from Lender or any of its Affiliates were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such recipient (whether or not known to such recipient) (any such funds whether as a payment, prepayment or repayment of principal, interest, fees or other amounts; a distribution or otherwise; individually and collectively, a "Payment" and any such recipient, an "Unintended Recipient") and demands the return of such Payment (or a portion thereof), such Unintended Recipient shall promptly, but in no event later than one Business Day thereafter, return to Lender the amount of any such Payment (or portion thereof) as to which such a demand was made, in immediately available funds, together with interest thereon in respect of each day from and including the date such Payment (or portion thereof) was received by such Unintended Recipient to the date such amount is repaid to Lender in immediately available funds at the greater of the Pricing Rate and a rate determined by Lender in accordance with banking industry rules on interbank compensation from time to time in effect. Any Payment shall at all times remain the property of Lender and shall be held in trust by the applicable Unintended Recipient for the benefit of Lender until repaid to Lender pursuant to this Section 11.13(a)(i).

(i)      To the extent permitted by applicable law, neither Borrower nor any other party hereto (other than Lender) shall assert any right or claim to a Payment, and hereby waives, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by Lender for the return of any Payments received, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine.

(ii)     A notice from Lender to any Unintended Recipient under this clause (a) shall be conclusive, absent manifest error.

(b)     If an Unintended Recipient receives a Payment from Lender (or any of its Affiliates)

(i)     that is in a different amount than, or on a different date from, that specified in a notice of payment or calculation statement sent by Lender (or any of its Affiliates) with respect to such Payment (a "Payment Notice"),

(ii)     that was not preceded or accompanied by a Payment Notice, or

(iii)     that such Unintended Recipient otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part) or any Payment is otherwise inconsistent with such recipient's or market expectations,

in each case, an error shall be presumed to have been made with respect to such Payment absent written confirmation from Lender to the contrary. Upon demand from Lender, such Unintended Recipient shall promptly, but in no event later than one Business Day thereafter, return to Lender the amount of any such Payment (or portion thereof) as to which such a demand was made.

(c)     Borrower hereby agrees that the receipt by an Unintended Recipient of a Payment shall not pay, prepay, repay, discharge or otherwise satisfy any obligations owed to such Unintended Recipient by Borrower.

(d)     Without prejudice to the survival of any other agreement of Borrower hereunder, the covenants and obligations of Borrower contained in this Section 11.13 shall survive the termination of this Agreement, any assignment permitted hereunder, and/or the satisfaction and discharge of all Obligations (or any portion thereof) under any Facility Document.

Section 11.14   Provisions Applicable to Freddie Mac and the Collateral.

Notwithstanding anything to the contrary in this Agreement or the other Facility Documents, Lender and Borrower acknowledge and agree that:

(a)     Priority of Freddie Mac. The terms and provisions of this Agreement and the Facility Documents, the transactions contemplated hereby and thereby, the rights and remedies of the parties provided hereby and thereby, the security interest granted herein, and any payments or disbursements hereunder and thereunder are subject and subordinate in all respects to (i) Freddie Mac's Superior Interests, (ii) the terms and provisions of the Freddie Mac Acknowledgment Agreement and the other Freddie Mac Requirements, and (iii) all claims of Freddie Mac arising out of or relating to any and all breaches, defaults and outstanding obligations of Borrower to Freddie Mac. In accordance with and subject to the Freddie Mac Acknowledgment Agreement, any funds received by Lender in connection with Lender's exercise of its rights and remedies with respect to the Collateral will be applied first to reduce any amounts owed to Freddie Mac.

(b)     Collateral. Lender has no security interest, assignment or any other form of pledge, security interest or lien in any collateral other than the Collateral expressly set forth in Section 4.01. The Collateral does not include or convey (i) payments of principal, interest, taxes and/or insurance made in respect of any Freddie Mac Mortgage Loans, (ii) Borrower's rights or interests to reimbursement for any servicing advances related to Freddie Mac Servicing Contract

46

Rights, (iii) the Freddie Mac Servicing Contract, (iv) Borrower's rights and claims under the Freddie Mac Acknowledgment Agreement, or (v) the right to (1) perform servicing under the Freddie Mac Guide, (2) terminate Borrower as an approved Freddie Mac Seller/Servicer, (3) terminate the Freddie Mac Servicing Contract (in whole or in part), (4) transfer any of the Freddie Mac Servicing Contract Rights, (5) any successor servicer or (6) Excess Yield.

      (c)    Approved Purposes. The Freddie Mac Servicing Contract Rights and related Collateral may only be pledged, and the proceeds of the Loans may only be used, for the purposes set forth in the Freddie Mac Acknowledgment Agreement.

      (d)    VPC Agreements. In connection with any Freddie Mac VPC Agreement, effective as of each date of transfer pertaining thereto, and without any payment by Borrower or compliance by Borrower with any other terms and provisions of this Agreement, Lender hereby covenants, represents, and warrants to Freddie Mac, without any further requirement or action by Lender, that Lender shall be conclusively deemed to have fully and finally released its lien, charge, security interest, encumbrance, claims, or interests arising out of or relating to (A) the Collateral pertaining to the Freddie Mac Servicing Contract Rights subject to the applicable transfer of servicing, and (B) the Acknowledgment Agreement, including without limitation, any right to make claims against Freddie Mac (for itself and for any principal), solely as related to the Freddie Mac Servicing Contract Rights subject to the applicable transfer of servicing. If requested by Freddie Mac, Lender shall promptly execute such further documentation as requested by Freddie Mac in order to further effectuate the terms and provisions of this Section 11.14(d). Solely in the event that defined term "Mortgage Loan Eligibility Criteria" or any other provision in either the VPC Agreement or referenced in Section 25(a) of the Freddie Mac Acknowledgment Agreement, is amended to include performing Mortgage Loans (as defined in the VPC Agreement) that would constitute Released Freddie Mac Servicing Rights, then this release provided by Lender in this Agreement as to Release Dates subsequent to the effective date of such amendment shall be subject to further review and approval by Freddie Mac and Lender.

      (e)    Terminology. Notwithstanding any extra-contractual meanings, the terms "MSR", "mortgage servicing rights" and "Servicing Rights" (and any references to ownership thereof by Borrower) (i) are for convenience purposes only as a result of industry and accounting convention, and (ii) in fact refer to conditional servicing contract rights (as further described in the definition of "Freddie Mac Servicing Contract Rights") with respect to which Borrower may have rights sufficient to satisfy UCC § 9-203(b)(2), but which Borrower cannot own.

      (f)    Consent in Sole and Absolute Discretion. Whenever in this Agreement there is a requirement Freddie Mac's consent, Freddie Mac's approval, Freddie Mac's determination, Freddie Mac's acceptance, Freddie Mac's judgment or any other phrase of similar nature pertaining to an action required of Freddie Mac, it is understood by such phrase that Freddie Mac shall exercise the granting or withholding of its consent, approval, determination, acceptance, right or judgment in its sole and absolute discretion.

      (g)    Confidentiality. The parties hereto may disclose Confidential Information to Freddie Mac in connection with the Freddie Mac Acknowledgment Agreement.

      (h)    Assignment. Lender may not sell or assign any security interest in the Freddie Mac Servicing Contract Rights, in whole or in part, or any of its rights or obligations under this Agreement, except as may be expressly set forth in the Freddie Mac Acknowledgment Agreement and subject to Freddie Mac's prior written consent.

(i)     Amendment. Any modification or amendment of this Agreement or any of the Facility Documents must be made in compliance with the Freddie Mac Acknowledgment Agreement.

(j)     Third-Party Beneficiary. Freddie Mac shall be an express third-party beneficiary of, and entitled to rely upon in all respects, Sections 4.01, 4.02(b) and this 11.14. Such Sections shall not be amended or modified without the prior written consent of Freddie Mac.

(k)     Conflict. To the extent that any conflict exists or shall be adjudged to exist between the terms and provisions of (i) this Agreement or any of the Facility Documents, and (ii) the Freddie Mac Acknowledgement Agreement, the terms and provisions of the Freddie Mac Acknowledgement Agreement shall govern and control. To the extent that any conflict exists or shall be adjudged to exist between the provisions of (i) this Agreement or any of the Facility Documents and (ii) this Section 11.14, the terms and provisions of this Section 11.14 shall govern and control.

(l)     Facility Documents.     With respect to interpretation of the term "Facility Documents" in this Agreement or any of the other Facility Documents:

(i)     The Freddie Mac Acknowledgment Agreement shall not be included within the term "Facility Documents" for purposes of this Section 11.14;

(ii)     Any references to the phrase "notwithstanding anything to the contrary herein or in any other Facility Document" (or any similar phrasing) shall be interpreted to mean "notwithstanding anything to the contrary herein or in any other Facility Document (other than the Freddie Mac Acknowledgment Agreement)";

(iii)     Inclusion of the Freddie Mac Acknowledgment Agreement within the term "Facility Documents" shall not give to any party hereto any additional rights or remedies in the Freddie Mac Acknowledgment Agreement, nor the ability to assign rights or issue participations in the Freddie Mac Acknowledgment Agreement; and

(iv)     The parties hereto shall not use the inclusion of the Freddie Mac Acknowledgment Agreement within the term "Facility Documents" in any way to contest, delay, obstruct, hinder or interfere, directly or indirectly, with rights of Freddie Mac in this Agreement or the Freddie Mac Acknowledgment Agreement or in any way adverse to the interests of Freddie Mac.

Section 11.15   Amendment and Restatement.

The terms and provisions of the Existing LSA shall be amended and restated in their entirety by the terms and provisions of this Agreement and shall supersede all provisions of the Existing LSA as of the date hereof. From and after the date hereof, all references made to the Existing LSA in any Facility Document or in any other instrument or document shall, without more, be deemed to refer to this Agreement. The execution, delivery and effectiveness of this Agreement shall not operate as a waiver of any power, remedy or right of the Lender, or constitute a waiver of any provision of, or any past noncompliance with the Existing LSA, or any other documents, instruments and agreements executed or delivered therewith or future noncompliance with any of the Facility Documents or any other documents, instruments and agreements executed or delivered therewith, and shall not operate as a consent to any further or

48

other matter under the Facility Documents. Each party hereto agrees and understands that by entering into and performing its obligations hereunder, this Agreement, as it amends and restates the Existing LSA shall not constitute a novation and shall in no way adversely affect or impair the priority of the Lender's security interest and lien on the Collateral. UWM acknowledges and agrees that all obligations of UWM (including representations and warranties made, and covenants to be performed, prior to the Closing Date) under the Existing LSA will remain outstanding and continue in full force and effect, unpaid, unimpaired and undischarged, and all liens created under the Existing LSA will continue in full force and effect, unimpaired and undischarged having the same perfection and priority for payment and performance of the obligations of UWM as were in place under the Existing LSA.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

UNITED WHOLESALE MORTGAGE, LLC, as Borrower

By: /s/ Alex Elezaj
Name: Alex Elezaj
Title: Executive Vice President, Chief Strategy Officer

CITIBANK, N.A., as Lender

By: /s/ Arunthathi Thievakumaran
Name: Arunthathi Thievakumaran
Title: Vice President

**[Loan and Security Agreement (Citi-United Wholesale MSR) (2023)]**

SCHEDULE I

DEFINITIONS

1.1   <u>Definitions</u>. As used in this Agreement the following terms have the meanings as indicated:

"<u>Acknowledgement Agreement</u>" means, with respect to (i) Fannie Mae Servicing Rights, any Acknowledgement Agreement to be entered into by and among Fannie Mae, Borrower, and the applicable secured party, pursuant to which Fannie Mae acknowledges the security interest of the Lender or an agent on behalf of the Lender in the Pledged Servicing Rights arising under the Fannie Mae Servicing Contracts, together with any amendments and addenda thereto, and (ii) Freddie Mac Servicing Contract Rights, the Freddie Mac Acknowledgement Agreement, together with any amendments and addenda thereto.

"<u>Adjusted Tangible Net Worth</u>" shall have the meaning set forth in the Pricing Side Letter.

"<u>Affiliate</u>" shall mean, with respect to any Person, any other Person which, directly or indirectly, controls, is controlled by, or is under common control with, such Person; provided that with respect to Borrower, "Affiliate" shall exclude First Look Appraisals, LLC and Class Valuation LLC. For purposes of this definition, "control" (together with the correlative meanings of "controlled by" and "under common control with") means possession, directly or indirectly, of the power (a) to vote 25% or more of the securities (on a fully diluted basis) having ordinary voting power for the directors or managing general partners (or their equivalent) of such Person, or (b) to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by contract, or otherwise.

"<u>Agreement</u>" has the meaning set forth in the <u>preamble</u>.

"<u>Agency</u>" means each of Fannie Mae, Freddie Mac and Ginnie Mae.

"<u>Agency Consent Agreements</u>" shall mean, to the extent related to Pledged Servicing Rights, each of (i) the subordination of interest agreements set forth on <u>Schedule VII</u> attached hereto, together with any amendments, modifications or supplements thereto, and (ii) any other applicable agreement entered into among the Borrower and any Agency.

"<u>Agency Event</u>" shall mean, with respect to any Subservicer servicing any Pledged Servicing Rights: (1) the failure of the Subservicer to be an approved seller/servicer or its approval shall be revoked, suspended, rescinded, halted, eliminated, withdrawn, annulled, repealed, voided or terminated under the guidelines of each Applicable Agency with respect to which any Eligible Servicing Rights pledged under this Agreement relate, (2) the Subservicer fails to service or subservice, as applicable, in accordance with any Applicable Agency Guide (subject to any cure right provided by the Agency) and the Lender determines in its good faith discretion that such failure is reasonably likely to have a Material Adverse Effect, (3) the Subservicer is terminated as servicer with respect to any Eligible Servicing Rights by any Applicable Agency, or (4) all or a portion of Subservicer's servicing or subservicing portfolio consisting of loans of any Agency is seized.

"<u>Agency Financial Covenants</u>" shall mean the financial covenants applicable to Borrower required by each Agency, as applicable, which covenants are set forth in <u>Exhibit 6.01(z)</u> attached hereto.

Schedule I-1

"Agency Obligations" means with respect to any mortgage loan associated with a Specified Seller/Servicer ID, or otherwise attributed to Borrower by any Agency (a) any obligation, cost, fee, claim or liability (actual or contingent) of the Borrower in respect of such Mortgage Loan to indemnify the relevant Agency for any losses incurred in respect of any Mortgage Loan that was determined at the time of sale to have been ineligible for sale to the Agency due to a breach of one or more representations and warranties but accepted for purchase subject to any waiver and indemnity obligations, (b) any and all other obligations, costs, fees, claims or liabilities described from time to time as being sold "with recourse" as such term (or terms of similar meaning) are defined in the Applicable Agency Guide, as amended or supplemented from time to time, and any successor publications thereto having the same general contents and purpose and (c) any and all obligations, costs, fees, claims or liabilities (actual or contingent) imposed by any Agency.

"Alternate Rate" shall mean, with respect to each Interest Period, (a) the per annum rate of interest of the applicable Benchmark Replacement, determined by Lender for such Interest Period, plus (b) the Applicable Margin.

"Alternate Rate Loan" shall mean the Loan at such time as interest thereon accrues at a per annum rate of interest equal to the Alternate Rate.

"Ancillary Income" means all money which is due and payable in connection with each Mortgage Loan other than the Servicing Fee and specifically including, without limitation, late charge fees, assignment transfer fees, insufficient funds check charges, amortization schedule fees, interest from escrow accounts and all other incidental fees and charges and any Float Benefit, in each case, to the extent such amounts are allocable to a Mortgage Loan.

"Anti-Money Laundering Laws" has the meaning set forth in Section 6.01(u).

"Anti-Terrorism Laws" shall mean any Requirements of Law relating to terrorism, trade sanctions programs and embargoes, import/export licensing, money laundering or bribery, and any regulation, order, or directive promulgated, issued or enforced pursuant to such Requirements of Law, all as amended, supplemented or replaced from time to time as applicable to Borrower or its subsidiaries.

"Applicable Agency" means, (i) with respect to Fannie Mae Servicing Rights, Fannie Mae and (ii) with respect to Freddie Mac Servicing Contract Rights, Freddie Mac.

"Applicable Agency Guide" shall mean (i) with respect to Fannie Mae, the Fannie Mae Lender Contract, (ii) with respect to Freddie Mac, the Freddie Mac Guide and (iii) with respect to Ginnie Mae, the Ginnie Mae Guide.

"Applicable Law" shall mean as to any Person, any law, treaty, rule or regulation (including the Investment Company Act of 1940, as amended) or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Applicable Margin" shall have the meaning set forth in the Pricing Side Letter.

"Attributed Rate" shall have the meaning set forth in the Pricing Side Letter.

"Available Loan Amount" shall have the meaning set forth in the Pricing Side Letter.

"Basel III" means "A Global Regulatory Framework for More Resilient Banks and Banking Systems" developed by the Basel Committee on Banking Supervision (or any successor or similar authority), initially published in December 2010.

"Benchmark" shall mean, (a) initially, the Term SOFR Reference Rate; and (b) if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to the Term SOFR Reference Rate or the then current Benchmark, then the applicable Benchmark Replacement. Notwithstanding anything to the contrary herein, Lender shall have the sole discretion to re-set the Benchmark on a daily basis.

"Benchmark Replacement" shall mean, with respect to any Benchmark Transition Event, the sum of (a) the alternate benchmark rate that has been selected by Lender, giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a rate of interest as a replacement for the then-current Benchmark for U.S. dollar-denominated syndicated or bilateral credit facilities at such time and (b) the Benchmark Replacement Adjustment; provided that, in no event shall the Benchmark Replacement for any Interest Period be deemed to be less than zero.

"Benchmark Replacement Adjustment" shall mean, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment (which may be a positive or negative value or zero) that has been selected by Lender giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of the then-current Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of the then current Benchmark with the applicable Unadjusted Benchmark Replacement for U.S. dollar denominated syndicated or bilateral credit facilities at such time.

"Benchmark Replacement Date" shall mean the earlier to occur of the following events with respect to the then current Benchmark:

(a)   in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of the Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide the Benchmark (or such component thereof); and

(b)   in the case of clause (c) of the definition of "Benchmark Transition Event," the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by or on behalf of the administrator of such Benchmark (or such component thereof) or the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative or non-compliant with or non-aligned with the International Organization of Securities Commissions (IOSCO) Principles for Financial Benchmarks; provided that such non-representativeness, non-compliance or non-alignment will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if any available tenor of such Benchmark (or such component thereof) continues to be provided on such date.

"Benchmark Transition Event" shall mean the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a)   a public statement or publication of information by or on behalf of the administrator of the Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide the Benchmark (or such component thereof), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the Benchmark (or such component thereof);

(b)   a public statement or publication of information by the regulatory supervisor for the administrator of the Benchmark (or the published component used in the calculation thereof), the central bank for the currency of the Benchmark, an insolvency official with jurisdiction over the administrator for the Benchmark (or such component), a resolution authority with jurisdiction over the administrator for the Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for the Benchmark (or such component), which states that the administrator of the Benchmark (or such component) has ceased or will cease to provide the Benchmark (or such component thereof) permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the Benchmark (or such component thereof); or

(c)   a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) or the regulatory supervisor for the administrator of such Benchmark (or such component thereof) announcing that the Benchmark (or such component thereof) is not, or as of a specified future date will not be, representative or in compliance with or aligned with the International Organization of Securities Commissions (IOSCO) Principles for Financial Benchmarks.

"Benchmark Unavailability Period" shall mean, unless and until a Benchmark Replacement is implemented with respect to the then-current Benchmark pursuant to Section 2.11(e)(i) (rather than pursuant to Section 2.11(c)), each (if any) Interest Period for which Lender determines that (a) adequate and reasonable means do not exist for ascertaining the component of the Interest Rate based on Term SOFR (or the then-current Benchmark if the Loan is then an Alternate Rate Loan) (including, if the Benchmark is the Term SOFR Reference Rate, that Term SOFR cannot be determined in accordance with the definition thereof) or (b) it is unlawful to use the then-current Benchmark to determine the applicable Interest Rate for any Interest Period.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrower" has the meaning set forth in the preamble.

"Borrower Funding Request" means the request to fund a Loan on any Funding Date, substantially in the form of Exhibit 2.03, delivered in accordance with Section 2.03.

"Borrowing Base" has the meaning set forth in the Pricing Side Letter.

"Borrowing Base Deficiency" has the meaning set forth in Section 2.08(b).

"Borrowing Base Report" means the borrowing base report, substantially in a format agreed upon between the Borrower and Lender, delivered by the Lender in accordance with Section 2.04.

"Borrowing Base Shortfall Day" has the meaning set forth in Section 2.08(b).

"<u>Business Day</u>" means any day other than (i) a Saturday or Sunday, or (ii) a day on which banking institutions in the states of New York, Texas or Michigan are required or authorized by law to be closed.

"<u>Capital Lease Obligations</u>" means, for any Person, all obligations of such Person to pay rent or other amounts under a lease of (or other agreement conveying the right to use) Property to the extent such obligations are required to be classified and accounted for as a capital lease on a balance sheet of such Person under GAAP, and, for purposes of this Agreement, the amount of such obligations shall be the capitalized amount thereof, determined in accordance with GAAP.

"<u>Capital Stock</u>" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests, including, without limitation, limited and general partnership interests, in a person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing.

"<u>Cash Equivalents</u>" shall have the meaning set forth in the Pricing Side Letter.

"<u>Change of Control</u>" shall mean, the occurrence of any of the following: (a) any transaction or event as a result of which any "person" or "group" (as such terms are used for purposes of Sections 13(d) and 14(d) of the Exchange Act), other than SFS Holding Corp. or Mathew Ishbia, is or becomes the beneficial owner directly or indirectly, of more than 50% of the total voting power of UWM Holdings Corporation; (b) any transaction or event as a result of which (i) UWM Holdings Corporation ceases to serve as the manager of UWM Holdings, LLC or (ii) any Person other than SFS Holding Corp. or UWM Holdings, LLC becomes the sole member of, and/or serves as the sole manager of, Borrower; (c) the sale, transfer, or other disposition of all or substantially all of Borrower's assets (excluding any such action permitted under this Agreement or taken in connection with any securitization transaction or routine sales of Mortgage Loans and Servicing Rights); or (d) the consummation of a merger or consolidation of Borrower with or into another entity or any other corporate reorganization, if more than 50% of the combined voting power or equity interests of the continuing or surviving entity's equity outstanding immediately after such merger, consolidation or such other reorganization is owned by persons who were not equity holders of the Borrower immediately prior to such merger, consolidation or other reorganization.

"<u>Closing Date</u>" means the date on which all of the conditions set out in <u>Section 5.01</u> are satisfied or waived in writing by Lender.

"<u>Code</u>" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"<u>COBRA</u>" has the meaning set forth in <u>Section 6.01(y)</u>.

"<u>Collateral</u>" has the meaning set forth in <u>Section 4.01</u>.

"<u>Collateral Account</u>" means, as applicable, each account established by the Borrower for the benefit of Fannie Mae, Freddie Mac or Ginnie Mae (as applicable) as currently set forth on Schedule II attached hereto.

"<u>Collateral Account Activity</u>" has the meaning set forth in Section 7.01(v).

"<u>Collateral Reporting Date</u>" has the meaning set forth in Section 2.03(a).

"<u>Collateral Value</u>" shall have the meaning set forth in the Pricing Side Letter.

"<u>Collection Period</u>" means, with respect to any Monthly Settlement Date, the calendar month most recently ended.

"<u>Committed Amount</u>" shall have the meaning set forth in the Pricing Side Letter.

"<u>Commitment Adjustment Notice</u>" means a notice substantially in the form of Exhibit 2.10(b) attached to the Pricing Side Letter.

"<u>Commitment Fee</u>" shall have the meaning set forth in the Pricing Side Letter.

"<u>Compliance Certificate</u>" means a certificate substantially in the form of <u>Exhibit 7.01</u> hereto or another form mutually acceptable to Lender and Borrower.

"<u>Confidential Borrower Financials</u>" shall mean, any financial statements and related supporting documents of Borrower which were clearly marked confidential when received by Lender from Borrower or (i) which was presented to a Responsible Officer of the Lender and (ii) would be understood by a reasonable person to be confidential.

"<u>Conforming Changes</u>" shall mean, with respect to either the use or administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Business Day," "Determination Date," "Interest Period," "Payment Date," and "U.S. Government Securities Business Day," timing and frequency of determining rates and making payments of interest, preceding and succeeding business day conventions and other administrative or operational matters) that Lender determines may be appropriate or necessary to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by Lender in a manner substantially consistent with market practice (or, if Lender decides that adoption of any portion of such market practice is not administratively feasible or if Lender determines that no market practice for the administration of any such rate exists, in such other manner of administration as Lender decides is reasonably necessary in connection with the administration of this Agreement and the other Facility Documents).

"<u>Connection Income Taxes</u>" means, with respect to any Lender, Taxes imposed as a result of a present or former connection between such Lender and the jurisdiction imposing such Tax (other than connections arising from such Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Facility Document, or sold or assigned an interest in any Loan or any Facility Document).

"<u>Contractual Obligation</u>" shall mean as to any Person, any material provision of any material agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound or any material provision of any security issued by such Person.

"<u>Covered Entity</u>" shall mean (a) Borrower and each of its Subsidiaries and (b) each Person that, directly or indirectly, is in control of a Person described in clause (a) above. For purposes of this definition, control of a Person shall mean the direct or indirect (x) ownership of, or power to vote, 25% or more of the issued and outstanding equity interests having ordinary voting power for the election of directors of such Person or other Persons performing similar functions for such Person, or (y) power to direct or cause the direction of the management and policies of such Person whether by ownership of equity interests, contract or otherwise.

"<u>Covered Mortgage</u>" shall have the meaning set forth in the Freddie Mac Acknowledgment Agreement.

"Credit Fee in Yield" -- has the meaning set forth in the Glossary to the Freddie Mac Guide.

"Custodial File" means with respect to any Mortgage Loan, a file pertaining to such Mortgage Loan being held by the Custodian that contains the mortgage documents pertaining to such Mortgage Loan.

"Custodian" means any financial institution that holds documents for any of the Mortgage Loans on behalf of the Applicable Agency related thereto.

"Default" means an Event of Default or an Unmatured Event of Default.

"Default Rate" shall have the meaning provided in the Pricing Side Letter.

"Deficiency Threshold" shall have the meaning provided in the Pricing Side Letter.

"Determination Date" shall mean, with respect to any Interest Period, (a) if the Loan is a SOFR Loan, the Periodic Term SOFR Determination Day for such Interest Period, or (b) if the Loan is an Alternate Rate Loan, the date and time determined by Lender in accordance with the Conforming Changes.

"Diligence Expenses" shall have the meaning set forth in Section 7.01(d).

"Disposition" shall mean, with respect to any Person, any sale or other whole or partial conveyance of all or any portion of such Person's Property, or any direct or indirect interest therein to a third party, including the granting of any purchase options, rights of first refusal, rights of first offer or similar rights in respect of any portion of such assets or the subjecting of any portion of such assets to restrictions on transfer.

"Dodd-Frank Act" means the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub. L. No. 111-203 and any successor statute.

"Dollars" means dollars in lawful money of the United States of America.

"Effective Date" means September 27, 2022.

"Eligible Servicing Rights" means, servicing contract rights held by the Borrower that are appurtenant to Mortgage Loans pooled in securitizations by (a) Fannie Mae and/or (b) Freddie Mac and associated with a Specified Seller/Servicer ID, which servicing contract rights in each case also satisfy the eligibility criteria set forth in Schedule 6.02.

"Encumbrance" shall have the meaning set forth in the Freddie Mac Acknowledgment Agreement.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" shall mean any Affiliate, whether or not incorporated, that is a member of any group of organizations described in Section 414(b), (c), (m) or (o) of the Code of which Borrower is a member.

"Event of Default" has the meaning set forth in Section 8.01.

"Excess Yield" means with respect to each Released Excess Yield Mortgage, and each monthly payment period for the pools relating to such Released Excess Yield Mortgage, the interest-rate cash flow that remains after subtracting the sum of (i) the applicable pass-through rate for the related pool multiplied by the unpaid principal balance of such Released Excess Yield Mortgage and divided by 12, (ii) the applicable Credit Fee in Yield payable to Freddie Mac on a monthly basis, (iii) the Minimum Servicing Spread multiplied by the unpaid principal balance of such Released Excess Yield Mortgage divided by 12, and (iv) the maximum amount of any premiums required to be paid by Servicer for any related underlying mortgage lender-purchased mortgage insurance renewal premium.

"Excess Yield Transaction" a transaction in which Servicer sells Excess Yield to Freddie Mac in exchange for the Stripped Interest Certificate, and, to the extent applicable, Servicer agrees to sell the Stripped Interest Certificate to an underwriter who will offer the Stripped Interest Certificate from time to time in negotiated transactions at varying prices either directly or through designated dealers.

"Excluded Taxes" means, with respect to the Lender or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, (a) taxes imposed on or measured by its overall net income (however denominated), and franchise taxes and branch profits Taxes, in each case, imposed by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located or, in the case of the Lender, in which its applicable lending office is located, or imposed as a result of a present or former connection between such Lender or recipient and the jurisdiction imposing such Tax (other than such connection arising from such Lender or recipient having executed, delivered, become a party to, performed its obligations under, received payment under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document) (b) any branch profits taxes imposed by the United States or any similar tax imposed by any other jurisdiction in which the Borrower is located (c) any withholding tax that is required to be withheld from amounts payable to a Lender that has failed to comply with Section 3.02(d), (d) any backup withholding tax that is required by the Code to be withheld from amounts payable to a Lender that has failed to comply with of Section 3.02(d), (e) in the case of a Lender, any United States withholding tax that (i) is required to be imposed on amounts payable to such Lender pursuant to the laws in force at the time such Lender becomes a party hereto, or (ii) results from the designation a new lending office, except to the extent that such Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Borrower with respect to such withholding tax pursuant to Section 3.02(a)(ii) and (f) withholding Taxes imposed under FATCA.

"Executive Order" shall mean Executive Order 13224 -- Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism.

"EYT Notice" shall have the meaning set forth in Section 2.08(c).

"Facility" means the loan facility provided to the Borrower by the Lender pursuant to this Agreement.

"Facility Documents" means, subject to Section 11.14(l), this Agreement, the Note, the Pricing Side Letter, each Subservicer Acknowledgment Agreement, each Acknowledgement Agreement, each Subservicing Agreement and all notices, certificates, financing statements and other documents to be executed and delivered by the Borrower in connection with the transactions contemplated by this Agreement.

"Fannie Mae" means Fannie Mae, also known as The Federal National Mortgage Association, or any successor thereto.

"Fannie Mae Guides" means the Fannie Mae Selling Guide and the Fannie Mae Servicing Guide, as amended from time to time, and any related announcements, directives and correspondence issued by Fannie Mae.

"Fannie Mae Lender Contract" means, the "Lender Contract" as defined in the Fannie Mae Guides.

"Fannie Mae Servicing Rights" means all Servicing Rights that are Eligible Servicing Rights with respect to Fannie Mae.

"Fannie Mae Stop-Loss Cap" shall have the meaning set forth in the Pricing Side Letter.

"Fannie Mae Stop-Loss Cap Failure" shall have the meaning set forth in the Pricing Side Letter.

"Fannie Mae Stop-Loss Cap Failure Borrowing Base Deficiency" shall have the meaning set forth in the Pricing Side Letter.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantially comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Body entered into in connection with the implementation of the foregoing.

"Federal Reserve Board" shall mean the Board of Governors of the Federal Reserve System of the United States.

"Financial Covenants" shall have the meaning set forth in the Pricing Side Letter.

"Financial Sponsor" means any Person, including any Subsidiary of such Person, whose principal business activity is acquiring, holding and selling investments (including controlling interests) in otherwise unrelated companies that are each distinct legal entities with separate management, books and records and bank accounts, whose operations are not integrated with one another and whose financial condition and creditworthiness are independent of the other companies so owned by such Person.

"Float Benefit" means the net economic benefit resulting from investments of funds representing escrow and custodial deposits held for the account of the Borrower, or the Applicable Agency relating to the Mortgage Loans.

"Foreign Lender" means any successor or assignee of Lender that is organized under the laws of a jurisdiction other than that in which the Borrower is resident for tax purposes. For purposes of this definition, the United States of America, each State and Commonwealth thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Freddie Mac" means The Federal Home Loan Mortgage Corporation, its successors and permitted assigns.

"<u>Freddie Mac Acknowledgment Agreement</u>" means the Acknowledgment Agreement, dated as of September 30, 2022, entered into among Borrower, Lender and Freddie Mac, as amended or modified from time to time.

"<u>Freddie Mac Claims Cap Amount</u>" shall have the meaning set forth in the Pricing Side Letter.

"<u>Freddie Mac Claims Cap Failure</u>" shall have the meaning set forth in the Pricing Side Letter.

"<u>Freddie Mac Claims Cap Failure Borrowing Base Deficiency</u>" shall have the meaning set forth in the Pricing Side Letter.

"<u>Freddie Mac Guide</u>" means the Freddie Mac Single-Family Seller/Servicer Guide, as it may be modified, amended or supplemented from time to time.

"<u>Freddie Mac Mortgage Loans</u>" means those Mortgage Loans owned or guaranteed by Freddie Mac.

"<u>Freddie Mac Purchase Documents</u>" has the meaning given to the term "Purchase Documents" in the Freddie Mac Guide.

"<u>Freddie Mac Requirements</u>" means the Freddie Mac Acknowledgment Agreement, the Freddie Mac Servicing Contract, the Freddie Mac Guide and the other Freddie Mac Purchase Documents, in each case, together with any amendments, modifications or supplements thereto.

"<u>Freddie Mac Servicing Contract</u>" means the unitary, indivisible master servicing contract comprising all the rights, duties, obligations, representations, warranties, covenants and agreements between Borrower and Freddie Mac, as set forth in the Freddie Mac Purchase Documents.

"<u>Freddie Mac Servicing Contract Rights</u>" means the indivisible, conditional, non-delegable right and obligation of the Borrower to perform servicing of the Mortgage Loans for Freddie Mac in accordance with, subject to, and under the Freddie Mac Servicing Contract.

"<u>Freddie Mac's Superior Interest</u>" means (i) the first-priority and continuing security interest of Freddie Mac in the Freddie Mac Collateral (as defined in the Freddie Mac Acknowledgment Agreement), and (ii) all rights, powers, interests, and prerogatives of Freddie Mac under the Freddie Mac Requirements.

"<u>Freddie Mac VPC Agreement</u>" means any bulk or flow purchase Voluntary Partial Cancellation of Servicing Contract Rights Agreement by and between Freddie Mac and Borrower, whether currently in effect or executed in the future, whereby Borrower relinquishes Servicing Contract Rights to Freddie Mac, as amended or modified from time to time.

"<u>Funding Date</u>" shall mean the date on which Lender makes any Loan hereunder.

"<u>Funding Notice Date</u>" means the date on which Borrower shall deliver a Borrower Funding Request, which shall be no later than (i) [***] Business Day prior to any Funding Date in which no new Eligible Servicing Rights are being added to the Collateral and (ii) [***] Business Days prior to each Funding Date where new Eligible Servicing Rights are to be added to the Collateral.

Schedule I-10

"GAAP" shall mean United States Generally Accepted Accounting Principles inclusive of, but not limited to, applicable statements of Financial Accounting Standards issued by the Financial Accounting Standards Board, its predecessors and successors and SEC Staff Accounting Guidance as in effect from time to time applied on a consistent basis.

"Ginnie Mae" means Ginnie Mae, formerly known as The Government National Mortgage Association, or any successor thereto.

"Ginnie Mae Guides" shall mean the Ginnie Mae Handbook 5500.3 and all amendments and additions thereto.

"Governing Document" shall mean, as applicable, each limited liability company agreement, limited partnership agreement, operating agreement, trust agreement, articles or certificate of incorporation or formation, by-laws and/or any other document governing the formation, operation and existence of any Person.

"Governmental Action" means all permits, authorizations, registrations, consents, approvals, waivers, exceptions, variances, orders, decrees, licenses, exemptions, publications, filings, notices to and declarations of or with, or required by, any Governmental Authority, or required by any Legal Requirement.

"Governmental Authority" shall mean with respect to any Person, any nation or government, any state or other political subdivision, agency or instrumentality thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and any court or arbitrator having jurisdiction over such Person, any of its Affiliates or Subsidiaries or any of its properties.

"Guarantee" means, as to any Person, any obligation of such Person directly or indirectly guaranteeing any Indebtedness of any other Person or in any manner providing for the payment of any Indebtedness of any other Person or otherwise protecting the holder of such Indebtedness against loss (whether by virtue of partnership arrangements, by agreement to keep-well, to purchase assets, goods, securities or services, or to take-or-pay or otherwise); provided that the term "Guarantee" shall not include (a) endorsements for collection or deposit in the ordinary course of business, or (b) obligations to make servicing advances for delinquent taxes and insurance or other obligations in respect of a Mortgage Loan or mortgaged property, to the extent required by Borrower. The amount of any Guarantee of a Person shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by such Person in good faith. The terms "Guarantee" and "Guaranteed" used as verbs shall have correlative meanings.

"HUD" means the United States Department of Housing and Urban Development, or any successor thereto.

"Indebtedness" shall mean, for any Person: (a) obligations created, issued or incurred by such Person for borrowed money (whether by loan, the issuance and sale of debt securities or the sale of Property to another Person subject to an understanding or agreement, contingent or otherwise, to repurchase such Property from such Person); (b) obligations of such Person to pay the deferred purchase or acquisition price of Property or services, other than trade accounts payable (other than for borrowed money) arising, and accrued expenses incurred, in the ordinary course of business so long as such trade accounts payable are payable and paid within ninety (90) days of the date the respective goods are delivered or the respective services are rendered; (c) indebtedness of others secured by a Lien on the Property of such Person, whether or not the respective indebtedness so secured has been assumed by such Person; (d) obligations (contingent

Schedule I-11

or otherwise) of such Person in respect of letters of credit or similar instruments issued or accepted by banks and other financial institutions for account of such Person; (e) Capital Lease Obligations of such Person; (f) payment obligations of such Person under repurchase agreements, single seller financing facilities, servicing advance financing facilities, warehouse facilities and other lines of credit; (g) indebtedness of others Guaranteed on a recourse or partial recourse basis by such Person; (h) all obligations of such Person incurred in connection with the acquisition or carrying of fixed assets by such Person; (i) indebtedness of general partnerships of which such Person is a general partner; and (j) any other indebtedness of such Person by a note, bond, debenture or similar instrument; provided that such Indebtedness shall exclude any non-recourse debt or obligation; provided, that "Indebtedness" shall not include Non-Recourse Debt.

"Indemnified Amounts" has the meaning set forth in Section 10.01.

"Indemnified Party" has the meaning set forth in Section 10.01.

"Indemnified Taxes" means Taxes other than (i) Excluded Taxes and (ii) Other Taxes.

"Initial Borrower Funding Request" means the request to fund the Loan on the Initial Funding Date, substantially in the form of Exhibit 2.03, delivered in accordance with Section 2.03.

"Initial Borrowing Base Report" means the initial borrowing base report delivered by the Lender in accordance with Section 2.04 based on the information set forth in the related Servicing Schedule with respect to the Collateral then pledged to Lender hereunder.

"Initial Funding Date" means the Funding Date on which the first Loan is made pursuant to this Agreement, as specified in the Initial Borrower Funding Request.

"Insolvency Event" shall mean, as to any Person, the occurrence of any of the following events: (1) such Person files a voluntary petition in bankruptcy, seeks relief under any provision of any Insolvency Law or consents to the filing of any petition against it under any such law; (2) a proceeding shall have been instituted by such Person in a court having jurisdiction in the premises seeking a decree or order for relief in respect of such Person in an involuntary case under any applicable Insolvency Law, or for the appointment of a receiver, liquidator, assignee, trustee, custodian, sequestrator, conservator or other similar official of such Person, or for any substantial part of its Property, or for the winding-up or liquidation of its affairs, (3) a proceeding shall have been instituted against such Person in a court having jurisdiction in the premises seeking a decree or order for relief in respect of such Person in an involuntary case under any applicable Insolvency Law, or for the appointment of a receiver, liquidator, assignee, trustee, custodian, sequestrator, conservator or other similar official of such Person, or for any substantial part of its Property, or for the winding-up or liquidation of its affairs and such Person shall have failed to obtain a relief (including, without limitation, a dismissal) or a stay of such involuntary proceeding within [***] days, (4) the admission in writing by such Person of its inability to pay its debts as they become due, (5) such Person consents to the appointment of or taking possession by a custodian, receiver, conservator, trustee, liquidator, sequestrator or similar official, of all or any part of its Property or any custodian, receiver, conservator, trustee, liquidator, sequestrator or similar official takes possession of all or any part of the Property of such Person; (6) such Person makes an assignment for the benefit of any of its creditors; or (7) such Person generally fails to pay its debts as they become due.

"Insolvency Law" shall mean any bankruptcy, reorganization, moratorium, delinquency, arrangement, insolvency, readjustment of debt, dissolution or liquidation law of any jurisdiction in effect at any time during the term of this Agreement.

"Interest Rate" shall have the meaning set forth in the Pricing Side Letter.

"Interest Period" means, for any Loan, (i) an initial period beginning on the Funding Date for such Loan and ending on the last day of the calendar month in which such Funding Date occurs; and (ii) subsequent consecutive periods thereafter, beginning on the first day of each subsequent calendar month and ending on the earlier of (x) the last day of the same calendar month in which such Interest Period began and (y) the Loan Repayment Date.

"Investment Company Act" means the Investment Company Act of 1940, as amended, together with the rules and regulations promulgated thereunder.

"Lender" means Citibank, N.A.

"Lien" means with respect to any property or asset of any Person (a) any mortgage, lien, pledge, charge or other security interest or encumbrance of any kind in respect of such property or asset or (b) the interest of a vendor or lessor arising out of the acquisition of or agreement to acquire such property or asset under any conditional sale agreement, lease purchase agreement or other title retention agreement, and in each case, other than the interest of the Applicable Agency's rights and interests in the related Eligible Servicing Rights.

"Liquidity" shall have the meaning set forth in the Pricing Side Letter.

"Loan Repayment Date" shall mean, the earliest to occur of (i) September 26, 2023, (ii) a Change of Control of the Borrower, or (iii) if such day is not a Business Day, the immediately preceding Business Day, or such earlier date as may be notified by Lender in accordance with Section 8.02(a).

"Loans" has the meaning set forth in Section 2.01.

"Margin Call" has the meaning set forth in Section 2.08.

"Margin Deficit" has the meaning set forth in the Master Repurchase Agreement.

"Market Value" shall have the meaning set forth in the Pricing Side Letter.

"Master Repurchase Agreement" shall mean that certain master repurchase agreement, dated as of October 30, 2020, among Lender, as buyer, Borrower, as a seller, and United Shore Repo Seller 3 LLC, as a seller.

"Material Adverse Effect" shall mean a material adverse effect on (a) the business, operations or financial condition of the Borrower, taken as a whole, (b) the ability of the Borrower to perform its obligations under any of the Facility Documents to which it is a party, (c) the validity or enforceability of any of the Facility Documents, (d) the rights and remedies of Lender under any of the Facility Documents, (e) a material portion of the Collateral or (f) the validity, perfection or enforceability of Lender's security interest in the Collateral.

"MBS" means Mortgage Backed Security.

"Minimum Servicing Spread" means as applicable to each Released Excess Yield Mortgage, on a per annum basis, an amount equal to 0.25% (25 basis points).

"Monthly Settlement Date" means the 18th day of each calendar month or, if such 18th is not a Business Day, the first Business Day thereafter, or such other date occurring at least once

each month as may be agreed to by the Borrower and Lender, commencing in the month immediately following the month in which the initial Loan is funded.

"Moody's" means Moody's Investors Service, Inc. or its successor in interest.

"Mortgage" means a mortgage, mortgage deed, deed of trust, or other instrument creating a first lien on or first priority security interest in an estate in fee simple in real property securing a Mortgage Note including any riders, assumption agreements or modifications relating thereto.

"Mortgage File" means, with respect to any Mortgage Loan, a file or files pertaining to such Mortgage Loan that contains the mortgage documents pertaining to such Mortgage Loan and incorporated herein by reference, and any additional mortgage documents pertaining to such Mortgage Loan required by the Applicable Agency Guide.

"Mortgage Loan" means any mortgage loan serviced by the Borrower pursuant to any Servicing Contracts.

"Mortgage Note" means note or other evidence of indebtedness of a Mortgagor secured by a Mortgage pertaining to a Mortgage Loan.

"Mortgagor" means the obligor on a Mortgage Note.

"Multiemployer Plan" shall mean a multiemployer plan defined as such in Section 3(37) of ERISA to which contributions have been or are required to be made by either Borrower or any ERISA Affiliate or as to which either Borrower or any ERISA Affiliate has any actual or potential liability or obligation and that is covered by Title IV of ERISA.

"MV Criteria" shall have the meaning set forth in the Pricing Side Letter.

"Net Income" shall have the meaning set forth in the Pricing Side Letter.

"Net Worth" shall have the meaning set forth in the Pricing side Letter.

"Non-Recourse Debt" means liabilities for which the assets securing such obligations are the only source of repayment.

"Note" means the promissory note of the Borrower issued to the Lender, in substantially the form of Exhibit 2.02(a), as amended from time to time, and any replacement thereof or substitution therefor.

"Obligations" means the Outstanding Aggregate Loan Amount, all accrued and unpaid interest thereon, any servicing, subservicing. termination, deboarding, exit or similar fees and amounts (if any) paid by Lender and all other amounts payable by the Borrower to the Lender pursuant to this Agreement, the Note or any other Facility Document.

"Official Body" means any central bank or any accounting board or authority (whether or not part of a government) which is responsible for the establishment or interpretation of national or international accounting principles, in each case whether foreign or domestic.

"Opinion of Counsel" means a written opinion of counsel, reasonably acceptable to each Person to whom such opinion is addressed.

"Optional Prepayment Date" has the meaning set forth in Section 2.09.

Schedule I-14

"<u>Other Taxes</u>" means all present or future stamp or documentary taxes or any other excise or property taxes arising from any payment made hereunder or under any other Facility Document or from the execution, delivery or enforcement of this Loan Agreement or any other Facility Document.

"<u>Outstanding Aggregate Loan Amount</u>" means, at any time, the aggregate principal amount of the Loans funded by the Lender, minus the aggregate amount of payments received by the Lender prior to such time and applied to reduce the principal amount of the Loans.

"<u>Partial Release (Excess Yield)</u>" means, with respect to an Excess Yield Transaction, that certain separate Partial Release document, executed and delivered by Lender in favor of Freddie Mac, dated effective as of the Excess Yield Transaction Date, which evidences, inter alia, the full release by Lender of its Security Interest in, to, and under the Released Excess Yield.

"<u>Participant</u>" has the meaning set forth in <u>Section 9.04</u>.

"<u>Participant Register</u>" has the meaning specified in Section 9.04.

"<u>PBGC</u>" shall mean the Pension Benefit Guaranty Corporation or any entity succeeding to any or all of its functions under ERISA.

"<u>Periodic Term SOFR Determination Day</u>" shall have the meaning set forth in the definition of "Term SOFR."

"<u>Person</u>" means any individual, corporation, estate, partnership, limited liability company, limited liability partnership, joint venture, association, joint-stock company, business trust, trust, unincorporated organization, government or any agency or political subdivision thereof, or other entity of a similar nature.

"<u>Plan</u>" shall mean an employee benefit or other plan established or maintained by Borrower or any ERISA Affiliate and that is either covered by Title IV of ERISA or is subject to the minimum funding standards under section 412 of the Code or section 303 of ERISA, other than a Multiemployer Plan.

"<u>Pledged Servicing Rights</u>" means any Eligible Servicing Rights with respect to which the Lender's security interest has not been released by Lender. For the avoidance of doubt Pledged Servicing Rights does not include any Excess Yield.

"<u>Pool</u>" means a group of Mortgage Loans, which are the security for a mortgage-backed security issued by an Applicable Agency or any part of a whole loan portfolio of an Applicable Agency.

"<u>Pre-Default Diligence Cap</u>" shall have the meaning set forth in the Pricing Side Letter.

"<u>Prepayment Notice</u>" means a notice substantially in the form of <u>Exhibit 2.09</u>.

"<u>Pricing Side Letter</u>" means that certain pricing side letter, dated September 27, 2022, between Citibank, N.A. and United Wholesale Mortgage, LLC.

"<u>Prime Rate</u>" shall mean rate of interest published in The Wall Street Journal from time to time as the "Prime rate" for the U.S. If more than one such "Prime rate" is published in The Wall Street Journal for a day, the average of such "Prime rates" shall be used, and such average shall be rounded up to the nearest 1/100th of one percent (0.01%). If The Wall Street Journal ceases to publish the "Prime rate" for the U.S., Lender shall select an equivalent publication that

publishes such "Prime rate," and if such "Prime rates" are no longer generally published or are limited, regulated or administered by a governmental or quasigovernmental body, then Lender shall select a comparable interest rate index. Notwithstanding the foregoing, in no event will the Prime Rate be deemed to be less than zero.

"Prohibited Jurisdiction" means, any country or jurisdiction, from time to time, that is the subject of a prohibition order (or any similar order or directive), sanctions or restrictions promulgated or administered by any Governmental Authority of the United States.

"Prohibited Person" shall mean any Person:

(i)      listed in the Annex to the Executive Order, or otherwise subject to the provisions of, the Executive Order;

(ii)     that is owned or controlled by, or acting for or on behalf of, any person or entity that is listed in the Annex to, or is otherwise subject to the provisions of, the Executive Order;

(iii)    with whom Lender is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering law, including the Executive Order;

(iv)     that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order;

(v)      that is named as a "specially designated national and blocked person" on the most current list published by the OFAC at its official website, http://www.treas.gov.ofac/t11sdn.pdf or at any replacement website or other replacement official publication of such list; or

(vi)     that is an Affiliate of a Person listed above.

"Property" shall mean any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.

"Register" has the meaning set forth in Section 9.02.

"Related Escrow Account Balances" means the balance, on the related Funding Date, of any escrow or impound accounts maintained by the Borrower which relate to any Mortgage Loan, including, without limitation, items escrowed for mortgage insurance, property taxes (either real or personal), hazard insurance, flood insurance, ground rents, or any other escrow or impound items required by any Mortgage Note or Mortgage, reduced by any unpaid real estate taxes or insurance premiums required to be paid by the Borrower, with respect to which amounts have been escrowed by the related Mortgagor.

"Related Principal and Interest Custodial Accounts" means all principal and interest custodial accounts maintained by the Borrower that relate to any Mortgage Loan or Pool.

"Released Excess Yield Mortgages" means those Covered Mortgages which, as of the Excess Yield Transaction Date, are listed on Schedule I attached to the Partial Release (Excess Yield).

Schedule I-16

"<u>Relevant Governmental Body</u>" shall mean the Federal Reserve Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York or any successor thereto.

"<u>Reportable Compliance Event</u>" shall mean that any Covered Entity becomes a Sanctioned Person, or is charged by indictment, criminal complaint or similar charging instrument, arraigned, or custodially detained in connection with any Anti-Terrorism Law or any predicate crime to any Anti-Terrorism Law, or has knowledge of facts or circumstances to the effect that it is reasonably likely that any aspect of its operations is in actual or probable violation of any Anti-Terrorism Law.

"<u>Reportable Event</u>" shall mean any of the events set forth in Section 4043(b) of ERISA, other than those events as to which the thirty day notice period is waived (provided that a failure to meet the minimum funding standard of Section 412 of the Code or Sections 302 or 303 of ERISA, including, without limitation, the failure to make on or before its due date a required installment under Section 430(j) of the Code or Section 303(j) of ERISA, shall be a reportable event regardless of the issuance of any waivers in accordance with Section 412(d) of the Code).

"<u>Requirement(s) of Law</u>" means, with respect to any Person or any of its property, the certificate of incorporation or articles of association and by-laws, certificate of limited partnership, limited partnership agreement or other organizational or governing documents of such Person, and any law, treaty, rule or regulation, or determination of any arbitrator or Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject, whether Federal, state or local (including, without limitation, usury laws, the Federal Truth in Lending Act and retail installment sales acts).

"<u>Responsible Officer</u>" or "<u>Financial Authorized Officer</u>" means (a) with respect to the Borrower, the chief executive officer, president, chief financial officer, treasurer, senior, vice or assistant vice president, assistant treasurer, secretary or assistant secretary of the Borrower, or any other officer having substantially the same authority and responsibility; <u>provided</u>, that with respect specifically to the obligations of the Borrower set forth in <u>Section 6.01(i) and Section 7.01(h)</u> hereof, only the chief financial officer, treasurer, assistant treasurer, or comptroller of the Borrower shall be deemed to be a Responsible Officer; and (b) with respect to the Lender, a lending officer charged with responsibility for the day to day management of the relationship of such institution with the Borrower.

"<u>Restricted Payment</u>" shall mean with respect to any Person, collectively, all dividends or other distributions of any nature (cash, securities, assets or otherwise), and all payments, by virtue of redemption or otherwise, on any class of equity securities (including, warrants, options or rights therefor) issued by such Person, which may hereafter be authorized or outstanding and any distribution in respect of any of the foregoing, whether directly or indirectly other than payments made in the ordinary course solely for the purpose of originating, servicing, subservicing and/or administrating Mortgage Loans.

"<u>Retained Citi Covered Mortgage</u>" means any Covered Mortgage, from and after the Excess Yield Transaction Date, which is (a) not a Released Excess Yield Mortgage, or (b) a Released Excess Yield Mortgage, but only to the extent of the Servicer's Servicing Contract Rights to the Minimum Servicing Spread related to such Released Excess Yield Mortgage. For the avoidance of doubt, Lender shall not have any interest in, or Encumbrance on, the Released Excess Yield pertaining to any Released Excess Yield Mortgage.

"<u>S&P</u>" means Standard & Poor's, a division of The McGraw Hill Companies, Inc.

Schedule I-17

"<u>Sanctioned Country</u>" has the meaning set forth in <u>Section 6.01(v)</u>.

"<u>Sanctioned Person</u>" has the meaning set forth in <u>Section 6.01(v)</u>.

"<u>Sanctions</u>" has the meaning set forth in <u>Section 6.01(v)</u>.

"<u>Servicer</u>" means Borrower in its capacity as servicer of any Mortgage Loans.

"<u>Servicing Contracts</u>" means (i) with respect to all Fannie Mae Servicing Rights, the Fannie Mae Lender Contract, (ii) with respect to all Freddie Mac Servicing Contract Rights, the Freddie Mac Servicing Contract and (iii) any other agreement in any form between the Borrower and any Applicable Agency with respect to the servicing of any Pools regarding the Applicable Agency, in each case as such agreements may be amended, amended and restated, supplemented or otherwise modified from time to time.

"<u>Servicing Fee</u>" means the total amount of the fee payable to the Servicer as compensation for subservicing and administering the Mortgage Loans.

"<u>Servicing Rights</u>" means with respect to each Mortgage Loan (other than Freddie Mac Mortgage Loans), all of the Borrower's right, title and interest in, to and under the related Servicing Contract, whether now or hereafter existing, acquired or created, whether or not yet accrued, earned, due or payable, as well as all other present and future right and interest under such Servicing Contract, including, without limitation, the indivisible, conditional and non-delegable right (i) to service the Mortgage Loans under the related Servicing Contracts, (ii) to receive the Servicing Fee income payable after the related Funding Date (including without limitation, any Uncollected Fees), (iii) to any and all Ancillary Income received after the related Funding Date, (iv) to hold and administer the Related Escrow Account Balances, (v) to hold and administer, in accordance with the related Servicing Contract, the Related Principal and Interest Custodial Account, the Custodial File, and the Mortgage File arising from or connected to the servicing or subservicing of such Mortgage Loan under this Agreement, and (vi) all proceeds, income, profits, rents and products of any of the foregoing including, without limitation, all of the Borrower's rights to proceeds of any sale or other disposition of the Servicing Rights. With respect to Freddie Mac Mortgage Loans, "Servicing Rights" means the Freddie Mac Servicing Contract Rights. For the avoidance of doubt, as to Freddie Mac Mortgage Loans, Servicing Contract Rights and Servicing Rights does not include Excess Yield.

"<u>Servicing Schedule</u>" shall mean an electronically delivered schedule delivered by the Borrower to Lender or its designee (including any Person identified on Schedule 7.01(i)) in accordance with <u>Section 2.03(a)</u>, and otherwise from time to time on a monthly basis or as otherwise requested by Lender with respect to all Collateral pledged or to be pledged to Lender hereunder; it being understood that Lender shall limit such requests to one occurrence per calendar month; provided that Borrower shall update the Servicing Schedule as an when required under <u>Sections 2.03</u> and <u>4.05</u> in connection with the pledge of additional Eligible Servicing Rights or any release of Pledged Servicing Rights, as applicable. Each Servicing Schedule shall contain updated information with respect to the Collateral and all Agency Obligations as of the date of delivery of such Servicing Schedule.

"<u>SOFR</u>" shall mean a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"<u>SOFR Administrator</u>" shall mean the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"<u>SOFR Loan</u>" shall mean the Loan at such time as interest thereon accrues at a rate of interest equal to the SOFR Rate.

"<u>SOFR Rate</u>" shall mean the sum of (a) Term SOFR applicable to such Interest Period and (b) the Applicable Margin.

"<u>Solvent</u>" has the meaning set forth in <u>Section 6.01(g)</u>.

"<u>Specified Seller/Servicer ID</u>" shall mean each Seller/Servicer ID identified pursuant to an Acknowledgment Agreement with the Applicable Agency, if any.

"<u>Subservicer</u>" shall mean (i) Cenlar FSB or (ii) any Person engaged by the Borrower, with the written consent of Lender (not to be unreasonably delayed, conditioned or withheld), to subservice the Mortgage Loans, together with its permitted successors and assigns.

"<u>Subservicing Agreement</u>" means any subservicing agreement between Borrower and any Subservicer to the extent of any Subservicer other than Borrower.

"<u>Subservicer Termination Event</u>" means (i) the occurrence of an Insolvency Event with respect to any Subservicer or (ii) the occurrence of an Agency Event with respect to any Subservicer, (iii) an event that entitles Borrower to terminate a Subservicer for cause (subject to any cure right(s) that may exist under the Subservicing Agreement unless the default is of such a type as to be incapable of being cured) under the Subservicing Agreement and (iv) a Subservicer's audited annual financial statements or the notes thereto or other opinions or conclusions stated therein shall be qualified or limited by reference to the status of such Subservicer, as a "going concern" or a reference of similar import or shall indicate that such Subservicer, is insolvent.

"<u>Subsidiary</u>" means a corporation of which a Person and/or its other Subsidiaries own, directly or indirectly, such number of outstanding shares as have more than 50% of the ordinary voting power for the election of directors.

"<u>Tangible Net Worth</u>" shall have the meaning set forth in the Pricing Side Letter.

"<u>Taxes</u>" shall mean all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"<u>Term SOFR</u>" shall mean, with respect to each day in an Interest Period, the Term SOFR Reference Rate determined daily for a one-month period on such day (such day, the "Periodic Term SOFR Determination Day"), as such rate is published by the Term SOFR Administrator; provided, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for a one-month period has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for a one-month period as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for a one-month period was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day. Notwithstanding the foregoing, in no event will Term SOFR be deemed to be less than zero.

"Term SOFR Administrator" shall mean CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by Lender in its reasonable discretion).

"Term SOFR Reference Rate" shall mean the one-month forward-looking term rate based on SOFR, currently identified on the CME Group's website at https://www.cmegroup.com/market-data/cme-group-benchmark-administration/term-sofr.html.

"Total Indebtedness" shall have the meaning set forth in the Pricing Side Letter.

"TNW Threshold" shall have the meaning set forth in the Pricing Side Letter.

"UCC" means the Uniform Commercial Code as in effect on the date hereof in the State of New York; provided that if by reason of mandatory provisions of law, the perfection or the effect of perfection or non-perfection of the security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than New York, "Uniform Commercial Code" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection.

"Uncollected Fees" means with respect to any Mortgage Loan, any accrued late charges, insufficient funds fees, assumption fees, and other fees charged to Mortgagors in connection with the servicing or subservicing of such Mortgage Loan which have not been collected by the Borrower or Subservicer as of the related Funding Date.

"Uncommitted Amount" shall have the meaning set forth in the Pricing Side Letter.

"Unmatured Event of Default" means any event that, with the giving of notice or lapse of time, or both, would become an Event of Default.

"Valuation Agent" shall mean a qualified, unaffiliated third party (acceptable to Lender in its sole reasonable discretion including but not limited to any independent third party appointed by the Lender in its sole reasonable discretion pursuant to Section 7.01(d)) that specializes in establishing a fair market value of servicing portfolios with respect to mortgage loans substantially similar to the mortgage loans originated, serviced or acquired by the Borrower.

"Valuation Assumptions" shall have the meaning set forth in the Pricing Side Letter.

"VPC Servicing Transfer Date" has the meaning given to such term in the Freddie Mac VPC Agreement.

"Voting Stock" means, with respect to any person, such person's Capital Stock having the right to vote for election of directors (or the equivalent thereof) of such person under ordinary circumstances.

"Unadjusted Benchmark Replacement" shall mean the Benchmark Replacement excluding the Benchmark Replacement Adjustment.

"U.S. Government Securities Business Day" shall mean any day except for (a) a Saturday, (b) a Sunday, or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

SCHEDULE 5.01

CONDITIONS PRECEDENT TO THE EFFECTIVENESS OF THIS AGREEMENT

(a)    This Agreement duly executed by the parties hereto;

(b)    The Note duly executed by the Borrower;

(c)    The Pricing Side Letter duly executed by the parties thereto;

(d)    Reserved;

(e)    Reserved;

(f)    Reserved;

(g)    An Opinion of Counsel with respect to the Borrower, delivered by outside counsel acceptable to the Lender in its reasonable discretion, opining as to: New York enforceability, corporate matters and non-contravention, security interest creation and perfection, no material litigation, and the Investment Company Act of 1940;

(h)    No event shall have occurred which could cause a Material Adverse Effect;

(i)    Borrower has not received any notice by any Agency or Government Authority that could reasonably be expected to have a Material Adverse Effect;

(j)    A separate power of attorney of Borrower with respect to the powers described in Section 4.04 substantially in the form attached hereto as Exhibit 4.04;

(k)    Lender shall have received evidence of Borrower's insurance pursuant to Section 7.01(q); and

(l)    Lender shall have received a Commitment Adjustment Notice with respect to this Agreement and the Master Repurchase Agreement in the form attached to the Pricing Side Letter as Exhibit 2.10(b).

Exhibit 7.01

SCHEDULE 5.02

CONDITIONS PRECEDENT TO EACH LOAN

(including, with respect to paragraphs (b)-(e) inclusive,
to the automatic continuation of a Loan upon the conclusion of an Interest Period)

(a)     The Lender shall have received a duly executed copy of the Borrower Funding Request for such Loan in accordance with Section 2.03;

(b)     The making of such Loan, and the application of the proceeds thereof, shall not result in the Outstanding Aggregate Loan Amount exceeding the lesser of (i) the Borrowing Base and (ii) the then current Committed Amount plus the Uncommitted Amount;

(c)     The making of such Loan, and the application of the proceeds thereof, shall not result in a Borrowing Base Deficiency;

(d)     On the applicable Funding Date, the following statements shall be true (and the Borrower by delivering such Borrower Funding Request shall be deemed to have certified that):

(i)     the representations and warranties set forth in Article VI are true and correct on and as of such day as though made on and as of such day and shall be deemed to have been made on such day (except to the extent any such representation or warranty is stated to relate solely to an earlier date, in which case, such representation or warranty shall have true and correct as of such date);

(ii)     the Borrower is in compliance with all covenants set forth in Article VII;

(iii)     all conditions precedent to the making of such Loan have been satisfied;

(iv)     no Default or Event of Default has occurred and is continuing, or would result from such Loans; and

(v)     all of the Servicing Rights included in the most recently delivered Servicing Schedule are Eligible Servicing Rights, except for any non-qualifying Servicing Rights listed as such therein, have been identified on such Servicing Schedule;

(e)     The amount of the any Loan shall be not less than $500,000;

(f)     The Lender shall have received (i) with respect to the Initial Borrower Funding Request, the initial Servicing Schedule with respect to all Collateral to be pledged on the initial Funding Date; and (ii) with respect to any subsequent Borrower Funding Request, an updated Servicing Schedule with respect to all Collateral to be pledged on the related Funding Date on or prior to time required by Section 2.03;

(g)     All Facility Documents shall continue to be in full force and effect;

(h)     The Borrower shall have delivered to the Lender with respect to each Agency, a report prepared by Borrower regarding such Agency listing all outstanding Agency Obligations, fees, costs, claims and liabilities of the Borrower to such Agency, whether under any Servicing Contract or otherwise as and when required pursuant to Section 2.03, which report shall contain be in form and substance as set forth in Section 7.01(x);

Exhibit 5.02-1

(i)     Borrower shall have paid to Lender all fees and expenses due and owing to Lender in accordance with this Agreement and any other Facility Document including, without limitation the amount of any Commitment Fees then due and owing, and all of Lender's attorney fees and expenses and due diligence and valuation expenses then due and owing;

(j)     The Loan Repayment Date shall not have occurred;

(k)     Borrower shall have provided Lender with copies of any ESS Transaction Documents prior to the related Subordination Agreement Effective Date;

(l)     Except with respect to a Funding Notice Date, Lender shall have received any other information requested by Lender with respect to the Eligible Servicing Rights;

(m)     To the extent that a Stop-Loss Cap Failure has occurred and is continuing, (i) Borrower shall have delivered to Lender an updated Agency Obligations report in accordance with Section 7.01(r), (ii) Lender shall have recalculated the Borrowing Base based on such updated Agency Obligations report and (iii) any resulting Borrowing Base Deficiency has been cured; and

(n)     Notwithstanding anything contained herein to the contrary; Borrower shall have until October 7, 2022 to deliver the opinions requested in Section 5.01(g) to Lender.

Exhibit 5.02-2

**Exhibit 23.1**

## CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We consent to the incorporation by reference in Registration Statements No. 333-252422 on Form S-1 and Registration Statement No. 333-254621 on Form S-8 of our reports dated March 1, 2023, relating to the financial statements of UWM Holdings Corporation and the effectiveness of UWM Holdings Corporation's internal control over financial reporting appearing in this Annual Report on Form 10-K for the year ended December 31, 2022.

/s/ Deloitte & Touche LLP

Detroit, Michigan
March 1, 2023

Exhibit 31.1

**CERTIFICATION PURSUANT TO**
**RULES 13a-14(a) AND 15d-14(a) UNDER THE SECURITIES EXCHANGE ACT OF 1934,**
**AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Mathew Ishbia, certify that:

1.  I have reviewed this Annual Report on Form 10-K of UWM Holdings Corporation (the "Registrant")

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report;

4.  The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal controls over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Registrant and have

    a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.  Evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d.  Disclosed in this report any change in the Registrant's internal control over financial reporting that occurred during the Registrant's most recent fiscal quarter (the Registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5.  The Registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Registrant's auditors and the audit committee of Registrant's board of directors (or persons performing the equivalent functions):

    a.  All significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and

    b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal controls over financial reporting.

Date: March 1, 2023

By: /s/ Mathew Ishbia
Mathew Ishbia
Chairman, President and Chief Executive Officer
(Principal Executive Officer)

**Exhibit 31.2**

**CERTIFICATION PURSUANT TO
RULES 13a-14(a) AND 15d-14(a) UNDER THE SECURITIES EXCHANGE ACT OF 1934,
AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Andrew Hubacker, certify that:

1. I have reviewed this Annual Report on Form 10-K of UWM Holdings Corporation (the "Registrant")

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report;

4. The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal controls over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Registrant and have

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the Registrant's internal control over financial reporting that occurred during the Registrant's most recent fiscal quarter (the Registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5. The Registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Registrant's auditors and the audit committee of Registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal controls over financial reporting.

Date: March 1, 2023

By: /s/ Andrew Hubacker
Andrew Hubacker
Executive Vice President, Chief Financial Officer and Chief Accounting Officer
(Principal Financial Officer)

Exhibit 32.1

**CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

I, Mathew Ishbia, President, Chief Executive Officer and Chairman of UWM Holdings Corporation (the "Company"), do hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to the best of my knowledge:

1.  the Annual Report on Form 10-K of the Company for the year ended December 31, 2022 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.  information contained in the Report fairly presents, in all material respects, the financial condition and results of the operations of the Company.

Date: March 1, 2023

By: /s/ Mathew Ishbia
_____
Mathew Ishbia
Chairman, President and Chief Executive Officer
(Principal Executive Officer)

**Exhibit 32.2**

**CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

I, Andrew Hubacker, Executive Vice President and Chief Financial Officer and Chief Accounting Officer of UWM Holdings Corporation (the "Company"), do hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to the best of my knowledge:

1. the Annual Report on Form 10-K of the Company for the year ended December 31, 2022 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. information contained in the Report fairly presents, in all material respects, the financial condition and results of the operations of the Company.

Date: March 1, 2023

By: /s/ Andrew Hubacker

Andrew Hubacker
Executive Vice President, Chief Financial Officer and Chief Accounting Officer
(Principal Financial Officer)

# EXHIBIT  B



Transcripts



# UWM Holdings Corporation (UWMC) Q4 2022 Earnings Call Transcript

Mar. 01, 2023 10:18 PM ET | **UWM Holdings Corporation (UWMC)** | 5 Comments

 **SA Transcripts**
138.86K Followers

## Q4: 2023-03-01 Earnings Summary



| Play Call | Press Release | 10-K |

EPS of $0.00 misses by $0.01 | Revenue of $302.43M (-50.05% Y/Y) beats by $7.33M

UWM Holdings Corporation (NYSE:UWMC) Q4 2022 Earnings Conference Call March 1, 2023 10:30 AM ET

**Company Participants**

Blake Kolo - Chief Business Officer & Head of IR

Mat Ishbia - Chairman & CEO

Andrew Hubacker - Chief Financial Officer

**Conference Call Participants**

Bose George - KBW

Eric Hagen - BTIG

Douglas Harter - Credit Suisse

Steven Delaney - JMP Securities

## Operator

Good morning. My name is Chris, and I'll be your conference operator today. At this time, I'd like to welcome everyone to the UWM Holdings Corporation's Fourth Quarter and Full Year 2022 Earnings Conference Call. All lines have been placed on mute to prevent any background noise. After the speakers' remarks, there will be a question-and-answer session. [Operator Instructions] Thank you.

Blake Kolo, you may begin your conference.

## Blake Kolo

Good morning. This is Blake Kolo, Chief Business Officer and Head of Investor Relations. Thank you for joining us and welcome to the fourth quarter and full year 2022 UWM Holdings Corporation's earnings call.

Before we start, I would like to remind everyone that this conference call includes forward-looking statements. For more information about factors that may cause actual results to differ materially from forward-looking statements, please refer to the earnings release that we issued this morning.

I will now turn the call over to Mat Ishbia, Chairman and CEO of UWM Holding Corporation and United Wholesale Mortgage.

## Mat Ishbia

Thanks, Blake, and thank you, everyone, for joining us today. I appreciate you guys being here and looking forward to going through another great quarter and an awesome year here at UWM. 2022 was great across the board. As I've been saying all along, a higher interest rate environment is where you'll see the best mortgage companies separate even further from the rest of the mortgage companies remaining and we definitely saw that happened in 2022.

I'm confident UWM is the best mortgage company in America because of our efficiencies and partnership with mortgage brokers. The broker channel is the best place for consumers to get a loan and the best place for loan officers to work, and we're seeing that happen in front of all of our eyes.

With that being said, UWM is not slowing down. Regardless of interest rates, we continue to invest in our people and our technology. We continue to focus on our effort to help brokers win in the market. Our 54% market share of the broker channel in the fourth quarter is proof for that partnership, has never been stronger. And I'm sure everyone knows on this call, that is an all-time market share record in mortgage and it's truly amazing accomplishment for the broker channel and for UWM as their partner.

Before talking about the fourth quarter, I'd like to touch base on the new -- a few full year financial and business highlights. So first off, best purchase year of all time 2022, about $91 billion. In addition, it's our third best production year with 100 -- over $127 billion of total production. We delivered almost $1 billion in profit in a market where most lenders lost money, were laying people off or went out of business altogether. I'm also very proud to announce that it's our ninth consecutive quarter paying a $0.10 per share dividend, which is close to a 10% yield at today's stock price. I explained nine quarters ago, when we first went public, I feel comfortable paying this dividend in various market environments, and we continue to demonstrate this in best market conditions and even in very tough market conditions. This will continue.

Lastly and most important to me, while my competitors are cutting investments and laying off thousands and thousands of people, we continue to invest in technology, take care of our people and have never laid off a single team member in our 37-year history. I'm extremely proud of our team members and the brokers we are continuing to push forward and grind and ultimately win regardless of the market. 2023 is another huge opportunity for UWM and the broker community to continue to separate ourselves further from our competition, invest in the future and continue to win together as a team.

Now let's look closely at the fourth quarter. We closed $25.1 billion of production for the quarter, about $21.7 billion of this coming from purchase. Brokers are dominant in purchase market, and we see that continue to happen in 2023 and beyond. As I mentioned earlier, UWM has 54% brokers market share in the fourth quarter, the highest share reading ever, up from 41% in the third quarter. There's a 100% result of our commitment to the broker channel. Our partners continue to improve and win regardless of the market.

Helping our partners grow faster than the rest of the market has been a huge part of this success. We'll remain dedicated and committed to helping the mortgage brokers across America, dominate, provide the best service, rates and technology to their consumers, so they can grow in their individual markets as they continue to win as well.

The fourth quarter was our second consecutive quarters in number one overall mortgage lender America. And to add a little perspective on this, we're the -- this is the third consecutive year as the number one purchase lender, the eighth consecutive year as the number one wholesale lender. And as I said before, doing mortgages, look, everyone is doing mortgages, looks decent when rates are low and having success in a purchase market continue to set us apart in high rate purchase market, are you succeeding or are you not? That's a difference you see at UWM.

If you actually look at the market, with brokers being about 20% and us being about 54%, like we're about 11% of the overall mortgage market which is crazy to think about while we only are in the wholesale channel. It's great for brokers. It's great for UWM and we're continuing to win together as a team.

Now in the fourth quarter, we showed a $62.5 million loss, but that's inclusive of about $151 million decrease of fair value of MSRs. So really operationally profitable once again. Our gain margin was 51 basis, well within our guidance. And the momentum with the broker channel has never been stronger in the last six months since announcing game on strategy, as a result of more retail loan officers joining the wholesale channel than ever before.

In addition, the second largest month of all time of retail loan officers converting over was January of this year, just 1.5 months ago. And so amazing numbers, and a lot of that stuff takes six, nine, 12 months for them to actually produce, get going, get license and switch over[ph]. So all of the benefits have still not really come to fruition. We're really proud of the game on strategy and all the great things that's done for the broker community and for UWM as a partner with brokers.

As you can tell, I'm excited about 2023, a year in which we can expect our competitive advantage to continue to become clearer to everybody as we continue to invest in our people, the brokers and our business. We know this formula works because we've seen it in similar market cycles and every time we've emerged stronger and more dominant. Right now, it is not any different.

Case 3:21-cv-00448-BJD-LLL    Document 102    Filed 08/14/23    Page 255 of 357 PageID 1565

Before I turn things over to Andrew Hubacker, I want to congratulate him on officially being named our Chief Financial Officer. He's done great work since joining us over two years ago, and I'm excited for him to continue to take this next step in his career and continue to help UWM grow and be more successful. So Andrew, take it away.

**Andrew Hubacker**

Thanks, Mat. We finished 2022 strong with fourth quarter production volume on the high end of our outlook and gain margin well within the range we expected. Our fourth quarter profitability was impacted by negative MSR fair value marks, but we delivered strong net income for 2022 in a challenging and volatile mortgage market.

The rising rate environment throughout the year resulted in positive MSR fair value marks, but our core purchase business was strong in 2022 with the year-over-year increase in purchase origination volume. We've said this before, but it's worth repeating. Our servicing portfolio remains very strong, with a total UPB of approximately $312 billion as of the end of 2022, as newly originated and retained MSRs largely kept pace with sales and payoffs throughout the year.

With a low ac and very low delinquencies and high asset quality, our MSR portfolio remains strong and continues to provide balance to our business model, a recurring quarterly cash flow stream and a strategic source of additional liquidity if and when we choose to sell our MSRs in the bulk secondary market.

On the call last quarter, we discussed steps we took in Q3 to further enhance our access to liquidity, which included establishing a line of credit secured by our agency MSRs. Our available borrowing capacity on the secured facility was $750 million at the end of the year and our total available liquidity increased to approximately $2.1 billion as of the end of 2022 compared to just over $700 million at the end of 2021. We believe the measures we took last year and plan to continue to take in 2023 to enhance our liquidity will allow for our continued investments in growing both the wholesale channel and our market share.

On the cost side, we continue to focus on prudent cost management in the current origination environment. Excluding the impact of an incremental addition to our repurchase reserves recorded in Q4 due to changes in estimates and increased interest expense from borrowings under secured line of credit, total expenses decreased in Q4. Year-to-date, total operational expenses are also down as our cost structure aligns with the current mortgage origination environment.

Okay, turn things back over to our Chairman and CEO, Mat Ishbia, for some closing remarks.

**Mat Ishbia**

Yes. Thanks a lot, Andrew. Before the Q&A, I want to make a quick few points to everybody, 2023 will be the year that continues to separate the best lenders from the rest, okay? We'll continue to support the broker channel, do everything we can to help them be successful and continue to grow.

At UWM, we're investing in people, process, technology, continuing to deliver the best service experience for our brokers. In fact, this year, we're expecting to have 20,000-plus loan officers out to our campus to get trained, improve their game and continue to grow their business, including as many of you guys know, UWM LIVE! which has been a huge success.

Many of you guys actually on the call were at last year, but you can come again this year, it's May 4. We expect to have that to be the biggest mortgage event of the year in all the industry here at UWM, I'll be speaking at it. Tony Robbins will be speaking at it. We'll have a couple of great brokers. There will be a great all-around event. We'd love to have a couple of you out there.

Lastly, I want to touch on [indiscernible] I think is undervalued by the investment community. We have control of our business. The decisions we make are intentional. And for the long-term success of the business, what I continue to tell you on these calls continues to happen quarter over quarter over quarter. I think we continue to demonstrate having great control of our margins and our business in general. I've consistently said that 75 to 100 of annualized margin is what you can expect in a really purchase heavy market or a higher rate environment. And as you saw, the full year ended in that range. And now we're back to guiding that range again for Q1

2023.

So realize, with that said, we expect Q1 production to be between $16 billion and $23 billion, and our margins would be in the range of 75 to 100 basis points. We have complete control of our business, complete control of our margins, complete control of what's going on here at UWM and that we've been consistent with our message on strategy and the results have shown that.

I want to thank our amazing team members at UWM for a great year in 2022, and we look forward to dominating again in 2023.

I'll pause now and turn it back over to Q&A for all of you guys and look forward to answering some of your questions.

## Question-and-Answer Session

### Operator

[Operator Instructions] The first question is from Bose George with KBW. Your line is open.

### Bose George

Hey, good morning. So I wanted to start with a question just on market share. Obviously, a very impressive level just in terms of both the share overall and of the broker channel. Just can you remind us where you think the broker channel as a whole could go to? And that with your share at 54%, do you think that's peaked? And where do you think that trends?

### Mat Ishbia

Yes. Thanks for the question. I appreciate it. So if you go back to the roadshow when we went on public, and that's why I think it's important people go back and what we said then is happening now. What I said back then was, hey, UWM could get to 40% market share in the channel and the broker channel should be 30% of the overall market.

I said 33% by 2025, 2026, like, I stated that stuff. I still believe in those numbers. 54% is off the charts crazy, right? 11% of the overall market, right? But what I told you back then, 40% of the broker channel, 30% of the overall channel -- of the overall industry's brokers would be about 12% of our market share. That's kind of what I still see the trend.

Do I think UWM will stay 54% forever? No. But I do think UWM, 11%, 12% of the overall market is very realistic. And if you look at what we said back [Technical Difficulty] we're a lot less impacted by the cycle as everyone else. Like no one expected 2022, and we still made about $1 billion. We are very competitive and very successful in market share and profitability, and we continue to pay the dividend.

So the way I look at the market share, the broker channel will get to 30%, then eventually 33%, I think I stated by 2025 or 2026. We will -- our belief is going to be 40%-plus of that market share. So 40% of a bigger pie being 11%, 12% of the mortgage market in general, one out of every eight or nine loans in America, we're pretty proud of that, especially in a purchase market.

**Bose George**

Okay, great. Makes sense. Thank you. And then just one on the margin guidance. Just to increase -- does that imply that is Game On being sort of playing a smaller role in the first quarter?

**Mat Ishbia**

Yes. So, the way I look at it is, Game On has made a big impact. We still have very, very competitive pricing. That's why the margins are still in that 75 to 100 range. But as I told you, I have control of it. I decide when we want to change things and tweak things and we've done things to help our brokers in certain ways, and we have different initiatives out there to help brokers succeed and excel. I don't know if it's your phone, but – sorry, no worries, it's all good.

And so, as you can see with Game On, our pricing is still extremely competitive. Brokers have extremely competitive pricing, it's helping them grow their business right now. But we aren't going to be at that investment of being at 50 basis point margins, as you saw for two quarters. I don't expect that to continue unless I decide to do it again in the future. Right now, I have no expectation of that. [Technical Difficulty] and I think that is just a belief because you'll see everyone else will follow because we do control the margins in this industry.

**Bose George**

Okay, great. Thanks a lot.

**Operator**

The next question is from Eric Hagen with BTIG. Your line is open.

**Eric Hagen**

Hey, good morning. Good to hear from you, guys. Maybe I've got a couple of questions. We know that the interest rate buy-downs have been popular for borrowers that are confronting affordability challenges. Are there any limitations that you see to continue offering that solution if rates head even higher and just maybe how valuable is that opportunity going forward?

**Mat Ishbia**

Yes. Thanks for the question, Eric. Appreciate it. So the buy-down opportunity is great. It's a 2-1 buy-down 1-0 buy-down and even a 3-2-1 buy-down. And I think the key is mortgage brokers are knowledgeable. They understand they have those options [Technical Difficulty] those are still viable. Those will continue to be viable. Those don't go away or change. Those are very good opportunities. And whether it affects affordability or really what they more for us to give a borrower the consistency of a 30-year fix, but the lower rate or the lower payment for the first two or three years or one year, depending on the buy-down of the buy-down product.

And it's been a very successful product instead of real estate agents and sellers lowering their price, you can contribute towards a buy-down and it creates opportunity. We're seeing a lot of it, and it's been very successful. And we're the largest purchase lender in the country, we're kind of leading on that, and people are using it quite a bit right now.

**Eric Hagen**

Yes. That's really helpful detail. So there's lots of focus out there on bulk MSR supply and they're being a pretty robust pipeline. I'm just curious how you guys are thinking about the opportunity and sort of the value in selling MSRs against that backdrop, even how you think about doing that versus drawing against the MSR financing that you have? Thank you, guys.

**Mat Ishbia**

Yes. Thanks for the question on that, too. So, I think there is a lot more made out of this crazy amount of supply hitting the market. I think that's a little bit more of a fun media story than a reality. UWM's liquidity is extremely strong. We think the MSR market is actually more liquid than you guys are recognizing and we're taking advantage of that. If we want to, we have complete control of it.

We can either, A, tap the MSR line, as you pointed out; or B, sell MSRs, sell the -- we have all different options. Liquidity is not a concern. [indiscernible] liquidity is always a concern in any mortgage business. It's not a concern for UWM with a great job at our finance team and our MSR sales team. Everyone has been doing to make sure that we don't have to think about that stuff.

And so we're opportunistic. We're in exactly the position we want to be. Our MSR book is strong. It produces a lot of liquidity. And at the same time if we want to sell, we can sell that as well. And so I think a lot more has been made of this [Technical Difficulty] because of who we are, that people want to buy our servicing. And when you're a company that's maybe struggling, people don't want to buy your service because of rep and warrants and other things. We're the strongest mortgage company in America, period, and people know that. So for us, it's not an issue. I don't think it's as much of an issue as people make, but maybe it's a little more for some of the weaker counterparties.

### Eric Hagen

Yes. That's helpful detail. Thanks you, guys, very much.

### Operator

The next question is from Doug Harter with Credit Suisse. Your line is open.

### Douglas Harter

Thanks. Just -- I apologize if this is asked, but just can you talk about how you think your market share trends as you kind of have pulled back from gain on and how sticky kind of the additions that -- of brokers that you have added will be?

### Mat Ishbia

Yes. Thanks for the question. So Doug, I think I talked about it even when we rolled out Game On, that the expectation of what I consider success on it. And my expectation is Game On was not a market share play, it obviously helped market share. It was -- let's grow the broker channel play. Help the loan officer in the broker channel get new realties, build relationships, win more loans, continue to educate consumers that -- and educate the markets, what you guys have it be happy to road, it's $9,400 cheaper to go through a mortgage broker than a retail lender or a mega bank. That's why the big mega banks, you heard as well back out. You see rocket falling through the ground. All these companies are really struggling because they are charging so much more to consumers.

Game On accelerates that and shows even more. And so it's going to be very interesting to watch and see how that happens and that [Technical Difficulty] and then market share obviously went up. Do I expect the market share to stay at 54%? No, I probably don't expect it to stay there, but I never expected it to get there to be clear.

What we said was, "Hey, can we get over 40% and maintain in that level? We've seen this happen before. We did this. This isn't like a new thing. We just went public last time I did it back in 2019. We've seen it. We know the stickiness. We understand how to control the stickiness and make sure clients understand the value because it wants a loan officer. And you can call any loan officer you want, Doug, in the mortgage, go to find at mortgagebroker.com, call loan officer and ask them. And they'll say, once you use UWM, you realize it's faster, it's easier, it's cheaper. They look good to dealers. They look good to consumers. Why would they not use UWM?

And so Game On helped bring a couple of those loan officers to use UWM that hadn't in a while and they see it. They're going to see the value of UWM, and they're going to stick with us for the long-term. We've seen it happen before. You'll see it play out. It will happen quarter-on-quarter [Technical Difficulty] stay 54%, I don't think so, but it will be higher market share than I had before it, absolutely without question.

**Douglas Harter**

Appreciate that. Thanks, Mat.

**Mat Ishbia**

Thank you.

**Operator**

The next question is from Steve Delaney with -- who is a research analyst. Your line is open.

**Steven Delaney**

Thanks. Good morning, Mat and everyone at UWM. A lot of focus, obviously, on originations side of the business, but love to talk about servicing for a bit. Rising rates where the economy really hasn't broken from an employment standpoint yet.

But at some point, the higher rates are going to have an impact. Just curious if you're seeing any increase in delinquency, special servicing, servicing advances that obviously follow delinquency? And are your cost per unit on the servicing side of the business -- are you seeing any pressure there that those are moving higher? Thanks.

**Mat Ishbia**

Yes. So thank you for the question and the focus on the servicing, I understand that is important. And so what we've done differently is this, it's just not been effective, no impact at all, right? And so our delinquencies. One thing that people don't give us credit for us, although we're the largest lender in the country, I focus on being the best lender in the country. We've been the best for years. The delinquency rate at UWM is lower than almost anyone in the country. The FICO scores of the loans UWM does is the highest in the country. So I'm not just comparing to other nonbanks, I'm looking at banks, nonbanks, credit unions. We are the lead on this. And so our delinquency rate is less than one -- the numbers are just aren't impacting. So lower delinquency rates we have, better credit quality, which we have, not doing the loans like we don't go below [Technical Difficulty] lower credit scores. They're trying to do -- they're doing riskier loans. We just don't do it. And so therefore, my servicing costs stay low.

My delinquencies stay low. My concerns about employment going -- unemployment going up, impacting -- it's less of an impact. We're like the same thing on the [indiscernible]. We're less cyclical. We're less impacted. We're a little bit more protected on the same exact thing because of our business strategy and business model on the type of loans we do.

**Steven Delaney**

That's helpful. And just one last comment and question, I guess, is, look, it's been widely publicized that you've been successful in your bid to acquire a leading NBA franchise. So congratulations on that interesting and exciting part of your life. I guess from an investor standpoint in UWMC, what could you say to your investors or would you, if you can, what impact, if any, on that successful business opportunity. What impact could that have on your equity commitment to UWMC going forward because of that new opportunity? Thank you.

### Mat Ishbia

So thank you for the question. So first off, yes, really excited about the Phoenix Suns and Phoenix Mercury as something completely outside of UWM and been a lifelong dream and something I'm excited to be involved with. With that being said, there's actually zero impact. Actually, I'd reverse that and say there's probably a positive impact on UWM and my leadership here, not only the notoriety of me, but the broker channel in general and educating consumers. I have a bigger platform personally, more people following me, more people listen to me, more people learning and being educated by brokers. It's only going to help. It's not taking any more of my time.

I actually can argue that I spend more time trying to research to find the right thing and getting lucky enough to get the Suns and Mercury was like of the lead. But I actually think I have more time on my hands now that I'm not chasing a team and trying to find the right thing for me and then I actually can focus on UWM. And so it will have zero impact is probably what I would say, but I would probably say, on the reverse side, a positive impact on UWM in the broker channel and consumers with the new platform we have. Thank you.

### Steven Delaney

Thank you. Appreciate it.

### Blake Kolo

Are there any other question. I feel like there is some in the queue. May be --

### Mat Ishbia

Operator. Is there any other question. I see some in the queue. If not, we can close the meeting now. But I want to make sure I answered those couple of questions that are out there. One again. Operator, are there -- it looks like there is questions in the queue. I see couple of different analyst. I don't know if you can open up the line for -- it looks like Kevin Barger. I hope he can speak.

All right. Well, I think there's some issue with the operator. If anyone wants to reach out. I see Kevin, I see a couple of questions there. You can reach out to Blake Kolo. He's Business Officer, Head of Investor Relations. You can also -- I'm happy to jump on a call. But I guess I'll close with this.

Amazing 2022 UWM. 2023, I'm so optimistic about and excited about the opportunity ahead. We are the biggest and best mortgage company in the country. We will maintain that and continue to grow and dominate, take the market share, continue to help brokers win and help consumers across the board and UWM and our investors are going to be excited about it with the dividend and all the great things we've got going. So thanks for the questions. We're excited about 2023 [Technical Difficulty].

Read more current UWMC analysis and news

View all earnings call transcripts

# Recommended For You


**Ford's Growing Dominance In The EV Market Expands Globally**
Nathan Aisenstadt


**Lumen Technologies: Few Things Go To Zero**
Brett Ashcroft Green


**Nvidia: Top AI Stock - Much More Upside Likely Ahead (Rating Upgrade)**
Victor Dergunov


**The Hunt For Potential 10x Returns: Enphase Is Growing Its Market, Very Profitably**
Philip Eriksson



**Walgreens Is Cheap For A Reason: 2 Better 7+% Yielding Dividend Aristocrat Buys**

Dividend Sensei

# Comments (5)

Sort by   

**hueyuh1**                        01 Mar. 2023, 11:56 PM

 Premium    Comments (2.44K)   |   + Follow

Mat Ishbia comments concerning the dividend:

I'm also very proud to announce that it's our ninth consecutive quarter paying a $0.10 per share dividend, which is close to a 10% yield at today's stock price. I explained nine quarters ago, when we first went public, I feel comfortable paying this dividend in various market environments, and we continue to demonstrate this in best market conditions and even in very tough market conditions. This will continue.

Like no one expected 2022, and we still made about $1 billion. We are very competitive and very successful in market share and profitability, and we continue to pay the dividend. So the way I look at the market share, the broker channel will get to 30%, then eventually 33%, I think I stated by 2025 or 2026. We will -- our belief is going to be 40% plus of that market share.

      Like (1)

**kingRIG2.0**                        02 Mar. 2023, 4:54 AM

Comments (9.6K)   |   + Follow

@hueyuh1 you still have to wonder how long can they keep paying that dividend

      Like (2)

Case 3:21-cv-00448-BJD-LLL   Document 102   Filed 08/14/23   Page 266 of 357 PageID 1576



**hueyuh1**                                                    02 Mar. 2023, 9:08 AM

Premium   Comments (2.44K)   |   + Follow

*@kingRIG2.0* True. Interesting reading the transcript and how Ishbia kept referring to himself as the one making all the rules for the company and the industry. He certainly comes across as a mix of self-confident, pompous, and a showman.

→ Reply        👍 Like (1)

**desicon**                                                   02 Mar. 2023, 1:36 PM

Comments (2.34K)   |   + Follow

*@kingRIG2.0* What made you wonder?

→ Reply        👍 Like

See More Replies

To report an error in this transcript, click here.Contact us to add your company to our coverage or use transcripts in your business. Learn more about Seeking Alpha transcripts here. Your feedback matters to us!

# EXHIBIT C





# UWM Holdings Corporation Announces Fourth Quarter & Full Year 2022 Results

*UWM Remains America's #1 Overall Mortgage Lender in the Fourth Quarter*
*Fourth Quarter Loan Origination Volume of $25.1 billion, including Purchase Volume of $21.7 billion*
*$931.9 million in FY 2022 Net Income*

March 01, 2023 08:30 AM Eastern Standard Time

PONTIAC, Mich.--(BUSINESS WIRE)--**UWM Holdings Corporation (NYSE: UWMC)** (the "Company"), the publicly traded indirect parent of United Wholesale Mortgage ("UWM"), today announced its results for the fourth quarter and full year ended December 31, 2022. For the second consecutive quarter, UWM is the number one overall mortgage lender in the U.S. Total loan origination volume for the fourth quarter was $25.1 billion, of which $21.7 billion was purchase volume. The Company's net income for 2022 was $931.9 million and diluted earnings per share was $0.45. For 4Q22, the Company reported a net loss of $62.5 million, inclusive of a $150.8 million decline in fair value of MSRs, and diluted loss per share of $(0.03).

Mat Ishbia, Chairman and CEO of UWMC, said, "2022 was a historic year for UWM. Becoming the #1 overall mortgage lender in America, while originating mortgage loans exclusively through the wholesale channel, demonstrates our unrelenting commitment to the broker channel. We also delivered earnings of $931.9 million and have continued to reward our shareholders with consistent dividends. In 2023, we will continue to invest in technology to serve the broker channel and products that put brokers in a position to win. As we have done in other purchase-centric markets, we plan to grow market share and emerge stronger to better capitalize on the next boom."

**Fourth Quarter 2022 Highlights**

- Originations of $25.1 billion in 4Q22, compared to $33.5 billion in 3Q22 and $55.2 billion in 4Q21

- Purchase originations of $21.7 billion in 4Q22, compared to $27.7 billion in 3Q22 and $24.5 billion in 4Q21

- Net loss of $62.5 million in 4Q22 compared to $325.6 million of net income in 3Q22 and $239.8 million of net income in 4Q21

- Total gain margin of 51 bps in 4Q22 compared to 52 bps in 3Q22 and 80 bps in 4Q21

Cookies Settings

Accept All Cookies

By clicking "Accept All Cookies", you agree to the storing of cookies on your device to enhance site navigation, analyze site usage, and assist in our marketing efforts.

Cookie Policy  (https://services.businesswire.com/cookie-policy)

- Total equity of $3.2 billion at December 31, 2022, compared to $3.4 billion at September 30, 2022 and $3.2 billion at December 31, 2021

- Unpaid principal balance of MSRs of $312.5 billion with a WAC of 3.64% at December 31, 2022, compared to $306.0 billion with a WAC of 3.44% at September 30, 2022, and $319.8 billion with a WAC of 2.94% at December 31, 2021

- Ended 4Q22 with approximately $2.1 billion of available liquidity, including $886.2 million of cash and self-warehouse, and $1.25 billion of available borrowing capacity, which includes $750 million under a line of credit secured by agency MSRs, and $500 million under an unsecured line of credit

- Achieved 11% share of the overall mortgage market and 54% share of the wholesale channel for 4Q22

**Full Year 2022 Highlights**

- Originations of $127.3 billion in 2022, compared to $226.5 billion in 2021

- Record purchase originations of $90.8 billion in 2022, compared to $87.3 billion in 2021

- Net income of $931.9 million in 2022 inclusive of a $284.1 million increase in fair value of MSRs, as compared to $1.6 billion of net income in 2021 inclusive of $587.8 million decline in fair value of MSRs

- Total gain margin of 77 bps in 2022 compared to 114 bps in 2021

- Largest wholesale mortgage lender in the U.S. by closed loan volume eight years in a row, with approximately 38% market share of the wholesale channel for the year ended December 31, 2022

- Achieved 8% share of the overall mortgage market for the year ended December 31, 2022

By clicking "Accept All Cookies", you agree to the storing of cookies on your device to enhance site navigation, analyze site usage, and assist in our marketing efforts.
**Cookie Policy (https://services.businesswire.com/cookie-policy)**

**Production and Income Statement Highlights** (dollars in thousands, except per share amounts)

|  | Q4 2022 | Q3 2022 | Q4 2021 | FY 2022 | FY 2021 |
|---|---|---|---|---|---|
| Loan origination volume[1] | **$25,126,844** | $33,464,480 | $55,194,365 | **$127,285,461** | $226,503,692 |
| Total gain margin[1][2] | **0.51%** | 0.52% | 0.80% | **0.77%** | 1.14% |
| Net income (loss) | **$ (62,484)** | $ 325,610 | $ 239,826 | **$ 931,858** | $ 1,568,400 |
| Diluted EPS | **(0.03)** | 0.13 | 0.11 | **0.45** | 0.66 |
| Adjusted diluted EPS[3] | **N/A** | 0.16 | N/A | **0.45** | N/A |
| Adjusted net income[3] | **(53,308)** | 254,294 | 177,215 | **719,415** | 1,206,407 |
| Adjusted EBITDA[3] | **60,393** | (1,392) | 206,567 | **282,402** | 1,418,337 |

(1) Key operational metric (see discussion below)

(2) Represents total loan production income divided by loan origination volume

(3) Non-GAAP metric (see discussion and reconciliations below)

**Balance Sheet Highlights as of Period-end** (dollars in thousands)

|  | Q4 2022 | Q3 2022 | Q4 2021 |
|---|---|---|---|
| Cash and cash equivalents | **$ 704,898** | $ 799,534 | $ 731,088 |
| Mortgage loans at fair value | **7,134,960** | 5,031,068 | 16,909,901 |
| Mortgage servicing rights | **4,453,261** | 4,305,686 | 3,314,952 |
| Total assets | **13,600,625** | 11,890,083 | 22,528,358 |
| Non-funding debt [1] | **2,880,178** | 2,146,157 | 2,158,911 |
| Total equity | **3,171,693** | 3,392,033 | 3,171,001 |
| Non-funding debt to equity [1] | **0.91** | 0.63 | 0.68 |

(1) Non-GAAP metric (see discussion and reconciliations below)

**Mortgage Servicing Rights** (dollars in thousands)

|  | Q4 2022 | Q3 2022 | Q4 2021 |
|---|---|---|---|
| Unpaid principal balance | **$ 312,454,025** | $ 306,016,670 | $ 319,807,457 |
| Weighted average interest rate | **3.64%** | 3.44% | 2.94% |
| Weighted average age (months) | **16** | 14 | 9 |

**Operational Highlights**

- Achieved highest ever Net Promoter Score of +90.0 in 4Q22, up from +87.1 in 4Q21

- Our 0.85% 60+ days delinquency and our 0.65% forbearance rates, as of December 31, 2022, are significantly better than the industry averages of 2.0%[1] and 0.70%,[2] respectively, highlighting our strong credit quality

By clicking "Accept All Cookies", you agree to the storing of cookies on your device to enhance site navigation, analyze site usage and assist in our marketing efforts.

**Cookie Policy (https://services.businesswire.com/cookie-policy)**

**Product and Investor Mix – Unpaid Principal Balance of Originations** (dollars in thousands)

| Purchase: | Q4 2022 | Q3 2022 | Q4 2021 | FY 2022 | FY 2021 |
|---|---|---|---|---|---|
| **Conventional** | **$15,030,972** | 19,246,298 | $16,643,586 | **$ 62,274,030** | $ 63,026,794 |
| **Government** | **6,135,366** | 7,592,116 | 4,996,092 | **23,773,422** | 14,833,808 |
| **Jumbo and other** | **484,098** | 854,925 | 2,861,921 | **4,782,879** | 9,395,143 |
| **Total Purchase** | **$21,650,436** | 27,693,339 | $24,501,599 | **$ 90,830,331** | $ 87,255,745 |

| Refinance: | Q4 2022 | Q3 2022 | Q4 2021 | FY 2022 | FY 2021 |
|---|---|---|---|---|---|
| **Conventional** | **$ 2,254,680** | 3,935,550 | $25,032,327 | **$ 27,059,252** | $120,152,065 |
| **Government** | **1,005,048** | 1,640,127 | 3,586,086 | **7,834,636** | 12,034,583 |
| **Jumbo and other** | **216,680** | 195,464 | 2,074,353 | **1,561,242** | 7,061,299 |
| **Total Refinance** | **$ 3,476,408** | 5,771,141 | $30,692,766 | **$ 36,455,130** | $139,247,947 |
| **Total Originations** | **$25,126,844** | 33,464,480 | $55,194,365 | **$127,285,461** | $226,503,692 |

[1] Source: CoreLogic (as of November 2022); [2] Source: Mortgage Bankers Association.

Mat Ishbia, Chairman and CEO of UWMC, also said, "I want to give a huge thank you to everyone at UWM. It is because of the dedication of our team members and the broker community that 2022 was a historic year. Rest assured, we will not relax in 2023 as there is still much work to be done."

**First Quarter 2023 Outlook**

We anticipate first quarter production to be in the $16 to $23 billion range, with gain margin from 75 to 100 basis points.

**Dividend**

Subsequent to December 31, 2022, for the ninth consecutive quarter, the Company's Board of Directors declared a cash dividend of $0.10 per share on the outstanding shares of Class A common stock. The dividend is payable on April 11, 2023, to stockholders of record at the close of business on March 10, 2023. Additionally, the Board approved a proportional distribution to SFS Corp., which is payable on April 11, 2023.

**Earnings Conference Call Details**

As previously announced, the Company will hold a conference call for financial analysts and investors on Wednesday, March 1, at 10:30 AM ET to review the results and answer questions. Interested parties may register for a toll-free dial-in number by visiting:

- https://conferencingportals.com/event/YModynrv

Please dial in at least 15 minutes in advance to ensure a timely connection to the call. Audio webcast, taped replay and a transcript will be available on the Company's investor relations website at https://investors.uwm.com/.

**Key Operational Metrics**

"Loan origination volume" and "Total gain margin" are key operational metrics that the Company's management uses to evaluate the performance of the business. "Loan origination volume" is the aggregate principal of the residential mortgage loans originated by the Company during a period. "Total gain margin" represents total loan production income divided by loan origination volume for the applicable periods.

By clicking "Accept All Cookies", you agree to the storing of cookies on your device to enhance site navigation, analyze site usage, and assist in our marketing efforts.

**Cookie Policy (https://services.businesswire.com/cookie-policy)**

the Company's net income for periods presented does not reflect a significant income tax provision since UWM (the Company's accounting predecessor) is a pass-through entity not subject to federal and most state income taxes. For periods commencing with the first quarter of 2021, the Company's net income does not reflect the income tax provision that would otherwise be reflected if 100% of the economic interest in UWM was owned by the Company. Therefore, for comparison purposes, the Company provides "Adjusted net income," which is our pre-tax income adjusted for a 23.03% and 23.56% estimated annual effective tax rate for the periods during 2022 and 2021, respectively. "Adjusted net income" is a non-GAAP Metric. "Adjusted diluted EPS" is defined as "Adjusted net income" divided by the weighted average number of shares of Class A common stock outstanding for the applicable period, assuming the exchange and conversion of all outstanding Class D common stock for Class A common stock, and is calculated and presented for periods in which the assumed exchange and conversion of Class D common stock to Class A common stock is anti-dilutive to EPS.

We also disclose Adjusted EBITDA, which we define as earnings before interest expense on non-funding debt, provision for income taxes, depreciation and amortization, stock-based compensation expense, the change in fair value of MSRs due to valuation inputs or assumptions, the impact of non-cash deferred compensation expense, the change in fair value of the Public and Private Warrants, the change in Tax Receivable Agreement liability and the change in fair value of retained investment securities. We exclude the change in Tax Receivable Agreement liability, the change in fair value of the Public and Private Warrants, the change in fair value of retained investment securities, and the change in fair value of MSRs due to valuation inputs or assumptions, as these represent non-cash, non-realized adjustments to our earnings, which is not indicative of our performance or results of operations. Adjusted EBITDA includes interest expense on funding facilities, which are recorded as a component of interest expense, as these expenses are a direct operating expense driven by loan origination volume. By contrast, interest expense on non-funding debt is a function of our capital structure and is therefore excluded from Adjusted EBITDA.

In addition, we disclose "Non-funding debt" and the "Non-funding debt to equity ratio" as a non-GAAP metric. We define "Non-funding debt" as the total of the Company's senior notes, lines of credit, borrowings against investment securities, equipment note payable, and finance leases and the "Non-funding debt to equity ratio" as total non-funding debt divided by the Company's total equity.

Management believes that these non-GAAP metrics provide useful information to investors. These measures are not financial measures calculated in accordance with GAAP and should not be considered as a substitute for any other operating performance measure calculated in accordance with GAAP, and may not be comparable to a similarly titled measure reported by other companies.

The following tables set forth the reconciliations of these non-GAAP financial measures to their most directly comparable financial measure calculated in accordance with GAAP (dollars in thousands, except per share amounts):

| Adjusted net income | Q4 2022 | Q3 2022 | Q4 2021 | FY 2022 | FY 2021 |
|---|---|---|---|---|---|
| Earnings before income taxes | $(69,258) | $330,381 | $231,836 | $ 934,669 | $1,578,241 |
| Impact of estimated annual effective tax rate of 23.03% and 23.56% for periods during 2022 and 2021, respectively | 15,950 | (76,087) | (54,621) | (215,254) | (371,834) |
| Adjusted net income | $(53,308) | $254,294 | $177,215 | $ 719,415 | $1,206,407 |

By clicking "Accept All Cookies", you agree to the storing of cookies on your device to enhance site navigation, analyze site usage, and assist in our marketing efforts.
**Cookie Policy (https://services.businesswire.com/cookie-policy)**

| Adjusted diluted EPS | Q3 2022 | FY 2022 |
|---|---|---|
| Diluted weighted average Class A common stock outstanding | 92,571,886 | 92,475,170 |
| Assumed pro forma conversion of Class D common stock [1] | 1,502,069,787 | 1,502,069,787 |
| Adjusted diluted weighted average shares outstanding [1] | 1,594,641,673 | 1,594,544,957 |
| **Adjusted net income** | $ 254,294 | $ 719,415 |
| **Adjusted diluted EPS** | 0.16 | 0.45 |

[1] Reflects the pro forma exchange and conversion of antidilutive Class D common stock to Class A common stock.

| Adjusted EBITDA | Q4 2022 | Q3 2022 | Q4 2021 | FY 2022 | FY 2021 |
|---|---|---|---|---|---|
| Net income | **$(62,484)** | $ 325,610 | $239,826 | **$ 931,858** | $1,568,400 |
| Interest expense on non-funding debt | **43,611** | 29,786 | 25,417 | **132,647** | 86,086 |
| Provision for income taxes | **(6,774)** | 4,771 | (7,990) | **2,811** | 9,841 |
| Depreciation and amortization | **11,713** | 11,426 | 10,422 | **45,235** | 35,098 |
| Stock-based compensation expense | **2,055** | 1,986 | 2,014 | **7,545** | 6,467 |
| Change in fair value of MSRs due to valuation inputs or assumptions | **71,865** | (373,232) | (65,104) | **(868,803)** | (286,348) |
| Deferred compensation, net | **461** | (8,468) | (2,135) | **7,370** | 21,900 |
| Change in fair value of Public and Private Warrants | **54** | (755) | (5,161) | **(7,683)** | (36,105) |
| Change in Tax Receivable Agreement liability | **—** | — | 8,537 | **3,200** | 11,937 |
| Change in fair value of investment securities | **(108)** | 7,484 | 741 | **28,222** | 1,061 |
| **Adjusted EBITDA** | **$ 60,393** | $ (1,392) | $206,567 | **$ 282,402** | $1,418,337 |

| Non-funding debt and non-funding debt to equity | Q4 2022 | Q3 2022 | Q4 2021 |
|---|---|---|---|
| Senior notes | $ **1,984,336** | $ 1,983,099 | $ 1,980,112 |
| Borrowings against investment securities | **101,345** | 114,875 | 118,786 |
| Secured line of credit | **750,000** | — | — |
| Equipment note payable | **992** | 1,266 | 2,046 |
| Finance lease liability | **43,505** | 46,917 | 57,967 |
| **Total non-funding debt** | $ **2,880,178** | $ 2,146,157 | $ 2,158,911 |
| **Total equity** | $ **3,171,693** | $ 3,392,033 | $ 3,171,001 |
| **Non-funding debt to equity** | **0.91** | 0.63 | 0.68 |

By clicking "Accept All Cookies", you agree to the storing of cookies on your device to enhance site navigation, analyze site usage, and assist in our marketing efforts.
**Cookie Policy (https://services.businesswire.com/cookie-policy)**

**Cautionary Note Regarding Forward-Looking Statements**

generally identified by the use of words such as "anticipate," "believe," "estimate," "expect," "intend," "may," "plan," "potential," "predict" and similar words indicating that these reflect our views with respect to future events. Forward-looking statements in this press release and our earnings call include statements regarding: (1) our position amongst our competitors and ability to capture market share; (2) growth of the wholesale and broker channels, the impact of our strategies on such growth and the benefits to our business of such growth; (3) our growth to remain the leading mortgage lender, and the timing and drivers of that growth; (4) the benefits and liquidity of our MSR portfolio; (5) our beliefs related to the amount and timing of our dividend; (6) our "Game On" strategy and its impact on our business and industry; (7) our foundation and strategies for success and growth and the drivers of that growth; (8) our expectations related to production and margin in the first quarter of 2023; (9) our "All-In" initiative and its impact on our business and industry; (10) our performance in shifting market conditions and the comparison of such performance against our competitors; (11) our ability to produce results at or above prior levels and strategies for producing such results; (12) our position and ability to capitalize on opportunities and the impacts to our results; (13) our investments in technology and the impact to our operations and financial results; and (14) our purchase production and product mix. These statements are based on management's current expectations, but are subject to risks and uncertainties, many of which are outside of our control, and could cause future events or results materially differ from those stated or implied in the forward-looking statements, including (i) UWM's dependence on macroeconomic and U.S. residential real estate market conditions, including changes in U.S. monetary policies that affect interest rates; (ii) UWM's reliance on its warehouse facilities and the risk of a decrease in the value of the collateral underlying certain of its facilities causing an unanticipated margin call; (iii) UWM's ability to sell loans in the secondary market; (iv) UWM's dependence on the government-sponsored entities such as Fannie Mae and Freddie Mac; (v) changes in the GSEs, FHA, USDA and VA guidelines or GSE and Ginnie Mae guarantees; (vi) UWM's dependence on Independent Mortgage Advisors to originate mortgage loans; (vii) the risk that an increase in the value of the MBS UWM sells in forward markets to hedge its pipeline may result in an unanticipated margin call; (viii) UWM's inability to continue to grow, or to effectively manage the growth of its loan origination volume; (ix) UWM's ability to continue to attract and retain its Independent Mortgage Advisor relationships; (x) UWM's ability to implement technological innovation; (xi) UWM's ability to continue to comply with the complex state and federal laws, regulations or practices applicable to mortgage loan origination and servicing in general; and (xii) other risks and uncertainties indicated from time to time in our filings with the Securities and Exchange Commission including those under "Risk Factors" therein. With respect to expectations regarding the share repurchase program, the amount and timing of share repurchases will depend upon, among other things, market conditions, share price, liquidity targets and regulatory requirements. We wish to caution readers that certain important factors may have affected and could in the future affect our results and could cause actual results for subsequent periods to differ materially from those expressed in any forward-looking statement made by or on behalf of us. We undertake no obligation to update forward-looking statements to reflect events or circumstances after the date hereof.

**About UWM Holdings Corporation and United Wholesale Mortgage**

Headquartered in Pontiac, Michigan, UWM Holding Corporation (UWMC) is the publicly traded indirect parent of United Wholesale Mortgage, LLC ("UWM"). UWM is the nation's largest home mortgage lender, despite exclusively originating mortgage loans through the wholesale channel. UWM has been the largest wholesale mortgage lender for eight consecutive years and is also the largest purchase lender in the nation. With a culture of continuous innovation of technology and enhanced client experience, UWM leads the market by building upon its proprietary and exclusively licensed technology platforms, superior service and focused partnership with the independent mortgage broker community. UWM originates primarily conforming and government loans across all 50 states and the District of Columbia. For more information, visit uwm.com or call 800-981-8898. NMLS #3038.

By clicking "Accept All Cookies", you agree to the storing of cookies on your device to enhance site navigation, analyze site usage, and assist in our marketing efforts.

**Cookie Policy (https://services.businesswire.com/cookie-policy)**

**UWM HOLDINGS CORPORATION**

**CONSOLIDATED BALANCE SHEETS**

**(in thousands, except shares and per share amounts)**

| | December 31, 2022 | December 31, 2021 |
|---|---|---|
| **Assets** | | |
| Cash and cash equivalents | $ 704,898 | $ 731,088 |
| Mortgage loans at fair value | 7,134,960 | 16,909,901 |
| Derivative assets | 82,869 | 67,356 |
| Investment securities at fair value, pledged | 113,290 | 152,263 |
| Accounts receivable, net | 383,147 | 415,691 |
| Mortgage servicing rights | 4,453,261 | 3,314,952 |
| Premises and equipment, net | 152,477 | 151,687 |
| Operating lease right-of-use asset, net | | |
| (includes $102,322 and $104,595 with related parties) | 104,181 | 104,828 |
| Finance lease right-of-use asset | | |
| (includes $26,867 and $28,619 with related parties) | 42,218 | 57,024 |
| Loans eligible for repurchase from Ginnie Mae | 345,490 | 563,423 |
| Other assets | 83,834 | 60,145 |
| **Total assets** | $ 13,600,625 | $ 22,528,358 |
| **Liabilities and Equity** | | |
| Warehouse lines of credit | $ 6,443,992 | $ 15,954,938 |
| Derivative liabilities | 49,748 | 36,741 |
| Secured line of credit | 750,000 | — |
| Borrowings against investment securities | 101,345 | 118,786 |
| Accounts payable, accrued expenses and other | 439,719 | 523,988 |
| Accrued distributions and dividends payable | 159,465 | 9,171 |
| Senior notes | 1,984,336 | 1,980,112 |
| Operating lease liability | | |
| (includes $109,473 and $111,999 with related parties) | 111,332 | 112,231 |
| Finance lease liability | | |
| (includes $27,857 and $29,087 with related parties) | 43,505 | 57,967 |
| Loans eligible for repurchase from Ginnie Mae | 345,490 | 563,423 |
| **Total liabilities** | 10,428,932 | 19,357,357 |
| **Equity:** | | |
| Preferred stock, $0.0001 par value - 100,000,000 shares authorized, none issued and outstanding as of December 31, 2022 or 2021 | — | — |
| Class A common stock, $0.0001 par value - 4,000,000,000 shares authorized, 92,575,974 and 91,012,305 shares issued and outstanding as of December 31, 2022 and December 31, 2021, respectively | 9 | 9 |

By clicking "Accept All Cookies", you agree to the storing of cookies on your device to enhance site navigation, analyze site usage, and assist in our marketing efforts.
**Cookie Policy (https://services.businesswire.com/cookie-policy)**

Class B common stock, $0.0001 par value - 1,700,000,000 shares authorized, none issued and outstanding as of December 31, 2022 or 2021 | — | —
Class C common stock, $0.0001 par value - 1,700,000,000 shares authorized, none issued and outstanding as of December 31, 2022 or 2021 | — | —
Class D common stock, $0.0001 par value - 1,700,000,000 shares authorized, 1,502,069,787 shares issued and outstanding as of December 31, 2022 and December 31, 2021, respectively

| | | |
|---|---:|---:|
| Class B common stock, $0.0001 par value - 1,700,000,000 shares authorized, none issued and outstanding as of December 31, 2022 or 2021 | — | — |
| Class C common stock, $0.0001 par value - 1,700,000,000 shares authorized, none issued and outstanding as of December 31, 2022 or 2021 | — | — |
| Class D common stock, $0.0001 par value - 1,700,000,000 shares authorized, 1,502,069,787 shares issued and outstanding as of December 31, 2022 and December 31, 2021, respectively | 150 | 150 |
| Additional paid-in capital | 903 | 437 |
| Retained earnings | 142,500 | 141,805 |
| Non-controlling interest | 3,028,131 | 3,028,600 |
| **Total equity** | 3,171,693 | 3,171,001 |
| **Total liabilities and equity** | $ 13,600,625 | $ 22,528,358 |

By clicking "Accept All Cookies", you agree to the storing of cookies on your device to enhance site navigation, analyze site usage, and assist in our marketing efforts.

**Cookie Policy (https://services.businesswire.com/cookie-policy)**

**UWM HOLDINGS CORPORATION**

**CONSOLIDATED STATEMENTS OF OPERATIONS**

**(in thousands, except shares and per share amounts)**

| | For the three months ended | | | For the year ended | |
|---|---|---|---|---|---|
| | December 31, 2022 | September 30, 2022 | December 31, 2021 | December 31, 2022 | December 31, 2021 |
| **Revenue** | (Unaudited) | (Unaudited) | (Unaudited) | | |
| Loan production income | $ 129,180 | $ 172,402 | $ 442,407 | $ 981,988 | $ 2,585,807 |
| Loan servicing income | 217,225 | 196,781 | 194,976 | 792,072 | 638,738 |
| Change in fair value of mortgage servicing rights | (150,808) | 236,780 | (138,988) | 284,104 | (587,813) |
| Gain (loss) on sale of mortgage servicing rights | — | — | 2,461 | — | 1,791 |
| Interest income | 106,837 | 78,210 | 104,601 | 314,462 | 331,770 |
| **Total revenue, net** | 302,434 | 684,173 | 605,457 | 2,372,626 | 2,970,293 |
| **Expenses** | | | | | |
| Salaries, commissions and benefits | 118,266 | 135,028 | 146,697 | 552,886 | 697,680 |
| Direct loan production costs | 17,396 | 20,498 | 25,292 | 90,369 | 72,952 |
| Marketing, travel, and entertainment | 22,976 | 17,730 | 25,334 | 74,168 | 62,472 |
| Depreciation and amortization | 11,713 | 11,426 | 10,422 | 45,235 | 35,098 |
| General and administrative | 49,668 | 51,649 | 36,467 | 179,549 | 133,334 |
| Servicing costs | 36,809 | 37,596 | 36,200 | 166,024 | 108,967 |
| Interest expense | 114,918 | 73,136 | 88,772 | 305,987 | 304,656 |
| Other expense/(income) | (54) | 6,729 | 4,437 | 23,739 | (23,107) |
| **Total expenses** | 371,692 | 353,792 | 373,621 | 1,437,957 | 1,392,052 |
| **Earnings before income taxes** | (69,258) | 330,381 | 231,836 | 934,669 | 1,578,241 |
| **Provision for income taxes** | 6,774 | 4,771 | (7,990) | 2,811 | 9,841 |
| **Net income (loss)** | (62,484) | 325,610 | 239,826 | 931,858 | 1,568,400 |

By clicking "Accept All Cookies", you agree to the storing of cookies on your device to enhance site navigation, analyze site usage, and assist in our marketing efforts.
**Cookie Policy (https://services.businesswire.com/cookie-policy)**

| Net income (loss) attributable to non-controlling interest | (62,207) | | 313,914 | | 222,876 | | 890,143 | | 1,469,955 |
|---|---|---|---|---|---|---|---|---|---|
| Net income (loss) attributable to UWMC | $ | (277) | $ | 11,696 | $ | 16,950 | $ | 41,715 | $ | 98,445 |

**Earnings per share of Class A common stock:**

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Basic | $ | — | $ | 0.13 | $ | 0.17 | $ | 0.45 | $ | 0.98 |
| Diluted | $ | (0.03) | $ | 0.13 | $ | 0.11 | $ | 0.45 | $ | 0.66 |

**Weighted average shares outstanding:**

| | | | | |
|---|---|---|---|---|
| Basic | 92,575,549 | 92,571,886 | 97,138,073 | 92,475,170 | 100,881,094 |
| Diluted | 1,594,645,336 | 92,571,886 | 1,599,785,759 | 92,475,170 | 1,603,157,640 |

**Addendum to Exhibit 99.1**

This addendum includes the Company's Consolidated Balance Sheets as of December 31, 2022, and the preceding four quarters and Statements of Operations for the quarter ended December 31, 2022, and the preceding four quarters for purposes of providing historical quarterly trending information to investors.

By clicking "Accept All Cookies", you agree to the storing of cookies on your device to enhance site navigation, analyze site usage, and assist in our marketing efforts.

**Cookie Policy (https://services.businesswire.com/cookie-policy)**

**CONSOLIDATED BALANCE SHEETS**

**(in thousands, except shares and per share amounts)**

| | December 31, 2022 | September 30, 2022 | June 30, 2022 | March 31, 2022 | December 31, 2021 |
|---|---|---|---|---|---|
| | | (Unaudited) | (Unaudited) | (Unaudited) | |
| **Assets** | | | | | |
| Cash and cash equivalents | $ 704,898 | $ 799,534 | $ 958,656 | $ 901,174 | $ 731,088 |
| Mortgage loans at fair value | 7,134,960 | 5,031,068 | 5,022,806 | 4,824,165 | 16,909,901 |
| Derivative assets | 82,869 | 385,348 | 125,079 | 241,932 | 67,356 |
| Investment securities at fair value, pledged | 113,290 | 115,079 | 125,193 | 138,417 | 152,263 |
| Accounts receivable, net | 383,147 | 556,153 | 350,090 | 617,608 | 415,691 |
| Mortgage servicing rights | 4,453,261 | 4,305,686 | 3,736,359 | 3,514,102 | 3,314,952 |
| Premises and equipment, net | 152,477 | 152,172 | 153,971 | 151,206 | 151,687 |
| Operating lease right-of-use asset, net | 104,181 | 101,377 | 102,533 | 103,670 | 104,828 |
| Finance lease right-of-use asset | 42,218 | 45,667 | 50,179 | 53,857 | 57,024 |
| Loans eligible for repurchase from Ginnie Mae | 345,490 | 310,149 | 309,577 | 384,002 | 563,423 |
| Other assets | 83,834 | 87,850 | 82,467 | 60,820 | 60,145 |
| **Total assets** | **$13,600,625** | **$ 11,890,083** | **$ 11,016,910** | **$ 10,990,953** | **$22,528,358** |
| **Liabilities and Equity** | | | | | |
| Warehouse lines of credit | $ 6,443,992 | $ 4,712,719 | $ 4,497,353 | $ 4,076,829 | $15,954,938 |
| Derivative liabilities | 49,748 | 215,330 | 93,958 | 115,430 | 36,741 |
| Secured line of credit | 750,000 | — | — | — | — |
| Borrowings against investment securities | 101,345 | 114,875 | 118,786 | 118,786 | 118,786 |
| Accounts payable, accrued expenses and other | 439,719 | 846,905 | 470,589 | 823,143 | 523,988 |
| Accrued distributions and dividends payable | 159,465 | 159,465 | 159,461 | 159,460 | 9,171 |
| Senior notes | 1,984,336 | 1,983,099 | 1,982,103 | 1,981,106 | 1,980,112 |
| Operating lease liability | 111,332 | 108,591 | 109,811 | 111,010 | 112,231 |
| Finance lease liability | 43,505 | 46,917 | 51,370 | 54,945 | 57,967 |
| Loans eligible for repurchase from Ginnie Mae | 345,490 | 310,149 | 309,577 | 384,002 | 563,423 |
| **Total liabilities** | **10,428,932** | 8,498,050 | 7,793,008 | 7,824,711 | 19,357,357 |
| **Equity:** | | | | | |

By clicking "Accept All Cookies", you agree to the storing of cookies on your device to enhance site navigation, analyze site usage, and assist in our marketing efforts.

**Cookie Policy (https://services.businesswire.com/cookie-policy)**

| | | | | | |
|---|---|---|---|---|---|
| Preferred stock, $0.001 par value - 100,000,000 shares authorized, none issued and outstanding as of December 31, 2022 or 2021 | **—** | — | — | — | — |
| Class A common stock, $0.0001 par value - 4,000,000,000 shares authorized, 92,575,974 and 91,612,305 shares issued and outstanding as of December 31, 2022 and December 31, 2021, respectively | **9** | 9 | 9 | 9 | 9 |
| Class B common stock, $0.0001 par value - 1,700,000,000 shares authorized, none issued and outstanding as of December 31, 2022 or 2021 | **—** | — | — | — | — |
| Class C common stock, $0.0001 par value - 1,700,000,000 shares authorized, none issued and outstanding as of December 31, 2022 or 2021 | **—** | — | — | — | — |
| Class D common stock, $0.0001 par value - 1,700,000,000 shares authorized, 1,502,069,787 shares issued and outstanding as of December 31, 2022 and December 31, 2021 | **150** | 150 | 150 | 150 | 150 |
| Additional paid-in capital | **903** | 784 | 669 | 542 | 437 |
| Retained earnings | **142,500** | 141,194 | 137,955 | 138,834 | 141,805 |
| Non-controlling interest | **3,028,131** | 3,249,896 | 3,085,119 | 3,026,707 | 3,028,600 |
| **Total equity** | **3,171,693** | 3,392,033 | 3,223,902 | 3,166,242 | 3,171,001 |
| **Total liabilities and equity** | **$13,600,625** | $ 11,890,083 | $ 11,016,910 | $ 10,990,953 | $22,528,358 |

By clicking "Accept All Cookies", you agree to the storing of cookies on your device to enhance site navigation, analyze site usage, and assist in our marketing efforts.
**Cookie Policy (https://services.businesswire.com/cookie-policy)**

**CONSOLIDATED STATEMENTS OF OPERATIONS**

**(in thousands, except shares and per share amounts)**

**(Unaudited)**

| | For the three months ended | | | | |
|---|---|---|---|---|---|
| | December 31, 2022 | September 30, 2022 | June 30, 2022 | March 31, 2022 | December 31, 2021 |
| **Revenue** | | | | | |
| Loan production income | $ 129,180 | $ 172,402 | $ 296,535 | $ 383,871 | $ 442,407 |
| Loan servicing income | 217,225 | 196,781 | 179,501 | 198,565 | 194,976 |
| Change in fair value of mortgage servicing rights | (150,808) | 236,780 | 26,169 | 171,963 | (138,988) |
| Gain (loss) on sale of mortgage servicing rights | — | — | — | — | 2,461 |
| Interest income | 106,837 | 78,210 | 62,020 | 67,395 | 104,601 |
| **Total revenue, net** | 302,434 | 684,173 | 564,225 | 821,794 | 605,457 |
| **Expenses** | | | | | |
| Salaries, commissions and benefits | 118,266 | 135,028 | 138,983 | 160,609 | 146,697 |
| Direct loan production costs | 17,396 | 20,498 | 25,757 | 26,718 | 25,292 |
| Marketing, travel, and entertainment | 22,976 | 17,730 | 20,625 | 12,837 | 25,334 |
| Depreciation and amortization | 11,713 | 11,426 | 11,181 | 10,915 | 10,422 |
| General and administrative | 49,668 | 51,649 | 39,909 | 38,323 | 36,467 |
| Servicing costs | 36,809 | 37,596 | 44,435 | 47,184 | 36,200 |
| Interest expense | 114,918 | 73,136 | 57,559 | 60,374 | 88,772 |
| Other expense/(income) | (54) | 6,729 | 9,562 | 7,502 | 4,437 |
| **Total expenses** | 371,692 | 353,792 | 348,011 | 364,462 | 373,621 |
| **Earnings before income taxes** | (69,258) | 330,381 | 216,214 | 457,332 | 231,836 |
| **Provision for income taxes** | (6,774) | 4,771 | 769 | 4,045 | (7,990) |
| **Net income (loss)** | (62,484) | 325,610 | 215,445 | 453,287 | 239,826 |
| **Net income (loss) attributable to non-controlling interest** | (62,207) | 313,914 | 207,079 | 431,357 | 222,876 |

By clicking "Accept All Cookies", you agree to the storing of cookies on your device to enhance site navigation, analyze site usage, and assist in our marketing efforts.
Cookie Policy (https://services.businesswire.com/cookie-policy)

**Net income (loss) attributable to UWMC** | $ | **(277)** | $ | 11,696 | $ | 8,366 | $ | 21,930 | $ | 16,950

**Earnings per share of Class A common stock:**

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Basic | $ | — | $ | 0.13 | $ | 0.09 | $ | 0.24 | $ | 0.17 |
| Diluted | $ | **(0.03)** | $ | 0.13 | $ | 0.09 | $ | 0.22 | $ | 0.11 |

**Weighted average shares outstanding:**

| | | | | | |
|---|---|---|---|---|---|
| Basic | **92,575,549** | 92,571,886 | 92,533,620 | 92,214,594 | 97,138,073 |
| Diluted | **1,594,645,336** | 92,571,886 | 92,533,620 | 1,594,284,381 | 1,599,785,759 |

## Contacts

**For inquiries regarding UWM, please contact:**

**INVESTOR CONTACT**
BLAKE KOLO
InvestorRelations@uwm.com

**MEDIA CONTACT**
NICOLE ROBERTS
Media@uwm.com

## #Hashtags

#UWMC

## Social Media Profiles

UWM Twitter

By clicking "Accept All Cookies", you agree to the storing of cookies on your device to enhance site navigation, analyze site usage, and assist in our marketing efforts.
**Cookie Policy (https://services.businesswire.com/cookie-policy)**

# EXHIBIT  D



The Detroit News
SERVING MICHIGAN SINCE 1873
150 YEARS

BUSINESS

# Q&A: Mat Ishbia, United Wholesale Mortgage CEO, on Gilbert, Rocket and the Phoenix Suns

**John Niyo** and **Breana Noble** The Detroit News

Published 11:00 p.m. ET Feb. 25, 2023 | **Updated 12:03 a.m. ET Feb. 26, 2023**

---

## Key Points

On the Phoenix Suns: "I'm not sitting here planning to win. We're gonna go try to win right now. And then we'll try to win again next year, and then we'll try to win the year after that."

On Rocket: "Rocket Mortgage doesn't do the right thing. They're not run well. And Dan Gilbert knows I think that."

On Gilbert: "You guys saw what a class act that was. You know his character. It was public."

---

*Note: Q&A is a Sunday feature on detroitnews.com. If you'd like to recommend a subject, email Special Projects Editor Kelley Root at kroot@detroitnews.com.*

Mat Ishbia is as persistent as he is impatient.

That's evident in the Detroit-area native's success in the business world, where he turned his father's small business into the nation's No. 1 mortgage lender as CEO of United Wholesale Mortgage. It likely plays a role in the 43-year-old's roiling rivalry with fellow Detroit billionaire Dan Gilbert and his Rocket Cos. Inc., as well. And it helps explain how Ishbia, a former walk-on for Tom Izzo's 2000 national championship team at Michigan State, managed to fast-track his pursuit of a professional sports franchise, culminating in the record $2.28 billion purchase of a majority interest in the NBA's Phoenix Suns and WNBA's Phoenix Mercury.

The News sat down with Ishbia recently to discuss the Suns, the Kevin Durant trade and his competition with Rocket and Gilbert. (The transcript has been edited for clarity and length.)

**Question: Your brother told a story at your introductory press conference with the Suns, joking about how he realized before you did that you weren't going to**

**be NBA players. But the point of his story was about your persistence. How did that translate for you in business, and also with your pursuit of a pro sports team?**

Answer: Yeah, maybe it's the thought of not really knowing that I wasn't able to be good enough to be there. So with the work ethic, and the grind, I didn't let anyone else take away my dream. I had the dream of becoming an NBA player, and I was gonna work extremely hard. And to my parents' credit, and even my older brother, they didn't tell me I couldn't do it. They just said, 'OK, keep going out there and practice all day.' But that was my mindset.

And that's the same thing here in the mortgage business at UWM. No one said you couldn't be the largest mortgage company in America. They just said, 'OK, have fun with that.' You know, like, there's Wells (Fargo) and there's Chase and all these big companies out there. How are you gonna pass them, or pass Rocket Mortgage? So a little bit of that is believing in myself and no one telling me I couldn't, and then it's working hard to accomplish that goal.

**Q: When you finished at Michigan State, did you think about getting into the sports business? (Ishbia graduated from MSU's Eli Broad College of Business in 2003.)**

A: No, I was planning on going into coaching. I was gonna be a coach. I got offered a job and ended up coming to my father's little mortgage company instead. And I'm happy I did, happy it worked out. But sports had been my whole life. So of course I was going to stay in sports. I didn't know what a mortgage was. I wasn't thinking about going into mortgages. I didn't even know my dad had a mortgage company. My dad's a lawyer, he just had a small little company on the side, just like he had a couple other little companies. So my (original) thought was basketball, basketball, basketball ... and then I went into mortgages. And now I've got a way to get back into basketball.

**Q: When did this way back into basketball become a reality in your mind, not just a far-fetched thought?**

A: Maybe 5-6 years ago. Probably in 2016 or '17, I started realizing, 'Gosh, we're pretty successful here at UWM.' I've got a great team of people. Could one day, in 15-20 years, a guy buy an NBA team? That started to cross my mind, like, maybe it's possible? Teams kept going up in value quicker than I expected. But then I started making more money quicker than maybe I had expected, too, and here at UWM we grew faster than expected. And so we were able to catch up to that opportunity.

**Q: The process of buying a team, how much work went into that, once you realized it was a realistic goal?**

A: A lot of work, because it's not just like, 'Oh, there's something for sale, let's go buy it.' There's only 30 NBA teams in the world, right? And 20 of them are never going to sell, because that's just the way it is. They're owned by families and it's just generational. So there's 10 that maybe will sell and Phoenix wasn't one that we thought would sell until obviously what happened. (Last September, the NBA suspended owner Robert Sarver for one year and fined him $10 million after a lengthy investigation found he'd fostered a toxic workplace environment with the Suns.) And so as soon as it became available, that was the target.

I looked at the Denver Broncos. (The Ishbias were among a handful of serious bidders for the NFL franchise, which was sold to an ownership group headed by Walmart heir Rob Walton for $4.65 billion in January.) And I learned a lot through that bidding process, knowing that it was really slotted to Rob Walton a little bit. Not that it was slotted ... I'll just say he was the frontrunner, and I was in there for the opportunity. And I learned so much going through that process that it prepared me to know how to go get this team.

But it was also years of legwork. Meeting other NBA owners, spending time with the commissioner, finding out (and) learning about the process, flying around the country to spend time with different people, getting on Zoom meetings. Having dinners with NFL and NBA owners to just learn, one, is this possible; and two, is this what I really want to do with my time outside of UWM? And so it was a long process. It was a lot more complex than people recognize or realize. But I'm really excited that we got all the way to the finish line.

**Q: What did you learn that surprised you in all that fact-finding you did?**

A: You know, what was really great was how welcoming they were. The NBA owners probably get people saying they want to buy a team all the time. But they were all welcoming, friendly, and encouraged me. And they look at it as a partnership, not just like, 'Oh, I'm coming in to compete with this guy.' It's like, 'Hey, the 30 of us are partners, we work together as a team.'

For the 48 minutes we play on the court, we want to beat them, they want to beat us. But after the game, it's like, 'How are you doing on ticket sales?' 'Hey, I got this new sponsorship: Have you done this?' 'You should talk to this guy or gal.' And so that's been pretty eye-opening, in a positive way.

**Q: You mentioned the Broncos, and the (NFL's Washington) Commanders also have come up for sale. Were there other attempts that you made that maybe never went anywhere?**

A: So the Commanders was never really a thing. It was just someone asked me (for) a quote and I just said, 'I'm always interested.' The Denver Broncos was a thing. I knew I was coming in behind the 8-ball on that opportunity. But I knew I could learn a lot and kind of get myself into the mix, so that people knew I wasn't just another guy out there wanting to buy a team. And so that was really helpful. And Roger Goodell, the NFL, everyone was first-class with that as well. It was a great opportunity.

But no, there really weren't a bunch of (other opportunities) ... like outside of my hometown teams, which aren't for sale, right? It's like, 'Where would you want to buy?' And, you know, when I (made) that list, Phoenix *was* the list. I have another place in Florida, so it's like, could Miami or Phoenix be the two options? Miami's never selling, I knew that. So Phoenix was the option. And when it came up, it was, 'How could this come up right now? What a perfect time.' This is the one I wanted, and it had a WNBA team, which is something I wanted as well. I had already looked into how could I get involved with the WNBA in addition to an NBA team, so this was perfect. I got the WNBA and NBA team together in one location, one place. And Phoenix isn't a bad place to spend a little time in the winter.

**Q: You mentioned the hometown teams aren't for sale. How much did you look into the possibility of that changing at some point, or waiting for it to change?**

A: So I'm not that patient. And I'm not patient (about) waiting on *if* something happens. I'm patient if I know something's *going* to happen. But you know, for example, the Fords (with the Lions), and the Pistons and Tom Gores, they love being an owner. Part of me, it excited me more knowing that they love it so much. It's like, 'Gosh, you see why they're so hard to get: Nobody wants to sell 'em.' Because they love it. It's not about, 'Hey, just give me more money,' and I'll buy it. That's not how it works. And so it kind of excites me a little more about being an NBA owner, or potentially one day an NFL owner, too, that they love it so much.

The Fords have always been nothing but first class with me. Tom Gores, same thing. They were helping me with my pursuit of the other teams, and were nothing but friendly and positive. And same thing with Chris Ilitch locally, too. He has become a friend as well. I'm not as much a baseball or hockey person, but I learned a lot from Chris, and he's been great to work with.

**Q: In those conversations with other owners, what are the things you learned? Maybe about what I don't want to do if and when I get this opportunity?**

A: Well, you know, I think every owner handles it differently. So you know, Chris Ilitch obviously lives in town, is very hands-on and involved with everything and does a great job with that. I learned that from a baseball/hockey world. You know, the Fords, it's the same thing. Sheila (Hamp) is here, she goes to the office, I understand that. Tom (Gores) is distant, he's not here, but he's still involved. And so you kind of learn a little bit about what each does. And then I've got to make it my own. You know, I've talked to a lot of the owners from other NFL, NBA teams ... and heard their perspective on things that they liked doing, what they enjoy about being an owner. What's the one thing they would have done differently when they bought a team than they did? What's some advice they'd give me? What's the one thing you would never do? I've asked a lot of these questions, and kind of put together kind of what I think and then I put my own spin to it.

This is just like in the mortgage business: I'm a little different than others. I do things my own way. But I take other people's guidance and ideas and apply my way of doing things. And so it has been extremely helpful meeting all these owners. Not just the ones that are local, but throughout the country they have been so great to me.

**Q: You didn't waste any time with the trade deadline. (The Suns made a blockbuster deal Feb. 9 to acquire former NBA MVP Kevin Durant from the Brooklyn Nets.) You sort of put your imprint on this right away.**

A: Yeah, I mean, so Kevin Durant's one of the best players in the world, right? And the reality is, you guys know me around here, I'm not much of a patient person. I'm not gonna sit there and say, 'Well, let's develop over the next 5-7 years. Like, I'm not *planning* to win. We're gonna go try to win. And I had an opportunity to get Kevin Durant, along with Devin Booker, Chris Paul and DeAndre Ayton — and I'm not gonna mention every name, but I have a lot of other great players that people don't even know the names as well on the team, and so ... how could I not take advantage of the opportunity? So we gave up a couple guys that we really liked, which, that's part of the deal. But I'm not sitting here planning to win. We're gonna go try to win *right now*. And then we'll try to win again next year, and then we'll try to win the year after that. And we're gonna try to compete at the highest level, just like I do in the mortgage business.

It's not sitting there with a nine-year plan to become the No. 1 mortgage lender. I'm gonna outwork everyone every day and do my best to put us in position to be successful in the

mortgage business. And I'm gonna try to do that in basketball as well. So without question, I knew what I was going to do when that opportunity came. I didn't know if it was gonna be Kevin Durant or something else, but we were going to try to upgrade our team to be competitive now. And we already had a great team, by the way. We were a top team out there in the West. But getting Kevin Durant is something different.

**Q: That's a trade that could have happened last summer. They talked, but it didn't go very far. What changed?**

A: Well, we wanted Kevin Durant, you know? And I wanted Kevin Durant on our team. Devin Booker and Kevin Durant are two of the top 10 players in the NBA, and you got Chris Paul leading 'em, we got a great team We've got a young guy in DeAndre Ayton. And so the way I looked at is, I'm not planning to win, we're gonna go try to win. And we might not win, right? That's gonna happen. Someone could get hurt. Something can happen on our team. And there's 29 other amazing owners out there that are working hard to try to win every single year, too. But we're going to compete and, like I said, I'm not going to back down, or wait and think about it. Like if there's an opportunity to go and be aggressive and be successful, we're going to. And a lot of times, other people focus on money and how much this is going to cost in the luxury tax and these things. Money follows success. I'm not a person focused on money. I'm focused on going and winning, being successful. Create an amazing fan experience. Do great things in the community. Win. And guess what? Money will follow. Right? I'm not focused on money. Money has never driven me. It's never been my focus. Winning and being successful has been the focus. And usually when you do those things. money will follow.

**Q: You mentioned the luxury tax. It's viewed as a barrier by some, but maybe not so much by you?**

A: It's something to be conscious of, and it's very expensive. You're writing a big check. But how much is that smile on the 12-year-old kid's face worth? How excited can the city of Phoenix be if we win a championship? How does it make Devin Booker's career better — or Chris Paul's — getting Kevin Durant next to them? Like, how do you measure those things? I'm not big on ROI (return on investment): 'You spent this money, what'd you get for it?' This is the right thing to do. Without question, it's the right thing to do. James Jones, our general manager, was completely supportive. He wanted to do it. We made the decision as a team, and it's the right decision for our team. And now how the outcome goes, we're gonna find out. I'm gonna be watching just like you. I can't go out there and play. I'm not any good. So

we're gonna watch it. But it was the right decision, without any question, and it's exactly my style of how I do things.

**Q: You showed up, got introduced as owner, and then you guys went to work, with calls back and forth. What was that whole process like for you?**

A: Well, it was a lot of fun. A lot of fun. The process started before that day. The NBA was good: I had the ability to control some things prior to closing. So it wasn't like it just all came together Wednesday. I was working on it, and we were working on the opportunity for a little while before that.

But it's so much fun sitting there looking at salary caps, understanding players, talking to the general manager, understanding how they think of different players — outside of our team, within our team — and understanding the NBA. I understand basketball a little bit, so I feel like I could be a little more helpful in those conversations than maybe some other owners that had never played or maybe are not involved as well. But I'm in the weeds. It's just like anything. It's not like I sat there like, 'Hey, just call me and let me know how it goes.' I was involved with every detail of it.

**Q: And then when it's finally done, what's the celebration like?**

A: It was late at night. I got a bunch of texts and I tried to fall asleep. But, you know, working with James Jones and (Suns VP) Ryan (Resch) ... going through the details — and my brother was involved, so talking to him to get his perspective — it was a lot of fun figuring that out together as a team and making a decision as a team. Some people were 99% or 100%, let's do it. Let's do it. Some people were 50-50 or 60-40, and (we were) all talking through it together and then making a decision and walking out the door saying, 'We're doing this.'

**Q: What's Tom Izzo's response? Did you call him for advice?**

A: I didn't talk to him before the trade, but we texted after and I talked to him this morning again. You know, he's a great mentor. He knows basketball inside and out, But in these trades — and not that Izzo is somebody I'd worry about — but just in general, like, you can't tell anybody. As soon as one person hears I'm talking to (Nets owner) Joe Tsai about Kevin Durant, it would be all over social media within minutes. So I had to keep it extremely tight. I didn't call anybody outside of our inner circle there about advice on it. No one could know what was going on. Because that can that can knock the deal off. And so it was very quiet. But I talked to Izzo about the deal after, talked to him again today, and he's really excited about it and excited about what we got out there in Phoenix.

**Q: So Jerry Colangelo (the Hall of Fame former GM of the Suns) was on the radio the other day and called you a "breath of fresh air" for the franchise and its fans. What does that mean to you, and how do you see yourself changing things there?**

A: It's great. I mean, Jerry Colangelo was a legend out there in Phoenix, and really throughout basketball. I got to have lunch with him a couple of weeks ago when I was out there and heard his stories and what he went through and a little bit about the Phoenix Suns' history. Which is important, (because) in order to take someplace into the future, you've got to understand where it came from. So I spent a lot of time with him on that. I really enjoy my relationship with him and look forward to continuing it going forward. Him saying confident, positive words means a lot to me, and I think it means a lot to the fans out there, because everyone reveres him in such a positive way.

**Q: You mentioned Tom Gores owning the Pistons while living elsewhere. How are you going to juggle all this?**

A: One day at a time in balancing it. You know, I took the pressure off myself (by saying) I don't have to be at every game. So if I get to 15-20 home games and 10 road games — the games that are in Indiana or Milwaukee or Chicago or wherever it may be, and obviously the ones in Detroit — I can balance it. You know, it's more than just going to the games. There's work in the office, It's trying to change the culture in a positive way. Spending time with the people in Phoenix with the Mercury and the Suns. So, yeah, I'll balance it one day at a time. I love, love, love UWM and what I do here, That's not changing. I'm the CEO and chairman of this place. And that's not changing anytime soon. I love it. And so my time here will be consistent. And then how do I figure out time (in Phoenix). More of a balancing act is with my three kids. I flew back late Saturday night, (deciding) not to stay for the Super Bowl while it was in Phoenix, because I had three games to coach with my sons and my daughter (Sunday, Feb. 12) in Michigan. So I prioritize my kids, I prioritize UWM and the Phoenix Suns and Mercury all together. And I'll make sure I can balance it."

**Q: You talked about building the culture, and putting your imprint on things there. Is that harder to do from a distance? Do you have people here that you're planning on bringing with you to Phoenix?**

A: I'm gonna listen, learn, figure out what's going on first. No one from UWM is going out there. UWM is its own entity and own company that's focused on dominating the mortgage world. Being the No. 1 mortgage company, it's a lot of work to stay there and continue to win.

And so we're gonna keep doing that at UWM. So nobody's leaving UWM to go out there, just like I'm not leaving UWM to go out there. But will I find people that can relate? Will I have my awesome chief marketing officer from Michigan giving advice to the one in Phoenix, and vice versa? I'm sure we can trade notes and help each other out. But we're not moving anybody out there. UWM is UWM, and it's UWM strong the way it is. And the Phoenix Suns and Mercury, we'll figure it out. I'll spend time, I'll evaluate, I'll get the right people. They'll understand the culture. We'll get the Phoenix Suns and Mercury leadership out to UWM. They can walk through here and see how it is. And we'll start to collaborate as a team and use each other's resources. But that's kind of where I'm starting.

## Q: Do you see this newfound presence in Phoenix as advantageous for UWM itself?

A: Absolutely. It's great. The Arizona market in general was one of UWM's best markets. We have some of our top clients in the country out there. Being able to be out there and spend time with them a little bit more when I'm out there, or I go to a game, I bring one of them with me. That's all positive stuff, working with the mortgage brokers and elevating the broker channel. This puts the broker channel just like going public elevated the broker channel, owning the Suns and Mercury will elevate the broker channel. And so we're excited about that opportunity. I think it will help UWM and maybe do events out at Phoenix Suns or Mercury games, right? Can we do different things? Possibly we can. Maybe I have in, maybe one of these players can speak at a mortgage event sometime. All positives. There's nothing negative to the broker channel or UWM.

## Q: UWM made a lot of revenue ($925 million) from going public, how did that contribute to becoming the No. 1 largest mortgage lender in America?

A: Well, going public helped UWM in many ways to become the No. 1 overall lender in the country. First, it put mortgage brokers on the map. It helped elevate UWM's brand. It helped elevate UWM's name throughout the industry. At the same time, it gave us access to liquidity, access to things that we didn't have as a private company, which I was able to with my leadership team here use in the right way to catapult our growth even more. That's how we became the No. 1 mortgage company in the country. We've been No. 1 in wholesale for eight straight years, and now the No. 1 overall lender, and so that's been a process. Not it's like, not only do we have to maintain, we have to continue to excel and build our business, not just for the refi market, but for the purchase market, which obviously went in our direction, because rates went up, and so the (loan refinancings) have slowed down, and the purchase market is the game right now.

**Q: When you talk about the liquidity obtained and using it "the right way," what specifically was the right way?**

A: Well, just investments, right? How do you invest in our people? A lot of other places have money, but they laid off people. We don't lay off people. I invested in our people. A lot of people spend money on buying tech. We invested it in our tech by building our tech with our people, and so investing our money, rather than spending our money, or saving our money is the difference. And so, having that liquidity, having access to capital that we just didn't have as a private company. We didn't have any other investors. This is just me, my brother, my dad. It's really hard to build a company of this size without any outside capital, and we were able to do that now bringing in a little bit of capital to the company that could help catapult our growing, and it did.

**Q: We've seen other lenders in the market offer layoffs and buyouts, because of the shape the market is in. Obviously, UWM's workforce has shrunk (to 7,000 from more than 8,000 a year ago). How were you able to stave off those decisions of taking actions to reduce the workforce?**

A: Because we're a family company. You don't lay off your family. You don't lay off your brother, your cousin, your sister. You take care of family. Companies that lay off people, sometimes they have to. I understand that, but it's not who we are. At UWM, we'll never do that. And so, yeah, we have less people, because I used to hire 400 or 500 people a month. Now, I hire 80 to 100 people a month, and naturally, if a lot of people, a couple hundred people leave a month, and you only hire 80, your team member count goes down. If you hire 500, it goes up, and so it's just a balance. The way we look at it is, we take care of our family, we take care of our people here. Our people are our greatest asset. Rule No. 1: We will never lay people off. We don't offer buyouts. That's just a fancy word for layoff. They're laying people off and saying if you don't do this — that's what other companies are doing. That's fine. That's what they decide. I don't believe in it. I think that's the owner and CEO's job to make sure you don't have to lay people off. And I'm not frowning upon other companies that have to do that, because they have to do it sometimes, but we make sure we don't have to, and we won't here at UWM.

**Q: Having 100 people leave per month, that's not a concerning statistic?**

A: Not at all when you have 7,000, 8,000, 9,000. Just do the math. A hundred actually is low. I've got 50 people a month who move to relocate out of state. People have babies. People get married. People move out of town. That's not a concerning stat at all. Zero concern. It's

just managing how many people we need at the company, and hiring continuously, which we do. We hired 100 people last month. We'll hire another 100 people this month, just hiring the right people with the right jobs. At the same time, developing our team members to become the best version of themselves.

**Q: You have been vocal about actions taken by competitor Rocket Mortgage with respect to their offering of buyouts, and you've taken steps like the "All In" initiative. Can you speak to being so vocal in that competitive nature against a leading competitor like that?**

A: Rocket Mortgage doesn't do the right thing. They're not run well. And (Rocket founder and chairman) Dan Gilbert knows I think that. They know I think that. I think that's why they let their CEO go (on Feb. 13). I think they've struggled for a while. My opinion is my opinion, and I'm very positive and confident in my opinion that it's accurate, that Rocket Mortgage doesn't do the right thing by their people. They run a really good business. They've been profitable and successful. I'm not going to not comment on that. I'm not going to say negative things about that. They've been successful. But they don't take care of their people, and when they try to say that they do like UWM, it frustrates me. And then they lay off thousands of people when they've made $1 billion in a quarter. It's just not the right thing to do. I've been vocal with it. You guys know my opinion of Dan Gilbert and Rocket Mortgage. That's not going to change. Just keeping it real. *(Editor's note: Rocket recorded net income of $1 billion in Q1 of 2021 and offered two rounds of buyouts that year that reduced its workforce by 6,000.)*

**Q: Was there reason for (the Gilbert-owned Cleveland Cavaliers) to abstain from that vote (by the NBA Board of Governors on Ishbia's purchase of the Suns)?**

A: I'm sure there were reasons. You guys always wonder what I think about him. You guys saw what a class act that was. You know his character. It was public. It's public now, so it made me happy to see it, because it was not a surprise at all.

**Q: What are your thoughts on the initiative being called the "Bully Shield" response to the All In plan?**

A: It's Rocket Mortgage silliness. When they're losing, they like to just keep complaining about things. Two years ago, we came out with the All In initiative. You guys reported on it. What did they tell you? 'This is so great for Rocket. They're growing to grow. All the brokers are going to choose them.' That's what they told you. Then what happened? Two years later,

now they're coming up with new things. 'I can't believe this happened. This is not fair.' The thing is, we do what's best for brokers. We always will at UWM. We always will. Brokers love working with UWM, because we take care of them. We're partners. The Bully Shield? There's no penalty. They're so focused on, 'Oh, there's a fine.' How much have we collected from brokers? $0. There's no fine.  The penalty for working with Rocket and UWM is you don't get to work with UWM. And nobody is willing to take that chance. That's what Rocket doesn't understand. They do understand it. They just like to market it and spin it, so you ask questions like that, which make people feel good. But it's very clear, and we enjoy beating them, and we'll continue to beat them until rates drop, and they'll be happy and tell you how good they did when rates drop again.

*(Editor's note: A UWM spokesperson clarified that UWM requires brokers to pay at least $50,000 or $5,000 per loan submitted to Rocket, whichever is greater. Brokers can stop working with UWM at any time without penalty.)*

## Q: Don't you have three court cases and litigation against brokers who had signed the addendum and continued to submit mortgages to Rocket?

A: Yeah, they no longer work with UWM. That's the penalty. Once you have brokers that don't work UWM, they lose out. That's why of the 12,000 brokers, 11,500 all stayed with UWM. And then since then, a couple hundred more have joined in with UWM that stayed with Rocket. It's not because I'm better looking or I'm nicer, it's because we're a better mortgage company, and everyone knows that in the mortgage industry.

*(Editor's notes: UWM is seeking $2.8 million from America's Moneyline Inc., $310,000 from Mid Valley Funding & Inv. Inc. and $110,000 from Kevron Investments Inc., which does business as Westlake Mortgage Group. UWM's original ultimatum had March 15, 2020, as the deadline. By then, it had 10,400 confirmed broker partners, down from 12,000 after 300 brokers declined to accept the addendum and others didn't respond. Today, the company has approximately 12,000 brokers.)*

## Q: Overall, how would you say the result of the All In initiative has come from it?

A: What do you think? When we announced the initiative, they were more than twice my size overall, not wholesale, overall. Now I'm bigger than them at UWM. So, how do you think it worked? Do you think Jay Farner's spinning nonsense was right? Do you think that Dan Gilbert's crying was right? Or was what I told you was going to happen happened? Because we take care of our brokers. It's not about UWM. It's about the broker channel. We've been

very consistent with that all the way through, and everything I told you guys would happen has happened. Eventually, you'll start to believe what we say rather than the rhetoric that Dan and Rocket likes to spin out there all the time, the Bully Shield, and all these silly things. It's not what's real.

**Q: Obviously mortgages are a significant financial step for a lot of people. It's the largest purchase that somebody will make in their lifetime. Given the rhetoric we're seeing between you guys, what is the message that's sending to folks who are looking to purchase a mortgage?**

A: Hopefully it sends them a message to shop for their mortgage. The average consumer that goes through a broker saves $9,400 versus going through a big bank or Rocket Mortgage-type company. $9,400. If they pay attention to nothing else I've said, how does that not get written? 'Cause Rocket pays you guys enough marketing? How does that not get written? $9,400 cheaper. That's not my data. Government data. $9,400 cheaper for a consumer to go through a mortgage broker. Like, all day. It's better for the consumer. I think it's great that we're competing, and that people know about it. The more notoriety it creates, the more people realize you should go to FindAMortgageBroker.com, a local mortgage broker. And do you know what happens? They end up saving a lot of money for their family. We just did good work for the people across America.

**Q: UWM's stock is currently trading at less than half of the $10 of the original (special-purpose acquisition company) level. Is there a timeline for when investors can expect to see that valuation rise, or how you are looking at targeting that?**

A: You know, I pay zero attention to the stock price. The stock price will follow our success. The stock price gets pushed down by the market sometimes. I know a lot of stocks are down. Definitely mortgage-related stocks are down. Money follows success. We're going to keep winning every day. We're the largest mortgage company. We're profitable. We're successful. In one of the worst years in history, we made about $1 billion. I think we're doing OK. The shareholders now are getting an amazing dividend. So, I think that they like that the stock price is I don't know what it is, $4, $4.50, whatever the number is they get a 40-cent (yearly) dividend, which is about 10%, which you can't get that money anywhere. People love it. People are buying it, and they're happy. When the stock price follows our success, and it goes to $8, $10, $12, $14 in the next two, three, four years, it will. But I don't pay any attention to it. My job is to dominate every day at UWM, take care of our team members, take care of our

clients, take care of our shareholders. Money will follow. We're focused on winning and success right now.

**Q: One of the things analysts have said that is challenging the valuation is that institutional investors are more hesitant to invest, given the amount of stock available is so small, and it makes it more of a day-trading stock. Is there any plan to address that?**

A: You're exactly right. Most people don't understand that is why the stock has not done as well. There's not enough float is what they call it. The problem with that is I am the one that has all the other shares. And I am not willing to sell them at this price. I was barely willing to sell them at $100 a share. I'm not willing to sell at this price. I understand that if I sell some, it will create a positive where institutional investors can come in and invest and put money in, and then that will raise the price up, but I don't need any money right now. For me to sell shares at $4 or $5 or wherever it's at doesn't make financial sense for me, and I know where this company is going. I run it every day, all day every day. I know the stock price is going to be $10, $12, $14 in a couple years. I know it. We're going to keep dominating, winning, building our business, making a lot of money, so at that point, I'll sell shares. Maybe they'll talk me into doing it a little bit sooner than that, but definitely not at $4.

*jniyo@detroitnews.com*

*bnoble@detroitnews.com*

# EXHIBIT E

## WHOLESALE BROKER AGREEMENT

THIS WHOLESALE BROKER AGREEMENT ("Agreement") is made and entered into as of 11/20/2020, between United Shore Financial Services, LLC, a Michigan limited liability company, d/b/a United Wholesale Mortgage ("UWM"), with its office located at 585 South Blvd E., Pontiac, MI 48341, and The Okavage Group, LLC ("Broker") with its principal offices located at 300 Kingsley Lake Drive, Suite 402, SAINT AUGUSTINE, FL, 32092.

RECITALS:

WHEREAS, UWM is engaged in the business of, among other activities, purchasing and/or funding mortgage loans on residential real estate and reselling such loans in the secondary mortgage market; and

WHEREAS, Broker is engaged in the business of taking applications for residential mortgage loans; assisting borrowers in pre-qualifying for mortgage loans; selecting a mortgage product and completing an application; and processing those applications on behalf of others in exchange for a fee and other consideration; and

WHEREAS, during the term of this Agreement, UWM will advise Broker of UWM's various FHA, VA, USDA, conventional, jumbo and/or non-agency mortgage loan products as well as select bond program mortgage loan products, and Broker intends, from time to time, to offer to UWM for potential purchase and/or funding certain FHA, VA, USDA, conventional, jumbo and/or non-agency mortgage loans as well as select bond program mortgage loans which fall within the parameters of UWM's mortgage loan products;

NOW, THEREFORE, in consideration of the mutual agreements and covenants hereinafter set forth, and other good and valuable consideration, the receipt and legal sufficiency of which is hereby severally acknowledged, UWM and Broker hereby agree as follows:

### ARTICLE I
### DEFINITIONS

All words and phrases defined in this Article I (except as herein otherwise expressly provided or unless the context otherwise requires) shall, for the purposes of this Agreement, have the following respective meanings:

**1.01. "Agreement"** means this Wholesale Broker Agreement and any written amendments or modifications hereto which are made in accordance with the terms of this Wholesale Broker Agreement.

**1.02. "Bond Authority"** means a federal, state or local authority established for the purpose of making residential Mortgage Loans to low and moderate income borrowers and issuing bonds or other obligations to fund such loans.

**1.03. "Bond Program"** means a qualified single family residential Mortgage Loan program of a local, state or federal housing authority under which residential Mortgage Loans are made available to low and moderate income borrowers at below market interest rates and/or upon other terms and conditions favorable to the borrowers.

**1.04. "Borrower"** means the person or persons who submit a Mortgage Loan Application to Broker, receive a Mortgage Loan, and are liable on a Mortgage Note to UWM.

**1.05. "Closing"** means the funding of a Mortgage Loan by UWM.

**1.06. "Complaint"** means a consumer communication of dissatisfaction regarding a product, service and/or participant in the loan process.

**1.07. "Defect"** means a breach in any respect of any representation or warranty herein contained with respect to a Mortgage Loan or any failure by Broker to comply with any covenant or condition herein contained with respect to a Mortgage Loan which could reasonably be expected to result in a loss or damage to UWM or a subsequent purchaser of such Mortgage Loan.

**1.08. "Defective Loan"** means any Mortgage Loan that has a Defect.

**1.09. "FHA"** means the Federal Housing Administration.

**1.10. "Freddie Mac"** means the Federal Home Loan Mortgage Corporation or any successor thereto.

**1.11. "FIRREA"** means the Financial Institutions Reform, Recovery and Enforcement Act of 1989.

**1.12. "Fannie Mae"** means the Federal National Mortgage Association or any successor thereto.

**1.13. "Formal Complaint"** means a Complaint received via: (i) any means from any state or regulatory agency, including but not limited to Attorney General offices, Congressman offices, and the Consumer Financial Protection Bureau; and (ii) electronic mail, fax, or letter that is addressed to the Chief Executive Officer, Branch Manager, President or other member of Broker's senior management.

**1.14. "Ginnie Mae"** means the Government National Mortgage Association or any successor thereto.

**1.15. "Mortgage"** means a valid and enforceable Mortgage, Deed of Trust, or other Security Instrument creating a first or second lien upon described real property improved by a one-to-four family residential dwelling, which secures a Mortgage Note.

**1.16. "Mortgage Documents"** means all documents and instruments required by UWM and applicable law pertaining to a particular Mortgage Loan.

**1.17. "Mortgage Loan"** means a loan to individuals which is secured by a Mortgage and is subject to this Agreement.

**1.18. "Mortgage Loans"** means each and every Mortgage Loan, which is subject to this Agreement.

**1.19. "Mortgage Loan Application"** or **"Mortgage Loan Applications"** means an application for a Mortgage Loan processed by Broker in accordance with the lending requirements of UWM, including but not limited to those contained in the UWM Guide, the terms of this Agreement, all applicable governmental regulations, and the generally accepted practices and procedures within the mortgage industry.

**1.20. "Mortgage Note"** means a written promise to pay a sum of money at a stated interest rate during a specified term that is secured by a Mortgage.

**1.21. "Mortgagor"** means the obligor on a Mortgage Note.

**1.22. "Repurchase"** means the obligation of the Broker to purchase a Mortgage Loan from UWM which was previously transferred and/or sold to UWM by the Broker.

**1.23. "RESPA"** means the Real Estate Settlement Procedures Act of 1974 (12 U.S.C. 2601, et seq.), as amended from time to time.

**1.24. "Servicing Rights"** or **"Servicing"** means the rights, title, and interest in and to the servicing of the Mortgage Loans and the maintenance and servicing of the escrow accounts, along with the right to receive the servicing fee income and any and all ancillary income arising from or connected with all such Mortgage Loans.

**1.25. "Training and Information Services"** means the training, marketing and/or information services provided to Broker in furtherance of Broker's business, including but not limited to licensing related training and/or discounts, sample communications and/or related templates.

**1.26. "Underwrite"** or **"Underwriting"** means the examination of a Borrower's application, credit history, income and financial resources for the purpose of determining whether to extend credit to such Borrower.

**1.27. "USDA"** means the United States Department of Agriculture or any successor thereto.

**1.28. "UWM Guide"** means all verbal procedures and requirements delivered by UWM or its representatives as well as those procedures and requirements contained on UWM's website and all links incorporated therein, including but not limited to EASE, as amended from time to time.

**1.29. "VA"** means the United States Department of Veterans Affairs.

**ARTICLE II**
**PURCHASE & FUNDING OF LOANS**

**2.01. Purchase and/or Funding of Loans by UWM.** UWM agrees to consider purchasing and/or funding certain Mortgage Loans from Broker, provided that all of the following requirements are met:

(a) Upon payment by UWM of the purchase price for each such Mortgage Loan so purchased and/or funded, all rights, title and interest in and to said Mortgage Loan shall be assigned and transferred by the Broker to UWM free and clear of all claims, liens and encumbrances whatsoever.

(b) Each Mortgage Loan shall be transferred and/or sold to UWM on a "servicing released" basis meaning that Broker shall release, transfer, convey and assign in a form and manner acceptable to UWM, all of Broker's rights, title and interest in and to the Mortgage Loan, including, without limitation, the right to provide mortgage servicing in connection therewith.

(c) All FHA, VA, conventional, USDA, jumbo, non-agency and select Bond Program Mortgage Loans shall be closed in the name of UWM, unless another name is specifically authorized by UWM in writing in advance of closing; and

(d) All such Mortgage Loans shall meet UWM's lending requirements, including but not limited to those contained in the UWM Guide, and any other terms and conditions required by UWM, in its sole and absolute discretion, which may be amended from time to time.

**2.02. UWM Loan Requirements.** UWM will advise Broker from time to time regarding the types of FHA, VA, USDA, conventional, jumbo and/or non-agency Mortgage Loan products it is interested in considering purchasing and/or funding (individually a **"Mortgage Loan Product"** and collectively the **"Mortgage Loan Products"**), including, without limitation, information concerning interest rates, loan limits, loan-to-value, ratios, points, fees and underwriting requirements. Any commitment from UWM to Broker to purchase and/or fund any Mortgage Loan or Mortgage Loans or Mortgage Loan Applications will be issued in accordance with UWM's current lending policies and shall be in UWM's sole and absolute discretion. Such commitment must be in writing and be signed by an authorized employee of UWM and the terms of such commitment will be applicable only to the Mortgage Loan or Mortgage Loans specified therein. UWM may, in its sole and absolute discretion, cancel or discontinue any of the Mortgage Loan Products, with or without notice to the Broker. UWM will attempt to give advance notice of such changes but shall have no obligation to do so. Broker agrees to follow all practices and procedures required by UWM, as modified from time to time, including but not limited to those contained in the UWM Guide, as well as those required under applicable law.

**2.03. Pricing of Loans; Lock-in Rates.**

(a) UWM will provide price protection for the Mortgage Loans which it agrees to purchase and/or fund hereunder in the form of a written lock-in confirmation pursuant to its lock-in policies and in accordance with UWM's lending requirements. The time at which the interest rate for a Mortgage Loan is locked in shall be at Broker's option, provided, however, a Mortgage Loan with a locked in interest rate must be presented to UWM for purchase and/or funding before the expiration of the lock-in period. For purposes of the Agreement, the "lock-in period" shall be determined in accordance with UWM's lending requirements. If a Mortgage Loan is not presented for funding by UWM within the lock-in period, such Loan may be re-priced at the sole option of UWM. The transfer or sale by Broker of a Mortgage Loan locked in by UWM during the lock-in period to another entity, shall constitute a violation of the Agreement, and the Broker shall be liable, and promptly indemnify UWM, for any loss sustained as a result thereof by UWM. In addition, Broker shall notify UWM immediately should any commitment by UWM for a locked-in Mortgage Loan be canceled, withdrawn, or otherwise determined not to be set for purchase and/or funding by UWM.

(b) Broker will deliver the underwriting package to UWM not later than ten (10) calendar days prior to the expiration of the lock-in period.

**2.04 Broker's Fees.** Subject to all other provisions of this Agreement, including Section 7.18, broker's fee shall be payable by UWM when a Mortgage Loan is closed and funded by UWM and Broker has: (a) obtained in writing from UWM a firm commitment for UWM's interest rate, discount rate and ancillary fees; (b) successfully negotiated with the borrower(s) any fees in excess of UWM's fees for the Mortgage Loan; and (c) negotiated a spread premium fee from UWM for the Mortgage Loan, if applicable. UWM's pricing is published on a daily basis and is often adjusted several times throughout the day and reflects market conditions, the efficiency of UWM's operations and the value of the services (including Training and Information Services) that UWM provides. All pricing is subject to change without notice and no Mortgage Loan is price protected until UWM has issued a written lock confirmation. Broker shall not be entitled to any fee if a Mortgage Loan does not fund, regardless of the reason. In the event that any fees negotiated by Broker exceed those payable under applicable law, UWM may reduce such fees to a level which is in compliance with applicable law, without notice to Broker. Broker's fees are payable only after UWM has first deducted all of its fees and charges from the loan proceeds. If the mortgagor(s) fails to make any one (1) or more of the first three (3) mortgage payments due on his/their Mortgage Loan by the last day of the month in which the payment is due, then Broker shall promptly reimburse UWM for all amounts paid by UWM to Broker in connection with said Mortgage Loan.

**ARTICLE III**
**DUTIES, WARRANTIES & REPRESENTATIONS**

**3.01. Duties of Broker.** The Broker shall exercise its best efforts in connection with the performance of the following duties:

(a) Broker shall take Mortgage Loan Applications in accordance with applicable law at its offices in its own name through its employees and agents;

(b) Broker shall comply with all procedures established by UWM from time to time for the submission of Mortgage Loan Applications under the Mortgage Loan programs made available to Broker, including but not limited to those contained in the UWM Guide;

(c) Broker shall confirm whether each Mortgage Loan Application meets the terms, conditions and requirements established by UWM with respect to the Mortgage Loan programs;

(d) After securing the requisite authority from the applicant(s), the Broker shall secure financial and credit information from the applicant(s) and analyze the income and indebtedness of the applicant(s) to determine the maximum reasonable Mortgage Loan obligations that the applicant(s)

can bear;

(e) Broker shall: (i) educate the applicant(s) in regard to the home buying and financing process; (ii) advise the applicant(s) about the different Mortgage Loan programs made available by UWM; and (iii) explain to the applicant(s) how the closing costs and monthly payments would vary under the each of the Mortgage Loan programs for which the applicant(s) may be eligible;

(f) Broker shall also: (i) verify the employment of the applicant(s); (ii) verify the deposits required; (iii) initiate requests for mortgage loan verifications and payoffs; (iv) order an appraisal of the property through an approved appraisal management company, as required; (v) order the necessary title commitment; (vi) order a mortgage survey of the property, as required; (vii) provide the applicant(s) with all notices and disclosures required by law; and (viii) assist UWM in obtaining any additional information reasonably required by UWM in order to consider the Mortgage Loan Applications and/or facilitate the closing of all Mortgage Loans;

(g) Broker shall communicate with the applicant(s), real estate agent(s), and UWM in an effort to keep them informed as to the status of the application and/or the Mortgage Loan transaction and any changes in the terms of a Mortgage Loan within a reasonable time, and if UWM and other lenders represented by Broker deny credit to the applicant, Broker will prepare and deliver to the applicant a denial notice meeting all requirements of applicable law;

(h) Broker shall assist the applicant(s) in understanding and clearing credit problems;

(i) Broker shall notify UWM via electronic mail sent to theadvocate@unitedshore.com within five (5) business days of receipt of any Formal Complaint relating to a loan application submitted to, underwritten and/or closed by UWM and provide a copy of the Formal Complaint received;

(j) Broker shall perform such closing services as shall be reasonably required by UWM; and

(k) Broker shall further: (i) maintain, and will ensure that its employees and agents maintain, the confidentiality of all non-public personal information collected in connection with Mortgage Loan Applications; (ii) comply, and will ensure that its employees and agents comply, with all applicable privacy laws and other laws with respect to the completion and processing of Mortgage Loan Applications; (iii) maintain an information security program; and (iv) originate and process each Mortgage Loan in full compliance with applicable law, the requirements of investors, and other written communications of UWM, including but not limited to those contained in the UWM Guide.

(l) Broker agrees that it will not use for its own benefit or the benefit of any other person or entity, will hold in complete confidence in compliance with applicable law, and will not disclose to any person or entity (other than Broker's employees or agents who need access to the Confidential Information, as defined below, for the purpose of assisting Broker in fulfilling its obligations hereunder): (a) the confidential information relating to UWM which it has acquired or which it may acquire during the term of this Agreement; (b) any information that it has received or which it may receive during the term of this Agreement from UWM, its employees or agents of a confidential nature; (c) all notes, documents or materials prepared by Broker, its employees or agents which contain, reflect or are based upon, in whole or in part, the information described in subparagraphs (a) and (b) above (collectively the "Confidential Information"). UWM makes no representations or warranties of any kind, express, implied or statutory, with respect to the Confidential Information. Broker will return to UWM or destroy upon demand, all Confidential Information acquired by Broker, its employees or agents, including all copies thereof. Broker will ensure that its employees and agents comply with the terms of this paragraph.

**3.02. Duties of UWM.** UWM shall exercise commercially reasonable efforts in connection with the performance of the following duties:

(a) UWM shall Underwrite or cause to be Underwritten every Mortgage Loan submitted by Broker under this Agreement, provided, however, UWM shall have no obligation to issue a commitment for or close a Mortgage Loan which it determines, in its sole and absolute discretion, does not meet UWM's Underwriting requirements;

(b) UWM shall: (i) issue a loan approval if the Mortgage Loan Application complies with all UWM requirements, including but not limited to those contained in the UWM Guide, and UWM elects to accept a Mortgage Loan Application; or (ii) issue a notice of rejection in compliance with law if UWM determines that any Mortgage Loan Application submitted hereunder does not meet its Underwriting standards, in its sole and absolute discretion;

(c) UWM shall duly consider each and every Mortgage Loan Application submitted by Broker and may rely upon the materials and information supplied to it by the Broker as well as the authenticity and accuracy of all signatures appearing on documents and instruments delivered to UWM; and

(d) Upon the issuance of a commitment in UWM's name to the Borrower, UWM shall generally proceed with Closing of the Mortgage Loan in accordance with the terms and conditions set forth in the commitment to the Borrower but UWM reserves the right, in its sole and absolute discretion, to cancel the purchase and/or funding of any Mortgage Loan or Mortgage Loans for any reason which UWM determines to be material, in its sole and absolute discretion.

(e) UWM agrees to supply such Training and Information Services as it believes in its reasonable discretion will be productive and feasible to provide.

**3.03. Broker Warranties & Representations.** Broker hereby warrants, represents and covenants to UWM with regard to each Mortgage Loan submitted to UWM for underwriting, purchase and/or funding that the following are true, complete and correct in all material respects as of the date of such submission, as if such warranties, representations and covenants are again made by Broker on those dates and shall continue to be valid and accurate throughout the entire lending process:

(a) Broker is duly organized, validly existing and in good standing in each jurisdiction in which it originates Mortgage Loans delivered to UWM pursuant to this Agreement, and Broker has complied with all applicable statutes, laws, rules and regulations, orders and decrees of all federal, state, county and municipal authorities in connection with all such Mortgage Loans, including, but not limited to all applicable federal consumer financial laws. Broker further has qualified, registered, obtained and maintains all licenses and permits, and has taken all other requisite actions required in order to originate all Mortgage Loans delivered to UWM pursuant to this Agreement. The execution and delivery of this Agreement and the transactions contemplated hereby are duly authorized and binding on Broker. Broker shall provide UWM with documentation to substantiate such existence and/or compliance upon the request of UWM;

(b) All Mortgage Loans which Broker submits to UWM have met all material requirements of federal, state, or local laws, as amended from time to time, including, but not limited to those contained in the UWM Guide, and (i) usury; (ii) the Federal Truth-in-Lending Act of 1969 and Federal Regulation Z thereunder; (iii) RESPA and Regulation X thereunder; (iv) the Federal Equal Credit Opportunity Act and Regulation B thereunder; (v) the Federal Fair Credit Reporting Act; (vi) the Flood Disaster Protection Act of 1973; (vii) the Fair Housing Act; (viii) the Home Mortgage Disclosure Act; (ix) the FIRREA; (x) New York Executive Law Article 15, Section 296-a; (xi) the Secure and Fair Enforcement for Mortgage Licensing Act of 2008, (xii) the Gramm-Leach-Bliley Act (Pub. L. No. 106-102, 113 Stat. 1338), as amended from time to time; (xiii) the Fair and Accurate Credit Transactions Act; (xiv) the Home Ownership Equity Protection Act; (xv) all rules, regulations and guidelines promulgated by the Consumer Financial Protection Bureau; (xvi) The Dodd-Frank Wall Street Reform and Consumer Protection Act; (xvii) any and all licensing requirements relating to Broker's rights to originate and sell Mortgage Loans; (xviii) the requirements of all governmental authorities regulating Broker; and (xix) any and all laws, rules, ordinances, and regulations concerning adjustable rate mortgages, negative amortization, and graduated payment mortgages, and Broker shall maintain in its possession, and make available for UWM's inspection, and shall deliver to

UWM upon demand, evidence of compliance with all such laws and requirements;

(c) Broker has no knowledge of any circumstances or conditions with respect to any Mortgage Loan submitted to UWM for underwriting, purchase and/or funding, that the mortgaged property, the Mortgagor or the Mortgagor's credit standing could cause an institutional investor to regard the Mortgage Loan as an unacceptable investment, or otherwise cause the Mortgage Loan to become delinquent or materially adversely affect the value or marketability of the Mortgage Loan;

(d) With regard to FHA, VA or USDA insured Mortgage Loans, the Federal Housing Commissioner, VA or USDA, as applicable, has or will issue the mortgage insurance certificate or loan guaranty certificate; and all payments due for mortgage insurance premiums have been paid to the insuring authority; nothing has been done or omitted, and no circumstances exist, the effect of which act, omission or circumstances would invalidate the contract of mortgage insurance with the FHA, VA or USDA as applicable; and the Mortgage Loan complies with the regulations of the FHA, VA or USDA as applicable;

(e) All of the appraisers who have performed appraisals in connection with the Mortgage Loans submitted to UWM for purchase and/or funding have been properly licensed and are currently approved in accordance with applicable law and any appraisal management company utilized has passed UWMs approval process;

(f) The appraisal submitted in connection with each Mortgage Loan meets the requirements of FIRREA, and the Underwriting for each Mortgage Loan, if performed by Broker, has been performed in accordance with all of the provisions of applicable law, UWM's lending requirements, including but not limited to those contained in the UWM Guide, and the terms of this Agreement;

(g) No legal actions are pending or threatened which might reasonably affect any Mortgage Loan or the Broker's ability to transfer any Mortgage Loan to UWM free and clear of all claims and liens, or otherwise perform its obligations hereunder, except as previously disclosed by Broker to UWM in writing;

(h) Broker is not in default with respect to any material agreement to which it is party or by which it is bound, and the execution and performance of this Agreement will not violate any law, or term of its organizational and governance documents, as amended, or any material agreement to which Broker is a party or by which it is bound, and will not violate or conflict with any other restriction of any kind or character to which Broker is subject;

(i) All information submitted by Broker to UWM with regard to the Mortgage Loan, including all written materials, is presented and warranted by Broker to be true, correct, currently valid, and genuine in all material respects, as to all information within Broker's knowledge and as reported by each applicant and do not omit to state any facts necessary to make the statements contained therein not misleading; Broker has no knowledge of any circumstances or conditions with respect to any Mortgage Loan submitted to UWM for underwriting, purchase and/or funding, that the mortgaged property, the mortgagor or the mortgagee's credit standing could cause an institutional investor to regard Mortgage Loan as an unacceptable investment, or otherwise cause the Mortgage Loan to become delinquent or materially adversely affect the value or marketability of the Mortgage Loan;

(j) The Mortgage Documents and all other materials submitted to UWM in connection with the Mortgage Loan do not contain any fraudulent information or misstatement or omission of fact, and the Mortgage Loan has been originated in a manner consistent with prudent mortgage banking practices and consistent with the guidelines and policies established by UWM, Ginnie Mae, Fannie Mae, Freddie Mac, a Bond Authority, the FHA, the USDA, the VA, or other investor, as applicable;

(k) There are no undisclosed agreements between the Mortgagor and Broker concerning any facts or conditions, whether past, present or future, which might in any material way affect the payment and performance obligations of the Mortgagor or otherwise make the Mortgage Loan non-salable in the secondary market, Broker did not unduly influence or otherwise steer the Borrower into selecting a higher cost Mortgage

Loan program;

(l) Broker is solvent and has adequate capitalization and financial resources to properly engage in the business of originating and processing Mortgage Loans;

(m) Broker shall promptly advise UWM of any material change concerning the Broker, including, but not limited to, any change in ownership, financial condition or senior management, as well as the termination of any manager, mortgage loan officer or mortgage loan originator;

(n) Broker has no interest or direct or indirect ownership of all or any part of the property subject to a Mortgage Loan and Broker has no ownership interest in, or familial relationship with, the seller(s), Borrower(s), broker(s), Realtor(s), inspectors, appraisers or other persons performing any settlement services relating to any Mortgage Loan and shall not receive any fees or payments, either directly or indirectly, in violation of applicable law (unless such relationship has been disclosed to and approved by UWM in its sole discretion);

(o) All Mortgage Loan Applications and/or Mortgage Loans presented to UWM by Broker for underwriting, purchase and/or funding have been originated by Broker, and no such Mortgage Loan Applications and/or Mortgage Loans have been originated by a third party;

(p) Broker acknowledges that it does not and shall not discriminate against applicants on the basis of age, race, color, gender, ethnic background, national origin, religion, marital status, familial status, veteran status, handicap, sexual orientation, receipt of public assistance, because rights have been exercised by the applicant under any consumer protection law, or any other prohibited basis;

(q) With respect to subsections (a) through (p), inclusive, of this Section 3.03, Broker will promptly notify UWM if Broker becomes aware that any terms, conditions, warranties, representations or covenants hereunder become untrue or incomplete in any material respect in the future;

(r) The representations and warranties of Broker set forth in this Agreement are applicable whether or not non-employee contractors are used in lieu of employees of Broker in fulfilling any of Broker responsibilities and obligations set forth in this Agreement;

(s) Broker will immediately notify UWM if: (i) Broker fails to maintain any license or registration in violation of subsection (a) above, or if any such license or registration is cancelled or suspended; or (ii) Broker becomes subject to any enforcement and/or investigative proceeding by any licensing or regulatory authority or agency (subject to any confidentiality restrictions imposed by such licensing or regulatory authority or agency); or (iii) Broker is named as a party or becomes involved in any litigation; or (iv) Broker and/or any of its principal director(s) or owner(s) becomes the debtor in any voluntary or involuntary bankruptcy proceeding; or (v) Broker and/or any of its principal director(s) or owner(s) suffers the appointment of a receiver, custodian or trustee; or (vi) Broker and/or any of its principal director(s) or owner(s) has incurred or is likely to incur a material, adverse change in its/their financial condition; or (vii) Broker suffers a levy, execution or seizure upon material business assets;

(t) All representations, warranties and covenants contained in this Agreement shall inure for the benefit of UWM and its successors and assigns;

(u) Broker hereby appoints UWM and its directors, officers, employees, agents, successors and assigns, as its true and lawful attorney-in-fact, which appointment shall be deemed to be coupled with an interest, without right of revocation and with full power of substitution for and in its place and stead to: (i) demand and control all sums due on Mortgage Loans closed and funded pursuant to this Agreement and to enforce all rights with respect thereto, (ii) endorse, mark, place or otherwise evidence Broker's name as payee on all checks, drafts, acceptances or other form of partial or full payment delivered or tendered to UWM with respect to a Mortgage Loan, (iii) endorse, mark, place or otherwise evidence Broker's name on all notes, Mortgages, deeds of trust, and other forms of security instruments or collateral and all assignments, full or partial releases or satisfactions of said Mortgages, deeds of trust, and other forms of security instruments or collateral for all Mortgage Loans closed and funded pursuant to this Agreement, Broker agrees to execute such other documents as UWM may reasonably request to evidence the

appointment of UWM, as Broker's attorney-in- fact.

(v) Broker has in full force and effect and will continue to maintain an errors and omissions policy or policies or mortgage bankers blanket bond covering all of its activities under this agreement, as required by and with terms acceptable to Fannie Mae and Freddie Mac and shall provide to UWM, on an annual basis or as required by UWM satisfactory evidence thereof, and Broker also has and will continue to comply with any and all fidelity bond and surety bond requirements of Fannie Mae, Freddie Mac, and/or any state agency having or claiming to have jurisdiction over Broker.

(w) No employee, contractor, agent or other representative of Broker, or acting on behalf of Broker is: (a) subject to the provisions of such Executive Order 13224 or the Office of Foreign Assets Control of the United States Department of the Treasury (the "OFAC Regulations"); (b) listed as a "blocked person" for purposes of the OFAC Regulations; or (c) listed on Freddie Mac's Exclusionary List, the U.S. General Services Administration (GSA) Excluded Parties List (EPL), the HUD Limited Denial of Participation List (LDP List), and/or the Federal Housing Finance Agency's (FHFA) Suspended Counterparty Program (SCP) list.

**3.04. UWM's Warranties & Representations.** UWM represents and warrants that UWM possesses all necessary licenses from all regulatory authorities having jurisdiction over the Mortgage Loans to engage in the activities contemplated by this Agreement.

**3.05 Survival.** All representations, warranties and covenants of Broker contained in this Agreement shall survive the expiration and termination of this Agreement and shall continue in effect as to each Mortgage Loan for so long as any amount due from the Borrower remains outstanding and unpaid.

## ARTICLE IV
## POST-CLOSING DOCUMENTATION

**4.01. Broker's Obligation Regarding Post-Closing Documents.** Broker agrees that it is responsible for assisting in obtaining and delivering post-closing documents required to complete closed Mortgage Loan packages within the time frames established by UWM in its lending requirements or otherwise. UWM, in its sole and absolute discretion, may exercise its option to NOT fund a Mortgage Loan if all underwriting and/or closing conditions are not satisfied prior to funding. Broker understands that it is not authorized or empowered to accept or clear any lending conditions of UWM. Broker further understands and agrees that if Broker fails, neglects or refuses to obtain and deliver any post-closing documents reasonably required by UWM, UWM shall have the unilateral right to offset the reasonable costs associated with securing such post-closing documents against any amounts due Broker by UWM. Broker shall upon request from UWM, exercise its best efforts to take all actions necessary, in a timely and accurate manner, to obtain corrections to any and all loan documents deemed appropriate or desirable in UWM's sole and absolute discretion and to otherwise assist UWM in remedying any matter not in compliance with applicable law, regulations, or the requirements of UWM, including assisting UWM in obtaining recorded documentation related to a Mortgage Loan and title policies from closing agents, or to enable UWM to sell, convey, obtain guaranty for, or market loans. The failure, refusal and/or neglect of Broker to secure post-closing documentation in a timely manner shall entitle UWM to exercise a right of set off with respect to any amounts due Broker, and/or the right to require the repurchase of the Mortgage Loan in question by the Broker, in the sole and absolute discretion of UWM.

## ARTICLE V
## INDEMNIFICATION & REPURCHASE BY BROKER

**5.01. Indemnification by Broker.** Broker agrees to indemnify, defend (by counsel acceptable to UWM), and hold UWM harmless from and against any and all liabilities, claims, losses, damages and out of pocket costs ("individually a "Claim" and collectively the "Claims"): (a) resulting from any breach of this Agreement; (b) resulting from any act or omission by Broker in connection with any Mortgage Loan subject to this Agreement; (c) arising from or in connection with Broker's use of any non-industry standard form not provided or approved by UWM in connection with any Mortgage Loan; (d) concerning

miscalculations and other errors which result from Broker's independent application and processing procedures as well as for its misuse of forms required by UWM; (e) asserted against UWM under provisions of RESPA, including without limitation, claims based upon, or arising as a result of, any payments received by Broker in the nature of rate spread premium, service release premium, back points, discount points, broker rebates, and the like; (f) incurred or paid by UWM as a result of the exercise of a right of cancellation or right of recession by any Borrower in connection with a Mortgage Loan; and (g) extraordinary servicing costs or carrying costs related to any Mortgage Loan as a result of any of the following circumstances: (i) any breach of any representation, warranty or covenant contained herein, or any material breach of this Agreement; or (ii) if UWM is required to repurchase any Mortgage Loan which it has sold to an investor, or which it has placed or pledged to a mortgage pool, which repurchase requirement is a result of the Mortgage Loan being classified as a Defective Loan as the result of any act or omission of Broker;(each a "**Repurchase Event**"), the Broker shall be obligated to promptly repurchase such Mortgage Loan. If any Claim shall be asserted or brought against UWM by reason of any such act or omission of Broker, Broker shall upon demand, obtain representation by legal counsel acceptable to UWM to defend UWM against any such Claim and Broker shall pay all costs and attorney's fees incurred in such defense. All of the provisions of this Article V shall survive the closing of each Mortgage Loan transaction and shall inure to the benefit of UWM and future assignees of UWM.

**5.02. Terms of Indemnification.**

    (a) Broker may be required (at UWM's option) to remit to UWM immediately upon demand a good faith advance to be applied by UWM to cover any such Claim arising from such Repurchase Event, and

    (b) Broker may be required (at UWM's option) to remit to UWM immediately upon demand a non-refundable loan administration fee, and

    (c) Broker shall immediately upon receipt of notice from UWM confirming the occurrence of a Repurchase Event, fully reimburse UWM for the rate premium and/or service release premium originally paid to Broker at the time the Mortgage Loan was purchased by UWM, whether such premium was included in the gross price paid or referenced separately, and

    (d) Broker may additionally be required to remit to UWM immediately upon demand following a Repurchase Event, any additional amount to cover actual loss to UWM not otherwise reimbursed by the good faith advance or loan administration fee, as outlined above. Any good faith advance and additional amounts required under Section 5.02(a) and/or 5.02(b) herein in excess of actual losses will be returned to the Broker upon final loss reconciliation by UWM. Broker agrees that its failure to comply with the terms of the indemnification sections within this Agreement shall give UWM the right to demand full repurchase of said Mortgage Loan, and upon any such demand, Broker shall promptly repurchase such Mortgage Loan and reimburse UWM for all costs and expenses associated therewith.

**5.03. Right of Set-off.** Broker grants UWM the right of set-off and UWM may deduct any fees, penalties, damages, or other sums owed by Broker to UWM hereunder from the purchase price or loan funding of any Mortgage Loans purchased from Broker and/or funded by UWM. Broker shall be responsible for compensating UWM for any tolerance cure(s) the UWM is required to make to the Borrower because of Broker's acts or omissions in connection with the Mortgage Loan as determined by UWM in its sole and absolute discretion. UWM may also withhold, set-off and apply any fees, expenses, tolerance cures or other matters otherwise due and payable to Broker to any obligations of the Broker to UWM. UWM shall have the right to withhold any fees or payments until the Loan file is complete and the Broker has performed all of its obligations under this agreement.

**ARTICLE VI**
**BROKER USE OF DESKTOP UNDERWRITER**

**6.01. ARTICLE VI Definitions.** Any capitalized terms used in ARTICLE VI and not otherwise defined in ARTICLE VI or this Agreement have the meanings given to them in the License Agreement (as hereinafter defined). UWM has entered into the Fannie Mae Licensed Application Master Terms and Conditions

("**Master Terms**") and its Desktop Underwriter® Schedule and associated Redistribution Addendum thereto ("**DU Schedule**" and "**Addendum**", respectively, and together with the Master Terms, the "**License Agreement**") with Fannie Mae governing the rights and obligations of UWM and Fannie Mae with respect to UWM's use of Desktop Underwriter (the "**Licensed Application**"). Broker is an Affiliate or Subsidiary of UWM and desires to use the Licensed Application in connection with Prequalification Analysis, mortgage loan origination and/or underwriting activities.

All words and phrases defined in this ARTICLE VI shall, for the purposes of this ARTICLE VI **only**, have the following respective meanings:

(a) **"Affiliate"** shall mean a mortgage lending entity or Third Party Originator that performs Prequalification Analyses, origination or underwriting in relation to mortgage loans intended to be closed by UWM or assigned or sold to UWM.

(b) **"Consumer Credit Data"** shall mean any information obtained by Broker, either directly or indirectly, which bears on a consumer's creditworthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living (the "Seven Factors") and which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in underwriting a Mortgage Loan Application or performing a Prequalification Analysis. Such data may include, but are not limited to, data contained in: (i) residential mortgage credit reports, "in-file" credit reports, or "consumer reports," as defined in the FCRA; (ii) the Uniform Residential Loan Application, including any attachments and/or supplements thereto; and (iii) any correspondence or communication from the consumer or any third party which includes information relating to one of the Seven Factors.

(c) **"Mortgage Loan Application"** shall mean the submission by a mortgage loan applicant of financial information and identification of the specific property to secure the mortgage loan for the purpose of obtaining an underwriting decision.

(d) **"Prequalification Analysis"** shall mean the evaluation of Consumer Credit Data with respect to a prospective mortgage loan applicant for the purpose of evaluating such prospective applicant's qualification for mortgage financing, other than in connection with a Mortgage Loan Application.

(e) **"Subsidiary"** shall mean a mortgage lending entity more than fifty percent (50%) of whose controlling interest or outstanding voting shares or securities are owned or controlled, directly or indirectly, by UWM.

**6.02. License Agreement.** Broker represents that it is an Affiliate or Subsidiary of UWM and that it has received and read the License Agreement and understands and agrees that it shall be fully obligated to comply with each and every provision of such License Agreement in connection with its use of the Licensed Application.

**6.03. Licensing Rights.** UWM agrees that, as and to the extent set forth in this ARTICLE VI, its license rights under the License Agreement shall extend to Broker in connection with the Licensed Application. Broker agrees that the rights granted to it shall not extend to any third party, including, but not limited to, Broker's customers, subsidiaries and/or affiliates.

**6.04. UWM Agent.** Broker expressly appoints UWM as its agent, as that term is defined in the FCRA, in connection with any use of the Licensed Application by Broker with respect to Mortgage Loan Applications or Prequalification Analyses. Broker also expressly acknowledges, understands and agrees that UWM's role as Broker's agent shall not extend beyond the limited purposes set forth in this Section 6.04, and for all other purposes, there shall be no such principal and agent relationship. Moreover, Broker shall in no way misrepresent to third parties the limited extent of this principal/agent relationship. Broker further acknowledges, understands and agrees that any recommendation rendered by the Licensed Application in the evaluation of Consumer Credit Data will not constitute an approval or denial of the Mortgage Loan Application by UWM or a commitment to lend by UWM.

**6.05. Fannie Mae Agent.** In connection with the processing and evaluation of Consumer Credit Data by the Licensed Application for purposes of making an underwriting recommendation or performing a Prequalification Analysis (if applicable), Broker expressly appoints Fannie Mae, as owner of the Licensed Application, as its agent, as that term is defined in the FCRA. As Broker's agent, Fannie Mae shall, and is hereby expressly authorized by Broker to, obtain

Consumer Credit Data for the sole purpose of performing a Prequalification Analysis and/or making an underwriting recommendation. Broker also expressly acknowledges, understands and agrees that Fannie Mae's role as Broker's agent shall not extend beyond the limited purposes set forth in this Section 6.05, and for all other purposes, there shall be no such principal and agent relationship. Moreover, Broker shall in no way misrepresent to third parties the limited extent of this principal/agent relationship. Broker further acknowledges, understands and agrees that any recommendation rendered by the Licensed Application in the evaluation of Consumer Credit Data will not constitute an approval or denial of the Mortgage Loan Application by Fannie Mae or a commitment to purchase the loan by Fannie Mae. Broker shall disclose any secondary use of Consumer Credit Data that is facilitated by use of the Licensed Application to the issuing consumer reporting agency.

**6.06. Affiliate Relationship.** If Broker is an Affiliate, Broker shall use the Licensed Application for the primary purpose of (i) originating or underwriting mortgage loans intended to be closed by UWM, or assigned or sold to UWM, and/or (ii) performing Prequalification Analyses for UWM (to the extent that the performance of Prequalification Analyses utilizing the Licensed Application is permitted under the License Agreement). If Broker is an Affiliate, Broker shall not be permitted to use the Licensed Application's wholesale lending ("DU® wholesale") functionality pursuant to this ARTICLE VI. If Broker is a Subsidiary, Broker shall use the Licensed Application only in connection with its own Mortgage Loan Applications and/or Prequalification Analyses and/or those of UWM (to the extent that the performance of Prequalification Analyses utilizing the Licensed Application is permitted under the License Agreement).

**6.07. Requesting Additional Consumer Reports.** Notwithstanding anything to the contrary in that Section of the DU Schedule captioned "Use of Licensed Application," Broker must first obtain written permission from the mortgage loan applicant to request additional consumer reports before using the Licensed Application as described below:

(a) With respect to Mortgage Loan Applications previously approved but not yet closed:

(i) to request and receive additional Consumer Reports through the Credit Retrieval Module, when Broker is requesting such reports in connection with its own Mortgage Loan Applications and/or Prequalification Analyses, or because other circumstances exist which Broker believes justify the request for such additional consumer reports under the FCRA;

(ii) to analyze or evaluate Consumer Credit Data, including Consumer Reports, when Broker determines that data obtained subsequent to its initial approval may affect its prior underwriting approval decision;

(iii) to request and receive Consumer Reports and/or analyze or evaluate Consumer Credit Data when the loan applicant(s) request different loan terms or a different loan product than that originally requested by the loan applicant(s); and

(b) With respect to Mortgage Loan Applications previously denied by Broker, which denial decision has been communicated to the applicant(s):

(i) to request and receive Consumer Reports through the Credit Retrieval Module, when Broker is requesting such reports in connection with its own Mortgage Loan Applications and/or Prequalification Analyses;

(ii) to analyze or evaluate Consumer Credit Data, including Consumer Reports, when (A) Broker determines that data obtained subsequent to its initial denial decision may affect its prior underwriting decision, and (B) Broker intends to make and communicate an offer of credit to the applicant(s) if an approval recommendation decision is rendered by the Licensed Application as a result of consideration of the additional data obtained.

**6.08. Intended Beneficiary.** Broker and UWM acknowledge and agree that Fannie Mae is an intended beneficiary of ARTICLE VI.

**6.09. Termination of ARTICLE VI.** ARTICLE VI shall remain in full force and effect unless terminated pursuant to the provisions of this Section or terminated pursuant to Section 7.06 of this Agreement. The parties acknowledge and agree that ARTICLE VI is subject to the License Agreement and that ARTICLE VI shall automatically terminate upon termination of the Desktop Underwriter Schedule and/or the Redistribution Addendum by Fannie Mae and/or UWM. The

parties acknowledge that, pursuant to the terms of that Section of the Redistribution Addendum captioned "Termination of Affiliates and Subsidiaries", Fannie Mae may, in its absolute discretion, immediately terminate access by Broker to the Licensed Application for any breach of (a) the License Agreement, (b) ARTICLE VI of the Agreement, or (c) any other agreement between Broker and any lender (including UWM) that has access to the Licensed Application. Upon termination of ARTICLE VI, the other terms and conditions of this Agreement shall continue in full force and effect unless otherwise terminated or amended pursuant to the terms hereof.

**6.10. Licensed Materials.** Immediately upon termination of either ARTICLE VI or this Agreement, Broker shall cease using the Licensed Materials, and destroy or return all copies of the Licensed Materials in its possession to UWM. Promptly upon request from UWM or Fannie Mae, Broker shall provide UWM or Fannie Mae with written certification of its compliance with the foregoing, executed by a duly authorized officer of Broker.

**6.11. DU Support.** UWM, and not Fannie Mae, shall be responsible for providing Broker with (i) first line support with respect to Broker questions and comments concerning Fannie Mae's automated underwriting guidelines and policies, including, but not limited to, questions concerning the interpretation and applicability of the Licensed Application's findings reports and questions relating to Fannie Mae's Selling Guide and (ii) appropriate training relating to the use of the Licensed Application and such guidelines and policies.

**6.12. ARTICLE VI Conflict with License Agreement.** In the event of a conflict between the terms of ARTICLE VI and the terms of the License Agreement, the terms of the License Agreement shall govern.

**6.13. Assignment of ARTICLE VI Rights.** Rights under ARTICLE VI may not be assigned by Broker to any other person(s), firm(s), corporation(s) or other entities without the prior express written consent of Fannie Mae and UWM.

**6.14. Notification.** This Section 6.14 applies only to notices required by ARTICLE VI. All other notices required pursuant to this Agreement shall be provided according to Section 7.21 of this Agreement. All notices, requests, demands, and other communications with required pursuant to ARTICLE VI (other than routine operational communications) shall be in writing and shall be deemed to have been received by a party (i) when actually received in the case of hand delivery, (ii) one (1) business day after being given to a reputable overnight courier with a reliable system for tracking delivery, (iii) when sent by confirmed facsimile with a copy sent by another means specified in this paragraph, or (iv) seven (7) days after the date of mailing, when mailed by United States mail, registered or certified mail, return receipt requested, postage prepaid, and addressed to the recipient's contact person/address set forth below:

UWM: United Shore Financial Services, LLC,
d/b/a United Wholesale Mortgage
585 South Blvd E.
Pontiac, MI 48341
Attention: CLIENT APPROVAL TEAM

Broker: The Okavage Group, LLC
300 Kingsley Lake Drive
Suite 402
SAINT AUGUSTINE, FL 32092

In the event that the recipient does not so specify a contact person/address, notices shall be addressed to the general counsel at the recipient's corporate headquarters. A party may from time to time change its address or designee for notification purposes by giving the other party prior written notice of the new address or contact person.

**6.15. Conflict.** In the event that any provision of ARTICLE VI conflicts with the law under which ARTICLE VI is to be construed, or if any such provision is held invalid, void or unenforceable by a court with jurisdiction over the parties to ARTICLE VI, such provision shall be deemed to be restated to reflect as

nearly as possible the original intention of the parties in accordance with applicable law, and the remainder of ARTICLE VI and the Agreement shall remain in full force and effect.

## ARTICLE VII
### MISCELLANEOUS PROVISIONS

**7.01. Amendment of Agreement.** Except as set forth on Section 7.08, this Agreement may not be amended except in writing executed by authorized representatives of both Broker and UWM.

**7.02. Waiver Nonbinding.** The failure of UWM to insist in any one or more instances upon strict performance of any of the covenants, agreements, or conditions of this Agreement, or to the exercise of any rights hereunder, shall not be construed as a waiver or a relinquishment for the future of such covenants, agreements, conditions or rights, and any and all waivers must be in writing and be signed by the party waiving its rights.

**7.03. No Obligations To Make Loans.** Nothing contained in this Agreement shall be construed to require UWM to approve, purchase and/or fund any Mortgage Loan or Mortgage Loans submitted by Broker pursuant to the terms hereof. Approval and funding of any such Mortgage Loan or Mortgage Loans shall be in the sole and absolute discretion of UWM, and said decision will be made on a loan by loan basis. Broker shall not be obligated to submit any particular mortgage loan applications or any minimum number of loan applications to UWM.

**7.04. No Agency or Employment Relationship.** With the limited exception in Section 6.04 of this Agreement, both parties understand and agree that it is not intended that this Agreement create or establish a relationship of employer and employee between UWM and Broker, nor is it intended that Broker will be UWM's partner, joint venturer or agent. Broker is an independent contractor, and is hereby expressly prohibited from holding itself out as an agent, representative or employee of UWM or of having any endorsement from or affiliation with UWM.

**7.05. Term.** This Agreement is for an initial term of one (1) year and shall automatically renew for successive terms of one (1) year each, unless terminated pursuant to Section 7.06 below.

**7.06. Termination.** This Agreement may be terminated by either party for any reason, with or without cause, breach or other justification, upon seven (7) days prior written notice, and may be terminated immediately: (a) for breach of any covenant, obligation, or duty herein contained; or (b) for violation of any law, ordinance, statute rule or regulation governing the conduct of either party hereto; or (c) upon the suspension, cancellation, or termination of any license or permit required by a party to conduct business and/or perform its obligations hereunder; or (d) if any warranty, representation or statement made by a party to this Agreement was false in any material respect when made or furnished; or (e) in the event a party becomes a debtor in any voluntary or involuntary bankruptcy proceeding; or (f) in the event that a party shall become insolvent, fails to pay its debts as they become due, or makes an assignment for the benefit of its creditors; or (g) in the event of a seizure, execution or levy upon material assets of a party; or (h) in the event of a dissolution of a party; or (i) upon the sale or disposition of a significant portion of the assets or equity interests of a party; or (j) in the event that a trustee, custodian or receiver shall be appointed in connection with material assets of a party. Termination shall not affect the obligations with respect to any Mortgage Loans submitted prior to such termination, except that UWM shall not be obligated to purchase and/or fund any such Mortgage Loans approved prior to termination if UWM terminates this Agreement for breach by Broker on the basis of fraud, dishonesty, misrepresentation, negligence or other breach of this Agreement. In addition, termination shall not affect either party's obligations with respect to amounts previously owed to the other party pursuant to this Agreement, or Broker's indemnification and confidentiality obligations to UWM.

**7.07. Current Financials & Document Retention.** . At UWM's request, Broker shall provide to UWM its year-end financial statements, including a balance sheet and income statement. If UWM acts as FHA or VA sponsor for Broker, copies of all closing documents for Mortgage Loans funded by UWM shall be retained by Broker for the time period required by FHA or VA. Broker is responsible for maintaining a complete origination file containing all documents that were used in processing and underwriting a Mortgage Loan.

**7.08. UWM Amendments & Website.** This Agreement, and UWM's policies, procedures, requirements and instructions concerning Mortgage Loan Applications and Mortgage Loans, including but not limited to those contained in the UWM Guide, may be amended by UWM from time to time, and UWM will endeavor to provide broker with prompt notice thereof, which may occur by posting any such amendments on UWM's website, which Broker is required to regularly check and monitor as a condition of this Agreement. Broker agrees that the submission of any Mortgage Loan Applications or Mortgage Loans to UWM after such amendment shall be Broker's agreement to the amendment without further signature or consent of any kind. Any such amendment shall apply to pending, and/or future Mortgage Loan Applications submitted by Broker.

**7.09. Quality Control.** Broker agrees to provide UWM upon its request copies of Broker's policies and procedures, training materials and other applicable documentation related to Broker's business practices for review by UWM. Broker shall also permit any officer, employee or designated representative of UWM, at any reasonable time during regular business hours, to examine, reproduce and make audits of any of the processes implemented and documents in the possession or control of Broker regarding any Mortgage Loan or Mortgage Loan Application submitted to UWM pursuant to this Agreement. If upon the request of UWM, Broker fails to timely deliver all documents and records associated with or related to any Mortgage Loan or Mortgage Loan Application submitted to UWM pursuant to this Agreement, Broker shall give UWM and its officers, employees, or designated representatives reasonable access to Broker's premises in order to allow UWM to retrieve, prepare, reproduce and otherwise obtain all such documents and records. Broker shall also make its officers, employees, and/or designated representatives available to UWM and shall cooperate with UWM in connection with all such examinations, audits and document and record collection activities. Further, Broker hereby consents and gives UWM permission to record telephone calls between employees and independent contractors of UWM and Broker for quality control purposes and further, Broker represents and warrants that it has obtained or will obtain all required consents and approvals of Broker's current and future employees and independent contractors authorizing UWM to record such phone calls.

**7.10. Unacceptable Applications & Submissions.** Under no circumstances shall Broker submit any Mortgage Loan Applications for Mortgage Loans that could be considered to constitute a "high cost loan" or "predatory loan" as defined in: (a) the Home Ownership and Equity Protection Act, as amended; or (b) any other federal, state or local law or regulations.

**7.11. Broker Advertising & Customer Privacy.** Broker may advertise to the public the availability of various loan programs and Broker's services, but Broker may not, in any way, directly or indirectly identify UWM or related parties in any such advertising unless: (i) required by applicable laws or regulations; or (ii) UWM has, in advance, approved use of UWM's name by the Broker in writing. Broker agrees to provide UWM upon its request with model advertising samples in use at the time of application to do business with UWM, as well as to notify UWM with questions on any substantive changes to those advertisements, or of any new advertisements Broker uses. Without the prior consent of UWM, Broker shall not sell or distribute any customer or contact list incorporating the names, addresses or any non- public personal information of such Borrower(s) or Mortgagors.

**7.12. Entire Agreement.** The arrangements and relationships contemplated in this Agreement and/or any document referred to herein constitute the sole understanding and agreement of the parties. This Agreement supersedes all other agreements, covenants, representations, warranties, understandings and communications between the parties, whether written or oral, with respect to the transactions contemplated by this Agreement.

**7.13. Invalidity & Severability.** The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions of this Agreement, and any provision determined to be invalid and/or unenforceable by a court or tribunal of competent jurisdiction shall be revised and reformed to make such provision valid and/or enforceable, if possible, to the fullest extent permitted by law, otherwise this Agreement shall be construed as if such invalid or unenforceable provision was omitted.

**7.14. Benefit & Assignment.** Broker may not assign its rights and/or delegate its duties and obligations under this Agreement without the written consent of UWM. UWM may assign its rights and/or delegate its duties and obligations under this Agreement to any subsidiary, affiliate or successor in interest without the consent of Broker. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties and their respective heirs, legal representatives, successors and assigns.

**7.15. Governing Law.** This Agreement shall be governed by, and construed and enforced in accordance with, applicable federal laws and the laws of the State of Michigan, without reference to conflict of laws principles. The parties to this Agreement hereby unconditionally and irrevocably: (a) submit to the

exclusive jurisdiction of the Oakland County (Michigan) Circuit Court, or in the event that original jurisdiction may be established, the United States District Court for the Eastern District of Michigan, Southern Division, sitting in Detroit, Michigan (hereinafter the "Courts"), in any action arising out of this Agreement; (b) agree that all Claims in any action must be decided in one of said Courts; and (c) waive, to the fullest extent that they may effectively do so, the defenses of: (i) lack of subject matter jurisdiction of such Courts; (ii) the absence of personal jurisdiction by such Courts over the parties to this Agreement; and (iii) forum non-conveniens.

**7.16. Attorney's Fees.** In the event a dispute arises under this Agreement between Broker and UWM, which dispute results in legal action being taken by one or both of the parties, the prevailing party shall be entitled to recover its reasonable attorney fees, costs and other expenses associated with the enforcement of its rights under this Agreement, and the non-prevailing party hereby agrees to promptly pay same.

**7.17. Early Payoffs.** UWM is committed to the long term performance of its loans. As such, should any Mortgage Loan delivered hereunder be paid off within one hundred eighty (180) days of the funding of such Mortgage Loan for any reason, Broker shall promptly deliver to UWM the greater of: (a) any credit for the rate paid by UWM to the borrower or Broker, in the aggregate; or (b) one (1%) percent of the amount of the Mortgage Loan.

**7.18. Enforceability & Construction.** Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction, and to this end, the provisions hereof are severable. In the event any of the terms or provisions contained in this Agreement conflict with those contained in other documents executed in connection with this Agreement, the terms and provisions of this Agreement shall govern and control. In the event of any conflict, inconsistency or ambiguity between the terms of this Agreement and those contained in any Addendum hereto or Amendment hereof, the terms and conditions of such Addendum or Amendment shall be deemed to govern and control. Notwithstanding the foregoing, in the event of any conflict, ambiguity or inconsistency between the terms and conditions contained in this Agreement and those set forth in the UWM Guide, the terms and conditions of the UWM Guide shall be deemed to supersede and control.

**7.19. Counterparts & Electronic Signatures.** This Agreement may be executed in one or more counterparts, each of which shall constitute an original and all of which shall constitute the same Agreement. The parties to this Agreement hereby further agree that due to their distant locations and/or differing schedules, this Agreement may be executed via facsimile, electronic mail or electronic signature and that a facsimile or electronic signature of this Agreement containing counterpart facsimile or electronic or other signature shall be valid and binding for all purposes.

**7.20. Notices.** Any notices necessary to be given under the provisions of the Agreement will be sufficient if in writing and delivered personally, by U.S. certified mail, return receipt requested or by any nationally recognized express courier service to the addresses set forth below, or to such other address as may hereafter be furnished by either party to the other party by like notice, or via electronic mail if consented to by the parties;

UWM: United Shore Financial Services LLC,
d/b/a United Wholesale Mortgage
585 South Blvd E.
Pontiac, MI 48341
Attention: CLIENT APPROVAL AND TEAM

Broker: The Okavage Group, LLC
300 Kingsley Lake Drive
Suite 402
SAINT AUGUSTINE, FL 32092

**7.21. No Third Party Beneficiaries.** Except for Section 6.08 and Section 7.27 of this Agreement the parties to the Agreement do not intend to confer benefits upon any person or entity who or which is not a signatory to this Agreement.

**7.22. Time Is Of The Essence.** Time shall be of the essence for purposes of this Agreement as well as with respect to all of the documents and instruments executed in connection herewith.

**7.23. Interpretation.** This Agreement (and all agreements, documents, instruments and/or exhibits referred to or incorporated into this Agreement) is being entered into among competent persons, who are experienced in business and represented by counsel, and has been reviewed by the parties and their counsel. Therefore, any conflicting or ambiguous language contained in this Agreement (and all agreements, documents, instruments and/or exhibits referred to or incorporated herein) shall not necessarily be construed against any particular party as the drafter of such language.

**7.24, WAIVER OF JURY TRIAL.** BROKER AND UWM ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED. UWM AND BROKER, AFTER CONSULTING COUNSEL OF THEIR CHOICE, EACH HEREBY KNOWINGLY AND VOLUNTARILY, WITHOUT COERCION, WAIVE ALL RIGHTS TO A TRIAL BY JURY OF ALL DISPUTES BETWEEN THEM.

**7.25, Authorization.** Broker hereby consents and gives UWM permission to obtain information about the Broker. Broker agrees to provide written confirmation to UWM that is has conducted background checks on any and all employees and independent contractors of the Broker that include, without limitation, professional history information, criminal record information, credit information and other public information. Further, at UWM's request, Broker agrees to provide UWM with the adjudication criteria associated with such background checks as well as the results indicating conformance to such criteria. At UWM's request, Broker also agrees to confirm in writing that the background checks of its employees and independent contractors produced no violation(s) of applicable agency guidelines as well as all federal, state and/or local laws by said employees and independent contractors. Broker consents to the release of information to regulators and law enforcement agencies about any Mortgage Loan or loan application that may be suspected to contain misrepresentations and/or irregularities. It is understood and agreed that Broker and its employees may be named as the originator or loan officers on such Mortgage Loans, whether or not Broker or its employees are implicated in any allegations of wrongdoing. Broker hereby releases and agrees to indemnify, defend and hold harmless UWM from and against any and all liability for damages, losses, costs and expenses that may arise from the reporting or use of any information submitted by UWM or used in any way by UWM.

**7.26. Authorization Release.** Broker hereby consents to a review and confirmation of any and all documents, records and other information related to its officers, directors, principals, and similarly situated persons with strategic decision making authority in Broker and Broker as to their and its business professional and financial reputation and standing, personal financial standing, fitness as a mortgage broker, a concurrent funding broker and/or wholesale correspondent, and such other information as may be received during the review and confirmation to be provided to UWM. Every firm, company, governmental agency, court, association or institution having control of any documents, records and other information pertaining to Broker or any of its officers, directors, principals, and similarly situated persons with strategic decision making authority in Broker is hereby authorized and requested to furnish, allow to be copied or otherwise provide, information of the kind described above to UWM or its representatives, conducting the review and confirmation. This authorization and request includes, but is not limited to, documents, records or files regarding any charges or complaints filed against any of the aforementioned individuals, including any complaints erased by law, whether formal or informal, pending or closed, and information from Interthinx, Inc. database, Broker specifically authorizes and requests consumer credit reporting agencies to provide personal credit history on any owner of Broker, executive officer of Broker, or similarly situated person with strategic decision making authority in Broker to UWM. In consideration of the time and expense incurred in reviewing and evaluating the application and qualifications of Broker and its officers, directors, principals and similarly situated persons with strategic decision making authority in Broker as to its and their fitness as a broker for UWM, and to facilitate the providing of information for the review and confirmation by UWM, on behalf of the aforementioned persons and Broker, on behalf of itself and its officers, directors, principals, and similarly situated persons with strategic decision making authority in Broker, hereby releases, discharges, exonerates and covenants not to sue any person, company or governmental organization providing information in the review and confirmation, any recipient of information, including UWM, its representative, its parent, sister and affiliate companies and its and their officers, agents, employees and independent contractors, from any and all liability of every nature and kind arising from or in connection with the furnishing of information, the inspection of documents, records and other information, and the preparation of the review and confirmation of the information provided to UWM.

**7.27. Loan Prospector/Intended Beneficiary.** Freddie Mac offers its automated underwriting service, Loan Prospector, to organizations which are licensed

originators of mortgage loans but do not have a seller agreement or seller number with Freddie Mac (*"Third -Party Originators"*). For Third-Party Originators to access Loan Prospector, the Third-Party Originators must obtain a Third-Party Originator Number from Freddie Mac. Broker represents and warrants to UWM that it shall comply with any rules, guidelines or other requirements established by Freddie Mac in connection with Broker's use of Loan Prospector. Broker and UWM acknowledge and agree that Freddie Mac is an express, intended third-party beneficiary of this Agreement solely for the purpose of enforcing Freddie Mac's rights under this Agreement, including but not limited to under this Section 7.27.

**7.28. Blink Application System.** While Broker is registered to do business with UWM, UWM grants to Broker a non-exclusive, revocable, non-sublicensable, non-transferable license to use the mark, name or logo of its Blink application system (*"Blink Mark"*) in association or in connection with the operation of Broker's services or business within the United States. It is understood and agreed that this license shall pertain only to the Blink Mark. Broker acknowledges that Broker shall not acquire any right, title or interest in the Blink Mark by virtue of this license. Broker shall not by any act or omission use the Blink Mark in any manner that disparages or reflects adversely on UWM or its business reputation and shall indemnify, defend and hold harmless UWM in connection with any act or omission of Broker, its employees or agents associated with the license granted hereunder. UWM may terminate this license at any time and for any reason. Upon either the termination of the license or if Broker is no longer registered to do business with UWM, the Broker shall immediately discontinue all use of the Blink Mark. Further, Broker shall not use any other mark, name or logo of UWM or any related entity of UWM without UWM's prior written approval. Further, in connection with the Blink application system, Broker may be provided with certain information, including but not limited to loan documentation and/or disclosures, from third party providers or otherwise enter into certain agreements with such third party providers (*"Blink Relationships"*). Broker waives, releases and forever discharges UWM from and against any and all responsibility, liability, demands, damages, claims and actions of every name and nature that may arise from the Blink Relationships.

**7.29. UWM Programs.** From time to time, certain programs may be offered by UWM, or on behalf of UWM, to Broker, or through Broker to the Borrowers, in connection with the Mortgage Loans or Broker's business relationship with UWM (collectively, the *"UWM Programs"*). Broker waives, releases and forever discharges UWM from and against any and all responsibility, liability, demands, damages, claims and actions of every name and nature that may arise from the UWM Programs.

**WHEREFORE**, the parties hereto have executed the above and foregoing Agreement as of the day and year first above written.

Electronically signed **11/20/2020 3:45:12 PM** by **DANIEL Okavage** of **The Okavage Group, LLC** from **10.10.5.240**.

United Wholesale Mortgage, LLC Accepted **11/27/2020 2:12:23 PM** by **cisabella** from **10.10.5.240**.

# EXHIBIT  F

```
 1              IN THE UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF FLORIDA
 2                   JACKSONVILLE DIVISION

 3                   CASE NO. 3:21-CV-00448

 4

    THE OKAVAGE GROUP, LLC,
 5  on behalf of itself and
    all others similarly
 6  situated,

 7          Plaintiff,

 8      v.

 9  UWM HOLDINGS CORPORATION and
    MAT ISHBIA, individually,
10
            Defendants.
11  _____/

12

13

14         TRANSCRIPTION OF FACEBOOK LIVE VIDEO

15                   March 4, 2021

16

17

            Transcribed by Mary Ann Collier, a Court
18  Reporter and Notary Public for the State of Florida.

19

20

21

22

23

24

25
```

1          Hi there.  I'm Mat Ishbia, president and CEO
2     of UWM.  Welcome to Facebook Live.  Thanks for
3     being here with us.  We're so excited to have you
4     join.  We've got some big announcements.
5          I've got a couple of big things I'm excited
6     to tell you about, state of the industry, a new
7     jumbo loan and even more.  But before I wanted to
8     just say thank you.  Proud to be part of the
9     family, the broker family.  I'm all in with you
10    guys; you're all in with us.  I'm proud to be
11    part of it and excited about our future together
12    as a team, as a family.
13         Now, as you guys know, I'm out there as much
14    as possible, broker family.  Faster, easier,
15    cheaper.  We're all in for mortgage brokers,
16    helping independent mortgage companies succeed,
17    whether it's the national press or on national
18    television, or, you know, I'm always put out,
19    findamortgagebroker.com, help the brokers win,
20    brokers are best for consumers, brokers are best
21    for realtors.  Super Bowl commercial.  We did
22    that.  Helped you grow.  We're all in.  There's
23    no other way to say it.  You know, educating
24    realtors and consumers.  We're helping them
25    realize that you're the best place to go, the

          1          independent mortgage companies, the mortgage
          2          brokers.
          3               And so our goal, my goal, 33 percent mortgage
          4          broker market share by 2025.  Right now it's
          5          anywhere between 17 and 22 percent, depending on
          6          what numbers you look at.  But brokers are
          7          growing and we're gonna to grow together as a
          8          family.
          9               You guys have a huge advantage over retail,
         10          because you have options.  You have options of
         11          different lender's, return times, pricing, and
         12          you're always going to have options.  There's 75
         13          amazing wholesale lenders out there, 75 amazing
         14          wholesalers doing.  There may be more in the
         15          future.
         16               Options are key.  You have an advantage,
         17          because it's faster, it's easier and it's
         18          cheaper.  Technology investment.  And what we're
         19          trying to do as brokers, and you guys know this,
         20          is help you dominate, help make you invincible.
         21          Give you access to marketing, give you access to
         22          technology, so you can compete with the biggest
         23          lenders in America.
         24               We're here to help support you so you can
         25          continue to win.  Because we already know you're

```
1        cheaper, you have a better price, because you're
2        in wholesale.  How to make it faster and easier,
3        and that' what we're going to continue to invest
4        in.
5            I've got some big technology rollouts coming
6        soon.  But we're not going to talk about that
7        stuff today.  I have three big things I want to
8        talk about today with you guys.  First thing is
9        this.  Prime jumbo.  The UWM prime jumbo is back.
10       We're pivoted to a simplified, easy, one-stop
11       product, where you can run it though DU, and,
12       boom, just like high balance nationwide, you're
13       good to go.  Run it through DU.  There's a couple
14       overlays, but a lot less, because Appendix Q,
15       right, that's going away where you don't have to
16       follow this.  So we have less overlays than those
17       high balance nationwide and jumbo bank buster.
18           But now you have one program called the Prime
19       Jumbo with amazing pricing.  Right?  Two million
20       dollar loan amounts, up to an 89.99 LTV on
21       purchases and rate and terms, and probably over
22       80 on cash out.  We're trying to get that just so
23       that the last little piece will work out.
24           This has come alive March 17th.  One product,
25       run through DU, simplified, great pricing, 45
```

```
1          ETI, 89.99 LTV.  Brokers, we're going to win.
2          We're going to help those jumbo borrowers,
3          because pre-COVID, we were great on jumbo and you
4          were great on jumbo.  We kind of backed off on it
5          during COVID.  Now it's back.  Now we have the
6          full suite of products, again, at UWM, from FHA,
7          to the VA, to the conventional.  Of course, as
8          guys know it now, prime jumbo is back in about
9          two weeks, March 17th.  So be on the lookout.
10         We're real excited about that opportunity.
11              Now, speaking about products, Conquest, one
12         of the best products in America.  Consistently
13         has been great.  Help brokers close loans fast.
14         Help you win retail loans.  It's been great.
15         It's had its time and place.  It's been
16         successful, very successful.  But now we're going
17         to pivot.  We're going to pivot here at UWM.
18         We're all going to pivot together.
19              Conquest will still be out there, but our
20         regular programs, our elite programs, our
21         non-elite programs, our regular conventional,
22         FHA, VA, all those programs, those are going to
23         be the focus, simplifying the rate sheet, making
24         our rate policies, our rate sheet policies
25         better, to use it the way we always had it.
```

1          That's back.

2               And on top of it, the pricing's substantially

3          sharper across the board.  IPO 61 is over.  The

4          61 base points is now in the rate sheet.  All

5          right?  IPO 61 is over.  Sixty-one base points in

6          this rate sheet, like I just said, self-employed

7          now that matters.  Three properties, you're good.

8          Right?  There's no more complexities.

9               It's simple.  Use our regular pricing, elite

10         and non-elite, you're good to go with UWM, 61

11         base points in the pricing.  Lock plus 12 is now

12         in there, too.  You can lock on 30, 45, 60 day

13         locks.  Whatever you want.  There's higher rate

14         ranges, so if you want to have a little more

15         premium on there, it's out there.

16              Also, I'm throwing in more pricing, another

17         40 to 50 base points on top of the 61.  We are

18         going to be, if you look at the pricing that's

19         going to come out, so we're probably the best

20         price with everyone else chasing us, which is

21         great, I'm fine with that.  We're not going to

22         try to be the best price.  We are going to try to

23         be very consistent.

24              You know, the 61 base points is in.  Another

25         40 to 50 on top of that, we are going to grow

```
 1        together.  2.99, 2.875, those are real rates
 2        right now.  The refi boom didn't go anywhere.
 3        It's still here.  Take advantage with UWM.
 4        Purchases have been off the charts right now.
 5        We're blowing up our purchases.  Now you can use
 6        them on all your loans with UWM.
 7             You want investment properties, right?  You
 8        couldn't do that on Conquest.  Now you're good.
 9        Investment price.  There's no 18 month
10        requirement anymore.  That's done.  That was
11        Conquest.
12             You can do all your loans with UWM,
13        investment properties, cash outs, you know,
14        higher rate ranges, lower ranges, whatever you
15        need, self-employed, you don't need a 760 FICO, a
16        740 FICO.  Self-employed, you're good to go.
17             Our high balance pricing's really sharp.  Our
18        15 year pricing is really sharp.  We're going to
19        knock these loans out extremely fast.  It's what
20        it's for.  Guess what?  We're closing these loans
21        this month, every one of these loans.  Bring them
22        on in.  Let's dominate.  Let's finish the quarter
23        strong.  Let's continue to grow as a team.  We
24        went public.  We talked about that.  We had
25        access to resources.  It's time to turn it on.
```

1          It's game on for all of us.

2               Now, like I say, we're going to be consistent

3          on pricing across the board.  Our competitors are

4          going to follow us, so even the brokers that

5          don't use UWM, they got a big boost, because all

6          the other brokers, all of the lenders, excuse me,

7          will follow our pricing.  So if you look at

8          pricing yesterday and look at it tomorrow, watch

9          the difference and watch how everyone else is

10         just sharpening.  Keep up with UWM, so we're

11         helping the whole broker channel.

12              Why would we do that?  Because we're

13         separating retail from wholesale.  Enough of this

14         talk that retail is close to competing with us.

15         It's over.  It was a moment in time.  The market

16         was crazy.  Margins were different.  That's a

17         moment in time.

18              Brokers are dominating.  We're taking over

19         the market.  There's no stopping brokers.  We're

20         going to win together as a family.  I'm all in,

21         you're all in, we're all in together.

22              So look out for the rate sheet, 12:15 p.m.,

23         you know, a couple minutes from now.  It's going

24         to be out there.  It's live.  Get ready.  Our

25         competitors will follow us.  Now, whether you

1        work with us or not, everyone's getting the

2        advantage.

3            If you're a broker, you know who you just

4        lost?  Retail.  The retail losses, they're

5        struggling.  They're going to struggle, because

6        we just widened the gap, service, technology,

7        pricing, it's all there with UWM.  Let's dominate

8        together.

9            We're all in.  We're going to continue to

10       talk about findamortgagebroker.com.  We're going

11       to continue to help you grow.  We're all in for

12       brokers.  Faster, easier, cheaper.  Educate

13       realtors.  Help everyone win.  We want to

14       continue to help  you have a significant

15       advantage over the retail channel.  So our

16       pricing's sharp.  Look at it.  It's going to be

17       great.

18           Now, I have another big announcement before

19       we go, because I got a couple big things.  You

20       know, there's three big things.  One is jumbo,

21       prime jumbo is huge.  It's going to be great.

22       But pricing's game over.  Right?  Let's do this.

23       Let's take it to another level.  We're excited

24       about it.  Hoping you are, too.

25           Take a look at it.  Everyone is going to be

 1          excited.  We're going to take loans.  We're
 2          dominate for you.  Help you.  Now, there's no
 3          float downs, just to be clear.  You can't float
 4          down loans, you can't switch.  It's renew locks,
 5          you know, that's what the new pricing's for.  But
 6          we're going to grow together as a team, as a
 7          family.  And so we're very excited about this.
 8              Now, before we get to the last point, and I'm
 9          talking about you growing, you succeeding, before
10          I get to the last point, pricing's great.  We
11          talked about success track is coming back.
12          Training, coaching, helping you get better.
13              I want to just point out a couple of things.
14          We've been doing it virtually, but back in May
15          and June, coming up in May and June, we're going
16          back out here.  You're welcome to come back out.
17          We have hundreds of people here a week.
18          Obviously, we will do the social distance, make
19          sure everyone's feeling comfortable and safe.
20          But we're getting ready to go.  We're going to
21          dominate together.
22              So on top of that we added a partner services
23          team, so you guys know.  It's brokers are trying
24          to do a lot of retail branch services or whatever
25          they call it.  We have partner services.  You

```
 1        need help recruiting new LOs?  We got you.  You

 2        need help with licensing?  We got you.  You need

 3        any help with culture, training, we got it.

 4        Marketing and branding, you need help with your

 5        website, we got it.  Technology.  We are trying

 6        to make the brokers invincible.  Our technology,

 7        your team, our services, we're going to win

 8        together.

 9             Now, the last thing I want to talk about

10        before we go, and this is a big one, it's

11        important, because, listen, big goals, big goals,

12        big responsibilities on all of us.  Thirty-three

13        percent mortgage broker channel by 2025.  We're

14        going to get there as a family.  What's going to

15        stop us?  Nothing's stopping us.  We're getting

16        there.  We're getting there together so you guys

17        know.

18             Now, what can slow us down?  One thing is if

19        the loan officers don't come to the broker

20        channel or even leave the broker channel and go

21        to the retail channel.  That would hurt us.  That

22        would hurt you and that would hurt all of us

23        together.

24             Or let's think about it, purchases where we

25        all dominate.  What if real estate just stopped
```

1        referring business to brokers?  What if they try

2        to cut the loan officers and the brokers out?

3        Right?  Or if a consumer came to a broker and

4        then left and never came back.  Never referred

5        people to you.  Bad experience with a broker.

6        You know, what can we do?  Those things would

7        hurt us.

8             Well, let me talk about something.  There's

9        two companies out there that are hurting the

10       wholesale channel.  Right?  At UWM we only grow

11       if you grow.  I've got no chance.  I got 8500

12       plus people here.  We win when you win and all of

13       us win together.

14            But there's two companies out there hurting

15       the wholesale channel.  Specifically, Fairway

16       Independent.  They have a wholesale company

17       called Fairway Independent Wholesale.  They're

18       out there soliciting loan officers and talking

19       negatively about brokers right now.  They're

20       calling, trying to steal your loan officers, they

21       are soliciting them,  they are aggressive and

22       they're not doing right by the broker channels.

23            But some of our brokers are still referring

24       them loans, sending them loans.  That's not good.

25       Loan officers, we don't want them leaving.  We

1     want them coming to us, not leaving.  Fairway

2     Independent is out there trying to hurt the

3     wholesale channel.

4          The other company is Rocket Mortgage.

5     They're going after real estate agents.  They're

6     trying to cut the loan officer out.  They're

7     paying real estate agents to get licensed and

8     then paying them 50 basis points.  I don't know

9     what this is.  It's not my job to figure that

10    out.  Paying them 50 base point and cut the loss,

11    just refer them right to Rocket's partnership

12    team.  Cut the brokers out.  Cut the loan

13    officers out.  That's not good.  That's not good

14    for us.  That's not what we want.

15         The same thing with -- you know, we all know

16    Rocket Mortgage solicits your past clients and

17    solicits the -- they're -- once again, these are

18    their business models.  Fairway Independent and

19    Rocket Mortgage, whatever they want to do they

20    can do.  And as long as they play by the rules,

21    it's their rules, their world.

22         But that's not my business model.  My

23    business model is helping you win.  Helping the

24    family grow.  Being all in for brokers.  And I

25    can't stop other people's business models.  But

```
1            what I can do, I can control my business model.

2                 So I'm starting today and saying at UWM,

3        we're not helping those that help them.  If you

4        work and send loans and send business to Fairway

5        Independent or Rocket Mortgage, which, by the

6        way, is about 25 percent of the broker channel

7        works with either of those lenders.  So 35

8        percent you can just ignore this whole point.

9        But I wanted to point out, 25 percent work with

10       those lenders.  If you work with them, you can't

11       work with UWM anymore effective immediately.

12               So you can't work with UWM if you work with

13       those guys.  Because, you know what, I can't stop

14       you, but I'm not going to help you help the

15       people that are hurting the broker channel.

16               And that's what's going on right now.  We

17       don't need a fund, Fairway Independent or Rocket

18       Mortgage, to try to put brokers out of business.

19       We don't need to do that.  If you want to do

20       that, it's your own deal.  No hard feelings.

21       But at UWM, you can't work with UWM anymore.

22               So you have until -- so, owners, you have

23       until March 15th to sign an addendum saying

24       you're not working with those two lenders.

25       There's other lenders, by the way.  There's 75
```

1      great lenders.  Those lenders, I don't agree with

2      their business practices, but these two are going

3      after the broker channel and so we're not helping

4      them anymore.

5           You have until March 15th to sign the

6      addendum.  And if you don't sign the addendum,

7      but, hey I'm not working with them, that's no

8      problem.  Then you and nobody in your company

9      will be able to work with UWM anymore.

10          And that's okay.  There's no hard feelings.

11     Right?  I don't have a problem.  You can either

12     accept the addendum, you can decline the

13     addendum, in which case you can say I don't want

14     to work with UWM, or you can accept it and say I

15     have some loans to close out, because we don't

16     want you to not close out the loans.  Close out

17     your loans.  Take care of consumers.

18          Even if you were to decline the addendum and

19     the loans you have with UWM, we're not going to

20     hurt the consumer.  We'll close every one of

21     those loans with you.  We're here to help and do

22     the right thing.

23          But, going forward, I'm not supporting

24     brokers with our technology, with our service,

25     with our passion for the broker channel, with our

 1          recruiting, with all the things that are going to

 2          hurt the rest of the broker channel by funding

 3          the competition of brokers, the competition of

 4          the wholesale channel.

 5              So here's the question.  Are you all in?  Are

 6          you out?  Are you in or are you out?  If you're

 7          in, like I said, most of you guys don't worry.

 8          This is what I think.  There's 75 great lenders

 9          out there.  You need to have options.  But

10          there's two that are out there hurting the

11          channel.

12              And so what we think about is this.  You can

13          pick us and the 73 other lenders or you can pick

14          those others and not have you.  But, either way.

15          Well, one of them has great pricing.  Well,

16          Provident has the best pricing.  All right.

17          There's nothing that those two lenders do for

18          brokers that the other 73 lenders don't do.  And

19          so today we're taking a stand.  We're saying

20          we're all in.

21              Now, what's the response?  I mean, this is

22          great for the whole broker channel, to be honest

23          with you, because I love brokers either way.

24          Even if you don't pick us, I still love you,

25          because I'm supportive of the channel and excited

 1        for the channel's growth.

 2            But, here's the reality.  Today, after our

 3        rate sheet, or maybe tomorrow, Rocket Mortgage

 4        and Fairway Independent, you know what they're

 5        going to do?  Sharpen the price to another 100

 6        basis points.  Make it so that if they -- they

 7        just lost 80 percent of their business

 8        potentially.  Right?  Because the only thing 80

 9        to 90 percent of brokers are going to say, hey,

10        we're sticking with UWM and the other 73 lenders

11        that are out there trying to help us grow, not

12        with the people that are trying to put us out of

13        business.

14            So for the ten percent that stay with them,

15        hey, they're going to get some great pricing.

16        And then as soon as they know you're gone, UWM is

17        out of it, they'll probably back off the pricing

18        and change it.  But, hey, that's your decision.

19            That's what they're going to do.  They're

20        going to sharpen pricing.  You want great

21        pricing, there's a lot of great -- well, our

22        pricing is really sharp today and it's going to

23        be really sharp going forward.  But, like I said,

24        these guys just lost 70, 80, 90 percent of their

25        business, they're going to make some massive

1          changes right away.

2               And so I know that.  You know that.  But who

3          you are all in with?  Are you all in with the

4          brokers or are you all in with the people trying

5          to put brokers out of business?  So today, I'm

6          all in with you.  I'm all in with the brokers and

7          I'm going to always be all in.  That's what we're

8          doing.

9               Our pricing, extremely sharp today.  It's

10         going to be consistently sharp.  We're going to

11         help you win more loans.  We're going to help you

12         grow in the purchase market.  We're not going to

13         hurt you on the realtors; we're going to help you

14         with the realtors.

15              We're not going to, you know, sever loan

16         officers, we're going to help you get more loan

17         officers.  We're going to help you with your

18         consumers.  Our Plan 360, out new technology.

19         We've got some big tech stuff coming out.  We're

20         going to continue to invest, not hundreds of

21         millions, billions of dollars in the broker

22         channel and technology behind it.  That's how we

23         got here and that's how we're all going to get

24         there together.

25              So take a look at our amazing pricing. It's

1     out.  Jumbo is coming soon.  And then the

2     question is, you all in?  You all in with the

3     broker channel?  Because I'm all in.  We're all

4     in together as a family.

5           Thanks for joining me.  If you have any

6     questions, you can reach out to us.  We're

7     excited.  Hashtag all in.  I know a lot of people

8     are thinking right now that's how we're going to

9     do it.  I'm all in.  You're all in.  Let's

10    dominate.

11          We're going to grow the broker channel.

12    We're going to grow every single loan officer.

13    Watch us.  We're going to win together.  I'm

14    excited to do it with you as a family.  Have a

15    great day.

16          (End of Facebook Live video.)

17

18

19

20

21

22

23

24

25

1                    <u>CERTIFICATE OF REPORTER</u>

2

3          I, MARY ANN COLLIER, Court Reporter, do

4    hereby certify that I was authorized to and did

5    stenographically transcribe the Facebook Live video,

6    and that the transcript is a true and complete record

7    of my stenographic notes of said Facebook Live video.

8

9          DATED this 16th day of June 2021.

10

11

12          *Mary Ann Collier*
            MARY ANN COLLIER

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT G

## WHOLESALE BROKER AGREEMENT

THIS WHOLESALE BROKER AGREEMENT ("*Agreement*") is made and entered into as of _____,20\_\_    , between United Wholesale Mortgage, LLC, a Michigan limited liability company ("*UWM*"), with its office located at 585 South Blvd E., Pontiac, MI 48341, and _____ ("*Broker*") with its principal offices located at_____.

RECITALS:

WHEREAS, UWM is engaged in the business of, among other activities, purchasing and/or funding mortgage loans on residential real estate and reselling such loans in the secondary mortgage market; and

WHEREAS, Broker is engaged in the business of taking applications for residential mortgage loans; assisting borrowers in pre-qualifying for mortgage loans; selecting a mortgage product and completing an application; and processing those applications on behalf of others in exchange for a fee or other consideration; and

WHEREAS, during the term of this Agreement, UWM will advise Broker of UWM's various FHA, VA, USDA, conventional, jumbo and/or non-agency mortgage loan products as well as select bond program mortgage loan products, and Broker intends, from time to time, to offer to UWM for potential purchase and/or funding certain FHA, VA, USDA, conventional, jumbo and/or non-agency mortgage loans as well as select bond program mortgage loans which fall within the parameters of UWM's mortgage loan products;

NOW, THEREFORE, in consideration of the mutual agreements and covenants hereinafter set forth, and other good and valuable consideration, the receipt and legal sufficiency of which is hereby severally acknowledged, UWM and Broker hereby agree as follows:

## ARTICLE I
## DEFINITIONS

All words and phrases defined in this Article I (except as herein otherwise expressly provided or unless the context otherwise requires) shall, for the purposes of this Agreement, have the following respective meanings:

**1.01.**     "*Agreement*" means this Wholesale Broker Agreement and any written amendments or modifications hereto which are made in accordance with the terms of this Wholesale Broker Agreement.

**1.02.**     "*Bond Authority*" means a federal, state or local authority established for the purpose of making residential Mortgage Loans to low and moderate income borrowers and issuing bonds or other obligations to fund such loans.

**1.03.**     "*Bond Program*" means a qualified single family residential Mortgage Loan program of a local, state or federal housing authority under which residential Mortgage Loans are made available to low and moderate income borrowers at below market interest rates and/or upon other terms and conditions favorable to the Borrowers.

**1.04.**     "*Borrower*" means the person or persons who submit a Mortgage Loan Application to Broker, receive a Mortgage Loan, and are liable on a Mortgage Note to UWM.

**1.05.**     "*Closing*" means the funding of a Mortgage Loan by UWM.

**1.06.**     "*Complaint*" means a consumer communication of dissatisfaction regarding a product, service and/or participant in the loan process.

**1.07.**     "*Defect*" means a breach in any respect of any representation or warranty herein contained with respect to a Mortgage Loan or any failure by Broker to comply with any covenant or condition herein contained with respect to a Mortgage Loan which could reasonably be expected to result in a loss or damage to UWM or a subsequent purchaser of such Mortgage Loan.

Rev 3-4-2021

**1.08.** "*Defective Loan*"means any Mortgage Loan that has a Defect.

**1.09.** "*FHA*" means the Federal Housing Administration.

**1.10.** "*Freddie Mac*"means the Federal Home Loan Mortgage Corporation or any successor thereto.

**1.11.** "*FIRREA*"means the Financial Institutions Reform, Recovery and Enforcement Act of 1989.

**1.12.** "*Fannie Mae*"means the Federal National Mortgage Association or any successor thereto.

**1.13.** "*Formal Complaint*" means a Complaint received via: (i) any means from any state or regulatory agency, including but not limited to Attorney General offices, Congressman offices, and the Consumer Financial Protection Bureau; and (ii) electronic mail, fax, or letter that is addressed to the Chief Executive Officer, Branch Manager, President or other member of Broker's senior management.

**1.14.** "*Ginnie Mae*"means the Government National Mortgage Association or any successor thereto.

**1.15.** "*Mortgage*"means a valid and enforceable Mortgage, Deed of Trust, or other Security Instrument creating a first or second lien upon described real property improved by a one-to-four family residential dwelling, which secures a Mortgage Note.

**1.16.** "*Mortgage Documents*"means all documents and instruments required by UWM and applicable law pertaining to a particular Mortgage Loan.

**1.17.** "*Mortgage Loan*"means a loan to individuals which is secured by a Mortgage and is subject to this Agreement.

**1.18.** "*Mortgage Loans*"means each and every Mortgage Loan, which is subject to this Agreement.

**1.19.** "*Mortgage Loan Application*" or "*Mortgage Loan Applications*" means an application for a Mortgage Loan processed by Broker in accordance with the lending requirements of UWM, including but not limited to those contained in the UWM Guide, the terms of this Agreement, all applicable governmental regulations, and the generally accepted practices and procedures within the mortgage industry.

**1.20.** "*Mortgage Note*"means a written promise to pay a sum of money at a stated interest rate during a specified term that is secured by a Mortgage.

**1.21.** "*Mortgagor*" means the obligor on a Mortgage Note.

**1.22.** "*Repurchase*"means the obligation of the Broker to purchase a Mortgage Loan from UWM which was previously transferred and/or sold to UWM by the Broker.

**1.23.** "*RESPA*"means the Real Estate Settlement Procedures Act of 1974 (12 U.S.C. 2601, et seq.), as amended from time to time.

**1.24.** "*Servicing Rights*"or "*Servicing*"means the rights, title, and interest in and to the servicing of the Mortgage Loans and the maintenance and servicing of the escrow accounts, along with the right to receive the servicing fee income and any and all ancillary income arising from or connected with all such Mortgage Loans.

**1.25.** "*Training and Information Services*" means the training, marketing and/or information services provided to Broker in furtherance of Broker's business, including but not limited to licensing related training and/or discounts, sample communications and/or related templates.

**1.26** "*Underwrite*" or "*Underwriting*" means the examination of a Borrower's application, credit history, income

and financial resources for the purpose of determining whether to extend credit to such Borrower.

**1,27**,   "**USDA**" means the United States Department of Agriculture or any successor thereto.

**1.28.**   "**UWM Guide**" means all verbal procedures and requirements delivered by UWM or its representatives as well as those procedures and requirements contained on UWM's website and all links incorporated therein, including but not limited to EASE, as amended from time to time.

**1.29.**   "**VA**" means the United States Department of Veterans Affairs.

**ARTICLE II**
**PURCHASE & FUNDING OF LOANS**

**2.01.**   **Purchase and/or Funding of Loans by UWM**.   UWM agrees to consider purchasing and/or funding certain Mortgage Loans from Broker, provided that all of the following requirements are met:

(a)   Upon payment by UWM of the purchase price for each such Mortgage Loan so purchased and/or funded, all rights, title and interest in and to said Mortgage Loan shall be assigned and transferred by the Broker to UWM free and clear of all claims, liens and encumbrances whatsoever.

(b)   Each Mortgage Loan shall be transferred and/or sold to UWM on a "servicing released" basis meaning that Broker shall release, transfer, convey and assign in a form and manner acceptable to UWM, all of Broker's rights, title and interest in and to the Mortgage Loan, including, without limitation, the right to provide mortgage servicing in connection therewith.

(c)   All FHA, VA, conventional, USDA, jumbo, non-agency and select Bond Program Mortgage Loans shall be closed in the name of UWM, unless another name is specifically authorized by UWM in writing in advance of closing; and

(d)   All such Mortgage Loans shall meet UWM's lending requirements, including but not limited to those contained in the UWM Guide,  and any other terms and conditions required by UWM, in its sole and absolute discretion, which may be amended from time to time.

**2.02.**   **UWM Loan Requirements.** UWM will advise Broker from time to time regarding the types of FHA, VA, USDA conventional, jumbo and/or non-agency Mortgage Loan products it is interested in considering purchasing and/or funding (individually a "**Mortgage Loan Product**" and collectively the "**Mortgage Loan Products**"), including, without limitation, information concerning interest rates, loan limits, loan-to-value, ratios, points, fees and underwriting requirements.  Any commitment from UWM to Broker to purchase and/or fund any Mortgage Loan or Mortgage Loans or Mortgage Loan Applications will be issued in accordance with UWM's  current lending policies and shall be in UWM's sole and absolute discretion. Such commitment must be in writing and be signed by an authorized employee of UWM and the terms of such commitment will be applicable only to the Mortgage Loan or Mortgage Loans specified therein. UWM may, in its sole and absolute discretion, cancel or discontinue any of the Mortgage Loan Products, with or without notice to the Broker. UWM will attempt to give advance notice of such changes but shall have no obligation to do so.  Broker agrees to follow all practices and procedures required by UWM, as modified from time to time, including but not limited to those contained in the UWM Guide, as well as those required under applicable law.

**2.03.**   **Pricing of Loans; Lock-in Rates.**

(a)   UWM will provide price protection for the Mortgage Loans which it agrees to purchase and/or fund hereunder in the form of a written lock-in confirmation pursuant to its lock-in policies and in accordance with UWM's lending requirements.  The time at which the interest rate for a Mortgage Loan is locked in shall be at Broker's option, provided, however, a Mortgage Loan with a locked in interest rate must be presented to UWM for purchase and/or funding before the expiration of the lock-in period.  For purposes of the Agreement, the "**lock-in period**" shall be determined in accordance with UWM's lending requirements.  If a Mortgage Loan is not presented for funding by UWM within the lock-in

period, such Loan may be re-priced at the sole option of UWM.  The transfer or sale by Broker of a Mortgage Loan locked in by UWM during the lock-in period to another entity, shall constitute a violation of the Agreement, and the Broker shall be liable, and promptly indemnify UWM, for any loss sustained as a result thereof by UWM.  In addition, Broker shall notify UWM immediately should any commitment by UWM for a locked-in Mortgage Loan be canceled, withdrawn, or otherwise determined not to be set for purchase and/or funding by UWM.

(b)　　Broker will deliver the underwriting package to UWM not later than ten (10) calendar days prior to the expiration of the lock-in period.

**2.04**　　**Broker's Fees.**  Subject to all other provisions of this Agreement, including Section 7.18, broker's fee shall be payable by UWM when a Mortgage Loan is closed and funded by UWM and Broker has: (a) obtained in writing from UWM a firm commitment for UWM's interest rate, discount rate and ancillary fees; (b) successfully negotiated with the borrower(s) any fees in excess of UWM's fees for the Mortgage Loan; and (c) negotiated a spread premium fee from UWM for the Mortgage Loan, if applicable.   UWM's pricing is published on a daily basis and is often adjusted several times throughout the day and reflects market conditions, the efficiency of UWM's operations and the value of the services (including Training and Information Services) that UWM provides. All pricing is subject to change without notice and no Mortgage Loan is price protected until UWM has issued a written lock confirmation. Broker shall not be entitled to any fee if a Mortgage Loan does not fund, regardless of the reason.  In the event that any fees negotiated by Broker exceed those payable under applicable law, UWM may reduce such fees to a level which is in compliance with applicable law, without notice to Broker. Broker's fees are payable only after UWM has first deducted all of its fees and charges from the loan proceeds. If the mortgagor(s) fails to make any one (1) or more of the first three (3) mortgage payments due on his/their Mortgage Loan by the last day of the month in which the payment is due, then Broker shall promptly reimburse UWM for all amounts paid by UWM to Broker in connection with said Mortgage Loan.

## ARTICLE III
## DUTIES, WARRANTIES & REPRESENTATIONS

**3.01.**　　**Duties of Broker.**  The Broker shall exercise its best efforts in connection with the performance of the following duties:

(a)　　Broker shall take Mortgage Loan Applications in accordance with applicable law at its offices in its own name through its employees and agents;

(b)　　Broker shall comply with all procedures established by UWM from time to time for the submission of Mortgage Loan Applications under the Mortgage Loan programs made available to Broker, including but not limited to those contained in the UWM Guide;

(c)　　Broker shall confirm whether each Mortgage Loan Application meets the terms, conditions and requirements established by UWM with respect to the Mortgage Loan programs;

(d)　　After securing the requisite authority from the applicant(s), the Broker shall secure financial and credit information from the applicant(s) and analyze the income and indebtedness of the applicant(s)  to determine the maximum reasonable Mortgage Loan obligations that the applicant(s) can bear;

(e)　　Broker shall: (i) educate the applicant(s) in regard to the home buying and financing process; (ii) advise the applicant(s) about the different Mortgage Loan programs made available by UWM; and (iii) explain to the applicant(s) how the closing costs and monthly payments would vary under the each of the Mortgage Loan programs for which the applicant(s) may be eligible;

(f)　　Broker shall also: (i) verify the employment of the applicant(s); (ii) verify the deposits required; (iii) initiate requests for mortgage loan verifications and payoffs; (iv) order an appraisal of the property through an approved appraisal management company, as required; (v) order the necessary title commitment; (vi) order a mortgage survey of the property, as required; (vii)  provide the applicant(s) with all notices and disclosures required by law; and (viii) assist UWM in obtaining any additional information

reasonably required by UWM in order to consider the Mortgage Loan Applications and/or facilitate the closing of all Mortgage Loans;

(g)     Broker shall communicate with the applicant(s), real estate agent(s), and UWM in an effort to keep them informed as to the status of the application and/or the Mortgage Loan transaction and any changes in the terms of a Mortgage Loan within a reasonable time, and if UWM and other lenders represented by Broker deny credit to the applicant, Broker will prepare and deliver to the applicant a denial notice meeting all requirements of applicable law;

(h)     Broker shall assist the applicant(s) in understanding and clearing credit problems;

(i)     Broker shall notify UWM via electronic mail sent to theadvocate@unitedshore.com within five (5) business days of receipt of any Formal Complaint relating to a loan application submitted to, underwritten and/or closed by UWM and provide a copy of the Formal Complaint received;

(j)     Broker shall perform such closing services as shall be reasonably required by UWM; and

(k)     Broker shall further: (i) maintain, and will ensure that its employees and agents maintain, the confidentiality o f all non-public personal information collected in connection with Mortgage Loan Applications; (ii) comply, and will ensure that its employees and agents comply, with all applicable privacy laws and other laws with respect to the completion and processing of Mortgage Loan Applications; (iii) maintain an information security program; and (iv) originate and process each Mortgage Loan in full compliance with applicable law, the requirements of investors, and other written communications of UWM, including but not limited to those contained in the UWM Guide.

(l)     Broker agrees that it will not use for its own benefit or the benefit of any other person or entity, will hold in complete confidence in compliance with applicable law, and will not disclose to any person or entity (other than Broker's employees or agents who need access to the Confidential Information, as defined below, for the purpose of assisting Broker in fulfilling its obligations hereunder): (a) the confidential information relating to UWM which it has acquired or which it may acquire during the term of this Agreement; (b) any information that it has received or which it may receive during the term of this Agreement from UWM, its employees or agents of a confidential nature; (c) all notes, documents or materials prepared by Broker, its employees or agents which contain, reflect or are based upon, in whole or in part, the information described in subparagraphs (a) and (b) above (collectively the "**_Confidential Information_**"). UWM makes no representations or warranties of any kind, express, implied or statutory, with respect to the Confidential Information. Broker will return to UWM or destroy upon demand, all Confidential Information acquired by Broker, its employees or agents, including all copies thereof. Broker will ensure that its employees and agents comply with the terms of this paragraph.

**3.02.   Duties of UWM.**   UWM shall exercise commercially reasonable efforts in connection with the performance of the following duties:

(a)     UWM shall Underwrite or cause to be Underwritten every Mortgage Loan submitted by Broker under this Agreement, provided, however, UWM shall have no obligation to issue a commitment for or close a Mortgage Loan which it determines, in its sole and absolute discretion, does not meet UWM's Underwriting requirements;

(b)     UWM shall: (i) issue a loan approval if the Mortgage Loan Application complies with all UWM requirements, including but not limited to those contained in the UWM Guide, and UWM elects to accept a Mortgage Loan Application; or (ii) issue a notice of rejection in compliance with law if UWM determines that any Mortgage Loan Application submitted hereunder does not meet its Underwriting standards, in its sole and absolute discretion;

(c)     UWM shall duly consider each and every Mortgage Loan Application submitted by Broker and may rely upon the materials and information supplied to it by the Broker as well as the authenticity and

accuracy of all signatures appearing on documents and instruments delivered to UWM; and

(d)    Upon the issuance of a commitment in UWM's name to the Borrower, UWM shall generally proceed with Closing of the Mortgage Loan in accordance with the terms and conditions set forth in the commitment to the Borrower but UWM reserves the right, in its sole and absolute discretion, to cancel the purchase and/or funding of any Mortgage Loan or Mortgage Loans for any reason which UWM determines to be material, in its sole and absolute discretion.

(e)    UWM agrees to supply such Training and Information Services as it believes in its reasonable discretion will be productive and feasible to provide.

**3.03.    Broker Warranties & Representations.** Broker hereby warrants, represents and covenants to UWM with regard to each Mortgage Loan submitted to UWM for underwriting, purchase and/or funding that the following are true, complete and correct in all material respects as of the date of such submission, as if such warranties, representations and covenants are again made by Broker on those dates and shall continue to be valid and accurate throughout the entire lending process:

(a)    Broker is duly organized, validly existing and in good standing in each jurisdiction in which it originates Mortgage Loans delivered to UWM pursuant to this Agreement, and Broker has complied with all applicable statutes, laws, rules and regulations, orders and decrees of all federal, state, county and municipal authorities in connection with all such Mortgage Loans, including, but not limited to all applicable federal consumer financial laws. Broker further has qualified, registered, obtained and maintains all licenses and permits, and has taken all other requisite actions required in order to originate all Mortgage Loans delivered to UWM pursuant to this Agreement. The execution and delivery of this Agreement and the transactions contemplated hereby are duly authorized and binding on Broker.  Broker shall provide UWM with documentation to substantiate such existence and/or compliance upon the request of UWM;

(b)    All Mortgage Loans which Broker submits to UWM have met all material requirements of federal, state, or local laws, as amended from time to time, including, but not limited to those contained in the UWM Guide, and (i) usury; (ii) the Federal Truth-in-Lending Act of 1969 and Federal Regulation Z thereunder; (iii) RESPA and Regulation X thereunder; (iv) the Federal Equal Credit Opportunity Act and Regulation B thereunder; (v) the Federal Fair Credit Reporting Act; (vi) the Flood Disaster Protection Act of 1973; (vii) the Fair Housing Act; (viii) the Home Mortgage Disclosure Act; (ix) the FIRREA; (x) New York Executive Law Article 15, Section 296-a; (xi) the Secure and Fair Enforcement for Mortgage Licensing Act of 2008, (xii) the Gramm-Leach-Bliley Act (Pub. L. No. 106-102, 113 Stat. 1338), as amended from time to time; (xiii) the Fair and Accurate Credit Transactions Act; (xiv) the Home Ownership Equity Protection Act; (xv) all rules, regulations and guidelines promulgated by the Consumer Financial Protection Bureau; (xvi) The Dodd-Frank Wall Street Reform and Consumer Protection Act; (xviii) any and all licensing requirements relating to Broker's rights to originate and sell Mortgage Loans; (xix) the requirements of all governmental authorities regulating Broker; and (xx) any and all laws, rules, ordinances, and regulations concerning adjustable rate mortgages, negative amortization, and graduated payment mortgages, and Broker shall maintain in its possession, and make available for UWM's inspection, and shall deliver to UWM upon demand, evidence of compliance with all such laws and requirements;

(c)    Broker has no knowledge of any circumstances or conditions with respect to any Mortgage Loan submitted to UWM for underwriting, purchase and/or funding, that the mortgaged property, the Mortgagor or the Mortgagor's credit standing could cause an institutional investor to regard the Mortgage Loan as an unacceptable investment, or otherwise cause the Mortgage Loan to become delinquent or materially adversely affect the value or marketability of the Mortgage Loan;

(d)    With regard to FHA, VA or USDA insured Mortgage Loans, the Federal Housing Commissioner, VA or USDA, as applicable, has or will issue the mortgage insurance certificate or loan guaranty certificate; and all payments due for mortgage insurance premiums have been paid to the insuring authority; nothing has been done or omitted, and no circumstances exist, the effect of which act, omission or circumstances would invalidate the contract of mortgage insurance with the FHA,VA or

USDA as applicable; and the Mortgage Loan complies with the regulations of the FHA, VA or USDA as applicable;

(e)     All of the appraisers who have performed appraisals in connection with the Mortgage Loans submitted to UWM for purchase and/or funding have been properly licensed and are currently approved in accordance with applicable law and any appraisal management company utilized has passed UWMs approval process;

(f)     The appraisal submitted in connection with each Mortgage Loan meets the requirements of FIRREA, and the Underwriting for each Mortgage Loan, if performed by Broker, has been performed in accordance with all of the provisions of applicable law, UWM's lending requirements, including but not limited to those contained in the UWM Guide, and the terms of this Agreement;

(g)     No legal actions are pending or threatened which might reasonably affect any Mortgage Loan or the Broker's ability to transfer any Mortgage Loan to UWM free and clear of all claims and liens, or otherwise perform its obligations hereunder, except as previously disclosed by Broker to UWM in writing;

(h)     Broker is not in default with respect to any material agreement to which it is party or by which it is bound, and the execution and performance of this Agreement will not violate any law, or term of its organizational and governance documents, as amended, or any material agreement to which Broker is a party or by which it is bound, and will not violate or conflict with any other restriction of any kind or character to which Broker is subject;

(i)     All information submitted by Broker to UWM with regard to the Mortgage Loan, including all written materials, is presented and warranted by Broker to be true, correct, currently valid, and genuine in all material respects, as to all information within Broker's knowledge and as reported by each applicant and do not omit to state any facts necessary to make the statements contained therein not misleading; Broker has no knowledge of any circumstances or conditions with respect to any Mortgage Loan submitted to UWM for underwriting, purchase and/or funding, that the mortgaged property, the mortgagor or the mortgagee's credit standing could cause an institutional investor to regard Mortgage Loan as an unacceptable investment, or otherwise cause the Mortgage Loan to become delinquent or materially adversely affect the value or marketability of the Mortgage Loan;

(j)     The Mortgage Documents and all other materials submitted to UWM in connection with the Mortgage Loan do not contain any fraudulent information or misstatement or omission of fact, and the Mortgage Loan has been originated in a manner consistent with prudent mortgage banking practices and consistent with the guidelines and policies established by UWM, Ginne Mae, Fannie Mae, Freddie Mac, a Bond Authority, the FHA the USDA the VA, or other investor, as applicable;

(k)     There are no undisclosed agreements between the Mortgagor and Broker concerning any facts or conditions, whether past, present or future, which might in any material way affect the payment and performance obligations of the Mortgagor or otherwise make the Mortgage Loan non-salable in the secondary market. Broker did not unduly influence or otherwise steer the Borrower into selecting a higher cost Mortgage Loan program;

(l)     Broker is solvent and has adequate capitalization and financial resources to properly engage in the business of originating and processing Mortgage Loans;

(m)    Broker shall promptly advise UWM of any material change concerning the Broker, including, but not limited to, any change in ownership, financial condition or senior management, as well as the termination of any manager, mortgage loan officer or mortgage loan originator;

(n)     Broker has no interest or direct or indirect ownership of all or any part of the property subject to a Mortgage Loan and Broker has no ownership interest in, or familial relationship with, the seller(s), Borrower(s), broker(s), Realtor(s), inspectors, appraisers or other persons performing any settlement services relating to any Mortgage Loan and shall not receive any fees or payments, either

directly or indirectly, in violation of applicable law (unless such relationship has been disclosed to and approved by UWM in its sole discretion);

(o)    All Mortgage Loan Applications and/or Mortgage Loans presented to UWM by Broker for underwriting, purchase and/or funding have been originated by Broker, and no such Mortgage Loan Applications and/or Mortgage Loans have been originated by a third party;

(p)    Broker acknowledges that it does not and shall not discriminate against applicants on the basis of age, race, color, gender, ethnic background, national origin, religion, marital status, familial status, veteran status, handicap, sexual orientation, receipt of public assistance, because rights have been exercised by the applicant under any consumer protection law, or any other prohibited basis;

(q)    With respect to subsections (a) through (p), inclusive, of this Section 3.03, Broker will promptly notify UWM if Broker becomes aware that any terms, conditions, warranties, representations or covenants hereunder become untrue or incomplete in any material respect in the future;

(r)    The representations and warranties of Broker set forth in this Agreement are applicable whether or not non-employee contractors are used in lieu of employees of Broker in fulfilling any of Broker responsibilities and obligations set forth in this Agreement;

(s)    Broker will immediately notify UWM if: (i) Broker fails to maintain any license or registration in violation of subsection (a) above, or if any such license or registration is cancelled or suspended; or (ii) Broker becomes subject to any enforcement and/or investigative proceeding by any licensing or regulatory authority or agency (subject to any confidentiality restrictions imposed by such licensing or regulatory authority or agency); or (iii) Broker is named as a party or becomes involved in any litigation; or (iv) Broker and/or any of its principal director(s) or owner(s) becomes the debtor in any voluntary or involuntary bankruptcy proceeding; or (v) Broker and/or any of its principal director(s) or owner(s) suffers the appointment of a receiver, custodian or trustee; or (vi) Broker and/or any of its principal director(s) or owner(s) has incurred or is likely to incur a material, adverse change in its/their financial condition; or (vii) Broker suffers a levy, execution or seizure upon material business assets

(t)    All representations, warranties and covenants contained in this Agreement shall inure for the benefit of UWM and its successors and assigns;

(u)    Broker hereby appoints UWM and its directors, officers, employees, agents, successors and assigns, as its true and lawful attorney-in-fact, which appointment shall be deemed to be coupled with an interest, without right of revocation and with full power of substitution for and in its place and stead to: (i) demand and control all sums due on Mortgage Loans closed and funded pursuant to this Agreement and to enforce all rights with respect thereto, (ii) endorse, mark, place or otherwise evidence Broker's name as payee on all checks, drafts, acceptances or other form of partial or full payment delivered or tendered to UWM with respect to a Mortgage Loan, (iii) endorse, mark, place or otherwise evidence Broker's name on all notes, Mortgages, deeds of trust, and other forms of security instruments or collateral and all assignments, full or partial releases or satisfactions of said Mortgages, deeds of trust, and other forms of security instruments or collateral for all Mortgage Loans closed and funded pursuant to this Agreement.  Broker agrees to execute such other documents as UWM may reasonably request to evidence the appointment of UWM, as Broker's attorney-in- fact.

(v)    Broker has in full force and effect and will continue to maintain an errors and omissions policy or policies or mortgage bankers blanket bond covering all of its activities under this agreement, as required by and with terms acceptable to Fannie Mae and  Freddie Mac and shall provide to UWM, on an annual basis or as required by UWM satisfactory evidence thereof, and Broker also has and will continue to comply with any and all fidelity bond and surety bond requirements of Fannie Mae, Freddie Mac, and/or any state agency having or claiming to have jurisdiction over Broker.

(w)    No employee, contractor, agent or other representative of Broker, or acting on behalf of Broker is: (a) subject to the provisions of such Executive Order 13224 or the Office of Foreign Assets Control of the United States Department of the Treasury (the "**OFAC Regulations**"); (b) listed as a "blocked

person" for purposes of the OFAC Regulations; or (c) listed on Freddie Mac's Exclusionary List, the U.S. General Services Administration (GSA) Excluded Parties List (EPL), the HUD Limited Denial of Participation List (LDP List), and/or the Federal Housing Finance Agency's (FHFA) Suspended Counterparty Program (SCP) list.

(x)     Broker will not submit a mortgage loan or mortgage loan application to Rocket Mortgage or Fairway Independent Mortgage for review, underwriting, purchase, and/or funding.

**3.04.   UWM's Warranties & Representations.** UWM represents and warrants that UWM possesses all necessary licenses from all regulatory authorities having jurisdiction over the Mortgage Loans to engage in the activities contemplated by this Agreement.

**3.05    Survival.** All representations, warranties and covenants of Broker contained in this Agreement shall survive the expiration and termination of this Agreement and shall continue in effect as to each Mortgage Loan for so long as any amount due from the Borrower remains outstanding and unpaid.  Notwithstanding the foregoing, upon Broker providing notice of termination of this Agreement in accordance with Section 7.06, any future restriction of Broker under the representation and warranty in Section 3.03(x) shall no longer apply.

**ARTICLE IV**
**POST-CLOSING DOCUMENTATION**

**4.01.   Broker's Obligation Regarding Post-Closing Documents.** Broker agrees that it is responsible for assisting in obtaining and delivering post-closing documents required to complete closed Mortgage Loan packages within the time frames established by UWM in its lending requirements or otherwise.  UWM, in its sole and absolute discretion, may exercise its option to NOT fund a Mortgage Loan if all underwriting and/or closing conditions are not satisfied prior to funding.  Broker understands that it is not authorized or empowered to accept or clear any lending conditions of UWM.  Broker further understands and agrees that if Broker fails, neglects or refuses to obtain and deliver any post-closing documents reasonably required by UWM, UWM shall have the unilateral right to offset the reasonable costs associated with securing such post-closing documents against any amounts due Broker by UWM.  Broker shall upon request from UWM, exercise its best efforts to take all actions necessary, in a timely and accurate manner, to obtain corrections to any and all loan documents deemed appropriate or desirable in UWM's sole and absolute discretion and to otherwise assist UWM in remedying any matter not in compliance with applicable law, regulations, or the requirements of UWM, including assisting UWM in obtaining recorded documentation related to a Mortgage Loan and title policies from closing agents, or to enable UWM to sell, convey, obtain guaranty for, or market loans.  The failure, refusal and/or neglect of Broker to secure post-closing documentation in a timely manner shall entitle UWM to exercise a right of set off with respect to any amounts due Broker, and/or the right to require the repurchase of the Mortgage Loan in question by the Broker, in the sole and absolute discretion of UWM.

**ARTICLE V**
**INDEMNIFICATION & REPURCHASE BY BROKER**

**5.01.   Indemnification by Broker.** Broker agrees to indemnify, defend (by counsel acceptable to UWM), and hold UWM harmless from and against any and all liabilities, claims, losses, damages and out of pocket costs ("individually a "*Claim*" and collectively the "*Claims*"): (a) resulting from any breach of this Agreement; (b) resulting from any act or omission by Broker in connection with any Mortgage Loan subject to this Agreement; (c) arising from or in connection with Broker's use of any non-industry standard form not provided or approved by UWM in connection with any Mortgage Loan; (d) concerning miscalculations and other errors which result from Broker's independent application and processing procedures as well as for its misuse of forms required by UWM; (e) asserted against UWM under provisions of RESPA, including without limitation, claims based upon, or arising as a result of, any payments received by Broker in the nature of rate spread premium, service release premium, back points, discount points, broker rebates, and the like; (f) incurred or paid by UWM as a result of the exercise of a right of cancellation or right of recession by any Borrower in connection with a Mortgage Loan; and (g) extraordinary servicing costs or carrying costs related to any Mortgage Loan as a result of any of the following circumstances: (i) any breach of any representation, warranty or covenant contained herein, or any material breach of this Agreement; or (ii) if UWM is required to repurchase

any Mortgage Loan which it has sold to an investor, or which it has placed or pledged to a mortgage pool, which repurchase requirement is a result of the Mortgage Loan being classified as a Defective Loan as the result of any act or omission of Broker; (each a "**Repurchase Event**"), the Broker shall be obligated to promptly repurchase such Mortgage Loan.  If any Claim shall be asserted or brought against UWM by reason of any such act or omission of Broker, Broker shall upon demand, obtain representation by legal counsel acceptable to UWM to defend UWM against any such Claim and Broker shall pay all costs and attorney's fees incurred in such defense.  All of the provisions of this Article V shall survive the closing of each Mortgage Loan transaction and shall inure to the benefit of UWM and future assignees of UWM.

**5.02.   Terms of Indemnification.**

(a)   Broker may be required (at UWM's option) to remit to UWM immediately upon demand a good faith advance to be applied by UWM to cover any such Claim arising from such Repurchase Event, and

(b)   Broker may be required (at UWM's option) to remit to UWM immediately upon demand a non-refundable loan administration fee, and

(c)   Broker shall immediately upon receipt of notice from UWM confirming the occurrence of a Repurchase Event, fully reimburse UWM for the rate premium and/or service release premium originally paid to Broker at the time the Mortgage Loan was purchased by UWM, whether such premium was included in the gross price paid or referenced separately, and

(d)   Broker may additionally be required to remit to UWM immediately upon demand following a Repurchase Event, any additional amount to cover actual loss to UWM not otherwise reimbursed by the good faith advance or loan administration fee, as outlined above.  Any good faith advance and additional amounts required under Section 5.02(a) and/or 5.02(b) herein in excess of actual losses will be returned to the Broker upon final loss reconciliation by UWM.  Broker agrees that its failure to comply with the terms of the indemnification sections within this Agreement shall give UWM the right to demand full repurchase of said Mortgage Loan, and upon any such demand, Broker shall promptly repurchase such Mortgage Loan and reimburse UWM for all costs and expenses associated therewith.

**5.03.   Right of Set-off.**  Broker grants UWM the right of set-off and UWM may deduct any fees, penalties, damages, or other sums owed by Broker to UWM hereunder from the purchase price or loan funding of any Mortgage Loans purchased from Broker and/or funded by UWM. Broker shall be responsible for compensating UWM for any tolerance cure(s) that UWM is required to make to the Borrower because of Broker's acts or omissions in connection with the Mortgage Loan as determined by UWM in its sole and absolute discretion. UWM may also withhold, set-off and apply any fees, expenses, tolerance cures or other matters otherwise due and payable to Broker to any obligations of the Broker to UWM. UWM shall have the right to withhold any fees or payments until the Loan file is complete and the Broker has performed all of its obligations under this agreement.

**ARTICLE VI**
**BROKER USE OF DESKTOP**
**UNDERWRITER**

**6.01.   ARTICLE VI Definitions.** Any capitalized terms used in ARTICLE VI and not otherwise defined in ARTICLE VI or this Agreement have the meanings given to them in the License Agreement (as hereinafter defined). UWM has entered into the Fannie Mae Licensed Application Master Terms and Conditions ("**Master Terms**") and its Desktop Underwriter® Schedule and associated Redistribution Addendum thereto ("**DU Schedule**" and "**Addendum**", respectively, and together with the Master Terms, the "**License Agreement**") with Fannie Mae governing the rights and obligations of UWM and Fannie Mae with respect to UWM's use of Desktop Underwriter (the "**Licensed Application**"). Broker is an Affiliate or Subsidiary of UWM and desires to use the Licensed Application in connection with Prequalification Analysis, mortgage loan origination and/or underwriting activities.

All words and phrases defined in this ARTICLE VI shall, for the purposes of this ARTICLE VI **only**, have the following respective meanings:

(a) "***Affiliate***" shall mean a mortgage lending entity or Third Party Originator that performs Prequalification Analyses, origination or underwriting in relation to mortgage loans intended to be closed by UWM or assigned or sold to UWM.

(b) "***Consumer Credit Data***" shall mean any information obtained by Broker, either directly or indirectly, which bears on a consumer's creditworthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living (the "Seven Factors") and which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in underwriting a Mortgage Loan Application or performing a Prequalification Analysis. Such data may include, but are not limited to, data contained in: (i) residential mortgage credit reports, "in-file" credit reports, or "consumer reports," as defined in the FCRA; (ii) the Uniform Residential Loan Application, including any attachments and/or supplements thereto; and (iii) any correspondence or communication from the consumer or any third party which includes information relating to one of the Seven Factors.

(c) "***Mortgage Loan Application***" shall mean the submission by a mortgage loan applicant of financial information and identification of the specific property to secure the mortgage loan for the purpose of obtaining an underwriting decision.

(d) "***Prequalification Analysis***" shall mean the evaluation of Consumer Credit Data with respect to a prospective mortgage loan applicant for the purpose of evaluating such prospective applicant's qualification for mortgage financing, other than in connection with a Mortgage Loan Application.

(e) "***Subsidiary***" shall mean a mortgage lending entity more than fifty percent (50%) of whose controlling interest or outstanding voting shares or securities are owned or controlled, directly or indirectly, by UWM.

**6.02.  License Agreement.** Broker represents that it is an Affiliate or Subsidiary of UWM and that it has received and read the License Agreement and understands and agrees that it shall be fully obligated to comply with each and every provision of such License Agreement in connection with its use of the Licensed Application.

**6.03.  Licensing Rights.** UWM agrees that, as and to the extent set forth in this ARTICLE VI, its license rights under the License Agreement shall extend to Broker in connection with the Licensed Application. Broker agrees that the rights granted to it shall not extend to any third party, including, but not limited to, Broker's customers, subsidiaries and/or affiliates.

**6.04.  UWM Agent.** Broker expressly appoints UWM as its agent, as that term is defined in the FCRA, in connection with any use of the Licensed Application by Broker with respect to Mortgage Loan Applications or Prequalification Analyses. Broker also expressly acknowledges, understands and agrees that UWM's role as Broker's agent shall not extend beyond the limited purposes set forth in this Section 6.04, and for all other purposes, there shall be no such principal and agent relationship. Moreover, Broker shall in no way misrepresent to third parties the limited extent of this principal/agent relationship. Broker further acknowledges, understands and agrees that any recommendation rendered by the Licensed Application in the evaluation of Consumer Credit Data will not constitute an approval or denial of the Mortgage Loan Application by UWM or a commitment to lend by UWM.

**6.05.  Fannie Mae Agent.** In connection with the processing and evaluation of Consumer Credit Data by the Licensed Application for purposes of making an underwriting recommendation or performing a Prequalification

Analysis (if applicable), Broker expressly appoints Fannie Mae, as owner of the Licensed Application, as its agent, as that term is defined in the FCRA. As Broker's agent, Fannie Mae shall, and is hereby expressly authorized by Broker to, obtain Consumer Credit Data for the sole purpose of performing a Prequalification Analysis and/or making an underwriting recommendation. Broker also expressly acknowledges, understands and agrees that Fannie Mae's role as Broker's agent shall not extend beyond the limited purposes set forth in this Section 6.05, and for all other purposes, there shall be no such principal and agent relationship. Moreover, Broker shall in no way misrepresent to third parties the limited extent of this principal/agent relationship. Broker further acknowledges, understands and agrees that any recommendation rendered by the Licensed Application in the evaluation of Consumer Credit Data will not constitute an approval or denial of the Mortgage Loan Application by Fannie Mae or a commitment to purchase the loan by Fannie Mae. Broker shall disclose any secondary use of Consumer Credit Data that is facilitated by use of the Licensed Application to the issuing consumer reporting agency.

6.06.   **Affiliate Relationship.** If Broker is an Affiliate, Broker shall use the Licensed Application for the primary purpose of (i) originating or underwriting mortgage loans intended to be closed by UWM, or assigned or sold to UWM, and/or (ii) performing Prequalification Analyses for UWM (to the extent that the performance of Prequalification Analyses utilizing the Licensed Application is permitted under the License Agreement). If Broker is an Affiliate, Broker shall not be permitted to use the Licensed Application's wholesale lending ("DU® wholesale") functionality pursuant to this ARTICLE VI. If Broker is a Subsidiary, Broker shall use the Licensed Application only in connection with its own Mortgage Loan Applications and/or Prequalification Analyses and/or those of UWM (to the extent that the performance of Prequalification Analyses utilizing the Licensed Application is permitted under the License Agreement).

6.07.   **Requesting Additional Consumer Reports.** Notwithstanding anything to the contrary in that Section of the DU Schedule captioned "Use of Licensed Application," Broker must first obtain written permission from the mortgage loan applicant to request additional consumer reports before using the Licensed Application as described below:

   (a)   With respect to Mortgage Loan Applications previously approved but not yet closed:

      (i)   to request and receive additional Consumer Reports through the Credit Retrieval Module, when Broker is requesting such reports in connection with its own Mortgage Loan Applications and/or Prequalification Analyses, or because other circumstances exist which Broker believes justify the request for such additional consumer reports under the FCRA;

      (ii)   to analyze or evaluate Consumer Credit Data, including Consumer Reports, when Broker determines that data obtained subsequent to its initial approval may affect its prior underwriting approval decision;

      (iii)   to request and receive Consumer Reports and/or analyze or evaluate Consumer Credit Data when the loan applicant(s) request different loan terms or a different loan product than that originally requested by the loan applicant(s); and

   (b)   With respect to Mortgage Loan Applications previously denied by Broker, which denial decision has been communicated to the applicant(s):

      (i)   to request and receive Consumer Reports through the Credit Retrieval Module, when Broker is requesting such reports in connection with its own Mortgage Loan Applications and/or Prequalification Analyses;

(ii)   to analyze or evaluate Consumer Credit Data, including Consumer Reports, when (A) Broker determines that data obtained subsequent to its initial denial decision may affect its prior underwriting decision, and (B) Broker intends to make and communicate an offer of credit to the applicant(s) if an approval recommendation decision is rendered by the Licensed Application as a result of consideration of the additional data obtained.

**6.08.**   **Intended Beneficiary.** Broker and UWM acknowledge and agree that Fannie Mae is an intended beneficiary of ARTICLE VI.

**6.09.**   **Termination of ARTICLE VI.** ARTICLE VI shall remain in full force and effect unless terminated pursuant to the provisions of this Section or terminated pursuant to Section 7.06 of this Agreement. The parties acknowledge and agree that ARTICLE VI is subject to the License Agreement and that ARTICLE VI shall automatically terminate upon termination of the Desktop Underwriter Schedule and/or the Redistribution Addendum by Fannie Mae and/or UWM. The parties acknowledge that, pursuant to the terms of that Section of the Redistribution Addendum captioned "Termination of Affiliates and Subsidiaries", Fannie Mae may, in its absolute discretion, immediately terminate access by Broker to the Licensed Application for any breach of (a) the License Agreement, (b) ARTICLE VI of the Agreement, or (c) any other agreement between Broker and any lender (including UWM) that has access to the Licensed Application. Upon termination of ARTICLE VI, the other terms and conditions of this Agreement shall continue in full force and effect unless otherwise terminated or amended pursuant to the terms hereof.

**6.10.**   **Licensed Materials.** Immediately upon termination of either ARTICLE VI or this Agreement, Broker shall cease using the Licensed Materials, and destroy or return all copies of the Licensed Materials in its possession to UWM. Promptly upon request from UWM or Fannie Mae, Broker shall provide UWM or Fannie Mae with written certification of its compliance with the foregoing, executed by a duly authorized officer of Broker.

**6.11.**   **DU Support.** UWM, and not Fannie Mae, shall be responsible for providing Broker with (i) first line support with respect to Broker questions and comments concerning Fannie Mae's automated underwriting guidelines and policies, including, but not limited to, questions concerning the interpretation and applicability of the Licensed Application's findings reports and questions relating to Fannie Mae's Selling Guide and (ii) appropriate training relating to the use of the Licensed Application and such guidelines and policies.

**6.12.**   **ARTICLE VI Conflict with License Agreement.** In the event of a conflict between the terms of ARTICLE VI and the terms of the License Agreement, the terms of the License Agreement shall govern.

**6.13.**   **Assignment of ARTICLE VI Rights.** Rights under ARTICLE VI may not be assigned by Broker to any other person(s), firm(s), corporation(s) or other entities without the prior express written consent of Fannie Mae and UWM.

**6.14.**   **Notification.** This Section 6.14 applies only to notices required by ARTICLE VI. All other notices required pursuant to this Agreement shall be provided according to Section 7.21 of this Agreement. All notices, requests, demands, and other communications with required pursuant to ARTICLE VI (other than routine operational communications) shall be in writing and shall be deemed to have been received by a party (i) when actually received in the case of hand delivery, (ii) one (1) business day after being given to a reputable overnight courier with a reliable system for tracking delivery, (iii) when sent by confirmed facsimile with a copy sent by another means specified in this paragraph, or (iv) seven (7) days after the date of mailing, when mailed by United States mail, registered or certified mail, return receipt requested, postage prepaid, and addressed to the recipient's contact person/address set forth below:

UWM:        United Wholesale Mortgage, LLC
            585 South Blvd E.
            Pontiac, MI 48341
            Attention: CLIENT APPROVAL & SUPPORT

Broker:     _____
            _____
            _____
            Attention:_____

In the event that the recipient does not so specify a contact person/address, notices shall be addressed to the general counsel at the recipient's corporate headquarters. A party may from time to time change its address or designee for notification purposes by giving the other party prior written notice of the new address or contact person.

**6.15.  Conflict.** In the event that any provision of ARTICLE VI conflicts with the law under which ARTICLE VI is to be construed, or if any such provision is held invalid, void or unenforceable by a court with jurisdiction over the parties to ARTICLE VI, such provision shall be deemed to be restated to reflect as nearly as possible the original intention of the parties in accordance with applicable law, and the remainder of ARTICLE VI and the Agreement shall remain in full force and effect.

## ARTICLE VII
## MISCELLANEOUS PROVISIONS

**7.01.  Amendment of Agreement.** Except as set forth on Section 7.08, this Agreement may not be amended except in writing executed by authorized representatives of both Broker and UWM.

**7.02.  Waiver Nonbinding.** The failure of UWM to insist in any one or more instances upon strict performance of any of the covenants, agreements, or conditions of this Agreement, or to the exercise of any rights hereunder, shall not be construed as a waiver or a relinquishment for the future of such covenants, agreements, conditions or rights, and any and all waivers must be in writing and be signed by the party waiving its rights.

**7.03.  No Obligations To Make Loans.** Nothing contained in this Agreement shall be construed to require UWM to approve, purchase and/or fund any Mortgage Loan or Mortgage Loans submitted by Broker pursuant to the terms hereof.  Approval and funding of any such Mortgage Loan or Mortgage Loans shall be in the sole and absolute discretion of UWM, and said decision will be made on a loan by loan basis.   Broker shall not be obligated to submit any particular mortgage loan applications or any minimum number of loan applications to UWM.

**7.04.  No Agency or Employment Relationship.** With the limited exception in Section 6.04 of this Agreement, both parties understand and agree that it is not intended that this Agreement create or establish a relationship of employer and employee between UWM and Broker, nor is it intended that Broker will be UWM's partner, joint venturer or agent.  Broker is an independent contractor, and is hereby expressly prohibited from holding itself out as an agent, representative or employee of UWM or of having any endorsement from or affiliation with UWM.

**7.05.  Term.** This Agreement is for an initial term of one (1) year and shall automatically renew for successive terms of one (1) year each, unless terminated pursuant to Section 7.06 below.

**7.06.  Termination.** This Agreement may be terminated by either party for any reason, with or without cause, breach or other justification, upon seven (7) days prior written notice, and may be terminated immediately: (a) for breach of any covenant, obligation, or duty herein contained; or (b) for violation of any law, ordinance, statute

rule or regulation governing the conduct of either party hereto; or (c) upon the suspension, cancellation, or termination of any license or permit required by a party to conduct business and/or perform its obligations hereunder; or (d) if any warranty, representation or statement made by a party to this Agreement was false in any material respect when made or furnished; or (e) in the event a party becomes a debtor in any voluntary or involuntary bankruptcy proceeding; or (f) in the event that a party shall become insolvent, fails to pay its debts as they become due, or makes an assignment for the benefit of its creditors; or (g) in the event of a seizure, execution or levy upon material assets of a party; or (h) in the event of a dissolution of a party; or (i) upon the sale or disposition of a significant portion of the assets or equity interests of a party; or (j) in the event that a trustee, custodian or receiver shall be appointed in connection with material assets of a party. Termination shall not affect the obligations with respect to any Mortgage Loans submitted prior to such termination, except that UWM shall not be obligated to purchase and/or fund any such Mortgage Loans approved prior to termination if UWM terminates this Agreement for breach by Broker on the basis of fraud, dishonesty, misrepresentation, negligence or other breach of this Agreement.  In addition, termination shall not affect either party's obligations with respect to amounts previously owed to the other party pursuant to this Agreement, or Broker's indemnification and confidentiality obligations to UWM.

**7.07.**   **Current Financials & Document Retention.** At UWM's request, Broker shall provide to UWM its year-end financial statements, including a balance sheet and income statement.  If UWM acts as FHA or VA sponsor for Broker, copies of all closing documents for Mortgage Loans funded by UWM shall be retained by Broker for the time period required by FHA or VA.  Broker is responsible for maintaining a complete origination file containing all documents that were used in processing and underwriting a Mortgage Loan.

**7.08.**   **UWM Amendments & Website.** This Agreement, and UWM's policies, procedures, requirements and instructions concerning Mortgage Loan Applications and Mortgage Loans, including but not limited to those contained in the UWM Guide, may be amended by UWM from time to time, and UWM will endeavor to provide broker with prompt notice thereof, which may occur by posting any such amendments on UWM's website, which Broker is required to regularly check and monitor as a condition of this Agreement.  Broker agrees that the submission of any Mortgage Loan Applications or Mortgage Loans to UWM after such amendment shall be Broker's agreement to the amendment without further signature or consent of any kind.  Any such amendment shall apply to pending, and/or future Mortgage Loan Applications submitted by Broker.

**7.09.**   **Quality Control.** Broker agrees to provide UWM upon its request copies of Broker's policies and procedures, training materials and other applicable documentation related to Broker's business practices for review by UWM. Broker shall also permit any officer, employee or designated representative of UWM, at any reasonable time during regular business hours, to examine, reproduce and make audits of any of the processes implemented and documents in the possession or control of Broker regarding any Mortgage Loan or Mortgage Loan Application submitted to UWM pursuant to this Agreement. If upon the request of UWM, Broker fails to timely deliver all documents and records associated with or related to any Mortgage Loan or Mortgage Loan Application submitted to UWM pursuant to this Agreement, Broker shall give UWM and its officers, employees, or designated representatives reasonable access to Broker's premises in order to allow UWM to retrieve, prepare, reproduce and otherwise obtain all such documents and records.  Broker shall also make its officers, employees, and/or designated representatives available to UWM and shall cooperate with UWM in connection with all such examinations, audits and document and record collection activities. Further, Broker hereby consents and gives UWM permission to record telephone calls between employees and independent contractors of UWM and Broker for quality control purposes and further, Broker represents and warrants that it has obtained or will obtain all required consents and approvals of Broker's current and future employees and independent contractors authorizing UWM to record such phone calls.

**7.10.**   **Unacceptable Applications & Submissions**.  Under no circumstances shall Broker submit any Mortgage Loan Applications for Mortgage Loans that could be considered to constitute a "high cost loan" or "predatory loan" as defined in: (a) the Home Ownership and Equity Protection Act, as amended; or (b) any other federal, state or local law or regulations.

**7.11.**   **Broker Advertising & Customer Privacy**.  Broker may advertise to the public the availability of various loan programs and Broker's services, but Broker may not, in any way, directly or indirectly identify UWM or related parties in any such advertising unless: (i) required by applicable laws or regulations; or (ii) UWM has, in advance, approved use of UWM's name by the Broker in writing.  Broker agrees to provide UWM upon its

request with model advertising samples in use at the time of application to do business with UWM, as well as to notify UWM with questions on any substantive changes to those advertisements, or of any new advertisements Broker uses. Without the prior consent of UWM, Broker shall not sell or distribute any customer or contact list incorporating the names, addresses or any non-public personal information of such Borrower(s) or Mortgagors.

**7.12.**   **Entire Agreement**.  The arrangements and relationships contemplated in this Agreement and/or any document referred to herein constitute the sole understanding and agreement of the parties.  This Agreement supersedes all other agreements, covenants, representations, warranties, understandings and communications between the parties, whether written or oral, with respect to the transactions contemplated by this Agreement.

**7.13.**   **Invalidity & Severability.**   The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions of this Agreement, and any provision determined to be invalid and/or unenforceable by a court or tribunal of competent jurisdiction shall be revised and reformed to make such provision valid and/or enforceable, if possible, to the fullest extent permitted by law, otherwise this Agreement shall be construed as if such invalid or unenforceable provision was omitted.

**7.14.**   **Benefit & Assignment.** Broker may not assign its rights and/or delegate its duties and obligations under this Agreement without the written consent of UWM. UWM may assign its rights and/or delegate its duties and obligations under this Agreement to any subsidiary, affiliate or successor in interest without the consent of Broker. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties and their respective heirs, legal representatives, successors and assigns.

**7.15.**   **Governing Law**.  This Agreement shall be governed by, and construed and enforced in accordance with, applicable federal laws and the laws of the State of Michigan, without reference to conflict of laws principles. The parties to this Agreement hereby unconditionally and irrevocably: (a) submit to the exclusive jurisdiction of the Oakland County (Michigan) Circuit Court, or in the event that original jurisdiction may be established, the United States District Court for the Eastern District of Michigan, Southern Division, sitting in Detroit, Michigan (hereinafter the "Courts"), in any action arising out of this Agreement; (b) agree that all Claims in any action must be decided in one of said Courts; and (c) waive, to the fullest extent that they may effectively do so, the defenses of: (i) lack of subject matter jurisdiction of such Courts; (ii) the absence of personal jurisdiction by such Courts over the parties to this Agreement; and (iii) forum non-conveniens.

**7.16.**   **Attorney's Fees**.  In the event a dispute arises under this Agreement between Broker and UWM, which dispute results in legal action being taken by one or both of the parties, the prevailing party shall be entitled to recover its reasonable attorney fees, costs and other expenses associated with the enforcement of its rights under this Agreement, and the non-prevailing party hereby agrees to promptly pay same.

**7.17.**   **Early Payoffs.** UWM is committed to the long term performance of its loans. As such, should any Mortgage Loan delivered hereunder be paid off within one hundred eighty (180) days of the funding of such Mortgage Loan for any reason, Broker shall promptly deliver to UWM the greater of: (a) any credit for the rate paid by UWM to the borrower or Broker, in the aggregate; or (b) one (1%) percent of the amount of the Mortgage Loan.

**7.18.**   **Enforceability & Construction**.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction, and to this end, the provisions hereof are severable.  In the event any of the terms or provisions contained in this Agreement conflict with those contained in other documents executed in connection with this Agreement, the terms and provisions of this Agreement shall govern and control.  In the event of any conflict, inconsistency or ambiguity between the terms of this Agreement and those contained in any Addendum hereto or Amendment hereof, the terms and conditions of such Addendum or Amendment shall be deemed to govern and control.   Notwithstanding the foregoing, in the event of any conflict, ambiguity or inconsistency between the terms and conditions contained in this Agreement and those set forth in the UWM Guide, the terms and conditions of the UWM Guide shall be deemed to supersede and control.

**7.19.**   **Counterparts & Electronic Signatures**.  This Agreement may be executed in one or more counterparts, each of which shall constitute an original and all of which shall constitute the same Agreement.  The parties to this Agreement hereby further agree that due to their distant locations and/or differing schedules, this Agreement may be executed via facsimile, electronic mail or electronic signature and that a facsimile or electronic signature of this Agreement containing counterpart facsimile or electronic or other signature shall be valid and binding for all purposes.

**7.20.**   **Notices.** Any notices necessary to be given under the provisions of the Agreement will be sufficient if in writing and delivered personally, by U.S. certified mail, return receipt requested or by any nationally recognized express courier service to the addresses set forth below, or to such other address as may hereafter be furnished by either party to the other party by like notice, or via electronic mail if consented to by the parties;

**UWM:**        United Wholesale Mortgage, LLC

585 South Blvd E.
Pontiac, MI 48341
Attention:  CLIENT APPROVAL AND SUPPORT

**Broker:**       _____

_____

_____

_____

Attention: _____

**7.21.**   **No Third Party Beneficiaries.** Except for Section 6.08 and Section 7.27 of this Agreement the parties to the Agreement do not intend to confer benefits upon any person or entity who or which is not a signatory to this Agreement.

**7.22.**   **Time Is Of The Essence.**  Time shall be of the essence for purposes of this Agreement as well as with respect to all of the documents and instruments executed in connection herewith.

**7.23.**   **Interpretation.**  This Agreement (and all agreements, documents, instruments and/or exhibits referred to or incorporated into this Agreement) is being entered into among competent persons, who are experienced in business and represented by counsel, and has been reviewed by the parties and their counsel. Therefore, any conflicting or ambiguous language contained in this Agreement (and all agreements, documents, instruments and/or exhibits referred to or incorporated herein) shall not necessarily be construed against any particular party as the drafter of such language.

**7.24.**   **JURY TRIAL AND CLASS ACTION WAIVER.** BROKER AND UWM ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED. UWM AND BROKER, AFTER CONSULTING WITH, OR HAVING THE OPPORTUNITY TO CONSULT WITH, COUNSEL OF THEIR CHOICE, EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY, WITHOUT COERCION, WAIVE ALL RIGHTS TO A TRIAL BY JURY OF ALL DISPUTES BETWEEN THEM.  BROKER AND UWM FURTHER AGREE THAT ANY PROCEEDINGS WILL BE CONDUCTED ON AN INDIVIDUAL, NOT A CLASS-WIDE BASIS, AND THAT ANY PROCEEDING MAY NOT BE CONSOLIDATED WITH ANOTHER PROCEEDING. BROKER AGREES NOT TO SUE UWM AS A CLASS PLAINTIFF OR CLASS REPRESENTATIVE, JOIN AS A CLASS MEMBER, OR PARTICIPATE AS AN ADVERSE PARTY IN A CLASS ACTION LAWSUIT AGAINST UWM. NOTHING IN THIS SECTION LIMITS BROKER'S RIGHT TO BRING A LAWSUIT AS AN INDIVIDUAL PLAINTIFF.

**7.25.**   **Authorization.**  Broker hereby consents and gives UWM permission to obtain information about the Broker. Broker agrees to provide written confirmation to UWM that is has conducted background checks on  any and all employees and independent contractors of the Broker that include, without limitation, professional history information, criminal record information, credit information and other public information.   Further, at UWM's request, Broker agrees to provide UWM with the adjudication criteria associated with such background

checks as well as the results indicating conformance to such criteria. At UWM's request, Broker also agrees to confirm in writing that the background checks of its employees and independent contractors produced no violation(s) of applicable agency guidelines as well as all federal, state and/or local laws by said employees and independent contractors. Broker consents to the release of information to regulators and law enforcement agencies about any Mortgage Loan or loan application that may be suspected to contain misrepresentations and/or irregularities.  It is understood and agreed that Broker and its employees may be named as the originator or loan officers on such Mortgage Loans, whether or not Broker or its employees are implicated in any allegations of wrongdoing.  Broker hereby releases and agrees to indemnify, defend and hold harmless UWM from and against any and all liability for damages, losses, costs and expenses that may arise from the reporting or use of any information submitted by UWM or used in any way by UWM.

7.26.    **Authorization Release.**  Broker hereby consents to a review and confirmation of any and all documents, records and other information related to its officers, directors, principals, and similarly situated persons with strategic decision making authority in Broker and Broker as to their and its business professional and financial reputation and standing, personal financial standing, fitness as a mortgage broker, a concurrent funding broker and/or wholesale correspondent, and such other information as may be received during the review and confirmation to be provided to UWM. Every firm, company, governmental agency, court, association or institution having control of any documents, records and other information pertaining to Broker or any of its officers, directors, principals, and similarly situated persons with strategic decision making authority in Broker is hereby authorized and requested to furnish, allow to be copied or otherwise provide, information of the kind described above to UWM or its representatives, conducting the review and confirmation. This authorization and request includes, but is not limited to, documents, records or files regarding any charges or complaints filed against any of the aforementioned individuals, including any complaints erased by law, whether formal or informal, pending or closed, and information from Interthinx, Inc. database.  Broker specifically authorizes and requests consumer credit reporting agencies to provide personal credit history on any owner of Broker, executive officer of Broker, or similarly situated person with strategic decision making authority in Broker to UWM. In consideration of the time and expense incurred in reviewing and evaluating the application and qualifications of Broker and its officers, directors, principals and similarly situated persons with strategic decision making authority in Broker as to its and their fitness as a broker for UWM, and to facilitate the providing of information for the review and confirmation by UWM, on behalf of the aforementioned persons and Broker, on behalf of itself and its officers, directors, principals, and similarly situated persons with strategic decision making authority in Broker, hereby releases, discharges, exonerates and covenants not to sue any person, company or governmental organization providing information in the review and confirmation, any recipient of information, including UWM, its representative, its parent, sister and affiliate companies and its and their officers, agents, employees and independent contractors, from any and all liability of every nature and kind arising from or in connection with the furnishing of information, the inspection of documents, records and other information, and the preparation of the review and confirmation of the information provided to UWM.

7.27.    **Loan Prospector/Intended Beneficiary.** Freddie Mac offers its automated underwriting service, Loan Prospector, to organizations which are licensed originators of mortgage loans but do not have a seller agreement or seller number with Freddie Mac ("***Third Party Originators***"). For Third-Party Originators to access Loan Prospector, the Third-Party Originators must obtain a Third-Party Originator Number from Freddie Mac. Broker represents and warrants to UWM that it shall comply with any rules, guidelines or other requirements established by Freddie Mac in connection with Broker's use of Loan Prospector. Broker and UWM acknowledge and agree that Freddie Mac is an express, intended third-party beneficiary of this Agreement solely for the purpose of enforcing Freddie Mac's rights under this Agreement, including but not limited to under this Section 7.27.

7.28    **Blink Application System.** While Broker is registered to do business with UWM, UWM grants to Broker a non-exclusive, revocable, non-sublicensable, non-transferable license to use the mark, name or logo of its Blink application system ("***Blink Mark***") in association or in connection with the operation of Broker's services or business within the United States. It is understood and agreed that this license shall pertain only to the Blink Mark. Broker acknowledges that Broker shall not acquire any right, title or interest in the Blink Mark by virtue of this license. Broker shall not by any act or omission use the Blink

Mark in any manner that disparages or reflects adversely on UWM or its business reputation and shall indemnify, defend and hold harmless UWM in connection with any act or omission of Broker, its employees or agents associated with the license granted hereunder. UWM may terminate this license at any time and for any reason. Upon either the termination of the license or if Broker is no longer registered to do business with UWM, the Broker shall immediately discontinue all use of the Blink Mark. Further, Broker shall not use any other mark, name or logo of UWM or any related entity of UWM without UWM's prior written approval. Further, in connection with the Blink application system, Broker may be provided with certain information, including but not limited to loan documentation and/or disclosures, from third party providers or otherwise enter into certain agreements with such third party providers ("**Blink Relationships**"). Broker waives, releases and forever discharges UWM from and against any and all responsibility, liability, demands, damages, claims and actions of every name and nature that may arise from the Blink Relationships.

7.29    **UWM Programs.** From time to time, certain programs may be offered by UWM, or on behalf of UWM, to Broker, or through Broker to the Borrowers, in connection with the Mortgage Loans or Broker's business relationship with UWM (collectively, the "**UWM Programs**"). Broker waives, releases and forever discharges UWM from and against any and all responsibility, liability, demands, damages, claims and actions of every name and nature that may arise from the UWM Programs.

7.30.    **Liquidated Damages**. Broker and UWM agree that the measure of damages in the event of a breach of Broker's representation and warranty under Section 3.03(x) may be difficult, if not impossible, to ascertain. Accordingly, in the event of a violation of Section 3.03(x), Broker shall immediately pay to UWM the greater of: (i) Five Thousand Dollars ($5,000.00) per loan closed with UWM, or (ii) Fifty Thousand Dollars ($50,000.00), as liquidated damages for such breach without the need for proof of damages by UWM. UWM's right to liquidated damages are in addition to (not in lieu of) any other monetary or other remedies UWM may have under this Agreement and/or applicable law.

**WHEREFORE,** the parties hereto have executed the above and foregoing Agreement as of the day and year first above written.

**UWM**                                                      **BROKER**

United Wholesale Mortgage, LLC                 _____

By: _____          By: _____

Name: _____          Name: _____

Its: _____          Its: _____

Rev 3-4-2021