UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

THE OKAVAGE GROUP, LLC
on behalf of itself and all others
similarly situated,

        Plaintiff,                  Case No. 3:21-cv-448-BJD-LLL

v.                            Hon. Brian J. Davis

UNITED WHOLESALE         Magistrate Judge Laura Lothman Lambert
MORTGAGE, LLC and
MATTHEW ISHBIA, individually

        Defendants.

## PLAINTIFF'S RESPONSE AND BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SUPPLEMENTAL CLASS ACTION COMPLAINT

49136730.19

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................i

TABLE OF AUTHORITIES .......................................................................................iii

INTRODUCTION..........................................................................................................1

STATEMENT OF ALLEGED FACTS ..........................................................................2

      A.    Competition Among Mortgage Brokers ..................................................2

      B.    UWM's Deficiencies ................................................................................2

      C.    The Competitive Threats Faced By UWM................................................3

      D.    The Boycott...............................................................................................3

      E.    Effect of the Boycott ................................................................................5

      F.    The Boycotters' and UWM's Market Dominance ...................................6

      G.    Dangerous Probability of Monopolization by UWM ..............................7

      H.    Barriers to Entry ......................................................................................7

      I.    Anticompetitive Effects............................................................................7

ARGUMENT AND AUTHORITIES .............................................................................8

I.    THE SAC PLAUSIBLY ALLEGES A RELEVANT MARKET ...........................8

II.    THE SAC PLAUSIBLY ALLEGES A PER SE VIOLATION OF THE ANTITRUST LAWS ......................................................................................13

      A.    There Was a Horizontal Agreement Between The Brokers................13

             1.    Interbroker Communications Are a Compelling "Plus Factor" Here ..................................................................................15

             2.    The Fact That the Brokers Reversed Course and Acted Against Their Individual Interests Is Another Strong Plus Factor ................................................................................18

             3.    The Fact that the Brokers Were Coerced Does Not Rebut an Inference of Agreement ..........................................19

49136730.19

        4.      Defendants' Cases are Inapposite ............................................. 20

        5.      Group Boycotts May Be Proven By Parallel Conduct and Plus Factors Suggesting Agreement ............................................ 21

    B.    The Allegations in the SAC Demonstrate that the Boycotters Possess Sufficient Market Dominance to Support a *Per Se* Boycott Claim ....................................................................... 23

III.  THE SAC PLAUSIBLY ALLEGES AN UNREASONABLE RESTRAINT OF TRADE IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT ............ 25

    A.    Anticompetitive Effects ............................................................... 25

    B.    Market Power ................................................................................ 28

IV.  THE SAC STATES A CLAIM FOR ATTEMPTED MONOPOLIZATION ..... 31

V.   THE SAC PLAUSIBLY ALLEGES VIOLATIONS OF THE FLORIDA ANTITRUST ACT AND FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT ................................................................................. 33

VI.  THE SAC STATES A CLAIM FOR TORTIOUS INTERFERENCE .............. 34

VII. THE SAC STATES A CLAIM FOR DECLARATORY RELIEF ...................... 35

VIII. MR. ISHBIA'S PERSONAL LIABILITY IS PROPERLY ALLEGED ............. 36

IX.  THIS COURT HAS PERSONAL JURISDICTION OVER MR. ISHBIA ........ 37

X.   CONCLUSION .................................................................................... 39

49136730.19

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*A & E Auto Body, Inc. v. 21st Century Centennial Ins. Co.,*
    2015 WL 12867010 (M.D. Fla. Jan. 22, 2015) ................................................... 21

*All Care Nursing Serv. v. High Tech Staffing Servs.,*
    135 F.3d 740 (11th Cir. 1998) ............................................................................. 9

*Ares Defense Systems, Inc. v. Karras,*
    2016 WL 7042957 (M.D. Fla. Mar. 10, 2016) ................................................... 37

*Arnold Pontiac-GMC, Inc. v. General Motors Corp.,*
    786 F.2d 564 (3d Cir. 1986) .............................................................................. 18

*Arrington v. Burger King Worldwide, Inc.,*
    47 F.4th 1247 (11th Cir. 2022) .......................................................................... 13

*Atlanta Gas Light Co. v. Aetna Cas. Sur. Co.,*
    68 F.3d 409 (11th Cir. 1995) ............................................................................. 36

*Bell Atlantic v. Twombly,*
    550 U.S. 544 (2007) ..................................................................................... 15, 16

*Big Apple BMW, Inc. v. BMW of N. Am., Inc.,*
    974 F.2d 1358 (3d Cir. 1992) ............................................................................ 18

*Blomkest Fertilizer, Inc. v. Potash Corp. of Sask.,*
    203 F.3d 1028 (8th Cir. 2000) (*en banc*) ........................................................ 16

*Blue Water Int'l, Inc. v. Hattrick's Irish Sports Pub, LLC,*
    2017 WL 4182405 (M.D. Fla. Sept. 21, 2017) .................................................. 38

*Bolinger v. First Multiple Listing Service, Inc.,*
    838 F. Supp. 2d 1340 (N.D. Ga. 2012) .............................................................. 21

*Bon-Ton Stores, Inc. v. May Dept. Stores,*
    881 F. Supp. 860 (W.D.N.Y. 1994) .................................................................... 11

*Brown Shoe Co. v. United States,*
    370 U.S. 294 (1962) ........................................................................................ 9, 10

*Burge v. Ferguson,*
    619 F. Supp. 2d 1225 (M.D. Fla. 2008)..............................................................34

*Clear Spring Property & Casualty Co. v. Viking Power LLC,*
    608 F. Supp. 3d 1220 (S.D. Fla. 2022) ..............................................................13

*Danielson v. Tropical Shipping & Constr. Co.,*
    2019 WL 13183885 (S.D. Fla. June 25, 2019) ...................................................32

*Del Prado Mall Prof'l Condo. Ass'n v. Voyager Indem. Ins. Co.,*
    2021 WL 1578758 (M.D. Fla. Apr. 22, 2021).....................................................35

*Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.,*
    732 F.2d 480 (5th Cir. 1984)..............................................................................32

*E-Z Pack Mfg., LLC v. RDK Truck Sales & Serv., Inc.,*
    2011 WL 4343790 (M.D. Fla. Aug. 10, 2011).....................................................33

*E.I. du Pont de Nemours v. Kolon Indus.,*
    637 F.3d 435 (4th Cir. 2011)................................................................................9

*Eastman Kodak Co. v. Image Technical Sys., Inc.,*
    504 U.S. 451 (1992) ...........................................................................................28

*Evergreen Partnering Group, Inc. v. Pactiv Corp.,*
    720 F.3d 33 (1st Cir. 2013).................................................................................22

*Fishman v. Wirtz,*
    1981 WL 2153 (N.D. Ill. Oct. 28, 1981) .......................................................16, 17

*Fortner Enters., Inc. v. United States Steel Corp.,*
    394 U.S. 495 (1969).............................................................................................30

*FTC v. Indiana Fed'n of Dentists,*
    476 U.S. 447 (1986)................................................................................13, 25, 26

*FTC v. Staples,*
    970 F. Supp. 1066 (D.D.C. 1997) .......................................................................11

*FTC v. Staples, Inc.,*
    190 F. Supp. 3d 100 (D.D.C. 2016) ....................................................................10

*FTC v. Sysco Corp.,*
    113 F. Supp. 3d 1 (D.D.C. 2015)...................................................................10, 11

iv

*FTC v. Whole Foods Market, Inc.*,
   548 F.3d 1028 (D.C. Cir. 2008) ........................................................................ 11

*General Motors LLC v. Royal Motors Corp.*,
   769 F. Supp. 2d 73 (D.P.R. 2011) ...................................................................35

*Grasso Enterps., LLC v. Express Scripts, Inc.*,
   2017 WL 365434 (E.D. Mo. Jan. 25, 2017)........................................................22

*Gulf States Reorg. Grp., Inc. v. Nucor*,
   822 F. Supp. 2d 1201 (N.D. Ala. 2011) .............................................................. 31

*In re Coordinated Pretrial Proceedings in Petroleum Prods.
Antitrust Litig.*,
   906 F.2d 432 (9th Cir. 1990) ...........................................................................22

*In re Delta/Air Tran Baggage Fee Antitrust Litig.*,
   733 F. Supp. 2d 1348 (N.D. Ga. 2010) .............................................................. 15

*In re Delta/Airtran Baggage Fee Antitrust Litig.*,
   245 F. Supp. 3d, *aff'd sub nom. Siegel v. Delta Air Lines, Inc.*, 714
   F. App'x 986 (11th Cir. 2018) (per curiam).......................................................16

*In re Disposable Contact Lens Antitrust Litig.*,
   215 F. Supp. 3d 1272 (M.D. Fla. 2016).................................................. 14, 19, 22

*In re EpiPen Direct Purchaser Litigation*,
   2022 WL 1017770 (D. Minn. Apr. 5, 2022) ..................................................... 20

*In re High Fructose Corn Syrup Antitrust Litigation*,
   295 F.3d 651 (7th Cir. 2002)............................................................................ 19

*In re Insurance Brokerage Antitrust Litigation*,
   618 F.3d 300 (3d Cir. 2010)......................................................................18, 20

*In re January 2021 Short Squeeze Trading Litigation*,
   2021 WL 5359731 (S.D. Fla. Nov.17, 2021) .....................................................14

*In re Plywood Antitrust Litig.*,
   655 F.2d 627 (5th Cir. 1981)............................................................................16

*In re Salmon*,
   2021 WL 1109128 (S.D. Fla. Mar. 23, 2021).....................................................18

*In re Terazosin Hydrochloride*,
   220 F.R.D. 672 (S.D. Fla. 2004) ..................................................................... 30

*In re Toys R Us, Inc.*,
  126 F.T.C. 415 (1998) ......................................................................22

*In the Matter of ProMedica Health Sys., Inc.*,
  2012 WL 1155392 (F.T.C. 2012) ......................................................27

*Int'l Construction Prods. LLC v. Caterpillar Inc.*,
  2020 WL 4589775 (D. Del. Aug. 10, 2020) ......................................22

*Internet Solutions Corp. v. Marshall*,
  39 So.3d 1201 (Fla. 2010) ................................................................37

*Isaksen v. Vt. Castings, Inc.*,
  825 F.2d 1158 (7th Cir. 1987) ........................................................ 20

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
  626 F.3d 1327 (11th Cir. 2010) ..........................................................9

*JAWHBS, LLC v. Arevalo*,
  2017 WL 1345141 (S.D. Fla. Apr. 12, 2017) ....................................34

*JES Props. v. USA Equestrian, Inc.*,
  253 F. Supp. 2d 1273 (M.D. Fla. 2003) ..............................................9

*Kearney & Trecker Corp. v. Giddings & Lewis, Inc.*,
  452 F.2d 579 (7th Cir. 1971) ......................................................... 28

*Kitroser v. Hurt*,
  85 So. 3d 1084 (Fla. 2012) ...............................................................39

*Klinger v. Weekly World News, Inc.*,
  747 F. Supp. 1477 (S.D. Fla. 1990) ..................................................33

*Leon v. Cont'l AG*,
  301 F. Supp. 3d 1203 (S.D. Fla. 2017)............................................. 38

*Levine v. Cent. Fla. Med. Affiliates*,
  72 F.3d 1538 (11th Cir. 1996) ............................................................9

*Licciardello v. Lovelady*,
  544 F.3d 1280 (11th Cir. 2008).........................................................37

*M & M Med. Supplies & Serv. v. Pleasant Valley Hosp.*,
  981 F.2d 160 (4th Cir. 1992) (en banc)............................................32

vi

*Marco Island Cable v. Comcast Cablevision of S., Inc.*,
     312 F. App'x 211 (11th Cir. 2009) ....................................................33

*McGahee v. Northern Propane Gas Co.*,
     858 F.2d 1487 (11th Cir. 1988).........................................................32

*McWane, Inc. v. FTC*,
     783 F.3d 814 (11th Cir. 2015) ..................................... 10, 12, 27, 30

*Merck-Medco Managed Care, LLC v. Rite Aid Corp.*,
     201 F.3d 436, 1999 WL 691840 (4th Cir. 1999) ...............................19

*MM Steel L.P. v. JSW Steel (USA) Inc.*,
     806 F.3d 835 (5th Cir. 2015)..............................................................19

*Monsanto Co. v. Spray-Rite Service Corp.*,
     465 U.S. 752 (1984) ....................................................................15, 21

*NACM Tampa, Inc. v. Sunray Notices, Inc.*,
     2017 WL 2209970 (M.D. Fla. Feb. 8, 2017) .....................................33

*Nobody in Particular Presents, Inc. v. Clear Channel Comm's, Inc.*,
     311 F. Supp. 2d 1048 (D. Colo. 2004)...............................................32

*Northwest Wholesale Stationers, Inc. v. Pacific Stationery &
     Printing Co.*,
     472 U.S. 284 (1985).......................................................... 23, 24, 25

*OEM Glass Network, Inc. v. Mygrant Glass Co.*,
     436 F.Supp.3d 576 (E.D.N.Y. 2020)...................................................22

*Ohio v. Am. Express Co.*,
     138 S. Ct. 2274 (2018) ......................................................................25

*Omni Healthcare, Inc. v. Health First, Inc.*,
     2015 WL 275806 (M.D. Fla. Jan. 22, 2015) .....................................37

*Phelan v. Lawhon*,
     229 So.3d 853 (Fla. Dist. Ct. App. 2017) ........................................ 38

*Quality Auto Painting Center of Roselle, Inc. v. State Farm
     Indemnity Co.*,
     917 F.3d 1249 (11th Cir. 2019)..........................................................21

*Realcomp II, Ltd. v. F.T.C.*,
     635 F.3d 815 (6th Cir. 2011)............................................................ 26

*Restore Robotics LLC v. Intuitive Surgical, Inc.*,
   2022 WL 19408080 (N.D. Fla. Feb. 7, 2022) ............................................. 31, 32

*Silver v. New York Stock Exch.*,
   373 U.S. 341 (1963) .............................................................................. 24

*Simpson v. Sanderson Farms, Inc.*,
   744 F.3d 702 (11th Cir. 2014) .................................................................. 9

*Skypoint Advisors, LLC v. 3 Amigos Prods. LLC*,
   2019 WL 3343933 (M.D. Fla. July 25, 2019) ............................................ 38

*Spectators' Communication Network, Inc. v. Colonial Country Club*,
   253 F.3d 215 (5th Cir. 2001) ................................................................. 19

*Sticky Holsters, Inc. v. Ace Case Mfg., LLC*,
   2016 WL 1436602 (M.D. Fla. Apr. 12, 2016)............................................ 38

*Toys "R" Us, Inc. v. FTC*,
   221 F.3d 928 (7th Cir. 2000) ................................................................. 23

*U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*,
   7 F.3d 986 (11th Cir. 1993) ........................................................ 8, 28, 30

*United States v. Allen*,
   831 F. App'x 580 (2d Cir. 2020) ............................................................ 15

*United States v. Apple, Inc.*,
   791 F.3d 290 (2d Cir. 2015)............................................................. 16, 17

*United States v. Colgate & Co.*,
   250 U.S. 300 (1919) .............................................................................. 21

*United States v. Dentsply Int'l, Inc.*,
   399 F.3d 181 (3d Cir. 2005) ............................................................ 26, 28

*United States v. E. I. du Pont de Nemours & Co.*,
   351 U.S. 377 (1956) ............................................................................... 9

*United States v. H&R Block, Inc.*,
   833 F. Supp. 2d 36 (D.D.C. 2011) ............................................ 10, 11, 12, 26

*United States v. Visa USA, Inc.*,
   344 F.3d 229 (2d Cir. 2003) .................................................................. 28

*United States v. Wise,*
   370 U.S. 405 (1962) .................................................................37

*Valley Liquors, Inc. v. Renfield Importers, Ltd.,*
   822 F.2d 656 (7th Cir. 1987) ............................................... 29

*Virgin Atl. Airways, Ltd. v. British Airways PLC,*
   257 F.3d 256 (2d Cir. 2001) ................................................ 26

*Vitacost.com v. Oregon Freeze Dry, Inc.,*
   2009 WL 10667820 (S.D. Fla. July 21, 2009) ................... 21

*Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council,*
   857 F.2d 55 (2d Cir. 1988) ...................................................33

*Wendt v. Horowitz,*
   822 So.2d 1252 (Fla. 2002) ..................................................37

*Wiggins v. Tigrent, Inc.,*
   147 So.3d 76 (Fla. Dist. Ct. App. 2014) ............................37

*Yellow Cab Co. of Orlando v. Celebration Transp., Inc.,*
   2013 WL 656339 (M.D. Fla. Jan. 28, 2013) .......................33

**Statutes**

Sherman Act § 1 .......................................................15, 20, 21, 28, 29, 36

**Other Authorities**

Dennis W. Carlton & Jeffrey M. Perloff, *Modern Industrial
   Organization* 92 (3d ed. 2005) ............................................ 31

Fed. R. Civ. P. 57 .......................................................................35

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ............................... 22, 29

Plaintiff, The Okavage Group, LLC ("Okavage"), files this Response and Brief in Opposition to Defendants' Motion to Dismiss [ECF No. 102] the Supplemental Class Action Complaint (the "SAC"), filed July 19, 2023 [ECF No. 96].[1]

## **INTRODUCTION**

The SAC (and the Second Amended Class Action Complaint preceding it) includes substantial new factual allegations that directly address the issues raised in Magistrate Judge Lambert's Report and Recommendation ("R&R"). These include new allegations concerning the purpose and effect of Defendant United Wholesale Mortgage's ("UWM") ultimatum to brokers that they either cease originating loans with Rocket Pro TPO ("Rocket") and Fairway Independent Mortgage ("Fairway") or face termination of the their business relationship with UWM (the "Ultimatum"), SAC ¶¶ 103-104*[2]; new allegations reflecting UWM's dramatic increase in market share from 34% to 54%, *id.* ¶104*; new statements by UWM's CEO Mat Ishbia linking UWM's rise in market share to the Ultimatum, *id.* ¶ 105*; new and specific factual allegations relating to the agreement between brokers to boycott Rocket and Fairway, *id.* ¶¶37*, 40*, 42-49*, 51-53*, 65-66*; additional facts plausibly indicating the presence of market power and a dangerous probability of monopolization, *id.* ¶¶27-28*, 61-63*, 83*, 106*, 109*; new factual allegations relating to competitive effects, *id.* ¶¶32-35*, 47*, 61-63*, 72-73*, 77-

---

[1] The text of ECF No. 96 refers to the SAC as the Third Amended Complaint. However, the document itself is entitled Supplemental Class Action Complaint.

[2] An asterisk indicates that these allegations were added in the Second Amended Complaint or SAC, after issuance of the R&R.

1

49136730.19

81*, 102*, 106-108*; an additional series of specific factual allegations relating to barriers to entry, *id.* ¶¶83-84*; new allegations concerning the expectation that was tortiously interfered with, *id.* ¶¶31-35*, 47*, 72-82*, 142*, 144*; and additional alleged facts relating to the personal liability of Mr. Ishbia, *id.* ¶¶37*, 40*, 47*, 51*, 61*. With these new allegations, the SAC certainly states a valid claim for relief.

## STATEMENT OF ALLEGED FACTS

### A.  Competition Among Mortgage Brokers

The following summarizes the most significant facts alleged in the SAC. Wholesale mortgage lenders offer loans through independent third parties, such as mortgage brokers. SAC ¶20. As of the fourth quarter of 2022, UWM—the largest wholesale mortgage lender in the United States—had an approximate 54% share of the wholesale mortgage lending market. *Id.* ¶104*. UWM's 2021 prospectus notes that "the mortgage business has experienced substantial consolidation." *Id.* ¶28*. Commentators have predicted a "shakeout" of smaller mortgage lenders, leading to further gains in market share by larger firms like UWM. *Id.* 63*. A 2023 report indicates that at least 17 firms have exited the wholesale market since the filing of the Second Amended Complaint. *Id.* ¶106*.

UWM has over 10,000 mortgage brokers. *Id.* ¶27. Mortgage brokers deal directly with consumers and help them select the most appropriate lender. *Id.* ¶20.

### B.  UWM's Deficiencies

UWM's competition for wholesale mortgage lending includes Rocket and Fairway. *Id.* ¶31. These firms also compete at "retail," providing products directly

2

to consumers. *Id.* ¶¶30-31. Rocket offers a number of benefits to mortgage brokers and their customers not available through UWM. *Id.* ¶32.B* and C*. In particular, Rocket is less restrictive in the credit scores it requires than is UWM, and therefore provides loans to many consumers who would be refused by UWM. *Id.* ¶32.B*. Rocket also offers lower cost mortgage insurance than UWM and is rated more highly by many firms that evaluate mortgage lenders. *Id.* ¶32.C*.

Both UWM and numerous brokers have concluded that UWM was higher priced than its major competitors. Mr. Ishbia has stated that UWM is "not trying to be the best priced." *Id.* ¶34. One broker has stated that Rocket "consistently beat[s] UWM in price across every product type offered." *Id.*\* Another broker stated that UWM's "pricing is often higher than their competitors . . ." *Id.*\* In one illustrative case, Rocket's rate was less than 15% of UWM's rate. *Id.* ¶78*.

### C.    **The Competitive Threats Faced By UWM**

As of early 2021, UWM's leading position in the wholesale market was threatened by Fairway and Rocket. *See id.* ¶35. From 2018 to 2021 Rocket's wholesale business increased from 3,000 mortgage brokers to 10,000, reflecting the fact that Rocket's products and prices were especially attractive. *Id.*\*

### D.    **The Boycott**

In response, Mr. Ishbia announced UWM's Ultimatum at a live virtual meeting with brokers on UWM's Facebook page. *Id.* ¶36. UWM introduced an addendum to its broker agreements that included a requirement that the signatory not submit loans to either Rocket or Fairway. Any breach would result in

49136730.19

substantial penalties. *Id.* ¶54. Mr. Ishbia said specifically that "[i]f you work with

them [Rocket or Fairway], you can't work with UWM anymore." *Id.* ¶36. Okavage

refused to agree to the Ultimatum, and was terminated by UWM. *Id.* ¶70.

Mr. Ishbia's statements and its brokers' communications took place in

public view on an interactive Facebook site accessible to thousands of brokers. *Id.*

¶42*. Mr. Ishbia repeatedly referred to his plan as the "'all in' initiative." *Id.** Mr.

Ishbia stated that "all of our current clients are aligned" with respect to this

initiative and that the participating brokers "have locked arms with us." *Id.**

During the virtual meeting, brokers made numerous statements in support

of the boycott. These statements advocated collective action by the brokers:

> 'We are ALL IN' 'unstoppable together…' 'We are all family!
> Brokers are better when we work together'; 'Brokers are
> family. We don't go against our family'; 'All in….with us or
> out'; 'You're either with the captain [UWM] or off the boat';
> 'with us or against us'; and 'all for one and one for all.'

*Id.* ¶41.*

Brokers also used the Facebook page to successfully encourage other brokers

to join the boycott. *Id.* For example, Broker A urged Broker B to engage with Rocket

"no more! Sign the addendum." *Id.* ¶49*. Broker B confirmed that she had signed,

to which Broker A replied, "great job!" *Id.**

UWM provided forums for mortgage brokers to work together to terminate

Rocket and Fairway. *Id.* ¶50. Broker E asked "Where do we get the form to sign[?]"

and received a response from another broker with instructions on how to access

the addendum and terminate his broker agreement with Rocket. *Id.* ¶44*.

4

On the same day as the live virtual meeting, the Association of Independent Mortgage Experts ("AIME") issued a letter voicing support for the boycott. *Id.* ¶45*. AIME describes itself as "a community" of "mortgage professionals." *Id.* ¶46*, and states that its members "come from every region across the country." *Id.* ¶45*. As part of the live chat, AIME supported the boycott and stated: "Work with TRUE lender partners. Let's strengthen the challenge!" *Id.** Other trade groups acted similarly. *Id.* ¶48*.

The boycott was a dramatic change in behavior by the boycotting brokers, who until that time had been utilizing Rocket and Fairway in substantially increasing numbers because of Rocket's and Fairway's strong reputation, lower prices and high quality. *Id.* ¶¶35, 65*. The decision to boycott Rocket and Fairway was contrary to the brokers' unilateral self-interest. *Id.**

The decision to boycott would have been even more contrary to the interests of the brokers if they had not agreed to the boycott in overwhelming numbers. *Id.* If an individual broker deprived itself of the availability of loans from Fairway and Rocket, it risked losing substantial business to other brokers who offered these alternatives. But once thousands of brokers agreed to forego Rocket and Fairway, this risk was substantially reduced. This is reflected in the comments of brokers, discussed above, that they were "unstoppable together." *Id.* ¶¶41, 65-66*.

### E.     **Effect of the Boycott**

Mr. Ishbia predicted during the virtual meeting that Rocket and Fairway would lose 70%-90% of their business as a result of the boycott. *Id.* ¶61*. Mr. Ishbia

49136730.19

later indicated that the boycott exceeded his expectations, stating "I couldn't have imagined it going so well." *Id.*\* UWM announced "93% of the brokers presented with the addendum agreed to join the boycott." *Id.*\* Since UWM's brokers represent significantly more than 60% of the wholesale mortgage brokers in the United States, *id.* ¶27\*, simple arithmetic indicates that more than 55% of all wholesale brokers (93% of 60%) joined the boycott.

The success of the boycott is borne out by UWM's dramatic increase in market share from 34% to 54%. *Id.* ¶104\*. Mr. Ishbia directly linked this increase to the boycott: "When we announced the [Ultimatum], they [Rocket] were more than twice my size overall, not wholesale, overall. Now I'm bigger than them." *Id.* ¶105\*.

### F.    The Boycotters' and UWM's Market Dominance

UWM has substantial market power, reflected in its market share and its ability to successfully impose burdensome terms on its brokers. 93% of UWM's brokers agreed to the Ultimatum, even though that deprived them of access to lower priced, high quality lenders. *Id.* ¶82\*. In a February 2023 interview, Mr. Ishbia explained that the boycott was so successful because "[t]he penalty of working with Rocket … is you don't get to work with UWM. And nobody is willing to take that chance." *Id.* ¶103.A\*.

UWM's substantial market power is further evidenced by Mr. Ishbia's own statements in UWM's March 2023 earnings call that UWM "control[s] the margins

49136730.19

in this industry"—a strong indication that UWM has sufficient market power to control price in the market. *Id.* ¶109*.

### G.   Dangerous Probability of Monopolization by UWM

UWM's market strength is further increased by the continued exit of many competitors from the market. *Id.* ¶106*. This includes significant firms like loanDepot and Wells Fargo, which was once the market leader. *Id.*\* According to Mr. Ishbia, UWM enjoys significant advantages over many remaining firms because of UWM's "scale." *Id.* ¶63*, 107*, 108*.

### H.   Barriers to Entry

There are substantial barriers to entry into wholesale mortgage lending, including the need to develop (a) a sophisticated electronic platform that can take years to complete and costs millions of dollars, (b) hundreds, if not thousands, of qualified personnel, including a significant training program to develop personnel with the requisite skills, (c) a substantial sales force and a significant reputation, and (d) satisfaction of licensing requirements on a state by state basis, as well as compliance with federal guidelines. *Id.* ¶¶82-84*.

### I.   Anticompetitive Effects

The boycott harmed consumers by reducing their access to Fairway's and Rocket's lower priced, higher quality products. *Id.* ¶73*; *see also id.* ¶32* (Rocket accepts less restrictive credit scores, offers superior, lower cost mortgage insurance, and both Rocket and Fairway have higher satisfaction ratings than UWM). Customers of terminated brokers like Okavage were also harmed by the

49136730.19

boycott, because they did not have the opportunity to consider a UWM mortgage. *Id.** The boycott effectively insulated UWM from the need to compete with Rocket or Fairway's wholesale products on price or quality. *Id.* ¶¶31, 72*, 74*, 76-77*.

The boycott also prevented brokers from performing their essential function of providing their customers with the most suitable and lowest priced loans. *Id.* ¶72*. The fundamental value of independent mortgage brokers is their "flexibility to shop rates from multiple lenders." *Id.* ¶¶75-76*, 80*. That "flexibility" was seriously disrupted by the boycott. *Id.* ¶77*.

The boycott has also resulted in substantial foreclosure to Rocket and Fairway of at least 55% of the wholesale market. *See id.* ¶¶27*, 61*, discussion *supra* (93% of 60%).

## ARGUMENT AND AUTHORITIES

### I.    THE SAC PLAUSIBLY ALLEGES A RELEVANT MARKET

UWM argues that the "relevant market" is the "overall mortgage market," and that wholesaling cannot be a relevant market or submarket. This argument fails on multiple grounds.

First, as UWM's own cases make clear "[t]he definition of, the relevant market is essentially a factual question" reserved for discovery. *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 994 (11th Cir. 1993). As a result, "dismissals at the pre-discovery, pleading stage remain relatively rare and are generally limited to certain types of glaring deficiencies, such as failing to allege a relevant market

[altogether]." *E.I. du Pont de Nemours v. Kolon Indus.*, 637 F.3d 435, 444 (4th Cir. 2011) (quotations and citation omitted).

The cases cited by UWM are virtually all appeals from summary judgment or jury trials, and are thus based on facts developed in discovery. *See, e.g.*, *All Care Nursing Serv. v. High Tech Staffing Servs.*, 135 F.3d 740, 749 (11th Cir. 1998); *Levine v. Cent. Fla. Med. Affiliates*, 72 F.3d 1538, 1551 (11th Cir. 1996); *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 394-95 (1956).

UWM's remaining cases involved the absence of *any* factual allegations on relevant market. The plaintiff in *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1338 (11th Cir. 2010) offered only vague allegations which "beg[ged] the question of what, exactly, makes foam mattresses comprise this submarket." *Id.* Similarly, the plaintiffs in *JES Props. v. USA Equestrian, Inc.*, 253 F. Supp. 2d 1273, 1281-82 (M.D. Fla. 2003) "d[id] not provide [any] rationale why the relevant product market should be defined" as proposed. *Id.* at 1282. In *Simpson v. Sanderson Farms, Inc.*, 744 F.3d 702, 710-711 (11th Cir. 2014), the plaintiffs "failed even to identify the relevant geographic market."

Second, UWM argues that wholesale and retail mortgage lending are "reasonably interchangeable," but ignores the Supreme Court's holding in *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962). The Court stated that "[t]he *outer boundaries* of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe*, 370 U.S. at 325 (emphasis added). But

9

the Court also explained that the contours of a narrower submarket can be determined by examining such "practical indicia" as "industry or public recognition of the [relevant market] as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.* Courts "routinely rely" on these factors as a "useful analytical tool" in defining the product market. *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 118, 118 n.11 (D.D.C. 2016) ("*Staples II*"); *see also FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 27-33 (D.D.C. 2015); *United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 51-60 (D.D.C. 2011).

Here, the SAC alleges facts that closely track the *Brown Shoe* criteria. For example, the SAC alleges that wholesale market has a distinct group of customers, i.e. those who choose to utilize mortgage brokers. SAC ¶25.A*. Those customers (and the brokers who work with them) recognize the wholesale market as separate and distinct mortgage channel. *Id.* ¶25.B*. The wholesale market also involves specialized vendors, mortgage brokers, who provide substantial services to consumers not available at retail. *Id.* ¶¶ 23*, 25.C*. Wholesale and retail lenders utilize distinct marketing efforts. *Id.* ¶¶ 24*, 25.D*. And wholesale customers will not readily switch to a retail lender for small differences in price due to the significant value of broker advice. *Id.* ¶25.E*.

Critically, UWM has also stated that costs to consumers from wholesale lending are substantially lower than at retail ($9,400 over the life of the loan). *Id.* ¶25.F*. *See e.g. McWane, Inc. v. FTC*, 783 F.3d 814, 828-829 (11th Cir. 2015)

(domestic fittings were a separate submarket due, in part, to the "higher prices for
. . . domestic fittings"); *H&R Block*, 833 F. Supp. 2d at 55 (do-it-yourself and
assisted tax returns were separate submarkets in light of the "significant price
disparities" between the two).

Third, UWM argues that consumers can obtain mortgages through either
the retail or wholesale channel, and that means that both must be in the same
market. But that is not the law. "[T]he mere fact that a [product] may be termed a
competitor in the overall marketplace does not necessarily require that it be
included in the relevant product market for antitrust purposes." *See, e.g.*, *FTC v.
Staples*, 970 F. Supp. 1066, 1075 (D.D.C. 1997) ("*Staples I*").

Numerous cases have, like Okavage has here, defined markets consisting of
only some of the distribution channels for a product or service. *See Staples I*, 970
F. Supp. at 1073-1075 ("the sale of consumable office supplies through office
superstores" was a relevant market, even though "all sellers [of office supplies] . . .
at some level, compete with one another"); *Sysco*, 113 F. Supp. 3d at 27 (relevant
market was "broadline foodservice distribution," not including other food
distribution channels); *FTC v. Whole Foods Market, Inc.*, 548 F.3d 1028, 1040
(D.C. Cir. 2008) (relevant market was premium natural and organic supermarkets,
not all supermarkets); *Bon-Ton Stores, Inc. v. May Dept. Stores*, 881 F. Supp. 860,
869 (W.D.N.Y. 1994) (finding a distinct submarket of traditional department
stores, as opposed to all general merchandise, apparel, and furniture sales: "the

49136730.19

fact that two vendors both sell a particular type of merchandise does not necessarily mean that they are in the same product market").

Fourth, contrary to Defendants' claim, the fact that Rocket and Fairway operate in both the wholesale and retail submarkets does not suggest that they are "interchangeable." *See* ECF No. 102, PageID.1336-37. Companies routinely offer products in different markets. In a number of the cases finding that particular distribution channels were submarkets, defendant sold in multiple channels. *See, e.g., McWane*, *783* F.3d at 828-829; *H&R Block*, 833 F. Supp. 2d at 45.

Fifth, UWM's efforts to mine the sources from which some of the SAC's allegations are derived are both inaccurate and irrelevant. Contrary to Defendants' assertions, UWM's 2022 annual report does not "define[] the relevant market" as the "overall mortgage market." *See, e.g.,* ECF No. 102, Ex. A at PageID.1367-1370, 1376, 1381, 1410 (repeatedly referring to UWM's "market share" in the "wholesale loan origination market"). Nor did Mr. Ishbia "define" the relevant market as the "overall mortgage market." In fact, he repeatedly recognized the distinct nature of competition in wholesaling. *See generally* ECF No. 102, Ex. B at PageID.1561-76 (repeatedly referring to UWM's "54% market share" among wholesalers and touting UWM as "the number one wholesale lender").

The other sources cited by Defendants also confirm the distinction between wholesale and retail. For example, UWM's annual report describes numerous benefits offered solely at wholesale. ECF No. 102, Ex. A at PageID.1369-70 (distinguishing the wholesale channel as providing, among other things, brokers

12

able to "leverag[e] their deep knowledge base of complex financial products to help borrowers make informed decisions," "flexibility of matching their borrowers' needs with the most applicable lender and lender program," "enhance[d] efficiency," "volume," and "scalability," alignment of broker and borrower interests, and provision of "Superior Sophisticated and Personalized Service.").

In any event, at most, these assertions represent an effort to offer evidence contrary to the allegations in the SAC. But it is not appropriate at the motion to dismiss stage to weigh evidence; all inferences are to be drawn in favor of the plaintiff. *Arrington v. Burger King Worldwide, Inc.*, 47 F.4th 1247, 1249 n.1 (11th Cir. 2022). *Clear Spring Property & Casualty Co. v. Viking Power LLC*, 608 F. Supp. 3d 1220, 1227 (S.D. Fla. 2022) ("[C]ourts may not '. . . weigh evidence . . . at the motion to dismiss stage of the proceedings.'" (citation omitted)).

Sixth, successful allegation of a relevant market is not essential to Okavage's claims. Even in the absence of *per se* liability, an unreasonable restraint of trade can be proven through direct evidence of effects on consumers without proof of a relevant market. *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460 (1986) (no need to examine "market definition and market power" where there is evidence of "actual detrimental effects"). *See* discussion of direct effects, *infra* at Section III.A.

## II.  THE SAC PLAUSIBLY ALLEGES A PER SE VIOLATION OF THE ANTITRUST LAWS

### A.  There Was a Horizontal Agreement Between The Brokers

As Magistrate Judge Lambert stated in her R&R, a "hub and spoke" conspiracy, involving agreement between competing brokers coordinated by

UWM, would be a *per se* antitrust violation. ECF No. 61, PageID.622. The numerous new allegations of the Second Amended Complaint and SAC provide a more than plausible basis for inferring such an agreement.

The first element is parallel conduct. Here, the agreement by 11,000 brokers to forego relationships with two lenders who had previously been gaining their business clearly alleges such conduct. As this Court stated in *In re Disposable Contact Lens Antitrust Litig.*, 215 F. Supp. 3d 1272, 1289 (M.D. Fla. 2016), an allegation of parallel conduct "gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility . . ."

The "plus factors" that create such enhancement

> may include: a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications, [as well as] speeches at industry conferences, announcements of future prices, statements on earnings calls, and in other public ways.

*In re January 2021 Short Squeeze Trading Litigation*, 2021 WL 5359731, at *17 (S.D. Fla. Nov.17, 2021) (citations omitted).

The brokers' communications with each other, the facilitation of such communications by UWM, the fact that thousands of brokers dramatically changed their behavior, and the fact that such actions were even more against the brokers' unilateral interests unless they acted together, are all "plus factors" which make the conspiracy allegations eminently plausible.

14

### 1. Interbroker Communications Are a Compelling "Plus Factor" Here

As described above, the Ultimatum was proposed at a virtual meeting at which the brokers communicated at length with one another. Statements such as "unstoppable together," "brokers are better when we work together," "brokers are family. We don't go against our family," "All in," SAC ¶41, are statements indicating that numerous brokers agreed on a common course of action.

These statements constitute direct evidence of agreement: "all in" is little different from "we agree." The brokers' statements plausibly suggest "a conscious commitment to a common scheme" or a "meeting of minds," which is all that is required under the antitrust laws. *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 764, 765 (1984). "Plaintiffs need not allege the existence of collusive communications in 'smoke-filled rooms' in order to state a § 1 Sherman Act claim," *In re Delta/Air Tran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d 1348, 1360 (N.D. Ga. 2010), but these virtual discussions between brokers, facilitated by UWM, are the modern equivalent.

The fact that the SAC does not quote 9,000 brokers is certainly not disqualifying, especially at the pleading stage. Once a conspiracy is shown, only a slight amount of evidence is needed to link other defendants with it. *See United States v. Allen*, 831 F. App'x 580, 581 (2d Cir. 2020) (*citing United States v. Abelis*, 146 F.3d 73, 80 (2d Cir. 1998)). *Twombly* makes clear that a complaint "does not need detailed factual allegations." *Bell Atlantic v. Twombly*, 550 U.S. 544, 555

15

(2007). All that is required at this stage is "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* at 556.

Even if these statements were not considered direct evidence, they certainly plausibly suggest agreement. Numerous courts have held that parallel behavior coupled with interfirm communications is sufficient to prove a conspiracy, even at the summary judgment stage. *Blomkest Fertilizer, Inc. v. Potash Corp. of Sask.*, 203 F.3d 1028, 1033 (8th Cir. 2000) (*en banc*) ("Courts have held that a high level of communications among competitors can constitute a plus factor which, when combined with parallel behavior, supports an inference of conspiracy."); *In re Plywood Antitrust Litig.*, 655 F.2d 627, 633, 634 (5th Cir. 1981).

The allegations here are even more compelling, because statements such as "unstoppable together," "brokers are better when we work together," and "we don't go against our family" constitute, at the least, explicit invitations to collude. *See In re Delta/Airtran Baggage Fee Antitrust Litig.*, 245 F. Supp. 3d at 1372, *aff'd sub nom. Siegel v. Delta Air Lines, Inc.*, 714 F. App'x 986 (11th Cir. 2018) (per curiam) ("Numerous cases have recognized that an invitation to collude can serve as evidence of a conspiracy."); *Fishman v. Wirtz*, 1981 WL 2153, at *59 (N.D. Ill. Oct. 28, 1981) ("One of the strongest circumstantial indicators of a conspiracy is the existence of a common invitation or request to join into a concerted plan of action.").

The decision in *United States v. Apple, Inc.*, 791 F.3d 290 (2d Cir. 2015), in which the court found facilitation of an agreement between competing publishers

49136730.19

by Apple, is highly relevant. The Second Circuit noted that "Apple coordinated phone calls between the publishers who had agreed and those who remained on the fence." *Id.* at 319. The SAC similarly includes allegations that UWM responded to other brokers who had concerns, SAC ¶53*, established a digital forum for brokers to discuss the Ultimatum with one another, *id.* ¶49*, and worked with brokers who could assist other brokers to sign the addendum, *id.* ¶44*.

The Second Circuit also noted that Apple "endeavored to assure the publishers that they weren't going to be alone . . . ." *Apple*, 791 F.3d at 319 (brackets omitted). The SAC similarly alleges that Mr. Ishbia said publicly that "all our current clients are aligned," and that all the brokers "have locked arms with us." *Id.* ¶42*. Mr. Ishbia also said in a public forum that "everybody is going to sign." *Id.* ¶51*. UWM's account executives contacted brokers who had not yet signed the addendum and "falsely asserted that that mortgage broker was the only one who had not yet accepted" it. *Id.* ¶56.

The facts alleged here are much stronger than in *Apple*, since the assurances were also made by the brokers themselves. The statements regarding the "all in" nature of the brokers' actions provided assurances to other brokers that they would be acting as part of a large group.

The new allegations in the SAC regarding statements by AIME and other trade associations also plausibly suggest an agreement by their members. *See* SAC ¶¶45-48*. "[P]articipation in a trade association, where the defendants had opportunities to exchange information or make agreements, coupled with

17

allegations of parallel conduct, are sufficient to tie the defendants to the conspiracies." *In re Salmon*, 2021 WL 1109128, at *10 (S.D. Fla. Mar. 23, 2021).

The Third Circuit in *In re Insurance Brokerage Antitrust Litigation*, 618 F.3d 300, 322 (3d Cir. 2010), previously relied upon by the Magistrate Judge, explained that "evidence implying a traditional conspiracy" requires "'proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan . . . .'" (citations omitted). Here, the statements regarding the parties' being "all in," "unstoppable together," "all family," and "all for one" are certainly "assurances of common action" and "a common plan." *Id.*

### 2. The Fact That the Brokers Reversed Course and Acted Against Their Individual Interests Is Another Strong Plus Factor

Another plus factor arises from the fact that the brokers acted against their individual self-interests. Prior to UWM's meeting with its brokers, Fairway and Rocket had gained additional business from at least 7,000 new mortgage brokers. SAC ¶35*. After the meeting, there was an abrupt about face by 93% of UWM's brokers.

This is compelling evidence of conspiracy. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1365 (3d Cir. 1992). (discussing the holding in *Arnold Pontiac-GMC, Inc. v. General Motors Corp.*, 786 F.2d 564 (3d Cir. 1986), that evidence was sufficient to withstand summary judgment where "GM had favorably viewed Arnold Pontiac's franchise application until after the GM dealers collectively expressed disapproval and threatened non-cooperation."); *see also*

18

*MM Steel L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 844 (5th Cir. 2015); *In re*

*High Fructose Corn Syrup Antitrust Litigation*, 295 F.3d 651, 663 (7th Cir. 2002).[3]

Additionally, the brokers' conduct would have been even more contrary to

their self-interests if not undertaken collectively. *See* SOF, *supra* at Section D. This

"is perhaps the strongest plus factor indicative of conspiracy." *Merck-Medco*

*Managed Care, LLC v. Rite Aid Corp.*, 201 F.3d 436, 1999 WL 691840, at *10 (4th

Cir. 1999); *see also Disposable Contact Lens*, 215 F. Supp. 3d at 1296 (new pricing

policy would only make sense if a manufacturer "can be confident that other

manufacturers will be taking similar action"). As the brokers said, they are

"unstoppable together." *Id.* ¶¶ 41, 66*. The implication was that they were *not*

unstoppable individually, and therefore collective action was necessary.

### 3.    The Fact that the Brokers Were Coerced Does Not Rebut an Inference of Agreement

Contrary to UWM's argument that the brokers cannot be both conspirators

and victims, the case law makes clear that co-conspirators need not share the same

motive or goal, and a conspiracy can involve coercion. In *Spectators'*

*Communication Network, Inc. v. Colonial Country Club*, 253 F.3d 215, 222 (5th

Cir. 2001), the Fifth Circuit held that the plaintiff had presented "sufficient

evidence of a combination or conspiracy when one conspirator . . . is enticed or

coerced into knowingly curtailing competition by another conspirator who has an

---

[3] UWM's contrary assertion that thousands of brokers suddenly and simultaneously acted in unison because they happened to share Mr. Ishbia's "concern" for the broker channel (but apparently had never acted on that concern before the Ultimatum), is a speculative (and highly dubious) factual claim. Certainly, it is far from the only plausible claim here.

anticompetitive motive." *See also Isaksen v. Vt. Castings, Inc.*, 825 F.2d 1158, 1163 (7th Cir. 1987) (holding that the fact that a party was "coerced into agreeing is of no moment; an agreement procured by threats is still an agreement for purposes of section 1"); *Insurance Brokerage*, 618 F.3d at 344 ("[T]he conspiracy was instigated, coordinated, and policed by Marsh, but this does not belie the alleged horizontal agreement. On the contrary, Marsh's influence could create a powerful incentive for exactly such an agreement . . . .").

Defendants argue that brokers expressed enthusiasm for the boycott. That does not change the fact that UWM imposed a penalty (no more access to its loans) for brokers who did not comply. Nor does it change the fact that, prior to the boycott, brokers had been utilizing Rocket and Fairway in ever-increasing numbers. In any event, the "enthusiasm" is fully consistent with collective action.

Defendants also argue that any broker was "free" to decline to sign the Addendum. But such "freedom" would result in an inability to sell UWM loans. *See* SAC ¶36 ("[I]f you work with them [Fairway Mortgage and Rocket Pro TPO], you can't work with UWM.").

### 4.    **Defendants' Cases are Inapposite**

Defendants' cases do not suggest a contrary conclusion. In *Insurance Brokerage, supra*, the Third Circuit noted that "there are no allegations that any insurer ever horizontally disclosed to its competitors the details of its vertical agreement with a broker." *Insurance Brokerage*, 618 F.3d at 329. Here, of course, the Addendum was extensively discussed by the competing brokers. *In re EpiPen*

20

*Direct Purchaser Litigation*, 2022 WL 1017770, at *7 (D. Minn. Apr. 5, 2022) only says that "[m]ere knowledge of the existence of other . . . agreements . . . does not constitute an agreement under § 1." But the conduct alleged here is far more than "mere knowledge;" it involves active participation.

Similarly, *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919) and *Vitacost.com v. Oregon Freeze Dry, Inc.*, 2009 WL 10667820, at *6 (S.D. Fla. July 21, 2009), involved nothing more than a communication by the manufacturer. *A & E Auto Body, Inc. v. 21st Century Centennial Ins. Co.*, 2015 WL 12867010 (M.D. Fla. Jan. 22, 2015), also did not involve factual allegations of communications between the defendants. The same is true of *Quality Auto Painting Center of Roselle, Inc. v. State Farm Indemnity Co.*, 917 F.3d 1249, 1264, 1271-72 (11th Cir. 2019) (finding no allegation that the defendants "had communicated in advance" regarding labor rates) and *Bolinger v. First Multiple Listing Service, Inc.*, 838 F. Supp. 2d 1340, 1361 (N.D. Ga. 2012).

UWM argues that its orchestration of the boycott could not constitute a *per se* antitrust violation because it "has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently." ECF No. 102 at PageID.1342 (quoting *Monsanto*, 465 U.S. at 761). But UWM's thousands of agreements with brokers and the extensive communications between brokers were in no sense done "independently." Notably, in *Monsanto* an agreement was found.

### 5. **Group Boycotts May Be Proven By Parallel Conduct and Plus Factors Suggesting Agreement**

Contrary to Defendants' assertions, the analysis of parallel conduct and plus factors are regularly applied in the boycott context. *See, e.g.*, *Evergreen Partnering Group, Inc. v. Pactiv Corp.*, 720 F.3d 33, 47 (1st Cir. 2013) (finding allegations to support claim of a per se illegal group boycott sufficient on the basis of several "plus factors,"); *OEM Glass Network, Inc. v. Mygrant Glass Co.*, 436 F.Supp.3d 576, 593-94 (E.D.N.Y. 2020) (finding sufficient "plus factors" were alleged to support group boycott claim); *Int'l Construction Prods. LLC v. Caterpillar Inc.*, 2020 WL 4589775, at *4 (D. Del. Aug. 10, 2020); *Grasso Enterps., LLC v. Express Scripts, Inc.*, 2017 WL 365434, at *3 (E.D. Mo. Jan. 25, 2017).

Defendants' argument that the "plus factor" analysis applies only in the "price fixing" context finds no support even in the authorities they cite. *See, e.g., Disposable Contact Lens*, 215 F. Supp. 3d at 1297 ("[P]lus factors tend to establish . . . collusive agreement[s] to fix prices *or otherwise restrain trade*." (emphasis added)).

Defendants also argue that plus factor analysis does not support Okavage because the market allegedly is not "concentrated." ECF No. 102, PageID.1344 (emphasis added) (citing SAC ¶27). But that is only one "plus factor" among many. Numerous authorities have held that collusion can still occur where overall concentration is low. *See In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 443 (9th Cir. 1990); *In re Toys R Us, Inc.*, 126 F.T.C. 415, 529 (1998); and Areeda & Hovenkamp, *Antitrust Law* ¶1606h3.

49136730.19

The fact that UWM was able to obtain the assent of 93% of its brokers shows that
a concentrated market was not necessary for success here.

### B.    The Allegations in the SAC Demonstrate that the Boycotters Possess Sufficient Market Dominance to Support a *Per Se* Boycott Claim

The new allegations in the SAC are also sufficient to meet the standards in
*Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472
U.S. 284, 294 (1985), for *per se* boycotts, that it "cut off access to a supply, facility
or market necessary to enable the boycotted firm to compete . . . and frequently the
boycotting firms possessed a dominant position in the relevant market."

The standard for dominance under *Northwest Stationers* is not demanding.
As the court held in *Toys "R" Us, Inc. v. FTC,* 221 F.3d 928, 936 (7th Cir. 2000),
"[w]e have found that this case satisfies the criteria the Court used in *Northwest
Stationers* for condemnation without any extensive inquiry into market power and
economic pros and cons . . . 'dominant' is an undefined term, but [is] plainly
chosen to stand for something different from antitrust's term of art 'monopoly.'"

Under any standard, the boycotting brokers clearly represented a dominant
force. *See* SOF, *supra* at Section E (55% of brokers in market participated in
boycott). To quote Mr. Ishbia from the video of the live chat linked to the
Complaint, "these guys [Rocket and Fairway] just lost 70%, 80%, 90% of their
business." SAC ¶36.

Defendants conflate monopoly power with the kind of dominance that is
required by *Northwest Stationers*. They assert that a showing of "substantial or

49136730.19

even *dominant* market share alone cannot establish market power." (Emphasis added.) But since the standard here in the words of the Supreme Court is "dominance," Defendants' argument is nonsensical.

The SAC also satisfies the *Northwest Stationers* standard that "the boycott . . . cut off access to a supply, facility, or market necessary to enable the boycotted firm to compete"—here, the thousands of brokers who would otherwise refer borrowers to Rocket or Fairway. The competitive necessity of the brokers is revealed by the allegation that according to Mr. Ishbia, UWM's wholesale market share increased, and Rocket's and Fairway's shares dropped significantly, due to the boycott. SAC ¶¶61-62*. Mr. Ishbia also stated that Rocket and Fairway would be cut off from 70-90% or more of the referrals they received from brokers, and subsequently confirmed that the result was even more successful than he expected. *Id.* ¶61*. In *Silver v. New York Stock Exch.*, 373 U.S. 341, 348 (1963), cited by the *Northwest Stationers* court with regard to the "essentiality" requirement, the Supreme Court found that the denied services were important because a party without them would be "hampered substantially in [their] crucial endeavor," and provided "important business advantages[.]" The loss of 70-90% of the competitors' business, involving brokers representing 55% of the market, more than meets this standard.

Finally, Defendants argue that there is a "plausible procompetitive rationale" for the Ultimatum. ECF No. 102, PageID.1327, 1340. But the alleged threat that Defendants claim the Ultimatum "procompetitively" prevented—

24

"converting the brokers' customers to the retail side"—is simply a description of competition. Thus, Defendants admit that the Ultimatum was designed to limit competitive choices. *Cf. Northwest Stationers*, 472 U.S. at 295-96 (procompetitive rational would "increase economic efficiency and render markets more, rather than less, competitive" (citation omitted)). There is no basis in the SAC to conclude that UWM's actions increased economic efficiency.

## III.    THE SAC PLAUSIBLY ALLEGES AN UNREASONABLE RESTRAINT OF TRADE IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

Even if the Court rejected *per se* treatment here, the allegations of the SAC are sufficient to plausibly allege an unreasonable restraint of trade, which requires only vertical agreements between UWM and its brokers. Here, UWM sought that its brokers acquiesce in the Ultimatum and sign the Addendum, and 11,000 brokers did so. *See* SAC ¶¶36, 37*, 38-39, 40*, 41.

### A.    Anticompetitive Effects

An unreasonable restraint of trade must involve either "actual detrimental effects," or market power plus "the potential for genuine adverse effects on competition . . . ." *F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460 (1986). All are plausibly alleged here.

Direct harm can be shown by factors "such as reduced output, increased prices, or decreased quality . . . ." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018). The SAC alleges that the boycott has increased the costs of mortgage loans by eliminating lower priced, higher quality competitors. SAC ¶¶32(B)*, 32(C)*,

49136730.19

72*, 73*, 78*. *See H&R Block*, 833 F. Supp. 2d at 79-80; *Virgin Atl. Airways, Ltd. v. British Airways PLC*, 257 F.3d 256, 264-265 (2d Cir. 2001). In *Virgin Airways*, the court found that "consumers experienced a decrease in quality due to Virgin's delayed entry" because "Virgin offered higher quality services than British Airways."

Restrictions on choice can also constitute anticompetitive effects. The "anticompetitive nature of the restraint" in *Realcomp II, Ltd. v. F.T.C.*, 635 F.3d 815, 827, 829-31 (6th Cir. 2011), was the reduction in competitive brokerage options available to home sellers—circumstances quite analogous to the restriction of consumers' lender options caused by the Ultimatum. *See also Indiana Fed'n of Dentists*, 476 U.S. at 459 (stating that "an agreement limiting consumer choice by impeding the 'ordinary give and take of the market place,' cannot be sustained under the Rule of Reason" (citation omitted)).

Restrictions on brokers are plainly harmful to consumers. *See United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191-194 (3d Cir. 2005) (condemning exclusive arrangements imposed on dealers). The *Dentsply* court recognized that consumers derived a substantial benefit from dealers, "which as a class traditionally carr[y] the products of multiple vendors," and facilitate "one stop shopping" across multiple competing products. *Id.* at 192. The SAC alleges the very same facts as to brokers. SAC ¶¶76-79*.

The SAC also alleges that Rocket and Fairway are UWM's largest rivals and closest competitors. *Id.* ¶¶31, 72*, 76*. "Combining competitors for which

49136730.19

consumers view the firms' products as significant substitutes may enable the merged firm profitability to increase prices," because it limits the choices to customers. *In the Matter of ProMedica Health Sys., Inc.*, 2012 WL 1155392, at *36 (F.T.C. 2012). Limiting competition from UWM's two largest and closest substitutes will plausibly have similar effects. Defendants' argument that there are other adequate alternatives is a factual argument for later in the case, especially since none of their assertions are contained within the SAC.

While the SAC does not specifically allege Rocket's or Fairway's market shares after the boycott, it does allege that Mr. Ishbia predicted a 70-90% decline in their business, and then after the fact announced that the boycott was more successful than he expected. *See* SAC ¶61*; *see also id.* ¶105* (Ishbia said that "When we announced the [Ultimatum], they [Rocket Mortgage] were more than twice my size overall, not wholesale, overall. Now I'm [UWM] bigger than them.").

Contrary to Defendants' assertions, the SAC also alleges facts which plausibly allege substantial foreclosure. A loss to Rocket and Fairway of 70-90% of their business due to the boycott would reflect substantial foreclosure. Additionally, the brokers participating in the boycott (and therefore not accessible to Rocket and Fairway) represent a foreclosure of more than 55% of the market. *McWane*, 783 F.3d at 837 ("Traditionally a foreclosure percentage of at least 40% has been a threshold for liability in exclusive dealing cases.").

Finally, UWM argues that its agreement could not harm competition because it is "of relatively short duration" and "can be terminated upon short

27

notice." ECF No. 102, PageID.1350. But the SAC explains that brokers can *never* opt out of the Ultimatum if they want to do business with UWM. As Mr. Ishbia stated, "The penalty of working with Rocket ... is you don't get to work with UWM. *And nobody is willing to take that chance.*" SAC ¶103(A)* (emphasis added). As the *Dentsply* court explained, a similar restraint "imposes an 'all-or-nothing' choice on the dealers. The fact that dealers have chosen not to drop Dentsply teeth in favor of a rival's brand demonstrates that they acceded to heavy economic pressure." *Dentsply*, 399 F.3d at 196. The same is alleged here.

**B.**    **Market Power**

Even if these allegations involved only "potential" rather than actual anticompetitive effects, they are more than sufficient, given the extensive factual allegations regarding UWM's market power. This Circuit held in *U.S. Anchor Mfg. v. Rule Indus., Inc.*, 7 F.3d 986, 1000 (11th Cir. 1993), that even "a dangerous probability of achieving monopoly power may be established by a 50% share." UWM's 54% share is therefore more than sufficient to establish market power under the lesser standard applicable to Section 1 of the Sherman Act. *Eastman Kodak Co. v. Image Technical Sys., Inc.*, 504 U.S. 451, 481 (1992) ("Monopoly power under § 2 requires, of course, something greater than market power under § 1."); *see also Kearney & Trecker Corp. v. Giddings & Lewis, Inc.*, 452 F.2d 579, 598 (7th Cir. 1971) (holding that one-third market share was sufficient where the firm's conduct "would endanger the competitive process" and the "[f]ulfillment of its objectives would have significantly enhanced its market position"); *United*

28

*States v. Visa USA, Inc.*, 344 F.3d 229, 239-40 (2d Cir. 2003) (26% share sufficient for market power under Section 1); *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 667 (7th Cir. 1987) ("17%-25% . . . is an absolute minimum necessary to establish market share" in a Section 1 case).

Defendants argue that the boycotting brokers are just 11.6% of all "federally registered loan officers in the United States." ECF No. 102, PageID.1324. But the relevant market does not include all wholesale and retail loan officers. In any event, this figure is also based upon evidence outside of the SAC.

Defendants also attempt to dispute the 54% allegation, claiming that the source refers to a 38% average market share. But this is over the course of the entire previous year. *See* ECF No. 102, PageID.1323 (citing Ex. A, UWM 10-K at PageID.1370 (noting a 38% market share "[f]or the year ended December 31, 2022")). This ignores UWM's quarter-over-quarter increases, which culminated in a 54% market share in the fourth quarter of 2022. *Id.* at Ex. B, Q4 2022 Earnings Call (Mr. Ishbia: "UWM has 54% brokers market share in the fourth quarter, the highest share reading ever, up from 41% in the third quarter.").

54% is thus the most recent—and therefore most relevant—figure reflecting UWM's market share. *See, e.g.*, Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶807d2 ("Where the defendant's market share rises substantially during the course of the challenged behavior, the later higher number is the one most relevant for determining the existence of a dangerous probability of success.").

29

Defendants further cloud the issue by inventing a distinction between UWM's percentage share of the "broker channel" (54%) and its share of the "wholesale channel" (38%). ECF No. 102, PageID.1324 (citing Ex. C at PageID.1579). But, again, the 38% figure refers to average market share "for the year ended December 31, 2022," not UWM's most recent market share data. *Id.* Ex. C, PageID.1579. The terms "broker channel" and "wholesale channel" were used interchangeably by Mr. Ishbia. *See, e.g.*, *id.* Ex. B at PageID.1563 ("UWM has 54% brokers market share in the fourth quarter . . . ."); *id.* Ex. C at PageID.1579 ("Achieved . . . 54% share of the wholesale channel for 4Q22.").

Moreover, market share is not the only way to measure UWM's power. The ability to exclude competition is sufficient to establish even monopoly power. *McWane*, 783 F.3d at 830 ("Monopoly power is the ability 'to control prices or exclude competition.'" (citation omitted)). *Anchor Mfg., supra*, cited by Defendants, states only that market share is the "principal" device for assessing market power, not the exclusive one. *Anchor Mfg.*, 7 F.3d at 994.

The Supreme Court has held that there was sufficient market power to establish a *per se* tying violation where the defendant "has the power to raise prices or impose other burdens and terms such as a tie-in, with respect to any appreciable number of buyers," *Fortner Enters., Inc. v. United States Steel Corp.*, 394 U.S. 495, 503-4 (1969); *see also In re Terazosin Hydrochloride*, 220 F.R.D. 672, 696 (S.D. Fla. 2004) ("In determining whether a defendant has market power, a court must assess whether the 'seller has the power to raise prices, or impose other

49136730.19

burdensome terms such as a tie-in, with respect to any appreciable number of buyers within the market.'" (quoting *Fortner*, 394 U.S. at 504)).

The SAC alleges that UWM had sufficient power to successfully impose its Ultimatum on 93% of its brokers, many of whom had previously chosen to utilize Rocket and Fairway. SAC ¶¶61*, 82*. This imposed "burdensome terms" on an "appreciable number of buyers." As Mr. Ishbia explained, "nobody is willing to take th[e] chance" of losing UWM. That itself proves its power.

The new allegations of the SAC also address another important indicium of market power: Mr. Ishbia says that UWM controls industry margins. SAC ¶109*. The Lerner Index, the difference between price and cost, and thus a measure of margins, is well recognized in antitrust law and economics as a measure of market power. *Restore Robotics LLC v. Intuitive Surgical, Inc.*, 2022 WL 19408080, at *7 (N.D. Fla. Feb. 7, 2022) (collecting cases); *see also* Dennis W. Carlton & Jeffrey M. Perloff, *Modern Industrial Organization* 92 (3d ed. 2005) ("[C]ourts have accepted that index as a valid method of identifying monopoly power.").[4]

## IV.    THE SAC STATES A CLAIM FOR ATTEMPTED MONOPOLIZATION

The SAC also satisfies the "dangerous probability of success" element of attempted monopolization. A "majority position in the market,'" such as UWM's 54% share here, poses such a dangerous probability. *Gulf States Reorg. Grp., Inc.*

---

[4] Defendants claim that Mr. Ishbia was merely assuring investors that he would "control" the company's margins within an acceptable range going forward. ECF No. 102, PageID.1325-26. But Defendants omit a critical portion of his statement quoted in the SAC: "we do control the margins *in this industry*." SAC ¶109* (emphasis added).

31

*v. Nucor*, 822 F. Supp. 2d 1201, 1237 (N.D. Ala. 2011). As discussed above, Mr. Ishbia's admission that UWM controls the margins "in this industry" and its ability to impose burdensome terms on brokers are further indicia of monopoly power, and are certainly sufficient to allege a dangerous probability of such power.

The substantial consolidation in the wholesale market provides further support. *Id.* ¶106*. *See Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 490 (5th Cir. 1984) (holding that a "consolidation trend in the market" makes successful monopolization more likely). UWM's dramatic growth in market share (from 34% to 54%) also supports this inference. *Nobody in Particular Presents, Inc. v. Clear Channel Comm's, Inc.*, 311 F. Supp. 2d 1048, 1103 (D. Colo. 2004) ("[W]hen the defendant's market share grows significantly in a short period of time, while the market share of its major competitors shrinks significantly in a short period of time, a probability of monopolization may exist.").

The SAC's specific allegations of high barriers to entry also support this conclusion. *See, e.g., McGahee v. Northern Propane Gas Co.*, 858 F.2d 1487, 1495 n.11 (11th Cir. 1988) (reversing summary judgment because, in holding that there were no significant barriers to entry, the district court neglected to consider "factors, such as large capital outlays required to start a new business"); *Danielson v. Tropical Shipping & Constr. Co.*, 2019 WL 13183885, at *4 (S.D. Fla. June 25, 2019) (barriers to entry include "legal license requirements").[5]

---

[5] The SAC also properly alleges a specific intent to monopolize, since that can be inferred from anticompetitive conduct. *M & M Med. Supplies & Serv. v. Pleasant Valley Hosp.*, 981 F.2d 160, 166 (4th Cir. 1992) (en banc) ("Specific intent may be inferred from the defendant's

## V.    THE SAC PLAUSIBLY ALLEGES VIOLATIONS OF THE FLORIDA ANTITRUST ACT AND FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

Defendants argue that the SAC fails to adequately allege causation or damages under the FDUPTA. But the SAC specifically alleges that the class members participating in the boycott have been injured by their loss of an opportunity to offer their customers Rocket or Fairway. SAC ¶¶76*, 142-145, 153, 200. Those like Okavage who did not participate lost the opportunity to offer UWM's loans. *Id.* This has cost them customers and commissions. *Id.* ¶153.

Many cases have approved FDUPTA claims involving similar claims. *Marco Island Cable v. Comcast Cablevision of S., Inc.*, 312 F. App'x 211, 214 (11th Cir. 2009) (allowing recovery for diminution in value of business); *Klinger v. Weekly World News, Inc.*, 747 F. Supp. 1477, 1480 (S.D. Fla. 1990) (loss of business opportunities); *NACM Tampa, Inc. v. Sunray Notices, Inc.*, 2017 WL 2209970, at *11 (M.D. Fla. Feb. 8, 2017) ("Lost profits are compensable under [the FDUTPA]."); *Yellow Cab Co. of Orlando v. Celebration Transp., Inc.*, 2013 WL 656339 (M.D. Fla. Jan. 28, 2013) (allowing recovery for lost business); *E-Z Pack Mfg., LLC v. RDK Truck Sales & Serv., Inc.*, 2011 WL 4343790 (M.D. Fla. Aug. 10, 2011) (allowing recovery for lost sales and business opportunities).

Nor does the SAC fail to adequately allege a "deceptive act or unfair practice." False statements are specifically alleged at ¶¶38-39 and ¶¶56-57. The

anticompetitive practices."); *Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d 55, 74 (2d Cir. 1988).

49136730.19

anticompetitive actions of UWM in orchestrating a boycott are "unfair practices." *JAWHBS, LLC v. Arevalo*, 2017 WL 1345141, at *7 (S.D. Fla. Apr. 12, 2017) ("[A]llegations that amount to a violation of the antitrust laws would satisfy this element.").

For the same reasons set forth above, Okavage's claims under the Florida Antitrust Act should not be dismissed, since, as the parties agreed, the Florida statute is governed by the same principles as the federal antitrust laws.

## VI.    THE SAC STATES A CLAIM FOR TORTIOUS INTERFERENCE

The elements of tortious interference are also properly alleged here. The new allegations contained in the SAC state that the business relationships interfered with are those between borrowers desiring, and brokers capable of referring, a choice of mortgage loans from Rocket, Fairway, and UWM. *Id.* ¶142*. The SAC alleges that UWM's actions interfered with these relationships by depriving brokers of the opportunity to offer all these alternatives. *Id.* ¶144*.

Defendants argue that Okavage fails to allege "an actual and identifiable understanding or agreement" that was lost due to UWM's actions. ECF No. 102, PageID.1356.) But that is not required. "[A] plaintiff may properly bring a cause of action alleging tortious interference with present or *prospective* customers . . . ." *Burge v. Ferguson*, 619 F. Supp. 2d 1225, 1239 (M.D. Fla. 2008) (emphasis added).

Defendants' claim that the SAC fails to allege tortious intent is similarly inaccurate. The SAC specifically alleges numerous intentional and purposeful actions. *See, e.g.*, SAC ¶37* ("Mr. Ishbia stated on the video chat on Facebook that

34

one purpose of the boycott related to efforts to prevent Fairway's and Rocket Mortgage's competition at retail"); *id.* ¶¶7; 51* (stating publicly that "everyone's going to sign an addendum that says 'hey listen, we're not working with those two lenders,'"); *id.* ¶61* ("predict[ing] on the video that Rocket Mortgage and Fairway would lose 70%-90% of their business").

The fact that wholesale mortgage lenders do not work directly with a broker's clients is irrelevant. It is enough that Defendants interfered with the customers' relationships with the broker.

## VII. THE SAC STATES A CLAIM FOR DECLARATORY RELIEF

Contrary to Defendants' assertions, there is unquestionably an "actual controversy" here regarding the validity of the Addendum. Okavage's contract with UWM was terminated because of its refusal to sign the Addendum. SAC ¶¶56, 64, 70. Okavage contends that was improper because the Addendum was unlawful. If Okavage is right, UWM could not cut off Okavage for refusing to agree to an illegal contract. This is precisely what the declaratory judgment statute was designed to prevent. *See, e.g.*, *General Motors LLC v. Royal Motors Corp.*, 769 F. Supp. 2d 73, 76 (D.P.R. 2011) ("GM's right to terminate its contractual relationship with RMC is the exact type of dispute considered ripe for declaratory judgment.").

The fact that there exists some overlap between the SAC's antitrust claims and the request for declaratory relief is no reason to dismiss either. *See* Fed. R. Civ. P. 57 ("The existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate."). In *Del Prado Mall Prof'l Condo. Ass'n*

49136730.19

*v. Voyager Indem. Ins. Co.,* 2021 WL 1578758, at *1 (M.D. Fla. Apr. 22, 2021), cited by Defendants, the court declined to exercise jurisdiction over a declaratory judgment claim because it sought "the same exact relief Count I seeks." Here, the SAC's other claims do not seek a declaration as to the validity of the contract.

Defendants' suggestion that Plaintiffs' declaratory judgment claim is non-justiciable because Okavage is "not a party to the Addendum" finds no support in *Atlanta Gas Light Co. v. Aetna Cas. Sur. Co.,* 68 F.3d 409 (11th Cir. 1995). The *Atlanta Gas* court dismissed the action because it had been brought prematurely. *Id.* at 414-15.

## VIII.  MR. ISHBIA'S PERSONAL LIABILITY IS PROPERLY ALLEGED

Defendants assert that the SAC "alleges no new or additional facts against Mr. Ishbia." (*See* ECF 102, PageID.1348, 1351-52, 1355.) In fact, the new allegations in the SAC specifically allege that Mr. Ishbia personally announced the boycott, SAC ¶¶36, 37*, 40*, stated publicly that "everyone's going to sign an addendum that says 'hey listen, we're not working with those two lenders,'" *id.* ¶51*, and "predicted on the video that Rocket Mortgage and Fairway would lose 70%-90% of their business," *id.* ¶¶61*, 42 (repeatedly referring to this collective action as the "'all in' initiative").

This is more than enough to establish personal liability. "[A] corporate officer is subject to prosecution under § 1 of the Sherman Act whenever he knowingly participates in effecting the illegal contract, combination, or conspiracy—be he one who authorizes, orders, or helps perpetrate the crime—

36

regardless of whether he is acting in a representative capacity." *United States v. Wise*, 370 U.S. 405, 416 (1962); *see also Omni Healthcare, Inc. v. Health First, Inc.*, 2015 WL 275806, at *15 (M.D. Fla. Jan. 22, 2015) (a corporate officer's participation in an anticompetitive scheme "suffice[s] for individual antitrust liability").

## IX. THIS COURT HAS PERSONAL JURISDICTION OVER MR. ISHBIA

Defendants' challenge to this Court's personal jurisdiction over Mr. Ishbia ignores binding case law construing Florida's long-arm statute. The Eleventh Circuit has made clear that courts may exercise personal jurisdiction under Florida's "long arm statute" over a non-resident defendant "who commits a tort outside of the state that causes injury inside the state." *See Licciardello v. Lovelady*, 544 F.3d 1280, 1283 (11th Cir. 2008). "[A] defendant's physical presence is not required." *Wiggins v. Tigrent, Inc.*, 147 So.3d 76, 86 (Fla. Dist. Ct. App. 2014) (citation and quotations omitted). "'Committing a tortious act' in Florida under section 48.193(1)[(a)] can occur through the nonresident defendant's telephonic, electronic, or written communications into Florida." *Wendt v. Horowitz*, 822 So.2d 1252, 1260 (Fla. 2002). This principle has been applied repeatedly to interactive internet posts accessible in Florida or directed at Florida residents. *Internet Solutions Corp. v. Marshall*, 39 So.3d 1201, 1214-15 (Fla. 2010); *Licciardello*, 544 F.3d at 1283; *Ares Defense Systems, Inc. v. Karras*, 2016 WL 7042957, at *8 (M.D. Fla. Mar. 10, 2016). Of course, the SAC specifically alleges such internet communications by Mr. Ishbia. *See* SAC ¶¶36, 37*, 40*, 51*.

Defendants accuse Okavage of arguing that the mere accessibility of a defendant's website in Florida would confer personal jurisdiction. ECF No. 102, PageID.1333. But this is a straw man, since the claims here relate to specific statements by Mr. Ishbia intended to effectuate UWM's anticompetitive scheme. Defendants' cases are therefore inapposite. *See Blue Water Int'l, Inc. v. Hattrick's Irish Sports Pub, LLC*, 2017 WL 4182405, at *4 (M.D. Fla. Sept. 21, 2017) (denying personal jurisdiction based solely on a Missouri bar's "presence" on Facebook and other social media sites, where it "undisputedly sells food, alcohol, and merchandise only in Missouri"); *Leon v. Cont'l AG*, 301 F. Supp. 3d 1203, 1229 n.16 (S.D. Fla. 2017) (addressing the "mere presence" of unrelated "press releases on websites").

There are a host of decisions finding jurisdiction over out-of-state defendants engaged in intentional wrongdoing on behalf of their company, notwithstanding the corporate shield doctrine. *See, e.g., Phelan v. Lawhon*, 229 So.3d 853, 860 (Fla. Dist. Ct. App. 2017) (out of state defendants "may not claim the benefit of the corporate shield doctrine, in light of the unrebutted allegations of intentional misconduct against each of them"); *Skypoint Advisors, LLC v. 3 Amigos Prods. LLC*, 2019 WL 3343933, at *8, 9 (M.D. Fla. July 25, 2019) (holding that "the defendant does not have to be physically present in Florida for the tortious act to occur within that state," and that defendant's reliance on the corporate shield doctrine was "misplaced, as the doctrine does not apply to intentional torts"); *Sticky Holsters, Inc. v. Ace Case Mfg., LLC*, 2016 WL 1436602,

38

at *3, 4 (M.D. Fla. Apr. 12, 2016) ("Florida law excludes claims for fraud from the purview of the Corporate Shield Doctrine, [and] physical presence in Florida is not required").

Defendants' cases are not to the contrary. *Kitroser v. Hurt*, 85 So. 3d 1084, 1088 n.3 (Fla. 2012), states that "a corporate officer who commits fraud or other intentional misconduct outside of Florida may be subject to personal jurisdiction." The court only held that "a nonresident employee-defendant who works only outside of Florida, commits no acts in Florida, and has no personal connection with Florida will not be subject to the personal jurisdiction of Florida courts *simply because* he or she is a corporate officer or employee." *Id.* at 1089 (emphasis added). Here, Mr. Ishbia is not being sued "simply because he is a corporate officer."

## X.    **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully submits that Defendants' Motion to Dismiss should be denied.

Date: August 29, 2023         Respectfully Submitted,
                              **PARRISH & GOODMAN, PLLC**
                              /s/ Robert H. Goodman
                              ROBERT H. GOODMAN
                              Florida Bar No.: 1008059
                              13031 McGregor Blvd., Suite 8
                              Fort Myers, Florida 33919
                              Phone: (813) 643-4529
                              Facsimile: (813) 315-6535
                              Primary: rgoodman@parrishgoodman.com
                              Secondary: admin@parrishgoodman.com
                              AND
                              JOSEPH E. PARRISH
                              Florida Bar No: 690058
                              Primary: jparrish@parrishgoodman.com
                              Secondary: admin@parrishgoodman.com

39

49136730.19

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on this 29th day of August, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing Generated by CM/ECF.

/s/Robert H. Goodman

*Attorney for Plaintiffs*

49136730.19