United States District Court
Middle District of Florida
Jacksonville Division

THE OKAVAGE GROUP, LLC
ON BEHALF OF ITSELF AND
ALL OTHERS SIMILARLY SITUATED,

    **Plaintiff,**

v.                         **NO. 3:21-cv-448-WWB-LLL**

UNITED WHOLESALE MORTGAGE,
LLC, AND MATHEW ISHBIA,
INDIVIDUALLY,

    **Defendants.**

---

### Report and Recommendation

Defendants United Wholesale Mortgage (UWM) and Matthew Ishbia move to dismiss Plaintiff's Supplemental Class Action Complaint under Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6), doc. 102. Plaintiff, The Okavage Group, LLC, responded in opposition, doc. 105, and the parties submitted supplemental briefing with leave of court, docs. 107, 108. This motion has been referred to me for a report and recommendation regarding the appropriate resolution. For the reasons discussed below, I respectfully recommend defendants' motion be granted.

## Background

Plaintiff filed the initial complaint in April 2021, doc. 1, and the first amended complaint in August 2021, doc. 32. Defendants moved to dismiss, doc. 46; that motion was referred for the issuance of a report and recommendation. Order, doc 60. In July 2022, the undersigned recommended that the motion to dismiss under Rule 12(b)(2) for lack of personal jurisdiction as to defendant Ishbia be granted, and the motion to dismiss under Rule 12(b)(6) for failure to state a claim also be granted. Report and Recommendation, doc. 61 at 49-50. Within that report and recommendation, plaintiff was advised of the deficiencies in its first amended complaint. *See generally id*. It was also recommended that plaintiff be given an opportunity to refile. *Id*. at 50. Plaintiff then moved to file a second amended complaint, doc. 67; that was granted by the Court and the report and recommendation was withdrawn. Order, doc. 68.

Plaintiff filed its second amended complaint, doc. 69; defendants again moved to dismiss, doc. 73. In March 2023, plaintiff requested leave to file a supplemental complaint, doc. 80; it was opposed by defendants, doc. 84. In July 2023, the Court granted plaintiff's motion, directing the Clerk to file plaintiff's Supplemental Class Action Complaint as the operative, third amended complaint. Order, doc. 95 at 7.[1] Defendants then filed the instant motion to dismiss the third amended complaint, doc. 102.

---

[1] Citations to page numbers in the record are to the CM/ECF pagination.

The factual allegations are summarized as follows. UWM is a wholesale residential mortgage lender. Third Amended Complaint (TAC), doc. 96 ¶ 20. Wholesale mortgage lenders offer mortgage loans through "independent third parties, such as mortgage brokers." *Id.* As such, a wholesale mortgage lender does not work directly with borrowers until after a loan has been funded, if at all.[2] *Id.* Fairway Mortgage (Fairway) is a competitor of UWM; it offers both retail and wholesale mortgage lending. Rocket Mortgage is another a competitor of UWM; it also offers both retail and wholesale mortgage lending, with Rocket Pro TPO (Rocket) handling the wholesale side. TAC ¶¶ 30-31. Neither Fairway nor Rocket are parties to this lawsuit, but their status as competitors to UWM is central to understanding the alleged anticompetitive scheme. Plaintiff alleges that a "relevant market or relevant sub-market in this case is the national market for wholesale lending for mortgages sold through mortgage brokers." *Id.* ¶ 20. Plaintiff asserts that UWM is the largest wholesale mortgage lender, which in March 2020 possessed a 34% share of the wholesale mortgage lending market. *Id.* ¶¶ 26-27. Plaintiff alleges UWM's market share increased to 54% of the wholesale market in the fourth quarter of 2022. *Id.* ¶ 104.

Plaintiff, the Okavage Group, is a one-member LLC and mortgage broker based in St. Augustine, Florida. *Id.* ¶¶ 1, 3-4. Plaintiff alleges it is, or has been, a client of

---

[2] Retail mortgage lenders, on the other hand, work directly with borrowers "from the beginning of a transaction, including providing loan applications and collecting completed loan applications, performing income verification and collecting other required documentation, as well as quoting interest rates." TAC ¶ 21.

UWM and either Fairway or Rocket. *Id.* ¶ 1. According to plaintiff, during the process of wholesale lending, third parties, such as mortgage brokers, provide loan applications to the borrower, collect completed loan applications, verify income, and gather other documentation. Mortgage brokers also advise borrowers of interest rates, loan terms, and select the wholesale mortgage lender who best suits the needs of the borrower. *Id.* ¶ 22. Plaintiff emphasizes the importance of independence to the mortgage broker business because brokers must be able "to choose from a variety of wholesale lenders to select the mortgage product and experience that best matches the specific needs of the broker's client." *Id.*

Plaintiff alleges that UWM, faced with a declining stock price and decreasing share of the wholesale lending market, acted improperly by orchestrating an anticompetitive scheme that violated federal and state antitrust laws. *Id.* ¶¶ 35-36. Specifically, on March 4, 2021, UWM hosted a virtual event, and its Chief Executive Officer Mathew Ishbia publicly announced an ultimatum[3] by UWM to mortgage brokers; Ishbia's speech was posted to Facebook. *Id.* ¶ 36. In the video, Ishbia stated that mortgage brokers who worked with Fairway or Rocket would not be able to work with UWM. *Id.*

---

[3] The Court refers to the allegation by plaintiff that defendants forced it to choose between working with UWM or Rocket and Fairway to secure mortgages as "the ultimatum." By doing so, however, the Court does not imply the alleged conduct was illegal. Instead, I use the term ultimatum because it is the descriptor given by plaintiff and, at this stage, the Court must accept well-pleaded allegations as true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

4

Throughout the speech, Ishbia highlighted that UWM is "all in" for the broker family; emphasized its goals of being faster, easier, and cheaper; and stressed UWM's mantra as helping mortgage brokers succeed. http://www.facebook.com/97640871999/videos/845176203005957 (last visited January 29, 2024).[4] Ishbia explained in the announcement that UWM was separating retail mortgage lending from wholesale mortgage lending and made a series of statements geared towards exciting the broker network, exclaiming, "there is no stopping brokers," and "we are going to win together as a family." *Id.*

Ishbia further alleged there were two companies "hurting the wholesale channel"—Fairway and Rocket—by cutting the mortgage brokers out. He announced that "at UWM, we're not helping those, that help them . . . if you work with them, you can't work with UWM anymore, effective immediately." *Id.* at 11:30-11:56. Ishbia continued, "owners, you have until March 15 to sign an addendum saying you're not working with those two lenders . . . And if you don't sign the addendum . . . you and nobody at your company will be able to work with UWM anymore, and that's okay, there's no hard feelings." *Id.* starting at 12:17. Ishbia stated: "this is what I think, there are 75 great lenders out there, you need to have options, but there's two that are out there hurting the channel . . . . You can pick us and the 73 other lenders or you can pick those others and not have UW[M]. . . ." *Id.* at 13:20.

---

[4] Plaintiff cites to the Facebook video in the complaint. TAC ¶ 36.

Plaintiff claims that many of the brokers attending the event made public comments on the Facebook live event forum which "included many expressions of agreement," including "We are ALL IN;" "We are all family! Brokers are better when we work together;" and "Brokers are family. We don't go against our family;" among other comments showing support for the change. TAC ¶ 41. Ishbia's statements and the brokers' communications took place on a public forum—Facebook—and plaintiff claims that "[b]rokers also used UWM's Facebook page to discourage brokers who disagreed with the boycott," citing to various comments. *Id.* ¶ 43. Further, plaintiff states that brokers "facilitated and offered assistance to other brokers" to participate, citing a comment in which one broker told another where to access the form. *Id.* ¶ 44. Plaintiff states the Association of Independent Mortgage Experts (AIME) issued a letter expressing support for the boycott, citing it as evidence of "the collective agreement of its members." *Id.* ¶¶ 45-46. Plaintiff claims that mortgage brokers belong to various trade groups and organizations, which "have provided significant vehicles for communication and agreement between the mortgage brokers with regard to the boycott." *Id.* ¶ 48.

To "implement the [u]ltimatum and coerce the boycott" of Fairway and Rocket, defendants advised their broker clients that "they were required to consent to a contract addendum." *Id.* ¶ 54. The addendum memorialized Ishbia's announcement, that from now on, brokers could not engage in business with Fairway or Rocket if they wanted to work with UWM, and that UWM would seek damages if the agreement was violated:

> United Wholesale Mortgage, LLC ("UWM") is amending its broker, correspondent[,] and financial institution agreements by adding a representation and warranty that its clients will not submit loans to either Rocket Mortgage or Fairway Independent Mortgage . . . . for review, underwriting, purchase and/or funding (unless such loan was locked with Rocket Mortgage or Fairway Independent Mortgage prior to March 15, 2021). If client or client's employees breach this representation and warranty, client agrees to pay liquidated damages to UWM of: (i) Five Thousand Dollars ($5,000.00) per loan closed with UWM, or (ii) Fifty Thousand Dollars ($50,000.00), whichever is greater.

*Id*. According to plaintiff, 93% of the brokers presented with the addendum signed it and UWM stated that "not even 500" of its brokers declined to participate. *Id*. ¶ 61. In June 2021, Ishbia hypothesized it was "more than realistic" that UWM would pass Rocket in total mortgage loan sales. *Id*. ¶ 62.

Plaintiff refused to sign the addendum; UWM terminated its contract with plaintiff and no longer accepted mortgage applications by plaintiff's customers. *Id*. ¶¶ 69-70. Before plaintiff's contract was terminated, it regularly submitted mortgage loan applications to UWM. *Id*. ¶ 68. As a result, plaintiff alleges it has "suffered direct financial injury, including lost sales and lost commissions." *Id*. ¶ 71. Plaintiff states defendants' conduct harmed consumers, participating and non-participating brokers, and "lessened competition with Rocket and Fairway on innovation, price[,] and quality of product." *Id*. ¶¶ 73-74, 76-77.

Plaintiff claims that UWM is aware of its position as an industry leader in the wholesale mortgage industry and points to UWM's annual report from March 2023 in support, specifically its claim that "it has agreements with more than 12,000 individual

brokers," and out of those, 11,500 brokers chose to work with UWM after the ultimatum was issued. *Id.* ¶¶ 101-103. Further, plaintiff alleges that in a Q4 2022 earnings call in March 2023, Ishbia indicated that 2022 was UWM's "eighth consecutive year as the number one wholesale lender," and has referred to UWM in interviews as "dominant" in the wholesale market. *Id.* ¶ 102. Plaintiff states that "[d]ata from the fourth quarter of 2022 indicates that UWM is the largest wholesale market lender, with a most recent approximate 54% share of the wholesale market," increased from 34% in 2020. *Id.* ¶ 104. Plaintiff claims UWM's influence was enhanced by the exit of "many wholesale lenders from the market," as evidenced by a 2023 report. *Id.* ¶ 106. Finally, plaintiff alleges that Ishbia's statements in the March 2023 earnings call, in which he said UWM "has great control of [its] margins" and "control[s] the margins in this industry" further underscores UWM's influence in the market. *Id.* ¶ 109.

Plaintiff claims defendants' conduct "has had the effect of increasing the costs of mortgage loans and has increased the costs of operations" of plaintiff and other class members to "an artificially high, non-competitive level." *Id.* ¶ 72. Plaintiff states that, although there are other alternatives in the wholesale mortgage market, "elimination of two of the largest, and two leading wholesale mortgage lenders, who have been very highly rated, and have offered very competitive prices, significantly reduced competition in the relevant market." *Id.* Notably, plaintiff does not allege that either Fairway or Rocket was ever actually eliminated from the wholesale market. *See generally* TAC.

8

As a result of UWM's ultimatum, plaintiff alleges defendants violated the Sherman Act by unlawfully restraining trade (counts I, II, X, XI) in violation of 15 U.S.C. § 1; and by attempting to monopolize the wholesale mortgage market (counts III, XII) in violation of 15 U.S.C. § 2. Plaintiff also brings claims under Florida law alleging that defendants: 1) unlawfully restrained trade (counts IV, V, XIII, XIV) and unlawfully attempted to monopolize the wholesale mortgage market (counts VI, XV) in violation of the Florida Antitrust Act, Fla. Stat. §§ 542.18 and 19;[5] 2) tortiously interfered with business contracts and prospective economic advantage (counts VII, XVI),[6] and 3) violated Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 (counts VIII, XVII). Plaintiff also brings a claim for declaratory relief under 28 U.S.C. §§ 2201-2202 (count IX) against UWM, asking the Court to declare: 1) the ultimatum and associated addendum are illegal under federal and Florida antitrust laws; 2) the addendum is unlawful and unenforceable; and 3) the liquidated damages provision in the addendum is unenforceable.                                      .

In their motion to dismiss, defendants assert the TAC cannot proceed for a number of reasons: 1) the Court lacks personal jurisdiction over Ishbia; 2) plaintiff's

---

[5] The Florida legislature has adopted the antitrust law developed by the federal courts under the Sherman Act. *All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.*, 135 F.3d 740, 745 n.11 (11th Cir. 1998) (citations omitted) (noting "[f]ederal and Florida antitrust laws are analyzed under the same rules and case law."). As a result, my analysis of federal antitrust law in section II, A-B, applies equally to alleged violations of the Florida Antitrust Act, Fla. Stat. §§ 542.18 and 542.19 (counts IV, V, VI, XIII, XIV, and XV).

[6] Plaintiff does not specify what body of law applies to its tortious interference claims, but when read in tandem with the rest of the TAC and plaintiff's response to the motion to dismiss, it is evident plaintiff intended Florida law to apply.

antitrust claims rest on a legally unsustainable market definition; 3) plaintiff's antitrust claims fail to state a claim upon which relief can be granted under federal and Florida law; 4) plaintiff's tortious interference claims and claims under the Florida Deceptive and Unfair Trade Practices Act fail to state a claim on which relief can be granted; and 5) plaintiff's count for declaratory relief (count IX) is duplicative and improper. Doc. 102. Below, I address these arguments in turn.

**Analysis**

**I. Rule 12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction.**

Defendants move to dismiss Ishbia under Federal Rule of Civil Procedure 12(b)(2), because they argue the Court lacks personal jurisdiction over him. Defendants assert that plaintiff's claims against Ishbia are based solely upon his role in "directing and announcing the [ultimatum], giving interviews about it, and making follow-up statements." Doc. 102 at 22. Defendants also note that plaintiff alleges no separate connection that exists between Ishbia, a Michigan resident, and the state of Florida, and so the corporate shield doctrine prohibits the exercise of jurisdiction under Florida's long-arm statute over corporate employees whose only conduct in Florida was in furtherance of the corporation's interests. *Id*. at 22-23; *see also* doc. 107 at 5-6. Plaintiff counters that, notwithstanding the corporate shield doctrine, the court may exercise personal jurisdiction over a non-resident defendant who commits a tort outside of Florida which causes injury in Florida. Docs. 105 at 47-49; 108 at 7-8.

At this stage, I must accept the facts alleged in the complaint as true and "construe all reasonable inferences in favor of . . . plaintiff." *Madara v. Hall*, 916 F.2d

10

1510, 1514 (11th Cir. 1990). Courts in the Eleventh Circuit ask two questions when determining whether personal jurisdiction exists over a party—1) if personal jurisdiction exists under the forum state's long-arm statute; and 2) if so, whether the exercise of that jurisdiction violates the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution. *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1350 (11th Cir. 2013) (citation omitted).

I look to Florida's long-arm statute, section 48.193, to determine whether the Court has personal jurisdiction over non-Florida resident Ishbia; in doing so, I construe the statute as the Florida state courts would. *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 627 (11th Cir. 1996) (citations omitted). I consider that Florida's corporate shield doctrine, however, precludes the exercise of personal jurisdiction over a non-resident corporate employee sued individually for conduct performed in his corporate capacity. *Doe v. Thompson*, 620 So. 2d 1004, 1006 (Fla. 1993). "The rationale of the doctrine is the notion that it is unfair to force an individual to defend a suit brought against him personally in a forum with which his only relevant contacts are acts performed not for his own benefit but for the benefit of his employer." *Id.* (quotations and citations omitted).

"A plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction." *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009) (citations omitted). If a defendant challenges personal jurisdiction "by submitting affidavit evidence in support of its position, the burden traditionally shifts

11

back to the plaintiff to produce evidence supporting jurisdiction." *Louis Vuitton*, 736 F.3d at 1350 (citation omitted). But when the defendant provides only conclusory allegations that it is not subject to jurisdiction, the burden does not revert to the plaintiff. *Id.* (quoting *Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino*, 447 F.3d 1357, 1360 (11th Cir. 2006)). Defendants have submitted no affidavit(s) or other evidence in support of the motion regarding personal jurisdiction. Thus, I look to the TAC to determine if plaintiff has pleaded a prima facie case of personal jurisdiction over Ishbia. *Id.*

Plaintiff alleges Ishbia is a citizen of Michigan who "has conducted and continues to regularly conduct business in and with mortgage brokers in the state of Florida." TAC ¶ 6. Plaintiff claims Ishbia "knowingly and intentionally directed communications announcing the unlawful [u]ltimatum and false statements to mortgage brokers in order to coerce brokers to acquiesce to the [u]ltimatum and agree to boycott Rocket and Fairway" and that the "communications announcing the unlawful [u]ltimatum and false statements were received by mortgage brokers," including plaintiff and class members located in Florida. *Id.* ¶¶ 7-8. Plaintiff alleges Ishbia engaged in "substantial and not isolated activity" in the state of Florida and "committed the illegal and tortious conduct alleged [in the TAC] within the State of Florida," making him subject to personal jurisdiction under Florida's long-arm statute, specifically committing a tortious act under section 48.193(1)(a). *Id.* ¶ 12; doc. 105 at 47. After review, I find plaintiff's conclusory statements fail to allege Ishbia has a personal connection to the state of Florida outside of those as CEO of UWM and thus,

12

it cannot not overcome the corporate shield doctrine. *Snow v. DirecTV, Inc.*, 450 F.3d 1314, 1318 (11th Cir. 2006) (vague and conclusory allegations cannot establish a prima facie case of personal jurisdiction).

Plaintiff claims this Court may find personal jurisdiction because Ishbia committed a tortious act in Florida as a result of his internet communications regarding UWM's decision not to work with brokers who worked with Fairway or Rocket. Doc. 105 at 47 (citing TAC ¶¶ 36-37, 40, 51). In the TAC, plaintiff alleges these communications were available to UWM's brokers throughout the United States, including Florida. Although plaintiff claims Ishbia's communications were "directed specifically at Florida residents," the only factual allegation to support this is that UWM is licensed to operate in Florida and, at times, interacts with brokers at events in Florida. TAC ¶ 40. In its response to the motion to dismiss, plaintiff claims the corporate shield doctrine is inapplicable because Ishbia committed intentional wrongdoing, citing cases which hold that fraud or intentional torts serve as exceptions to the corporate shield doctrine. Doc. 105 at 47-49; *see also* doc. 108 at 7-8.

While it is true that the corporate shield doctrine does not protect a corporate officer who commits intentional torts, such as fraud or other intentional misconduct, *Louis Vuitton*, 736 F.3d at 1355 (citations omitted), the next question is "whether the complaint sufficiently states a cause of action for an intentional tort." *LaFreniere v. Craig-Myers*, 264 So. 3d 232, 239 (Fla. 1st DCA 2018) (citations omitted). Here, plaintiff has alleged at least one intentional tort against Ishbia, tortious interference with business contracts and prospective economic advantage (count XVI), but due to

13

the pleading infirmities outlined below, count XVI should be dismissed and cannot serve as plaintiff's jurisdictional hook to Ishbia. *Drewes v. Cetera Fin. Grp., Inc.*, no. 19-CV-80531-KAM, 2020 WL 1875639, at *3-*4 (S.D. Fla. Jan. 14, 2020). Because I find the corporate shield doctrine applies here, I do not reach the question of whether Ishbia's electronic communications, which were merely accessible in Florida, are sufficient to satisfy Florida's long-arm statute.

I respectfully recommend defendants' motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2) be granted and Ishbia be dismissed from this lawsuit (counts X - XVII).

## II. Rule 12(b)(6) Motions for Failure to State a Claim.

Defendants argue that each count of the TAC fails to state a claim upon which relief can be granted and should be dismissed under Rule 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court has explained this requires "a complaint . . . contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Conclusory allegations are insufficient. *Twombly*, 550 U.S. at 555 ("[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements

of a cause of action will not do . . . ." (alterations, quotations, and citations omitted)). "The plausibility standard 'calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' of the defendant's liability." *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012) (per curiam) (quoting *Twombly*, 550 U.S. at 556).

In deciding a Rule 12(b)(6) motion, a district court should construe the complaint broadly and view the allegations in the light most favorable to the plaintiff. *Levine v. World Fin. Network Nat'l Bank*, 437 F.3d 1118, 1120 (11th Cir. 2006). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (quotations and citation omitted).

### A. Unlawful Restraint of Trade, Section 1 of the Sherman Act.

Plaintiff sues for unlawful restraint of trade in violation of the Sherman Act, 15 U.S.C. § 1 (counts I and II). In count I,[7] plaintiff alleges a "per se violation" of section 1 of the Sherman Act; in count II, plaintiff alleges an "unreasonable restraint of trade," also under section 1 of the Sherman Act. I analyze each in turn.

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. In interpreting this prohibition, the Supreme Court explained that "Congress intended

---

[7] Because I recommend that plaintiff's claims against Ishbia be dismissed for lack of personal jurisdiction, I do not analyze the claims against him here. However, should the Court find personal jurisdiction over Ishbia, the same analysis below regarding the claims against UWM would apply to the corresponding claims against Ishbia (counts X - XVII).

only to prohibit 'unreasonable' restraints on trade." *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1260 (11th Cir. 2019) (citing *Arizona v. Maricopa Cnty. Med. Soc.*, 457 U.S. 332, 343 (1982)). *See also Texaco, Inc. v. Dagher*, 547 U.S. 1, 5 (2006) (emphasis in original) (observing that the Supreme Court does not take a "literal approach" to the language of section 1, but "has long recognized that Congress intended to outlaw only *unreasonable* restraints[.]"). A section 1 claim has three elements: (1) a conspiracy that (2) unreasonably (3) restrains interstate or foreign trade. *Quality Auto Painting*, 917 F.3d at 1260 (citation omitted). In deciding whether an alleged restraint is unreasonable, a court generally analyzes the claim under one of two frameworks—the rule of reason or the per se rule. *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 848 (5th Cir. 2015). Antitrust claims are typically analyzed under the rule of reason, which requires a court to "decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." *State Oil Co. v. Khan,* 522 U.S. 3, 10 (1997) (citation omitted). But as the law has developed, courts have recognized that some restraints on trade are per se illegal. *Id.* (citing *Maricopa Cnty.*, 457 U.S at 344). "Some types of restraints . . . have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit, that they are deemed unlawful per se." *Id.* (emphasis omitted) (citing *N. Pac. R.R. Co. v. United States*, 356 U.S. 1, 5 (1958)). *See also Jacobs v. Tempur-*

*Pedic Int'l, Inc.*, 626 F.3d 1327, 1334 (11th Cir. 2010) (additional citations omitted) (explaining "per se violations of § 1 of the Sherman Act are limited to a very small class of antitrust practices whose character is well understood and that almost always harm competition.").

### 1. Per Se Analysis (counts I and IV).

A court's decision "to apply the per se rule turns on whether the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output . . . or instead one designed to 'increase economic efficiency and render markets more, rather than less, competitive.'" *Nw. Wholesale Stationers, Inc. v. Pac. Stationary and Printing Co.*, 472 U.S. 284, 289 (1985) (emphasis omitted, alteration in original) (quoting *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 19-20 (1979)). Generally, horizontal agreements are per se illegal, *In re Disposable Contact Lens Antitrust Litig.*, 215 F. Supp. 3d 1272, 1291 (M.D. Fla. 2016), as are group boycotts, because, "in the courts' experience, [these business relationships] virtually always stifle competition." *Jacobs*, 626 F.3d at 1334 (citing *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 607-08 (1972)). *See also State Oil*, 522 U.S. at 10 (additional quotations, alteration, and citation omitted) ("Per se treatment is appropriate once experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it." (emphasis omitted)). The Supreme Court has cautioned, however, against adopting per se rules "where the economic impact of certain practices is not immediately obvious." *Dagher*, 547 U.S. at 5 (additional quotations and citations

17

omitted). The courts, therefore, "should apply the per se label 'infrequently and with caution.'" *United Am. Corp. v. Bitmain, Inc.*, 530 F. Supp. 3d 1241, 1272 (S.D. Fla. 2021) (quoting *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1567 (11th Cir. 1991)).

In count I, plaintiff alleges the conduct of UWM and its mortgage brokers constituted a "per se illegal group boycott in violation of Section 1 of the Sherman Act," which amounted to a coerced, concerted refusal to deal with Rocket or Fairway by 93% of UWM's 10,000 brokers, representing the majority of brokers in the wholesale mortgage loan market. TAC ¶ 111. The Eleventh Circuit has defined a group boycott as:

> [p]ressuring a party with whom one has a dispute by withholding, or enlisting others to withhold, patronage or services from the target. The ultimate target of the agreement can be either a competitor or a customer of some or all of the [boycotters] who is being denied access to desired goods or services because of a refusal to accede to particular terms set by some or all of the [boycotters].

*Quality Auto Painting*, 917 F.3d at 1271 (quotations and citations omitted). *See also In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 245 (S.D.N.Y 2019) (quotations and citation omitted) (explaining a "group boycott is an agreement to pressure a supplier or customer not to deal with another competitor.").

The Supreme Court has treated boycotts as per se unlawful, *see, e.g.*, *Klor's, Inc. v. Broadway Hale Stores, Inc.*, 359 U.S. 207, 212 (1959). But it has limited "the per se rule in the boycott context to cases involving horizontal agreements among direct competitors." *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998) (emphasis omitted) (detailing an example of group boycott "in the strongest sense: A group of

competitors threatened to withhold business from third parties, unless those third parties would help them injure their directly competing rivals."). The Court reasoned that:

> [t]he freedom to switch suppliers lies close to the heart of the competitive process that the antitrust laws seek to encourage. *Cf. Standard Oil,* 221 U.S. at 62, 31 S.Ct. 502 (noting "the freedom of the individual right to contract when not unduly or improperly exercised [is] the most efficient means for the prevention of monopoly"). At the same time, other laws, for example, "unfair competition" laws, business tort laws, or regulatory laws, provide remedies for various "competitive practices thought to be offensive to proper standards of business morality." 3 P. Areeda & H. Hovenkamp, Antitrust Law ¶ 651d, p. 78 (1996). Thus, this Court has refused to apply per se reasoning in cases involving that kind of activity. *See Brooke Group Ltd. V. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 225, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993) ("Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws"); 3 Areeda & Hovenkamp, *supra,* ¶ 651d, at 80 ("[I]n the presence of substantial market power, some kinds of tortious behavior could anticompetitively create or sustain a monopoly, [but] it is wrong categorically to condemn such practices ... or categorically to excuse them").

*Id.* at 137 (punctuation and citations in original).

Here, the gist of plaintiff's per se section 1 claim is this: because UWM mandated its brokers sign the ultimatum to continue working with UWM, and 93% of UWM's brokers complied, it is per se illegal. Defendants claim this theory fails for three reasons: 1) plaintiff fails to plead a per se group boycott based on a horizontal agreement between UWM and its competitors; 2) plaintiff does not adequately plead

an illegal hub-and-spoke conspiracy; and 3) plaintiff's allegations do not demonstrate market power sufficient to support a per se violation of section 1. Doc. 102 at 28-38.

The TAC is silent as to whether defendants engaged in a horizontal or hub-and-spoke agreement. TAC ¶¶ 110-13, 162-66. Plaintiff claims in its response, however, that it plausibly alleges a hub-and-spoke conspiracy via agreement amongst the brokers. Doc. 105 at 23-24. Because plaintiff does not allege, either in the TAC or in its response to the motion to dismiss, any horizontal agreement between UWM and its direct competitors such as other wholesale lenders, I analyze only the alleged hub-and-spoke conspiracy and whether plaintiff's allegations demonstrate sufficient market power to support a per se violation.

A type of agreement "dubbed a 'hub and spoke' conspiracy exists where an entity at one level of the market structure (the 'hub') coordinates an agreement among competitors at a different level (the 'spokes')." *Bitmain*, 530 F. Supp. 3d at 1255-56 (citations omitted). "A horizontal conspiracy either alone, or as part of a 'rimmed hub-and-spoke conspiracy,' defined as 'a collection of vertical agreements joined by horizontal agreements,' is a per se violation of § 1 of the Sherman Act." *In re Disposable Contact Lens Antitrust Litig.*, 215 F. Supp. 3d at 1294 (emphasis omitted) (citing *In re Musical Instruments and Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 n.3 (9th Cir. 2015)). Once a horizontal agreement, alone or as part of a hub-and-spoke conspiracy, is established, a court need not inquire further into the alleged wrongful act's effect on the market. *Id.* (citations omitted).

In the TAC, plaintiff alleges that "[m]any brokers in attendance at the [Facebook] event explicitly heeded Mr. Ishbia's clarion call to boycott UWM's closest competitors[.]" TAC ¶ 41. In support, plaintiff gives examples of broker comments during the virtual event. As noted above, some of those comments were: "'We are ALL IN' 'unstoppable together . . .' 'We are all family! Brokers are better when we work together'; 'Brokers are family. We don't go against our family'; 'All in . . . . with us or out'; 'You're either with the captain [UWM] or off the boat'; 'with us or against us'; and 'all for one and one for all.'" *Id.* (punctuation and errors in original). Plaintiff further asserts that Ishbia referred to this action as the "all in initiative" and that participating brokers have "locked arms with [UWM]." *Id.* ¶ 42. Plaintiff also, however, provides examples of brokers who disagreed with the initiative. *Id.* ¶ 43. Plaintiff then alleges the participating brokers facilitated other brokers in signing the addendum, providing an example of one broker telling another where to find the form. *Id.* ¶ 44. Plaintiff states the AIME issued a statement voicing support for Ishbia's actions and encouraged its members to join. *Id.* ¶¶ 45-46. Plaintiff alleges the boycott was "highly successful" because UWM announced that 93% of the brokers participated. *Id.* ¶ 61. Plaintiff states UWM facilitated the boycott by providing a digital forum where brokers could discuss the boycott and encouraged brokers to sign the agreement. *Id.* ¶¶ 49-50, 53.

In its response to the motion to dismiss, plaintiff claims that 11,000 brokers engaged in parallel conduct to forgo relationships with Fairway and Rocket and, additionally,

> [t]he brokers' communications with each other, the
> facilitation of such communications by UWM, the fact that
> thousands of brokers dramatically changed their behavior,
> and the fact that such actions were even more against the
> brokers' unilateral interests unless they acted together, are
> all 'plus factors' which  make the conspiracy allegations
> eminently possible.

Doc. 105 at 24; *see also* doc. 108 at 11-13.

An agreement under section 1 of the Sherman Act is a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (quotations and citations omitted). "The critical issue for establishing a per se violation with the hub and spoke system is how the spokes are connected to each other." *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 436 (6th Cir. 2008) (emphasis omitted). To adequately plead a claim under section 1, a complaint must contain "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556. However, plausible grounds to infer an agreement "[do] not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id*.

Plaintiff's allegation of a per se violation based on a hub-and-spoke conspiracy fails because there are not enough facts in the TAC to plausibly suggest the brokers agreed among themselves to boycott Rocket and Fairway. Put differently, plaintiff does not plausibly allege any horizontal agreement between each spoke (the brokers); only a hub (UWM) and vertical agreements between it and each spoke (the brokers). The wheel, in antitrust terms, has no rim, and a rimless wheel does not amount to a

22

per se restraint of trade under section 1. The Ninth Circuit explained the centrality of a horizontal agreement between vertical members of the conspiracy this way: "a rimless hub-and-spoke conspiracy is not a hub-and-spoke conspiracy at all (for what is wheel without a rim?); it is a collection of purely vertical agreements." *In re Musical Instruments and Equip. Antitrust Litig.*, 798 F.3d at 1192 n.3 (citation omitted).

Although plaintiff cites to several independent expressions of enthusiasm and encouragement among the brokers who observed Ishbia's speech and a statement of support from one organization whose members include mortgage brokers, this is inadequate to plausibly suggest "concerted action" or an agreement among the brokers sufficient to form the rim of a conspiracy. TAC ¶¶ 41, 43- 45, 49, 52. *See In re. Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 329-30 (3d Cir. 2010) (rejecting the plaintiff's attempt to infer a horizontal agreement from information sharing between the spokes and upholding the district court's refusal to find a per se hub-and-spoke conspiracy when the plaintiff established no agreement between the spokes). Nor is the allegation that the brokers knew they were all accepting UWM's ultimatum sufficient to plead an agreement. TAC ¶ 41-42, 49-50. *See In re: EpiPen Direct Purchaser Litig.*, no. 20-cv-0827 (ECT/JFD), 2022 WL 1017770, at *7 (D. Minn. Apr. 5, 2022) (citations and quotations omitted) (explaining the vertical spokes' knowledge of the other vertical spokes' deals with the hub was insufficient to establish an agreement under section 1, and so its hub-and-spoke conspiracy failed).[8] The mere fact that some brokers who

---

[8] I do not, however, imply that a rimless hub-and-spoke conspiracy may never restrain trade. *In re Musical Instruments and Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 n.3 (9th Cir. 2015).

23

watched the announcement expressed support for Ishbia's announcement via comments, or even directed other brokers to the form that UWM published to participate in the boycott, is insufficient to establish the "rim," or an agreement between the brokers. TAC ¶¶ 41, 44. And, the fact that one organization expressed a statement of support, with no information regarding how many of the "mortgage professionals" in the organization are actually brokers, is also insufficient. TAC ¶¶ 45-46. Plaintiff's allegations regarding UWM and/or Ishbia's facilitation of the brokers' communication similarly fails to allege the existence of an agreement between the brokers beyond parallel conduct or parallel expressions of support.  TAC ¶¶ 47, 49-50, 53.

"Antitrust plaintiffs may plead and prove a § 1 violation with circumstantial evidence that amounts to both 'parallel conduct' plus 'some further factual enhancement'" *Bitmain*, 530 F. Supp. 3d at 1258 (citing *Twombly*, 550 U.S. at 557). Plaintiff contends it has plausibly alleged an agreement between the brokers in this manner. In support, plaintiff claims the various comments cited in the TAC expressing brokers' support for Ishbia's announcement constitute interbroker communications which are "direct evidence of agreement[.]" Doc. 105 at 25. However, as noted above, the comments made on the Facebook forum relied on by plaintiff amount to individual

---

Rather, it is the mode of analysis affected by a lack of horizontal agreement. "[O]ne key difference between a rimless hub-and-spoke conspiracy (*i.e.*, a collection of purely vertical agreements) and a rimmed hub-and-spoke conspiracy (*i.e.*, a collection of vertical agreements joined by horizontal agreements): courts analyze vertical agreements under the rule of reason, . . . whereas horizontal agreements are violations per se." *Id.* (citations omitted).

statements of support for the announcement, not a "conscious commitment to a common scheme designed to achieve an unlawful objective," *Monsanto*, 465 U.S. at 753. Plaintiff further asserts that the brokers acting against their individual interests is a strong "plus factor" which plausibly alleges an agreement. Regarding this, the TAC alleges

> [t]he boycott was a dramatic change in behavior by the boycotting brokers, who until that time had been utilizing [Rocket] and Fairway in increasing numbers because of their strong reputation, good prices[,] and high quality service.

TAC ¶ 65. This conclusory assertion is inadequate to establish that signing UWM's addendum was against the interest of the brokers who did so. For instance, it seems equally likely that the participating brokers viewed the possibility of being unable to work with UWM as worse than being unable to work with Rocket and Fairway. I find plaintiff has not established the "plus factors" to adequately plead the existence of a hub-and-spoke conspiracy.

Even if plaintiff had sufficiently alleged a horizontal agreement between direct competitors (either between UWM and competing wholesale residential mortgage lender, or as part of a rimmed hub-and-spoke conspiracy), I find its section 1 claim is still not entitled to per se treatment because plaintiff has not plausibly alleged that UWM and the mortgage brokers it conspired with wield "market power or exclusive access to an element essential to effective competition[.]" *Nw. Wholesale*, 472 U.S. at 296 (citations omitted).

In *Northwest Wholesale*, the defendant, a wholesale purchasing cooperative made up of office supply retailers, expelled the plaintiff from membership without any explanation; plaintiff alleged that the expulsion without procedural protections amounted to a group boycott that limited its ability to compete. The Supreme Court addressed the question of whether a rule of reason or per se analysis should apply, rejecting per se treatment because the plaintiff had not made a preliminary showing the expulsion was "characteristically likely . . . to result in predominately anticompetitive effects[.]" 472 U.S. at 284, 296-97. Put another way, "[c]onduct is unreasonable per se when it 'always or almost always tend[s] to restrict competition and decrease output.'" *Retina Assocs., P.A. v. S. Baptist Hosp. of Fla., Inc.*, 105 F.3d 1376, 1381 (11th Cir. 1997) (per curiam) (emphasis omitted) (quoting *Broad. Music, Inc.*, 441 U.S. at 19-20). *See also F.T.C. v. Ind. Fed. Of Dentists*, 476 U.S. 447, 458-59 (1986) (holding that the policy of the defendants was a group boycott; nevertheless, the Supreme Court did not invoke the per se rule, because it was not a case in which "firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor . . . .").

The Supreme Court has further explained that applications of "the per se approach have generally involved joint efforts by a firm or firms to disadvantage competitors by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle." *Nw. Wholesale*, 472 U.S. at 294 (quotations, citations, and emphasis omitted). In cases where the per se rule was applied, "the boycott often cut off access to a supply, facility, or market

necessary to enable the boycotted firm to compete . . . and frequently the boycotting firms possessed a dominant position in the relevant market." *Id.* (citations omitted). Critically, the Court highlighted that "not every cooperative activity involving a restraint or exclusion will share with the per se forbidden boycotts the likelihood of predominately anticompetitive consequences." *Id.* at 295 (emphasis omitted). "Unless the cooperative possesses market power or exclusive access to an element essential to effective competition, the conclusion that expulsion is virtually always likely to have an anticompetitive effect is not warranted." *Id.* at 296 (citations omitted). The holding of *Northwest Wholesale* is not limited to any particular organization, such as cooperatives and associations, because in its decision, the Court "engaged in a[n] explicit and detailed survey of the broad classes of cases that comprise the 'group boycott category.'" *Victory Int'l (USA) Inc. v. Perry Ellis Int'l, Inc.*, no. 08-20395-Civ-Huck/O'Sullivan, 2008 WL 11468225, at *6 (S.D. Fla. June 12, 2008) (citing *Nw. Wholesale*, 472 U.S. at 293-94).

Upon review of the TAC, it is not facially apparent, nor characteristically likely, that the anticompetitive conduct alleged here cut off consumer or broker access to the wholesale mortgage market. Plaintiff has not plausibly pled that plaintiff's access was cut off to certain essential supplies (wholesale mortgages) that it needed to compete. *Nw. Wholesale*, 472 U.S. at 295. Additionally, it is not facially apparent that an ultimatum of this nature in the wholesale mortgage market "tends to restrict competition and decrease output." *Retina Assocs.*, 105 F.3d at 1381 (quotations, citations, and alteration omitted).

Further, the TAC fails to plausibly allege UWM possessed a dominant position in the marketplace at the time of the ultimatum or after 93% of its mortgage brokers signed the addendum promising not to do business with Rocket or Fairway. "[T]he principal judicial device for measuring actual or potential market power remains market share[.]" *U.S. Anchor Mfg. v. Rule Indus., Inc.*, 7 F.3d 986, 994 (11th Cir. 1993). In analyzing UWM's market share, I first consider what constitutes the relevant market; this is disputed by the parties. "Although the parameters of a given market are questions of fact, antitrust plaintiffs still must present enough information in their complaint to plausibly suggest the contours of the relevant geographic and product markets." *Jacobs*, 626 F.3d at 1336 (quotations and citation omitted). Defining the relevant market involves identifying "producers that provide customers of a defendant firm (or firms) with alternative sources for the defendant's product or services." *Id.* at 1337 (citation omitted). Thus, the market is composed of products that have reasonable interchangeability and courts should look to "the uses to which the product is put by consumers in general." *Id.* (citation omitted).

"A relevant product market can exist as a distinct subset of a larger product market." *Id.* (citation omitted). "The Supreme Court has provided 'practical indicia' that can determine the contours of the submarket, such as 'industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.'" *Id.* (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)). When analyzing the factors articulated

28

in *Brown Shoe Co.*, "[a] court should pay particular attention to evidence of the cross-elasticity of demand and reasonable substitutability of the products, because if consumers view the products as substitutes, the products are part of the same market." *Id.* at 1337-38 (quoting *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1435 (9th Cir. 1995)). A high cross-elasticity of demand refers to "consumers demanding proportionately greater quantities of Product X in response to a relatively minor price increase in Product Y," and indicates that "the two products are close substitutes for each other and are part of the same product market." *Duty Free Ams., Inc. v. Estee Lauder Cos., Inc.*, 797 F.3d 1248, 1264 (11th Cir. 2015) (quotations and citation omitted).

Plaintiff claims the relevant market or submarket here is, specifically, "the national market for wholesale lending for mortgages sold through mortgage brokers." TAC ¶ 20. In support, plaintiff distinguishes between wholesale lenders like UWM, who offer mortgage loans through independent third parties, and retail mortgage lenders who deal directly with prospective borrowers. *Id.* ¶¶ 20-21. Plaintiff claims the "central pillar of the mortgage broker business is independence," or the ability of the brokers to choose from a variety of wholesale lenders to choose the best product for their client. *Id.* ¶ 22. Notably, plaintiff states wholesale lenders work with third parties, "such as mortgage brokers," *id.* ¶¶ 20, 22, but does not allege that wholesale lenders always work with a broker, as opposed to some other third party.

In support of its claim that the wholesale mortgage lending market is distinct from the overall mortgage lending market, plaintiff asserts that: 1) the wholesale market has a distinct group of consumers; 2) the wholesale lending channel is

recognized as separate and distinct by brokers and others in the industry; 3) mortgage brokers are specialized vendors with unique facilities; 4) wholesale mortgage lenders do not operate facilities for marketing directly to the consumer; 5) consumers who use mortgage brokers and wholesale lenders would not readily switch to a retail mortgage lender for a small difference in price because of their desire to obtain advice from a mortgage broker professional; and 6) UWM maintains that the typical borrower using a broker would save $9,400 over the life of a loan. *Id.* ¶ 25 (A-F).

Defendants counter a broader interpretation of the mortgage industry is appropriate because plaintiff fails to adequately plead the existence of a "wholesale mortgage" market or submarket. Doc. 102 at 24-28; *see also* doc. 107 at 6-10. Specifically, defendants assert plaintiff's allegations regarding the relevant market are conclusory and fail to address the "reasonable interchangeability and substitutability of all residential mortgage loans—wholesale and retail." *Id.* at 26 (emphasis omitted). Put differently, defendants claim that plaintiff fails to allege adequate facts that plausibly explain why wholesale and retail residential mortgages are not interchangeable. *Id.* Because most consumers require a mortgage to purchase a home, and both a retail and wholesale mortgage fulfill this need, defendants assert they are close substitutes and thus, plaintiff has not adequately alleged a different market composition made up of only the wholesale residential lending market. *Id.* at 26-27.

I agree that plaintiff's conclusory allegations detailed above fail to adequately plead the wholesale lending market as the relevant submarket. First, merely using the words "distinct," "separate," or "unique" to describe the market is not enough, and

30

plaintiff fails to adequately allege why consumers may prefer mortgages from a wholesale lender, as opposed to a retail lender, or why wholesale lending is not simply a part of the mortgage lending market overall. Further, plaintiff's assertion that consumers "would not readily switch to a retail mortgage lender for a small difference in price, because of their desire to obtain advice from a mortgage broker professional" is again, unsupported by any facts. Plaintiff does not discuss why a consumer using a retail lender could not obtain advice from a professional regarding the proper choice of a mortgage. TAC ¶ 25E. And plaintiff's implication that the wholesale mortgage market is distinct because "the typical borrower who uses a mortgage broker will save $9,400 over the life of the loan, compared to a borrower who uses the standard retail shop"[9] actually constitutes evidence of the cross-elasticity of demand and reasonable substitutability of these products, lending support to defendant's assertion that they are part of the same market. *Id.* ¶ 25F.

Thus, I find plaintiff fails to adequately plead facts establishing that a residential mortgage from a retail lender, as opposed to a wholesale lender, would not be viewed as reasonable substitutes by a consumer. Although plaintiff includes statements regarding mortgage brokers generally and how they operate, *see id.* ¶¶ 22-23, it again fails to address the reasonable substitutability, or lack thereof, of mortgages from a wholesale lender versus mortgages from a retail lender or the cross-elasticity of demand, aside from a conclusory statement that wholesale consumers would not

---

[9] A savings of $9,400 over the life of a 30-year loan averages out to $26.10 per month.

readily switch to a retail lender due to their desire to obtain professional advice. Further, the TAC alleges no facts to indicate that consumers could not—or would not—be able to get this advice elsewhere, for instance from a real estate agent or retail lender. *See Jacobs*, 626 F.3d at 1338 ("[I]f consumers view the products as substitutes, the products are part of the same market." (citation omitted)).

Plaintiff argues its allegations regarding the alleged submarket "closely track the *Brown Shoe* criteria." Doc. 15 at 20. Although plaintiff did include words that track the language in *Brown Shoe*, I find the assertions conclusory and unsupported by facts as required by Rule 12(b)(6). *See* TAC ¶ 25; *Jacobs*, 626 F.3d at 1338 (discussing plaintiff's "responsibility under *Twombly* to plead facts 'plausibly suggesting' the relevant submarket's composition;" finding "skimpy allegations" inadequate). Thus, I find plaintiff's proposed submarket of mortgages from wholesale lenders is not well-pleaded.[10]

As explained above, I find plaintiff has failed to adequately plead the wholesale lending market as a relevant submarket; however, even if it had, plaintiff still fails to

---

[10] In its response, plaintiff argues that successful allegation of a relevant market "is not essential" to its claims because, under a rule of reason analysis, "an unreasonable restraint of trade can be proven through direct evidence of effects on consumers without proof of a relevant market." Doc. 105 at 23. This fails for two reasons: 1) plaintiff failed to adequately plead any direct effects on consumers, as discussed in further detail below; and 2) the Supreme Court has found that "courts usually cannot properly apply the rule of reason without an accurate definition of the relevant market." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018). Although the Court acknowledged that, in cases involving horizontal restraints or "agreements between competitors not to compete in some way," it has concluded that it did not need to precisely define the relevant market to find they were anticompetitive, *id.* n.7, I find that, as discussed above, plaintiff has failed to adequately plead either a horizontal agreement standing alone, or as part of a hybrid hub-and-spoke agreement.

plausibly allege UWM possessed a dominant position in the marketplace. In arriving at this conclusion, I acknowledge that anticompetitive effect is a fact-intensive inquiry developed in discovery. But plaintiff does not allege sufficient facts in the TAC that UWM wielded actual market power or exclusive access; or facts on this point that could be developed further in discovery.

Regarding market share, plaintiff alleges UWM is the largest wholesale mortgage lender, "with [an] approximately 34% market share of the wholesale market," citing UWM's Holdings Corporation Prospectus dated March 31, 2020. TAC ¶¶ 26-27. Plaintiff further alleges that unspecified "[d]ata from the fourth quarter of 2022" indicates UWM is the largest wholesale mortgage market lender, with a "most recent approximate 54% share of the wholesale market." *Id.* ¶ 104. In their motion to dismiss, defendants assert the "data" on which plaintiff relies is a Q4 2022 earnings call, doc. 102 at 14; plaintiff does not dispute this. *See* doc. 105 at 39. In that earnings call, Ishbia references "54% market share of the broker channel" but states UWM was at about "11% of the overall mortgage market." Doc. 102 at 253-54.[11] Because, as explained above, plaintiff failed to adequately plead the wholesale mortgage lending market as the relevant market or submarket, I find an 11% share of

---

[11] "A court may consider documents attached directly referred to in the complaint, and doing so will not convert the motion to one for summary judgment." *Wydler v. Bank of Am., N.A.*, 360 F. Supp. 2d 1302, 1306 n.1 (citing *Brooks v. Blue Cross & Blue Shield*, 116 F.3d 1364, 1369 (11th Cir. 1997)); *see also Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005) (courts may consider a document attached to a motion to dismiss without converting it into a motion for summary judgment, if it is (1) central to the plaintiff's claim and (2) undisputed, *i.e.*, the authenticity of the document is not challenged).

the overall mortgage market insufficient to establish market dominance. *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1250 (11th Cir. 2002) ("A market share at or less than 50% is inadequate as a matter of law to constitute monopoly power;" collecting cases). And even assuming, as plaintiff contends, the relevant market is the wholesale lending market, UWM's annual report dated March 1, 2023, cited by plaintiff in the TAC and otherwise relied upon to establish UWM's volume and investment in the residential loan process, *see* TAC ¶ 108, only indicates a "38% market share of the wholesale channel" for the year ending on December 31, 2022. Doc. 102 at 269.

Related to market share, plaintiff alleges general "barriers to entry" for new competitors into the wholesale market, but does not address whether other retail lenders, who likely already possess resources needed, would be unable to enter the wholesale market, *e.g.*, Rocket and Fairway, both of which operated in the retail and wholesale markets. TAC ¶¶ 82-84. *See Paycargo, LLC v. CargoSpring, LLC*, no. 3:19-cv-85-TCB, 2019 WL 5793113, at *5 (N.D. Ga. Nov. 4, 2019) (collecting cases explaining that "a mere showing of substantial or even dominant market share alone cannot establish market power sufficient to carry out a predatory scheme . . . [a] plaintiff must show that new rivals are barred from entering the market;" collecting cases. (quotations and citations omitted)). And, although plaintiff alleges 17 firms have exited the wholesale market, it does not say how many wholesale lenders remain, aside from UWM, Rocket, and Fairway, or how many lenders have entered the wholesale market in that time, if any. *See* TAC ¶ 106.

34

The Eleventh Circuit has also suggested a plaintiff may establish entitlement to a per se rule if "prior cases have shown that a certain practice" regularly poses anticompetitive consequences, "a deleterious effect on the market will be presumed[,] and no detailed market analysis is required." *Retina Assocs.*, 105 F.3d at 1381. *See, e.g.*, *Pierson v. Orlando Reg'l Healthcare Sys., Inc.*, 619 F. Supp. 2d 1260, 1278 (M.D. Fla. 2009) (noting that where the plaintiff was unable to cite a case in which the alleged anticompetitive conduct was a per se violation, it had to "rely on the 'rule of reason' to attempt to set forth a [section] 1 violation."). Plaintiff has pointed to no historical comparison, no case on all fours with the conduct alleged here, when a court analyzed the case under the per se rubric. Thus, plaintiff fails to plausibly establish it is entitled to per se treatment. I respectfully recommend counts 1 and IV be dismissed because plaintiff failed to plausibly allege defendants committed a per se violation. *See All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.*, 135 F.3d 740, 745 n.11 (11th Cir. 1998) (citations omitted) (noting "[f]ederal and Florida antitrust laws are analyzed under the same rules and case law.").

## 2. Rule of Reason Analysis (counts II and V).

I next consider whether plaintiff has alleged a cause of action under the "rule of reason" analysis. "Restraints that are not unreasonable per se are judged under the rule of reason." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) (quotations, citation, and emphasis omitted). The Supreme Court explained that "[t]he rule of reason requires courts to conduct a fact-specific assessment of 'market power and market structure . . . to assess the restraint's actual effect' on competition." *Id.* (quotations and

citations omitted). *See also Dagher*, 547 U.S. at 5 (explaining that whether the restraint is an undue burden presumptively turns on a rule of reason analysis). The Supreme Court has outlined a three-step, burden-shifting analysis to determine whether a particular restraint violates the rule of reason. *Am. Express Co.*, 138 S. Ct. at 2284.

Under this approach, a plaintiff "has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Id.* (citations omitted). If a plaintiff makes such a showing, the burden shifts back to the defendant to show "a procompetitive rationale for the restraint." *Id.* (citations omitted). "If a defendant makes that showing, then the burden shifts back to the plaintiff to demonstrate that the competitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.* (citation omitted). These steps are not to be applied mechanically or without thought; rather, "[t]he whole point of the rule of reason is to furnish 'an enquiry meet for the case, looking to the circumstances, details, and logic of a restraint' to ensure that it duly harms competition before a court declares it unlawful." *Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141, 2160 (2021) (quoting *Ca. Dental Ass'n v. F.T.C*, 526 U.S. 756, 781 (1999)).

To satisfy step one—an anticompetitive effect on the market—plaintiff may either show 1) "the potential for genuine adverse effects on competition;" or 2) that the "behavior had an actual detrimental effect on competition." *Levine v. Cent. Fla. Med. Affiliates*, 72 F.3d 1538, 1551 (11th Cir. 1996) (additional quotations and citations omitted). Plaintiff can meet this initial burden with direct or indirect evidence. *Am.*

*Express Co.*, 138 S. Ct. at 2284. "Direct evidence of anticompetitive effects would be proof of actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality in the relevant market . . . [i]ndirect evidence would be proof of market power plus some evidence that the challenged restraint harms competition." *Id.* (quotations and citations omitted).

In its response to the motion to dismiss, plaintiff appears to proceed on a theory of direct evidence of anticompetitive effects, *see* doc. 105 at 35-37, but I find the allegations in the TAC inadequate to do so. Plaintiff claims the "boycott has had the effect of increasing the costs of mortgage loans and has increased the cost of operations of Plaintiff . . . to an artificially high, non-competitive level." TAC ¶ 72. Plaintiff provides no underlying facts at all, however, to support its conclusion that the ultimatum has increased the costs of mortgage loans, nor does it specify whether the cost of all mortgage loans have increased, or only those in the wholesale market. *See Jacobs*, 626 F.3d at 1339 (explaining that "[t]he plaintiff has the burden of demonstrating damage to competition with specific factual allegations" and that "[h]igher prices alone are not the epitome of anticompetitive harm [but] . . . . [r]ather, consumer welfare, understood in the sense of allocative efficiency, is the animating concern of the Sherman Act." (internal quotations and citations omitted)). Moreover, plaintiff does not explain how increasing operation costs has had a direct or potentially adverse effect on competition.

Although plaintiff alleges the brokers who decided to work with UWM could not apply for mortgages from Rocket or Fairway, there are no facts indicating the

actual effects of this on the market as a whole. TAC ¶ 72. Moreover, plaintiff asserts the "elimination" of Rocket and Fairway "significantly reduced competition in the relevant market;" but there is nothing in the factual assertions—and plaintiff does not argue—that Rocket and Fairway were ever eliminated, or that they no longer participate in the wholesale mortgage market. Thus, plaintiff's allegations are speculative at best and fall short of adequately pleading direct evidence of anticompetitive effects. *Id.* ¶¶ 72-74.

To the extent plaintiff intends to proceed on the theory that anticompetitive conduct has the "potential for genuine adverse effects on competition," it must "define the relevant market and establish that the defendants possessed power in that market." *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1073 (11th Cir. 2004) (citations omitted). For the reasons discussed above, plaintiff has not alleged sufficient factual detail to support its claim that the alleged unlawful behavior—the ultimatum—had the potential to adversely affect competition because it has not successfully defined the relevant market as the wholesale lending market or established that defendants possessed adequate market power. Further, plaintiff has not sufficiently described how the ultimatum would be likely to harm competition. *See id.* at 1071 ("anticompetitive effects are measured by their impact on the market rather than by their impact on competitors." (internal quotations and citation omitted)).

Although the TAC claims the boycott harmed consumers by reducing their access to mortgages from Rocket and Fairway, it alleges no supporting facts regarding how this harmed the overall mortgage market—or wholesale market—as a whole,

particularly considering that consumers were free to access those mortgages from the brokers who did not work with UWM or sign the agreement. Plaintiff then claims the boycott harmed consumers using brokers who did work with Fairway and Rocket because "they did not have the opportunity to consider a UWM mortgage," but again includes no facts about the potential effects of this on the overall market. TAC ¶ 73.

The remainder of plaintiff's allegations regarding potential anticompetitive effects are equally conclusory and boil down to simply this—brokers and consumers were harmed because brokers working with UWM could not work with Rocket and Fairway and vice versa. *See* TAC ¶¶ 72-81. However, plaintiff includes no factual allegations to plausibly allege the potential for genuine adverse effects on competition and thus, fails to allege a sufficient link between the ultimatum and harm to competition within the overall mortgage market or the wholesale retail mortgage market. *See Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1084 (11th Cir. 2016) ("[A] plaintiff may not meet its burden of showing actual anticompetitive effects with mere conclusory assertions; rather, [the Eleventh Circuit has] repeatedly required a plaintiff to point to specific facts demonstrating harm to competition." (citation omitted)); *Jacobs*, 626 F.3d at 1339 (plaintiff "has the burden of demonstrating damage to competition with specific factual allegations" and regarding potential harm, must define the relevant market, establish that defendants possessed power in that market and after those threshold requirements, plaintiff must make "specific allegations linking market power to harm to competition in that market." (internal quotations and citations omitted)).  Thus, even assuming, arguendo, that plaintiff adequately pleaded

1) the relevant market is the wholesale mortgage market and 2) adequate market power, I find its rule of reason claim still fails because there is no plausible and adequately pleaded connection of the ultimatum to actual or potential harm to competition. *See Appleton v. Intergraph Corp.*, 627 F. Supp. 2d 1342, 1355 (M.D. Ga. 2008). Thus, I respectfully recommend counts II and V be dismissed. *See All Care Nursing Serv.,* 135 F.3d at 745 n.11.

### B. Attempted Monopolization, Section 2 of the Sherman Act.

In count III, plaintiff sues under section 2 of the Sherman Act for attempted monopolization, which makes it a crime to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations[.]" 15 U.S.C. § 2. "This provision covers behavior by a single business as well as coordinated action taken by several businesses." *Spanish Broad. Sys.*, 376 F.3d at 1074. A claim for attempted monopolization must establish "three distinct elements: '(1) the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.'" *Id.* (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)). "Monopoly power is 'the power to raise prices to supra-competitive levels or . . . the power to exclude competition in the relevant market either by restricting entry of new competitors or by driving existing competitors out of the market.'" *U.S. Anchor Mfg.*, 7 F.3d at 994 (quoting *Am. Key Corp. v. Cole Nat'l Corp.*, 762 F.2d 1569, 1581 (11th Cir. 1985)).

A claim brought under section 2, like claims brought under section 1 "require[s] harm to competition that must occur within a 'relevant,' that is, a distinct market, with a specific set of geographical boundaries and a narrow delineation of the products at issue." *Spanish Broad. Sys.*, 376 F.3d at 1074 (citing *U.S. Anchor Mfg.*, 7 F.3d at 995). For a section 1 claim, the "relevant market" must be harmed by an alleged unreasonable restraint on trade; to bring a section 2 claim, however, defendants "must possess enough power or potential power in this relevant market [to] harm competition." *Id.* (quotations omitted) (citing *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1293-94 (11th Cir. 2004)). "A dangerous probability of success arises when the defendant comes close to achieving monopoly power in the relevant market." *Gulf States Reorg. Grp., Inc. v. Nucor Corp.*, 721 F.3d 1281, 1285 (11th Cir. 2013).

Plaintiff alleges that because of UWM's high market share and market power, "there is a dangerous probability that UWM will achieve its goals and attain monopoly power." TAC ¶ 122. As noted above, plaintiff has not adequately established the relevant market as the wholesale mortgage market, and thus, fails to plead that defendants possessed enough market power in the overall mortgage market to pose a danger of monopolization, as the evidence plaintiff relies on reflects only an 11% share in the overall mortgage market. *See* doc. 102 at 254. And, as explained above, even assuming the relevant market is the wholesale mortgage market and taking plaintiff's allegation that UWM possessed a 54% market share for the fourth quarter of 2022 as as true, the documents plaintiff relies on indicates only "38% market share of the

wholesale channel" for the year ending on December 31, 2022. TAC ¶ 108 (citing UWM's March 1, 2023 annual report); doc. 102 at 269.

Put another way, plaintiff has the burden to show that, as result of the wrongful conduct, there is a dangerous probability a monopoly will exist or already exists. An 11% (overall mortgage) or 38% (wholesale mortgage) market share does not plausibly suggest that UWM has come close to achieving monopoly power in the relevant market. *See U.S. Anchor Mfg.*, 7 F.3d at 1001 (holding that because the defendant "possessed less than 50 percent of the market at the time the alleged predation began and throughout the time when it was alleged to have continued, there was no dangerous probability of success . . . as a matter of law."); *Paycargo*, 2019 WL 5793113, at *5 (collecting cases explaining that even when a plaintiff pleads a defendant has at least 50 % market share, they must also "show that new rivals are barred from entering the market."); *Moecker v. Honeywell Int'l, Inc.*, 144 F. Supp. 2d 1291, 1308 (M.D. Fla. 2001) (citations and quotations omitted) (explaining that "[a]lthough a high market share . . . may ordinarily raise an inference of monopoly power, it will not do so in a market with low entry barriers or other evidence of a defendant's ability to control process or exclude competitors." (alterations omitted)).

"There can be no 'dangerous probability of success' [under section 2 of the Sherman Act] if the defendant 'was never able to maintain a majority position in the market.'" *Gulf States Reorg. Grp. Inc. v. Nucor Corp.*, 822 F. Supp. 2d 1201, 1237 (N.D. Ala. 2011) (quoting *U.S. Anchor Mfg.*, 7 F.3d at 1001). Although, as detailed above, plaintiff alleges very general barriers to entry into the wholesale market, TAC ¶¶ 82-

84, I find them inadequate to establish a lack of low entry barriers or "other evidence of a defendant's ability to control process or exclude competitors." *Moecker*, 144 F. Supp. 2d at 1308. Plaintiff further claims that "UWM's market power is also evidenced by Mr. Ishbia's statements in UWM's March 1, 2023 earnings call that UWM has 'great control of our margins' and that 'we do control the margins in this industry.'" TAC ¶ 109. However, the TAC provides no context or information regarding the meaning of these vague statements, or more importantly, any supporting facts. *See id*.

Even if plaintiff adequately alleged the relevant market, and that UWM has a dangerous possibility of achieving market power, I find it still fails to sufficiently plead defendants "engaged in predatory or anticompetitive conduct with . . . a specific intent to monopolize" for the reasons explained in the rule of reason analysis above. *Spectrum Sports*, 506 U.S. at 456. In arriving at that conclusion, I consider that "injury to a competitor need not always result in injury to competition. The use of unfair means resulting in the substitution of one competitor for another without more does not violate the antitrust laws." *Spanish Broad. Sys.*, 376 F.3d at 1076 (citation omitted). Even if the ultimatum qualified as "unfair means," *id.*, it is not clear from the TAC that defendants' actions had or could have an anticompetitive effect to the market or competition in general. It appears, rather, that plaintiff has "merely alleged an attempt to eliminate two firms from the market rather than injury to competition[.]" *Id*. Thus, I recommend that counts III and VI be dismissed. *See All Care Nursing Serv.,* 135 F.3d at 745 n.11.

**C. Tortious Interference with Business Contracts and Prospective Advantage.**

In count VII, plaintiff alleges tortious interference with business contracts and prospective economic advantage, presumably under Florida law, although plaintiff does not specify. Plaintiff's theory is as follows: plaintiff "had and w[as] likely to maintain business relationships with borrowers desiring recommendations[s] for the best source of mortgage loans, including choices among mortgage loans from Fairway, [Rocket,] and UWM and with real estate brokers and others who referred customers to the mortgage brokers so that they could make such recommendations." TAC ¶ 142. Defendants allegedly knew of these relationships and contracts and made intentional false statements and engaged in anticompetitive and coercive acts which "interfered with these relationships and contracts by depriving brokers of either the opportunity to offer [Rocket or Fairway] mortgages . . . or the opportunity to offer UWM[.]" *Id.* ¶ 144. Plaintiff was "financially damaged by loss of business and disruption of those relationships and contract because [it] could not offer the full choice of mortgage brokers to consumers" and suffered and will suffer in the future, damages, including "compensatory and consequential damages" in excess of $75,000. *Id.* ¶¶ 145-46.

The elements of a claim of tortious interference with a business relationship under Florida law are: "(1) the existence of a business relationship, not necessarily evidenced by an enforceable contract, under which the plaintiff has legal rights; (2) the defendant's knowledge of the relationship; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as

a result of that interference." *Palm Beach Cnty. Health Care Dist. v. Pro. Med. Educ., Inc.*, 13 So. 3d 1090, 1094 (Fla. 4th DCA 2009) (citation omitted).

Defendants argue count VII must be dismissed for four reasons: 1) plaintiff does not allege any identified existing or potential customers ended their business with plaintiff as a result of UWM's actions; 2) plaintiff does not allege a "disruption" of its business relationships with consumers based on the unavailability of one lender; 3) plaintiff alleges no facts indicating defendants' intent to damage plaintiff's business relationships; and 4) an action for tortious interference is untenable where a party tortiously interferes with a contract terminable at will. Doc. 102 at 46-47.

The count, as pleaded, must be dismissed. It appears plaintiff alleges the business contract and prospective economic advantage that serves as the basis for its claim is the relationship between plaintiff and borrowers desiring mortgages from UWM[12] and with "real estate brokers and others who referred customers to the mortgage brokers so that they could make [recommendations for a mortgage from UWM.]" TAC ¶ 142.

While a cause of action may lie for present or prospective customers, "[a]s a general rule, an action for tortious interference with a business relationship requires a business relationship evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had

---

[12] Because plaintiff did not sign UWM's addendum, there is no basis for the proposition that it was unable to refer customers and potential customers to Rocket and Fairway. *See* TAC ¶ 69-70.

not interfered." *Ethan Allen, Inc. v. Georgetown Manor Inc.*, 647 So. 2d 812, 815 (Fla. 1995). *See also Int'l Sales & Serv., Inc. v. Austral Insulated Prods., Inc.,* 262 F.3d 1152, 1155 (11th Cir. 2001). Although plaintiff alleges very generally that it "lost customers who were interested in loans from UWM," TAC ¶ 70, this is insufficient to plausibly allege a business relationship "evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant has not interfered." *Ethan Allen, Inc.*, 647 So. 2d at 815. Plaintiff's skimpy and conclusory statement does not indicate whether these were potential or existing customers, or if there was an understanding or agreement that would have been completed absent UWM's actions coupled with plaintiff's choice to not sign the addendum. *See, e.g.*, *Med. Sav. Ins. Co. v. HCA, Inc.*, no. 2:04cv156FTM-29DNF, 2005 WL 1528666, at *9 (M.D. Fla. June 24, 2005), *aff'd by* 186 F. App'x 919 (11th Cir. 2006) (explaining that because the complaint failed to allege existing customers were induced to breach their contracts, or that any breach occurred, there was no claim for tortious interference; a mere hope that its customers would renew could not sustain the claim).

Further, plaintiff does not plead sufficient facts to plausibly allege that defendants engaged in the conduct at issue with both "the intent to damage the business relationship [between plaintiff and consumers desiring mortgages from UWM] and a lack of justification for doing so." *Romika-USA, Inc. v. HSBC Bank USA, N.A.*, 514 F. Supp. 2d 1334, 1339 (citations omitted). Rather, plaintiff's allegations establish that defendants' actions were aimed at disrupting business to Fairway and Rocket, *see* doc. 105 at 44-45, but include nothing about an intent to disrupt plaintiff's

relationships with consumers or potential consumers desiring mortgages from UWM. I recommend that count VII be dismissed.

### D. FDUPTA Claim.

In count VIII, plaintiff alleges defendants violated Florida's Deceptive and Unfair Trade Practices Act (FDUPTA), Fla. Stat. § 501.201. The FDUPTA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" Fla. Stat. § 501.204(1). To state a FDUPTA claim, plaintiffs must allege "(1) a deceptive act or unfair trade practice; (2) causation; and (3) actual damages." *Dolphin LLC v. WCI Cmtys., Inc.*, 715 F.3d 1243, 1250 (11th Cir. 2013) (per curiam) (citing *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2d DCA 2006)).

In support of its claim under the FDUPTA, plaintiff claims defendants' actions are "unlawful and unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct with any trade or commerce[.]" TAC ¶ 151. Because the Court previously found the federal antitrust violations as alleged are insufficient, I need not reach the question of whether the acts as alleged violated the FDUPTA. *See Hunter v. Bev Smith Ford, LLC*, no. 07-80665-CIV, 2008 WL 1925265, at *7 (S.D. Fla. Apr. 29, 2008) (dismissing FDUTPA claims based on violations of state and federal statutes that the court had considered and rejected); *JES Props., Inc. v. USA Equestrian, Inc.,* no. 802CV1585T24MAP, 2005 WL 1126665, at *19, n.23 (M.D. Fla. May 9, 2005) ("Plaintiffs concede that their FDUPTA claims 'survive' or 'fall' with their antitrust claims."). For the same reason, I do not reach the question

of whether plaintiff stated a claim for declaratory relief. I recommend that counts VIII and IX be dismissed.[13]

### Recommendation

I respectfully **recommend**:

> Defendants' Motion to Dismiss Supplemental Class Action Complaint pursuant to Rules 12(b)(2) and 12(b)(6) and Memorandum of Law in Support, doc. 102, be **granted**, and the third amended complaint, doc. 96, be **dismissed on all counts**.

**Entered** in Jacksonville, Florida, on February 6, 2024.

LAURA LOTHMAN LAMBERT
United States Magistrate Judge

---

[13] Further, I harbor reservations as to whether plaintiff has sufficiently pleaded damages for the FDUPTA claim. *See Casa Dimitri Corp. v. Invicta Watch Co. of Am., Inc.*, 270 F. Supp. 3d 1340, 1352 (S.D. Fla. 2017) (citations and quotations omitted) (explaining the element of "actual damages" is a "term of art" that does not include "consequential damages;" and that "harm in the manner of competitive harm, diverted or lost sales, and harm to the goodwill and reputation" are consequential damages).

### Notice to the parties

Plaintiff has fourteen days from the date the party is served a copy of this report to file written objections to this report's proposed findings and recommendations or to seek an extension of the fourteen-day deadline to file written objections. 28 U.S.C. § 636(b)(1)(C). "Within 14 days after being served with a copy of [a report and recommendation on a dispositive issue], a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2). "A party may respond to another party's objections within 14 days after being served with a copy." *Id*. A party's failure to serve and file specific objections to the proposed findings and recommendations changes the scope of review by the District Judge and the United States Court of Appeals for the Eleventh Circuit, including waiver of the right to challenge anything to which no specific objection was made. *See* Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1; Order (Doc. No. 3), No. 8:20-mc-100-SDM, entered October 29, 2020, at 6.

c.
The Honorable Wendy W. Berger, United States District Judge
Megan E. Shaw, Esquire
Avi Benayoun, Esquire
Glenn E. Goldstein, Esquire
Joseph E. Parrish, Esquire
Robert H. Goodman, Esquire