UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

THE OKAVAGE GROUP, LLC
on behalf of itself and all others
similarly situated,

    Plaintiff,                                   Case No. 3:21-cv-448-BJD-LLL

v.                                                 Hon. Wendy W. Berger

UNITED WHOLESALE MORTGAGE,    Magistrate Judge Laura Lothman Lambert
LLC and MATTHEW ISHBIA,
individually

    Defendants.

## PLAINTIFF'S OBJECTIONS TO MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON MOTION TO DISMISS (ECF NO. 112)

The Okavage Group, LLC ("Okavage") objects to the Magistrate Judge's Report and Recommendation (ECF No. 112) (the "Report"), as to all claims except tortious interference, for the following reasons:

1.    The Report includes errors on each element critical to its rejection of Okavage's claim of an illegal *per se* antitrust conspiracy:

a.    The conclusion that Okavage did not plausibly allege a horizontal conspiracy violates the principle that on dispositive motions, a plaintiff's evidence "is to be believed, and all justifiable inferences are to be drawn in their favor." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992). The "choice between two reasonable interpretations" is for the jury. *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984); *Levine v. World Fin. Network Nat'l Bank,* 437 F.3d 1118, 1120 (11th Cir. 2006). The Report also failed to properly analyze the law of conspiracy.

1

b. The Report improperly labeled as conclusory Okavage's allegations that the brokers acted against their unilateral self-interests.

c. The Report's conclusion that the SAC's allegations do not exclude the "equally likely" possibility that the brokers individually chose to accede to the Ultimatum contravenes the rule that at the motion to dismiss phase, the Court should not choose between alternative plausible inferences from the complaint. *Marshon v. Fresh Market, Inc.*, 2017 WL 78797, at *5 n.5 (S.D. Fla. Jan. 6, 2017). The choice between or among plausible inferences or scenarios is one for the factfinder ... [not for] the court on a Rule 12(b)(6) motion." (citation omitted)); *Smith v. Healthcare Authority for Baptist Health*, 2022 WL 857036, at *3 (M.D. Ala. Mar. 22, 2022) (collecting cases) ("[I]t is not for the court to weigh competing, plausible inferences at the motion-to-dismiss stage." (citations omitted)). It also fails to address substantial factual allegations that the brokers engaged in extensive interactions. *See* SAC ¶¶41-44.

d. The Report made similar errors in applying the statement in *Nw. Wholesale Stationers, Inc. v. Pac. Stationary and Printing Co.*, 472 U.S. 284, 294 (1985), that *per se* boycotts "often cut off access to a supply, facility or market necessary to enable the boycotted firm to compete . . . ." The Report states that "it is not *facially apparent*, nor *characteristically likely*, that the anticompetitive conduct alleged here cut off consumer or broker access to the wholesale mortgage market." ECF No. 112 at p.27 (emphasis added). But "[t]he plausibility standard is not akin to a probability requirement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Report also failed to address the contrary authority explaining this standard.

2
51093216.19

e. The Report incorrectly faulted Okavage for insufficiently detailed allegations on market definition, as to "why consumers may prefer mortgages from a wholesale lender," or why "consumers would not readily switch to a retail mortgage lender for a small difference in price, because of their desire to obtain advice from a mortgage broker professional." ECF No. 112 at p.31.

f. The Report erred in concluding that the SAC did not adequately allege market dominance based on the Report's impermissible selection of one (weaker) piece of market share evidence as more relevant than another. The Report also failed to consider that market share is not the only way to measure UWM's dominance, or that *Northwest Stationer* requires only that the "boycotters" (i.e. the brokers) must be dominant.

g. The Report improperly faulted the SAC's allegations regarding barriers to entry because they did not specifically address "whether other retail lenders . . . would be unable to enter the wholesale market." ECF No. 112 at p.34.

2. The Report incorrectly rejected Okavage's allegations regarding harm to competition by incorrectly concluding that there were "no underlying facts" to support the assertion that "the Ultimatum has increased the costs of mortgage loans." ECF No. 112 at p.37. The Report distinguished allegations of harm to Rocket and Fairway from harm to the market, *id.* pp.38-39, without addressing the SAC's allegations on this issue.

3. The Report's rejection of Okavage's claims of attempted monopolization, violations of the FDUTPA, personal liability and declaratory judgment rest on the foregoing erroneous conclusions.

51093216.19

On attempted monopolization, the Report also failed to consider that the scheme had increased UWM's share to 54% at the expense of Rocket and Fairway. SAC ¶104. *See Nobody in Particular Presents, Inc. v. Clear Channel Comm's, Inc.*, 311 F. Supp. 2d 1048, 1103 (D. Colo. 2004) ("[W]hen the defendant's market share grows significantly in a short period of time . . . a probability of monopolization may exist.").

4. The Report concluded that this Court does not have personal jurisdiction over Mr. Ishbia based on its incorrect assertion that there were no allegations of intentional torts. But antitrust violations are a statutory tort. *Advanced Cartridge Tech., LLC v. Lexmark Int'l, Inc.*, 2011 WL 6719725, at *3 (M.D. Fla. Dec. 21, 2011); *JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*, 190 F.3d 775, 778 (7th Cir. 1999). The SAC makes clear that Mr. Ishbia intended to exclude Rocket and Fairway. SAC ¶¶36-38, 51, 105.

## **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OBJECTIONS**

This Memorandum contains additional authority in support of many objections identified above, numbered consistently with the objections:[1]

**I.   OBJECTION 1**

a. The Report made a number of inferences contrary to Okavage's factual allegations on conspiracy. The Report characterized communications between brokers as "*independent* expressions of enthusiasm and encouragement," *id.* p.23 (emphasis added), despite acknowledging that brokers "directed other brokers to the forum that

---

[1] Because of the need to comply with this Court's 15 page limit for objections to a 49 page Report, Okavage is unable to provide the full context for its objections herein. Okavage respectfully refers the Court to its Response and Brief in Opposition to Defendants' Motion to Dismiss Supplemental Class Action Complaint [ECF No. 105] for that context.

4

UWM published to participate in the boycott." *Id.* pp.23-24. And statements such as "unstoppable together," "brokers are better when we work together," "brokers are family. We don't go against our family," "All in," SAC ¶41, plausibly indicate that numerous brokers engaged in "a conscious commitment to a common scheme" or a "meeting of minds." *Monsanto*, 465 U.S. at 764, 765.

The Report also failed to address significant authority that "interfirm communications" like these are sufficient to prove a conspiracy. *Blomkest Fertilizer, Inc. v. Potash Corp. of Sask.*, 203 F.3d 1028, 1033 (8th Cir. 2000) (*en banc*) ("[A] high level of communications among competitors can . . . support[] an inference of conspiracy."); *In re Plywood Antitrust Litig.*, 655 F.2d 627, 633, 634 (5th Cir. 1981).

Statements such as "unstoppable together," "brokers are better when we work together," and "we don't go against our family" constitute invitations to collude. *See In re Delta/Airtran Baggage Fee Antitrust Litig.*, 245 F. Supp. 3d 1343, 1372 (N.D. Ga. 2017), *aff'd sub nom. Siegel v. Delta Air Lines, Inc.*, 714 F. App'x 986 (11th Cir. 2018) ("Numerous cases have recognized that an invitation to collude can serve as evidence of a conspiracy."); *Fishman v. Wirtz*, 1981 WL 2153, at *59 (N.D. Ill. Oct. 28, 1981).

The Report also failed to address *United States v. Apple, Inc.*, 791 F.3d 290 (2d Cir. 2015), where the Court found facilitation of a horizontal agreement under highly analogous circumstances. "Apple coordinated phone calls between the publishers who had agreed and those who remained on the fence." *Id.* at 319. The SAC similarly alleges that United Wholesale Mortgage ("UWM") established a forum for brokers to discuss its Ultimatum with one another, SAC ¶49, and worked with brokers to assist others to sign the Addendum excluding Rocket and Fairway, *id.* ¶44.

5

Apple "endeavored to assure the publishers that they weren't going to be alone . . . ." *Apple*, 791 F.3d at 319. Mr. Ishbia said publicly that "all our current clients are aligned," and that all the brokers "have locked arms with us." *Id.* ¶42. *See also id.* ¶51 ("everybody is going to sign").

The Report also misinterpreted *In re Insurance Brokerage Antitrust Litigation*, 618 F.3d 300, 322 (3d Cir. 2010). The Third Circuit explained that "evidence implying a traditional conspiracy" requires "'proof that the defendants got together and exchanged assurances of common action.'" Here, the statements regarding the parties' being "all in," "unstoppable together," "all family" and "all for one" can plausibly be viewed as "assurances of common action."

While the conspiracy claim was rejected in *Insurance Brokerage*, "there are no allegations [in that case] that any insurer ever horizontally disclosed to its competitors the details of its vertical agreement with a broker." 618 F.3d at 329. Here, the brokers specifically discussed the Addendum among themselves. SAC ¶41-44. *In re EpiPen Direct Purchaser Litigation*, 2022 WL 1017770 (D. Minn. Apr. 5, 2022), simply says "[m]ere knowledge of the existence of other . . . agreements . . . does not constitute an agreement under § 1." *Id.* at *7. Far more is alleged here.

b. The Report failed to address the specific allegations in the SAC at ¶35 that "[f]rom 2018 to 2021 Rocket's wholesale business increased from 3,000 mortgage broker partners to 10,000, reflecting the fact that Rocket's products and prices were especially attractive to mortgage brokers and their customers." The abrupt "about face" after the Ultimatum, when more than 11,000 brokers agreed to not deal with Rocket or Fairway, SAC ¶61, were certainly actions against the brokers' individual interests, as reflected in

6

their behavior before the Ultimatum was issued. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1365 (3d Cir. 1992); *MM Steel L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 844 (5tch Cir. 2015).

d. The Report failed to address controlling Supreme Court authority on the "cutoff" element under *Northwest Stationers*. In *Silver v. New York Stock Exch.*, 373 U.S. 341, 348 (1963), cited by the *Northwest Stationers* court, the Supreme Court found that a party without the services denied by the boycott would be "hampered substantially in [their] crucial endeavor," because the services provided "important business advantages[.]" Here, the SAC alleges that Rocket's and Fairway's shares dropped significantly due to the boycott, SAC ¶¶61-62, that Mr. Ishbia said that Rocket and Fairway would be cut off from 70-90% or more of the referrals they received from brokers, and that he subsequently confirmed that the result was even more successful than he expected. *Id.* ¶61. Moreover, access to brokers provides more than "important business advantages," the broker is an essential part of the wholesale process as the source of all referrals to wholesale lenders. SAC ¶¶20, 22. This plausibly meets the standard in *Silver*.

e. On the relevant market issue, the Report contravened the critical principle in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 551 (2007), that "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." This Court has noted that "specific facts are not necessary" to adequately plead a complaint. *Little v. FNU Cheatham*, 5:18-cv-303-Oc-78PRL, 2020 WL 7039959, at *2 (M.D. Fla. Oct. 28, 2020)

(quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)); *see also Suescum v. Family First Life, LLC,* 6:21-cv-1769-WWB-EJK, at *2 (M.D. Fla. Jan. 19. 2023).[2]

Additionally, the Magistrate Judge failed to address the detailed allegations in ¶¶22-23 of the SAC, which explain that customers "may prefer mortgages from a wholesale lender" because:

> 22. . . . mortgage brokers[] provide loan applications to the consumer/prospective borrower, collect completed loan applications, perform income verification and collect other required documentation. Additionally, mortgage brokers advise the customer of available interest rates and loan terms and select a particular wholesale mortgage lender in order to find the best mortgage loan product and pricing for their client.
>
> 23. . . . The broker's value rests in his or her sophistication and knowledge of mortgage options that lenders offer. The broker can often find mortgage options that are less expensive, but still meet the buyer's preferences, based on his or her knowledge of which lenders are suitable for each buyer.

On the issue of whether customers who utilize mortgage brokers and lenders would not readily switch to retail channels, in addition to the functions explained in ¶¶22-23, the fact that wholesale mortgage lending is less costly by $9,400, *id.* ¶25.F, is recognized in the case law as a plausible indication of a separate submarket. *See, e.g.* U.S. v. *H & R Block*, 833 F. Supp. 2d 36, 55 (D.D.C. 2011) (do-it-yourself and assisted tax returns were separate submarkets in light of the "significant price disparities" between the two). More detail should not be necessary at the motion to dismiss phase.

    f.    The SAC alleged that in the most recent quarter UWM had achieved a 54% market share. ECF No. 112, pp.33-34. 54% is thus the most relevant figure to show

---

[2] "The definition of the relevant market is essentially a factual question" reserved for discovery. *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 994 (11th Cir. 1993).

51093216.19

market power. *See, e.g.*, Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶807d2 ("Where the defendant's market share rises substantially during the course of the challenged behavior, the later higher number is the one most relevant for determining the existence of a dangerous probability of success.").

But the Report impermissibly weighed the evidence, stating that the more relevant number is the average 38% share for the last year of UWM's operation. ECF No. 112 p.42. "The choice between or among plausible inferences or scenarios is one for the factfinder ... [not for] the court on a Rule 12(b)(6) motion." *Marshon*, 2017 WL 78797, at *5 n.5; *Healthcare Authority*, 2022 WL 857036, at *3.

The Report also failed to consider that market power is established where the defendant has the power to raise prices or impose other burdensome terms. *In re Terazosin Hydrochloride*, 220 F.R.D. 672, 696 (S.D. Fla. 2004). UWM had sufficient power to impose its Ultimatum on 93% of its brokers, many of whom had previously chosen to utilize Rocket and Fairway. SAC ¶¶61, 82. As Mr. Ishbia explained, "nobody is willing to take th[e] chance" of losing its relationship with UWM. SAC ¶103.A.[3]

The Report failed to address evidence of the dominance of the boycotting brokers. UWM announced that 93% of UWM's brokers joined the boycott. *Id.* ¶61. Since UWM's brokers represent more than 60% of all brokers, *id.* ¶27, simple arithmetic indicates that more than 55% of all brokers (93% of 60%) joined the boycott. This plausibly alleges dominance.

---

[3] The Report's rejection of Mr. Ishbia's statement that UWM controls industry margins as too vague, ECF No.112, p.43, imposes another improper demand for greater detail.

9

g. The SAC (*see* ¶83.A-E) provides detailed allegations regarding barriers to entry. The Magistrate effectively imposed a requirement that the SAC anticipate, and address, every possible counter-argument on barriers to entry, e.g. possible entry by retailers. No court has ever so held. A plaintiff "need not prove his case on the pleadings[.]" *Speaker v. U.S. Dep't of Health & Human Servs. Centers for Disease Control & Prevention*, 623 F.3d 1371, 1386 (11th Cir. 2010). Moreover, ¶83.C of the SAC references the need for a substantial sales force directed at mortgage brokers. That is something retailers do not possess.

The single case the Report cites, *Paycargo, LLC v. CargoSpring, LLC*, No. 3:19-cv-85-TCB, 2019 WL 5793113 (N.D. Ga. Nov. 4, 2019), involved monopolization, not the *Northwest Stationers* standard. As the court held in *Toys "R" Us, Inc. v. FTC,* 221 F.3d 928, 936 (7th Cir. 2000), "[t]his case satisfies the criteria the Court used in *Northwest Stationers* for condemnation without any extensive inquiry into market power . . . 'dominant' is an undefined term, but [is] plainly chosen to stand for something different from antitrust's term of art 'monopoly.'"

## II. **OBJECTION 2**

The Report's distinction between competition and competitors failed to consider that "[c]ompetition does not exist in a vacuum; it consists of rivalry among competitors. Clearly, injury to competitors may be probative of harm to competition." *Hasbrouck v. Texaco, Inc.*, 842 F. 2d 1034, 1040 (9th Cir. 1987), *aff'd*, 496 U.S. 543 (1990).

The SAC's allegations (not addressed by the Report) make clear why harm to Rocket and Fairway does harm the market; Rocket and Fairway offered lower prices and better quality than UWM. *See, e.g.*, SAC ¶¶32.A, 73 (UWM acknowledged competitors' "more operational flexibility in approving loans"); 32.C (Rocket and Fairway rated higher

10

than UWM in consumer satisfaction and affordability); 34 (Rocket consistently beats UWM in price); 78 (specific examples of lower Rocket prices compared to UWM).

Elimination of or harm to competitors offering superior price or quality harms competition because it reduces the availability of low cost, higher quality options. *See H&R Block*, 833 F. Supp. 2d at 79; *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 146 (D.D.C. 2004); *Virgin Atl. Airways, Ltd. v. British Airways PLC*, 257 F.3d 256, 264-265 (2d Cir. 2001) ("[C]onsumers experienced a decrease in quality due to Virgin's delayed entry" because "Virgin offered higher quality services than British Airways.").

The Report also failed to address the allegations that Rocket and Fairway are UWM's largest rivals and closest competitors. *Id.* ¶¶31, 72, 76. That makes limitations on their low price, high quality services especially important. *In the Matter of ProMedica Health Sys., Inc.*, 2012 WL 1155392, at *36 (F.T.C. 2012).

The Report failed to consider that by disrupting brokers' ability to act independently, SAC ¶¶5, 76-79, the boycott interfered with the "autonomy of the marketplace." *See e.g. Realcomp II, Ltd. v. Federal Trade Commission*, 635 F.3d 815, 827, 827-831 (2011) (reduction in competitive brokerage options available to home sellers were unlawful because they "narrow[ed] consumer choice" and "hinder[ed] the competitive process."); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191-194 (3d Cir. 2005) (consumers derived a substantial benefit from free choices by dealers). *See also* discussion of market power, *supra*, to establish potential effects.

The Report also assumed erroneously that Rocket and Fairway would have had to be completely eliminated from the market to harm competition. But the loss of 75-90% of their brokers certainly precluded Rocket and Fairway from providing lower prices and

11

better quality to many consumers. *See Realcomp*, *supra* at 830 (harm to 10% of buyers was sufficient).

## III.  RELIEF REQUESTED

Okavage requests that this Court reject the Report and Recommendation and deny Defendants' Motion to Dismiss in its entirety, with the exception of Counts VII and XVI relating to tortious interference.

Date: March 15, 2024

Respectfully Submitted,
**PARRISH & GOODMAN, PLLC**
/s/ Robert H. Goodman
ROBERT H. GOODMAN
Florida Bar No.: 1008059
13031 McGregor Blvd., Suite 8
Fort Myers, Florida 33919
Phone: (813) 643-4529
Facsimile: (813) 315-6535
Primary: rgoodman@parrishgoodman.com
Secondary: admin@parrishgoodman.com
AND
JOSEPH E. PARRISH
Florida Bar No: 690058
Primary: jparrish@parrishgoodman.com
Secondary: admin@parrishgoodman.com
*Counsel for Plaintiffs*