UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

Case No. 3:21-cv-00448-BJD-JRK

THE OKAVAGE GROUP, LLC,
on behalf of itself and all others
similarly situated,

    *Plaintiff*,

       v.

UNITED WHOLESALE MORTGAGE, LLC and
MATHEW ISHBIA, individually,

    *Defendants*.
_____/

## DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR LEAVE TO FILE SECOND SUPPLEMENTAL COMPLAINT

Defendants, United Wholesale Mortgage, LLC ("UWM") and Mathew Ishbia ("Mr. Ishbia," and collectively with UWM, "Defendants"), respond in opposition to Plaintiff's Motion for Leave to File Second Supplemental Complaint [Dkt. 118] ("Motion") and Supporting Memorandum of Law [Dkt. 119] ("Memo."), as follows:

### INTRODUCTION

Plaintiff The Okavage Group, LLC ("Plaintiff") seeks leave to file a Second Supplemental Class Action Complaint (the "Second Supplemental Complaint" or "SSC") in response to the Magistrate Judge's [Second] Report and Recommendation (the "Second Report") [Dkt. 112], recommending dismissal of Plaintiff's [First] Supplemental Class Action Complaint (the "First Supplemental Complaint" or "FSC"). This is not the first time Plaintiff has employed this tactic. It previously sought leave to amend in response to the Magistrate Judge's first Report and Recommendation ("First Report") [Dkt. 61],

ACTIVE 699345785v3

recommending dismissal of Plaintiff's then-operative First Amended Complaint. Then, Plaintiff again sought leave to supplement while Defendants' motion to dismiss the Second Amended Complaint was pending. The Magistrate Judge granted this request on July 18, 2023 [Dkt. 95] (the "July 18 Order"), stating: "In the end, the Court's interest in deciding the sufficiency of the pleading, ***with finality***, outweighs other considerations and requires that plaintiff's motion be granted. Notwithstanding my analysis above, ***plaintiff will not be given future, additional opportunity to amend, supplement, or modify its pleading absent extraordinary circumstances***." (July 18 Order at 6-7 (emphasis added)).

Notwithstanding this clear statement, in a bid to escape finality and revive its moribund claims, Plaintiff has gone back to the same playbook and filed yet another motion for leave to supplement. Plaintiff asserts that its Second Supplemental Complaint—its fifth attempted pleading overall—is based on "newly revealed evidence" and "extraordinary circumstances" justifying an opportunity to supplement. (Motion ¶ 8; Memo. at 4). But the Second Supplemental Complaint is not "extraordinary," or at least not in the sense Plaintiff claims. Plaintiff seeks to add seven paragraphs of new allegations, most of which pertain to what Plaintiff calls the "Hunterbrook study," which Plaintiff describes as "[e]xtensive statistical analyses" supposedly revealing evidence of price and cost increases and curtailment of choices. (Motion ¶ 8; SSC ¶¶ 110-13; Memo. at 1-2, 4-5, 9, 11-12, 14-15). But Plaintiff omits the most salient detail about this ostensible "study."

Plaintiff fails to mention that the author of the "Hunterbrook study," Hunterbrook Media, is an arm of a hedge fund, Hunterbrook Capital (collectively, "Hunterbrook"), which

2

has launched a smear campaign against UWM while "shorting" UWM's stock (a bet that the stock value would drop) and going "long" on Rocket Mortgage's stock, one of UWM's competitors (a bet that the stock value would rise). Hunterbrook has not concealed this bet. Nor has Hunterbrook hidden the methodological flimsiness of its "study," acknowledging that it has omitted numerous variables that meaningfully impact mortgage pricing. Hunterbrook's "study" uses bad data, bad statistics, and bad economics in a campaign of market manipulation, but provides no new facts that would overcome any of the findings of the Second Report. The only thing about the Second Supplemental Complaint that might be called "extraordinary" is Plaintiff's extraordinary lack of candor in failing to disclose the background and motives of its source, and the fact that Plaintiff is attempting to enlist this Court to abet Hunterbrook's scheme.

The Court should deny Plaintiff's Motion for two reasons.

<u>First</u>, Plaintiff has not satisfied its threshold burden of demonstrating good cause or extraordinary circumstances to seek leave to supplement its pleadings, as required by both the July 18 Order and the Court's earlier Order of September 26, 2022 [Dkt. 66] (the "September 26 Order"), setting a deadline of October 21, 2022 for Plaintiff to amend. Absent this threshold showing, Plaintiff cannot seek leave to supplement and its Motion cannot proceed.

<u>Second</u>, Plaintiff's proposed supplementation should be denied on grounds of futility and bad faith. The proposed supplementation is futile because it does not cure the deficiencies of Plaintiff's antitrust claims, including the Second Report's finding that the relevant market is all residential mortgage loans, not just wholesale loans. Plaintiff's failure to disclose the bias and methodological deficiencies of the Hunterbrook "study"

3

also evidences bad faith.

## ARGUMENT

### I. Legal Standard

Plaintiff seeks leave to supplement its pleadings under Rule 15(d), which states this Court "may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Fed. R. Civ. P. 15(d). "The standard to be applied when considering a motion for leave to supplement a complaint under Rule 15(d) is the same standard applied when considering a motion for leave to amend a complaint under Rule 15(a)." *Porter v. Inch*, No. 4:20cv230-MW-HTC, 2020 U.S. Dist. LEXIS 125154, at *16 (N.D. Fla. June 19, 2020) (citing *Nat'l Franchisee Ass'n v. Burger King Corp.*, No. 09-2243-CIV, 2010 U.S. Dist. LEXIS 150732, at *4 (S.D. Fla. Jul. 16, 2010) (citation omitted)).

This Court "need not" allow Plaintiff to supplement. *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001). It may deny leave to supplement "(1) where there has been an undue delay, bad faith, dilatory motive, or repeated failures to cure deficiencies by amendments previously allowed; (2) where allowing amendment would cause undue prejudice to the opposing party; or (3) where amendment would be futile." *Id*. See also *Nance v. Rico Elec., Inc.*, 381 F. App'x 919, 923 (11th Cir. 2010 (same); *Laurie v. Ala. Ct. of Crim. App.*, 256 F.3d 1266, 1274 (11th Cir. 2001) (same). Leave to supplement may also be denied where it would "unduly delay resolution of the case." *United States ex rel Gadbois v. Pharmerica Corp.*, 809 F.3d 1, 7 (1st Cir. 2015) (quoting *Hall v. CIA*, 437 F.3d 94, 101 (D.C. Cir. 2006).

4

## II. Plaintiff Has Failed to Show the Requisite Good Cause or Extraordinary Circumstances to Supplement

As a threshold matter, Plaintiff's Motion should be denied because Plaintiff has failed to make the requisite showing of good cause or extraordinary circumstances required by this Court's prior scheduling orders. The July 18 Order is unambiguous: "plaintiff will not be given future, additional opportunity to amend, supplement, or modify its pleading absent extraordinary circumstances." (July 18 Order at 6-7). "Extraordinary circumstances" are those "that are both beyond [plaintiff's] control and unavoidable even with diligence." *Sandvik v. United States*, 177 F.3d 1269, 1271 (11th Cir. 1999). This is "a fact-specific determination" because a finding of "extraordinary circumstances" is "reserved for extraordinary facts." *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1154-55 (11th Cir. 2005) (internal quotations and citation omitted).

Plaintiff must also show good cause to supplement years after the deadline to amend passed. Leave to supplement "is not guaranteed," and the Court may deny such leave "in the exercise of its inherent power to manage the conduct of litigation before it." *Porter*, 2020 U.S. Dist. LEXIS 125154, at *16-17 (quoting *Reese v. Herbert*, 527 F.3d 1253, 1263 (11th Cir. 2008)). Under Rule 16(b), district courts are required to enter scheduling orders that "must limit the time to join other parties, amend the pleadings, complete discovery, and file motions." Fed. R. Civ. P. 16(b)(3)(A). These orders "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). "This good cause standard precludes modification unless the schedule cannot 'be met despite the diligence of the party seeking the extension.'" *Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1418 (11th Cir. 1998) (citing Advisory Committee's note to Rule 16(b)).

When a plaintiff does not move to amend or supplement within the time directed

5

by the Court, "a two-step analysis is appropriate." *James Gorman Ins., Inc. v. Bankers Ins. Co.*, No. 8:16-cv-816-T-27AEP, 2017 U.S. Dist. LEXIS 31769, at *3 (M.D. Fla. Mar. 7, 2017) (citing *Sosa*, 133 F.3d at 1419). The movant must first "demonstrate good cause under Rule 16(b)[.]" *Sosa*, 133 F.3d at 1419 (citing *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607-08 (9th Cir. 1992)). It is the movant's burden to "show good cause why leave to amend the complaint should be granted" after the Court's deadline. *Smith v. School Bd. of Orange Cty.*, 487 F.3d 1361, 1366 (11th Cir. 2007). Only then can the Court proceed to the second step of evaluating the request to supplement under Rule 15(d). *See Gorman*, 2017 U.S. Dist. LEXIS 31769, at *4. To establish good cause, "the movant has the burden of proving that the scheduling deadline could not have been met despite the movant's diligent efforts to do so." *John Morrell & Co. v. Royal Caribbean Cruises Ltd.*, 243 F.R.D. 699, 701 (S.D. Fla. 2007).

### A. Plaintiff's Efforts to Postpone Dismissal Are Not Good Cause or Extraordinary Circumstances to Supplement

Plaintiff cannot show good cause or extraordinary circumstances for its Motion. To the contrary, the history of this case reflects that this is just another in a line of serial motions to amend or supplement that Plaintiff has used to evade dismissal for nearly two years. The Magistrate Judge entered the First Report recommending dismissal of the First Amended Complaint on July 27, 2022. [Dkt. 61]. Plaintiff objected on August 10, 2022, but also indicated in its objections that it intended to amend, and Defendants responded on August 24, 2022. [Dkts. 63, 65]. Based on Plaintiff's announced plan to amend, the Court entered its September 26 Order, holding Defendants' motion to dismiss in abeyance and setting a deadline of October 21, 2022 for Plaintiff to amend. [Dkt. 66]. Plaintiff submitted its Second Amended Complaint on October 21, 2022. [Dkt. 71].

6

Defendants filed their motion to dismiss on December 14, 2022. [Dkt. 73]. Plaintiff responded on February 1, 2022. [Dkt. 79]. Plaintiff then moved to file its First Supplemental Complaint on March 24, 2023. [Dkts. 80, 81]. The Magistrate Judge granted leave over Defendants' objection on July 18, 2023. [Dkt. 95].

Plaintiff filed its First Supplemental Complaint on July 19, 2023. [Dkt. 96]. Defendants again moved to dismiss on August 14, 2023. [Dkt. 102]. Plaintiff responded on August 29, 2023. [Dkt. 105]. Defendants replied and Plaintiff sur-replied on September 5, 2023 and September 12, 2023. [Dkts. 107, 108]. The Magistrate Judge entered the Second Report on February 6, 2024, recommending dismissal of all claims in the First Supplemental Complaint. [Dkt. 112]. Plaintiff objected on February 20, 2024, Defendants responded on March 4, 2024, and both parties filed revised objections and responses on March 15, 2024. [Dkts. 113-117]. Now, after four prior rounds of pleading, four prior motions to dismiss, two prior Reports recommending dismissal of Plaintiff's operative pleading, and two fully-briefed rounds of objections and responses, Plaintiff seeks once more to evade a final dismissal ruling by filing its Second Supplemental Complaint.

Plaintiff acknowledges the Court's directive in the July 18 Order to show "extraordinary circumstances," but does not attempt to define what that means and instead simply asserts that it has done so, because its new allegations include information that is "unusually detailed" and "highly relevant." (Motion ¶ 8; Memo. at 4). Plaintiff seeks to add seven supplemental allegations. Four concern the so-called "Hunterbrook study," which purports to demonstrate price changes, increased costs, and more loan officers sending 99% or more of their loans to UWM "after the Ultimatum and boycott." (SSC ¶¶ 110-13). One relates to Fairway's decision to stop offering wholesale mortgage loans. (*Id*.

7

¶ 114). And two involve additional quotes from Mr. Ishbia on an earnings call. (*Id*. ¶¶ 115-16). These supplemental allegations do not satisfy Plaintiff's burden.

Plaintiff's proposed supplemental allegations do not set out good cause or extraordinary circumstances. Although the particulars vary and are based on media reports and events following the Second Report, they amount to additional allegations of like character to those the Magistrate Judge has twice found insufficient to state any claim. If the mere occurrence of further events, new media reports, or new earnings calls were sufficient to supplement the pleadings in the face of a pending dismissal recommendation, the Court and Defendants will be trapped in an endlessly recursive exercise. Plaintiff should not be able to postpone a final dismissal ruling indefinitely just by scouring the headlines and transcripts of quarterly earnings calls for anything it can spin as supportive of its claims and requesting further supplementation every time dismissal appears imminent. Plaintiff has had four opportunities to come up with enough factual allegations to state a claim. New embellishments of existing insufficient allegations are neither good cause nor extraordinary. *See Uppal v. Hosp. Corp. of Am.*, No. 8:09-cv-634-T-33TBM, 2011 U.S. Dist. LEXIS 71702, at *18 (M.D. Fla. July 5, 2011) (finding leave to amend should be denied where plaintiff "has already filed four versions of her Complaint without success"); *see also Okeke v. Allied Barton Sec. Servs.*, No. 2:14-cv-531-FtM-29CM, 2015 U.S. Dist. LEXIS 80574, at *6-7 (M.D. Fla. May 26, 2015) (denying further leave to amend where "there has been repeated failure to cure deficiencies" despite "multiple opportunities to amend").

### B. Plaintiff's Mischaracterization of Its Supplemental Allegations Confirms the Absence of Good Cause or Extraordinary Circumstances to Supplement

Plaintiff attempts to differentiate the "Hunterbrook study" from its earlier

ACTIVE 699345785v3

allegations, likening the "study" to an "expert analysis" that "would not normally be available at the pleading stage[.]" (Memo. at 4). It is nothing of the kind. As Hunterbrook itself has disclosed, but Plaintiff does not, Hunterbrook Media is the media arm of hedge fund Hunterbrook Capital, which "is short $UWMC and long $RKT at the time of publication" of the Hunterbrook Report. *See* Hunterbrook Report, available at hntrbrk.com/uwm/. In other words, Hunterbook released its so-called "study" through its media outlet even as its hedge fund made a bet against UWM and in support of UWM's "biggest competitor[]," Rocket Mortgage, in the financial markets. *Id*. Hunterbrook further acknowledges that its methodology fails to account for "many variables not included" in its data source, like credit scores, regulatory changes, and industry market shifts, "which meaningfully impact mortgage pricing" and that there are "likely confounding variables which may have pushed the results in one direction or another that we did not observe." *See* Hunterbrook Report, Methodology Appendix, available at https://hntrbrk.com/how-we-crunched-the-numbers-behind-the-uwm-investigation/. It expresses "hope" that "this analysis is reviewed and improved by readers[.]" *Id*.

These admissions belie Plaintiff's attempt to cast the Hunterbrook "study" as the equivalent of "expert analysis," as it is patently obvious Rule 702 would exclude the "study" in its entirety. *See* Fed. R. Evid. 702; *Wilson v. B/E Aero., Inc.*, 376 F.3d 1079, 1089 (11th Cir. 2004) ("Statistics without any analytical foundation are 'virtually meaningless.'") (internal citation omitted)); *Henderson v. Demars*, No. 11-80589-Civ-Scola/Hopkins, 2012 U.S. Dist. LEXIS 202973, at *8 (S.D. Fla. Aug. 21, 2012) ("testimony of an expert witness may be excluded when the witness is so biased as to render his or her testimony unhelpful").

Plaintiff similarly mischaracterizes its other "new evidence." Fairway did not "exit" the residential mortgage market, nor does its decision to cease offering wholesale mortgages "confirm[]" any "anticompetitive effects of UWM's Ultimatum and boycott." (Memo. at 1-2, 4). As Fairway made clear when it announced its decision—but Plaintiff again omits from its false narrative—it ceased wholesale mortgage lending to "pivot[] the company's business model to 100% retail originations," explaining, "We are simply making a business shift, nothing more, nothing less, in order to focus on our core business[.]" *Fairway Independent Mortgage Corporation Announces Changes to Wholesale Department*, available at www.prnewswire.com/news-releases/fairway-independent-mortgage-corporation-announces-changes-to-wholesale-department-302052100.html. Likewise, as the full context of Mr. Ishbia's recent earnings call statement makes clear, Mr. Ishbia's quotes are *not* about UWM's profit margins, but about the broker margins UWM delivers to "help the brokers be competitive," and Mr. Ishbia also expressly acknowledges that "the market changes and evolves" and that UWM's "*range will change* … as the market changes," debunking Plaintiff's out-of-context assertion that UWM controls the market. (SSC ¶¶ 115-16 (emphasis added)).

Plaintiff's mischaracterizations and half-truths do not set out good cause or extraordinary circumstances to support its supplemental allegations.

**III.    Plaintiff's Motion Should Be Denied as Futile and Bad Faith**

Plaintiff also fails to satisfy Rule 15(d) on grounds of futility and bad faith. Plaintiff's new allegations in the Second Supplemental Complaint do not cure the deficiencies identified in the Second Report, which are dispositive of all of Plaintiffs' antitrust claims and make supplementation futile. The July 18 Order expressly contemplates futility as a basis to oppose future supplementation. (*See* July 18 Order at 6 n.5). Plaintiff's

mischaracterization of the Hunterbrook "study" also demonstrates bad faith and is a separate basis to deny supplementation.

### A. Plaintiff's Supplementation Is Futile Because Plaintiff Still Has Not Sufficiently Alleged Its Asserted Market

Leave to file Plaintiff's proposed Second Supplemental Complaint should be denied as futile. "Leave to amend a complaint is futile when the complaint as amended would still be properly dismissed or be immediately subject to summary judgment for the defendant." *Cockrell v. Sparks*, 510 F.3d 1307, 1310 (11th Cir. 2007). The Second Report sets out the grounds for the Magistrate Judge's recommendation that all counts of the First Supplemental Complaint be dismissed. The Second Supplemental Complaint does not cure these grounds, and thus further supplementation is futile.

Plaintiff's proposed supplemental allegations do not cure the most significant defect in Plaintiff's pleadings—its failure to allege facts defining the relevant market as wholesale residential mortgage loans. The Second Report found Plaintiff failed to allege facts to support its allegations in the First Supplemental Complaint that the "relevant market or relevant sub-market in this case is the national market for wholesale lending for mortgages sold through mortgage brokers," and that UWM's actions "significantly reduced competition in the relevant market." (Second Report at 3, 8 (quoting FSC ¶¶ 20, 72)). The Second Report agreed with Defendants that Plaintiff's allegations regarding the relevant market are "conclusory," and "fail to address the 'reasonable interchangeability and substitutability of all residential mortgage loans—wholesale and retail," and concluded that the relevant market is the market of all residential mortgage loans. (Second Report at 26-32). The Second Report found that this market definition precludes each of Plaintiff's antitrust claims, because Plaintiff has not alleged and cannot allege that

11

UWM possesses market dominance in, has excluded competitors from, or has caused substantial anticompetitive effects that harm consumers in the relevant market of all residential mortgage loans. (*Id*. at 33-34 (per se), 36-40 (rule of reason), 40-43 (attempted monopolization)).

The Second Supplemental Complaint does not fix this fatal defect. Indeed, it expressly relies upon the exact same conclusory "relevant market" allegations. (SSC ¶¶ 20, 72, 124). Plaintiff attempts to assert that its new allegations "plausibly allege a wholesale market" because "[i]f UWM is able to increase prices and control its margins … that means that competition from retail lenders is not sufficient to keep it from doing so." (Memo. at 11-12). But Plaintiff makes no such allegations. To the contrary, it alleges that UWM's rates and costs compare unfavorably to "comparable loans," "alternative prices," and "other available loans" in the market. (SSC ¶¶ 110-12). These allegations at best indicate that UWM can set its own prices and its own margins, while its competitors can offer comparable and alternative loans at lower prices and lower margins to compete with UWM. And Mr. Ishbia himself acknowledged that "when the market changes and evolves," UWM's "range will change." (*Id*. ¶ 116). None of these allegations indicate a "separate market or submarket" with "distinct prices" subject to UWM's exclusive control under *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1926), or Plaintiff's other cases in which a single entity sets prices for the entire market. (*See* Memo. at 12).

Plaintiff also attempts to sidestep this pleading deficiency by insisting that it is "unnecessary to allege a relevant market," because its new allegations purportedly "indicate the presence of market power directly" and allege "actual competitive effects on price and choice." (Memo. at 12-14). But Plaintiff asserted this same argument in

12

opposing dismissal of the First Supplemental Complaint, and the Second Report rejected it based on the U.S. Supreme Court's finding that "courts usually cannot properly apply the rule of reason without an accurate definition of the relevant market," and that the only exception involves "horizontal restraints or 'agreements between competitors not to compete in some way.'" (Second Report at 32 n. 10 (quoting *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018)). As the Second Report found, Plaintiff has failed to allege such a horizontal restraint or agreement because "there are not enough facts" alleged "to plausibly suggest the brokers agreed among themselves to boycott Rocket and Fairway" meaning Plaintiff "does not plausibly allege any horizontal agreement between each spoke," leaving a "rimless wheel[.]" Second Report at 22-23. Plaintiff's proposed supplemental allegations do not address this defect.

Plaintiffs' own authorities confirm the inapplicability here of the narrow set of cases in which courts have found definition of the relevant market or considerations of market power unnecessary. In *DeCurtis LLC v. Carnival Corp.*, No. 20-22945-CIV, 2021 WL 7539904 (S.D. Fla. Feb. 9, 2021), the court found market definition unnecessary only because the plaintiff had alleged "direct evidence" that defendant had "already excluded competition," including a telephone call between direct competitors that resulted in one competitor putting "on hold any work" and not paying amounts owed. *Id*. at *23. In *Federal Trade Commission v. Indiana Federation of Dentists*, 476 U.S. 447 (1986), the Supreme Court found inquiry into "market definition and market power" was unnecessary in the face of "a naked restriction on price or output." *Id*. at 460-61 (citations omitted). In *Realcomp II, Ltd. v. Federal Trade Comm'n*, 635 F.3d 815 (6th Cir. 2011), the Sixth Circuit found that such "abbreviated treatment" is often unsuitable because "actual

13

anticompetitive effects may be difficult to demonstrate," and it repeatedly emphasized the need to consider "the relevant market" for "less obviously anticompetitive restraints," such as the allegation in that case of "higher priced [brokerage] services." *Id*. at 827-29.[1]

Plaintiff has identified no direct evidence that UWM has excluded competition from the market of all residential mortgage loans. It has not alleged a naked restriction on price or output. At best, Plaintiff's proposed supplemental allegations assert the kinds of "less obviously anticompetitive restraints" and indirect effects—aggregate loan costs, comparative basis points, lender-specific closing costs, brokerage utilization, and broker margins—that require the Court to inquire into the relevant market. (SSC ¶¶ 110-16). The Second Supplemental Complaint concedes as much, continuing to allege that the "relevant market" or "relevant sub-market" is the national wholesale residential lending market, while failing to offer any supplemental allegations to cure these conclusory assertions. (SSC ¶¶ 20, 72, 124). If Plaintiff truly believed relevant market definition "need not be alleged here" (Memo at 12), it would not have sought to do so.

### B.  Plaintiff's Other Rationales for the Second Supplemental Complaint Are Also Futile

Plaintiff further attempts to demonstrate the non-futility of its proposed Second Supplemental Complaint by asserting other "benefits" of supplementation, including that its new "specific factual allegations" supposedly "resolve virtually all the concerns expressed in the [Second] Report[.]" (Memo. at 1, 6). Putting aside that, as just discussed, Plaintiff's allegations demonstrably do ***not*** address its failure to plead facts defining its

---

[1] Plaintiff's last case, *In the Matter of Promedica Health Sys., Inc.*, 2012-1 Trade Cas. (CCH) ¶ 77840, 2012 WL 1155392 (MSNET Mar. 28, 2012), is a "[m]erger enforcement" case under Section 7 of the Clayton Act, and is "concerned with preventing the unlawful acquisition, maintenance, and exercise of market power" through horizontal mergers. *Id*. at *12. It has no relevance here, where there is no horizontal merger at issue.

14

asserted wholesale market, these other rationales for the Second Supplemental Complaint also do not hold up to examination.

Plaintiff argues that its supplemental allegations shore up its "rule of reason" claim by providing "substantial additional support" for its allegations of anticompetitive effects, including higher prices and costs, reduced customer choice, and Fairway's "exit" from the market. (Memo. at 7-8). But the "rule of reason" analysis cannot be separated from the "relevant market" question, as Plaintiff's own lead authority acknowledges. Plaintiff "has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers ***in the relevant market***," and "courts usually cannot properly apply the rule of reason without an accurate definition of the relevant market," because without such a definition "there is no way to measure [the defendant's] ability to lessen or destroy competition." *Am. Express*, 585 U.S. at 541, 543 (emphasis added, citation omitted). Here, Plaintiff's supplemental allegations not only fail to show anticompetitive effects in the relevant market; they show no anticompetitive effects at all. At most, Plaintiff cites the Hunterbrook "study" to assert that UWM loans carried higher rates, prices, or closing costs compared to "comparable loans," "alternative prices," and "other available loans." (SSC ¶¶ 110-12). But the very existence of these "comparable," "alternative," and "other available" options confirms that the pricing and cost differences are not "anticompetitive effects," because they indicate lower-priced competitors were offering different terms in competition with UWM. And Fairway did not "exit" the relevant market. As discussed in § II.B, *infra*, it simply pivoted to 100% retail originations, and thus still competes in the residential loan market.

Plaintiff contends that the new allegations cure the "plus factors" analysis for its

15

*per se* claims because the Hunterbrook "study" shows that the so-called Ultimatum "doubled the number of brokers" purportedly acting against their interests by sending more than 99% of their loans to UWM. (Memo. at 8-9). But Plaintiff omits to mention that more than half of the brokers that supposedly gave 99% or more of their loans to UWM only closed **one loan** during the entire year, with that one loan happening to go to UWM, and Hunterbrook acknowledges a substantial majority of the loan officers it analyzed still send less than 75% of their loans to UWM. *See* Hunterbrook Report, Methodology Appendix, available at https://hntrbrk.com/how-we-crunched-the-numbers-behind-the-uwm-investigation/. Regardless, Plaintiff offers no factual allegations plausibly demonstrating how the subset of brokers sending more business to UWM act "against their interests"; it just asserts *ipse dixit* that this is so. (Memo. at 9). Some brokers choosing to send business to UWM is equally consistent with UWM providing those brokers with valuable benefits—making the loan process faster, easier, and more reliable with fewer contingencies, hassles, or headaches for borrowers. Thus, this "plus factor" does not "create a 'reasonable' inference of conspiracy" or "tend[] to exclude the possibility that the alleged conspirators acted independently." *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1303 (11th Cir. 2003). Plaintiff also again points to Fairway being "driven from" the market as support for its *per se* claims (Memo. at 9), but as already discussed, Fairway did not exit the residential mortgage market.

Plaintiff also asserts that its new allegations demonstrate monopoly power based on Mr. Ishbia's discussion of margins on a recent earnings call, where Plaintiff asserts Mr. Ishbia said "in so many words" that "UWM is able to control price." (Memo. at 9-10). Mr. Ishbia said nothing of the kind. He was discussing broker margins, not prices, and

16

what he said is that "the market changes and evolves" and that UWM's "range will change … as the market changes." (SSC ¶¶ 115-16). That is no different than Plaintiff's previous references to Mr. Ishbia's statements that UWM has "great control of our margins" and "we do control the margins in this industry," which the Second Report found "vague" and lacking "any supporting facts." (Second Report at 43). These statements do not establish dominance or market power according to Plaintiff's authorities, as they do not indicate that UWM had the singular power to raise prices and restrict output in the residential mortgage market. *See Fortner Enters., Inc. v. United States Steel Corp.*, 394 U.S. 495, 503-04 (1969) (holding in the tying context that market power is "the ability of a single seller to raise prices and restrict output"); *In re Terazosin Hydrochloride*, 220 F.R.D. 672, 696 (S.D. Fla. 2004) (defining "monopoly power" as "the power to control market prices or exclude competition").

### C. Plaintiff's Supplementation Is Brought in Bad Faith

The Court should also deny Plaintiff's Motion for bad faith. Bad faith to amend "can be shown where 'an attorney knowingly or recklessly raises a frivolous argument[] or argues a meritorious claim for the purpose of harassing an opponent. A party also demonstrates bad faith by delaying or disrupting the litigation[.]" *Hall v. Merola*, 67 F.4th 1282, 1296 (11th Cir. 2023) (quoting *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998)). Here, as discussed in § II.A, *infra*, Plaintiff has engaged in a serial campaign of seeking leave to amend or supplement while dismissal of its operative pleading is pending, with four iterations to date of pleadings, motions to dismiss, and requests to amend or supplement, and two instances of seeking leave to supplement while a Report recommending dismissal and objections thereto have been pending before the District Court. Moreover, as discussed in § II.B, *infra*, Plaintiff's Motion seeks to supplement

17

based on the Hunterbrook "study," yet Plaintiff failed to disclose to the Court the relationship between Hunterbrook Media and Hunterbrook Capital, Hunterbrook's pending bet against UWM in the market, or even the disclosed methodological deficiencies of the Hunterbrook "study." These actions demonstrate patent bad faith in Plaintiff's tactics and separately warrant denial of Plaintiff's Motion.

## CONCLUSION

When this Court granted Plaintiff leave to file its First Supplemental Complaint, it did so in the interest of "finality." (July 18 Order at 6). That same interest supports denial of the present Motion. Plaintiff has had four opportunities to plead its antitrust claims against Defendants. It has failed four times. The pending Second Report carefully and conscientiously explains why Plaintiff has failed to state a claim and why its claims should be dismissed. Plaintiff has had its opportunity to object, and Defendants have responded. It is time for the Court to decide if this case has reached finality. The Court should deny Plaintiff's last-ditch attempt to delay this final disposition based on a hedge fund's media report seeking to manipulate the market for its own profit.

For the foregoing reasons, Defendants respectfully request the Court enter an order denying Plaintiff's Motion for Leave to File Supplemental Complaint, and granting Defendants such other relief as the Court deems just and proper.

Dated: June 20, 2024    Respectfully submitted,

**GREENBERG TRAURIG, P.A.**
401 East Las Olas Boulevard
Suite 2000
Fort Lauderdale, Florida 33301
Telephone: 954-765-0500
Telefax: 954-765-1477

By:   /s/ *Glenn E. Goldstein*

18

**Glenn E. Goldstein, Esquire**
Florida Bar No. 435260
Email: GoldsteinG@gtlaw.com
           geistc@gtlaw.com
           FLService@gtlaw.com
**Sabrina D. Niewialkouski**
Florida Bar No. 0123630
Email: Niewialkouskis@gtlaw.com
FLService@gtlaw.com

*Attorneys for Defendants United Wholesale Mortgage, LLC and Mathew Ishbia*

19

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of June, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

/s/ *Glenn E. Goldstein*
GLENN E. GOLDSTEIN

## SERVICE LIST
*The Okavage Group, LLC v. United Wholesale Mortgage, LLC and Mathew Ishbia*
Case No. 3:21-cv-00448
United States District Court, Middle District of Florida

*Counsel for Plaintiff*:

**PARRISH & GOODMAN, PLLC**
13031 McGregor Blvd., Suite 8
Fort Myers, Florida 33919
Phone: (813) 643-4529
Facsimile: (813) 315-6535
**ROBERT H. GOODMAN**
Florida Bar No.: 1008059
Primary: rgoodman@parrishgoodman.com
Secondary: admin@parrishgoodman.com
**JOSEPH E. PARRISH**
Florida Bar. No: 690058
Primary: jparrish@parrishgoodman.com
Secondary: admin@parrishgoodman.com