United States District Court
Middle District of Florida
Jacksonville Division

**THE OKAVAGE GROUP, LLC**
**ON BEHALF OF ITSELF AND**
**ALL OTHERS SIMILARLY SITUATED,**

    Plaintiff,

v.                                        No. 3:21-cv-448-WWB-LLL

**UNITED WHOLESALE MORTGAGE,**
**LLC AND MATHEW ISHBIA,**
**INDIVIDUALLY,**

    Defendants.

___

### Order Denying Motion for Leave to File
### Second Supplemental Complaint

Before the Court is The Okavage Group, LLC's Motion for Leave to File Second Supplemental Complaint, doc. 118; United Wholesale Mortgage, LLC (UWM) and Mathew Ishbia's Response to Plaintiff's Motion for Leave to File Second Supplemental Complaint, doc. 120, and plaintiff's reply brief in support of its motion, doc. 123.[1] This action was initiated against defendants in April 2021, doc. 1. Over the last three years, plaintiff has been given four separate opportunities to plead its case. Docs. 1, 32, 69, 96. Now, plaintiff seeks a fifth opportunity to amend its complaint, docs. 118, 118-1. For the reasons discussed below, plaintiff's motion is denied.

---

[1] The Court and the parties are familiar with the factual allegations underlying this action, so a summary of the factual background will not be provided here.

## Background

Plaintiff asserts that after briefing closed for the pending motion to dismiss and objection was made to the accompanying report and recommendation, doc. 112, a new study (the Hunterbrook study) was published that "involved an analysis of 25% of loans closed by UWM for which sufficient data was available[.]" Doc. 118-1 ¶ 110. Plaintiff believes that the Hunterbrook study[2] "directly address the rationale for the recommendation to dismiss" and "should lead to a different decision on dismissal." Doc. 118 at 2-3.

Plaintiff alleges that after UWM's ultimatum, consumers paid between $894 to $912 million more for UWM's loans than "average priced loans." *Id.* ¶ 110. Moreover, plaintiff argues, "the Hunterbrook study found that in 2020 (before the [u]ltimatum and boycott) UWM appeared to offer rates 4 basis points below comparable loans . . . . After the [u]ltimatum, UWM appeared to offer loans 3 basis points above comparable loans." *Id.* ¶ 111 (emphasis omitted). Plaintiff represents that there was also an increase in lender-specific closing costs throughout the wholesale market. *Id.* ¶ 112. Plaintiff also uses the Hunterbrook study to argue that the "boycott has had a substantial impact in diminishing choices available to consumers from so-called 'independent' mortgage brokers." *Id.* ¶ 113. In addition, plaintiff alleges that "UWM's dominance and market power have also been enhanced by the exit of many wholesale lenders from the

---

[2] Plaintiff does not attach a copy of the study to its motion; thus, the Court only considers the allegations in the proposed supplemental complaint. *See* docs. 118, 118-1.

market." *Id.* ¶ 114. Plaintiff points to Fairway's exit from the wholesale lending market in support of this claim. *Id.*

Plaintiff further argues that statements made by Mr. Ishbia in UWM's most recent earnings call are indicative of anticompetitive effects. *See id.* ¶¶ 115-16. During the earnings call, Mr. Ishbia allegedly said: "So, like I've said for years, I set the margins daily. So it's – we make the decision what the margins are going to be. We control those, and we always will control the margins in a positive way. So, we – so it's not market-driven. It's not – its UWM driven . . . ." *Id.* ¶ 116. Plaintiff urges the court to accept the supplementation because this is "new evidence" that could not have been obtained earlier through due diligence. Doc. 118 at 2.

Defendants oppose supplementation on two grounds: (1) "[p]laintiff has not satisfied its threshold burden of demonstrating good cause"; and (2) the supplementation would be futile and in bad faith "because it does not cure the deficiencies of [p]laintiff's antitrust claims[.]" Doc. 120 at 3-4.

Rule 15(d) allows a court, to "permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Fed. R. Civ. P. 15(d). The Eleventh Circuit has analyzed a Rule 15(d) motion to supplement under the Rule 15(a) standard. *See Nance v. Ricoh Elecs. Inc.*, 381 F. App'x 919, 923 (11th Cir. 2010).[3] Rule 15(a)(2) sets a

---

[3] The Court acknowledges and considers that "[u]npublished opinions are not controlling authority and are persuasive only insofar as their legal analysis warrants." *Bonilla v. Baker Concrete Constr., Inc.*, 487 F.3d 1340, 1345 n.7 (11th Cir. 2007) (citation omitted).

3

permissive standard for allowing amendment by stating "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). "[A] district court need not, however, allow an amendment (1) where there has been undue delay, bad faith, dilatory motive, or repeated failure to cure deficiencies by amendments previously allowed; (2) where allowing amendment would cause undue prejudice to the opposing party; or (3) where amendment would be futile." *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001). Amendment is futile "when the 'complaint as amended is still subject to dismissal.'" *Lawrence v. Bank of Am., N.A.*, 455 F. App'x 904, 907 (11th Cir. 2012) (quoting *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1320 (11th Cir. 1999)).

## Discussion

Guided by the factors above and my prior recommendations, the Court finds plaintiff's motion to supplement its complaint should be denied because amendment would be futile, and plaintiff has repeatedly failed to cure deficiencies by amendments previously allowed. Plaintiff, hoping for a fifth opportunity to properly plead its case, proposes insufficient supplementary material to prevent dismissal.[4] As noted in my second report and recommendation, doc. 112, plaintiff's complaint was insufficient because it failed to plead (1) a conspiracy existed; (2) UWM's market share was large enough to support a per se or rule of reason finding of anticompetitive effects; (3) that the Florida tort law claims can survive without the federal antitrust claims; and (4) that

---

[4] In its proposed "Second Supplemental Class Action Complaint," doc. 118-1, plaintiff requests to add 8 new paragraphs to its over 200 paragraph complaint in an effort to cure the Court's previously identified deficiencies.

this Court has personal jurisdiction over Mathew Ishbia. Doc. 112. Because accepting plaintiff's proposed supplement as true would not cure the third amended complaint's deficiencies, thereby warranting dismissal, I find amendment is futile.

I.  Sherman Act and Florida Antitrust Claims: Per Se and Unreasonable Restraint of Trade Violations (Counts A, I, III, IV, IX, X, XII, XIII) [5]

"Liability under § 1 of the Sherman Act, 15 U.S.C. § 1, requires a contract, combination . . . , or conspiracy, in restraint of trade or commerce." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 548 (2007) (internal quotations omitted). Moreover, "the Supreme Court has long concluded that Congress intended only to prohibit unreasonable restraints on trade." *Guzman v. Robinhood Mkts., Inc. (In re January 2021 Short Squeeze Trading Litig.)*, 105 F.4th 1346, 1354 (11th Cir. 2024) (quoting *Quality Auto Painting Ctr. Of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1260 (11th Cir. 2019)). Under *Guzman*, a plaintiff must plead "that defendants had (1) a conspiracy that (2) unreasonably restrained trade." *Id.* Analysis of Florida antitrust statutes mirrors analysis of the federal statute. *All Care Nursing Serv. v. High Tech Staffing Servs.*, 135 F.3d 740, 745 n.11 (11th Cir. 1998).

1.  Conspiracy

Plaintiff proceeds under the theory that the brokers' decisions to stop working with other lenders constitutes a per se illegal boycott. Doc. 118-1 ¶ 118. "For boycotting to be per se illegal, it must involve 'horizontal agreements among direct

---

[5] Plaintiff's first count in its seventeen-count proposed supplemental complaint is not numbered. Thus, I will call plaintiff's first count "Count A" and the rest will be referred to as they are labeled. Doc. 118-1.

competitors.'" *Quality Auto Painting Ctr.*, 917 F.3d at 1271 (quoting *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998)). The relevant and "crucial [ ] antecedent question is whether the alleged actions of the [companies] stem from independent action or from prior agreement." *Id.*

Concerted action between the mortgage brokers is an essential element to properly assert the presence of a conspiracy in this case. *Id.* In my prior report and recommendation, doc. 112, I found that there were insufficient facts to plausibly suggest a horizontal agreement between the brokers. Although the pleadings support an agreement between UWM and the brokers, expressions of enthusiasm regarding the ultimatum are insufficient to plausibly suggest concerted action between the brokers. *Id.* Plaintiff includes no additional allegations that would show the brokers ever agreed amongst themselves to boycott Rocket Mortgage or Fairway (the competing lenders). In fact, of its eight proposed amendments, plaintiff does not include a single allegation with reference to an agreement between the brokers.

Moreover, plaintiff's allegation fails because parallel action alone is not enough to constitute a conspiracy. *See Twombly*, 550 U.S. at 553-57. Here, there is no plus factor that would make it plausible (not just possible) that the brokers agreed to boycott Rocket Mortgage and Fairway. Therefore, even if all the proposed amendments are adopted, accepted as true, and construed in a light most favorable to the plaintiff, plaintiff cannot proceed on its theory of conspiracy. Because plaintiff does not address this deficiency in its proposed supplemental complaint, these counts remain deficient for lack of conspiracy, and amendment is futile with respect to them.

## 2. Unreasonable Restraint of Trade

Restraints of trade that are not per se unreasonable "are judged under the rule of reason." *Guzman*, 105 F.4th at 1355. The rule of reason requires courts to "ask whether the plaintiff has shown that the alleged restraint has had an anticompetitive effect on the market." *Id.* (quotation omitted). To show an anticompetitive effect on the market, a plaintiff may plead either direct or indirect evidence. *Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018). "Direct evidence of anticompetitive effects would be proof of actual detrimental effects, such as reduced output, increased prices, or decreased quality in the relevant market. Indirect evidence would be proof of market power plus some evidence that the challenged restraint harms competition." *Id.* (citations omitted).

### a. Direct Evidence of Anticompetitive Effects

To survive dismissal of a Sherman Act § 1 claim, plaintiff must plead facts showing direct, actual detrimental impact on competition within the relevant market. *Levine v. Cent. Fla. Med. Affiliates*, 72 F.3d 1538, 1551 (11th Cir. 1996). Plaintiff's operative complaint failed to meet the threshold to show direct evidence of anticompetitive effects. In its proposed supplement, plaintiff makes the following claims: (1) UWM borrowers paid more for their loans than the average borrower, (2) UWM charged higher rates than other lenders, (3) closing costs increased within the *wholesale* market, (4) brokers conducted more business with UWM, and (5) one competitor is no longer in the *wholesale* mortgage lending market. Doc. 118-1 ¶¶ 110-114 (emphasis added).

"Actual harm is indicated by a factual connection between the alleged harmful conduct and its impact on the competition in the market and the plaintiff claiming it should point to the specific damage done to consumers in the market." *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1339 (11th Cir. 2010) (internal citation omitted). In other words, plaintiff must assert (i) a connection between the challenged conduct and its alleged effects (ii) by pleading specific facts (iii) relating to impacts on consumers in the market. *See id.* While plaintiff's proposed supplement is more specific than its operative complaint, it is still insufficient to state a claim.

Plaintiff does not plead a sufficient connection between the alleged anticompetitive conduct and the harm it asserts. Although consumers may pay more for loans now than they did before the challenged conduct, neither plaintiff's supplement, nor its operative pleading, set forth specific facts showing a plausible connection between the challenged conduct and the price increase.

Moreover, "higher prices alone are not the 'epitome' of anticompetitive harm[.]" *Jacobs*, 626 F.3d at 1339. "Rather, consumer welfare, understood in the sense of allocative efficiency, is the animating concern of the Sherman Act." *Id.* Plaintiff asserts that lack of competition drove UWM consumers to pay more for UWM's services: however, based on the facts before the Court, it is equally likely that UWM's consumers chose to pay more for its services because its services were superior. Plaintiff does not plead facts indicating the price "was higher than the price one would expect to find in a competitive market." *Am. Express Co.*, 585 U.S. at 547-48. Given the equal likelihood, it cannot be said the pleadings push the allegation from merely

possible to plausible. Because plaintiff's proposed supplement does not remedy the deficiencies explained in my report and recommendation, doc. 112, amendment would be futile.

### b. Indirect Evidence of Anticompetitive Effects

Regardless of how market share is calculated, UWM does not possess a large enough share of the market to constitute indirect evidence of anticompetitive effects. In my report and recommendation, doc. 112, I found UWM's market share is 11% of the total mortgage lending market—at least 39% shy of the minimum requirement for monopoly power. *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1250 (11th Cir. 2002) ("A market share at or less than 50% is inadequate as a matter of law to constitute monopoly power."). Even assuming arguendo that plaintiff's definition of the relevant market as the wholesale lending market is correct, plaintiff alleges that UWM has approximately 34% of the wholesale market, which is least 16% shy of the threshold for monopoly power. Third Amended Complaint, doc. 96 at ¶ 27; *see also* doc. 112 at 33-34, 41-42; doc. 102 at 269 (discussing a market share as high as 38% of the wholesale market). Because plaintiff's proposed amendments fail to address the market share deficiencies, my findings remain the same.

## II. Sherman Act and Florida Antitrust Claims: Attempt to Monopolize (Counts II, V, XI, XIV)

Section two of the Sherman Act prohibits action taken to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States or with foreign

nations . . . ." 15 U.S.C. § 2. "As a legal matter, Sherman Act § 2 requires that the defendant either have monopoly power or a dangerous probability of achieving it[.]" *McWayne, Inc. v. FTC*, 783 F.3d 814, 830 (11th Cir. 2015) (internal quotation omitted). When a firm comes close to achieving monopoly power in the relevant market, it reaches the threshold required for showing a "dangerous probability" of achieving such power. *Gulf States Reorg. Grp., Inc. v. Nucor Corp.*, 721 F.3d 1281, 1285 (11th Cir. 2013). The typical measure of monopoly power is the firm's market share. *McWayne*, 783 F.3d at 830.

Here, plaintiff fails to assert that UWM has a dangerous probability of achieving monopoly power. As discussed above — and in my report and recommendation, doc. 112—UWM has insufficient market share to constitute monopoly power over the mortgage lending market. *See McWayne*, 783 F.3d at 830 (recognizing that a market share of more than 50% is necessary for a finding of monopoly power); *see also U.S. Anchor Mfg. v. Rule Indus.*, 7 F.3d 986, 1001 (11th Cir. 1993) (holding that because the defendant "possessed less than 50% of the market at the time the alleged predation began and throughout the time when it was alleged to have continued, there was no dangerous probability of success . . . as a matter of law"). Moreover, plaintiff continues to use the incorrect market definition. This Court has repeatedly defined the relevant market as the general mortgage lending market—not the much smaller wholesale mortgage lending market. Docs. 61, 112 at 41 ("[P]laintiff has not adequately established the relevant market as the wholesale mortgage market, and thus, fails to plead that defendants possessed enough market power in the overall mortgage market

to pose a danger of monopolization[.]"). Nevertheless, plaintiff continues to refer to the wholesale mortgage lending market in its analysis. *E.g.,* doc. 118-1 ¶114.

Additionally, the only new allegation plaintiff proposes to support its claim that UWM is close to achieving monopoly power is that one competitor (Fairway) no longer competes in the wholesale mortgage market. *Id.* This allegation is insufficient because "[d]amage to individual competitors is rarely sufficient to establish this element." *Duty Free Ams. v. Estee Lauder Cos.*, 797 F.3d 1248, 1263 (11th Cir. 2015). Additional facts must be presented to show how damage to that one competitor is likely to affect the broader market as a whole. *See id.* Because plaintiff does not provide additional facts plausibly suggesting imminent damage to the market, its complaint remains deficient even if the proposed supplement was permitted.

Plaintiff also fails to properly plead the intent element of its attempted monopolization claims. In addition to alleging a dangerous probability of achieving monopoly power, plaintiff must allege facts indicating UWM acted with "a specific intent to monopolize." *See Duty Free Ams.*, 797 F.3d at 1263. While plaintiff's proposed supplement states "UWM specifically sought to attain monopoly power[,]" doc. 118-1 ¶ 145, this allegation is conclusory and not entitled to a presumption of truth, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Plaintiff has been given four opportunities to address these deficiencies, however, plaintiff's complaint remains insufficient to state a claim even when considering its proposed supplementary allegations. Because the deficiencies outlined

above are fatal to plaintiffs claim, the proposed supplements are futile with respect to counts II, V, XI, and XIV.

### III. Tortious Interference with Business Contracts and Prospective Advantage (Counts VI, XV)

Although plaintiff does not specify, I construe its tortious interference claim as one brought under Florida law. To state a claim for tortious interference, a plaintiff must plead: "(1) the existence of a business relationship, not necessarily evidenced by an enforceable contract, under which the plaintiff has legal rights; (2) the defendant's knowledge of the relationship; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) the damage to the plaintiff as a result of that interference." *Palm Beach Cnty. Health Care Dist. v. Pro. Med. Educ., Inc.*, 13 So. 3d 1090, 1094 (Fla. 4th DCA 2009) (citation omitted). In my report and recommendation, doc. 112, I suggested dismissal of this claim because plaintiff did not allege concrete facts indicating it lost clients. I also noted that plaintiff's operative complaint failed to address the scienter element of tortious interference.

Even accepting the proposed allegations as true, these counts are still subject to dismissal. Plaintiff alleges no additional facts related to its tortious interference claim. Plaintiff fails to allege any facts suggesting defendants had knowledge of the existing business relationships. The only allegation plausibly consistent with this element is a conclusory statement not subject to a presumption of truth. Doc. 118-1 ¶ 151 ("UWM knew of these business relations and contracts between mortgage brokers in the wholesale lending market and their clients.").

Further, plaintiff fails to assert concrete damages. Plaintiff again attempts to establish damages through vague statements that fail to describe a single instance where it sustained specific harm. Instead, plaintiff merely describes how UWM's actions "interfered with these relationships and contracts[,]" doc. 118-1 ¶ 152, and that "[p]laintiff and class members were financially damaged by the loss of business and disruption of those relationships[,]" doc. 118-1 ¶ 153. These vague allegations do not warrant a presumption of truth. Because plaintiff proposes no additional allegations for this count, amendment as to counts VI and XV is futile.

### IV. Florida's Deceptive and Unfair Trade Practices Act (Counts VII, VIII, and XVI)

Florida's Deceptive and Unfair Trade Practices Act (FDUTPA), Fla. Stat. § 501.201, prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct with any trade or commerce[.]" Fla. Stat. § 501.204(1). Because I still find the federal antitrust violations as alleged are insufficient, I need not reach the question of whether the acts as alleged violated FDUTPA. *See Qqgi, Inc. v. IBM Global Fin.*, No. 11-CV-80880-RYSKAMP, 2012 U.S. Dist. LEXIS 202583, at *14 (S.D. Fla. Jul. 31, 2012) ("When a plaintiff's FDUTPA claim is based on the same allegations as its antitrust claim, failure to establish a violation of the antitrust law is sufficient to conclude that the plaintiff has also failed to state a FDUTPA claim."). For the same reason, I do not reach the question of whether plaintiff stated a claim for declaratory relief.

## V. Personal Jurisdiction (Mathew Ishbia)

Florida's "corporate shield" doctrine states "that acts performed by a person exclusively in his corporate capacity not in Florida, but *in a foreign* state may not form the predicate for the exercise of personal jurisdiction over the employee." *Kitroser v. Hurt*, 85 So. 3d 1084, 1088 (Fla. 2012) (emphasis in original). Nevertheless the "corporate shield doctrine is inapplicable where the corporate officer commits intentional torts." *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1355 (11th Cir. 2013). At the motion to dismiss stage, the pivotal question is whether the plaintiff has properly stated a claim for an intentional tort. *Lafreniere v. Craig-Myers*, 264 So. 3d 232, 239 (Fla. 1st DCA 2018).

As discussed above with respect to the tortious interference claim, the complaint fails to state a claim for an intentional tort under Florida law. Thus, a claim for personal jurisdiction over Mr. Ishbia necessarily fails with the insufficiency of the tortious interference claim. The proposed supplement does not include factual allegations plausibly suggesting that Mr. Ishbia acted outside his scope as a corporate officer in such a way that would subject him to the jurisdiction of this Court.

## Conclusion

After five attempts to plead its case over the last three years, plaintiff still has not alleged a sufficient factual basis to state a claim for any of its counts. For the reasons stated above, the proposed supplement will not cure the complaint's deficiencies and the complaint would still be subject to dismissal. Because allowing

amendment would prove futile, and plaintiff has repeatedly failed to cure deficiencies through its numerous previous amendments, plaintiff's motion is denied.

It is **ordered**:

Plaintiff's Motion for Leave to File Second Supplemental Complaint, doc. 118, is **denied**.

**Ordered** in Jacksonville, Florida, on September 18, 2024.

LAURA LOTHMAN LAMBERT
United States Magistrate Judge

c:
Joseph E. Parrish, Esquire
Megan E. Shaw, Esquire
Robert Henry Goodman, Esquire
Avi Benayoun, Esquire
Glenn E. Goldstein, Esquire