UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

THE OKAVAGE GROUP, LLC
on behalf of itself and all others
similarly situated,

      Plaintiff,                         Case No. 3:21-cv-448-WWW-LLL

v.                                       Hon. Wendy W. Berger

UNITED WHOLESALE MORTGAGE,    Magistrate Judge Laura Lothman Lambert
LLC and MATTHEW ISHBIA,
individually

      Defendants.

**<u>PLAINTIFFS' OBJECTIONS TO MAGISTRATE'S ORDER DENYING LEAVE TO FILE SECOND SUPPLEMENTAL COMPLAINT</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................................ii

I.      INTRODUCTION .................................................................................. 1

II.     STANDARD OF REVIEW..................................................................... 4

III.    SUMMARY OF SUPPLEMENTAL ALLEGATIONS............................... 6

IV.     THE ORDER DENYING LEAVE IS CLEARLY ERRONEOUS AND
        CONTRARY TO LAW.......................................................................... 7

        A.      The Magistrate Judge Imposed a Heightened Pleading Standard............ 7

        B.      The Order Denying Leave Ignored Critical New Allegations and
                Evidence ..................................................................................... 10

                1.      The Brokers' Actions Against Self-Interest.................................... 10

                2.      Fairway's Exit From the Wholesale Market ................................... 12

                3.      Reduction in Consumer Choice.................................................... 13

                4.      UWM's Dominant Market Power .................................................. 13

        C.      The Magistrate Judge Ignored Allegations Supporting the Relevant
                Market Analysis and Misapplied the Law .................................. 15

                1.      The New Allegations Plausibly Allege a Wholesale Market ......... 15

                2.      A Relevant Market Need Not Be Proven or Alleged Here ............. 17

        D.      There Was No Unreasonable Delay and Supplementation Would
                Not Cause Prejudice to Defendants........................................... 19

V.      CONCLUSION.................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

Cases

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..................................................................................... 7

*Bell Atlantic v. Twombly*,
550 U.S. 544 (2007).................................................................................. 7, 8

*Brown Shoe Co. v. U.S.*,
370 U.S. 294 (1926).................................................................................. 16

*DeCurtis LLC v. Carnival Corp.*,
2021 WL 7539904 (S.D. Fla. Feb. 9, 2021) ........................................... 17

*DeLong Equip. Co. v. Washington Mills Abrasive Co.*,
887 F.2d 1499 (11th Cir. 1989)................................................................. 8

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992)................................................................................. 10

*F.T.C. v. Indiana Fed'n of Dentists*,
476 U.S. 447 (1986)............................................................................ 13, 18

*Federal Trade Comm'n v. Staples, Inc.*,
970 F. Supp. 1066 (D.D.C. 1997) ........................................................... 16

*Fortner Enters., Inc. v. United States Steel Corp.*,
394 U.S. 495 (1969)............................................................................ 14, 15

*FTC v. Whole Foods Market, Inc.*,
548 F.3d 1028 (D.C. Cir. 2008)............................................................... 16

*Gen. Chems., Inc. v. Exxon Chem. Co., USA*,
625 F.2d 1231 (5th Cir. 1980).................................................................. 8

*Harris v. Garner*,
216 F.3d 970 (11th Cir. 2000)................................................................... 5

*Henderson v. Stewart*,
82 F.3d 415 (5th Cir. 1996)....................................................................... 5

*Keith v. Volpe*,
858 F.2d 467 (9th Cir. 1988)..................................................................... 5

*La Salvia v. United Dairymen of Ariz.*,
　804 F.2d 1113 (9th Cir. 1986) ................................................................. 19

*Lussier v. Dugger*,
　904 F.2d 661 (11th Cir. 1990) ........................................................... 5, 15

*Manning v. City of Auburn*,
　953 F.2d 1355 (11th Cir. 1992) ............................................................... 5

*McWane, Inc. v. FTC*,
　783 F.3d 814 (11th Cir. 2015) ............................................................... 14

*Merck-Medco Managed Care, LLC v. Rite Aid Corp.*,
　201 F.3d 436, 1999 WL 691840 (4th Cir. 1999) .................................... 10

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
　465 U.S. 752 (1984) ................................................................................ 7

*New Amsterdam Cas. Co. v. Waller*,
　323 F.2d 20 (4th Cir. 1963) .................................................................... 5

*Nw. Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*,
　472 U.S. 284 (1985) ...................................................................... 3, 12, 13

*Ohio v. Am. Express Co.*,
　585 U.S. 529 (2018) ................................................................................ 8

*In the Matter of ProMedica Health Sys., Inc.*,
　2012-1 .................................................................................................. 19

*R.E.B., Inc. v. Ralston Purina Co.*,
　525 F.2d 749 (10th Cir. 1975) ............................................................... 19

*Realcomp II, Ltd. v. Federal Trade Commission*,
　635 F.3d 815 (6th Cir. 2011) ........................................................... 13, 18

*Servicetrends, Inc. v. Siemens Medical Systems, Inc.*,
　870 F. Supp. 1042 (N.D. Ga. 1994) ....................................................... 14

*Silver v. New York Stock Exch.*,
　373 U.S. 341 (1963) ......................................................................... 3, 12

*Smith v. Healthcare Authority for Baptist Health*,
　2022 WL 857036 (M.D. Ala. Mar. 22, 2022) ......................................... 10

*State Oil Co. v. Khan*,
　522 U.S. 3 (1997) .................................................................................... 9

57596220.4

*State Teachers Ret. Bd. v. Fluor Corp.*,
    654 F.2d 843 (2d Cir.1981) ...................................................................... 19

*In re Terazosin Hydrochloride*,
    220 F.R.D. 672 (S.D. Fla. 2004) ......................................................... 14, 15

*In re Text Messaging Antitrust Litig.*,
    630 F.3d 622 (7th Cir. 2010) .................................................................... 7

Trade Cases P 77840,
    2012 WL 1155392 (F.T.C. Mar. 28, 2012) ............................................ 19

*United States v. Dentsply Int'l, Inc.*,
    399 F.3d 181 (3d Cir. 2005) .................................................................... 13

*United States v. E.I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956) ................................................................................ 14

*United States v. H&R Block, Inc.*,
    833 F. Supp. 2d 36 (D.D.C. 2011) .......................................................... 16

*West Alabama Women's Ctr. v. Miller*,
    318 F.R.D. 143 (M.D. Ala. 2016) ......................................................... 5, 6

**STATUTES**

28 U.S.C. § 636(b)(1)(C) ................................................................................. 4

Areeda & Hovenkamp, *Antitrust Law* ¶531a ................................................ 19

**OTHER AUTHORITIES**

Fed. R. Civ. P. 72(a) ......................................................................................... 4

Federal Rule of Civil Procedure 15(a) ............................................................. 5

Federal Rule of Civil Procedure 15(d) .......................................................... 4, 5

*The Lie that Helped Make UWM America's Largest Mortgage Lender*,
    HUNTERBROOK MEDIA (Apr. 2, 2024), https://hntrbrk.com/uwm/ .................. 1

iv

## I.     __INTRODUCTION__

Plaintiff The Okavage Group, LLC ("Okavage") moved for leave to file a Second Supplemental Class Action Complaint ("Second Supplemental Complaint") in this case. (Doc. 119.) The proposed Second Supplemental Complaint alleges a number of material facts, most of which arose only after the Magistrate Judge's February 6, 2024 Report and Recommendation on Defendants United Wholesale Mortgage ("UWM") and Mat Ishbia's Motion to Dismiss the Supplemental Class Action Complaint ("Report"). (Doc. 112). The new allegations directly address numerous issues central to the Report, which the Court adopted in its September 23, 2024 Order Dismissing the Supplemental Class Action Complaint without prejudice ("Order of Dismissal"). (Doc. 125). Nevertheless, the Magistrate Judge denied the motion for leave to supplement ("Order Denying Leave"), concluding that it was futile. (Doc. 125.) However, as discussed below, the Order Denying Leave imposes a heightened pleading standard, improperly weighs "equally likely" competing inferences, ignores critical allegations, and misapplies the law. For these reasons, and those discussed below, the Court should reject the Order Denying Leave and permit Okavage to file the proposed Second Supplemental Complaint.

*First*, a recent market analysis conducted by Hunterbrook Media disclosed on April 2, 2024 has uncovered substantial anticompetitive effects caused by UWM's Ultimatum and the resulting boycott.[1] *Second*, one of the two targets of UWM's boycott, Fairway Independent Mortgage Corporation ("Fairway"), has shut down all wholesale mortgage operations, and has thereby exited the wholesale market. *Third*, Defendant Mat Ishbia

---

[1] *The Lie that Helped Make UWM America's Largest Mortgage Lender*, HUNTERBROOK MEDIA (Apr. 2, 2024), https://hntrbrk.com/uwm/.

has made public statements that plausibly establish UWM's market power and dominance.

In particular, the Hunterbrook analysis has revealed that prices increased, and choice was significantly curtailed, after the Ultimatum and boycott began, and that UWM's prices are substantially higher than those of its wholesale competitors. These facts directly address the Report's conclusion that Plaintiff failed to adequately allege harm to competition. Yet, the Order Denying Leave did not address these allegations, and instead improperly substituted its own "equally likely" interpretation that customers may have been willing to pay more for UWM's services because they are superior. But this possible inference is directly contradicted by the allegations of the operative complaint, which alleges that Rocket and Fairway provided superior mortgage options and were increasingly preferred by brokers before the Ultimatum and boycott. Regardless, it is improper for the Court to weigh competing inferences at the pleading stage.

The proposed Second Supplemental Complaint also includes evidence cited in the Hunterbrook analysis, which shows that the number of brokers sending 99% or more of their mortgages to UWM has doubled (to more than 8,000) since the Ultimatum. This finding addresses both the Report's conclusion on competitive effects and its conclusion that Okavage did not allege specific evidence of actions against the boycotters' self-interest. This is a key "plus factor" in addressing the "horizontal agreement" element of Okavage's *per se* claim. Since both the Supplemental Class Action Complaint (Doc. 96) ("Supplemental Complaint") and the proposed Second Supplemental Complaint specifically allege that brokers have an interest in utilizing multiple lending options for their customers, the fact that many more brokers now utilize only UWM shows that they

2

have acted against their interests as a result of the Ultimatum and boycott. However, the Order Denying Leave does not address these new allegations at all, concluding without explanation that there are "no plus factors" present.

Fairway's exit is directly relevant to both the issue of competitive effects as well as whether the impact of the boycott was sufficient to justify *per se* illegality. The exit is evidence that the boycott did "cut off access to a supply, facility or market necessary to enable [Fairway] to compete . . ." *Nw. Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 294 (1985). *See also Silver v. New York Stock Exch.*, 373 U.S. 341, 348 (1963), cited by the *Nw. Stationers* court with regard to the "essentiality" requirements (without the denied services a competitor would be "hampered substantially in [their] crucial endeavor," and the services provided "important business advantages[.]"). It also directly addresses the statement in the Report that the continued participation of Fairway and Rocket in the wholesale market indicates the absence of anticompetitive effects. (*See* Doc. 112 at PageID.1795.) However, the Order Denying Leave does not address these new allegations in the context of Okavage's Section 1 claims, concluding instead that they are insufficient to demonstrate monopoly power under Section 2—an issue that was not raised in Okavage's motion.

Mr. Ishbia's new statements relating to UWM's—not the market's—control over margins, are directly probative of UWM's market power and are significantly more specific than Mr. Ishbia's previous statements that the Report found to be "vague." (Doc. 112 at PageID.1800.) In UWM's earnings call, Mr. Ishbia explicitly stated that UWM can "set the margins daily," and that UWM's margins are "not market-driven." Instead, he said, margins in "the market" are "completely tied to what UWM does, and others will follow."

These statements indicate that not only does UWM have control over its margins and therefore its price on a daily basis, but that margins in the market are controlled by UWM as well. This is the definition of dominant market power. This evidence should lead to a change in the conclusions of the Report and Order of Dismissal regarding market dominance.

Permitting Okavage to file the proposed Second Supplemental Complaint to include these new facts would permit the Court to address the validity of Plaintiff's claims based on all the available evidence, and, Plaintiff believes, materially alter the findings and conclusions of the Report and Order of Dismissal. Okavage should be granted the opportunity to pursue its claims where this new evidence makes clear that they are at least plausible. Because discovery has not yet commenced, permitting the proposed Second Supplemental Complaint would not delay this case or prejudice Defendants.

## II.   STANDARD OF REVIEW

When a magistrate judge issues an order on a non-dispositive, pretrial matter, "[a] party may serve and file objections to the order within 14 days after being served with a copy." Fed. R. Civ. P. 72(a). When objections are timely filed, the district court "must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law." *Id.* The district court reviews a magistrate's order *de novo*, and may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

Under Federal Rule of Civil Procedure 15(d), the court may "permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened

after the date of the pleading to be supplemented." Fed. R. Civ. P. 15(d).[2] The 11th Circuit has explained that "[a] supplemental pleading is an appropriate vehicle by which to set forth new facts in order to update the earlier pleading." *Lussier v. Dugger*, 904 F.2d 661, 670 (11th Cir. 1990) (citation and quotations omitted).

"[A]n application for leave to file a supplemental pleading is addressed to the discretion of the court and should be freely granted when doing so will promote the economic and speedy disposition of the entire controversy between the parties." *Henderson v. Stewart*, 82 F.3d 415 (5th Cir. 1996); *see also Harris v. Garner*, 216 F.3d 970, 984 (11th Cir. 2000) (noting "the liberal allowance of amendments or supplements to . . . pleading under Rule 15"). Indeed, courts have long held that supplemental pleadings are "[s]o useful [and] of such service in the efficient administration of justice that they ought to be allowed as of course, unless some particular reason for disallowing them appears . . . ." *New Amsterdam Cas. Co. v. Waller*, 323 F.2d 20, 28–29 (4th Cir. 1963); *Keith v. Volpe*, 858 F.2d 467, 473 (9th Cir. 1988); *West Alabama Women's Ctr. v. Miller*, 318 F.R.D. 143, 148 (M.D. Ala. 2016).

In addressing the appropriateness of a supplemental complaint, courts typically apply (where relevant) many of the same fairness factors considered on a motion to amend the pleadings under Rule 15(a), such as "Would the supplementation be futile? Would a nonmovant be prejudiced? Has there been unreasonable delay in presenting the supplementation? And would the supplementation facilitate the efficient resolution of

---

[2] In contrast, "an amendment to the pleadings pursuant to Federal Rule of Civil Procedure 15(a) encompasses facts or legal claims in existence at the time the original pleading was filed." *Manning v. City of Auburn*, 953 F.2d 1355, 1360 n.8 (11th Cir. 1992) (citing 6A C. Wright, A. Miller, & M.K. Kane, *Federal Practice & Procedure* § 1504, at 184 (1990)).

current claims as well as any new ones?" *Miller*, 318 F.R.D. at 147–48 (quoting *U.S. ex rel. Gadbois v. PharMerica Corp.*, 809 F.3d 1, 7 (1st Cir. 2015)). As described below, these factors argue in favor of supplementation in this case.

## III.   SUMMARY OF SUPPLEMENTAL ALLEGATIONS

The proposed Second Supplemental Complaint adds critical allegations relating to each issue addressed in the Report. These include the findings and analysis from the Hunterbrook study, statements by UWM's CEO, Mat Ishbia, during a November 2023 UWM earnings call, and news of Fairway's recent exit from the wholesale market:

1.  The Hunterbrook study demonstrated that the prices charged by UWM became substantially greater than alternative prices available in the wholesale market after the Ultimatum and boycott. The study by Hunterbrook Media, *The Lie That Helped Make UWM America's Largest Mortgage Lender*, involved an analysis of 25% of loans closed by UWM for which sufficient data was available, and estimated (after controlling for numerous variables) that since 2020 consumers paid $894 million more as compared to the average priced loan. When compared to the cheapest option, the Hunterbrook study found that consumers paid $912 million more for UWM loans. The study controlled for interest rates, month of closing, loan term, dwelling category, loan program, fixed versus adjustable rate, property type and loan type. Proposed Second Supplemental Complaint at ¶110.

2.  The Hunterbrook study found that in 2020 (before the Ultimatum and boycott) UWM appeared to offer rates 4 basis points below comparable loans. However, in 2021 and 2022, this pattern reversed. After the Ultimatum, UWM appeared to offer loans 3 basis points *above* comparable loans. UWM rates were one basis point higher than the rates of comparable loans in 2023. *Id.* at ¶111.

3.  The Hunterbrook findings are further evidence that the boycott has also caused costs to increase in the market as a whole. The study found that lender-specific closing costs in the wholesale market increased from 0.549% in 2021 to 1.223% in 2023. *Id.* at ¶112. The Ultimatum and boycott commenced on March 4, 2021. *Id.* at ¶36.

4.  Additional findings from the Hunterbrook study establish that the boycott has had a substantial impact in diminishing the choices available to consumers from so-called "independent" mortgage brokers. The study found that in 2023 more than twice as many loan officers sent greater than

99% of their loans to UWM as compared to 2020, before the boycott occurred. The number of brokers sending more than 75% of loans to UWM also doubled. *Id.* at ¶113.

5.    On February 2, 2024, Fairway announced that it was ceasing the sale of mortgages in the wholesale market. *Id.* at ¶114.

6.    Mr. Ishbia's recent statement that he can "set the margins daily," and that they are "not market-driven." Instead, margins "in the market" within broad ranges are "completely tied to what UWM does, and others will follow." *Id.* at ¶¶115-116.

## IV.    THE ORDER DENYING LEAVE IS CLEARLY ERRONEOUS AND CONTRARY TO LAW

### A.    The Magistrate Judge Imposed a Heightened Pleading Standard

The Supreme Court explained in *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007) that a conspiracy claim must allege "only enough facts to state a claim to relief that is plausible on its face." "Factual allegations must be enough to raise a right to relief above the speculative level." The test is whether there is a "reasonable expectation that discovery will reveal evidence of the illegal agreement..." *Id.* at 555-57. "The plausibility standard is not akin to a *probability* requirement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added) (citing *Twombly*, 550 U.S. at 556). The "choice between two reasonable interpretations" of documents and testimony is for the jury. *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984).

The requirement that a complaint need only plausibly (not probably) indicate a conspiracy is especially appropriate in antitrust conspiracy cases, where the proof is largely in the hands of the alleged conspirators. *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628–29 (7th Cir. 2010) (at the complaint stage, "plaintiffs have conducted no discovery" which "may reveal the smoking gun"). As this Court has explained, "[e]ven a successful antitrust plaintiff will seldom be able to offer a direct evidence of a conspiracy

and such evidence is not a requirement." *Gen. Chems., Inc. v. Exxon Chem. Co., USA,* 625 F.2d 1231, 1233 (5th Cir. 1980). As a result, "[c]onspiracies … must almost always be proven by inferences that may fairly be drawn from the behavior of the alleged conspirators." *DeLong Equip. Co. v. Washington Mills Abrasive Co.,* 887 F.2d 1499, 1515 (11th Cir. 1989). At the pleading stage, to be plausible a complaint must only provide "*some* factual context suggesting [that the parties reached an] agreement." *Twombly,* 550 U.S. at 549 (emphasis added).

The new facts provide substantial additional support for Okavage's allegations of anticompetitive effects. The Report and Order of Dismissal reject Okavage's rule of reason claim based on the conclusion that the Supplemental Complaint contained insufficient factual support for its allegations of anticompetitive effects.

The proposed Second Supplemental Complaint's allegations regarding higher prices at UWM than at other firms and increasing costs since the Ultimatum and boycott provide substantial additional factual allegations that directly address the Report's conclusion that there were no allegations that the conspiracy had "increased the costs of mortgage loans." (ECF No. 112 at PageID.1794.)

Direct harm to competition can be proven by evidence of factors "such as reduced output, increased prices, or decreased quality in the relevant market . . ." *Ohio v. Am. Express Co.,* 585 U.S. 529, 542 (2018). The new allegations plausibly suggest that consumers paid higher prices after (and therefore plausibly due to) the Ultimatum and boycott, and that the greater number of consumers who utilized UWM as a result of the Ultimatum and boycott paid the higher prices UWM charges as compared to its

competitors. They thus were found to pay higher prices. (*See* proposed Second Supplemental Complaint at ¶¶105-107, Doc. 118-1 at PageID1908.)

The Order Denying Leave acknowledges that "consumers may pay more for loans now that they did before the challenged conduct." (Doc. 124 at PageID.1992.) Courts regularly determine antitrust injury by comparing the state of the market before and after the alleged antitrust violations occurred. *See, e.g.*, *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997) (courts in antitrust cases take into account numerous factors, "including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect."). The fact that prices rose dramatically only after the Ultimatum at least **plausibly** demonstrates that the Ultimatum and resulting boycott permitted UWM to raise prices to anticompetitive levels. Yet the Order Denying Leave does not consider this plausible inference.

Instead, the Order Denying Leave substitutes its own inferences, asserting that "it is equally likely that UWM's consumers chose to pay more for its services because its services were superior." (Doc.124 at PageID.1992.) But this inference, which the Magistrate Judge found to be "equally likely," is directly contradicted by the allegations of the operative complaint. As Okavage alleged in the Supplemental Complaint, prior to the Ultimatum, brokers were moving **away** from UWM and toward Rocket and Fairway. (Doc. 96 at PageID.1263.) "The boycott was a dramatic change in behavior by the boycotting brokers, who until that time had been utilizing Rocket Pro TPO and Fairway in increasing numbers because of their strong reputation, good prices and high quality service." (*Id.*) And there is nothing in the Supplemental Complaint to suggest that after the Ultimatum, UWM's **quality** suddenly improved.

9

More fundamentally, however, at the pleading stage, the existence of other possible—or even plausible—inferences does not render the new allegations implausible. *Smith v. Healthcare Authority for Baptist Health*, 2022 WL 857036, at *3 (M.D. Ala. Mar. 22, 2022) (collecting cases) ("[I]t is not for the court to weigh competing, plausible inferences at the motion-to-dismiss stage."). Indeed, even at the summary judgment stage, a plaintiff's evidence "is to be believed, and all justifiable inferences are to be drawn in their favor." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992) (brackets omitted).

The Order Denying Leave imposes a heightened pleading standard, permitting Okavage's claims to go forward only if they are ***more plausible*** than other "equally likely" explanations. In doing so, the Magistrate Judge clearly erred and the Order Denying Leave should be rejected.

**B.**     **The Order Denying Leave Ignored Critical New Allegations and Evidence**

**1.**     **The Brokers' Actions Against Self-Interest**

The Report concluded that the Supplemental Complaint failed to plausibly allege a horizontal agreement among the 93% of brokers who agreed to UWM's Ultimatum. (Doc. 112 at PageID.1779.) In support of this conclusion, the Report dismissed as "conclusory" allegations that the boycotting brokers were acting against their individual interests (*id.* at PageID.1782), which is the strongest "plus factor" supporting an inference of conspiracy. *See Merck-Medco Managed Care, LLC v. Rite Aid Corp.*, 201 F.3d 436, 1999 WL 691840, at *10 (4th Cir. 1999) ("Evidence of acts contrary to an alleged conspirator's economic interest is perhaps the strongest plus factor indicative of a conspiracy.").

10

Respectfully, Okavage believes that the Supplemental Complaint already plausibly suggested that brokers acted against their interests (Doc. 116 at PageID.1854) (brokers shifted to UWM after the Ultimatum despite their prior decision to move more business to Rocket). However, the proposed Second Supplemental Complaint provides important new evidence on this issue. It cites the Hunterbrook study finding that the conspiracy doubled the number of brokers sending more than 99% of their loans to UWM. This was against the broker's clear interest as "independent" brokers to offer multiple options to consumers, as explained in both the Supplemental Complaint and proposed Second Supplemental Complaint. (*See* proposed Second Supplemental Complaint at ¶20, Doc. 118-1 at PageID1883 ("The broker's value rests in his or her sophistication and knowledge of mortgage options that various wholesale lenders offer."); ¶21 ("As UWM stated in its most recent annual report, 'Independent Mortgage Brokers are able to provide borrowers with multiple options on product structure and pricing rather than being rooted in a single platform offering, which we believe empowers borrowers and enhances their borrowing experience.'"); ¶111 ("AIME further states on its website that mortgage brokers 'work for the borrower, not the bank. Independent mortgage brokers have flexibility to shop rates from multiple lenders[.]'").)

The Order Denying Leave does not address these new allegations, concluding without explanation that "there is no plus factor" present, and that none of the new allegations reference "an agreement between the brokers." (Doc. 124 at PageID.1990.) But as discussed above, direct evidence of agreement is not necessary when critical plus factors like actions against interest are alleged. The new allegations offer specific, quantitative evidence that despite broker's clear interest in maintaining independence

57596220.4

(and for doing business with Rocket and Fairway in particular), they suddenly shifted virtually all of their business to UWM after the Ultimatum and resulting boycott. The higher costs, loss of independence, and reduction of consumer choice offer clear evidence that the brokers were acting against their own self-interest. Thus, it was error for the Magistrate Judge to ignore this new evidence and to conclude that the proposed Second Supplemental Complaint alleges nothing beyond "parallel action alone."

### 2.   <u>Fairway's Exit From the Wholesale Market</u>

The Report concluded that it is "not facially apparent, nor characteristically likely, that the anticompetitive conduct alleged here cut off consumer or broker access to the wholesale mortgage market." (Doc. 112 at PageID.1984.) The fact that Fairway has been driven from the wholesale market more than plausibly suggests that UWM's Ultimatum cut Fairway off from a supply or facility necessary to allow it to compete, i.e. sufficient access to independent mortgage brokers, and was at the very least "hampered substantially" in its endeavors. *Nw. Stationers*, *supra*, at 294. *Silver, supra* at 348.

In addressing the rule-of-reason claim, the Report also concluded that the Supplemental Complaint contained no allegations "that Rocket and Fairway . . . no longer participate in the wholesale mortgage market," (Doc. 112 at PageID.1795) which would plainly show anticompetitive effects in the market. The proposed Second Supplemental Complaint specifically alleges that Fairway has exited the wholesale mortgage market.

The Order Denying Leave does not address this new evidence in the context of Okavage's allegations of anticompetitive effects. (*See* Doc. 124 at PageID.1991-93.) Instead, it couches Fairway's exit as insufficient evidence supporting Okavage's monopolization claim, finding that the elimination of "one competitor" does not demonstrate dangerous probability of achieving monopoly power. (*Id.* at PageID.1994.)

But Okavage did not argue in its motion for leave to file the Second Supplemental Complaint that Fairway's exit demonstrates monopoly power. In fact, the motion does not address Fairway's exit in the context of Okavage's monopolization claim at all. Instead, it is directly relevant to both the issue of competitive effects as well as whether the impact of the boycott was sufficient to justify *per se* illegality. *Nw. Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 294 (1985).

The Magistrate Judge's failure to address this new allegation as it relates to Okavage's Section 1 claims is clearly erroneous and contrary to law.

### 3.    Reduction in Consumer Choice

The new allegations regarding the number of brokers sending 99% or more of their business to UWM provide evidence of a substantial reduction in customer choice as a result of the Ultimatum. *See United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191-94 (3d Cir. 2005) (consumers derived a substantial benefit from free choices by dealers, "which as a class traditionally carr[y] the products of multiple vendors"); *F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 459 (1986) (stating that "an agreement limiting consumer choice by impeding the 'ordinary give and take of the market place,' cannot be sustained under the Rule of Reason" (citation omitted)); *Realcomp II, Ltd. v. Federal Trade Commission*, 635 F.3d 815, 829-30 (6th Cir. 2011) (Realcomp's policies were unlawful because they "narrow[ed] consumer choice" and "hinder[ed] the competitive process.").

Again, the Order Denying Leave does not acknowledge or address these material allegations in any way. (*See generally* Doc. 124.)

### 4.    UWM's Dominant Market Power

The new factual allegations in the proposed Second Supplemental Complaint also directly address the Report's conclusion that the Supplemental Complaint "fails to

plausibly allege UWM possessed the dominant position in the marketplace at the time of the ultimatum or after 93% of its mortgage brokers signed the addendum." (Doc. 112 at PageID.1785.) The Report relied upon a market share figure. However, proof of monopoly power or market power does not require proof of market share, which is only a "convenient proxy" for a direct analysis of monopoly power. "Monopoly power is the ability 'to control prices or exclude competition.'" *Servicetrends, Inc. v. Siemens Medical Systems, Inc*., 870 F. Supp. 1042, 1052 n.4 (N.D. Ga. 1994); *McWane, Inc. v. FTC*, 783 F.3d 814, 830 (11th Cir. 2015) (citation omitted).

The Supreme Court has held that market power arises where the defendant "has the power to raise prices, or impose other burdensome terms . . . with respect to any appreciable number of buyers[.]" *Fortner Enters., Inc. v. United States Steel Corp*., 394 U.S. 495, 503-4 (1969); *see also In re Terazosin Hydrochloride*, 220 F.R.D. 672, 696 (S.D. Fla. 2004).

Mr. Ishbia's new statements plausibly indicate that UWM is able to control price; he said so in so many words. As alleged in the proposed Second Supplemental Complaint, Mr. Ishbia recently stated that UWM's margins are "not market-driven," but are set by UWM "on a daily basis . . . and others will follow." (See proposed Second Supplemental Complaint at ¶114, Doc. 118-1 at PageID.1910.) In fact, Mr. Ishbia boasts that the market's margins are "completely tied to what UWM does." (*Id.*) This is certainly indicative of dominant market power. *United States v. E.I. du Pont de Nemours & Co*., 351 U.S. 377, 392 (1956) ("It is inconceivable that price could be controlled without power over competition or vice versa.").

14

The Report disregarded Mr. Ishbia's prior statements quoted in the Supplemental Complaint as "vague." (ECF No.112 at PageID.1880.) The new statements by Mr. Ishbia are far more specific. He indicated not only that UWM controls margins but that it "set[s] the margins daily." He specifically stated that UWM does not follow the market, but instead the market follows UWM (market margins are "completely tied to what UWM does, and others will follow."). That is a clear and specific statement that UWM, not market competition, sets prices. That is direct evidence of control over price.[3] The Hunterbrook analyses finding that UWM had high and increasing prices and Mr. Ishbia's statement meets the standard in *Fortner* and *Terazosin*.

Again, the Order Denying Leave fails to address Mr. Ishbia's new statements regarding UWM's dominant market power. (See generally Doc. 124.) For all these reasons, although the Court has dismissed the Supplemental Complaint without prejudice, the proposed Second Supplemental Complaint provides critical additional support for the adequacy of Okavage's claims. Permitting Okavage to timely "set forth new facts in order to update the earlier pleading" will thus promote the most efficient disposition of this case on the merits. *Lussier*, 904 F.2d at 670.

### C.   The Magistrate Judge Ignored Allegations Supporting the Relevant Market Analysis and Misapplied the Law

#### 1.   The New Allegations Plausibly Allege a Wholesale Market

The allegations concerning UWM's market power and pricing are also probative of the existence of a wholesale market. If UWM is able to increase prices and control its

---

[3] These conclusions also resolve the issues raised with regard to Okavage's attempted monopolization claim (which was rejected because of a failure to allege sufficient market power) and its state law claims under the UDTPA (which were dismissed based on the Report's conclusions regarding the antitrust claims).

margins, (*see* proposed Second Supplemental Complaint ¶¶110-112, 115, Doc. 118-1 at PageID.1909-10), that means that competition from retail lenders is not sufficient to keep it from doing so. That plausibly indicates that retail lenders' products are not reasonably interchangeable with wholesale products.

A number of cases have recognized that the ability of firms to raise prices successfully is evidence that those firms are in a separate market or submarket, beginning with Supreme Court's reference to "distinct prices" in *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325 (1926). In *Federal Trade Comm'n v. Staples, Inc.*, 970 F. Supp. 1066 (D.D.C. 1997), the court found an "office superstores" submarket because Staples was able to charge higher prices when it faced no competition from other office superstores, notwithstanding the fact that it faced competition from other stores selling office supplies. The court concluded that "even where Staples and Office Depot charge higher prices, certain consumers do not go elsewhere for their supplies… this indicates a low cross-elasticity of demand between the consumable office supplies sold by superstores and those sold by other sellers." *Id.* at 1078. *See also FTC v. Whole Foods Market, Inc.*, 548 F.3d 1028, 1039-1040 (D.C. Cir. 2008); *United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 55 (D.D.C. 2011) (the "key question" was whether the products "are sufficiently close substitutes to constrain any anticompetitive … pricing."). The same analysis applies here. The Hunterbrook studies coupled with Mr. Ishbia's new statements plausibly indicate that UWM's dominance in the wholesale market allows it to control margins, charge higher prices than other alternatives, and to increase prices after the Ultimatum. UWM could not do so if its pricing was constrained by retailer lenders.

16

Again, the Order Denying Leave does not address these new allegations and their impact on the relevant market analysis, stating only in conclusory fashion that Okavage "continues to use the incorrect market definition," and citing the Magistrate Judge's prior reports and recommendations. (Doc. 124 at PageID.1994.) The failure of the Magistrate Judge to consider these new allegations is clear error and yet another reason the Order Denying Leave should be rejected.

### 2.    A Relevant Market Need Not Be Proven or Alleged Here

The foregoing new allegations regarding competitive effects and market power also mean that it is unnecessary to allege a relevant market here. That is true because these new allegations plausibly indicate the presence of market power directly, which eliminates the need to address market share or define the bounds of a market from which a share is calculated. "[A]n antitrust plaintiff is not required to rely on indirect evidence of a defendant's monopoly power, such as high market share within a defined market, when there is direct evidence that the defendant has actually set prices or excluded competition." *DeCurtis LLC v. Carnival Corp.*, 2021 WL 7539904, at *23 (S.D. Fla. Feb. 9, 2021) (quoting *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1018 (6th Cir. 1999)).

The *DeCurtis* court explains further:

> Carnival's arguments are, in other words, misplaced because it sees only one way to show market power when, in fact, there are two. One type is direct evidence, where evidence exists of restricted output, supracompetitive prices, or the exclusion of competition. *See Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 196–97 (1st Cir. 1996) ("Market power can be shown through two types of proof. A plaintiff can either show direct evidence of market power (perhaps by showing actual supracompetitive prices and restricted output) or circumstantial evidence of market power.") (citing *Rebel Oil Co. v. Alt. Richfield Co.*, 51 F.3d

17

1421, 1434 (9th Cir. 1995)); *see also FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986).

The second type of proof (and the more common one) is where parties can use circumstantial evidence to show market power by looking at the structure of the market. *See Rebel Oil Co.*, 51 F.3d at 1434 ("To demonstrate market power circumstantially, a plaintiff must: (1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run.") (citing cases). That is unnecessary in this case because, as stated earlier, there are plausible allegations of direct evidence. **The other effect of alleging a plausible claim of direct evidence is that it eliminates the need to establish a relevant market.** *See In re Intuniv Antitrust Litig.*, 2020 WL 5995984, at *9 (D. Mass. Oct. 9, 2020) ("If the Plaintiffs have actual direct evidence of market power, they need not establish the relevant market.") (citing *Díaz Aviation Corp, v. Airport Aviation Servs., Inc.*, 716 F.3d 256, 265 (1st Cir. 2013)); *see also In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 388 n.19 (D. Mass. 2013) ("Where direct evidence of market power is available ... a plaintiff need not attempt to define the relevant market.") (citation omitted).

(Emphasis added.)

The allegations of actual competitive effects on price and choice demonstrated by the Hunterbrook analyses and the exit of Fairway also make market definition unnecessary. The Supreme Court has made clear that proof of actual anticompetitive effects obviates the need to define a market. *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460 (1986) (no need to examine "market definition and market power" where there is evidence of "actual detrimental effects"). *See also Realcomp II, Ltd. v. Federal Trade Comm'n*, 635 F.3d 815, 828 (6th Cir. 2011) (same).

Fairway's exit also harms competition irrespective of the precise definition of the market. "Combining competitors for which consumers view the firms' products as significant substitutes may enable the merged firm profitably to increase prices," because

18

it limits the choices to customers. *In the Matter of ProMedica Health Sys., Inc.*, 2012-1 Trade Cases P 77840, 2012 WL 1155392, at \*36 (F.T.C. Mar. 28, 2012). The same is true of elimination of a competitor. *See* proposed Second Supplemental Complaint ¶41 (Fairway and Rocket were UWM's closest competitors).

"Market definition is an important tool for estimating . . . competitive effects . . . But it should not be the only tool, particularly when better tools have been developed." Areeda & Hovenkamp, *Antitrust Law* ¶531a.

### D.   There Was No Unreasonable Delay and Supplementation Would Not Cause Prejudice to Defendants

Neither delay nor undue prejudice can be shown here (nor does the Order Denying Leave identify any). Mr. Ishbia's admissions in November 2023 occurred long after the filing of the Supplemental Complaint and after briefing on Defendants' Motion to Dismiss had been submitted. Fairway's exit from the market was announced in February. And the Hunterbrook study was issued in April. Where discovery has not yet begun, there can be no conceivable prejudice to UWM by permitting Okavage to file the proposed Second Supplemental Complaint. In fact, courts have granted a party's motion to supplement after the close of discovery and where allowing supplementation would require reopening discovery. *La Salvia v. United Dairymen of Ariz.*, 804 F.2d 1113, 1119 (9th Cir. 1986); *State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir.1981). Courts have even allowed parties to supplement pleadings where trial was fast approaching. *R.E.B., Inc. v. Ralston Purina Co.*, 525 F.2d 749 (10th Cir. 1975) (amendment allowed five weeks before trial).

57596220.4

## V.    **CONCLUSION**

For the foregoing reasons, Magistrate Judge Lambert's Order Denying Leave should be rejected, and supplementation should be permitted.

Date: October 2, 2024            Respectfully Submitted,
                                 **PARRISH & GOODMAN, PLLC**
                                 /s/ Robert H. Goodman
                                 ROBERT H. GOODMAN
                                 Florida Bar No.: 1008059
                                 13031 McGregor Blvd., Suite 8
                                 Fort Myers, Florida 33919
                                 Phone: (813) 643-4529
                                 Facsimile: (813) 315-6535
                                 Primary: rgoodman@parrishgoodman.com
                                 Secondary: admin@parrishgoodman.com
                                 AND
                                 JOSEPH E. PARRISH
                                 Florida Bar No: 690058
                                 Primary: jparrish@parrishgoodman.com
                                 Secondary: admin@parrishgoodman.com
                                 *Counsel for Plaintiffs*

57596220.4

**<u>CERTIFICATE OF SERVICE</u>**

**I HEREBY CERTIFY** that on this 2nd day of October, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing Generated by CM/ECF.

/s/Robert H. Goodman
*Attorney for Plaintiffs*

57596220.4